# EXHIBIT 3B

Page 117

1    Mark Tsoukalas.
2    Q    So some time in what month of 2004 did this
3    happen?
4    A    I don't remember. It was in the summer.
5    Q    Summer of 2004, they're all in --
6    A    June or July.
7    Q    -- New Hampshire, these four people including your
8    husband, right?
9    A    Yes, yes.
10    Q    Anyone else there besides Brian Kennedy,
11    Vinny Vacca?
12    A    There might have been one other person there.
13    Q    Who is that?
14    A    I don't know.
15    Q    And what does Brian Kennedy tell you happened
16    here?
17    A    He did a limo run, and when he went to return the
18    keys, Mike Mullins was drunk and confronted him
19    about Mark Tsoukalas.
20    Q    And what allegedly was said between Mike Mullins
21    and your husband?
22    A    I don't remember.
23    Q    And you said limo run, for whom was he working?
24    A    Danny.

Page 118

1    Q    Danny Donelan?
2    A    Yes.
3    Q    Did Danny Donelan have a business?
4    A    Yes.
5    Q    What kind of business?
6    A    Limos.
7    Q    And what transpired that they got into a fight or
8    they broke his ankle?
9    A    He confronted Brian about Officer Tsoukalas and
10    whatnot and then jumped him.
11    Q    So your understanding from Brian Kennedy is that
12    Mike Mullins jumped your husband?
13    A    Yes.
14    Q    Over Officer Tsoukalas?
15    A    Yes.
16    Q    And he broke his ankle?
17    A    Yes.
18    Q    How did he break his ankle?
19    A    He weighs like 350 pounds, and he fell on his
20    ankle when he was fighting with him or kicked it.
21    Q    Did he have to go to the hospital?
22    A    He had operations.
23    Q    Where did he go to the hospital?
24    A    Burlington Lahey.

Page 119

1    Q    Burlington Lahey?
2    A    Yes.
3    Q    And who was his doctor?
4    A    I don't remember his name.
5    Q    You said operations, several?
6    A    Two major ones.
7    Q    Okay. Who was the doctor who performed the
8    operation?
9    A    I don't remember his name.
10    Q    This is 2004?
11    A    Yes.
12    Q    And both at Burlington Lahey?
13    A    Yes, I believe they both were there.
14    Q    This wasn't a drug deal?
15    A    No, no.
16    Q    Was your husband involved in some drug deal with
17    these other three people?
18    A    No.
19    Q    Were they involved in a drug deal and your husband
20    walked in?
21    A    No.
22    Q    How do you know that?
23    A    Because my husband told me, and everybody else
24    that was there told me, Vinny Vacca --

Page 120

1    Q    Vinny Vacca, Danny Donelan and Mike Mullins all
2    told you the same thing?
3    A    Yes.
4    Q    And how do they describe, as best you can
5    remember, how do they describe the incident?
6    A    Vinny and Danny tried stopping Mike, and
7    eventually they kicked him out of the house.
8    Q    They kicked who out of the house?
9    A    The big guy, Mike.
10    Q    So this was somebody's house in New Hampshire this
11    all occurred in?
12    A    Yes.
13    Q    Whose house was it?
14    A    Danny's.
15    Q    Danny Donelan?
16    A    Yes.
17    Q    And these are friends of your husband's?
18    A    Some.
19    Q    Well, who is friends of your husband's of those
20    people?
21    A    Danny and Vinny.
22    Q    And had he known Mike before, Mike Mullins?
23    A    They knew of him. I guess Danny might have been
24    friends with him.

Page 121

1    Q    Now, just before we wrap up for lunch I want to
2         just finish one more thing on this. Relative to
3         your motion Restraining Order there is reference
4         to an incident that happened at your son's school,
5         do you recall that?
6    A    Correct, yes.
7    Q    You wrote that in your motion and reference it in
8         your affidavit. Did you have an incident with the
9         principal at that school?
10   A    Yes.
11   Q    And what's the principal's name?
12   A    I don't remember.
13   Q    If I said Mister --
14   A    Boucher.
15   Q    What happened with Mr. Boucher?
16   A    Well, I was just walking in, and he told me my son
17        Mitchell wasn't welcome there.
18   Q    Okay. Go ahead, I'm sorry.
19   A    I asked him why, he's been coming to this school
20        for years visiting teachers. And he said,
21        "Because I don't like you's."
22   Q    "I don't like you's."?
23   A    "I don't like you's."
24   Q    That's what he said, that's a quote?

Page 122

1    A    He told me to get my son Mitchell out, he couldn't
2         stay. So it was PTA night, and my son went and
3         sat in the car.
4    Q    All right. So he said you can't come in here
5         because I don't like you, that's what he said?
6    A    No, he said, "I don't like you's."
7    Q    "I don't like you's." Okay. And what did you do
8         as a result of that?
9    A    Ms. Lincoln was walking by, the other principal,
10        when he asked me to leave. And I said,
11        "Ms. Lincoln, he's kicking us out."
12        And she says, "Mrs. Kennedy, my hands are
13        tied. He's the head principal. If I had my way,
14        you wouldn't be kicked out."
15   Q    Did you say anything to Mr. Boucher threatening
16        him?
17   A    No.
18   Q    Talking about your lawsuit?
19   A    No.
20   Q    You didn't tell him I'm going to sue you as
21        well?
22   A    I don't believe so, no.
23   Q    Did you curse him out?
24   A    No.

Page 123

1    Q    Did you point your figure at him?
2    A    No.
3    Q    Did you make any gestures toward him?
4    A    No.
5    Q    Did you raise your voice?
6    A    No.
7         MR. SILVERFINE: Okay. Why don't we break for
8         lunch. We'll come back in 45 minutes, and we'll
9         try to move this along.
10        (Luncheon recess taken, 1:25 p.m.)
11        (Resumed, 2:20 p.m.)
12        MR. FISCHER: During the lunch break, I had
13        the opportunity to raise with Mr. Gilgun the
14        issues of documents that you were asking about,
15        specifically Mrs. Kennedy's notes.
16        And Mr. Gilgun indicates that there are notes,
17        that he has personal notes that he had initially
18        thought were all maintained for him in
19        anticipation of litigation; but having alerted
20        him, he looked at them, called me back and
21        indicates that there may well be things, he thinks
22        there are things that precede his involvement,
23        and, therefore, may be discoverable, and he will
24        have them for you perhaps as early as tomorrow at

Page 124

1    the depositions but certainly within the next
2    couple of days.
3         I also did some inquiry with respect to the
4    videotapes. And I think the record wasn't clear,
5    if my representation isn't adequate, feel free to
6    inquire further of Mrs. Kennedy, but, in fact, we
7    have produced all the videotapes that we're
8    capable of producing.
9         Mrs. Kennedy informs me that the videotapes
10   that Mr. Ashton took, which may or may not have
11   additional materials relating to this case or to
12   the Kennedys' claims or to taping of involvement
13   with the Billerica Police Department, haven't been
14   produced because she is incapable of reviewing
15   them.
16        They're not standard videotapes as I
17   believed and I suspect you understood. They're in
18   a -- they were taken on a video camera that they
19   no longer have, and they're not translatable onto
20   standard video cassettes; so that she's unable to
21   look at them, and that's why she gave you the
22   answers that she didn't know what's on them or she
23   didn't know what else she might have.
24        I've asked her to produce them for me, and I

Page 125

1  will make an effort to see if they can be
2  translated or transposed to a format by which we
3  can observe them. She's reluctant to just turn
4  over the entire videotapes or entire cassettes or
5  whatever they are because they contain a lot of
6  material that's personal and not relevant to the
7  case, and she wouldn't want us to do that until
8  we're able to edit them.
9      My inclination is to -- let me see what I can
10  do in terms of discovering a way that we can look
11  at them. And, again, I will try and do that
12  perhaps not within the next 24 hours, but it's my
13  intention to do it in that kind of time frame.
14      E-X-A-M-I-N-A-T-I-O-N, Continued
15      BY MR. SILVERFINE:
16  Q.  Okay. Mrs. Kennedy, let's get back to your
17  deposition --
18      MR. FISCHER: If I can just conclude, all of
19  the videotapes that are in a VCR format that she's
20  able to watch or monitor have been produced.
21      MR. SILVERFINE: I would note in response to
22  Mr. Fischer's comments that this case has been on
23  and active and a complaint for some time; and my
24  understanding is that even if they're in a

Page 126

1  different format, the Plaintiff has an obligation
2  which she hasn't met to produce same and has not
3  done so as of today, July 12, 2006. And I guess
4  we'll take whatever appropriate action if
5  necessary.
6  Q.  Let's get back to your depo, Mrs. Kennedy. And
7  since we last appeared at your deposition back in
8  January of 2006, have you had any other criminal
9  complaints filed against you?
10  A.  I don't think so.
11  Q.  Okay. Any other civil suits you've been involved
12  with?
13  A.  No.
14  Q.  Are you still working at the same job with Flossy?
15  A.  No.
16  Q.  Are you presently working?
17  A.  Yes.
18  Q.  Okay. Where are you working now?
19  A.  Taking care of another lady.
20  Q.  Of a different lady?
21  A.  Yes.
22  Q.  And who is this lady?
23  A.  Josephine.
24  Q.  And where does Josephine live?

Page 127

1  A.  Wilmington.
2  Q.  Is this the same type of work?
3  A.  Yes.
4  Q.  How many days a week do you work for Josephine at
5  the moment?
6  A.  Three.
7  Q.  And how much money do you receive working for
8  Josephine?
9  A.  15 an hour.
10  Q.  And how many hours a week do you work?
11  A.  Six.
12      MR. FISCHER: A week or a day?
13      THE WITNESS: A week.
14  Q.  And are you paid by check or by cash?
15  A.  Check.
16  Q.  And that's from Josephine?
17  A.  Yes.
18  Q.  And what's her last name?
19  A.  I don't know.
20  Q.  You don't know the woman you're working for name?
21  A.  Wolliard.
22  Q.  Spell it for us.
23  A.  I don't know how to spell it.
24  Q.  Do the best you can.

Page 128

1  A.  W-O-L-L-I-A-R-D.
2  Q.  And when did you start working for Josephine?
3  A.  A couple of months ago.
4  Q.  And why did you stop working for Flossy?
5  A.  She got better.
6  Q.  Okay. Now, again, I'm not meaning to confuse you,
7  so just help me on this. Relative to Ray Trainor
8  who we spoke about earlier today, at any point in
9  time did you have Mr. Trainor at your direction
10  call your attorneys?
11  A.  No.
12  Q.  So you never directed Mr. Trainor to call
13  Mr. Fischer or Mr. Gilgun relative to this
14  lawsuit?
15  A.  No.
16  Q.  And relative to the incidents we talked about just
17  before lunch that I asked you about on your motion
18  for Restraining Order, are any of those incidents
19  that you've described for us, the November 1,
20  2005, the January, February incident of 2006, the
21  April, May incidents, have any of those been
22  videotaped by you or anybody else that you know
23  of?
24  A.  Can you ask me again, please.

32 (Pages 125 to 128)

DUNN & GOUDREAU

## Page 129

1  Q    Sure. We had discussed right before lunch about
2       your motion on the Restraining Order that we
3       talked about, and I showed you affidavit,
4       Ms. Grainger's affidavit. We went over some
5       incidents involving November 2005, January,
6       February of 2006, April, May, 2006. Are any of
7       those incidents as far as you know videotaped by
8       anyone you know?
9  A    Not that I know.
10 Q    How about any still photography?
11 A    Not that I know of.
12 Q    Okay. I think you also relative to the last time
13      you were here you indicated that Mr. Tsoukalas
14      approached and threatened you some four times
15      since he drove past your home on November 1, 2005.
16      Could you tell us what dates you're referring to?
17         MR. FISCHER: Objection.
18 A    I don't know the dates.
19 Q    When do you say Mr. Tsoukalas approached and
20      threatened you?
21 A    Within the last year you mean?
22 Q    Sure.
23 A    Just driving by the house a couple of times that I
24      can remember at this point.

## Page 130

1  Q    Okay. Do you remember the dates of those?
2  A    No.
3  Q    Okay. Do you know who was present during those?
4  A    Brian, Billy one time, both times actually.
5  Q    Okay. And was this during the day or during
6       nighttime?
7  A    More towards the night.
8  Q    More toward the night?
9  A    Yes.
10 Q    Okay. Was he by himself?
11 A    One of the times he was with two other officers,
12      and the other he was with another gentleman.
13 Q    Do you know whose those people are?
14 A    Mike Casey, and I'm not sure, I think Lieutenant
15      Connors.
16 Q    That's what you mentioned earlier today?
17 A    Yes.
18 Q    Okay. Anything else that you remember?
19 A    Not at this time.
20 Q    Okay. Now, Tony Gallinaro, you know him?
21 A    No.
22 Q    You don't know Tony Gallinaro?
23 A    No.
24 Q    Is there a Gallinaro you're familiar with?

## Page 131

1  A    Yes.
2  Q    Which Gallinaro are you familiar with?
3  A    Steve Gallinaro, John Gallinaro, Thomas Gallinaro,
4       Barbara Gallinaro.
5  Q    Okay. How do you know John Gallinaro?
6  A    Been friends with him since I was about ten.
7  Q    Okay. And he lives in Billerica?
8  A    Yes.
9  Q    Where does he live?
10 A    I forgot the name of the street.
11 Q    And did you approach Mr. Gallinaro some two or
12      three months ago and have a conversation with him?
13 A    Yes.
14 Q    And was that at his house?
15 A    Yes.
16 Q    Was that on Sprague Street in Billerica?
17 A    Yes.
18 Q    What was the conversation you had with
19      Mr. Gallinaro then?
20 A    I knocked on his door, and he invited me in. I
21      told him I was in a hurry, and we just stayed at
22      the door and talked. And I said, you know, "Do
23      you remember the letter you wrote me from jail?"
24      And I had brought the letter with me.

## Page 132

1       And he said, "What one?"
2       I said, "When, you know, the kids — one of
3       your nephews went to court against my son, and you
4       said if you were on the streets that they'd never
5       be fighting. We been friends for too many years."
6       And I said, "Well, you know, as you know our court
7       case is coming up, and Teddy witnessed Brian
8       getting jumped at the Concord Shores. And I lost
9       his phone number, so here's my phone number, give
10      it to him and have him call me." And that was it.
11 Q    That was the entire conversation?
12 A    The entire conversation.
13 Q    Was anyone else present?
14 A    His girlfriend was like walking around, but —
15 Q    What's her name?
16 A    I don't know. Oh, Tammy.
17 Q    Tammy what?
18 A    I don't know.
19 Q    Does she live there?
20 A    I don't think so.
21 Q    Okay. And is Tammy from Billerica?
22 A    I don't know.
23 Q    Have you seen Tammy before?
24 A    I met her at a party. John introduced me to her

DUNN & GOUDREAU

Page 133

| | | |
|---|---|---|
| 1 | | at a party. |
| 2 | Q | Do you remember what the weather conditions were |
| 3 | | on the day you went to see Mr. Gallinaro? |
| 4 | A | Yes. |
| 5 | Q | What were they? |
| 6 | A | It was raining. |
| 7 | Q | And when you were saying related to the lawsuit, |
| 8 | | you're referring to this lawsuit, correct? |
| 9 | A | I said court date, yah. |
| 10 | Q | Not some other criminal case? |
| 11 | A | Correct. |
| 12 | Q | Or civil case? |
| 13 | A | Right. |
| 14 | Q | And did you tell Teddy that he better do the right |
| 15 | | thing or there would be a problem? |
| 16 | A | No. |
| 17 | Q | Did Mr. Gallinaro ask you if you were threatening |
| 18 | | his family at one point? |
| 19 | A | Never. |
| 20 | Q | Did you tell him you're a smart guy, you know the |
| 21 | | drills, words to that effect? |
| 22 | A | No. |
| 23 | Q | Was Brian Kennedy your husband outside in the car |
| 24 | | while you were having this conversation? |

Page 135

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | You and Brian Kennedy left the area? |
| 3 | A | Correct. |
| 4 | Q | Have you been in contact with Mr. Gallinaro since |
| 5 | | that meeting? |
| 6 | A | No. |
| 7 | Q | Are you familiar with Amy Balm? |
| 8 | A | Balm, yes. |
| 9 | Q | How do you know Amy Balm? |
| 10 | A | Grew up with her. |
| 11 | Q | When is the last time you talked to Amy Balm? |
| 12 | A | After the Ray Trainor incident. |
| 13 | Q | All right. Is it fair to say -- when you say the |
| 14 | | Ray Trainor incident, that's the incident you're |
| 15 | | describing -- |
| 16 | A | When Marty Conway followed me to his house, and I |
| 17 | | had Brian take his belongings out of there and |
| 18 | | whatnot. |
| 19 | Q | When was that? |
| 20 | A | The day Marty Conway gave me a ticket. I don't |
| 21 | | have the date. |
| 22 | Q | What were the weather conditions the day |
| 23 | | Marty Conway gave you a ticket -- |
| 24 | A | I don't remember. |

Page 134

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Was anyone else in the car with Brian Kennedy? |
| 3 | A | No. |
| 4 | Q | Did Mr. Gallinaro conclude the conversation with |
| 5 | | you by saying you're not allowed on this property |
| 6 | | ever again? |
| 7 | A | Never ever. |
| 8 | Q | Did he say to you if you ever made threats against |
| 9 | | him and his family in the future you would be |
| 10 | | sorry? |
| 11 | A | Did he say that to me? |
| 12 | Q | Right. |
| 13 | A | Not that I recall. |
| 14 | Q | Okay. Did he at one point after you finished |
| 15 | | talking go outside of his home? |
| 16 | A | Did I? |
| 17 | Q | Did he. |
| 18 | A | He walked me out. |
| 19 | Q | Okay. Did he talk to Brian Kennedy? |
| 20 | A | No. |
| 21 | Q | Did he say to Brian Kennedy similar words, don't |
| 22 | | mess around with my family? |
| 23 | A | He never said that to Brian. |
| 24 | Q | And then the two of you left, is that correct? |

Page 136

| | | |
|---|---|---|
| 1 | Q | -- in some time in March of this year, 2006? |
| 2 | A | I don't remember. |
| 3 | Q | All right. What did Marty Conway give you a |
| 4 | | ticket for? |
| 5 | A | Speeding. |
| 6 | Q | And were you speeding? |
| 7 | A | No. |
| 8 | Q | Okay. Did you have to pay the fine for the |
| 9 | | ticket? |
| 10 | A | No. |
| 11 | Q | What happened to that ticket? |
| 12 | A | The judge dismissed it. |
| 13 | Q | Were you charged with anything else besides |
| 14 | | speeding? |
| 15 | A | No. |
| 16 | Q | This is the day you left your car running in the |
| 17 | | middle of the street and ran into Mr. Trainor's |
| 18 | | house, or is that a different day? |
| 19 | | MR. FISCHER: Objection. |
| 20 | A | I didn't leave it running. |
| 21 | Q | You left it in the middle of the street? |
| 22 | A | No, I parked it on the side. |
| 23 | Q | Did you run inside and say there is a cop |
| 24 | | following me? |

Page 137

```
 1   A   Yah.
 2   Q   And sometime after that you had a conversation
 3       with Amy Balm?
 4   A   Yes.
 5   Q   Describe for us that conversation.
 6   A   I told her what had happened, just details about
 7       what happened at Ray's. And she just started
 8       crying on the phone.
 9   Q   So this conversation took place by telephone?
10   A   Yah.
11   Q   How long was the conversation?
12   A   I don't know, 15 minutes maybe.
13   Q   And you talked about the lawsuit?
14   A   I don't know about that.
15   Q   Well, what did you talk about?
16   A   About Ray Trainor.
17   Q   All right. Particularly, what did you talk about
18       Ray Trainor?
19   A   Just told her the incident what happened.
20   Q   Okay. Do you remember what you said?
21   A   I told her details about the incident.
22   Q   Did you ever tell Ms. Balm to lie if she was
23       called to testify?
24   A   Never.
```

Page 138

```
 1   Q   Did you tell her to make things up?
 2   A   No.
 3   Q   Did you tell Ms. Balm she was going to receive
 4       money if you won your suit?
 5   A   Never.
 6   Q   Did you tell Ms. Balm words to the effect you were
 7       going to collect $3 million in your lawsuit?
 8   A   No.
 9   Q   Did you tell Ms. Balm if she cooperated you would
10       take care of her in some fashion?
11   A   No.
12   Q   In any way compensate her?
13   A   What?
14   Q   Did you promise her anything?
15   A   No.
16   Q   In January 2006, did you show up at Dean Roisin's
17       Civil Service hearing?
18       MR. FISCHER: Objection.
19   A   If that was the date, I went.
20   Q   Why did you go?
21   A   I was asked to go.
22   Q   Who asked you to appear?
23   A   I don't remember.
24   Q   You don't remember?
```

Page 139

```
 1   A   No.
 2   Q   You just showed up?
 3       MR. FISCHER: Objection.
 4   A   Somebody asked me.
 5   Q   Who asked you to appear?
 6   A   I don't remember.
 7   Q   Did you talk to Mr. Roisin?
 8       MR. FISCHER: Objection. Ever?
 9   A   That day, no.
10   Q   Did you talk to Mr. Roisin's attorney that day?
11   A   For a few, maybe a minute.
12   Q   Did you stay at the hearing?
13   A   No.
14   Q   Why did you leave?
15   A   They decided they didn't need me.
16   Q   Do you currently suffer from any depression?
17   A   Yes.
18   Q   And how long have you had that?
19   A   Since my husband went to jail.
20   Q   And when was that?
21   A   It was in September of around about -- I don't
22       remember the exact date.
23   Q   All right. Roughly 1990's, 2000?
24   A   Well, when he got incarcerated for them 90 days,
```

Page 140

```
 1       that date.
 2   Q   Okay. And who are you being treated by for
 3       depression?
 4   A   I just got a new doctor. I actually haven't even
 5       met with her yet.
 6   Q   Okay. Who were you being treated by?
 7   A   Different doctors. I don't even remember the
 8       doctor's name, but --
 9   Q   You don't remember who was treating you for
10       depression?
11   A   No.
12   Q   That's your testimony today?
13   A   Yes.
14   Q   Do you know where you were going to be treated?
15   A   A few different places.
16   Q   Why don't you name them.
17   A   One of them was Saints Memorial.
18   Q   Okay. Where else?
19   A   Some doctor in Tewksbury.
20   Q   What's his name?
21   A   I don't know.
22   Q   Okay. Who else?
23   A   I don't know. I don't know how to say his name.
24       He's Cambodian or something.
```

DUNN & GOUDREAU

Page 141

```
 1   Q   What's the name?
 2   A   I treated with him probably the longest for
 3       awhile.
 4   Q   I'm sorry?
 5   A   I was treated with him for while.
 6   Q   And as part of your complaint, are you alleging
 7       that the Billerica police caused your depression?
 8   A   Absolutely.
 9   Q   Okay.  And so I need the names of all your doctors
10       who you've been treating with, ma'am.
11   A   I can work on getting them, but I don't know their
12       names.
13   Q   Okay.  And so far today you haven't provided any
14       of those names, have you, ma'am?
15   A   Yes, I did.
16   Q   Which doctors have you provided the names of?
17   A   The Asian doctor.
18   Q   What's his name?
19   A   I don't know.
20   Q   So how have you --
21   A   I thought I put it in with my paperwork, but maybe
22       I didn't.
23   Q   Besides Saints Memorial Hospital, what other
24       facilities have you been treated at?
```

Page 142

```
 1   A   In Lowell, the Asian doctor, Cambodian.
 2   Q   And you've been treated throughout the time since
 3       your husband went away you say, right?
 4   A   Well, the first -- when he went away, I was -- I
 5       felt like I was having a heart attack, and I went
 6       to the doctors.  And they told me it was anxiety
 7       from stress.  And I never heard of anxiety at that
 8       time, and that's the first time they put me on
 9       medication.
10   Q   What medication are you on?
11   A   It was Clonazepam or something.
12   Q   Can you spell it?
13   A   No.
14   Q   Are you on any other medication?
15   A   I'm not on that now.
16   Q   What is your understanding of what Clonazepam
17       does?
18   A   It relaxes you I guess.
19   Q   Okay.  How long were you on that for?
20   A   Like a couple of -- maybe a month.
21   Q   Okay.  Were you given any other kind of
22       prescriptions?
23   A   Then when I seen the doctor in Lowell, they gave
24       me all different medications; but I told them I
```

Page 143

```
 1       didn't like it because it made me lazy and
 2       sleepy.
 3   Q   Okay.  How often would you see somebody for
 4       treatment for depression?
 5   A   Every week.
 6   Q   Once a week?
 7   A   Yes.
 8   Q   For how long a period of time?
 9   A   Approximately like six months maybe.
10   Q   And have you had crying spells?
11   A   Constantly.
12   Q   Okay.  And when did this first happen?
13   A   When my husband's truck got fire bombed.
14   Q   I'm sorry, what?
15   A   When my husband's truck got fire bombed.
16   Q   When your husband's truck got fire bombed?
17   A   Yes.
18   Q   And what is your understanding of the diagnosis
19       that you've gotten from these doctors?
20   A   They told me I'm deeply depressed because of the
21       Billerica police.
22   Q   They told you that?
23   A   Yes, they did.
24   Q   Okay.  And have you provided any of those records
```

Page 144

```
 1       to the Defendants so far to date?
 2   A   I don't think so.
 3   Q   Okay.  How about Brian Kennedy, does he suffer
 4       from depression?
 5   A   Yes.
 6   Q   And does he get treatment?
 7   A   No.
 8   Q   Have you ever been investigated for child neglect?
 9   A   Yes.
10   Q   When was that?
11   A   When I lived at the mobile home park.
12   Q   What year did that happen?
13   A   Shortly after Lieutenant Connors' badge was
14       stolen.
15   Q   Was that 1998, is that right?
16   A   I don't know the date.
17   Q   Well, I think the complaint is in front of you;
18       and why don't you tell us when that was, ma'am.
19   A   What was the question again?
20   Q   You told us that you had been investigated for
21       child neglect.  And when I asked you when that
22       was, you said at the time that Officer Connors --
23   A   Around that time.
24   Q   So when was that, ma'am?
```

36  (Pages 141 to 144)

| Page 145 | Page 147 |
|---|---|
| 1  A   Maybe in '97. | 1  Q   Were you interviewed? |
| 2  Q   And what happened to that investigation? | 2  A   Yes. |
| 3  A   It was like closed after a week maybe. | 3  Q   And what was the result of those requests? |
| 4  Q   Okay. Do you know which agency conducted the | 4  A   He called me and told me that the Billerica police |
| 5       investigation? | 5       told him that we were really bad drug dealers and |
| 6  A   What do you mean? | 6       bad criminals. |
| 7  Q   Well, for instance, there's the police, there's | 7  Q   Okay. And? |
| 8       DSS. Who investigated the allegations of child | 8  A   That was it. |
| 9       neglect? | 9  Q   What was the name of the agent you're referring |
| 10  A   Well, I guess the Billerica police called; but the | 10      to? |
| 11       Lowell office came out and asked me and my | 11  A   I don't know; it's the FBI agent. |
| 12       children and myself, reading the complaint, they | 12  Q   This gentleman interviewed you and he called you |
| 13       closed it. | 13      back? |
| 14  Q   Were there any other times besides the one you | 14  A   Yes. |
| 15       mentioned when you were investigated for child | 15  Q   What was his name? |
| 16       neglect? | 16  A   I don't have it right now. |
| 17  A   I don't believe so. | 17  Q   Do your notes have that? |
| 18  Q   What is the name of your family dentist? | 18  A   I don't know. |
| 19  A   Dr. Lions. | 19  Q   Have you yourself followed the Billerica police |
| 20  Q   Spell it. | 20      cruisers around town? |
| 21  A   L-I-O-N-S. | 21  A   Never. |
| 22  Q   Where is his office? | 22  Q   Never? |
| 23  A   Billerica. | 23  A   Never. |
| 24  Q   That's the dentist that you and your husband and | 24  Q   Have you ever followed whether it be marked or |

| Page 146 | Page 148 |
|---|---|
| 1       kids use? | 1       unmarked cruisers around town? |
| 2  A   Yes. | 2  A   Never. |
| 3  Q   And have been using for some time? | 3  Q   Okay. Have you been in a car with somebody else, |
| 4  A   Me and my husband, yes. | 4       Brian Kennedy, Billy Ashton or anybody else who |
| 5  Q   Had you at one point in time asked the FBI to | 5       you followed a Billerica cruiser or unmarked |
| 6       investigate the Billerica PD? | 6       cruiser around? |
| 7  A   Yes, I did. | 7  A   Never. |
| 8  Q   When was that? | 8  Q   Mrs. Kennedy, just so I'm clear, have you in |
| 9  A   Maybe two or three different times. | 9       terms of your deposition today as well as the |
| 10  Q   Okay. Tell me your first memory of when you asked | 10      deposition we initiated on January 6, 2006, have |
| 11       them. | 11      you told us your entire employment history as best |
| 12  A   I don't know any dates of them. | 12      you can remember it? |
| 13  Q   Did you talk to an agent? | 13  A   As best as I can remember it. |
| 14  A   I did, yes. | 14  Q   Okay. Have you ever done any volunteer work? |
| 15  Q   So when did you talk to an agent? | 15  A   Yes. |
| 16  A   I don't know the date. | 16  Q   For whom? |
| 17  Q   Five years ago, ten years ago, twenty years ago? | 17  A   Maria O'Rourke. |
| 18  A   First time was after the my husband's truck got | 18  Q   O'Rourke? |
| 19       fire bombed. And then I believe I went back a | 19  A   Yes. |
| 20       second time after Lieutenant Connors' badge got | 20  Q   What is Maria O'Rourke? |
| 21       stolen. | 21  A   She works at the Veterans Department in Billerica. |
| 22  Q   Okay. And was there a third time? | 22  Q   The Veterans Department? |
| 23  A   Around about -- I don't know the date, after that | 23  A   Yes. |
| 24       maybe. | 24  Q   And what did you do for them? |

Page 149

1  A  Bagged food.
2  Q  Say again.
3  A  Bagged food.
4  Q  Bagged food?
5  A  Yes.
6  Q  And when did you do that?
7  A  I don't recall the date.
8  Q  Give me your best estimate. Last year, three
9     years ago, five years ago?
10  A  Again, it was after the badge incident, that's all
11     I can really remember at this time.
12  Q  How long a period of time did you do that for?
13  A  Oh, I just did it a couple of days.
14  Q  Okay. And besides those couple of days, any other
15     volunteer work?
16  A  Not that I can remember at this time.
17  Q  Okay. Was Maria O'Rourke the person you reported
18     to?
19  A  Yes.
20  Q  Does she still work at the Veterans Department in
21     Billerica?
22  A  Yes.
23  Q  Again, I don't mean to be jumping around, but some
24     of my notes are scattered, so I apologize. When

Page 150

1     you attended Dean Roisin's Civil Service hearing
2     some time in this year in January of 2006, did you
3     see Deputy Chief Connors there?
4  A  Yes.
5  Q  Did you give him the finger?
6  A  No.
7  Q  Have you given any police officer from Billerica
8     the finger during the last 15 years or so?
9  A  No.
10  Q  Never gave any other police officer the finger?
11  A  No.
12  Q  How about have you been present when Brian Kennedy
13     has given any Billerica police officer the finger?
14  A  No.
15  Q  How about William Ashton?
16  A  No.
17  Q  So I'm clear -- I don't think I gave you a copy
18     of this. So I'm clear for the record what we had
19     previously marked as Ashton Exhibit No. 1 I'm
20     going to ask you if in fact did you get handed
21     this to you back in November -- I'll give you a
22     copy, Mr. Fischer, in a second -- back in November
23     3, 2005?
24  A  What is this?

Page 151

1  Q  That's a deposition notice for Billy Ashton.
2  A  Do I have a copy of it?
3  Q  No, did someone hand it to you to give to
4     Mr. Ashton?
5  A  Not that I can recall.
6  Q  Did you ever look into to get a Restraining Order
7     against your mother Joyce Tibbets at one point in
8     time?
9  A  I don't believe so.
10  Q  But you said she had physically hit you at one
11     point.
12  A  I don't know about hitting. I mean I don't even
13     remember that.
14  Q  You never asked for a Restraining Order against
15     your mother?
16  A  I don't think so. I don't know.
17  Q  Okay. Give me a minute. Are you familiar with an
18     Officer John Voto of Tewksbury?
19  A  No.
20  Q  Never heard of him?
21  A  No.
22  Q  Did you ever have a conversation with the
23     Tewksbury Police Department in which you stated
24     that if the officer didn't stop running your plate

Page 152

1     that they would be in trouble because you're twice
2     as sneaky?
3  A  No.
4  Q  Never said that?
5  A  Not that I remember.
6  Q  Was a stay away order issued for you from the
7     school that your son attended?
8  A  Yes.
9  Q  And why was that?
10  A  I don't know why.
11  Q  Well, did you have a conversation with somebody
12     about why they issued a stay away order for you?
13  A  He said that I was acting out.
14  Q  When you say he, who are you referring to?
15  A  Boucher.
16  Q  And what did he say --
17  A  And it wasn't the first time.
18  Q  Okay. So he said you did what, Mr. Boucher
19     indicated you did what?
20  A  I don't remember.
21  Q  You have no idea?
22  A  (Nods head.)
23  Q  And they issued a stay away order to you?
24  A  Yes.

DUNN & GOUDREAU

Page 153

1  Q   And did you fight that stay away order?
2  A   Not really. I started to, but --
3  Q   Okay. Can I have the complaint back for a minute?
4  A   This here?
5  Q   Okay. Mrs. Kennedy, we at the last deposition
6      when we were walking through the complaint I asked
7      you a certain series was questions. I'm going to
8      continue where we left off about your knowledge
9      and information about certain of your allegations.
10     So this is based on what you put forward.
11 A   Okay.
12 Q   Okay. In paragraph No. 49, you wrote that you
13     were regularly issued citations by Billerica
14     police officers for motor vehicle violations you
15     did not commit; do you see that?
16 A   Yes.
17 Q   Where you wrote that?
18 A   Yes.
19 Q   You also wrote there were citations that lead to
20     findings based upon the influence of the officer
21     in the court. What do you mean by that?
22 A   Can you say that again.
23 Q   Sure. I will read today the section that's
24     pertinent here: The majority if not all of the

Page 154

1      citations were baseless and in some instances
2      dismissed. In other instances, however, the
3      citations lead to findings based upon the
4      influences of the officer in court.
5          MR. FISCHER: What paragraph of the complaint
6      is that?
7  A   Okay.
8          MR. SILVERFINE: 49.
9  Q   What officer in the court are you referring to?
10 A   Well, the clerk, like it's not in front of the
11     judge, it's in front of the clerk for the hearing
12     unless you appeal it. And Billerica always had
13     like a prosecutor like each town has. And, you
14     know, the Billerica prosecutor was really good
15     friends with the clerk; so when I would go for a
16     hearing, I really never got to tell like my side
17     of the story.
18 Q   And you had a right of appeal, which you testified
19     last time you didn't execute, do you remember
20     that?
21         MR. FISCHER: Objection.
22 A   A lot of times I didn't appeal them.
23 Q   Okay. Was there an officer in particular or any
24     officer that you're referring to?

Page 155

1  A   Well, the officer now is Marty Conway that I
2      believe does it.
3  Q   Okay. Let me ask you this: What instance are you
4      saying that Marty Conway influenced the court in
5      terms of a citation that is issued to you?
6  A   He sat in on the last few citations either my
7      husband or I got.
8  Q   Which you were found responsible for?
9  A   Correct, well  --
10 Q   Did you appeal any of those?
11 A   The last one I did. No, yah, the last one.
12 Q   What happened to the last one you had?
13 A   The judge dismissed it.
14 Q   Okay. And the other citations did you appeal?
15 A   Not all, some.
16 Q   Okay. And which ones do you say you appealed and
17     won, do you have a record of those?
18 A   I don't know.
19 Q   Did you keep track of those?
20 A   No.
21 Q   Do you keep track of your citations?
22 A   More than half of them maybe.
23 Q   And have you produced those to the Defendants?
24 A   Yes.

Page 156

1  Q   You have?
2  A   I believe so.
3  Q   Okay. And where can I find those?
4  A   I don't know, in my paperwork maybe.
5  Q   Okay. I have received no paperwork from you
6      through your counsel.
7  A   I don't know. I don't know what to say about
8      that, I don't know where it is.
9  Q   Well, you just said you produced it to us.
10 A   Some.
11 Q   Well, name one citation you've produced to us.
12 A   I didn't say to you, I said it's in my paperwork,
13     in with some of my paperwork.
14 Q   Okay. You haven't produced any of the citations
15     to us, have you, ma'am?
16 A   Not to you.
17 Q   Okay. But you have copies of those you're saying,
18     right?
19 A   Yes.
20 Q   Okay. How many do you have?
21 A   I don't know.
22 Q   And those are kept by you as part of this lawsuit?
23         MR. FISCHER: Objection.
24 A   Part of it.

39 (Pages 153 to 156)

Page 157

1  Q   Okay. You indicated in paragraph 50 that you
2      were leaving a restaurant bar in Billerica on
3      May 21, 1993 when you were confronted by
4      Mr. MacKenzie.
5  A   Okay.
6  Q   What restaurant were you leaving?
7  A   Mr. Tibbs maybe, or I need to know more about
8      it.
9  Q   It says: Mr. And Mrs. Kennedy felt threatened by
10     the officers and had one of the waitresses escort
11     them to the vehicle.
12 A   Mr. Tibbs.
13     MR. FISCHER: Since you and Mr. Rosa both have
14     a copy of the complaint, maybe you can give the
15     witness one.
16     MR. SILVERFINE: You don't have a copy?
17     MR. FISCHER: Not with me.
18     MR. SILVERFINE: If you wait a second, I'll
19     make a photocopy.
20     MR. FISCHER: You might make two, one for me
21     and one for the witness.
22     (Recess taken.)
23     (Discussion was held off the record.)
24 Q   Back on the record, Mrs. Kennedy, I put before you

Page 158

1      and gave a copy to your counsel --
2  A   Thank you.
3  Q   -- the complaint that's been previously marked,
4      and we can just leave it as Ashton Exhibit 3,
5      which is a complaint and demand for jury trial
6      filed by your attorneys.
7      MR. FISCHER: I appreciate the courtesy.
8      MR. SILVERFINE: No problem.
9  Q   If you can turn to what's been marked as page 11,
10     and we're on paragraph No. 50 so you can follow
11     along. Are you there, ma'am?
12 A   Yes.
13 Q   Okay. So we're at the bottom of page 11, No. 50.
14     And I was just asking you where you see line 2:
15     Mr. and Mrs. Kennedy felt threatened by officers
16     and had one of the waitresses escort them to their
17     vehicle; which waitress are you referring to
18     there?
19 A   Lynn Tierney.
20 Q   Lynn Tierney?
21 A   Yes.
22 Q   Is she a Billerica person?
23 A   Yes.
24 Q   And she's a friend of yours?

Page 159

1  A   No, she's an acquaintance.
2  Q   And why did you have her walk you to your
3      vehicle?
4  A   Because I felt threatened with like they were
5      going to jump my husband.
6  Q   When you say they, who are you referring to?
7  A   Frank MacKenzie, Steve Elmore, Donny McEkren, and
8      there was like two others there I can't recall at
9      this point.
10 Q   When you say in that first line they were
11     confronted, what was the confrontation that you
12     observed on May 21, 1993?
13 A   Frank MacKenzie and the officers followed us out,
14     and they circled my husband. And Frank MacKenzie
15     was calling him a coward and asking him to fight,
16     and he spit on my husband.
17 Q   All right. Did your husband say anything to
18     Mr. MacKenzie or any other officer during this
19     time?
20 A   Not that I can remember right now.
21 Q   What lead up to Mr. MacKenzie calling your husband
22     out to fight?
23 A   We were just out dancing with friends, and he
24     showed up with them.

Page 160

1  Q   You say Mr. MacKenzie just showed up with the
2      other officers?
3  A   Correct.
4  Q   And he just on his own wanted to fight your
5      husband?
6  A   Yes.
7  Q   Your husband didn't do anything else?
8  A   No.
9  Q   And who else was a witness to this?
10 A   Bob Spencer, Bobby Keefe, a few other people.
11 Q   And was this an incident you reported to anybody
12     in the Billerica PD?
13 A   Yes.
14 Q   Who did you report this too?
15 A   I know Al Munn was involved in the investigation.
16 Q   Okay. And when did you report that?
17 A   The very next day if not that night.
18 Q   Okay. Did you fill out some form?
19 A   I believe so.
20 Q   Okay. And who did you hand it to?
21 A   I think it was Al Munn.
22 Q   Paragraph 51 of page 12, you say that Officer
23     Nestor followed you as you were driving on Lowell
24     Street.

DUNN & GOUDREAU

Page 161

1      MR. FISCHER:  I'm sorry, so the record is
2  clear, the answer was Al, A-L, last name M-U-N-N?
3      THE WITNESS:  Correct.
4  Q   See at 51, page 12?
5  A   Yes.
6  Q   Okay.  Who else was present during this episode?
7  A   My husband.
8  Q   Okay.  Brian Kennedy?
9  A   Yes.
10 Q   And what time of day did this occur?
11 A   I don't remember the time of day.
12 Q   And did you report this incident to anybody at the
13     Billerica PD?
14 A   No.
15 Q   And according to your paragraph 51, there was a
16     charge filed against you on this episode?
17 A   About an hour later they came to my house and
18     arrested me.
19 Q   All right.  What did they arrest you for?
20 A   Assault and battery.
21 Q   All right.  Assault and battery with a dangerous
22     weapon, or just assault and battery?
23 A   I don't remember.
24 Q   What was the underlying basis for the charge of

Page 162

1      assault and battery, this paragraph?  What were
2      they claiming you did?
3  A   Assault and battery.
4  Q   Against who?
5  A   The officer that was following me.
6  Q   Okay.
7  A   Richard Nestor.
8  Q   Did you hit Mr. Nestor?
9  A   No.
10 Q   Were you driving the car that day?
11 A   My husband was if I can remember.
12 Q   Why did they charge you with assault charges
13     against you and issue a warrant for your arrest?
14 A   Just a lie.
15 Q   Did they charge your husband as well?
16 A   Not that day.
17 Q   Did they charge him later on for the same episode?
18 A   No.
19 Q   We're talking about this episode.  We're focusing
20     on your complaint, your charges breaking down your
21     paragraphs.  Why did they charge you alone if your
22     husband was driving?
23 A   Because I asked them to stop following us.  I
24     would assume that's probably why because I had

Page 163

1      words with them.
2  Q   Well, what did you say to him?
3  A   I asked him to stop teasing us and following us.
4  Q   Those were your words?
5  A   Yes.
6  Q   What did he say?
7  A   I don't remember.
8  Q   What was the allegation in the assault?  In other
9      words, what did the officer say you did?
10     MR. FISCHER:  Objection.
11 A   I don't remember.
12 Q   You went to trial on this matter?
13 A   Yes, I did.
14 Q   Was it a jury trial?
15 A   Yes.
16 Q   And who beside -- did you testify?
17 A   Yes, I believe.
18 Q   And Mr. Kennedy testified?
19 A   I don't remember.
20 Q   Anyone else that you can recall on this?
21 A   No, just the officer.
22 Q   Okay.  How about the next paragraph 52.  It said:
23     Mr. Kennedy's brother Michael was confronted by
24     Officer McKenzie, and Officer McKenzie warned

Page 164

1      Michael he better shut up, Mr. And Mrs. Kennedy;
2      do you see that?
3  A   Yes.
4  Q   It then says Officer McKenzie maliciously beat
5      Michael Kennedy.
6  A   Yes.
7  Q   You say Michael Kennedy filed a complaint against
8      Officer McKenzie here.
9  A   Yes.
10 Q   And do you know what happened to that case?
11 A   Nothing.
12 Q   Where does Michael Kennedy live?
13 A   Lowell.
14 Q   What kind of work does he do?
15 A   He owns his own business.
16 Q   What business is that?
17 A   Real estate.
18 Q   And where is that located?
19 A   Dracut.
20 Q   Dracut, what's the name of the company?
21 A   I don't know.
22 Q   This is your brother-in-law?
23 A   Yes.
24 Q   And fair to say you've known him for quite some

Page 165

1    time?
2   A   Yes.
3   Q   And you don't know the name of the company?
4   A   No.
5   Q   Did Mr. Michael Kennedy have to go to the
6      hospital?
7   A   I don't know.
8   Q   Have you talked to him about this complaint?
9   A   Well, the next day we took pictures of his black
10     eyes.
11   Q   Okay. And who has those photographs?
12   A   I don't know.
13   Q   Do you have those photographs?
14   A   No.
15   Q   On paragraph 54, bottom of page 12, you wrote:
16     The early evening of September 5, 1993 you were
17     driving with your grandmother when you were pulled
18     over by Officer Nestor and Roche who accused you
19     of operating a motor vehicle without a license.
20     Was your license at that point suspended?
21   A   No.
22   Q   Okay. It says here your license was suspended
23     between the hours of 10 p.m. and 10 a.m.
24   A   I mean I know for then I had a license from those

Page 166

1     hours, and I got pulled over.
2   Q   Okay. Had your license been partially suspended
3     at that point?
4   A   No, I had a license.
5   Q   You wrote in your complaint that you had a valid
6     license since your license was suspended between
7     the hours of 10 p.m. and 10 a.m.
8   A   Right.
9   Q   That's what you wrote.
10   A   Right.
11   Q   So I'm asking you was your license suspended in
12     any form or fashion?
13   A   Yah, I could only drive certain hours.
14   Q   Okay. And were you driving at an hour that you by
15     your own words could not drive?
16   A   No, I was driving in between those hours that I
17     could drive.
18   Q   What time do you say you were pulled over?
19   A   I don't know. I have it written down somewhere
20     though.
21   Q   Where do you have it written down?
22   A   I don't know, somewhere.
23   Q   Was that in your notes?
24   A   Possibly.

Page 167

1   Q   Were you charged with that as an offense?
2   A   Yes.
3   Q   What happened with that?
4   A   I don't remember.
5   Q   You don't remember?
6   A   No.
7   Q   Did you threaten anybody in terms of this
8     paragraph?
9   A   No.
10   Q   Okay. It says you were charged with threats, did
11     you say something to the officer?
12   A   No.
13   Q   Well, did you give them the information that you
14     say your license was only partially suspended?
15   A   I did. I had a letter from the Registry.
16   Q   Okay. And you showed it to them?
17   A   Yes, I did.
18   Q   And they arrested you anyway?
19   A   Yes.
20   Q   And did you curse the officers out?
21   A   No.
22   Q   Did you threaten them in any fashion?
23   A   No.
24   Q   What happened with this charge that you were given

Page 168

1     back in 1993?
2   A   Well, if it was a threat charge, I was obviously
3     found not guilty.
4   Q   When you say obviously, why do you say that?
5   A   Because I've only been convicted once, and as
6     far as driving cases, which is usually either
7     not -- you know, like appeal or whatever.
8   Q   Okay. The next paragraph 55 you say you're
9     visiting Kacey Heffernan, do you see that?
10   A   Yes.
11   Q   Is that a friend of yours?
12   A   He's an acquaintance.
13   Q   Was he a friend of yours?
14   A   Was.
15   Q   What happened that you're no longer friends?
16   A   The police told him to stay away from us.
17   Q   The police told Kacey Heffernan to stay away from
18     you?
19   A   Yes.
20   Q   And because of that, he's no longer friends of
21     yours?
22   A   Correct.
23   Q   You also say Heffernan was threatened by the
24     officers. How was he threatened by the officers?

42 (Pages 165 to 168)

Page 169

1  A  I was over his house, and they were kicking in his
2     door. And they said if he doesn't open the door
3     so they can get me, he was going to get arrested.
4  Q  When you say get arrested, is this for operating
5     without a license that you refer to in
6     paragraph 54?
7  A  Right, but I wasn't driving, I just had my car
8     parked outside of his house.
9  Q  This was a separate incident that happened in 55?
10 A  Yes.
11 Q  And they -- you received a separate citation on
12    that --
13    (The deposition was interrupted.)
14 A  Yah, I think I got it in the mail.
15    MR. FISCHER: Excuse me for a second.
16    (Discussion was held off the record.)
17 Q  It says here you were acquitted of the charge, do
18    you see that?
19 A  What paragraph?
20 Q  Paragraph 55.
21 A  Okay.
22 Q  And the next paragraph you say that you observed
23    Officer Roche, who is Officer Roche?
24 A  Just a Billerica cop.

Page 170

1  Q  What's his first name?
2  A  I don't remember.
3  Q  It says punctured two tires on Mr. Kennedy's
4     truck.
5  A  Correct.
6  Q  Tell me what happened there.
7  A  He pulled my husband over in the trailer park, and
8     they were just having words over Frank MacKenzie.
9     And his mom lived in the park as well, Roche's
10    mother. And they just had words, and then that
11    night he did that to my husband's tire.
12 Q  You saw this?
13 A  Well, we heard noise, so we looked out, and that's
14    what we seen.
15 Q  Tell me what you saw.
16 A  We seen him running from our driveway. We heard
17    the noise, and we looked out, and he was near the
18    tire, and then he ran.
19 Q  Was Officer Roche in uniform?
20 A  I don't think so. I don't remember at this point.
21    MR. FISCHER: Excuse me, that was Mr. Gilgun.
22    And he indicates -- put this on the record. He
23    indicates whatever traffic citations you asked
24    about were all produced. He said they were in the

Page 171

1     materials that were provided.
2     MR. SILVERFINE: I don't think I have any.
3  I'll double-check, but -- I'll double-check.
4     MR. FISCHER: I'm in an awkward spot because I
5  didn't do this part of the case.
6     MR. SILVERFINE: All right. I'll
7  double-check.
8     MR. FISCHER: I wouldn't -- the reason I
9  hesitate, off the record.
10    (Discussion was held off the record.)
11 Q  We were on this section of paragraph No. 56 on
12    page 13 where you say Officer Roche punctured two
13    tires. I asked you if Mr. Roche was in uniform.
14 A  Yah.
15 Q  Was he in uniform?
16 A  I don't recall at this time.
17 Q  Well, what do you remember seeing?
18 A  Just -- well, I heard a noise first. And I was
19    kind of like paying attention because Brian and
20    him had had words that day. And I heard a noise,
21    and I looked out. And I just seen him running
22    from the driveway. Well, he was right near the
23    tire, and then he ran out towards the Billerica
24    area.

Page 172

1  Q  He ran?
2  A  Yes.
3  Q  You're saying Officer Roche was on foot?
4  A  Yes.
5  Q  And he ran from your house?
6  A  Correct.
7  Q  And you said you heard a sound?
8  A  Yes.
9  Q  And you looked outside, and what did you do?
10 A  Brian ran out there, my husband Brian.
11 Q  Yah, what happened?
12 A  I think we called the Chief of Police.
13 Q  All right. Did you take photos?
14 A  I don't remember.
15 Q  Well, you say this officer punctured two tires on
16    your husband's truck.
17 A  Yes.
18 Q  So did you do anything to make sure that the
19    evidence you saw was preserved?
20    MR. FISCHER: Objection.
21 A  We called the Chief of Police.
22 Q  Besides calling the Chief of Police and telling
23    him this, did you take any photographs? Did you
24    save the tires? Anything like that?

DUNN & GOUDREAU

## Page 173

1  A   I don't remember.
2  Q   And when did you say this happened?
3  A   It was after, you know, the Frank MacKenzie blow
4      out, and Brian and Officer Roche had words that
5      day.
6  Q   When you say words, were you present when they had
7      words?
8  A   No.
9  Q   What did Mr. Kennedy relate to you? What kind of
10      words did they have?
11      MR. FISCHER: Objection. That's privileged
12      communication.
13  A   I don't remember.
14      MR. FISCHER: You'll have the opportunity to
15      ask Mr. Kennedy that.
16  Q   How do you know they had words?
17  A   He told me.
18      MR. FISCHER: Again, I assert there is a
19      marital privilege, and Mr. Kennedy is available to
20      testify.
21      MR. SILVERFINE: So far he hasn't been for the
22      record.
23      MR. FISCHER: I'll take exception to that.
24      MR. SILVERFINE: You can.

## Page 174

1      MR. FISCHER: You've noticed his deposition
2      four times, and you've made mighty about how it's
3      re noticed for the fourth time; and every time
4      Mr. Kennedy was available, you canceled the
5      depositions. We've been ready every time.
6      MR. SILVERFINE: That's not true.
7      MR. FISCHER: This last time, it's not true.
8      Three times in the fall we were prepared to go
9      forward, and you elected not to go forward.
10      MR. SILVERFINE: That's not an accurate
11      representation.
12  Q   You also wrote here in paragraph No. 57 that your
13      mother Joyce Tibbets went to the Billerica police
14      station to complain about threats, harassment to
15      her daughter. I'm assuming that's you, right?
16  A   Correct.
17  Q   And how do you know she went to the police station
18      to complain?
19  A   She told me.
20  Q   Okay. And what was she complaining about?
21  A   She was just sick of -- sick of the whole thing.
22  Q   Sick of what whole thing?
23  A   Them harassing us and arresting us, destroying our
24      property.

## Page 175

1  Q   And besides -- when you say destroying your
2      property, are you saying the two tires?
3  A   Fire bombing on my truck.
4  Q   All right. And we went over this --
5  A   Fires.
6  Q   When you say fire bombing, how do you know that
7      the Billerica police officers fire bombed your
8      truck?
9  A   Because Frank MacKenzie had threatened my husband
10      earlier that day or the day before; and after it
11      was done, he admitted to it.
12  Q   He admitted to you?
13  A   He admitted to it and said --
14  Q   To you?
15  A   -- if I keep going to the Chief -- to both of us.
16  Q   You were there when Frank MacKenzie said he fire
17      bombed your truck, that's your testimony?
18  A   Yes.
19  Q   And where were you when he said this to you?
20  A   At the -- the neighborhood in North Billerica,
21      Garden City.
22  Q   And who else was present when this conversation
23      took place?
24  A   Me and Brian.

## Page 176

1  Q   So Mr. MacKenzie, who you now have an adversary
2      relationship with, tells you he fire bombed your
3      truck?
4  A   Who I had a what relationship with?
5  Q   A bad relationship with.
6  A   Yes.
7  Q   He tells you he fire bombed your truck?
8  A   Correct.
9  Q   And you say this took place in Garden City?
10  A   Yes.
11  Q   And who else is present then?
12  A   Me and my husband.
13  Q   What time of day did this happen?
14  A   It was during the day.
15  Q   And he just casually mentioned he fire bombed your
16      truck?
17  A   No, he told me if I didn't stop calling the Chief
18      and going there, we'd be living in a shelter next.
19  Q   What were the exact words to you?
20  A   I don't remember the exact words at this point.
21  Q   It's a pretty significant event, don't you
22      think?
23  A   Absolutely.
24  Q   Give me your best memory as to what he told you.

44 (Pages 173 to 176)

Page 177

1   A   If we kept going to the Chief and complaining,
2       that we would be living in a shelter next.
3   Q   What else did he say?
4   A   My husband Brian said something to him, and he
5       responded and said, "You'll never prove that it
6       was me, I am the law."
7   Q   What did Brian Kennedy say to your husband?
8   A   I don't remember, no.
9   Q   You don't remember what he said?
10  A   Not word-for-word.
11  Q   Well, tell me what you remember.
12  A   I don't at this time.
13  Q   But you remember Mr. MacKenzie saying all this?
14  A   Yes, I do.
15  Q   Okay. You say on paragraph 59 on July 21, 1997,
16      there was a fight involving a Dan Dufault and
17      John Oblenis.
18  A   Correct.
19  Q   And you say: Upon information believed is a
20      nephew of Officer McNulty. How do you know that?
21  A   Because they're from North Billerica, they're
22      related.
23  Q   Well, how do you know that they're related?
24  A   John Oblenis made a comment in the past his uncle

Page 178

1       is a cop and he gets away with a lot.
2   Q   He said that to you?
3   A   Yes.
4   Q   You're friendly with Mr. Oblenis?
5   A   No.
6   Q   And Mr. Oblenis just casually mentioned that to
7       you?
8   A   Not casually, he said it before.
9   Q   It says Oblenis was allegedly sprayed with mace.
10      Who sprayed him with mace?
11      MR. FISCHER: Objection.
12  A   He had the mace actually.
13  Q   He sprayed himself?
14  A   I don't know who sprayed him.
15  Q   Well, you wrote here Mr. Oblenis was allegedly
16      sprayed with mace during the altercation.
17      MR. FISCHER: Objection.
18  A   Correct.
19      MR. FISCHER: You're drawing the conclusion
20      that he was sprayed with mace.
21      MR. SILVERFINE: That's what it says here in
22      your complaint.
23      MR. FISCHER: It says he was allegedly.
24      MR. SILVERFINE: I'm reading from your

Page 179

1       complaint.
2   Q   Well, my question is how do you know he was
3       allegedly sprayed with mace?
4   A   How do I know what?
5   Q   How do you know he was allegedly sprayed with
6       mace?
7       MR. FISCHER: Objection.
8   A   Because he was -- he had a bottle of mace, and one
9       of them, whether it was Danny Dufault, one of the
10      guys in the car grabbed it and I think squirted
11      him right in the face with his own mace.
12  Q   And you left -- you say you left -- you were
13      present at the scene but left when the fighting
14      started?
15  A   That's right.
16  Q   Why did you leave?
17  A   Because I didn't want a part of it.
18  Q   Why was this incident different from other
19      incidences?
20  A   What, with all the other incidences I left to?
21  Q   No, you didn't leave at the other incidences.
22  A   I assume I did. I can't leave my own house.
23  Q   Why did you leave this altercation?
24  A   Like I just told you, I didn't want to be involved

Page 180

1       in it.
2   Q   Where was your husband at the time?
3   A   Home.
4   Q   How do you know that?
5   A   Because we had just left the house a little while
6       before.
7   Q   Did your husband have mace?
8   A   No.
9   Q   You also indicate in paragraph 60 that
10      Mrs. Kennedy informed Officer Casey of the
11      alibi witnesses, do you see that?
12  A   60?
13  Q   Yes.
14  A   Yah.
15  Q   Who were the alibi witnesses that you were trying
16      to inform Officer Casey about?
17  A   That were present at the fight you mean? Who were
18      the people that were at the fight? Amy Balm,
19      myself, Dan Dufault, Jay -- I forgot his last
20      name, and Danielle.
21  Q   Danielle?
22  A   Danny Dufault's girlfriend.
23  Q   What's her last name?
24  A   I can't remember her last name. And then there

Page 181

```
 1       was John Oblenis, and, you know, Josh Clark maybe
 2       and a couple of other people he was with.
 3   Q   You wrote in paragraph 61: Two witnesses to that
 4       fight, Fred Kendall and Jean DeFrancisco; do you
 5       see that?
 6   A   Yes.
 7   Q   They spoke to the Billerica police, do you see
 8       that?
 9   A   Yes.
10   Q   Did you see them there?
11   A   No, not at that point.
12   Q   How come you didn't see them at that point?
13   A   Because I wasn't looking around for people.
14   Q   How many people were there at this fight?
15   A   From what I know who was in my car, there was five
16       of us. Well, it wasn't my car, it was Danny's
17       girlfriend's car.
18   Q   So you had to travel by car to this fight and
19       leave by car?
20           MR. FISCHER: Objection.
21   A   No, we were driving down a street.
22   Q   What street were you driving?
23   A   Wilson Street.
24   Q   How far is that from your home?
```

Page 182

```
 1   A   Well, I mean we owned a house right down there
 2       too, so my mom at the time --
 3   Q   Well, the question is how far is it from your
 4       home?
 5   A   I think I have might have been living at the
 6       trailer park at the time.
 7           MR. FISCHER: Just listen to the question, and
 8       answer the question.
 9   A   I don't know.
10   Q   You lived in Billerica you said your entire life?
11           MR. FISCHER: Objection.
12   Q   How far is Wilson Street from where you lived at
13       the time?
14           MR. FISCHER: Objection.
15   A   I don't know.
16   Q   You don't know?
17   A   No.
18   Q   You have to answer for the record.
19   A   I said no.
20   Q   You also write here in paragraph 61: John
21       Oblenis' father approached Mr. Kendall and
22       Mr. DeFrancisco and threatened to kill them if
23       they testified on your husband's behalf. Do you
24       see that?
```

Page 183

```
 1   A   Yes.
 2   Q   How do you know that?
 3   A   Because he told us.
 4   Q   Who told you?
 5   A   Gene DeFrancisco.
 6   Q   Gene DeFrancisco said what?
 7   A   That he got approached by John Oblenis' father.
 8   Q   And what -- allegedly what did he say?
 9   A   Not to testify and tell what happened.
10   Q   And why was that?
11   A   I don't know.
12   Q   Is Mr. DeFrancisco a friend of yours?
13   A   Yes.
14   Q   Is Mr. Fred Kendall a friend of yours?
15   A   An acquaintance.
16   Q   Used to be a friend of yours?
17   A   No.
18   Q   They're both from Billerica?
19   A   Yes.
20           MR. SILVERFINE: Did you want to take that
21       break?
22           MR. FISCHER: Yah, any time.
23           MR. SILVERFINE: No, I'm just plugging along,
24       so take the break.
```

Page 184

```
 1       (Recess taken.)
 2   Q   As I mentioned because of discovery issues we'll
 3       have to come back another day and hopefully finish
 4       then, okay?
 5   A   Yes.
 6   Q   I'm going to continue to ask questions about your
 7       complaint just to get some information. And,
 8       again, I'm literally basing it on Exhibit 3 from
 9       the Ashton, which is a copy of the complaint,
10       okay?
11   A   (Nods head.)
12   Q   Let's drop down to page 16, No. 70, paragraph 70.
13       This is the episode you've referenced before in
14       terms of police Lieutenant Connors' car
15       burglarized, right?
16   A   Right.
17   Q   Were you ever in possession of his badge?
18   A   Never.
19   Q   Were you ever in possession of his hat?
20   A   No.
21   Q   How about any of the items that Mr. Connors' had?
22   A   No.
23   Q   How about Brian Kennedy?
24   A   No.
```

46 (Pages 181 to 184)

## Page 185

1  Q   How about Billy Ashton?

2  A   Not to my knowledge.

3  Q   Was Mr. Ashton at one point walking around with

4      Mr. Connors' hat on?

5  A   Scott Ashton, yes.

6  Q   Scott Ashton, when was Scott Ashton walking around

7      with Mr. Connors' hat on?

8  A   I don't know, a couple of days later maybe.

9  Q   Uh-hum. And you saw this?

10 A   I seen him walking from up the corner where I

11     live, the four-way intersection.

12 Q   And you immediately recognized it to be Deputy

13     Chief Connors' hat?

14 A   I didn't know whose hat it was.

15 Q   You recognized it to be a police hat?

16 A   Yes.

17 Q   So did you have a conversation with Scott Ashton

18     at that point?

19 A   I yelled up the street.

20 Q   What did you yell?

21 A   Don't come down here with that.

22 Q   What did Mr. Ashton say to you?

23 A   He didn't.

24 Q   And what happened -- what else did you observe

## Page 186

1      about Mr. Scott Ashton and the hat?

2  A   That's it really.

3  Q   How about the badge?

4  A   That's it.

5  Q   Were you present when Brian Kennedy contacted

6      Officer Casey?

7  A   Yes.

8  Q   Tell us what the conversation between Brian

9      Kennedy and Officer Casey were as regards in badge

10     incident.

11 A   He called Mike Casey, and he said, "I'll be down

12     in a few minutes." And Brian and I were sitting

13     on the couch. And Mike Casey walked through my

14     door, and he was rubbing his belly saying "Tickle

15     me, Brian. Tickle me, Brian. What have you got

16     for me?"

17 Q   I'm not understanding, this is your house?

18 A   Yes, my mobile home.

19 Q   And what address?

20 A   129.

21 Q   Leicester Street?

22 A   Yes.

23 Q   And Officer Casey walked into your home and

24     started saying tickle me?

## Page 187

1  A   (Nods head.)

2  Q   You have to answer for the record?

3  A   (Indicating.)

4      MR. FISCHER: You can't nod, you have to say

5      the word yes.

6  A   Yes.

7  Q   Okay. Was Officer Casey by himself?

8  A   Yes.

9  Q   And he walked into your home and he said tickle

10     me?

11 A   Yes.

12 Q   All right. What else did he say?

13 A   He told my husband that -- that if we told who had

14     the badge that he would help my son with court.

15 Q   Which son are you referring to?

16 A   Brian, Jr.

17 Q   Did Brian, Jr. have some outstanding complaints

18     against him at that time?

19 A   Yes, well, it was gone, but it got brought back

20     up.

21 Q   What complaints did he have pending against him at

22     that point?

23 A   Throwing a rock.

24 Q   Do you know the charge that was pending?

## Page 188

1  A   Malicious destruction.

2  Q   Okay. How old was your son at that point?

3  A   13 maybe.

4  Q   And what happened, what was the discussion after

5      he said tickle me?

6  A   He said, "Tell us who stole the stuff and where it

7      is and we'll see to that your son's charges get

8      dropped."

9  Q   When he said tell me about the stuff, did you know

10     what stuff was missing?

11 A   Yes.

12 Q   How did you know what stuff was missing?

13 A   Because everybody in the neighborhood knew.

14 Q   How did you know?

15 A   Because Scott was bragging to people about it. I

16     think maybe Kacey Heffernan and other kids, and

17     they told me. And he came walking down the street

18     laughing with the backpack and hat, and I yelled

19     up to him don't come down here.

20 Q   Scott Ashton is Billy Ashton's brother?

21 A   Yes.

22 Q   And what was your relationship with Scott Ashton

23     at that particular time?

24 A   Friends.

Page 189

1  Q   Are you friends now?
2  A   No.
3  Q   Why aren't you friends now?
4  A   Because of the whole incident.
5  Q   Which incident?
6  A   This incident with the badge.
7  Q   You're angry at Scott Ashton for doing this?
8  A   Angry that we all got in trouble over it.
9  Q   Well, were you --
10     MR. FISCHER: Are you okay?
11     THE WITNESS: (Nods head.)
12     MR. FISCHER: Do you want a tissue?
13     THE WITNESS: No.
14     MR. FISCHER: Take a minute and refresh
15     yourself.
16     MR. SILVERFINE: Do you want another break?
17     THE WITNESS: I'm fine.
18     MR. FISCHER: She says she's fine.
19 Q   Were there any other officers present when you had
20     this conversation with Officer Casey?
21 A   I don't remember, I just remember him.
22 Q   And you say here Brian Kennedy refused to
23     cooperate with the interrogation, what do you mean
24     by that?

Page 190

1  A   He just didn't want a part of it.
2  Q   Well, did he refuse to answer any questions?
3  A   Yes.
4  Q   Okay. Did you answer any questions?
5  A   No.
6  Q   And at that point you wrote Officer Casey angrily
7      left your home. Do you see that at the bottom of
8      page -- strike that, the bottom of paragraph 71?
9  A   Yes.
10 Q   Okay. And what do you mean by that?
11 A   I don't remember the exact words, but he left mad.
12 Q   Okay. How did that manifest itself?
13 A   I don't remember.
14 Q   In the next paragraph 72, you discuss an episode
15     where Brian Kennedy was scheduled to go on trial
16     for assault and battery against John Oblenis; do
17     you see that?
18 A   Yes.
19 Q   You say a week earlier you had arranged to bring
20     two alibi witnesses. When you went to pick them
21     up, they refused to go. And you say here you
22     believe the witnesses were pressured not to show
23     up. What's the basis of your information in the
24     allegation there?

Page 191

1  A   Well, the lady, Monique I was really good friends
2      with --
3  Q   I'm sorry, who?
4  A   The lady, the witness, Monique, she was my
5      neighbor.
6  Q   What's Monique's last name?
7  A   Ladeau.
8  Q   How do you spell that?
9  A   I don't know.
10 Q   You said she was your neighbor?
11 A   Yes.
12 Q   How long was she your neighbor for?
13 A   Years.
14 Q   You don't know how to spell her name?
15 A   No.
16 Q   What kind of work does Monique do?
17 A   She don't. She was working at the pizza place.
18 Q   And how do you know she was pressured not to show
19     up?
20 A   Because we were friends, and we hung out like
21     every day; and then on the morning of the trial,
22     we pulled up out front and beeped the horn and she
23     didn't come.
24     I went to the door, and she said, "I can't

Page 192

1      go."
2      And I said, "Why?"
3      And she said, "Because I got a visit at the
4      pizza store, and I just can't go." And she shut
5      the door.
6  Q   Did she say who she was visited by?
7  A   No.
8  Q   Did she say anything else?
9  A   No.
10 Q   Okay. Did she say anything relative to the
11     Billerica Police Department?
12 A   No.
13 Q   You said there was another witness, who was that?
14 A   I don't remember. Let me think.
15 Q   Okay. Take your time.
16 A   This is for the Mason case?
17 Q   I'm reading, just so you understand, I'm in
18     section paragraph numbered 72 on page 17, and you
19     said --
20     MR. FISCHER: 72.
21 A   Oh, okay.
22 Q   -- bring two alibi witnesses. Who was the second
23     one?
24 A   I think it might have been Amy. I don't know. I

48 (Pages 189 to 192)

Page 193

1    can't remember at this point.
2  Q   Did you write that down somewhere?
3  A   I do have it written somewhere.
4  Q   Is that in your notes that you mentioned earlier?
5  A   Maybe.
6  Q   Was Amy involved in this case?
7  A   Yes.
8  Q   What was her involvement?
9  A   She was in the car.
10 Q   And was she going to be an alibi witness for you?
11 A   I wasn't charged, Brian was.
12 Q   For Brian Kennedy?
13 A   Yes.
14 Q   And did she back out?
15 A   Yes.
16 Q   Okay.  And did you have a conversation with her
17     about that?
18 A   Not at that point, no.
19 Q   Did you have a conversation with her at a later
20     point?
21 A   Yes.
22 Q   And what did she tell you?
23 A   That she got scared, and she just got scared and
24     didn't want to get her harassed like us.

Page 194

1  Q   She didn't what to get her what?
2  A   Harassed like us.
3  Q   Harassed, okay.  Did she say she had been spoken
4      to by any police officer?
5  A   No.
6  Q   Did she say -- did she mention the Billerica
7      Police Department to you?
8  A   Yes.
9  Q   All right.  What did she say?
10 A   She said that they told her if she didn't hang
11     around with me that she wouldn't be getting
12     charged and harassed, and she's never going to be
13     able to have a good life in Billerica as long as
14     she was friendly with us.
15 Q   Who said this to her?
16 A   And that there was a bullet out for me.
17 Q   Who said this?
18 A   I don't know.  She knows.
19 Q   Well, who did Amy Balm tell you said this?
20 A   I don't remember at this time.
21 Q   Did Amy Balm live with you?
22 A   Yes.
23 Q   At that time?
24 A   No.

Page 195

1  Q   When did she live with you?
2  A   She lived with me a couple of times.
3  Q   Tell us when.
4  A   I don't remember the years.  Around about the
5      Lieutenant Connors incident.
6  Q   Okay.  So we just talked about the Connors
7      incident --
8  A   With the badge.
9  Q   The badge incident in around November of '97?
10 A   Yes.
11 Q   And were you living with Brian Kennedy at that
12     time too?
13 A   Yes.
14 Q   And Amy Balm was living with you as well?
15 A   Yes.
16 Q   And Billy Ashton as well?
17 A   He was living with me on and off.
18 Q   And then when else did she live with you, when
19     else besides around the time of the badge
20     incident?
21 A   Her family moved away, and she moved in with me
22     for a couple of weeks.
23 Q   About when was this?
24 A   I don't remember the year.

Page 196

1  Q   Is there an event that happened that you recall?
2  A   No.
3  Q   And what's your relationship with Amy Balm
4      presently?
5  A   Friends.
6  Q   Have you ever pressured her to testify one way or
7      another?
8  A   No.
9  Q   The next page, 18, paragraph 73, you wrote:
10     February 18, 1998, the Kennedys were present in
11     Lowell District Court for a hearing on criminal
12     charges brought by Ms. Kaiser against her son; do
13     you see that?
14 A   Yes.
15 Q   What do you mean against your son?
16 A   Yes.
17 Q   Okay.  Which son was that?
18 A   Brian.
19 Q   And what was the charge they brought against your
20     son?
21 A   The rock throwing incident.
22 Q   Is this on the roof, the rock throwing, or is this
23     a different incident?
24 A   This is the one I already told you about.

Page 197

1  Q  I'm sorry, refresh my memory, which rock throwing
2     incident was this?
3  A  Malicious destruction I think the charge was.
4  Q  And was this against property of Ms. Kaiser?
5  A  Yes.
6  Q  You wrote: Officer Elmore failed to attend.
7        You wrote: Officer Elmore had been informed
8     by other children in the Kennedys' neighborhood
9     who witnessed the incident that Brian, Jr. was not
10    responsible.
11       Who in the neighborhood informed Officer
12    Elmore that Brian, Jr., was not involved?
13 A  Monique's son.
14 Q  I'm sorry?
15 A  Monique's son Roger.
16 Q  That's the same Monique Ladeau you mentioned
17    before?
18 A  Yes.
19 Q  Okay. And does he go by Roger Ladeau?
20 A  Yes.
21 Q  And who else?
22 A  Bennett, Joey Bennett.
23 Q  Spell that, please.
24 A  Joey, J-O-E-Y.

Page 198

1  Q  Bennett?
2  A  B-E-N-N-E-T-T.
3  Q  He's also a Billerica kid?
4  A  Yes.
5  Q  He's still in the neighborhood?
6  A  I don't know.
7  Q  Anyone else that you remember?
8  A  There was another kid, I forgot his name; and he
9     wrote a note or something saying Brian didn't do
10    it.
11 Q  Okay. You also wrote: When the Kennedys returned
12    from court that day, Mr. Kennedy called the
13    Billerica PD and left a message informing Officer
14    Elmore of the next hearing date.
15       Why would Mr. Kennedy call and leave a message
16    for Officer Elmore?
17 A  Because the court wanted him there since he's the
18    one that did the report.
19 Q  Right, but why would Mr. Kennedy, who is the
20    father of the charged, call the Officer?
21 A  Because Brian and Steve Elmore used to, you know,
22    like each other. And he was the one in charge of
23    the rock throwing incident.
24 Q  When you say -- the investigation, he's not in

Page 199

1     charge of the incident, the investigation you
2     mean?
3  A  Yah, the investigation.
4  Q  Okay. So Officer Elmore and your husband at least
5     back in 1998 had a good relationship?
6  A  No, they did before, you know, before.
7  Q  I'm confused. What I asked you was why would your
8     husband, where your son is being charged, why
9     would he call Officer Elmore?
10 A  Because the clerk said get a hold -- "I want the
11    cop that was the head of the investigation here."
12       And the charges were never brought against my
13    son until the badge incident, and then all of a
14    sudden my son was charged again several months
15    later.
16 Q  And those are for separate incidences?
17 A  Same.
18 Q  So the badge and the rock are the same incident?
19 A  No.
20 Q  I'm confused.
21       MR. FISCHER: I think she meant the two rock
22    incidences were the same.
23       THE WITNESS: Yes.
24 Q  Okay. The badge incident is a separate incident

Page 200

1     than the rock incident, right?
2  A  Yes.
3        MR. FISCHER: I think what she was saying was
4     they dropped the charges against her son until
5     the --
6        THE WITNESS: Badge incident.
7        MR. FISCHER: -- badge incident; and then to
8     coerce assistance with respect to the badge, the
9     charges came back. You asked were they the same
10    incident, and her -- she understood the two
11    charges were both for the same rock incident.
12 Q  Okay. Were you aware back in the time of February
13    1998 that it was Mrs. Kaiser who brought the
14    complaint against your son?
15 A  No, no.
16 Q  Was she at the hearing that you were referring to
17    here?
18 A  No, no, she wasn't.
19 Q  You also wrote here: When Officer Elmore returned
20    Mr. Kennedy's call, he agreed to meet him at his
21    home; do you see that?
22 A  Yes.
23 Q  Were you present?
24 A  Yes.

Page 201

1  Q   What was the conversation between Officer Elmore
2      and your husband?
3  A   He said, "Brian, find out where Lieutenant
4      Connors' stuff is and, you know, Brian, Jr. won't
5      have to go to court. That's all you got to do."
6  Q   And what was Brian's response?
7  A   I don't know. I walked away for a short period.
8  Q   You happened to walk away when Brian Kennedy was
9      giving a response?
10 A   Yes, I did.
11 Q   But this is after at the very least you say you
12     saw Scott Ashton wearing the hat, right?
13 A   Correct.
14 Q   So at the very least you knew --
15 A   I knew, yes, I did.
16 Q   But you didn't say anything?
17 A   No, I didn't.
18 Q   Even though it could exonerate your son?
19 A   Well, I was confused, I didn't know what to do.
20 Q   It could have exonerated your son, right?
21 A   I had --
22 Q   Brian, Jr. wasn't involved in this?
23 A   He wasn't, but I had faith that he'd get out of
24     it. He didn't do it.

Page 202

1  Q   Now, you wrote here on paragraph 74 that
2      Mr. Kennedy refused to cooperate with Officer
3      Elmore as you've testified, and then Officer
4      Elmore went to Scott Ashton's house; do you see
5      that?
6  A   Yes.
7  Q   And how do you know as you wrote Officer Elmore
8      misrepresented to Scott Ashton that you had signed
9      a statement implicating him?
10 A   Well, we watched him go down there, and we
11     walked --
12 Q   You watched who?
13 A   Steve Elmore, the officer.
14 Q   Go down where?
15 A   To Upton Street.
16 Q   Which is how far from where you live?
17 A   Two streets over.
18 Q   And?
19 A   We stood at the corner and watched him pull up at
20     the Ashtons' residence.
21 Q   Okay. So how do you know what he said or didn't
22     say to Scott Ashton?
23 A   Steve Elmore sometime after the fact admitted to
24     telling Scott that we told on him. And Scott

Page 203

1      Ashton also confronted everybody in the
2      neighborhood that we said we told on him.
3  Q   Okay. And you're saying today that you did not
4      give that information to Officer Elmore even
5      though you knew that was the truth, right?
6  A   That's right.
7  Q   Were you concerned about being called a rat, is
8      that the problem?
9  A   No, it was the way they did it, they approached me
10     with it.
11 Q   You also wrote here: Officer Elmore told
12     Mr. Ashton that even though Billerica police knew
13     the Kennedys had nothing to do with the stolen
14     property, they wanted to get the Kennedys in
15     trouble; do you see that?
16 A   What is it?
17 Q   Reading the second sentence of paragraph No. 74.
18     MR. FISCHER: Take your time and read it
19     yourself.
20 A   Yah, I see this.
21 Q   Okay. How do you know what Officer Elmore said to
22     Mr. Ashton?
23 A   Scott ended up talking to his brother Billy and
24     filled out a report saying -- saying all that.

Page 204

1  Q   So you're saying that Scott Ashton said this to
2      Billy Ashton?
3  A   Yes, and he signed a statement.
4  Q   Were Scott Ashton and Billy Ashton getting along
5      at this time?
6  A   They were on and off.
7  Q   Wasn't this one of the off times?
8  A   At this particular day, no.
9  Q   This particular day, what day do you say this
10     happened?
11 A   Whatever day Scott filled out the report and
12     reversed it.
13 Q   And were any promises made to Scott Ashton by you
14     or Billy Ashton or Brian Kennedy that you know
15     of?
16 A   Yah.
17 Q   What did you promise him?
18 A   Billy promised him that he would forgive him for
19     lying the first time and hang out with him again.
20 Q   What's their relationship now?
21 A   I don't know.
22 Q   Billy Ashton and Scott Ashton.
23 A   I'm not really sure.
24 Q   You're not really sure?

Page 205

1  A    No.
2  Q    Billy still lives with you?
3  A    Still? He does now.
4  Q    Do you ever see Scott Ashton over your house?
5  A    No.
6  Q    How long has it been since you've seen
7        Scott Ashton at your house?
8  A    At my house?
9  Q    Yes.
10 A    He's never been in my house.
11 Q    And the next line which says: Even though Ashton
12       insisted that the Kennedys had nothing to do with
13       the stolen property, he was ultimately pressured
14       into implicating the Kennedys. How did you learn
15       this information?
16 A    Scott told Billy about it. They met, and they
17       started to, you know, get along again and whatnot.
18       But then Scott told Billy he just couldn't handle
19       the pressure the police were putting him under, so
20       they started fighting again.
21 Q    Who started fighting again?
22 A    Scott and Billy.
23 Q    So after this episode, they didn't get along?
24 A    They were on and off again.

Page 206

1  Q    As a matter of fact, they didn't speak to each
2        other for quite sometime after this?
3  A    Correct.
4  Q    Did Billy Ashton ever threaten Scott Ashton
5        relative to this statement he gave to the police
6        before he retracted it?
7  A    No, not to my knowledge.
8  Q    Did you ever threaten him?
9  A    No.
10 Q    Did Scott Ashton originally implicate you on this
11       theft of the badge and the hat?
12 A    I think he said that he put it in a grill or
13       something of a house that I didn't own, and
14       they -- he said 4162, but I didn't own that mobile
15       home at the time.
16 Q    And you weren't angry at Scott Ashton for
17       implicating you in this?
18 A    Am I angry at him?
19 Q    Were you angry at him?
20 A    Yes.
21 Q    You didn't threaten him at all?
22 A    No.
23 Q    Now, who is Kacey Heffernan?
24       MR. FISCHER: Objection.

Page 207

1        MR. SILVERFINE: Who is Kacey Heffernan
2        you're objecting to?
3        MR. FISCHER: Asked and answered.
4  Q    In relation to paragraph No. 75, who is Kacey
5        Heffernan?
6  A    A neighborhood kid, guy.
7  Q    How long have you known Kacey Heffernan?
8  A    Since I was about eight.
9  Q    What's your relationship with Kacey Heffernan?
10 A    Acquaintances.
11 Q    Were you friends at this time?
12 A    Yes.
13 Q    What happened that you are no longer friends?
14 A    He was driving one of my cars at the time, and the
15       Billerica police pulled him over. And he had no
16       license.
17       And they said we're either going arrest you
18       and put you in jail and you're going to go to jail
19       for a year for driving with no license, or tell us
20       where the stuff is.
21       And he did, he told where the stuff was, so
22       that's how it all come out.
23 Q    All right. I'm sorry, Kacey Heffernan told the
24       police where all the stuff was?

Page 208

1  A    Yah, he got pulled over on Oak Street.
2  Q    How did Kacey Heffernan now where all the stuff
3        was?
4  A    Everybody in the neighborhood knew about Scott
5        doing what he did. He told everybody.
6  Q    And what was your understanding of where the stuff
7        was?
8  A    It was down in the woods somewhere. Kacey told
9        Scott to pick it up in the woods somewhere. And
10       for a short period, it was at Mrs. Ashton's in her
11       shed.
12 Q    And who put it in Mrs. Ashton's shed?
13 A    Scott.
14 Q    How do you know that?
15 A    Because he told his brother Billy, and Billy told
16       me.
17 Q    Paragraph 77 you wrote that Lieutenant Connors and
18       Officer Elmore approached Danny DuFault, who was
19       serving a sentence, and offered to have him
20       released if he signed a statement implicating
21       Mr. Kennedy. What's your basis for the
22       information about that?
23 A    Danny DuFault confronted Brian about it. And
24       whether it was by phone or when Brian ended up

52 (Pages 205 to 208)

Page 209

1  getting that short little time up there, somehow
2  he told Brian about it. And the Billerica police
3  went to Danny and said Brian filled out a
4  statement against you, and Danny said show me the
5  statement. And they didn't show him the
6  statement, they said they had it at the police
7  station.
8     So Danny claimed that they were lying and
9  ended up confronting Brian about it and telling us
10  about the deal that the Billerica police offered
11  him.
12 Q  And you're saying Danny DuFault and your husband
13  Brian Kennedy were at the House of Correction at
14  that time?
15 A  I don't know about that time. When Brian only
16  went there once, and when he was there, Danny was
17  there.
18 Q  Did you visit Danny DuFault in the House of
19  Correction?
20 A  Never.
21 Q  Never?
22 A  No.
23 Q  At any point in time?
24 A  Not that I remember.

Page 210

1  Q  You wouldn't remember that?
2  A  I think I would. I don't remember it.
3  Q  You have gone to visit people in the House of
4  Correction?
5  A  Oh, yes.
6  Q  For instance?
7  A  My husband Brian when he was there; my best friend
8  Billy.
9  Q  Billy Ashton?
10  A  Yes.
11  Q  Who else?
12  A  My boyfriend Nigel when I was dating him.
13  Q  Boyfriend Nigel Griffen was that his name?
14  A  Yah.
15  Q  And what was Nigel doing his stint for?
16  A  I think hitting me.
17  Q  Hitting you?
18  A  Uh-hum.
19  Q  You have to answer.
20  A  Yes.
21  Q  And after he hit you, he went to jail?
22  A  Yes.
23  Q  And you went to visit him in jail after he hit you
24  and was sentenced for hitting you?

Page 211

1  A  Yes, yes.
2  Q  You wrote on page 20, paragraph 78 that Mr. Ashton
3  was kept in the custody of the Billerica PD for
4  the entire weekend where he was repeatedly beaten
5  by Lieutenant Connors because he refused to sign a
6  statement implicating Mr. Kennedy; do you see
7  that?
8  A  Yes.
9  Q  What's the basis of the knowledge about that
10  statement?
11  A  I picked him up after he spent, you know, several
12  days in there.
13  Q  When you say he, you're referring to Billy Ashton?
14  A  Yes.
15  Q  And?
16  A  And he was really shook. He was young at the
17  time.
18  Q  How old was he then?
19  A  Never been in trouble with the law.
20  Q  How old was he then?
21  A  I don't remember.
22  Q  This is back in 1998, so how old was Mr. Ashton
23  then?
24  A  He's 25 maybe now, so --

Page 212

1  Q  And when you say repeatedly beat, how did you come
2  to know that?
3  A  He had marks on him.
4  Q  Did you take photographs of those?
5  A  I didn't, no.
6  Q  Did Mr. Ashton take photographs of those?
7  A  I don't know.
8  Q  Anyone take photographs of those?
9  A  We do have pictures somewhere.
10  Q  You do?
11  A  Yes, he does.
12  Q  Have you produced those photographs?
13  A  No.
14  Q  And --
15     MR. FISCHER: She said she doesn't know where
16  they are. If she did, we would have produced
17  them.
18     MR. SILVERFINE: Okay. Just like we would
19  have produced a lot of documents.
20     MR. FISCHER: You can't produce what you don't
21  have or can't find them.
22  Q  And as part of your complaint to the Billerica
23  Police Department or anyone relative to this
24  allegation, have you made copies or produced those

Page 213

1    photographs of this alleged beating of Mr. Ashton?
2        MR. FISCHER: Objection.
3    A   I personally don't have the pictures, but I
4        believe Billy Ashton might have them.
5    Q   Yah.  And did he produce them in any complaint or
6        anywhere that you're aware that was filed with
7        Billerica or any other agency?
8    A   I don't know.
9    Q   I'm sorry?
10   A   I don't know.
11   Q   You wrote in paragraph 81, bottom of page 20 into
12       21, that Billerica police officers in January of
13       1999, including Officer West, regularly showed up
14       at the job site where Mr. Kennedy was working.  Do
15       you see that?
16   A   Uh-hum, yes.
17   Q   And where was Mr. Kennedy working back in January
18       1999?
19   A   Oak Street in Billerica.
20   Q   And what kind of work was he doing?
21   A   Building houses.
22   Q   And how do you know that Officer West regularly
23       showed up at his job site?
24   A   I seen his car, and I lived right off there.

Page 214

1    Q   You lived right off where?
2    A   Right off of Oak Street, so I was at the job quite
3        a bit.
4    Q   You went to the job every day?
5    A   Just about.
6    Q   What were you doing at the job?
7    A   Hanging out, just helping them work.
8    Q   You were helping them do the work?
9    A   Yes.
10   Q   What were you doing?
11   A   Lugging studs.
12   Q   Lugging studs.  How long did you lugging studs
13       for?
14   A   I don't know.  I would do it when my husband would
15       be building, I'd go there and help him.
16   Q   Did you get paid for this?
17   A   No.
18   Q   And what would you say -- or what do you say
19       Officer West was doing when he would show up?
20   A   He confronted Gino DeFrancisco and two other
21       workers just walking up around the house looking
22       at the house he built asking what their names were
23       and where they lived and sitting outside the job
24       on Oak Street.

Page 215

1    Q   And what do you say, what purpose was Mr. West
2        taking this information for?
3    A   He didn't say.
4    Q   So he was just taking down information from people
5        at the job site?
6    A   Yes.
7    Q   What did you observe or did you hear Officer West
8        say?
9    A   Just asking who they were and whatnot.
10   Q   And this is the same DeFrancisco, the gentleman
11       you mentioned earlier who is a friend of yours?
12   A   Yes.
13   Q   And who else do you say this happened to?
14   A   Kenny Corone.
15   Q   Kenny Corone?
16   A   Yes.
17   Q   Is he a Billerica person?
18   A   He was.
19   Q   Is he a friend of yours?
20   A   Yes.
21   Q   Okay.  And where does he live?
22   A   I don't know, I haven't seen him in a couple of
23       years.
24   Q   You don't know where he lives either?

Page 216

1    A   No.
2    Q   How do you spell his last name?
3    A   I don't know.
4    Q   But you --
5    A   Actually, I seen him once in the last couple of
6        years, few years.
7    Q   On paragraph 82 when you talk about Officer
8        Micciche, you indicate that he threatened
9        Mr. Kennedy stating, quote, you're going to get
10       it, your time is going to come, me and my brothers
11       rule.  Were you there?
12   A   Let me see.
13       MR. FISCHER: Take your time and read it.
14   Q   According to paragraph --
15   A   I have to read this one.
16   Q   I'm just reading what you wrote, start at the top,
17       August 5, 1999.
18       (Discussion was held off the record.)
19   A   Okay.
20   Q   Have you had a chance to read paragraph 82?
21   A   Yes.
22   Q   Okay.  It says here you were present at Dunkin
23       Donuts in Lowell, do you see that?
24   A   Yes.

54 (Pages 213 to 216)

Page 217

1  Q  Are you saying Officer Micciche said that line?
2  A  He said more than that, I mean he started outside
3      and ended up inside.
4  Q  But you're saying he said, "You're going to get
5      it, your time has come, and me and my brothers
6      rule."
7  A  I believe so.
8  Q  Well, this is your complaint, is that what he
9      said?
10 A  Yes.
11 Q  Was Officer Micciche in uniform?
12 A  No.
13 Q  He was off duty?
14 A  Yes.
15 Q  And what did you understand that to mean?
16 A  I don't remember exactly that part. I remember
17     other parts.
18 Q  Tell me what you remember about that.
19 A  I was there getting gas --
20 Q  Okay. What do you remember about your interaction
21     with Officer Micciche?
22 A  -- with a friend of mine. And as I started to
23     pull away, he pulled up on a big bike, like a loud
24     motorcycle and parked in the fire lane and like

Page 218

1      cut me off. And he started calling me names and
2      stuff in front of one of my neighbors and friend.
3  Q  And you hadn't done anything at that point?
4  A  Not at that point.
5  Q  He just started calling you names?
6  A  Yes.
7  Q  Out of the blue?
8  A  Yes.
9  Q  In public?
10 A  Yes.
11 Q  In broad daylight?
12 A  Yes.
13 Q  People present?
14 A  Lots of people.
15 Q  What did he say?
16 A  He was swearing and calling me names. I don't
17     recall word-for-word right now.
18 Q  He was swearing and calling you names, what was he
19     swearing?
20 A  I don't remember.
21 Q  An off duty police officer pulls up in broad
22     daylight and just starts cursing you out, and you
23     don't remember what he said?
24 A  Yah, there was so many incidences, I don't

Page 219

1      remember exactly what he said.
2  Q  What do you remember?
3  A  And then I started to turn around, and my husband
4      pulled up with his crew.
5  Q  Okay. What happened next?
6  A  He seen me crying and everything and asked me what
7      happened. And I told him Brian Micciche was just
8      calling me names, and I think I had one of my kids
9      in the car.
10     And so my husband went in there and asked him
11     what his problem was, if you've got a problem and
12     you want to yell at somebody, you know, yell at
13     me.
14     And he just started -- Brian Micciche started
15     like saying a bunch of things. So the clerk --
16     Brian Micciche told the clerk to call the police,
17     and her response was "I'm going to call the police
18     on his behalf."
19 Q  Okay.
20 A  Meaning Brian's.
21 Q  Was the clerk a friend of yours?
22 A  No.
23 Q  Do you know the clerk's name?
24 A  Joanne her name was.

Page 220

1  Q  Does she still work there?
2  A  I don't know.
3  Q  And you say here that Officer Smith spoke with
4      Mrs. Kennedy, who informed him of the threats.
5      What threats did he make to you?
6  A  Again, I don't remember exactly at this time.
7  Q  Well, I mean just so you understand, your
8      allegations say he spoke to Mrs. Kennedy who
9      informed him about the threats made by Officer
10     Micciche. What did Officer Micciche say to you
11     you constituted as a threat?
12 A  I don't remember, but I told the cop.
13 Q  You're saying the cop, the Lowell cop?
14 A  Yes.
15 Q  What did you did you tell the Lowell cop?
16 A  I don't remember at this time.
17 Q  So what happened after the Lowell cop?
18 A  He seemed quite concerned and went over angry to
19     Officer Micciche; and then when he realized he was
20     a cop, things changed.
21 Q  Did you make any threats toward Officer Micciche?
22 A  No.
23 Q  Did your husband?
24 A  No.

55  (Pages 217 to 220)

DUNN & GOUDREAU

Page 221

1  Q    You were charged with making threats, were you
2        not?
3  A    Correct.
4  Q    Okay. And what happened with that charge?
5  A    Dismissed.
6  Q    And did you bring out any cross complaints?
7  A    I tried to. I was the one that tried do the
8        complaint first.
9  Q    Okay. What was the allegation of the threat made
10       against Officer Micciche made by you?
11 A    I don't remember.
12 Q    You wrote in the top of page 22, paragraph 83, it
13       says here: Mr. And Mrs. Kennedy were found not
14       guilty. Later Mrs. Kennedy learned Officer
15       Micciche told Scott Ashton, "I wouldn't think
16       twice about killing Mr. Kennedy."
17 A    Where?
18 Q    Top of page 22.
19 A    Okay.
20 Q    How did you hear that?
21 A    I don't know. It was probably Scott told maybe
22       Amy or I don't remember at this time.
23 Q    You don't remember how you heard that alleged
24       quote?

Page 222

1  A    No.
2  Q    Well, weren't you concerned about that?
3  A    Yes, I was.
4  Q    So what did you do when you heard that?
5  A    I contacted the Lowell police a few times.
6  Q    Yah, what did they do?
7  A    They called Billerica. And when the Lowell police
8        officer called me back, he said the same thing,
9        Billerica said you're trouble and big drug
10       dealers.
11 Q    And what did you say?
12 A    I just told them we weren't, it's not true.
13       MR. SILVERFINE: Give me a moment.
14       MR. FISCHER: It's 4:30.
15       MR. SILVERFINE: I'm trying to maybe just
16       finish one other paragraph.
17       MR. FISCHER: Take your time.
18       MR. SILVERFINE: Is that fair enough?
19       MR. FISCHER: Sure.
20       MR. SILVERFINE: Just trying to see if there's
21       a natural -- excuse me one minute.
22       (Discussion was held off the record.)
23 Q    Page 23, paragraph 86, directing your attention to
24       that, it says, July 2001, you're driving through

Page 223

1        town when you're pulled over by two marked police,
2        one Billerica, one the State Police. Do you see
3        that?
4  A    Yes.
5  Q    Officer Brown driving the marked Billerica car got
6        into a verbal confrontation with you and stated,
7        quote, first Billerica, then Tewksbury, and now
8        the State Police. What was the conversation you
9        had with Officer Brown that day?
10 A    We were arguing.
11 Q    What was the argument?
12 A    He was just saying that, you know, you're fighting
13       with Billerica, and we got Tewksbury against you,
14       now we're working the State Police.
15 Q    Well, what lead to the argument in the first
16       place?
17 A    He pulled us over.
18 Q    And what did he pull you over for?
19 A    I don't know whether it was -- I don't know. I
20       don't remember. Something I had going on.
21 Q    You also wrote: After observing hostility
22       displayed by Officer Brown, the State police
23       officer insisted he take Mr. Kennedy into custody.
24 A    I had warrant or something outstanding. I was due

Page 224

1        in court of something.
2  Q    You had a warrant out on you?
3  A    There was something, I don't know.
4  Q    And so the State Police took you into custody?
5  A    Yah, it was a no bail warrant maybe I guess.
6  Q    Okay. Where did they take you that night?
7  A    Andover.
8  Q    And did you make an accusation against the State
9        police officer at that point?
10 A    I don't know. I got released shortly after.
11       MR. FISCHER: Just answer the question.
12       THE WITNESS: I don't know.
13 Q    Did you ever make an accusation against the State
14       police officer in this episode that he touched
15       your breast?
16 A    Maybe he got it mixed up with --
17       MR. FISCHER: Just answer the question.
18 A    No, not him.
19 Q    Okay. Did you ever make that accusation against a
20       police officer?
21 A    Yes.
22 Q    How many times have you made that accusation?
23 A    Once.
24 Q    Against who?

56 (Pages 221 to 224)

Page 225

1  A    Billerica.

2  Q    Which Officer?

3  A    The Chief.

4  Q    Chief Rosa?

5  A    Yes.

6  Q    When did you make that accusation?

7  A    The Deanne Misoni incident.

8  Q    Dean --

9  A    Deanne Misoni incident.

10  Q    Deanne Misoni. When was that inside?

11  A    It was in November.

12  Q    Of?

13  A    I don't remember the year.

14  Q    Did you ever make that accusation against a

15      New Hampshire officer?

16  A    I don't believe so, no.

17  Q    Was the Deanne Misoni incident in 2001?

18  A    Let's see --

19      MR. FISCHER: Is that it?

20  A    Yes, it was in November of 2001.

21  Q    Okay. And is that, when you're referring to that,

22      are you referring to paragraph 91?

23  A    Yes.

24  Q    Okay. Are you saying under oath today that you

Page 226

1      never made an accusation against any other officer

2      in this state or any other state about touching

3      your breast?

4  A    I don't ever remember that, no.

5  Q    Whether it be State Police, local police, any

6      other officer.

7  A    Just this. I've talked about this incident to

8      people.

9      MR. SILVERFINE: All right. Why don't we

10     break now. We'll suspend, and we'll hopefully

11     come back with my -- and finish up another day.

12     COURT REPORTER: Mr. Fischer, would you like a

13     copy?

14     MR. FISCHER: And a mini and a disk; and if

15     you could get me a disk of the first day of this

16     deposition. I know it wasn't you.

17     (Whereupon, the deposition was closed

18     at 4:40 p.m.)

19     - - - -

20

21

22

23

24

Page 227

CERTIFICATE OF WITNESS

I, MICHELLE Y. KENNEDY, do hereby certify under the pains and penalty of perjury that I have read the foregoing transcript of my testimony, and further certify that said transcript is a true and accurate record of my testimony given under oath (including any and all corrections that may appear below.)

Page:      Line Number:
Correction/Deletions:
Reason:

Page:      Line Number:
Correction/Deletions:
Reason:

Page:      Line Number:
Correction/Deletions
Reason:

Page:      Line Number:
Correction/Deletions:
Reason:

Page:      Line Number:
Correction/Deletions:
Reason:

Page:      Line Number:
Correction/Deletion
Reason:

Signed under the pains and penalty of perjury this ____ day of ____

Page 228

COMMONWEALTH OF MASSACHUSETTS

I, Anne F. Penn, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing deposition was taken before me on the ____ day of ____, 2006;

That the witness named in the deposition, prior to being examined, was by me first duly sworn;

That said deposition was taken before me at the time and place herein set forth, and was taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That said deposition is a true record of the testimony given by the witness and of all objections made at the time of the examination.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name and affixed my seal this ____ day of ____ 2006.

Anne F. Penn, C.S.R., R.P.R.
Notary Public
Massachusetts
My Commission Expires:
July 10, 2007

57  (Pages 225 to 228)