UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

BRIAN KENNEDY, et al              \*
                                  \*
        Plaintiffs                \*
                                  \*
v.                                \*   C. A. No. 04-CV-12357-PBS
                                  \*
TOWN OF BILLERICA, et al          \*
                                  \*
        Defendants                \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MOTION FOR PROTECTIVE ORDER
REGARDING INAPPROPRIATE CONTACT WITH WITNESSES
BY THE DEFENDANT POLICE OFFICERS
AND FOR SANCTIONS**

Now come the plaintiffs and move that this Court issue a protective order barring the individual defendants from directly contacting or communicating with any witness listed on the plaintiffs' automatic disclosure and imposing appropriate sanctions upon the defendants for the contacts they have made that have spoiled the expected testimony of now several of plaintiffs' witnesses.

Plaintiffs are concerned about what appears to be a pattern and practice by the defendants of contacting and intimidating witnesses. Each of these witnesses was prepared to provide testimony favorable to the plaintiffs until being contacted by individual defendants acting in concert. These defendants have criminal histories, face exposure to arrest, or have other achilles' heels which make them susceptible to pressure by police officers and the defendants appear to have taken advantage of this. In several instances, once the defendants have "spoken" with the witnesses, these witnesses have cut off all contact with the plaintiffs or plaintiffs' counsel, effectively nullifying their potential testimony on behalf of the plaintiffs.

In each of these cases, the defendant officers, not acting with any legitimate law enforcement purpose but acting in uniform and under color of law.  In one instance, they came away from their "conversations" with an incident report that states that Mr. Kennedy, Mrs. Kennedy, or both have "threatened" the witness.  Incident reports like this, which are provided to plaintiffs, effectively cut off plaintiffs' ability to contact these witnesses, as the reports place the Kennedys at risk of arrest if they contact the witness who allegedly made the report and these witnesses no longer return phone calls from plaintiffs' counsel.  For the most part, these witnesses have been lifelong friends of the Kennedys.

That they are also tough street people with criminal histories suggests that these witnesses are no friends of the police, yet each of them have tossed aside their lifelong friendships with the Kennedys and their enmity for law enforcement upon the defendants "reaching out" to them.

## I. BACKGROUND

Plaintiffs describe below several of these "contacts"

### A. RAY TRAINOR

Ray Trainor grew up with Michelle Kennedy, in a tough neighborhood in Billerica that was known for drug dealing, local gang activity and hostility to the police.  He has a long criminal history of violent crime and has been involved in several shootings.  This is documented in the records the defendants have provided the plaintiffs, which describe Mr. Trainor and Brian Kennedy, both as the ringleader's "right hand man" in an alleged drug dealing conspiracy that the defendants were investigating in 1991.  [See Exhibit A, hereto]   Mr. Trainor presently is on probation for an operating under the influence conviction and his drivers license has been suspended.

In 2005, the Kennedys moved out of Billerica, to a home in Lowell. However, they had two high school age sons, one of whom played on the school hockey team. They had arranged to establish a residence at Mr. Trainor's home, on 16 Lowell Street in Billerica that satisfied Billerica School Department residency requirements so that their three sons could continue to attend Billerica schools. Mr. Kennedy, who builds homes for a living, finished the basement, in Mr. Trainor's home in partial payment of rent, and he and the three Kennedy sons slept their sufficient days during the week to meet residency requirements.

All went well until November, 2005, when defendant Deputy Chief Connors learned about the Kennedy's "residence" at the Trainor house through an incident during parents' night at the school. Defendant Connors confronted Mr. Trainor, telling him that if he did not get rid of the Kennedys as his tenants, Connors would beat him to death with a golf club. Mr. Trainor repeated this to Mrs. Kennedy, in explaining why he was asking her husband and sons to move out and vacate. He also inferred, in his explanation to the Kennedys, that he was driving freely around Billerica, even though he did not have a valid drivers license, and that this would be jeopardized if he did not comply with the defendants.

A few days later, also in November, 2005, defendant Conway and several other Billerica police officers approached Mrs. Kennedy outside the Trainor house. Mrs. Kennedy parked in front of the Trainor house and knocked on the door, seeking shelter and a witness to what she expected was another inevitable arrest. Mr. Trainor, her friend since childhood, heard her knock, came to the window and refused to come to the door or let her in.

Several months later when Officer Tsoukalis continued to harass the Kennedys, plaintiffs brought a motion for a restraining order [pleading # 26] against officer Tsoukalis. In the motion plaintiffs referred to the threats made by Deputy Chief Connors against Mr. Trainor. On the morning of the hearing Mr. Trainor appeared in court, escorted by Billerica police officers. He refused to look at or address Mrs. Kennedy. Plaintiffs learned, after the hearing that Mr. Trainor was prepared to refute the allegations against Deputy Chief Connors.

At about the same time, Mr. Trainor was the subject of a report from a local CVS pharmacist who said that Mr. Trainor had shouted and threatened the pharmacist who was unable to renew a prescription for Percocets.

When Mr. Trainor appeared for his deposition, he was driven there by defendant Connors, who explained that he was doing so as a "courtesy" to the plaintiffs, as Mr. Trainor did not have a driver's license. Defendant Connors sat through the deposition, listening to Mr. Trainor describe how he drove to the CVS in describing the incident mentioned above. In his deposition, while in front of Connors, Mr. Trainor acknowledged that he was on percocets and other "painkillers" at the time of his testimony.

Mr. Trainor also acknowledged, in Connors' presence, that he drove around town, doing errands, apparently without concern of being stopped by Billerica police.

### B. JOHN GALLINARO AND THOMAS 'TEDDY' GALLINARO

Thomas "Teddy" Gallinaro was in the bathroom of the bar the night Brian Kennedy was beaten in the presence of defendant MacKenzie and other Billerica police officers. In the bathroom, he overheard the assailant, Paul Parent, speaking about his connection with the police officer defendants. In fact, he gave a statement to the defendant police department.

Sometime in early April, 2006, Mr. and Mrs. Kennedy stopped by Teddy's brother John's house, in an effort to track Teddy down. They spoke with John, left a message that Teddy should contact them, and left. Some two months later, in June, 2006, defendants served a supplement to the Rule 26 Automatic Disclosure containing a "witness statement" from John Gallinaro, that Michelle Kennedy had come to his house (Brian Kennedy had stayed in the car) and threatened that his brother "Teddy" "better do the right thing" regarding his testimony in the Kennedy's case.

Notable is that the "witness statement" is two months later than the date of the alleged "threat" by Mrs. Kennedy, indicating that the Gallinaro brothers were not in immediate fear nor did they contact the Billerica police defendants. Indeed, the police document [Exhibit B hereto] is not a witness statement but a report of an interview with a witness. It is clear from the report that John Gallinaro did not contact the police. Rather, the report says "knowledge of the threat was brought to my attention through a third party who wished to remain anonymous for fear of retaliation from the Kennedy family."

John Gallinaro is on parole after serving a lengthy state prison sentence. During his incarceration the Kennedys were among the only regular visitors he had during his years in prison. The notion that he or his brother would feel "threatened" by the Kennedys is difficult to

believe, but the police report creates a risk of arrest for the Kennedys if they now approach the Gallinaro home or the Gallinaros. As the Gallinaros do not respond to phone calls from Mr. Gilgun or me, this has effectively cut off the plaintiffs and their counsel from these witnesses.

Teddy Gallinaro has told Mrs. Kennedy that he had expected the Billerica Police to arrest his son arising from a fight his son was in. He reported to Mrs. Kennedy that not only have the Billerica police not arrested his son: they have not even brought charges. His words were that they were "letting the charges slide". On the other hand, Teddy has stated that in 1991, during their investigation of the Concord Shores incident, the Billerica Police had made his life "a living hell".

Plaintiffs noticed the depositions of both John and "Teddy", neither of whom appeared, despite the subpoenae.[1] Plaintiffs suggest that, as with Mr. Trainor, who drives without a license, the Gallinaros have a concern over alleged parole violations that the defendant police officers can hang over them.

### C. AMY BAUM

What happened with John Gallinaro repeats with Amy Baum, in the form of the police defendants "reaching out" to plaintiffs' witnesses. Although Ms. Baum states that she came to the defendants unsolicited, even if this were true, the defendants should have sent her to their lawyers rather than make a lengthy recording under circumstances that likely comprised her objectivity, with defendant Connors and Nestor sitting over her, prompting her when she faltered and suggesting what she should say.

---

[1] The Court, on September 29, 2006, allowed the plaintiffs' motion to compel deposition attendance of the Gallinaros

Amy Baum is also a friend of the Kennedys for many years. As a teen Amy babysat for the Kennedy children, lived in the Kennedy home and looked up to the older Michelle Kennedy as a role model.

At about the same time that defendants served the Gallinaro "witness statement" as a supplement to Rule 26 Automatic Disclosure, defendants again "supplemented" their Automatic Disclosure with a DVD containing an hour and a half video interview or statement with Amy Baum at the Billerica Police station in the presence of defendants Thomas Connors and Richard Nestor. The interview starts with a disclaimer from Connors that the defendants did not solicit this interview but that Amy Baum had come in on her own and that she was offering to give this statement on her own initiative and had not been contacted by the defendant police officers. This claim that she came in on her own and without being contacted by the defendants is repeated several times.

Ms. Baum then proceeds with a lengthy character assassination of Michelle Kennedy. It is as if she had been given a script of the defendants' case about what a horrible person Michelle Kennedy is. From time to time, when the monologue falters, defendant Connors would prompt Ms. Baum with leading questions.

Ms. Baum also now refuses to respond to Mrs. Kennedy's phone messages or other efforts by the plaintiffs to contact her.

**D. TRACY HEFFERNAN**

The defendant police also have made several attempts to reach Tracy Heffernan, a tough woman with a criminal history and outstanding warrants. After several unsuccessful attempts to reach her, the defendant chief, Daniel Rosa, with another, non-defendant, Billerica police officer,

Detective Frost, showed up at the Heffernan home, ostensibly looking for Tracy's brother. In the course of the conversation, in which Ms. Heffernan expected to be arrested on the warrants, they told her "you've got a few warrants, and these are things we can help you on", directly suggesting that if she helps them with the Kennedys, the would take care of her warrants.

Ms. Heffernan is a critical witness to the Kennedys' case as she will testify that she was approached by Officer MacKenzie in 1991 and offered money to put Michelle Kennedy in the hospital. Ms Heffernan reported this to the then Chief Barretto (also a defendant) and signed a typed-written statement for the police. In their Automatic Disclosure, defendants not only provided a copy of the typewritten statement, signed by Ms. Heffernan, but also provided a second statement, recanting this original statement and also bearing what purports to be Ms. Heffernan's signature. Copies of these two statements are attached hereto as Exhibits C and D. When Attorney Gilgun asked Ms. Heffernan about this recantation and presented her with it, she denied ever making such a statement and specifically denied the signature as hers.

Plaintiffs suspect that the defendants' interest in speaking with Ms. Heffernan was sparked by recent discovery requests to the defendants seeking the originals of the Heffernan statements and other documents containing Ms. Heffernan's signature in order to provide them to a handwriting expert to corroborate her allegations of forgery of her signature.

## II. ARGUMENT

18 U.S.C. § 1512 (b) states that "whoever knowingly uses intimidation . . . or corruptly persuades another person, or attempts to do so, or engages in misleading conduct towards another person with intent to cause or induce any person . . . to withhold testimony" has obstructed justice. _United States v Byrne_, 435 F3d 16 (Dis. Mass., 2006)

Likewise, 42 U.S.C. § 1985 (2) provides, in relevant part, that "If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully . . . ", such conduct shall be actionable as a violation of the right to access to seek judicial redress, the right to access to the Courts. *Gerakaris v. Champagne*, 913 F.Supp. 646 (Dis. Mass.,1996) See, also, *Kinney et al v Weaver et al*, 367 F3d (5th Cir., 2004) .

Here the evidence is clear that the defendants have contacted not one but a number of witnesses.  The result in three of four instances has been that the witnesses once favorable to the plaintiffs have changed their expected testimony, have cut off communications with lifelong friends at the behest of the defendant police officers, or both.  This is clearly witness intimidation, as defined under both the criminal statute for obstruction of justice or by the civil rights statute, 42 U.S.C. §1985.

Moreover, the defendants have no plausible justification that they were carrying out any legitimate police or law enforcement function.  With respect to Mr. Trainor and Ms. Baum, the defendant police officers had no legitimate law enforcement reason for contacting the witness in question.  With respect to the Gallinaro brothers, the legitimate "police function" or "law enforcement" justification of protecting two hardened and violent criminals from "threats" by a woman who has been their friend for years is hardly plausible, especially when combined with the threat, spoken or unspoken, of a parole violation and the failure to arrest or prosecute the Gallinaro son.

With respect to Ms. Heffernan, it is the failure to carry out the legitimate police function of arresting Ms. Heffernam that makes the true motive of witness tampering so clear. As long as the warrants are outstanding, the offer that "we can help you with the warrants" is an open offer by the defendants to abuse their police powers to influence a witness' testimony. This is not only an abuse of their police powers: it is illegal obstruction of justice and a violation of the Kennedys' -- and the witnesses'[2] -- civil rights.

In this manner, the defendant police officers have left the threat open and hanging over Ms. Heffernan's head by failing to do their job and arrest. The same is true with the Gallinaros, where the threat of a parole violation or arresting the Gallinaro son remains open. The same is true for Mr. Trainor, whose ability to drive without a license remains subject to his cooperation, and for Ms. Baum, who also has the threat of a probation surrender and the offer of "cooperation" hanging over her head and clouding her expected testimony.

The question is not whether this is witness tampering. The question is what the Court can do to remedy the tampering. What is the appropriate sanction for this behavior, which is not just a violation of a citizen's civil rights but is also an outrageous interference with our justice system, and as such an affront to the Courts and the rule of law these defendants are entrusted to uphold.

At the very least, the defendants should be ordered to stay away from and to have no contact with any potential witness to this case. To the extent that the defense needs to communicate with witnesses to prepare for trial, this can be done by counsel directly.

---

[2] See Judge Stearns opinion in *Gerakaris v. Champagne*, supra, that both the witness and the party have standing under 42 U.S.C. §1985 for the civil rights violation arising from the witness intimidation.

However, this only addresses further poisoning of the well: a no contact order does not address the harm that has been done already to the ability to have a fair trial.  To address this, the plaintiffs ask, first, that the Court enter an order that, since expected testimony of each of the four witnesses identified herein has been tainted, that the plaintiffs shall be entitled to a presumption that the testimony of each of these four witnesses would have been what the plaintiffs expected the respective witnesses' testimony would have been.

Alternatively, or in addition, the Court should instruct the Jury specifically that the defendant police officers contacted these witnesses for the express purpose of influencing the testimony of these witnesses and that the Jury should consider this in weighing the credibility of these witnesses.

Finally, the Court should order that any further contact by the defendants with any identified witness will result in an entry of judgment for the plaintiffs against the defendant police officer who has contacted the witness.

|  |  |
|---|---|
|  | Respectfully submitted,<br>Brian Kennedy, et al<br>by their counsel |
| Date: October 3, 2006 | /s/Andrew M. Fischer<br>Andrew M. Fischer<br>BB0# 167040<br>JASON & FISCHER<br>47 Winter Street<br>Boston, MA 02108<br>(617) 423-7904<br>afischer@jasonandfischer.com |

kennedy\moproorderwitnessintim