Volume 1
Pages 1-124
Exhibits per index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 04-CV-12357-PBS

------------------------------:
                              :
Brian Kennedy, et al,         :
                Plaintiffs,   :
                              :
V.                            :
                              :
Town of Billerica, et al,     :
                Defendants.   :
                              :
------------------------------:


       DEPOSITION OF RAYMOND F. TRAINOR,
JR., a witness called on behalf of the Plaintiff,
taken pursuant to the Federal Rules of Civil
Procedure, before Patricia M. Haynes, a Certified
Shorthand Reporter and Notary Public in and for
the Commonwealth of Massachusetts, CSR No.:
14620F, at the Offices of Jason & Fischer, 47
Winter Street, Boston, Massachusetts, on
Wednesday, June 27, 2006, commencing at 10:30 a.m.


Copley Court Reporting
101 Tremont Street
Boston, Massachusetts  02108
(617) 423-5841

```
 1      APPEARANCES:

 2

 3

 4      Jason & Fischer
        (By: Andrew M. Fischer, Esquire)
 5      47 Winter Street
        Boston, Massachusetts 02108
 6      Counsel for the Plaintiff

 7      Brody, Hardoon, Perkins & Kesten, LLP
        (By: Jeremy I. Silverfine, Esquire)
 8      One Exeter Plaza
        Boston, Massachusetts 02116
 9      Counsel for the Defendant

10

11      ALSO PRESENT:

12      Thomas Conners

13

14

15

16

17

18

19

20

21

22

23

24
```

1                      I N D E X

2       Witness         Direct   Cross  Redirect   Recross
        RAYMOND F. TRAINOR, JR.
3
        (By Mr. Fischer)    4              110
4       (By Mr. Silverfine)        90

5                     E X H I B I T S

6
        Exhibit No.                      Page
7
                     (None Marked)
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

P R O C E E D I N G S

RAYMOND F. TRAINOR, JR.

having been previously sworn, was examined and

testified as follows:

DIRECT EXAMINATION BY MR. FISCHER:

Q.    Can you tell us your name and address?

A.    Raymond F. Trainor, Junior, 16 Lowell

Street, North Billerica, Mass., 01862.

Q.    My name is Andrew Fischer.  I represent

Brian and Michelle Kennedy and their children in

claims that they have against the various

Billerica police officers and the Billerica police

department.  You're aware of that lawsuit?

A.    Yes.

Q.    And as their attorney, I'm entitled to

ask you questions under oath and you're obliged to

answer the questions.

A.    I understand that.

Q.    You're entitled to be represented by an

attorney.  You don't have an attorney here,

correct?

A.    I do not have one, no.

Q.    If at any time you want to stop and say

you want to get an attorney, we'll come back and

5

1     do that.

2          A.    That's fine.

3          Q.    In the meantime, you're obliged to answer

4     any questions that I ask.

5          A.    Okay.

6          Q.    From time to time, Mr. Silverfine may say

7     objection and that's so we can argue about the

8     question later on.  You're still obliged to answer

9     the question.

10         A.    Okay.

11         Q.    Other than that, if you need a break, to

12    go to the bathroom or for any other reason, I'm

13    happy to accommodate you.  Let me know.

14         A.    Whatever it takes.

15         Q.    You need to answer questions yes or no.

16    You can't nod or shake your head because the

17    stenographer can't record that.

18         A.    Understandable.

19         Q.    You can't say um-hum or ah-ha, because

20    there's no way of understanding that either.

21         A.    Okay.

22         Q.    So you've got to answer each question

23    verbally.

24         A.    Very good.

```
 1        Q.   The last thing is if at any time I ask
 2   you a question that you don't understand --
 3   lawyers have a way of being confusing at times,
 4   and I'm no exception, so tell me you don't
 5   understand the question and I'll word it
 6   differently.
 7            Otherwise, we are going to assume that
 8   you understand the question.
 9        A.   Very good.
10        Q.   I understand you didn't bring any
11   identification with you?
12        A.   That's true.
13        Q.   Do you have a driver's license?
14        A.   No, I do not.  That's why I was brought
15   in by the Billerica police.  I lost my license.
16        Q.   When you say you lost your license, you
17   mean you misplaced it?
18        A.   No, it was taken away for a drunk driving
19   offense on July 3, 2005.
20        Q.   How long will your license be suspended
21   for?
22        A.   Two years.
23        Q.   How do you get around?
24        A.   I don't leave my house.  I'm bedridden.
```

1    I had major back surgery.

2        Q.    When did you have the back surgery?

3        A.    December.  I had neck surgery in August

4    and had the back surgery after that.

5        Q.    What was the reason for the back surgery?

6        A.    I broke my back.

7        Q.    How did you do that?

8        A.    Fell down my stairs.

9        Q.    When did that occur?

10       A.    The back?  July 17.

11       Q.    Of?

12       A.    '05.

13       Q.    This was in your home?

14       A.    On my porch.

15       Q.    Who was living with you?

16       A.    Me and my brother.

17       Q.    Who is your brother?

18       A.    Dennis Trainor.

19       Q.    How do I spell Trainor?

20       A.    T-R-A-I-N-O-R.

21       Q.    What is your date of birth?

22       A.    4/10/58.

23       Q.    And where were you born?

24       A.    Lowell, Massachusetts.

8

```
 1      Q.    What's your Social Security number?

 2      A.    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.

 3            MR. SILVERFINE:  Just for the record,

 4   can we put the stipulations on the record?

 5            MR. FISCHER:  That's fine.  We'll

 6   reserve objections, except as to form, until the

 7   time of trial and motions to strike until the time

 8   of trial.

 9            MR. SILVERFINE:  That's fine.

10   BY MR. FISCHER:

11      Q.    You have a right to read the deposition

12   transcript after it's been prepared and make any

13   corrections in errors.  It's not uncommon to say I

14   don't care about reading the deposition, but

15   you're entitled to if you want to.  If you want

16   to, we'll make arrangements for that.

17      A.    Okay.

18      Q.    Normally you have 30 days to make any

19   corrections and get them back.  We are going to

20   agree to 45 days to give you some time for the

21   mailing.  Is that fine?

22      A.    Very good.

23      Q.    Have you ever had your deposition taken

24   before?
```

```
 1        A.    Yes.   On this case, no.

 2        Q.    In any case?

 3        A.    Yes.

 4        Q.    In what case?

 5        A.    I've had a deposition in I guess an

 6   automobile accident or something like that.   It

 7   was years ago.

 8        Q.    Do you remember where?

 9        A.    Danvers.

10        Q.    Do you remember who the lawyer was?

11        A.    No.

12        Q.    When you say years ago, more than ten

13   years ago?

14        A.    No.   I was involved in an accident

15   September 7 of '04.

16        Q.    And a lawsuit was filed?

17        A.    Yes.

18        Q.    In what court was the lawsuit filed?

19        A.    I don't know what court it was filed in.

20   My attorney is handling it.

21        Q.    Who is your attorney?

22        A.    Richard Ahern.

23        Q.    Where is he?

24        A.    Lowell, Massachusetts.
```

1    Q.    What happened in that accident?

2    A.    Rear-ended.  Had a boat on the back of a

3    pickup truck, boat.  Stopped at the end of an off

4    ramp from the highway.  The person coming behind

5    us lost his brakes hitting the boat and knocking

6    it through the tailgate into the truck hitting me

7    in the back of the head.

8          That's why they are going to do the neck

9    surgery.

10   Q.    That's the reason for the neck surgery?

11   A.    Yes.  And that's when I got the shooting

12   pain down my arm on my deck, got dizzy, fell down

13   and broke my back.

14   Q.    So the back is a consequence of this car

15   accident also?

16   A.    They are saying -- I don't know.  I told

17   my attorney that, but I don't know how it's

18   working.

19   Q.    Where is Mr. Ahern's office?

20   A.    Right on the corner of Herd Street where

21   the Lowell courthouse is, the Lowell District

22   Court.  The main street, I can't think of the name

23   of the main street.

24   Q.    You say your deposition was taken a long

```
 1    time ago but --

 2         A.    I'll say within the accident time.

 3         Q.    Is that the only time you've had your

 4    deposition taken?

 5         A.    To my knowledge, yes.

 6         Q.    Have you ever been involved in any other

 7    lawsuits?

 8         A.    Yes.

 9         Q.    What other lawsuits have you been

10    involved in?

11         A.    Throughout the years?  I was shot in

12    Salsbury Beach in 1976.  There was a lawsuit.

13         Q.    Who represented you in that lawsuit?

14         A.    I have no clue.  It was 1976, I don't

15    know.  It ended up being dismissed.  I dropped

16    charges on the gentleman who shot me.

17         Q.    Do you know who the gentleman who shot

18    you was?

19         A.    No.  I don't remember his name.

20         Q.    Do you remember how that happened?

21         A.    Yeah.  He was drunk and pointed a gun at

22    me and said, "Get off my property," where I was on

23    the sidewalk, "or I'll shoot you."  I said, "Go

24    ahead and shoot me," and he dropped me right
```

```
 1    there.  So I never dare anyone with a gun to shoot
 2    me again.
 3         Q.   Who was with you at the time?
 4         A.   Several different people.
 5         Q.   Do you remember who they were?
 6         A.   One was Michelle's brother.
 7         Q.   Who was that?
 8         A.   Donald St. John.  There was a Raymond
 9    Gauthier, Brian Mansfield.
10         Q.   Were you friends with Michelle's brother?
11         A.   Yes.
12         Q.   Are you still friends with him?
13         A.   As far as I'm concerned, yes.
14         Q.   Close friends?
15         A.   Very close.  Grew up together in diapers.
16         Q.   Are you friends with any other of
17    Michelle's family?
18         A.   I felt until all this stuff happened that
19    I've been life-long friends of the family.
20         Q.   When did you first meet the family?
21         A.   I was four or five years old.
22         Q.   Where was that?
23         A.   Billerica, Massachusetts.
24         Q.   Was there a particular neighborhood?
```

1       A.   North Billerica where we all grew up.

2       Q.   In an area called Wilson Street?

3       A.   That's two streets up from me, yeah.

4       Q.   And does Wilson Street have any kind of

5 reputation?

6       A.   As far as what?  It's a street in

7 Billerica.

8       Q.   Is it known as the Wilson Street

9 neighborhood or a particular neighborhood?

10      A.   It was the name of a road in Billerica,

11 Wilson Street.

12      Q.   But it's in the neighborhood where you

13 grew up?

14      A.   Yes.

15      Q.   And you grew up with Michelle St. John

16 and her family?

17      A.   Yes, and several others individuals that

18 lived in the area.

19      Q.   Who would they be?

20      A.   Every person who was in every house in

21 the area.  Do you want me to name them all?

22      Q.   Yes.

23      A.   Give me a phone book.

24      Q.   Tell me who you remember as your close

```
 1    friends.
 2         A.   Donald St. John; his brother, Frank St.
 3    John; his father, Frank St. John, senior; Joyce
 4    St. John, the mother.
 5         Q.   Frank senior would be Michelle's father?
 6         A.   Yes.  Peg St. John would be the
 7    grandmother.  Did you get all of them?
 8         Q.   Keep going.
 9         A.   Joyce St. John, the mother.  Do you want
10    me to go down the street?  Thomas Perez, Sally
11    Perez, Clifford Perez, Nathaniel Perez.  Mr. and
12    Mrs. Perez, I call them Mr. and Mrs. Perez.
13    Everybody in the same block area.
14         Q.   Were close friends?
15         A.   Were close friends.
16         Q.   And you continue to be close friends with
17    Donald and Frank?
18         A.   Frank junior is deceased.  Frank senior,
19    yes, we are very close friends when I see him.
20         Q.   And how long have you know Brian Kennedy?
21         A.   Not as long as Michelle, but about 20
22    years.
23         Q.   How did you meet Brian?
24         A.   Just we grew up in a different area of
```

1  Billerica.  Bumping into him and knowing his name.

2  And once he started dating and married Michelle,

3  we became acquaintances.

4      Q.   Were you ever more than acquaintances?

5      A.   As far as what?

6      Q.   With Brian Kennedy?

7      A.   As far as what?

8      Q.   You're using the wording acquaintance

9  rather than the word friend.

10      A.   Exactly.  We'll keep it at that.

11      Q.   I'm asking you --

12      A.   We'll keep it as acquaintance.

13      Q.   What is the distinction between

14  acquaintance and friend?

15      A.   I didn't think he was that close to me to

16  say he was a friend.

17      Q.   But Michelle Kennedy was a close friend

18  of yours?

19      A.   Grew up with her for many years, lived at

20  their house with them for years.

21      Q.   Which house was that?

22      A.   Bedford, Massachusetts.  Davis Road,

23  Bedford, Massachusetts.  Lived there for about

24  four, five years with them.

1      Q.   Whose house was that?

2      A.   Her mother's.  She was married to Bill

3  Tibbets.

4      Q.   Who lived there when you were living

5  there?

6      A.   Joyce, Michelle's mother, stepfather,

7  Bill Tibbets, Frank junior, Donald St. John,

8  myself and Bill Tibbets senior, who was the

9  grandfather, and Michelle.

10     Q.   How did you end up living there?

11     A.   Friends throughout life.  Stay there,

12  this and that.  When they were in Billerica, stay

13  at my house.  We were that close.

14     Q.   When did you live there?

15     A.   I don't know the years.  '70s.

16     Q.   Would you say you're still friends with

17  Michelle Kennedy?

18     A.   Up to this point until she started lying

19  and using my name on paperwork, now I'd say no.

20  Eye to eye, no, no.  To involve me in something

21  like this with a ludicrous statement like this,

22  no.

23     Q.   What is the ludicrous statement you're

24  referring to?

1      A.    Why am I here?  You should know that.
2  You're deposing me.
3      Q.    You say she lied about you?
4      A.    That's right.
5      Q.    What lie did she make about you?
6      A.    Said Mr. Conners threatened to murder me
7  with a golf club.
8      Q.    And you're saying that's not true?
9      A.    That is definitely not true.
10     Q.    And by Mr. Conners, you mean the
11  gentleman that's here in the room?
12     A.    Second to my right, yes.
13     Q.    Do you play golf?
14     A.    Yes.
15     Q.    When was the last time you played golf?
16     A.    Thursday.
17     Q.    And who was with you when you played
18  golf?
19     A.    The whole of Moores Lumber, the whole
20  crew.
21     Q.    What is the crew of Moores Lumber?
22     A.    It's a company called Moores Lumber.
23  They had an outing.
24     Q.    Where is that located?

1    A.    I don't know.  The golf course was at

2  Passaconoway, Litchfield, New Hampshire.

3    Q.    How did you get there?

4    A.    Paul Caterino.

5    Q.    How do you spell that?

6    A.    C-A-T-E-R-I-N-O.

7    Q.    Did he golf with you?

8    A.    Yes, he did.

9    Q.    Do you golf in the Billerica/Lowell area?

10    A.    Yes, I do.

11    Q.    Have you ever golfed with Mr. Conners?

12    A.    Years ago.

13    Q.    Have you run into him on the golf course

14  in the last year?

15    A.    No.

16    Q.    Have you had any conversations with him

17  about your golf game?

18    A.    Since when?

19    Q.    In the last --

20    A.    Besides today?

21    Q.    What conversations did you have with him

22  today?

23    A.    How's your golf game?  The two of us are

24  avid golfers, which is a subject that would come

1    up every time we would bump into each other.

2         Q.    When was the last time you bumped into

3    each other?

4         A.    The last time you guys had me in court.

5    That was the first time I've seen him in a couple

6    of years.

7         Q.    Did Mr. Conners drive you to court?

8         A.    Not that day.  Mr. Frost, Detective Frost

9    drove me in that day.

10        Q.    Was Detective Frost in the courtroom?

11        A.    That day?

12        Q.    A week or two weeks ago?

13        A.    Yes, he was.

14        Q.    Why did you come to court?

15        A.    To state that this allegation is

16   completely false.

17        Q.    How did you know about the allegation?

18        A.    Two detectives came to my house to ask me

19   about it.

20        Q.    Who were the two detectives?

21        A.    Richard Nester and Roy Frost.

22        Q.    When did they come to your house?

23        A.    I think it was on like a Friday before --

24   I think it was a Monday court date, whatever that

1    court date was, to ask me about these allegations

2    and which I clearly stated were not true in any

3    fashion.

4            And he asked me if I would come in and

5    testify, and I said, yes, I would.

6        Q.    What other conversation was there?

7        A.    That was the end of it.  He tape-recorded

8    it and they left and said they would pick me up on

9    Monday morning, because they know I don't drive.

10       Q.    How did they know you don't drive?

11       A.    I told them.

12       Q.    So there was other conversation?

13       A.    What do you mean?

14       Q.    I asked you what other conversation there

15   was?

16       A.    I told them -- he said "Would you come to

17   court and testify?"  I said, "You would have to

18   pick me up.  I don't drive."  That was the end of

19   the conversation.  "Thank you."

20       Q.    Was there any other conversation?

21       A.    "Thank you.  Good-bye.  See you Monday."

22       Q.    Have you ever been arrested?

23       A.    Yes.

24       Q.    More than once?

```
 1        A.    Oh, yes.

 2        Q.    How many times?

 3        A.    You'd have to look it up.

 4        Q.    More than five times?

 5        A.    Sure.

 6        Q.    More than ten times?

 7        A.    Sure.

 8        Q.    More than 20 times?

 9        A.    Sure.

10        Q.    More than 30 times?

11        A.    Now you're pushing it.

12        Q.    More than a couple of dozen times?

13        A.    Most definitely.

14        Q.    For what have you been arrested?

15        A.    Drinking and driving, possession of

16   drugs, assault and battery.  That's about it.

17        Q.    What police departments have arrested

18   you?

19        A.    Billerica, Lowell, Chelmsford, Tewksbury,

20   Hampton, Salsbury, Boston.

21        Q.    How many times have you been arrested by

22   Billerica police officers?

23        A.    I couldn't answer that truthfully.

24        Q.    A dozen?
```

```
1        A.   I couldn't answer that truthfully.

2        Q.   Best estimate?

3        A.   More than once.

4        Q.   More than twice?

5        A.   More than once.

6        Q.   More than twice?

7        A.   More than once?

8        Q.   You don't recall --

9        A.   More than once I recall.

10       Q.   You don't know how many times more than

11   once?

12       A.   More than once.

13       Q.   Have Billerica police officers prosecuted

14   you in court?

15            MR. SILVERFINE:   Objection as to

16   form.

17   BY MR. FISCHER:

18       A.   Yes.

19       Q.   Have any Billerica police officers ever

20   testified against you?

21       A.   No.  I think I plead out most of them.

22       Q.   Have any Billerica police officers come

23   to court in order to testify in cases in which

24   you've been charged?
```

1  A. Probably, yes.

2  Q. Which police officers do you recall have

3 done so?

4  A. I don't know.

5  Q. More than one?

6  A. I don't know.  I can't answer it

7 truthfully.

8  Q. It's fair to say that you're not likely

9 to get along with a police officer who arrests you

10 and prosecutes you?

11  A. Why would you say that?  They do their

12 job if I'm wrong.  They are doing their job.  Why

13 would you hold a grudge?

14  Q. So you don't hold --

15  A. I hold no grudges against anybody.  If I

16 do something wrong, I'll stand right there and

17 tell you I did something wrong.  I think that's

18 the way everybody should be, but they're not.

19  Q. You said you plead out, and so you've

20 made deals with prosecuting officers?

21  A. Guilty.  Why go to trial and waste money?

22 Guilty.  Let's get it over instead of drawing

23 something out, out and keep going.  You got me.

24 Let's get to the next part of my life.

```
 1      Q.   Have you ever agreed to plead out in

 2  order to have a lesser sentence?

 3      A.   I don't understand that question.

 4      Q.   Did you ever agree to plead guilty in

 5  return for the prosecution agreeing you wouldn't

 6  go to jail?

 7      A.   Probably, yeah.

 8      Q.   Did you ever agree to plead guilty in

 9  return for not losing your license?

10      A.   Never.

11      Q.   Did you --

12      A.   Or I would have one right now.

13      Q.   One doesn't necessarily follow from the

14  other.

15           MR. SILVERFINE:  Objection to form.

16  BY MR. FISCHER:

17      Q.   How many times have you been arrested for

18  operating under the influence?

19      A.   Twice.

20      Q.   On the second offense, there's no choice

21  but to lose your license?

22      A.   That's news to me.  I don't know the

23  laws.

24      Q.   When was the first time you were arrested
```

```
 1    for a traffic offense?
 2         A.   Any traffic offenses?
 3         Q.   Yes.
 4         A.   The '70s.
 5         Q.   When was the first time you were arrested
 6    for drunk driving?
 7         A.   '70s.  I think I have one speeding ticket
 8    in my whole life.
 9         Q.   And that was in the '70s?
10         A.   I'm pretty sure, yeah.  One infraction
11    for a motor vehicle infraction besides the drunk
12    driving -- to my knowledge.
13         Q.   And the first drunk driving was in the
14    '70s?
15         A.   Yes.
16         Q.   And at that time, do you remember whether
17    you --
18         A.   I didn't even have a license at the time.
19         Q.   So you were driving without a license?
20         A.   Exactly.
21         Q.   Was there any other times where you've
22    driven without a license?
23         A.   As far as?
24         Q.   You told me you were driving without a
```

1      license at the time.

2          A.    In the '70s, right.

3          Q.    Other than that time, have you ever

4      operated a motor vehicle without a license?

5          A.    In the '70s?  Sure.

6          Q.    Since the '70s?

7          A.    Sure.

8          Q.    When was the last time you operated a

9      motor vehicle without a license?

10         A.    When was the last time?

11         Q.    Yes.

12         A.    I moved the car Thursday from one end of

13     my driveway to the other.  It was actually on the

14     street, so that would be considered moving a

15     vehicle I guess.

16         Q.    What about the last time you drove a

17     vehicle on the street from one place to another on

18     a public way?

19         A.    A couple of weeks ago.

20         Q.    Where did you drive?

21         A.    To the store to pick up my prescriptions.

22         Q.    When you say the store, you mean the

23     pharmacy?

24         A.    Yes.

```
 1        Q.    And you drove?

 2        A.    Yes, I did.

 3        Q.    How far did you drive?

 4        A.    A mile.

 5        Q.    And this was a couple of weeks ago?

 6        A.    Sure.

 7        Q.    And when was the last time before that?

 8        A.    I don't recall.

 9        Q.    So you continue to drive without a

10   license?

11        A.    When I have to, yes.

12        Q.    Do you have any fear that you're going to

13   get stopped and arrested?

14        A.    Of course.

15        Q.    Okay.

16        A.    Of course.  I know I'm doing wrong when I

17   do it.  I'm not afraid to admit that.

18        Q.    Have you ever had any discussion with any

19   Billerica police officer regarding the fact that

20   you continue to drive even though you don't have a

21   license?

22        A.    Not at all.

23        Q.    Do you know if any Billerica police

24   officer knows that you're operating without a
```

1   license?

2       A.    I've never called them up and told them,

3   but I imagine they are aware of it.

4       Q.    Why do you imagine they are aware of it?

5       A.    Aren't they notified once you're found

6   guilty from the courthouse that this person has

7   now lost their license?

8       Q.    You're saying the Billerica police

9   department is aware you don't have a license to

10  operate a motor vehicle?

11      A.    I would have to say so.

12      Q.    Do you have any reason to think that the

13  Billerica police department or any officers in the

14  Billerica police department know that you're

15  operating a vehicle without a license?

16      A.    No.

17      Q.    And you've never discussed this with any

18  Billerica police officer?

19      A.    No.

20      Q.    What did you talk about with Officer

21  Conners on your way here today?

22      A.    Golf.

23      Q.    Did you talk about anything else?

24      A.    Golf.

1      Q.    Did you talk about anything else?

2      A.    Golf.  That was it, straight golf.

3      Q.    You didn't talk about why you were coming

4   here today?

5      A.    None whatsoever.

6      Q.    You didn't talk about Michelle Kennedy?

7      A.    None whatsoever.

8      Q.    You didn't talk about this case?

9      A.    Not whatsoever.

10     Q.    What was your golf conversation about?

11     A.    Golf.  Different clubs, different swings,

12  different technology.  Are you a golfer?  You

13  wouldn't understand.

14     Q.    You can educate me.

15     A.    It would take quite awhile to educate you

16  on that, same as you if were trying to teach me to

17  be an attorney.  I don't think we have that much

18  time.

19     Q.    How long did it take you to drive here?

20     A.    Whatever it takes to get here from

21  Billerica, Massachusetts, to here and walk across

22  the Common.  You do the math.  I don't know.  I

23  don't pay attention to the time.  I don't have a

24  watch.  I can't afford one.

```
 1        Q.    What time did Officer Conners pick you

 2   up?

 3        A.    I don't know.  I don't wear a watch.

 4        Q.    Do you know what time this deposition was

 5   supposed to begin?

 6        A.    I got three different calls that it was

 7   changed to this to that.  I don't even know what

 8   time it is now, sir, with the medication and

 9   everything they have me on.

10        Q.    What medication are you on?

11        A.    I'm on several different things.

12        Q.    What medications are you on today?

13        A.    Vicodin, Percocet, Celexa, Paxil.  I

14   didn't take the Paxil.  I didn't pick it up yet.

15        Q.    But you took Vicodin and Percocet today?

16        A.    This morning, yes.  I just had major back

17   surgery, and I do have a prescription for all of

18   it in case you need to.

19        Q.    Are you uncomfortable sitting here?

20        A.    I'll let you know when I do.

21        Q.    That's fair.  Please do.  Who initially

22   called you to come to this deposition?

23        A.    I received a letter from your office to

24   come to this.
```

31

1      Q.    And after that, did you receive any other

2  notice or communication?

3      A.    From you?  No.

4      Q.    From anyone else?

5      A.    When I received the letter, I called

6  Detective Frost, who was the person that came and

7  took the initial conversation from me on the

8  recorder, to see what I should do.  And he said he

9  would make arrangements.

10     Q.    And did you have any other conversation

11 with Detective Frost?

12     A.    No.  "We'll make arrangements for you to

13 be brought in."

14     Q.    Did you have any other conversations

15 about the arrangements?

16     A.    When Mr. Conners called me, yes.

17     Q.    When did Mr. Conners call you?

18     A.    To pick me up to bring me in.  He

19 actually called me on Thursday.

20     Q.    Last week?

21     A.    I'm pretty sure it was Thursday.  Was it

22 Thursday, Mr. Conners?  It doesn't matter.  I

23 think it was Thursday.

24     Q.    He's not the witness, you are.

```
 1        A.    I'm just trying to get the date straight.

 2        Q.    Six days ago?

 3        A.    Whatever it was.

 4        Q.    Do you know what day today is?

 5        A.    Wednesday.

 6        Q.    So you're saying he called you six days

 7   ago?

 8        A.    I don't remember.  It could have been

 9   Monday.  Whatever day I played golf.  When did I

10   say I played golf?  I forget.  Monday?  I forget

11   what day the golf tournament was.

12        Q.    So it's fair to say you don't remember?

13        A.    Would you like me to play it for you off

14   my telephone.

15        Q.    Do you have it on tape from your

16   telephone?

17        A.    Yes, I do.  I save everything.

18        Q.    Do you have it on the cell phone?

19        A.    Yes.

20        Q.    What's your cell phone number?

21        A.    978-303-5046.

22        Q.    And could you play the message now?

23        A.    Yes, I can.

24        Q.    Can you do that and we'll ask the
```

1    stenographer to record it?

2         A.    "Tuesday, 11:34 a.m. Hey, Tom Conners.

3    How are you doing?  Just a question for you.  I'm

4    going to plan on leaving tomorrow morning early.

5    I got a call from the attorney.  Don't worry about

6    it but head to Boston for the second deposition

7    which begins at 1 o'clock.  Give me a call back

8    and let me know if that poses a problem with you.

9    That means I'll probably have to buy you lunch.

10   That's all right, I don't mind.  I'm only kidding.

11   Give me a call.  I'll give you my cell,

12   978-490-5031.  Just give me a call and let me know

13   when you have a chance.  I hope you're not playing

14   golf again.  Bye."  Does that answer your

15   question?

16        Q.    How often do you play golf?

17        A.    As much as my back will let me.

18        Q.    Where do you play?

19        A.    Everywhere.

20        Q.    You're not working now?

21        A.    No.

22        Q.    When did you last work?

23        A.    The date of the accident, September 7 of

24   '04.  The day before that, whatever it was.

```
 1          Q.    What do you live on?

 2          A.    My brothers have taken care of me right

 3     now.

 4          Q.    What does it cost you to play golf?

 5          A.    40 bucks a day.

 6          Q.    Who are your brothers?

 7          A.    Dennis, Kevin, Brian, sister Karen and

 8     friends.

 9          Q.    Who lives with you?

10          A.    My brother Dennis.  And right now there's

11     four children that are up for the summer from

12     Arizona.

13          Q.    Anybody else live in your house?

14          A.    No.

15          Q.    Do you own the house?

16          A.    Five of us own it.  My father died

17     without a will.  The house was paid for and left

18     to us.

19          Q.    Where do the other three live?

20          A.    Karen lives in New Hampshire and my

21     brother Brian lives in Nashua and my brother Kevin

22     lived in Hudson, New Hampshire.  They all own

23     their own homes.

24          Q.    What does your brother Dennis do?
```