```
 1          Q.   Do you know if Brian Kennedy was ever

 2    attacked or in a fight in a restaurant?

 3          A.   No.

 4          Q.   Do you know if Brian Kennedy's car or

 5    pickup truck was ever fire bombed?

 6          A.   No.

 7          Q.   Do you know if Michelle Kennedy ever

 8    slept with any Billerica police officer?

 9          A.   No.

10          Q.   That's no, you don't know, or no, she

11    never slept with any Billerica police officer?

12          A.   I answered no to the question you asked

13    me.

14          Q.   I'm asking you to clarify.

15          A.   You asked me to answer the question, and

16    I said no.

17          Q.   Did Michelle Kennedy ever sleep with any

18    Billerica police officer?

19          A.   How would I know that?  No, let me answer

20    no to that because I don't know.

21          Q.   Do you know if any Billerica police

22    officer ever wanted to sleep with Michelle

23    Kennedy?

24          A.   Oh, yeah, they call me up daily and check
```

1    on me who they want to sleep with.  I'm running a

2    talk show now.

3        Q.    Did you know that that's an issue in this

4    case?

5        A.    I don't know any issue about this except

6    that I am now involved with him supposedly

7    threatening to kill me with a golf club.  I could

8    care less about whatever else happens in there.

9    I'm here to clarify this man did not threaten me.

10       Q.    Just so we are clear --

11       A.    I don't want to know the rest of it.

12       Q.    The stenographer can only type down the

13   words you say.  She can't record sarcastic tones

14   in your voice.

15       A.    That's fine.  It will get sarcastic on

16   the stand, don't worry about it.

17              MR. SILVERFINE:  Objection to form.

18   BY MR. FISCHER:

19       Q.    I want you to understand.

20       A.    That's fine.

21       Q.    In fact, the defense of the Billerica

22   police department has to do with Michelle Kennedy

23   sleeping around with Billerica police officers.

24              MR. SILVERFINE:  Objection as to

1    form.

2    BY MR. FISCHER:

3        A.    I don't know any of this.

4        Q.    In the years you've grown up in Billerica

5    and been friends with Michelle Kennedy and been

6    through whatever you've been through with her,

7    you're not aware of any sexual involvement she may

8    have had with the Billerica police department?

9        A.    No.

10       Q.    And that's because nothing like that

11   existed to your knowledge?

12               MR. SILVERFINE:    Objection as to

13   form.

14   BY MR. FISCHER:

15       A.    Never heard of it until you just brought

16   it up right now.

17       Q.    And it's fair to say that you've also

18   never heard of any Billerica police officers

19   wanting to sleep with her?

20       A.    Like I said, they don't call me and talk

21   about things like that.  I would have no knowledge

22   of that, no.  Do you have fellow brothers in the

23   law industry calling you up saying they want to

24   sleep with the stenographer?  Do they check with

1    you first?  I didn't think so.

2         Q.    You indicated that you've been arrested

3    for assault and battery?

4         A.    Yeah.  I'm pretty sure I have.

5         Q.    How long ago?

6         A.    I don't know.  '70s, '80s, '90s.  Could

7    be all three decades.

8         Q.    Could be more than once?

9         A.    Could be.

10        Q.    Could be multiple times?

11        A.    Could be.

12        Q.    But you don't remember?

13        A.    No.  I don't keep track of them.

14        Q.    Would you be willing to sign a form that

15   would allow me to obtain your Board of Probation

16   criminal record history?

17        A.    Of course.

18              MR. FISCHER:  What I would like to do

19   is have Mr. Trainor sign a CORI form and suspend

20   the deposition until I get it back.

21              MR. SILVERFINE:  I would object.

22   Certainly as a witness it's up to him.

23              THE WITNESS:  I don't have legal

24   counsel here.

1      BY MR. FISCHER:

2          Q.    You're --

3          A.    Now he's objecting to it, now he's making

4      me kind of uncomfortable.

5          Q.    I think what he's objecting to is him

6      having to come back.

7          A.    Again?

8          Q.    Perhaps.  I'm reserving the right to

9      bring you back based on what is in your record or

10     if I look at it and have other questions.

11         A.    It's public record, isn't it?

12         Q.    It's not a public record as such.  But

13     it's likely that if I went to the court and asked

14     for a court order, I would get it.

15         A.    Let's make you do your job.  You go about

16     your business to make you work for your money.

17     Seeing as how I've paid a few lawyers in my day,

18     I'll make you work for it.  I won't sign it.

19              MR. SILVERFINE:  You're entitled to

20     get whatever records you deem appropriate.  The

21     witness is here.  In terms of any criminal

22     history, if you deem it appropriate, you can

23     petition the court.  And if the witness is willing

24     to give you the CORI, that's up to him.  He's not

1    our witness per se.  I'm just objecting to --

2                    MR. FISCHER:  I object to that "he's

3    not your witness per se."

4                    MR. SILVERFINE:  He's not --

5                    MR. FISCHER:  Your client brought him

6    here.

7                    MR. SILVERFINE:  For the record, I

8    want to put this on the record -- let me finish.

9    So it's clear, my client did bring him here as a

10   courtesy to you.  You certainly can arrange to

11   have him take his deposition.

12                  My understanding from the witness is that

13   he couldn't come here otherwise and that Mr.

14   Conners is a named defendant who has a right to be

15   here and was going to be here anyway.  And we

16   brought him here.  There's no question about that.

17                  In the future, if you want to make your

18   own accommodations for this witness or any other

19   witness to be here, then we certainly will defer

20   to you.  I think it was a matter of convenience

21   and as a courtesy to you and this witness.  But

22   it's got nothing to do with, he is not my witness.

23   I would say on the record that we do not represent

24   him.

```
 1                    THE WITNESS:  I want to cooperate

 2      fully.  But now I feel, who deposed me here?

 3      BY MR. FISCHER:

 4          A.    You, right?

 5          Q.    Yes.

 6          A.    If you had me come here knowing that I

 7      was to come for the deposition, didn't you feel

 8      you would need my criminal record before I came in

 9      here before we played the cat and mouse game?  We

10      could finish it in one day.  Maybe you're saying I

11      have to do this and that.  My job is fully

12      completed.  I'm here with the letter you sent me.

13      You're not ready.

14                    MR. FISCHER:  Let me answer Mr.

15      Silverfine first.  It was not a courtesy to me to

16      have the man who my client alleged threatened to

17      kill the witness bring the witness here.  Just let

18      me finish before you say anything.

19                    MR. SILVERFINE:  Note my objection.

20                    MR. FISCHER:  That speaks by itself.

21                    MR. SILVERFINE:  Note the objection.

22                    MR. FISCHER:  You could have had any

23      other Billerica police officer bring him here, and

24      it still wouldn't be a courtesy to us.
```

1          MR. SILVERFINE:  That's fine.  We

2     won't give you any further courtesies.

3          MR. FISCHER:  Mr. Trainor could have

4     called me and said I don't have a license and I

5     need transportation and I could have arranged to

6     accommodate him.  But the facts speak as they are,

7     and if you want to argue that's a courtesy, you

8     can.

9          With respect to Mr. Trainor's question,

10     Mr. Trainor testified he has some couple dozen

11     arrests but can't remember the particulars of any

12     of them.  And it might be that being able to

13     question from the probation record may refresh his

14     memory.  On that basis, I didn't have an

15     anticipation that I would need the record.

16     BY MR. FISCHER:

17          A.    What would my record have to do with me

18     disputing something Michelle Kennedy said?  What

19     does my record have to do with this?  Is there

20     something in there that Michelle and I had sex?

21          Q.    But I'm entitled to seek the record.

22          A.    That's fine.

23          Q.    And suspend the deposition.

24          A.    Would you sign the paper so I can see

1    your record?

2        Q.   I'm not a witness or party to the case.

3        A.   You're cross-examining me.  I'd like your

4    record in front of me to ask me questions.

5        Q.   If you want to talk to me after the

6    deposition is over, I'd be more than happy to do

7    that and answer any of your questions.

8        A.   We'll both sign same papers to obtain

9    each other's records then.  Sound fair to you?

10   You're a little hesitant.  I won't sign any paper.

11             MR. FISCHER:  We'll suspend at this

12   point.

13             MR. SILVERFINE:  I'm entitled to ask

14   questions.

15             MR. FISCHER:  Go ahead.  Do you want

16   to question now?

17             MR. SILVERFINE:  Sure.  I'm not

18   agreeing to the suspension.

19             MR. FISCHER:  How long of an

20   examination might you have?

21             MR. SILVERFINE:  I don't know.  It

22   depends on the questions I have.

23             MR. FISCHER:  It's 12:30.  And if you

24   want to go long, we should think about lunch here.

1    CROSS-EXAMINATION BY MR. SILVERFINE:

2        Q.    Good afternoon I'm going to follow up on

3    some questions that Mr. Fischer asked you about

4    today and hopefully I won't be too long.

5        A.    That's fine.

6        Q.    We met for the first time this morning?

7        A.    Yes.

8        Q.    And besides having coffee and introducing

9    myself, is there anything else we talked about

10   this morning?

11       A.    No.

12       Q.    Fair to say it was about a minute and we

13   came right up here to Mr. Fischer's office?

14       A.    Yes.

15       Q.    You stated on the record you live at 16

16   Lowell Street in Billerica?

17       A.    Yes.

18       Q.    And you've lived there for how long?

19       A.    46 years, 48.

20       Q.    At any time during those years, has

21   Michelle and/or Brian Kennedy lived there?

22       A.    Not physically.

23       Q.    Have their kids lived there, Brian and

24   Michelle Kennedy's kids lives there?

1      A.    Not physically.   They hang around the

2    house.

3      Q.    You allowed them to use your address at

4    one point?

5      A.    Yes, I did.

6      Q.    You stated to Mr. Fisher that that was

7    because Michelle wanted her kids to finish school

8    in Billerica?

9              MR. FISCHER:   Objection.

10    BY MR. SILVERFINE:

11      A.    Yes.

12      Q.    Had they moved out of Billerica to your

13    understanding?

14              MR. FISCHER:   Objection.

15    BY MR. SILVERFINE:

16      A.    Yes.

17      Q.    When did they move?

18      A.    I don't know the exact date from the

19    trailer part to Gorham Street in Lowell.

20      Q.    So you were aware they do live on Gorham

21    Street in Lowell, Massachusetts?

22              MR. FISCHER:   Objection.

23    BY MR. SILVERFINE:

24      A.    Yes.

1      Q.    To your understanding, how long have they

2    lived there?

3      A.    I couldn't say truthfully.  I had to be

4    under a year, I'm pretty sure.

5      Q.    Was there any arrangement wherein you

6    allowed them to use your address in Billerica

7    while they lived in Lowell?  Did you receive any

8    compensation of any kind?

9      A.    They did some work in the cellar.

10     Q.    What kind of work?

11     A.    Hung some wallboard and made it into like

12   a living area.

13     Q.    Was that with the understanding of them

14   being allowed to use your address?

15     A.    No understanding.  It was Brian said,

16   "I'll fix up the downstairs for you."  "Fine, go

17   ahead."

18     Q.    Why did you allow them to use your

19   address?

20     A.    Life-long friends.

21     Q.    Let's direct your attention to being here

22   today pursuant to a deposition subpoena you

23   received from Mr. Fischer.  At a certain point in

24   time, you received a deposition notice to be here

1      at his office?

2          A.    Yes, sir.

3          Q.    Did you call someone when you received

4      that?

5          A.    Yes, I did.

6          Q.    Who did you call?

7          A.    Detective Roy Frost.

8          Q.    And why did you call Detective Frost?

9          A.    To see what I should do about this.

10         Q.    And what was the conversation you had

11     with Detective Frost?

12         A.    I received the deposition on such and

13     such a date at such and such a time.  You know

14     don't drive due to loss of license for the DUI.

15     We can make arrangements for you.  I will get back

16     to you.  And he called me back once and then the

17     next phone call I got was from Deputy Chief

18     Conners.

19         Q.    Did you call Detective Deputy Chief

20     Conners to arrange or to talk about the hearing

21     here today?

22         A.    No.  He called me and then I returned the

23     call and he said, "Okay, what time?  They want us

24     here at ten or 10:15.  I'll pick you up at 7:30."

1   Then it changed until we weren't going to be here

2   until 1 o'clock and then it changed back.  He

3   called me this morning and made arrangements to

4   come and get me and drove in.

5        Q.   Do you feel at all threatened by Mr.

6   Conners being here?

7        A.   No, at all.

8        Q.   Do you feel intimidated by him being

9   here?

10       A.   Not at all.

11       Q.   Did you request Mr. Conners bring you to

12   the deposition?

13       A.   I didn't request anybody, no.

14       Q.   Why did you end up going with Mr. Conners

15   to attend the deposition today?

16       A.   He was the one that called me and told me

17   he would drive me in.  I don't know how it came

18   about.

19       Q.   At any point in time during the time

20   period you've known Mr. Conners, has he threatened

21   you at all?

22       A.   Not whatsoever.

23       Q.   Has he intimidated you at all?

24       A.   None whatsoever.

```
 1           Q.   Do you feel you're free to speak out if
 2      that happened?
 3           A.   Yes.
 4           Q.   Have you ever been threatened or
 5      intimidated by any police officer?
 6           A.   None.
 7           Q.   Including any Billerica police officers?
 8           A.   None.
 9           Q.   You had briefly mentioned your discussion
10      with an attorney when you were with Michelle
11      Kennedy and something to the effect of, Here, talk
12      to my attorney?
13           A.   Right.
14           Q.   Did the attorney identify himself on the
15      phone?
16           A.   No, I don't remember the name at that
17      time.
18           Q.   Did the attorney say it was Attorney
19      Fischer or attorney --
20           A.   I don't recall the name.
21           Q.   What was the conversation you had with
22      that attorney?
23           A.   They are saying they are living at my
24      house, because I don't think she actually told
```

 1     him, if you have any harassment or if you receive

 2     any threats from the Billerica police, I will

 3     represent you if they bother you in any matter or

 4     form.

 5         Q.    What did you say to the person at the

 6     other end of the phone?

 7         A.    I said, yeah, okay.

 8         Q.    Did you express any concern about being

 9     threatened at that point to that person?

10         A.    No.

11         Q.    Did you say you had been threatened or

12     intimidated?

13         A.    No.

14         Q.    Did you engage in any representation at

15     that point with that person?

16         A.    No.

17         Q.    Do you remember where this conversation

18     took place where you were speaking to Michelle

19     Kennedy's attorney while she was present?

20         A.    I don't recall the exact date.

21         Q.    I'm jumping around a bit.

22         A.    That's fine.

23         Q.    You had mentioned when asked by Mr.

24     Fischer about Brian Kennedy having his foot broken

1    in some incident with a drug dealer, do you recall

2    that?

3        A.    Yes.

4        Q.    And was there any allegation from Brian

5    Kennedy that the police had broken his leg or his

6    foot?

7        A.    No.

8        Q.    Did Michelle Kennedy ever make that

9    allegation that Brian broke his leg or his foot

10   broke by police?

11       A.    No.

12       Q.    Did you ever hear that allegation?

13       A.    No.

14       Q.    Are you aware of a claim by Michelle

15   Kennedy that she had her finger broken by the

16   police?

17       A.    No.

18       Q.    You indicated that you had gone to

19   federal court.  And if I represent it was on or

20   about June 12, 2006, does that refresh your

21   memory?

22       A.    Yes.

23       Q.    Did you talk to Brian or Michelle Kennedy

24   that day?

```
 1        A.    Brian Kennedy was there.  Michelle, no.
 2        Q.    Do you remember the conversation you had
 3   with either Brian or Michelle that day?
 4        A.    They weren't there.  She was there.
 5        Q.    Did you approach her and ask her what was
 6   going on?
 7        A.    No.
 8        Q.    Did she approach you?
 9        A.    No.
10        Q.    You did say you spoke to her attorney
11   though?
12        A.    I thought it was one of her attorneys
13   that took me aside along with whatever the
14   attorney who was representing the police that day.
15   I forget his name.  It wasn't you, right?  Who was
16   the attorney that represents --
17        Q.    If I suggested Sam Perkins or Lennie
18   Kesten?
19        A.    Kesten.  He took me aside and asked me
20   what I was here to testify.  I said I was here to
21   adamantly testify to the fact that Mr. Conners
22   under no means threatened me in any given manner
23   or form.
24        Q.    At any point in time, did you tell anyone
```

1       that Thomas Conners threatened to kill you with a

2       golf club?

3           A.    No.

4           Q.    Did you ever tell anyone that Thomas

5       Conners threatened to kill you with a golf club if

6       you did not stop allowing the Kennedys to use your

7       Billerica address for the purpose of keeping the

8       children in the Billerica schools?

9           A.    No, I did not.

10          Q.    As of the date in federal court on June

11      12, 2006, you had been a life-long friend of

12      Michelle Kennedy and her family?

13          A.    True.

14          Q.    And you told that to both the lawyers for

15      Michelle Kennedy and the lawyers for the Billerica

16      police officers?

17          A.    Yes, I did.

18          Q.    Did you at some point in time tell

19      officers and/or the attorneys that the Kennedy

20      family began providing your address to the

21      Billerica school district in order to keep the

22      children attending Billerica schools?

23          A.    Yes, I did.

24          Q.    Did you did tell that to the attorneys

1    for --

2        A.    If the other gentleman was there, one of

3    those attorneys, yes, I did.

4        Q.    Did you have occasion on that day in

5    federal court to address the court and tell them

6    that you had never been threatened?

7        A.    No.    I never got to speak to, to get on

8    the stand that day.    But it was brought up that I

9    was there to testify to that, but the judge did

10    not want to hear it that day.

11        Q.    And were there representations made in

12    court that you had never threatened or I should

13    say been threatened by Deputy Chief Conners

14    accurate when they were presented to the court

15    that day?

16        A.    Yes.    The allegation was presented but

17    was not heard that day.    But they knew that I was

18    going to testify that it did not take place.    I

19    should clarify that.

20        Q.    I think you said his name was Butch

21    Caterino?

22        A.    Yes.

23        Q.    Who is that?

24        A.    A life-long friend.

1    Q.    Was there conversation with Butchie

2    Caterino at one point relative to the Kennedys?

3    A.    Yes.

4    Q.    Was there some conversation that Butchie

5    made to you that he was surprised you had gotten

6    so involved with the Kennedys as to allow them to

7    use your address?

8                    MR. FISCHER:    Objection.

9    BY MR. SILVERFINE:

10    Q.    Words to that effect?

11    A.    Something to that effect.    You shouldn't

12    have them there.    They are life-long friends.    He

13    said, "Just be careful," bringing trouble to my

14    house or whatever.    Of course, he was right

15    because they did.

16    Q.    I believe you mentioned that two officers

17    came to your house the Friday before the hearing

18    in federal court on that Monday?

19    A.    Yes.    Was that a Monday?

20    Q.    I believe it was.    Do you recall where

21    that conversation with the officers took place?

22    A.    In my kitchen.

23    Q.    Did I invite them in?

24    A.    Yes, I did.

1  Q. At any point did anyone threaten you?

2  A. None whatsoever.

3  Q. Tell us what the conversation was between

4 you and the officers was.

5  A. Me and the two officers and my brother

6 Kevin were in the kitchen.  I said, "What's this

7 about?"  He said, "Do you mind if we tape-record

8 this?"  I said, "No, not at all."  They said, "We

9 have an allegation that Thomas Conners threatened

10 to murder you with a golf club," which was

11 vehemently denied.

12   It was almost like, Are you for real?

13 This has to be a joke.  I thought they were

14 playing a prank.  It turned out not to be because

15 it was so farfetched it was pathetic.

16  Q. Forgive me, Mr. Fischer might have asked

17 this, did you ever play golf with Tom Conners

18 before?

19  A. I think we have played together maybe

20 once.  We know we both golf and that's what we

21 talk about.

22  Q. Was there any discussion on that day with

23 the detectives about you two playing golf

24 together?

        A.    No, not that I recall.  They might have
said, "Who's better?"  I said, "I think he is
right now."

        Q.    Do you know who lives with Michelle
Kennedy in Lowell at present?

        A.    No.

        Q.    Are you familiar with Billy Ashton?

        A.    Yes.

        Q.    What is your understanding of the
relationship between the Michelle, Brian Kennedy
and Billy Ashton?

        A.    Just hangs around with him.  Yeah, I know
he does live with them, that's true, yeah.

        Q.    Did Mr. Ashton ever live in your home?

        A.    No.

        Q.    What's your relationship with Mr. Ashton?

        A.    Just knowing him through them.

        Q.    Have you ever observed either Brian or
Michelle Kennedy being violent toward anyone?

        A.    No.

        Q.    Has anybody made you any promises or
inducements for testifying today?

        A.    None.

        Q.    Do you understand what an inducement is?

1          A.    Trying to entice me into something.

2          Q.    Has anyone in any way --

3          A.    No.

4          Q.    Has anybody told you how to testify here

5    today?

6          A.    No.

7          Q.    Are you testifying to my questions and

8    Mr. Fischer's questions of your own volition?

9          A.    Yes, solely just the truth.

10          Q.    Have you understood the questions I've

11    asked?

12          A.    Yes, I have.

13          Q.    Have you understood the questions Mr.

14    Fischer has asked?

15          A.    Yes.

16          Q.    Has the medication in any way interfered

17    with your ability to comprehend with what Mr.

18    Fischer or I asked you?

19                MR. FISCHER:   Objection.   If it did,

20    he wouldn't know it.

21    BY MR. SILVERFINE:

22          A.    Not to my knowledge.

23          Q.    You told us something about Michelle

24    dropping the kids off early in the morning at 5

1    a.m.?

2        A.    They would all come to the house so it

3    would look like they were going out to the bus

4    stop.

5        Q.    How many kids are you referring to?

6        A.    How many she got?  I think four kids.

7        Q.    And she would drive them?

8        A.    They would come from Lowell to my house,

9    come in the house, sit on the couch and wait for

10   the bus, walk out and take the bus.  They had to

11   have the town official come to the house and

12   actually inspect the house.  The redhead kid.  I

13   can't think of his name.

14       Q.    Are any rooms set up so it appears --

15       A.    The one he was working on, the

16   downstairs, he was making it to look this is where

17   they are going to stay and they are doing it all

18   over.  So when the town official actually came

19   there, he brought him down to see this is where

20   they are going to stay.

21       Q.    Would they eat breakfast at your house?

22       A.    No.

23       Q.    When they left school, would they come

24   back to your house?

1    A.   Yes.   Then she would pick them up and go.

2    Q.   What time would she generally pick them

3    up?

4    A.   I think it was around 2 o'clock, 2:30.

5    One kid would get off the bus there.   It was all

6    disarray.

7    Q.   For how long a time period did this

8    arrangement occur?

9    A.   Right up until, I don't know, I forget

10   how long.   Right up to the day and time when she

11   got chased in the house and I threw her the hell

12   out.

13   Q.   When you say chased, this is in reference

14   to that --

15   A.   The speeding ticket.

16   Q.   Is this what she told you?

17   A.   Yeah.   "They are after me."

18   Q.   Did you witness any of the chase?

19   A.   I was asleep in bed.

20   Q.   What time did this occur?

21   A.   I don't know.   It was daylight.

22   Q.   Roughly what date was this, what month?

23   A.   I don't know.

24   Q.   What year was this?

1       A.    This year.

2       Q.    2006?

3       A.    Yes.

4       Q.    And do you have an estimate as to the

5    month approximately?

6       A.    No, I don't.

7       Q.    If today is June 28, 2006, can you tell

8    us as best you can when this incident with

9    Michelle Kennedy took place?

10      A.    Six to nine months ago.

11      Q.    And when she came into the house, just

12   tell us what she told you.

13      A.    Raving lunatic.  "They're after me,

14   they're after me."  I'm like, "You're waking me

15   up?  What are you talking about?"  Then I heard

16   the pounding at the door.  "The police are after

17   me, they are after me."

18           I said, "For what?"  She said, "They're

19   after me.  They're just trying to get me.  Give me

20   your telephone."  I stuck my head out the window,

21   pounding at my door, and I saw the police officer.

22   And I said, "Marty, hold on a minute."  I knew

23   him.  My father grew up with his father.

24           I said, "I'll be down in a minute."  It

1    takes me a few minutes to get out of bed because

2    this was around the surgery or whatever.  It

3    wasn't far after.  I think I was to be operated

4    on.

5            And she was just a raving lunatic.  The

6    whole thing came down to we want to give her a

7    speeding ticket.  When he ever told me that, I

8    said, then she grabbed the phone.  She said an

9    attorney.  I said, "Give me my phone back."  I

10   didn't say it in those words.  I said it a little,

11   you know.

12       Q.   You said she should leave and she left?

13       A.   Yes.  She said I'm a rat if I open the

14   door.

15       Q.   Was she arrested that day?

16       A.   No, given a citation from what I

17   understand and drove away.

18       Q.   And her car was in the middle of the

19   street as you've indicated in that exhibit?

20       A.   Yes.

21       Q.   And she left the door open and the car

22   was running?

23       A.   Yes.  I think it was running.  I can't

24   say from my house.

1      Q.   Did you observe any other people around

2    that particular day besides the officers?

3      A.   No.

4      Q.   How long did the entire incident from the

5    time she arrived until she left take place?

6      A.   Half an hour.

7      Q.   Did you yourself note any supervisors

8    from Billerica police show up?

9      A.   I wasn't really paying attention.  I know

10   there was a few officers there.

11     Q.   Did she have any conversation, she

12   meaning Michelle Kennedy, after the incident where

13   they gave her the citation?

14     A.   No.  She got in her car drove up the

15   street and come back down giving me the finger.

16   "Fuck you.  You're an asshole," this and that.

17     Q.   Did she have any other further

18   interaction --

19     A.   I have never seen or talked to her since

20   that day, except for the other day in court when I

21   saw her.  But didn't speak to her.

22     Q.   And do you recall anything about the

23   weather that particular day?

24     A.   No.

1          Q.    The way Michelle Kennedy was dressed?

2          A.    Sweat pants I think.

3                MR. SILVERFINE:   That's all I have

4     for today.

5     REDIRECT EXAMINATION BY MR. FISCHER:

6          Q.   I have a couple of questions to clarify

7     your answers to Mr. Silverfine's questions.  You

8     say Michelle Kennedy came into your house and

9     locked the door so that Officer Connelly had to

10    bank on the door?

11         A.    Yes.

12         Q.    Was the door unlocked?

13         A.    How did she get in if it wasn't?

14         Q.    She could have had a key.

15         A.    She did not have a keys to my home.

16         Q.    Does Brian Kennedy have a key?

17         A.    No one has a key to my home.

18         Q.    Do you normally keep the door unlocked?

19         A.    I leave my doors unlocked.  That's how

20    she ran through it and locked the door.  Every

21    door in my house is unlocked.

22         Q.    And you normally use the back door?

23         A.    The porch door, yes.

24         Q.    And she knows that?

A.    Yes.

Q.    Because she has been there frequently?

A.    Yes.

Q.    What's your brother Kevin's address?

A.    Hudson, New Hampshire.  He moved.  I don't know the address.  It's on Mammoth Road in Hudson.  He just bought a new home.  It's in Salem or something.  I don't know if he's moved from Mammoth road to there or not yet.  If you need his phone number, I'll give it to you and you can call him or whatever.

Q.    Can you give it to me?

A.    978-815-2788.

Q.    Can you tell us how much Percocet you've taken today?

A.    Percocet was 10 milligrams.  And 7.5 milligrams of Vicodin.  I don't know about the Celexa.  I take them at night, so I don't know if it's still in me or not.

Q.    You took the Percocet this morning?

A.    Percocet and Vicodin.  The Vicodin is for me neck.  The Percocet, I was run over on Thursday and broke my foot.  I'm supposed to be on crutches right now.

1      Q.   Billy Ashton, you said you know he lives

2   with the Kennedys?

3      A.   Yes.

4      Q.   How do you know that?

5      A.   From going up the trailer park.  From

6   being a life-long friend.  I used to stop by their

7   house and say hi.

8      Q.   They haven't lived in the trailer park

9   for at least a year.

10     A.   Yeah, but he was there years ago when

11   they lived there.

12     Q.   So when you said Billy Ashton lived with

13   the Kennedys, you don't mean he lives with them

14   now?

15     A.   As far as I know.

16     Q.   How do you know that?

17     A.   From them pretending to live at my house.

18   She would bring the kids.  They would go back and

19   forth.  He had a room at the house in Lowell.  I

20   had been there.

21     Q.   You've been to the house in Lowell?

22     A.   Yes, I have.

23     Q.   How many times have you been to the house

24   in Lowell?

1          A.    Four or five.

2          Q.    When was the last time you were there?

3          A.    I don't know.  I couldn't answer

4     truthfully.  Within the last year.

5          Q.    So don't know whether Billy Ashton has

6     lived there --

7          A.    Yes, I do.  I was in his room while he

8     lived there.

9          Q.    But the last time you were there was

10    perhaps a year ago?

11         A.    Within a year.  I don't know if he lives

12    there right to this minute, no.

13         Q.    Was it within the last month?  When was

14    the last time --

15         A.    I said within the last year.

16         Q.    Was it within the last month?

17         A.    I said within the last year.

18         Q.    You can't be more specific?

19         A.    Within the last year.  I don't keep

20    these points about the Kennedy family in my head.

21    I have other things in life to worry about in life

22    without worrying about the Kennedy family,

23    especially when they are telling mistruths about

24    me, which I can't wait to get on the stand and

1    point right at her and call her a liar for using

2    my name and making these false accusations against

3    me.

4        Q.    Did Butchie grow up in the same north

5    Billerica neighborhood?

6        A.    No.

7        Q.    He's a life-long friend?

8        A.    That's right.

9        Q.    Where did you meet him?

10       A.    In Billerica.

11       Q.    How long have you known him?

12       A.    About 30 years.

13       Q.    Where does he live now?

14       A.    Nashua, New Hampshire.

15       Q.    I think I asked if you had any

16   conversations with police about the Kennedys, and

17   I think you answered that you did. Did I ask if

18   you had any conversations with anyone else about

19   the Kennedys?

20       A.    I don't recall if you did or not.

21       Q.    Have you?

22       A.    Have I what?

23       Q.    Had any other conversations with anyone

24   about the Kennedys, problems with the Billerica

1    police?

2                    MR. SILVERFINE:  Objection as to

3    form.

4    BY MR. FISCHER:

5        A.    Not about their problems, only the

6    problems they have caused me.

7        Q.    What conversations have there been about

8    problems they have caused you?

9        A.    She signing papers that I made false

10   accusations about a police officer is going to

11   have me killed.

12       Q.    You described a conversation with Butchie

13   Caterino?

14       A.    Um-hum.

15       Q.    And when was that conversation?

16       A.    I don't recall.

17       Q.    Was it within the last two weeks?

18       A.    No.  Longer.

19       Q.    More than a month ago?

20       A.    I don't know.  I can't answer truthfully.

21       Q.    Was it within the last year?

22       A.    Cannot answer truthfully.  I'd have to

23   really sit down and speak about it.  At this time

24   I can't answer you.

```
 1          Q.    You said he told you to be careful?

 2                MR. SILVERFINE:   Objection as to

 3     form.

 4     BY MR. FISCHER:

 5          A.    Could bring problems to your home, yeah.

 6          Q.    What problems could he bring?

 7          A.    Could bring problems.

 8          Q.    What problems?

 9          A.    Could bring problems.  I don't know.

10          Q.    What problems could you imagine?

11          A.    Knowing that lunatic, several.

12          Q.    Tell me what kind of problems you can

13     imagine.

14          A.    Several.  Just like she did running in

15     the house with this drama about a speeding ticket.

16     Stupid lunatic friend things.  She is off the wall

17     crazy.  Good luck to you.

18          Q.    What problems --

19          A.    Anything you can come up with.

20          Q.    I can't come up with anything.

21          A.    Well, I couldn't name them all.

22          Q.    Can you name one?

23          A.    I just did.

24          Q.    Can you name a second?
```

1        A.    No.   I just named one.   That's as far as

2    I'll go.

3        Q.    What did you understand Butchie Caterino

4    was referring to when he said be careful, they

5    could bring you problems?

6        A.    Just knowing the problems they could

7    bring.

8        Q.    If you've been life-long friends --

9        A.    Right.   And I know they are involved in a

10   lot of problems.

11       Q.    What problems have they been involved

12   with?

13       A.    They're lunatics.   They're capable of any

14   stupid little things at any given moment.

15       Q.    You're not answering the question.   The

16   question is what problems have they brought could

17   they bring?

18              MR. SILVERFINE:   Objection to form.

19   BY MR. FISCHER:

20       A.    Anything.   I don't know and I'm not going

21   to answer further.

22

23       Q.    So you don't know of any problems they

24   could bring?

1          A.    Just like the speeding ticket problem.

2     There's one for instance on record.    There you go.

3     Ending that.

4          Q.    What do you mean?

5          A.    Police banging at my door on my porch at

6     my residence where she didn't live there running

7     in my house and causing police to pound on my

8     door?    That's not a problem to you?    Can I have

9     your address and we'll come running to your house

10    when I get a speeding ticket.    And you describe it

11    as a problem to me?

12         Q.    When Mr. Caterino told you to be

13    careful --

14         A.    Just that, just for that reason, just for

15    what happened.

16         Q.    Do you know what he was referring to?

17         A.    Just that, just like that, problems at my

18    house.

19         Q.    Was there any other problems you could

20    imagine?

21              MR. SILVERFINE:    Objection.

22    BY MR. FISCHER:

23         A.    You can't just make things up.    You have

24    to wait for them to happy guess.

1       Q.    What problem were you afraid was going to

2   happen?

3       A.    I wasn't afraid of any problem.

4       Q.    What problem did you think might happen?

5       A.    I wasn't thinking.  I was ready for

6   anything.  Battle gear on.  Let's go.  Let's play.

7   They are capable of anything.

8       Q.    What might they be capable of?

9       A.    Anything.  Use your imagination.  As far

10  as I'll go on that question.  Made up stories

11  about me?  That's a problem, isn't it?  Got me

12  into a federal court.  You don't think that's a

13  problem they brought to me?

14          Do you think I needed this?  You don't

15  think that's a problem in your mind?  They now

16  have my name involved in a lawsuit they have?

17  What do I have to do with this?  They are making

18  up accusations using my name.  That's not a

19  problem?  You mull that over in your mind a

20  little.

21      Q.    Is there any other problem you can think

22  of?

23      A.    That's as far as they got because I

24  kicked their ass out.

```
 1          Q.    Is there any other problem --
 2          A.    That's as far as we'll go with that.
 3          Q.    Is Butchie and Paul Caterino the same
 4    person?
 5          A.    Father and son.
 6          Q.    Which is the son?
 7          A.    Paul.
 8          Q.    What's Butchy Caterino's phone number?
 9          A.    603-765-1132.
10          Q.    Where does he live?
11          A.    Nashua, New Hampshire.
12          Q.    Do you know where in Nashua, New
13    Hampshire?
14          A.    No.  I think off of East Hollis Street.
15          Q.    Where does Paul Caterino live?
16          A.    He's divorced.  He's in-between.
17          Q.    And you're not willing to sign a CORI
18    authorization?
19          A.    Right.  Not until I speak to my attorney.
20          Q.    Your attorney is --
21          A.    We'll see.  I'll speak to him.  I might
22    obtain different counsel for this.  I might see
23    Attorney John McBride.  I'm going to speak to
24    counsel on this matter.
```

1    Q.    Can I ask when you'll get back to me?

2    A.    I'll let you know.

3    Q.    And can we put a time frame on this?

4    A.    You can get it yourself.

5    Q.    I have to prepare a motion and go to the

6    court.  It's a considerable effort on my part.

7    A.    It's a considerable effort on my part to

8    be here today.  I suggest you go do it your way

9    seeing as your client makes up lies about me.

10   Let's make you work a little.  I had to work to

11   come here sitting in this chair for three hours.

12   You work a little and thank your client.

13                   MR. FISCHER:  We'll suspend at this

14   point.

15                   MR. SILVERFINE:  Note my objection.

16                   MR. FISCHER:  Will you agree to

17   produce the tape of the conversation at Mr.

18   Trainer's house?

19                   MR. SILVERFINE:  That's fine.  I have

20   received no documentation from your client as to

21   any notes or any other documents that have been

22   referenced in her deposition.  The only thing I

23   received to date is five video cassettes and one

24   audio cassette.  Pursuant to the 7.1 rule, I'm

1    following up on a letter I sent to you guys last

2    week and I haven't received anything.

3                    MR. FISCHER:   I thought the

4    videotapes and audiotapes were the documentations

5    in response.   I understand that one, that the

6    audiotape was at a bad speed.   It's in the mail to

7    you.

8                    MR. SILVERFINE:   I'm noting that your

9    client indicated there were 17 notebooks and I

10   have received nothing.

11                   MR. FISCHER:   I'm not aware of any

12   notebooks that are not privileged.

13                   MR. SILVERFINE:   I disagree.   She

14   indicated she took notes from time the time of

15   your complaint and that can't be privileged.   For

16   the purposes of 7.1, I'm having this conversation.

17                   (Whereupon the deposition was

18   concluded, over the objection of Mr. Silverfine,

19   at 1:10 p.m.)

20

21

22

23

24

1                    C E R T I F I C A T E

2

3    COMMONWEALTH OF MASSACHUSETTS

4    PLYMOUTH, SS.

5            I, Patricia M. Haynes, a Notary Public in

6    and for the Commonwealth of Massachusetts, do

7    hereby certify:

8            That RAYMOND F. TRAINOR, JR., the witness

9    whose testimony is hereinbefore set forth, was

10   duly sworn by me and that such testimony is a true

11   and accurate record of my stenotype notes taken in

12   the foregoing matter, to the best of my knowledge,

13   skill and ability.

14           IN WITNESS WHEREOF, I have hereunto set

15   my hand and Notarial Seal this 22nd day of July

16   2006.

17

18   _____

19           Patricia M. Haynes, CSR
                 Notary Public

20

21   My commission expires July 30, 2010

22

23

24