# EXHIBIT 1

RECEIPT #_____
AMOUNT $____/5&____
SUMMONS ISSUED Y-3&
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK. _M_____
DATE⁴⁴ ____//-5-04____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

BRIAN KENNEDY, AND MICHELLE
KENNEDY, Individually and as mother and
next friend of BRIAN KENNEDY, JR.,
MITCHELL KENNEDY and DYLAN KENNEDY
Plaintiffs

VS.

TOWN OF BILLERICA, DANIEL C. ROSA, JR.,
Individually and as Chief of the Billerica Police
Department, JOHN BARRETTO, Individually and
as former Chief of the Billerica Police Department,
PAUL W. MATTHEWS, Individually and as
former Chief of the Billerica Police Department,
ROBERT LEE, Individually and as former Deputy
Chief of the Billerica Police Department, THOMAS
CONNORS, FRANK A. MACKENZIE,
RICHARD RHONSTOCK, ROBERT BAILEY,
JOHN ZARRO, MARK TSOUKALAS, TARA
CONNORS, MARTIN E. CONWAY, ANDREW
DEVITO, RICHARD HOWE, STEVEN ELMORE,
WILLIAM MCNULTY, DONALD
MACEACHERN, MICHAEL A. CASEY,
RICHARD NESTOR, ROBERT BROWN,
WILLIAM G. WEST, GREGORY KATZ,
GERALD B. ROCHE, BRIAN MICCICHE,
WILLIAM MACDONALD, SCOTT PARKER,
ALAN MUNN, TIMOTHY F. MCKENNA and
JOHN DOE
Defendants

MAGISTRATE JUDGE _Collings_

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

This is an action against officers of the Town of Billerica police department, the current

and former Chiefs of Police for the Town of Billerica and the Town of Billerica for civil rights

and other violations causing loss and damage to the plaintiffs, Brian Kennedy, Michelle

Kennedy, Brian Kennedy, Jr., Mitchell Kennedy and Dylan Kennedy, arising out of a

1

conspiratorial campaign by members of the Town of Billerica Police Department over a 13 year period to harass, intimidate and terrorize the plaintiffs through acts of violence and by abuse of their powers of arrest. Defendant Chiefs of Police, Daniel Rosa ("Rosa"), John Barretto ("Barretto"), Paul W. Matthews ("Matthews"), and Robert Lee ("Lee"), and Defendant Officers Thomas Connors ("Lt. Connors"), Frank MacKenzie ("MacKenzie"), Richard Rhonstock ("Rhonstock"), Robert Bailey ("Bailey"), John Zarro ("Zarro"), Mark Tsoukalas ("Tsoukalas"), Tara Connors ("Connors"), Martin E. Conway ("Conway"), Andrew DeVito ("DeVito"), Richard Howe ("Howe"), Stephen Elmore ("Elmore"), William McNulty ("McNulty"), Donald MacEachern ("MacEachern"), Michael Casey ("Casey"), Richard Nestor ("Nestor"), Robert Brown ("Brown"), William G. West ("West"), G. Katz ("Katz"), Gerald Roche ("Roche"), Brian Micciche ("Micciche"), William MacDonald ("MacDonald"), Scott Parker ("Parker"), Alan Munn ("Munn"), Timothy F. McKenna ("McKenna") and several unidentified officers from the Billerica Police Department, who are hereinafter collectively referred to as John Doe ("Doe") (collectively referred to as the "Individual Defendants"), violated the plaintiffs' state and federal civil rights by arresting the plaintiffs without probable cause multiple times, by maliciously prosecuting the plaintiffs without probable cause, and by otherwise tortuously injuring the plaintiffs.

The claims against the Town of Billerica and their Chiefs of Police (collectively referred to as the "Municipal Defendants") arise from their gross negligence in failing to adequately train, supervise and discipline the Individual Defendants named herein, who at the relevant times hereto were members of Town of Billerica Police Department, and from the environment created by Chiefs of Police as a result of their deliberate indifference and willful blindness towards the rights of individual citizens, which caused police officers to believe that the Town of Billerica

2

and its Chiefs of Police tolerated misuse of authority by its police officers.

## JURISDICTION

This action is brought pursuant to 42 U.S.C. § 1983, 1985 and 1988 in accordance with the First, Fourth, Fifth Eighth and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. § 1331 and 1343 as well as the aforementioned statutory provisions. plaintiffs invoke the pendant jurisdiction of this court to hear and to decide claims arising under M.G. L. Ch. 12 § 11, M. G. L. Ch. 258 § 4 and the decisional law of the Commonwealth of Massachusetts.

## PARTIES

1.    The plaintiff, Brian Kennedy, is a citizen of the United States of America and a resident of the Commonwealth of Massachusetts.

2.    The plaintiff, Michelle Kennedy, is a citizen of the United States of America and a resident of the Commonwealth of Massachusetts.

3.    The plaintiff, Brian Kennedy, Jr. is a minor and is a citizen of the United States of America and a resident of the Commonwealth of Massachusetts.

4.    The plaintiff, Mitchell Kennedy, is a minor and is a citizen of the United States of America and a resident of the Commonwealth of Massachusetts.

5.    The plaintiff, Dylan Kennedy, is a minor and is a citizen of the United States of America and a resident of the Commonwealth of Massachusetts.

6.    The Defendant Town of Billerica is a municipality duly incorporated under the laws of the Commonwealth of Massachusetts and is or was at the times relevant to the claims brought in this Complaint the employer of the defendants Rosa, Barretto, Matthews, Lee, Lt. Connors, MacKenzie, Rhonstock, Bailey, Zarro, Tsoukalis, Connors, Conway, DeVito, Howe,

Elmore, McNulty, MacEachern, Casey, Nestor, Brown, West, Katz, Roche, Micciche, MacDonald, Parker, Munn, McKenna and Doe.

7.  The Defendant, Daniel Rosa, at various times relevant hereto was a duly appointed Chief of Police of the Town of Billerica Police Department acting under color of law and is named in his individual and official capacity.

8.  The Defendant, John Barretto, at various times relevant hereto was a duly appointed Chief of Police of the Town of Billerica Police Department acting under color of law and is named in his individual and official capacity.

9.  The Defendant, Paul W. Matthews, at various times relevant hereto was a duly appointed Chief of Police of the Town of Billerica Police Department acting under color of law and is named in his individual and official capacity.

10.  The Defendant, Robert Lee, at various times relevant hereto was a duly appointed Deputy Chief of Police of the Town of Billerica Police Department acting under color of law and is named in his individual and official capacity.

11.  The Defendant, Thomas Connors, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

12.  The Defendant, Frank MacKenzie, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

13.  The Defendant, Richard Rhonstock, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

4

14.   The Defendant, Robert Bailey, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

15.   The Defendant, John Zarro, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

16.   The Defendant, Mark Tsoukalis, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

17.   The Defendant, Tara Connors, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

18.   The Defendant, Martin E. Conway, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

19.   The Defendant, Andrew DeVito, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

20.   The Defendant, Richard E. Howe, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

21.   The Defendant, Steven Elmore, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual

and official capacities.

22.    The Defendant, William McNulty, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

23.    The Defendant, Donald MacEachern, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

24.    The Defendant, Michael A. Casey, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

25.    The Defendant, Richard Nestor, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

26.    The Defendant, Robert Brown, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

27.    The Defendant, William G. West, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

28.    The Defendant, Gregory Katz, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

29.    The Defendant, Gerald B. Roche, at various times relevant hereto was a duly

6

appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

30.    The Defendant, Brian Micciche, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

31.    The Defendant, William MacDonald, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

32.    The Defendant, Scott Parker, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

33.    The Defendant, Alan Munn, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

34.    The Defendant, Timothy F. McKenna, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

35.    The Defendant, John Doe, at various times relevant hereto was a duly appointed and acting officer of the Billerica Police Department and is named in his individual and official capacities.

## STATEMENT OF FACTS

36.    For more than a decade the Individual Defendants have collectively engaged and continue to engage in a conspiracy to terrorize, intimidate, harass, humiliate, injure and deprive

7

the plaintiffs of their liberty and happiness. In furtherance of this conspiracy, the defendants have wrongfully arrested and maliciously prosecuted the plaintiffs on numerous occasions for crimes the defendants knew they did not commit; attempted to interfere with plaintiffs' defense of the criminal charges brought against them by threatening plaintiffs' witnesses; solicited perjured testimony from witnesses in order to justify the wrongful arrests of the plaintiffs and bolster the prosecution of bogus charges; violated normal bail and release procedures in order to extend the time that the plaintiffs would be incarcerated; subjected the plaintiffs to humiliation during periods of incarceration; threatened and engaged in unprovoked and unlawful physical violence against the plaintiffs causing them to suffer physical injuries; subjected the plaintiffs to an inordinate amount of surveillance and improperly stopped and issued numerous bogus citations to the plaintiffs; deliberately failed and refused to prosecute individuals who have perpetrated crimes against the plaintiffs; and threatened other individuals who either worked for or socialized with the plaintiffs.

37.    This course of conduct, which continues through this day, began after Mrs. Kennedy rejected the romantic advances made by Officer MacKenzie in the summer of 1991. Officer MacKenzie was so angered by Mrs. Kennedy's rejection that shortly thereafter he pulled over a car in which Mr. Kennedy was a passenger for the sole purpose of warning Mr. Kennedy to "keep a leash on your wife and watch your back". Officer MacKenzie threatened Mr. Kennedy that "[he] did not know who he was fucking with."

38.    On September 22 1991, at approximately 3:00 AM, only days after Officer MacKenzie threatened Mr. Kennedy, Mr. Kennedy's pick-up truck was set on fire and totally destroyed while it was parked in the driveway of his home. When Office Doyle responded to the fire, Mrs. Kennedy informed him of the recent threats made by Officer MacKenzie. The case

was assigned to Lieutenant Connors for investigation.

39.   While the arson was under investigation, on September 30, 1991 at approximately 5:15 PM, Officer MacKenzie, who was in uniform at the time, threatened Mr. and Mrs. Kennedy as they were shopping at the CVS Pharmacy in Billerica. Officer MacKenzie told them "if [they] didn't shut up they would be living in a shelter."

40.   Two days later Mr. Kennedy was a passenger in a tow truck being operated by Herb Vacca. Mr. Vacca was towing Mr. Kennedy's pick up truck that had been fire bombed on September 22, 1991, when he was pulled over by Officers MacKenzie and Steven Elmore, without justification. After running Mr. Vacca's plates and having no reason to issue a citation to Mr. Vacca, Officer MacKenzie released Mr. Vacca. As Mr. Vacca pulled away Officer MacKenzie was seen pointing at the burnt pick up truck and laughing.

41.   On October 7, 1991, Mrs. Kennedy met with Chief Barretto and reported to him the threats she and her husband had received from Officer MacKenzie and expressed their concern that Officer MacKenzie was involved in the arson of Mr. Kennedy's pick-up truck. Chief Barretto indicated he would speak to Officer MacKenzie about Mrs. Kennedy's concerns and get back to her. The Kennedys never heard back from Chief Barretto.

42.   Within just a few weeks of the arson, Mr. and Mrs. Kennedy learned from Chief Barretto that Lieutenant Connors had completed his investigation and concluded that although the fire was arson, there were no suspects. Lieutenant Connors completed his investigation without ever speaking with Mr. or Mrs. Kennedy and to the best of their knowledge without ever interviewing any of the Kennedys' neighbors. To this day, the Billerica Police Department has failed to adequately investigate the arson and as a result nobody has been prosecuted for this crime.

9

43.    In October, 1991, Mr. and Mrs. Kennedy were followed by marked Billerica police cars as they drove through town. When Mrs. Kennedy called to report this to Chief Barretto, she spoke with Deputy Chief Lee because Chief Barretto was on vacation. Deputy Lee told Mrs. Kennedy that he didn't believe her and accused her and Mr. Kennedy of being liars.

44.    The scope of the harassment grew more extended when on October 17, 1991, Officer MacKenzie pulled over Mrs. Kennedy's mother and had her car towed and impounded.

45.    On November 22, 1991, Mrs. Kennedy learned from Tracey Heffernan that two days earlier, Officer MacKenzie had offered to pay Ms. Heffernan $500.00 if she would beat Mrs. Kennedy to the point that she required hospitalization. Both Mrs. Kennedy and Ms. Heffernan met with Chief Barretto and informed him of this incident.

46.    Less than one month later on December 17, 1991, Mr. Kennedy received a call from Officer MacKenzie, threatening to beat him. Officer MacKenzie challenged Mr. Kennedy to meet him at the local middle school to fight. Mr. Kennedy did not accept the challenge but Mrs. Kennedy called and reported the incident to Chief Barretto that same morning.

47.    The next day Mr. Kennedy was assaulted by Officer MacKenzie's friend, Paul Parent. Mr. Kennedy was at Concord Shores bar when he was confronted by Mr. Parent, who asked if Mr. Kennedy had a problem with Officer MacKenzie. He told him that if he didn't stop reporting Officer MacKenzie to Chief Barretto he would have a problem with him. When Mr. Kennedy tried to walk away he was tackled from behind by Mr. Parent. Several uniformed officers who responded to a call from the bartender, David Lumbert, as well as several off duty Billerica police officers, including Officer MacKenzie, who were at the bar, tried to force Mr. Kennedy into the parking lot out of the view of witnesses. Mr. Kennedy was ultimately able to escape, but Mr. Lumbert insisted that criminal charges be brought against Mr. Parent. Mr. Parent

10

was prosecuted and ultimately was found responsible for the assault. While the case was pending Officer MacKenzie attempted to intimidate the witnesses, including Mr. Lumbert.

48.     On December 19, 1991 Mr. and Mrs. Kennedy once again met with Chief Barretto to discuss the many incidences involving Officer MacKenzie and members of the Billerica Police Department. They requested that Chief Barretto put an end to threats and harassment. Chief Barretto told the Mr. and Mrs. Kennedy that he would speak to the officers, however, nothing was ever done. As a result the harassment continued. Marked Billerica police cars continued to follow Mr. and Mrs. Kennedy and they continued to receive citations for traffic violations they did not commit.

49.     Over the next several years Mr. and Mrs. Kennedy were threatened, intimidated and harassed by members of the Billerica Police Department. Mr. and Mrs. Kennedy were regularly issued citations by Billerica police officers for motor vehicle violations that they did not commit. During a two year period from March, 1992 to April, 1993, Mr. Kennedy received four motor vehicle citations and Mrs. Kennedy received three motor vehicle citations, all from the Billerica Police Department. The majority if not all of these citations were baseless and in some instances dismissed. In other instances, however, the citations led to findings based upon the influences of the officer in court. As a result of the many citations they received both Mr. and Mrs. Kennedy had their licenses suspended.

50.     On May 21, 1993, Mr. and Mrs. Kennedy were leaving a restaurant/bar in Billerica when they were confronted by Officer MacKenzie, who was off duty at the time and with several other off duty Billerica police officers. Mr. and Mrs. Kennedy felt threatened by the officers and had one of the waitresses, escort them to their vehicle. As they were walking to their car, Officer MacKenzie challenged Mr. Kennedy to fight him and the other officers. When Mr. Kennedy

11

didn't respond Officer MacKenzie spat in his face.

51.    On June 5, 1993, Officer Nestor followed Mr. and Mrs. Kennedy as they were driving on Lowell Street in Billerica. Officer Nestor, who was off duty at the time, pulled along side the Kennedys' car and swerved towards it, forcing the Kennedy's car off the road. Officer Nestor repeated this several times until the Kennedys pulled over and stopped their vehicle. When Mrs. Kennedy accused Officer Nestor of running them off the road, Officer Nestor became hostile towards the Kennedys. Following this incident Officer Nestor fabricated assault charges against Mrs. Kennedy and a warrant was issued for her arrest. At the trial of this matter, the judge entered a required finding of not guilty at the close of the prosecutor's case.

52.    On June 19, 1993, Mr. Kennedy's brother, Michael, was confronted by Officer MacKenzie, who was on duty and in uniform. Officer MacKenzie warned Michael that he better shut up Mr. and Mrs. Kennedy. Then without any justification, Officer MacKenzie maliciously beat Michael Kennedy, causing him to suffer two black eyes. Officer MacKenzie then fabricated charges against Michael Kennedy claiming that he had assaulted and battered him. When Michael Kennedy went to the Billerica Police Department to file a complaint against Officer MacKenzie he was ignored and intimidated by the officers at the station.

53.    On June 28, 1993, Mr. and Mrs. Kennedy once again met with Chief Barretto to complain of the continued harassment they were suffering from members of the Billerica Police Department. When Mrs. Kennedy called Chief Barretto on July 11, 1993, to follow up on their meeting, Chief Barretto told her to stop calling him as he did not want to discuss her problems any more and suggested that she get a lawyer.

54.    In the early evening of September 5, 1993, Mrs. Kennedy was driving with her grandmother when she was pulled over by Officers Nestor and Roche who accused her of

12

operating a motor vehicle without a license. Mrs. Kennedy explained and the Officers knew that she a valid license to operate her vehicle at that time since her license was only suspended between the hours of 10:00 PM and 10:00 AM. Nevertheless, Officers Nestor and Roche ignored this information and arrested Mrs. Kennedy for operating a motor vehicle without a license and also charged her with threats.

55.     The next day Mrs. Kennedy was visiting her friend, Casey Heffernan, when Officers Nestor and Roche knocked on Mr. Heffernan's door and claimed they were looking for Mrs. Kennedy. When Mr. Heffernan refused to open the door the officers threatened him. Nevertheless Mr. Heffernan refused to open the door and the officers left. Subsequently Mrs. Kennedy received a citation in the mail from Officer Roche charging her with operating a motor vehicle without a license. Ultimately Mrs. Kennedy was acquitted of this charge.

56.     At around the same time, Mrs. Kennedy observed Officer Roche puncture two tires on Mr. Kennedy's truck while it was parked in the Kennedys' driveway. Mrs. Kennedy reported this incident to Chief Barretto, but as far as the Kennedys know there was no investigation into this matter nor was there any action taken against Officer Roche.

57.     Thereafter, out of concern for her daughter's safety, Mrs. Kennedy's mother, Joyce Tibbets, went to the Billerica Police Station to complain about the threats, harassment and intimidation her daughter and son-in-law were being subjected to by members of the Billerica Police Department. Once again Ms. Tibbets' complaint was not addressed.

58.     In October, 1993, shortly after Mrs. Kennedy was found not guilty of assaulting Officer Nestor, Mrs. Kennedy was picking up her son, Brian, Jr., from a karate class when she noticed Officer Nestor sitting in a police cruiser outside the building where her son's class was being held. Officer Nestor followed Mrs. Kennedy and her son from the karate studio all the

13

way to her home. Later that evening, Officer Nestor with Officer MacKenzie, followed Mrs.
Kennedy to a MacDonalds in Billerica where they tried to intimidate her by shining their lights
in her car and driving next to her while she went through the drive-thru.

59.    On July 21, 1997, there was a fight involving an individual named, Daniel DuFault
("DuFault") and John Oblenis ("Oblenis"), who upon information and belief is the nephew of
Officer McNulty. Mr. Oblenis was allegedly sprayed with mace during the altercation. Mrs.
Kennedy happened to be present at the scene of the incident but left when the altercation started.
At the time of the incident, Mr. Kennedy was at home with his son and his friend William
Ashton. The Kennedys' neighbor, witnessed Mr. Kennedy at home at the time of the altercation.
Even though Mr. Kennedy was not present, John Oblenis allegedly informed the Billerica Police
Department that Mr. Kennedy had punched him and sprayed him with mace.

60.    Anxious to corroborate Mr. Oblenis' complaint, members of the Billerica Police
Department, including Officer Zarro and Officer Casey, interviewed several witnesses to the
fight, including Kenneth Lewis, and attempted to convince them that Mr. Kennedy participated
in the assault on John Oblenis. Officer Casey spoke with Mrs. Kennedy, who informed him of
the alibi witnesses. Officer Casey told Mrs. Kennedy that he did not want to hear about it and
that the Kennedys should tell it to the judge.

61.    Two witnesses to the fight, Fred Kendall and Eugene DeFransisco, spoke with the
Billerica Police and insisted that Mr. Kennedy was not present during the fight. John Oblenis'
father approached Mr. Kendall and Mr. DeFrancisco the following day and threatened to kill
them if they testified on behalf of Mr. Kennedy.

62.    Nevertheless, on July 22, 1997, Officer McNulty swore out a criminal complaint in
the Lowell District Court charging Mr. Kennedy with Assault and Battery by Dangerous Weapon

14

and Assault and Battery.

63.    Also on July 22, 1997, Mrs. Kennedy had received a call from Ruth and Karen Atkinson, who live on Wilson Street across from John Oblenis warning her that Patty Stickney was threatening to jump Mrs. Kennedy. Mrs. Kennedy reported this to the Billerica Police Department. While she was waiting for the police to respond to her complaint she was outside her house when Patty Stickney drove by and threatened to kill her.

64.    When Officer Brown arrived, Mrs. Kennedy informed him of threat made by Ms. Stickney. Officer Brown indicated that he had to respond to another call but that he would drive by Wilson Street and investigate her complaint. Shortly thereafter Ms. Stickney returned to Mrs. Kennedy's neighborhood, wielding a bat and threatening to slice Mrs. Kennedy's throat. Officer Brown never informed Mrs. Kennedy of the results of his investigation and no charges were brought against Ms. Stickney.

65.    Later that day Ms. Stickney went to the Billerica Police station and filed a complaint against Mrs. Kennedy and Daniel DuFault alleging that they damaged her car with rocks and Mrs. Kennedy was charged with Malicious Destruction of Property. Ultimately the case against Mrs. Kennedy was dismissed.

66.    While this case was pending in the Lowell District Court, Mr. and Mrs. Kennedy continued to be followed and harassed by members of the Billerica Police Department. They received numerous citations for traffic violations that were fabricated by the Billerica police officers.

67.    On October 8, 1997, John Oblenis assaulted and battered Mrs. Kennedy and her friend Amy Baum. Both women suffered visible bruises to their faces and bodies. Mrs. Kennedy immediately reported the incident to the Billerica Police Department and Officer

15

MacEachern was assigned to investigate. Officer MacEachern took photographs that clearly depicted Mrs. Kennedy's bruises. In addition, Officer MacEachern took a statement from a witness who corroborated Mrs. Kennedy's claim that Mr. Oblenis had punched her in the face. Despite the substantial evidence of the criminal conduct on the part of Mr. Oblenis, the Billerica Police Department never arrested or prosecuted Mr. Oblenis for this crime. Instead Mrs. Kennedy received a summons issued by the Billerica Police Department charging her with Threats.

68.    On October 14, 1997, Officer Brown pulled over Mr. Kennedy and without justification issued him a citation for Speeding and Failure to Wear Safety Restraints.

69.    Also in the fall of 1997 there was an incident in the Kennedy's neighborhood that involved children throwing rocks at Ms. Kaizer's lawn ornaments. Ms. Kaizer called the police and spoke with Officer McNulty. Officer Elmore and another officer responded to the call and spoke with Ms. Kaizer. One of the officers told Ms. Kaizer that he wanted to "nail Mr. Kennedy to the wall." In a follow up conversation with Officer McNulty, Officer McNulty tried to convince Ms. Kaizer to bring charges against Brian, Jr. for throwing rocks despite Ms. Kaizer's insistence that she never saw Brian, Jr. throw rocks. Ultimately a criminal complaint was filed against Brian, Jr.

70.    In or around the same time in November of 1997, Billerica Police Lieutenant Connors' car was burglarized and his hat, badge and cellular phone were stolen. Although there were no witnesses, Detective Howe told Officers Micciche and Katz to question Mr. Kennedy about the incident. Mr. Kennedy, who had nothing to do with the burglary refused to speak with the officers. Subsequently, Detective Howe confronted Mr. Kennedy at a local junkyard. When Mr. Kennedy complained that members of the Billerica Police Department were following him,

16

Detective Howe intimated that members of the Billerica Police Department were pressuring him to provide information regarding Lieutenant Connors' stolen property.  Detective Howe encouraged Mr. Kennedy to contact either him or Officer Casey at the police station if he was willing to provide information about the stolen property.

71.    Mr. Kennedy did eventually contact Officer Casey and Officer Casey went to the Kennedys' home to speak with Mr. Kennedy.  Mr. Kennedy again complained about the unfair harassment he was being subjected to by the Billerica Police Department and asked Officer Casey to have it stop.  Officer Casey was unsympathetic towards Mr. Kennedy's complaints and offered no assistance.  Instead, Officer Casey interrogated Mr. Kennedy about the stolen badge.  When Mr. Kennedy refused to cooperate with Officer Casey's interrogation, Officer Casey angrily left the Kennedy home.

72.    On January 30, 1998, Mr. Kennedy was scheduled to go on trial for the Assault and Battery allegedly committed against John Oblenis.  A week earlier, the Kennedys had arranged to bring two alibi witnesses, to the trial.  However, when the Kennedys went to pick up the witnesses on the day of the trial, they refused to go to court.  The Kennedys believe that the witnesses were pressured by members of the Billerica Police Department not to show up for the trial.  Mr. Oblenis appeared at court with several witnesses, whom he had convinced to testify falsely against Mr. Kennedy.  Mr. Kennedy's lawyer informed him that the case could not be continued and warned Mr. Kennedy about the risk of going to trial without the alibi witnesses.  Reluctantly and despite his innocence, Mr. Kennedy accepted the recommendation of his attorney and entered into a plea bargain to avoid a jail sentence.  Mr. Kennedy was sentenced to two and one-half years in the House of Correction in Billerica, which sentence was stayed until March 31, 1998 on the condition that he not have any additional trouble with the law.

73.     On February 18, 1998, the Kennedys were present at the Lowell District Court for a hearing on the criminal charges brought by Ms. Kaiser against their son at the insistence of the Billerica Police Department. The hearing was continued because Officer Elmore failed to attend. Officer Elmore had been informed by other children from the Kennedys' neighborhood, who had witnessed the incident, that Brian, Jr. was not responsible. When the Kennedys returned from court that day, Mr. Kennedy called the Billerica Police Department and left a message informing Officer Elmore of the next hearing date. Officer Elmore returned Mr. Kennedy's call and agreed to meet with him at his home that evening to discuss the charges against his son. When Officer Elmore arrived that evening he immediately began interrogating Mr. Kennedy about Lieutenant Connors' stolen badge. Officer Elmore relayed a message from Lieutenant Connors that if Mr. Kennedy helped him find out who had the badge, he would take care of Brian Jr.'s court case. Mr. Kennedy told Officer Elmore that he didn't know anything about the missing badge.

74.     Because Mr. Kennedy refused to cooperate with Officer Elmore, Officer Elmore went to Scott Ashton's house and misrepresented to Mr. Ashton that Mr. and Mrs. Kennedy had signed a statement implicating him with possession of Lieutenant Connors' stolen badge. Officer Elmore told Mr. Ashton that even though the Billerica police knew the Kennedys had nothing to do with the stolen property, they wanted to get the Kennedys in trouble and that he could save himself if he implicated the Kennedys. Even though Mr. Ashton insisted that the Kennedys had nothing to do with the stolen property, he was ultimately pressured into implicating the Kennedys and signed a statement that Mr. and Mrs. Kennedy assisted his brother, William Ashton, in hiding the stolen property at the mobile home next to the Kennedys. Subsequently, Mr. Ashton retracted his statement and issued another statement confirming that he had been pressured by the Billerica Police Department to lie about the Kennedys'

18

involvement. Following his meeting with Scott Ashton, Officer Elmore called Mr. Kennedy and informed him that he could not help Brian, Jr. and that he would be charging Mr. Kennedy with Receiving Stolen Property in connection with Lieutenant Connors' badge.

75.    The next morning Casey Heffernan, who had witnessed Mr. Ashton with Lieutenant Connors' property on the evening it was taken from Lieutenant Connors' car and who subsequently returned most of the stolen property to Lieutenant Connors, went to the Billerica Police Department and explained to Officers Elmore, Casey and MacKenzie that the Kennedys had nothing to do with the property stolen from Lieutenant Connors. The officers laughed at him and told him to tell it to the judge. The next day, on February 20, 1998, Officer Elmore swore out a complaint against Mr. and Mrs. Kennedy charging them with Receiving Stolen Property and Intimidation of a Witness in connection with the theft of Lieutenant Connors' property.

76.    One day earlier, Officer McNulty, who was aware of the terms of Mr. Kennedy's sentence on the Oblenis assault case and the impact that new criminal charges would have, swore out a criminal complaint against Mr. Kennedy charging him with operating a motor vehicle without a license based on the stop by Officer Brown on October 14, 1997. Officer McNulty also swore out a criminal complaint against Mrs. Kennedy charging her with operating a motor vehicle without a license based upon a citation issued by Officer Katz on December 30, 1997.

77.    In an effort to bolster their case against the Kennedys, Lieutenant Connors and Officer Elmore approached Daniel DuFault, who was serving a sentence in the Billerica House of Correction and offered to have him released early if he would sign a statement implicating Mr. Kennedy in connection with the possession of Lieutenant Connors' badge. Officer Elmore deliberately lied to Mr. DuFault and told him that Mr. Kennedy had signed a statement implicating him in connection with the stolen property. Nevertheless Mr. DuFault insisted that

19

Mr. Kennedy had nothing to do with the stolen property.

78.    In addition, Lieutenant Connors tried to coerce William Ashton into implicating Mr. Kennedy. William Ashton was arrested and charged with Receiving Stolen Property in connection with Lieutenant Connors' property. Mr. Ashton was kept in the custody of the Billerica Police Department for an entire weekend during which he was repeatedly beat by Lieutenant Connors because he refused to sign a statement implicating Mr. Kennedy.

79.    On September 11, 1998, ten months after they were first charged with the crimes relating to Lieutenant Connors' stolen property, the Kennedys appeared for trial. Judge Neil Walker sent Mr. and Mrs. Kennedy's cases to the jury session, but without any notice or opportunity to be heard, vacated the stayed sentence Mr. Kennedy received in connection with his plea to the Oblenis assault and despite Mr. Kennedy's compliance with conditions imposed in connection with the stayed sentence, Judge Walker committed Mr. Kennedy to the Billerica House of Correction for a period of two and one half years.

80.    On September 14, 1998, the trial on the charges of Receiving Stolen Property began. After the completion of the prosecution's case, Judge Melhan allowed Mr. and Mrs. Kennedy's Motion for Required Findings of Not Guilty on both counts. Despite his acquittal of these charges, which had triggered the removal of the stay and the imposition of the jail sentence on the Oblenis case, Mr. Kennedy remained incarcerated for Eighty-three (83) days until December 3, 1998, when Judge Walker reconsidered his earlier decision to vacate the stay and ordered that Mr. Kennedy be released from the Billerica House of Correction.

81.    Following Mr. Kennedy's release from prison, the defendant members of the Billerica Police Department continued to harass Mr. and Mrs. Kennedy. On duty and off duty officers continued to follow Mr. And Mrs. Kennedy and continued to issue them citations for

moving violations that they did not commit. In January, 1999, Billerica police officers, including

Officer West, regularly showed up at a job site where Mr. Kennedy was working. The police

attempted to intimidate Mr. Kennedy's workers by taking down their names without justification.

82.    On August 5, 1999, Mrs. Kennedy, while at a Dunkin Donuts in Lowell, was

approached by Billerica Police Officer Micciche, who was off duty at the time. In the presence

of several witnesses, including a clerk who was working at the Dunkin Donuts, Officer Micciche

began cursing and verbally abusing Mrs. Kennedy. As Mrs. Kennedy was trying to leave, Mr.

Kennedy happened to arrive at the Dunkin Donuts. When Mr. Kennedy learned what had

happened he confronted Officer Micciche. Officer Micciche threatened Mr. Kennedy stating

"You're going to get it. Your time is going to come. Me and my brothers rule." Officer

Micciche directed the store clerk to call the police. The clerk responded that she was calling the

police on him, not for him. Officer Smith of the Lowell Police Department arrived and spoke

with the clerk. He then spoke with Mrs. Kennedy, who informed him of the threats made by

Officer Micciche. Officer Smith seemed concerned and then went to speak with Officer

Micciche. When he returned from speaking with Officer Micciche he concluded "Its nothing.

Forget about it."

83.    Mrs. Kennedy was not satisfied with this response; so she called the Lowell Police

Department seeking to file a complaint against Officer Micciche. The Lowell Police Department

thereafter called and informed Officer Micciche of the Kennedys' intention to seek a criminal

complaint against him. In response Officer Micciche filed a complaint against Mr. and Mrs.

Kennedy. The Kennedys received summonses in the mail informing them of the criminal

complaints filed by Officer Micciche charging them with making threats. The complaint made

by the Kennedys was never prosecuted by the Lowell Police Department. Ultimately both Mr.

and Mrs. Kennedy were found not guilty of these charges brought by Officer Micciche. Later Mrs. Kennedy learned that Officer Micciche told Scott Ashton "I wouldn't even think twice about killing [Mrs. Kennedy]".

84.    On or about January 22, 2000, Mr. and Mrs. Kennedy and a friend were helping Daniel DuFault move from his sister, Tina Huber's house. Mr. DuFault instructed Mr. Kennedy as to what items belonged to him and they worked together in loading the items onto a truck. One of the items that Mr. DuFault took was a carpet. While Mr. DuFault was removing the carpet, Mr. DuFault's brother-in-law, William Huber, arrived and began arguing with Mr. DuFault about taking the carpet. At this time Mr. and Mrs. Kennedy left. The following day Ms. Huber went to the Billerica Police Department and filed a report with Lieutenant Bailey. Purportedly, relying on information from her husband, Ms. Huber informed Lieutenant Bailey that her brother, Daniel DuFault had vandalized her property. Upon information and belief when Ms. Huber informed Lieutenant Bailey that Mr. and Ms Kennedy had also been present, Lieutenant Bailey coerced Ms. Huber to file a criminal complaint against Mr. Kennedy for Malicious Destruction of Property even though she insisted that Mr. Kennedy was not responsible for the destruction. Ultimately, Ms. Huber refused to cooperate with the prosecution against Mr. Kennedy and the charges were dismissed.

85.    In the spring of 2001, Mr. and Mrs. Kennedy were at the DeMoulas supermarket in Billerica. As they were entering the store, Mr. Kennedy was approached by an unknown male and female. The male menaced Mr. Kennedy with a knife in front of several witnesses and the female jumped on his back and was screaming "Stop harassing Johnny (Oblenis). You shouldn't try to get Micciche fired." Billerica Police Officer MacDonald responded to the scene and interviewed Mr. Kennedy and several other witnesses who identified the assailant. The next day

22

Mrs. Kennedy spoke with Officer MacDonald, who informed her that if it were up to him he would arrest the assailant, but that his sergeant told him that he had to set it up for a hearing. To this day the assailant has never been prosecuted for this crime.

86.     One Friday evening in July, 2001, Mrs. Kennedy was driving through town when she was pulled over by two marked police cars, one belonging to the Town of Billerica and the other belonging to the State Police. Officer Brown, who was driving a marked Billerica police car, got into a verbal confrontation with Mrs. Kennedy and stated "First Billerica, then Tewksbury and now the State police." Mrs. Kennedy was placed under arrest for operating a motor vehicle without a license despite that fact that she had a valid license. After observing the hostility displayed by Officer Brown, the State Police officer insisted that he take Mrs. Kennedy into custody. The State Police released Mrs. Kennedy that evening when they confirmed that she had a valid license.

87.     Two days later, on Sunday morning Mrs. Kennedy was again pulled over by Officer Brown, who again falsely arrested her for operating a motor vehicle without a license. Mrs. Kennedy's mother brought paperwork from the Registry of Motor Vehicles confirming Mrs. Kennedy's license was valid and ultimately Mrs.Kennedy was released from the custody of the Billerica Police Department.

88.     During October, 2001, Mrs. Kennedy learned that her son, Brian, Jr. had begun to have problems with one of his teachers at school. Mrs. Kennedy learned that the teacher's name was Tara Connors and immediately became concerned that the teacher may be related to Lieutenant Connors and that this teacher was acting out against Brian, Jr. because of the history between the Mr. and Mrs. Kennedy and Lieutenant Connors. Mrs. Kennedy explained the situation to the principal and a meeting involving all of Brian Jr.'s teachers, including Ms.

23

Connors, the principal and Mr. and Mrs. Kennedy was convened on October 31, 2001. At the meeting Mrs. Kennedy learned that Ms. Connors was the daughter of Lieutenant Connors. Mrs. Kennedy then confronted Ms. Connors about the lengthy history of horrific acts of harassment that her family has endured by Lieutenant Connors and members of the Billerica Police Department.

89.    Shortly thereafter, Mrs. Kennedy saw Lieutenant Connors and he threatened Mrs. Kennedy by stating "This is war."

90.    One week later, on November 9, 2001, in the early morning hours several members of the Billerica Police Department, including Chief Rosa, Officers DeVito, Conway and Doe arrived at the Kennedys' home and began banging on their windows, breaking one window and waking the Kennedys' children. When Mr. and Mrs. Kennedy stepped outside to speak with the officers, they were questioned by Officer Conway about a fight that had taken place that evening in the Kennedys' neighborhood. As they were talking with the police officers, Billy Ashton, who had been babysitting for the Kennedys earlier that evening, came to the door and he was immediately tackled by the police officers and arrested. When Mrs. Kennedy protested that Mr. Ashton had done nothing wrong, she too was arrested even though she had not committed any crimes.

91.    Mrs. Kennedy was handcuffed and taken to the Billerica police station where the police fabricated charges of Assault and Battery with a Dangerous Weapon and Malicious Destruction of Property against her. While in the holding cell and still handcuffed, Mrs. Kennedy was confronted by Sergeant Rohnstock, who in the presence of Chief Rosa and another officer, ripped off her sweatshirt, leaving her exposed in the cold cell with only her halter top and sweatpants. When the unknown officer tried to give Mrs. Kennedy a blanket, Chief Rosa, took

24

the blanket and threw it over the camera just outside the cell. Sergeant Rohnstock then punched Mrs. Kennedy in the back while Chief Rosa and the officer stood by and watched.

92.    Later, Sergeant Rohnstock returned to Ms. Kennedy's cell with Lieutenant Connors. Lieutenant Connors screamed at Ms. Kennedy, accusing her of having "a big fucking mouth." He told her "I've had enough of your shit. Nobody takes their son out my daughter's class. You'll learn yet. This is war. I'm going to get your kid. I'm going to go after the other one this time. Your bail is going to be $5,000.00."

93.    Ms. Kennedy remained in the cold cell until the next morning, when she was taken to Lowell District Court. At court Mrs. Kennedy learned that the Billerica police had obtained a warrant for the arrest of her son, Mitchell, for allegedly committing the same crimes with which she had been charged. At her arraignment, Mrs. Kennedy's bail was set at $2,500.00. By the time Mr. Kennedy raised the money for the bail, Mrs. Kennedy had been transferred to MCI Framingham and by the time Mr. Kennedy arrived at Framingham that evening, it was too late for Mrs. Kennedy to be bailed.

94.    Billerica Police Officers were waiting for Mr. Kennedy as he returned to his neighborhood from Framingham that evening. The car he was in was pulled over and Mr. Kennedy was grabbed and thrown to the ground were he was repeatedly kicked and punched about the head and body by approximately 5 police officers, including Officers Tsoukalis and Doe. Mr. Kennedy, who suffered contusions and abrasions as a result of said assault, was then handcuffed and taken to the Billerica Police Station where the Billerica police fabricated charges of Assault and Battery with a Dangerous Weapon, Malicious Destruction of Property and Resisting Arrest against him.

95.    While in the holding cell that evening, Mr. Kennedy was confronted by Lieutenant

Connors who told him that his bail would be set at $5,000 and also told Mr. Kennedy "Your wife's got a big mouth. You want to get my family involved. Leave my family out of it. The war is on." Mr. Kennedy remained incarcerated for four nights since it was a holiday weekend. He was never provided medical treatment for his injuries and he remained in the holding cell without any toilet paper as the police officers refused to provide him with any.

96.    Over the weekend, while Mr. Kennedy was being held at the Billerica Police Station, several people went to the police station seeking to obtain the bail money from Mr. Kennedy so that they could bail Mrs. Kennedy from Framingham. Each time the police refused to release the money and then laughed as they informed Mr. Kennedy of this. As a result Mrs. Kennedy was forced to remain incarcerated in MCI Framingham until Monday, when Attorney Thomas Mixon, who had been contacted by the Kennedys' neighbors, went to the Billerica police station and demanded the release of the money.

97.    One of the individuals who went to the Billerica police station that weekend was told by Lieutenant Connors to tell Mrs. Kennedy that "there is a bullet waiting for [Mrs. Kennedy]."

98.    For three nights while both their parents remained incarcerated the Kennedys' three children were forced to live with their grandmother. They were frightened and terrorized by the ordeal. Ultimately all of the charges against Mitchell Kennedy were dismissed.

99.    On January 28, 2002, at approximately 3:30 PM, Mr. Kennedy was pulled over by Officer Tsoukalis, who was operating a marked Billerica police car. Officer Tsoukalis was entirely without justification for stopping Mr. Kennedy. When Officer Tsoukalis approached Mr. Kennedy he asked him "How did my boot feel?" This comment was an obvious reference to the beating Mr. Kennedy suffered when he was arrested by Officer Tsoukalis and other members

26

of the Billerica police department on November 9, 2001.

100.   On March 31, 2002, Mrs. Kennedy was at the Billerica Boys Club where she was picking up some damaged skate board ramps that she had been authorized to take. Officer Parker arrived in uniform in a marked Billerica Police car and confronted Mrs. Kennedy about the jumps. Even though Mrs. Kennedy informed Officer Parker that she had been authorized to take the jumps, he insisted that she unload the jumps from her friend's truck.

101.   After unloading the jumps from her friend's truck Officer Parker accosted Mrs. Kennedy and shoved her. Mrs. Kennedy ran from Officer Parker and locked herself in her car. Officer Parker followed after Mrs. Kennedy and began screaming at her and kicking her car.

102.   Officer Dean Royston of the Billerica Police Department arrived at the scene and observed Officer Parker kicking Mrs. Kennedy's car and yelling vulgarities at her. Officer Royston reported the incident to the captain on duty at the Billerica Police Department that day. Despite Officer Royston's report, Mr. and Mrs. Kennedy are unaware of any action being taken against Officer Parker.

103.   Approximately two weeks later the Kennedy children were skateboarding in their neighborhood with several other children when Officer Munn arrived in a marked Billerica Police car. Officer Munn demanded that the children get off the road and he placed a call to a tow company to remove the skate board jumps, which had been built by the children. When the tow company failed to arrive Officer Munn called the Town of Billerica Department of Public Works and they came and picked up the skate board jumps. Shortly thereafter in response to inquiries by the local newspaper, the jumps were returned to the children by the Town officials. Officer Munn was present at the time the jumps were returned and he told Mr. and Mrs. Kennedy "your time is coming".

27

104.  Mrs. Kennedy placed a call to Chief Rosa to inform him of the threat made by Officer Parker.  Chief Rosa returned Ms. Kennedy's call, laughed at her and told her never call him again.

105.  On June 9, 2002, Ms. Kennedy was driving from her neighborhood with Mr. Kennedy and a friend when she noticed Officer Tsoukalis behind her in a marked Billerica Police car.  Officer Tsoukalis followed Mrs. Kennedy to the town line and then pulled her over and issued her a traffic citation for violations she did not commit.  As Officer Tsoukalis handed the ticket to Mrs. Kennedy he grabbed her hand and bent her finger causing it to fracture in two places.

106.  On another date in June, 2002, Mrs. Kennedy attended a fundraiser for her recently deceased brother's wife and children.  Officer Munn was working a detail at the fundraiser as there were several hundred people at the event.  Officer Munn for no reason insisted that Mrs. Kennedy leave the event and physically pushed her out of the building.

107.  In the summer of 2002 Mitchell Kennedy was visiting with friends in the neighborhood when George Brooks, a boy who lived in the neighborhood, barged into the neighbor's home.  George threw Mitchell down on the outside stairs, grabbed him around the neck and sprayed him with an aerosol cleaner in the face.

108.  When Mitchell went home and told his mother of the incident Mrs. Kennedy called the Billerica Police Department and Officers Elmore and Nestor responded.  When Mrs. Kennedy asked that a complaint be brought against George Brooks the officers refused and insisted "he's just a kid".

109.  A week or two thereafter Mitchell was with several children at a nearby pond in Tewksbury when George Brooks arrived and started throwing rocks at the children, including

28

Mitchell. George's father arrived and told him to beat up Mitchell. George who is much bigger than Mitchell tackled him and started hitting him. The other children then came to the rescue of Mitchell and pulled George off of him.

110. Officer Nestor arrived at the scene even though the incident clearly took place in Tewksbury. After speaking only with George and his father Officer Nestor filed a complaint against Mitchell in Lowell District Court for assault and battery against George and refused to file a cross-complaint on behalf of Mitchell against George.

111. At the clerk's hearing on the Complaint George admitted that he struck Mitchell first and the case was dismissed.

112. On September 7, 2002, Mrs. Kennedy observed Officer Tsoukalis in front of her house yelling at the neighborhood children including the Kennedy children. While Mrs. Kennedy was in her driveway, speaking to the children, Officer Tsoukalis drove by and made an obscene gesture towards her. Mrs. Kennedy called Mr. Kennedy on his telephone to inform him about what had happened.

113. As Mr. Kennedy and his son Brian were returning home that afternoon Officer Tsoukalis approached them from the opposite direction on Pond Street. Upon recognizing Mr. Kennedy's vehicle Officer Tsoukalis swerved his police car into Mr. Kennedy's lane forcing Mr. Kennedy to swerve off the road to avoid being struck Officer Tsoukalis' vehicle.

114. At around the same time Brian Jr. was in the neighborhood when he was confronted by Officer Tsoukalis who called him names. When Brian Jr. tried to walk away Tsoukalis grabbed him around the neck.

115. The next day Brian, Jr. went with Mrs. Kennedy to the Lowell District Court and filed a complaint against Officer Tsoukalis.

29

116. Approximately one week later Officer Tsoukalis confronted Mrs. Kennedy in her neighborhood. During this discussion with Officer Tsoukalis Mrs. Kennedy told Officer Tsoukalis that "he needed to get a life".

117. A couple of hours later Mrs. Kennedy was driving her car when she was pulled over by a minimum of six Billerica Police cars. Mrs. Kennedy was placed under arrest and charged with criminal threats against Officer Tsoukalis. While in custody Mrs. Kennedy was informed by Lieutenant Connors that her bail was set at Ten Thousand ($10,000) Dollars. Unable to make the bail, Mrs. Kennedy remained incarcerated until the next morning when she was arraigned at Lowell District Court.

118. Upon hearing the complaint, Judge Neil Walker released Mrs. Kennedy on her own recognizance.

119. While at Court that day Mrs. Kennedy asked the Assistant Clerk about the status of the complaint that she had filed on behalf of Brian, Jr. against Officer Tsoukalis based upon the incident on September 7, 2002 and she was informed that complaint had been denied without a hearing.

120. In January or February of 2004 Mr. Kennedy was confronted by Officer Tsoukalis at the Home Depot store in Tewksbury. Officer Tsoukalis swung a tool at Mr. Kennedy while threatening to kill him.

121. In March, 2004 the Kennedy children were in their neighborhood when they were approached by Officer Tsoukalis. Officer Tsoukalis called Brian, Jr. a moron and when he walked away Officer Tsoukalis turned to Mitchell Kennedy and yelled at him to "get over here". Mitchell remained on his property and Officer Tsoukalis confronted him and shined a flashlight in his face. Officer Tsoukalis taunted Mitchell by claiming his father was a "coward".

30

122. When Mitchell shielded his eyes from the glare of the flashlight and asked Officer Tsoukalis to remove the flashlight from his face Officer Tsoukalis placed Mitchell under arrest for Assault and Battery on a Police Officer. Officer Tsoukalis handcuffed Mitchell's hands behind his back and tossed him into the police car.

123. Mitchell suffered two lacerations to his face during the arrest and was held at the Billerica Police Station for approximately forty-five minutes until his mother came to take him home.

124. In the evening hours of May 17, 2004 Mrs. Kennedy returned home from doing an errand when she observed several police cars at the mobile home next to hers. She learned from a woman in the neighborhood that the woman had moved Mrs. Kennedy's car into another neighbor's driveway so that a load of loam could be dumped in the Kennedys' driveway. Mrs. Kennedy asked a female officer if she could move her car from the neighbor's driveway and she was told that she would have to wait until the neighbor moved his vehicle. When the female officer returned from speaking with the owner inside the mobile home she approached Mr. Kennedy and asked him if he had hit the neighbor's trailer with a hammer. Mr. Kennedy replied that he had not.

125. The other officers, including Officers Casey and Zarro, then began to taunt Mr. Kennedy by calling him a "pussy" and a "bitch" and challenged him to fight. Mr. Kennedy refused to engage in a fight with the police officers. Thereafter the officers remained in the neighborhood for several hours for no apparent reason. Mrs. Kennedy was forced to bring her children to a neighbor's house so they could have a decent night sleep.

126. The following day on May 18, 2004 Mitchell Kennedy was in class taking his MCAS examinations when one of the assistant principals entered the classroom and asked the

31

teacher and the other students to leave the classroom. Thereafter Officer Casey and another police officer confronted Mitchell. Officer Casey greeted Mitchell Kennedy by saying "I've been waiting to meet with you". He then accused Mitchell of breaking into the school and stealing money. He made Mitchell take off his sneaker. After examining the sneaker the police officer left Mitchell in the classroom.

127.  Later that day, three men, including George Woods, who owns the trailer next to the Kennedys, confronted the Kennedys at their home and attempted to goad Mr. Kennedy into a fight. One of the men brandished a gun and one of the men threw two bricks at Mrs. Kennedy. Mrs. Kennedy asked a neighbor to call the police. Officer Connors arrived with several other officers including Officer Casey. The Kennedys explained what had transpired, yet the officers took no action against the three men.

128.  While the Billerica police officers were at the Kennedys' residence that evening, Mitchell Kennedy began videotaping the events. When Officer Casey saw this he immediately went after Mitchell and threatened that if he did not stop videotaping he would be going to jail. Officer Casey shone a flashlight into the lens of the video camera so as to distort the image on the videotape.

129.  In late September, 2004, the Kennedys moved to a new address in Billerica. On Saturday and Sunday, October 2nd and 3rd of 2004, Mrs. Kennedy observed Officer Tsoukalis sitting in a police car across the street from her home. The following Monday Mrs. Kennedy reported this to the Manager for the Town of Billerica and she subsequently learned that Officer Tsoukalis had been transferred to a different patrol area in the Town. Almost immediately, however, Mrs. Kennedy noticed Officer Connors and Doe regularly patrolling her new neighborhood and on several occasions witnessed them pull up to the Kennedys' home and shine

32

a search light into their windows. On one occasion Mrs. Kennedy observed Officer Connors walking around her property for no apparent reason.

130.   On October 28, 2004 a default warrant issued from the Lowell District Court for the arrest of Mr. Kennedy based upon his failure to appear at court the day before. Officer McKenna arrested Mr. Kennedy on October 28, 2004 at 6:42 PM and he fabricated a charge of Resisting Arrest. As a result Mr. Kennedy was imprisoned overnight. At court the next day Mr. Kennedy's bail was set at $250.00, which he posted and was released. Upon information and belief the Billerica Police Department deliberately waited until the court had closed for business on October 28, 2004 to arrest Mr. Kennedy so that he could be imprisoned overnight.

131.   As a result of these events and the ongoing negligence of the Town and Chiefs Rosa, Barretto, Matthews and Lee, the Kennedys have lived under a constant state of fear since 1991 and continue to live in this state of fear, and have suffered; lost wages, physical injuries, loss of their liberties, loss of consortium and serious emotional distress. Brian Kennedy, Michelle Kennedy, Brian Kennedy, Jr., Mitchell Kennedy and Dylan Kennedy make claims for the maximum damages permitted by law.

132.   Cumulatively, this pattern of conduct by the defendants amounts to a deliberate and willful ongoing conspiracy to violate various constitutional rights of the plaintiffs. These rights include the right to be free from unlawful search and seizure, the right not to be punished except by due process of law, the right to liberty, the right to be free from excessive bail, the right to freedom of association and the right to be secure in one's person.

133.   Plaintiffs have been damaged severely and continue to suffer damages, monetary and otherwise, as a direct and proximate result of the constitutionally violative conduct of the defendants, acting in concert and conspiracy to deprive plaintiffs of their constitutionally

guaranteed rights as Americans and citizens of the Commonwealth of Massachusetts.

## STATEMENT OF CLAIMS

### COUNT I
(All Plaintiffs v. Municipal Defendants for Violation of 42 U.S.C. 1983)

134.  Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 133 above.

135.  Plaintiffs were deprived of their civil rights as secured by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, as a result of the customs and practices of the Town of Billerica and its Police Chiefs Rosa, Barretto, Matthews and Lee, who were deliberately indifferent towards the rights of individual citizens, and also as a result of the gross negligence of the Town of Billerica and its Police Chiefs Rosa, Barretto, Matthews and Lee in failing to properly hire, train and supervise the Individual Defendants.

136.  The plaintiffs were damaged as a direct and proximate result of these customs and practices of the Town of Billerica and its Police Chiefs Rosa, Barretto, Matthews and Lee and the gross negligence of the Town of Billerica and its Police Chiefs Rosa, Barretto, Matthews and Lee.

### COUNT II
(All Plaintiffs v Municipal Defendants for Negligence)

137.  Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 136 above.

138.  Defendants Town of Billerica and Chiefs Rosa, Matthews, Barretto and Lee owed the plaintiffs a duty to exercise reasonable care in hiring, training and supervising its police officers.

34

139.  Defendants Town of Billerica and Chief Rosa, Matthews, Barretto and Lee breached their duty by failing to properly hire, train and supervise the Individual Defendants.

140.  As a direct and proximate result of the negligence of the Defendant Town of Billerica and Chiefs Rosa, Matthews, Barretto and Lee, the plaintiffs have suffered damages.

### COUNT III
(All Plaintiffs v. Individual Defendants for Violation of 42 U.S.C. 1983 – Conspiracy to Violate Civil Rights)

141.  Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 140 above.

142.  By engaging in the conduct described above, the Individual Defendants, acting in concert with each other, acted to conspire and thereby violated the plaintiffs' civil rights, particularly those rights secured by the First, Fourth, Fifth, Eighth and Fourteenth Amendment to the United States Constitution.

143.  As a direct and proximate result of the conspiracy engaged in by the Individual Defendants to violate the plaintiffs' civil rights the plaintiffs have suffered damages.

### COUNT IV
(All Plaintiffs v. Individual Defendants for Violation of 42 U.S.C.A 1983)

144.  Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 143 above.

145.  By engaging in the conduct described above, the Individual Defendants violated the plaintiffs' civil rights as secured by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

146.  As a direct and proximate result of the Individual Defendants' conduct in violating the plaintiffs' civil rights the plaintiffs have suffered damages.

35

<u>COUNT V</u>
(All Plaintiffs v. Individual Defendants for Violation of M.G.L. ch. 12 § 11H-I)

147.  Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 146 above.

148.  By engaging in the conduct described above the Individual Defendants, acting singly and in concert with each other, interfered by means of threats, intimidation, and/or coercion with plaintiffs' exercise and enjoyment of their civil rights as guaranteed by Article I of the Massachusetts Declaration of Rights and the First, Fourth, Fifth, Eighth and Fourteenth Amendment to the United States Constitution and thereby violated M.G.L. ch. 12 § 11I.

149.  As a direct and proximate result of the Individual Defendants' conduct in violating the plaintiffs' exercise and enjoyment of their civil rights the plaintiffs have suffered damages.

<u>COUNT VI</u>
(All Plaintiffs v. Individual Defendants for Intentional Infliction of Emotional Distress)

150.  Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 149 above.

151.  The Individual Defendants knew or should have known that their actions as more specifically set forth above would likely result in the plaintiffs suffering emotional distress.

152.  The Individual Defendants' actions were intentional, reckless, extreme, outrageous, beyond all bounds of decency, and utterly intolerable in a civilized community.

153.  As a direct and proximate result of the Individual Defendants' conduct the plaintiffs suffered severe emotional distress of such a nature that no reasonable person could be expected to endure it.

36

## COUNT VII
### (All Plaintiffs v. All Defendants for Loss of Consortium)

154.  Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 153 above.

155.  The plaintiffs are related to each other as immediate family members and are entitled by law to the care, comfort, services, and consortium of one another.

156.  As a direct and proximate result of the tortuous conduct of the Defendants, each plaintiff sustained the loss of the care, comfort, services and consortium of the other plaintiffs.

## COUNT VIII
### (Michelle Kennedy v. Tsoukalis, Rhonstock, Parker, Nestor, Lieutenant Connors, Micciche, Munn and Doe for Assault)

157.  Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 156 above.

158.  On various and diverse dates, the Defendants, Tsoukalis, Rhonstock, Parker, Nestor, Lieutenant Connors, Micciche and Munn without right or privilege, intentionally assaulted the plaintiff, Michelle Kennedy.

159.  As a direct and proximate result of the assaults the plaintiff, Michelle Kennedy, suffered damages.

## COUNT IX
### (Michelle Kennedy v. Roche, Brown, Conway, Nestor and Doe for False Imprisonment)

160.  Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 159 above.

161.  On various and diverse dates the plaintiff, Michelle Kennedy was unlawfully and intentionally confined against her will, without right or privilege.  This was the direct result of

37

the unlawful conduct of the Defendants, Roche, Brown, Conway Nestor and Doe.

162.   As a direct and proximate result of the acts described above, the plaintiff, Michelle Kennedy was falsely imprisoned, deprived of her liberty, and therefore, was damaged.

## COUNT X
(Michelle Kennedy v. Roche, Brown, Rhonstock, Nestor, MacEachern, McNulty, Katz, Micciche, Conway, Lt. Connors, DeVito and Doe for Malicious Prosecution)

163.   Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 162 above.

164.   On various and diverse dates the Defendants, Roche, Brown, Rhonstock, Nestor, MacEachern, McNulty, Katz, Micciche, Conway, Connors, DeVito and Doe signed criminal complaints or otherwise participated in the prosecution of Michelle Kennedy in criminal actions, including those identified above, and they did so without probable cause and with malice.

165.   As a direct and proximate result of these acts, the plaintiff, Michelle Kennedy suffered emotional distress, humiliation, loss of liberty, monetary damages and other damages.

## COUNT XI
(Brian Kennedy v. Tsoukalis, Nestor, MacKenzie, Lt. Connors and Doe for Assault)

166.   Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 165 above.

167.   On various and diverse dates the Defendants, Tsoukalis, Nestor, MacKenzie, Lieutenant Connors and Doe without right or privilege, intentionally assaulted the plaintiff, Brian Kennedy.

168.   As a direct and proximate result of the assaults the plaintiff, Brian Kennedy, suffered damages.

## COUNT XII
### (Brian Kennedy v. Conway, Tsoukalis and Doe for False Imprisonment)

169.    Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 168 above.

170.    On various and diverse dates the plaintiff, Brian Kennedy was unlawfully and intentionally confined against his will, without right or privilege. This was the direct result of the unlawful conduct of the Defendants, Conway, Tsoukalis and Doe.

171.    As a direct and proximate result of the acts described above, the plaintiff, Brian Kennedy was falsely imprisoned, deprived of his liberty, and therefore, was damaged.

## COUNT XIII
### (Brian Kennedy v. Casey, Zarro, MacEachern, McNulty, Howe, Micciche, Katz, Elmore, Lieutenant Connors, MacKenzie, Brown, Bailey and Doe for Malicious Prosecution)

172.    Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 171 above.

173.    On various and diverse dates the Defendants, Casey, Zarro, MacEachern, McNulty, Howe, Micciche, Katz, Elmore, Lieutenant Connors, MacKenzie, Brown, Bailey and Doe signed criminal complaints or otherwise participated in the prosecution of Brian Kennedy in criminal actions, including those identified above, and they did so without probable cause and with malice.

174.    As a direct and proximate result of these acts, the plaintiff, Brian Kennedy suffered emotional distress, humiliation, loss of liberty, monetary damages and other damages.

## COUNT XIV
### (Mitchell Kennedy v. Tsoukalis for Assault)

175.    Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through

39

174 above.

176.  The Defendant, Tsoukalis without right or privilege, intentionally assaulted and battered the plaintiff, Mitchell Kennedy as described hereinabove.

177.  As a direct and proximate result of the assault and battery the plaintiff, Mitchell Kennedy, suffered damages.

## COUNT XV
### (Mitchell Kennedy v. Tsoukalis for False Imprisonment)

178.  Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 177 above.

179.  The plaintiff, Mitchell Kennedy was unlawfully and intentionally confined against his will, without right or privilege.  This was the direct result of the unlawful conduct of the Defendant Tsoukalis.

180.  As a direct and proximate result of the acts described above, the plaintiff, Mitchell Kennedy was falsely imprisoned, deprived of his liberty, and therefore, was damaged.

## COUNT XVI
### (Mitchell Kennedy v. Tsoukalis, Nestor and Doe for Malicious Prosecution)

181.  Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 180 above.

182.  On various and diverse dates the Defendants, Tsoukalis, Nestor and Doe signed criminal complaints or otherwise participated in the prosecution of Mitchell Kennedy in criminal actions, including those identified, and they did so without probable cause and with malice.

183.  As a direct and proximate result of these acts, the plaintiff, Mitchell Kennedy suffered emotional distress, humiliation, loss of liberty, monetary damages and other damages.

COUNT XVII
(Brian Kennedy, Jr. v. Tsoukalis for Assault)

184. Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 183 above.

185. The Defendant, Tsoukalis without right or privilege, intentionally assaulted the plaintiff, Brian Kennedy, Jr.

186. As a direct and proximate result of the assault the plaintiff, Brian Kennedy, Jr., suffered damages.

COUNT XVIII
(Brian Kennedy, Jr. v. Tsoukalis and Doe for False Imprisonment)

187. Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 186 above.

188. The plaintiff, Brian Kennedy, Jr. was unlawfully and intentionally confined against his will, without right or privilege. This was the direct result of the unlawful conduct of the Defendants, Tsoukalis and Doe.

189. As a direct and proximate result of the acts described above, the plaintiff, Brian Kennedy, Jr. was falsely imprisoned, deprived of his liberty, and therefore, was damaged.

COUNT XIX
(Brian Kennedy, Jr. v. Tsoukalis and Doe for Malicious Prosecution)

190. Plaintiffs reallege and incorporate as if fully set forth herein paragraphs 1 through 189 above.

191. On various and diverse dates the Defendants, Tsoukalis and Doe signed criminal complaints or otherwise participated in the prosecution of Brian Kennedy, Jr. in criminal actions,

41

including those identified above, and they did so without probable cause and with malice.

192.   As a direct and proximate result of these acts, the plaintiff, Brian Kennedy, Jr.

suffered emotional distress, humiliation, loss of liberty, monetary damages and other damages.

WHEREFORE, the plaintiffs request that this court grant them judgment against the

defendants, jointly and severally, on each count which they may be liable, in such amount as is

reasonable and just, plus such costs, attorneys' fees, punitive damages and interest as they are

entitled by law and that the court grant injunctive relief as it deems appropriate.

**PLAINTIFFS HEREBY INVOKE THEIR RIGHT TO TRIAL BY JURY.**

Respectfully submitted,
Brian Kennedy and Michelle
Kennedy, Individually and as mother
and next friend of Brian Kennedy, Jr.
Mitchell Kennedy and Dylan
Kennedy
by their counsel,

Date:   November 5, 2004

Andrew M. Fischer
BB0# 167040
JASON & FISCHER
47 Winter Street
Boston, MA 02108
(617) 423-7904

Frederick V. Gilgun, Jr.
NICHOLSON, SRETER & GILGUN, P.C.
BBO# 551477
33 Bedford Street, Suite 4
Lexington, MA 02420
(781) 861-9160

42

## VERIFICATION OF COMPLAINT

I have read each of the allegations set forth in the complaint herein and attest and verify the truth of each allegation. Signed and sworn under pains and penalties of perjury this 5th day of November, 2004.

Brian Kennedy

I have read each of the allegations set forth in the complaint herein and attest and verify the truth of each allegation. Signed and sworn under pains and penalties of perjury this 5ht day of November, 2004.

Michelle Kennedy, Individually and as Mother and Next Friend of Brian Kennedy, Jr., Mitchell Kennedy and Dylan Kennedy

43