# EXHIBIT 7

1

VOLUME:  I
PAGES:  1 through 124
EXHIBITS:  See Index


UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


* * * * * * * * * * * * * * * * * * * * * * * * * * * *
BRIAN KENNEDY and MICHELLE      )
KENNEDY, Individually and as    )
Mother and Next Friend of       )
BRIAN KENNEDY, JR., MITCHELL    )
KENNEDY, and DYLAN KENNEDY,     )      C.A. NO.
                 Plaintiffs,    )  04-CV-12357-PBS
                                )
        vs.                     )
                                )
TOWN OF BILLERICA, et al.,      )
                 Defendants.    )
* * * * * * * * * * * * * * * * * * * * * * * * * * * *



**DEPOSITION OF STEVEN ELMORE**, a witness called
on behalf of the Plaintiffs, taken pursuant to the
Provisions of the Federal Rules of Civil
Procedure, before Julie A. Healey, a Certified
Shorthand Reporter, Registered Professional
Reporter, and Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
Jason & Fischer, 47 Winter Street, Boston,
Massachusetts, on November 7, 2005, commencing at
2:00 p.m.



COPLEY COURT REPORTING
101 Tremont Street
Boston, Massachusetts 02108


COPLEY COURT REPORTING, INC.
(617) 423-5841

**Page 2**

1 APPEARANCES:

2 LAW OFFICES OF NICHOLSON, SRETER & GILGUN, P.C.
   BY: Frederick V. Gilgun, Jr., Esq.
3 33 Bedford Street, Suite 4
   Lexington, Massachusetts 02420
4 Counsel for the Plaintiffs

5

6 BRODY, HARDOON, PERKINS & KESTEN, LLP
   BY: Jeremy Silverfine, Esq.
7 One Exeter Plaza
   Boston, Massachusetts 02116
8 Counsel for the Defendants

9

10 ALSO PRESENT:

11 Michelle Kennedy
   John Mackin, Jr., IBPO
12

13

14

15

16

17
18
19
20
21
22
23
24

---

**Page 3**

1                    I N D E X

2 Witness        Direct      Cross

3 STEVEN ELMORE

4 (By Mr. Gilgun)        4

5

6

7

8

9
                   E X H I B I T S
10
   Exhibit No.              Page
11

12   15  Statement of David Lumbert    54

13   16  Statement of Craig Pickering  63

14   17  Investigative Action Report  66

15   18  Investigative Action Report  76

16   19  Investigative Action Report  108

17   20  Investigative Action Report  109

18

19

20

21

22
23
24

---

**Page 4**

1                    PROCEEDINGS
2                STEVEN ELMORE, having been
3 satisfactorily identified by Attorney Silverfine
4 and duly sworn by the Notary Public, was examined
5 and testified as follows:
6                DIRECT EXAMINATION
7 BY MR. GILGUN:
8    Q.    Could you please state your name for the
9 record?
10   A.    Steven Elmore, E-L-M-O-R-E.
11   Q.    Mr. Elmore, what is your rank within the
12 Billerica Police Department?
13   A.    Sergeant.
14   Q.    Do you go by any other names?
15   A.    No.
16   Q.    What is your date of birth?
17   A.    3/30/62.
18   Q.    And you live in Billerica?
19   A.    Correct.
20   Q.    Have you lived in Billerica all your
21 life?
22   A.    Not exactly.
23   Q.    Okay. Did you graduate from Billerica
24 High School?

---

**Page 5**

1    A.    I did.
2    Q.    What class were you in?
3    A.    1980.
4    Q.    Do you own a home in Billerica?
5    A.    I do.
6    Q.    Do you have any ownership interest in any
7 trust?
8    A.    Describe a trust for me, what is it?
9    Q.    Well, a trust can own real estate, it's a
10 legal entity that can own assets such as real
11 estate, such as other investments?
12   A.    Yes.
13   Q.    Okay. Can you describe for me what that
14 trust holds in terms of assets?
15   A.    A real estate holding.
16   Q.    And are you a beneficiary of that trust,
17 that is, you have a beneficial ownership in the
18 trust?
19   A.    I am an owner, yes.
20   Q.    What percentage ownership do you have in
21 the trust?
22   A.    50 percent.
23   Q.    Who is your partner in that?
24   A.    My wife.

---

**Page 6**

1    Q.    And where is the property located that
2 you own in the name of the trust?
3    A.    In Dracut.
4    Q.    What is the name of the trust?
5          MR. SILVERFINE: I don't know, are
6 you having problems answering, or?
7          THE WITNESS: I don't understand,
8 what is a trust?
9          MR. SILVERFINE: I don't think he
10 understands what a trust is, so, maybe you guys
11 are on different wavelengths.
12 BY MR. GILGUN:
13   Q.    Who is the owner of record of the
14 property in Dracut?
15   A.    I am.
16   Q.    You individually?
17   A.    With my wife.
18   Q.    You don't hold it, for example, in the
19 XYZ Realty Trust?
20   A.    No, no.
21   Q.    Okay, and the property that you own in
22 Dracut, do you live there?
23   A.    No.
24   Q.    Is that rental property for you?

---

**Page 7**

1    A.    Yes.
2    Q.    And what's the address of the property?
3    A.    35 School Street.
4    Q.    Do you have any ownership interests in
5 any partnerships?
6    A.    Yes, I do.
7    Q.    What is the name of the partnership?
8    A.    Crowinmore Realty.
9    Q.    Could you spell that, please?
10   A.    C-R-O-W-I-N-M-O-R-E.
11   Q.    And what is the business of Crowinmore
12 Real Estate?
13   A.    Additions, decks, sheds.
14   Q.    What ownership interest do you have in
15 that partnership?
16   A.    33 percent.
17   Q.    Who are your partners in that?
18   A.    John Crowley and Mike Gianetti.
19   Q.    Does the partnership have any holdings?
20   A.    No.
21   Q.    Are you employed by the partnership?
22   A.    No.
23   Q.    Do you receive dividends from the
24 partnership?

**8**

1  **A.**  If there's a job done, we get paid, yes.
2  **Q.**  Do you get paid pursuant to your
3  ownership in the partnership as opposed to any
4  work that you perform in connection with the job?
5  **A.**  Yes.
6  **Q.**  So, you just share in the profits, is
7  that fair to say?
8  **A.**  Yeah.
9  **Q.**  Does Mr. Crowley, and is it Mr. Gianetti?
10  **A.**  Gianetti.
11  **Q.**  Do they work for the partnership?
12  **A.**  When there's work, yes.
13  **Q.**  One has work in the partnership?
14  **A.**  When there's work.
15  **Q.**  Oh, okay.  Are there any other
16  partnerships you have ownership interest in?
17  **A.**  No.
18  **Q.**  What about corporations, any ownership
19  interest in any corporations?
20  **A.**  No.
21  **Q.**  What is your marital status?
22  **A.**  Married.
23  **Q.**  Your wife's name?
24  **A.**  Debra.

**9**

1  **Q.**  How long have you been married?
2  **A.**  Eighteen years.
3  **Q.**  Do you have any children?
4  **A.**  Yes.
5  **Q.**  How many?
6  **A.**  Three.
7  **Q.**  What are the ages of your children?
8  **A.**  Fifteen, thirteen, and eight.
9  **Q.**  Have you ever been deposed before?
10  **A.**  Yes.
11  **Q.**  How many times?
12  **A.**  Twice.
13  **Q.**  Can you tell me the nature of the actions
14  that you were deposed in?
15  **A.**  They would be civil suits I'd guess you
16  would call it.
17  **Q.**  Okay, and what were the causes of action
18  in the civil suits that you testified at
19  depositions for?
20  **A.**  Both prior cases were from, stemming from
21  arrests.
22  **Q.**  Were they arrests you were involved in?
23  **A.**  Yes.
24  **Q.**  Were you a party to those suits?

**10**

1  **A.**  Was I named in them?
2  **Q.**  Yes, as a party?
3  **A.**  Yes.
4  **Q.**  Were you named as a defendant?
5  **A.**  Yes.
6  **Q.**  Who was the plaintiff, who were the
7  plaintiffs in these suits?
8  **A.**  One was a female, the first one, the
9  other one is a male.  I don't recall the names
10  right now.  I'm sorry, the second one is Richard
11  Williams, I don't remember the woman's name.
12  **Q.**  When was it that Mr. Williams filed his
13  complaint against you?
14  **A.**  1995 maybe.
15  **Q.**  What were the allegations that
16  Mr. Williams brought against you in that
17  complaint?
18  **A.**  I don't know if it was misconduct or he
19  was claiming he was injured due to the arrest.
20  **Q.**  Was he claiming that you used excessive
21  force?
22  **A.**  That may have been in there.
23  **Q.**  And what was the result of that
24  litigation?

**11**

1  **A.**  There was never any conclusion to it, he
2  defaulted.
3  **Q.**  Was he representing himself or did he
4  have an attorney representing him?
5  **A.**  He had an attorney.
6  **Q.**  Where was that case brought, in what
7  court?
8  **A.**  I don't know.
9  **Q.**  Do you know if it was in the Federal
10  Court?
11  **A.**  I know the first one was, the second one
12  I don't know.
13  **Q.**  Was the first one brought by the woman?
14  **A.**  Yes, that was the United States Federal
15  Court.
16  **Q.**  So, you don't know whether or not
17  Mr. Williams federal case was brought in the
18  United States District Court or not?
19  **A.**  I don't.
20  **Q.**  Were there any other police officers
21  named in the complaint brought by Richard
22  Williams?
23  **A.**  No.
24  **Q.**  When did the incident allegedly take

**12**

1  place for which Mr. Williams brought this
2  complaint?
3  **A.**  1995.
4  **Q.**  With respect to the other civil lawsuit,
5  were you named as a defendant in that one as well?
6  **A.**  In the federal one?
7  **Q.**  Yes.
8  **A.**  Yes.
9  **Q.**  And were there any other officers named
10  as defendants in that case?
11  **A.**  Yes, there was.
12  **Q.**  Who else?
13  **A.**  Loranger, Weston.
14  **Q.**  Anybody else?
15  **A.**  I want to say maybe the Chief and the
16  town, I don't know if it was Barretto or Matthews.
17  **Q.**  And do you recall when that complaint was
18  brought against you?
19  **A.**  Before, before the Williams, maybe, like,
20  '93, '92.
21  **Q.**  And what was the result of that
22  litigation?
23  **A.**  That was an insurance settlement, it
24  never got to trial.

**13**

1  **Q.**  What were the allegations brought against
2  you in that complaint?
3  **A.**  There was, I think there was ten, I think
4  there was ten complaints in that one.  It was, I
5  remember one of them was we wouldn't let her use
6  the phone.
7  **Q.**  Was there anything more serious than not
8  letting her use the phone alleged in her
9  complaint?
10  **A.**  I don't remember.  There was ten, I know
11  there was ten, I know it was for 110 million
12  dollars in the Federal Court for each charge.
13  **Q.**  Do you know if any money was paid in the
14  settlement?
15  MR. SILVERFINE:  I don't know if
16  that's disclosable in the settlement.
17  MR. GILGUN:  If he doesn't know.
18  MR. SILVERFINE:  I'm just throwing it
19  out there by the terms of the agreement, but.
20  MR. GILGUN:  Okay.
21  BY MR. GILGUN:
22  **Q.**  Were any of the allegations in the
23  complaint, did they involve the use of excessive
24  force?

14

1   **A.**   They may have.
2   **Q.**   Did this woman allege that she was
3 injured, that is, that she suffered a physical
4 injury in any way?
5   **A.**   I don't recall, I don't remember.
6   **Q.**   And did the case proceed to a trial
7 before settlement or did it settle before the
8 trial?
9   **A.**   It settled before.
10   **Q.**   Were you ever disciplined for any actions
11 relating to either one of those two civil
12 lawsuits?
13   **A.**   No.
14   **Q.**   Was there ever an investigation conducted
15 within the Billerica Police Department relative to
16 the allegations brought in either of those two
17 lawsuits?
18   **A.**   None that I am aware of, no, sir.
19   **Q.**   I should backtrack actually.  You said
20 you've been deposed before, you know I'm going to
21 ask you questions, and if you don't understand a
22 question, just let me know and I'll try and
23 rephrase it so you can answer it.
24   **A.**   Sure.

15

1   **Q.**   And if you need to take a break, just let
2 us know.
3   **A.**   Sure.
4   **Q.**   What did you do to prepare for today's
5 deposition?
6   **A.**   Nothing.
7   **Q.**   Did you meet with your attorney in
8 preparation for today's deposition?
9   **A.**   Yes, I did.
10   **Q.**   Do you remember anything else you did in
11 preparation for today's deposition?
12   **A.**   Nothing.
13   **Q.**   When you met with your attorney, who was
14 present?
15   **A.**   Chief Rosa, Deputy Chief Conners,
16 Lieutenant MacKenzie, Officer Tsoukalas, Inspector
17 West, Billy West, Officer Farren, there was an
18 IBPO counselor there, I don't recall her name, my
19 counselor.
20   **Q.**   Anybody else?
21   **A.**   I think that's it.
22   **Q.**   Aside from telling somebody that you were
23 coming to this deposition, who did you speak to
24 about this deposition?

16

1   **A.**   I had a brief conversation with Officer
2 Tsoukalas about directions.
3   **Q.**   When you spoke to Officer Tsoukalas, was
4 it after he was deposed last week in this matter?
5   **A.**   Yes, it was.
6   **Q.**   And did you discuss with him anything
7 about his deposition?
8   **A.**   I just asked him how it went.
9   **Q.**   And what did he say?
10   **A.**   "Fine."
11   **Q.**   Was there anything more to your
12 conversation with Officer Tsoukalas relative to
13 his deposition?
14   **A.**   No, sir.
15   **Q.**   Did you speak with Deputy Chief Conners
16 following his deposition in this matter?
17   **A.**   No, I did not.
18   **Q.**   And you didn't speak to anybody else in
19 preparation for this deposition; is that correct?
20   **A.**   That's right.
21   **Q.**   And you didn't review any police reports
22 in preparation for the deposition, correct?
23   **A.**   No, I have not.
24   **Q.**   And you didn't review any audiotapes in

17

1 connection with this matter, did you?
2   **A.**   No, sir.
3   **Q.**   You didn't review any videotapes?
4   **A.**   No, sir.
5   **Q.**   Could you describe for me your education,
6 post high school education?
7   **A.**   I have an undergraduate degree from
8 Springfield College and a graduate degree from
9 Anna Maria, criminal justice.
10   **Q.**   In what year did you obtain your degree
11 from Springfield College?
12   **A.**   1989.
13   **Q.**   And what was your major course of studies
14 there?
15   **A.**   Criminal justice.
16   **Q.**   When did you get your master's degree
17 from Anna Maria?
18   **A.**   1997.
19   **Q.**   Have you ever been charged with a crime?
20   **A.**   No.
21   **Q.**   Have you ever been required to attend a
22 show cause hearing as a defendant?
23   **A.**   No.
24   **Q.**   Aside from the two lawsuits that you

18

1 spoke about earlier, have you ever been a party to
2 any other civil lawsuits?
3   **A.**   No, sir.
4   **Q.**   Aside from those two lawsuits that you
5 spoke about earlier, have you ever testified in
6 any civil lawsuits?
7   **A.**   No, sir.
8   **Q.**   Have you ever filed bankruptcy?
9   **A.**   No, sir.
10   **Q.**   What was your date of hire with the
11 Billerica Police Department?
12   **A.**   March 29th, 1991.
13   **Q.**   Were you hired as a full-time patrolman
14 at that time?
15   **A.**   Yes, sir.
16   **Q.**   Were you ever, did you ever hold a
17 position as a special officer prior to your
18 full-time employment in 1987?
19   **A.**   Yes, sir.
20   **Q.**   And when did you first hold that
21 position?
22   **A.**   September of 1983.
23   **Q.**   Was that a part-time position?
24   **A.**   Yes, sir, it was.

19

1   **Q.**   If you could just describe for me
2 chronologically the positions of employment you
3 have held following your graduation from Billerica
4 High School in 1980 up to the time that you became
5 employed as a full-time police officer in March of
6 '87?
7   **A.**   I got out of high school, I was a college
8 student for a year, I went to work for Crowinmore
9 Construction doing concrete foundations from 1982,
10 I went to work at the Billerica House of
11 Correction for the Middlesex County Sheriff's
12 Department, 1983 to '87 where I was hired as a
13 Billerica Police officer.
14   **Q.**   What was your position with the Billerica
15 House of Correction?
16   **A.**   I was a correctional officer.
17   **Q.**   What was your reason for leaving there?
18   **A.**   The opportunity to become a full-time
19 police officer.
20   **Q.**   Were you ever disciplined when you worked
21 for the Billerica House of Correction?
22   **A.**   No, sir.
23   **Q.**   Did you ever have any complaints brought
24 against you?

**20**

1 **A.** No, sir.
2 **Q.** Aside from your position with the
3 Billerica House of Correction and your positions
4 with the Billerica Police Department, have you
5 ever held any other positions in law enforcement?
6 **A.** No, sir.
7 **Q.** In what year did you achieve the rank of
8 Sergeant?
9 **A.** 2000, June 26, 2000.
10 **Q.** Have you ever held any assignments such
11 as to the, as a detective since your employment
12 with the Billerica Police Department?
13 **A.** Yes, sir.
14 **Q.** What are those assignments?
15 **A.** As a detective.
16 **Q.** And when did you hold the position as a
17 detective?
18 **A.** I've been there three times.
19 **Q.** Can you give me time frames?
20 **A.** 1988, I don't remember the dates, 1992,
21 and 2004.
22 **Q.** Are all detectives within the Billerica
23 Police Department assigned to the Criminal Bureau?
24 **A.** Yes.

**21**

1 **Q.** How many officers are currently assigned
2 to the Criminal Bureau?
3 **A.** Seven.
4 **Q.** Has it been that way pretty much since
5 the late 80's?
6 **A.** Yes.
7 **Q.** What is your current salary?
8 **A.** Yearly?
9 **Q.** Yes.
10 **A.** I don't know.
11 **Q.** Weekly?
12 **A.** $1,300 a week.
13 **Q.** Are you aware of anyone ever having made
14 a verbal complaint against you as a police officer
15 aside from Mr. Williams and the woman who brought
16 the other matter in the Federal District Court
17 against you?
18 **A.** No.
19 **Q.** Are you aware of anyone ever having made
20 a written complaint against you, and again, please
21 don't include these two nor the complaint that was
22 filed in this case?
23 **A.** No, sir.
24 **Q.** Are you aware of any investigation ever

**22**

1 having been conducted by the Billerica Police
2 Department into your conduct as a police officer?
3 **A.** No, sir.
4 **Q.** Have you ever been interviewed by, I keep
5 on forgetting, what is the equivalent of your IAD
6 Department, the public, what is the name of that
7 department?
8          MR. SILVERFINE:  Professional
9 Standards?
10         MR. GILGUN:  Yes, Professional
11 Standards.
12 BY MR. GILGUN:
13 **Q.** Have you ever been interviewed by anybody
14 from the Professional Standards Bureau with
15 regards to the investigation of another police
16 officer?
17 **A.** No, sir.
18 **Q.** Are you aware of any investigations
19 having been conducted by the Public Standards
20 Bureau?
21         MR. SILVERFINE:  Professional
22 Standards.
23         MR. GILGUN:  I'm sorry, Professional
24 Standards.

**23**

1 BY MR. GILGUN:
2 **Q.** Are you aware of any investigations ever
3 having been conducted by that bureau?
4 **A.** One.
5 **Q.** Okay, and which one is that?
6 **A.** An ongoing investigation with Officer
7 Royston, I believe they are involved.
8 **Q.** How long has the Professional Standards
9 Bureau been a part of the Billerica Police
10 Department?
11 **A.** I don't know.
12 **Q.** Has it been for as long as you remember
13 or is it a recent creation?
14 **A.** I'd have to have a definition of the
15 Professional Standards Bureau, has there always
16 been somebody there in my career to answer a
17 complaint?
18 **Q.** Okay, let's go with that.  What
19 department within the bureau investigated
20 complaints of misconduct by police officers in the
21 1980's?
22 **A.** The deputy chief then and now I believe
23 handles complaints.
24 **Q.** And what role does the investigative

**24**

1 bureau play into investigations of police
2 misconduct?
3 **A.** It must be upstairs, I'm not privy to it.
4 **Q.** What is your understanding as to how an
5 investigation commences through the deputy chief's
6 office, are all complaints that are made forwarded
7 to the deputy chief, is that the way it works?
8 **A.** If, it would be dependent upon the level
9 of the complaint I guess would clarify that for
10 you.  If someone came in and were mad about a
11 ticket, it would probably stay at the front desk,
12 maybe someone didn't like the officer's attitude,
13 it would stay at that level.
14         I guess it would rise to what level of
15 allegation is occurring at the front window.
16 **Q.** Are you aware of any procedures or
17 regulations that control, within the department
18 that control when a complaint is forwarded to the
19 deputy chief?
20 **A.** No.
21 **Q.** Okay.  What procedures are you aware of
22 regarding complaints that are -- let me strike
23 that.
24         What procedures are you aware of that

**25**

1 would provide you with guidance on what to do if
2 you received a complaint from a civilian about
3 policeman's conduct by another officer?
4 **A.** In my experience myself, again, I think
5 it rises to what the allegation is as to whether
6 or not it is something that can be aired out at
7 the front window with the shift commander or if it
8 is something that needs to go beyond that
9 upstairs.
10 **Q.** But are you aware of any procedures --
11 **A.** No.
12 **Q.** -- that dictate that?
13 **A.** No, I'm not, no, sir.
14 **Q.** Okay.  Is it fair to say that any time
15 you have received a complaint -- or let me ask
16 you.
17         Have you ever received a complaint from a
18 civilian regarding police misconduct of another
19 officer?
20 **A.** Say it again?
21 **Q.** Have you ever received a complaint from a
22 civilian concerning police misconduct of another
23 police officer?
24 **A.** Yes.

**26**

1  **Q.**  On how many occasions?
2  **A.**  Once.
3  **Q.**  And who was the officer?
4  **A.**  Officer Royston.
5  **Q.**  And who was the civilian that made the
6 complaint?
7  **A.**  His ex-wife.
8  **Q.**  So, in the eighteen years you've been in
9 the department, that's the only time you've
10 received a complaint from a civilian regarding
11 misconduct by another police officer?
12  **A.**  Yes, and that was in the capacity of a
13 supervisor.
14  **Q.**  Have you ever been the subject of any
15 disciplinary action by the Billerica Police
16 Department?
17  **A.**  No, sir.
18  **Q.**  Have you ever been involuntarily removed
19 or transferred from an assignment?
20  **A.**  Yes, sir.
21  **Q.**  And what assignment was that?
22  **A.**  Chief of Detectives.
23  **Q.**  And what was the reason for your being
24 reassigned?

**27**

1  **A.**  I don't know.
2  **Q.**  When did that happen?
3  **A.**  September of last year.
4  **Q.**  Whose decision was that?
5  **A.**  Chief Rosa.
6  **Q.**  So, that was something that you did not
7 prefer to have happen, correct?
8  **A.**  Correct.
9  **Q.**  Did you ever speak to the Chief about
10 that?
11  **A.**  I did.
12  **Q.**  And what was his explanation why you were
13 removed?
14  **A.**  The Chief's discretion where he moves his
15 bosses, and it was a realignment, reassignment, he
16 was moving some bosses around, and he's the boss.
17  **Q.**  Did he indicate in any way that it was
18 due to any of your, any performance by you?
19  **A.**  No.
20  **Q.**  How would you describe your working
21 relationship with Chief Rosa?
22  **A.**  Very good.
23  **Q.**  Is that the only time you've ever been
24 involuntarily removed or reassigned from a

**28**

1 position?
2  **A.**  Yes.
3  **Q.**  When did you first become aware of
4 Michelle Kennedy?
5  **A.**  I don't know.
6  **Q.**  Did you know her when she was in high
7 school?
8  **A.**  No.
9  **Q.**  Do you know how it is that you first,
10 Michelle Kennedy first became known to you?
11  **A.**  I don't remember.
12  **Q.**  At any point in time did you have a
13 relationship that you would describe as friendly
14 with Michelle Kennedy?
15  **A.**  I wouldn't describe it as friendly, it
16 was, you know, I might see her and wave, something
17 like that.
18  **Q.**  Prior to coming to know Michelle Kennedy,
19 did you know any of Michelle Kennedy's family?
20  **A.**  Yes.
21  **Q.**  And who did you know?
22  **A.**  Her brother, Donnie.
23  **Q.**  And that's Donnie St. John?
24  **A.**  Yes.

**29**

1  **Q.**  How did you know Donnie?
2  **A.**  Donnie and I went to school together.
3  **Q.**  How would you describe your relationship
4 with Donnie St. John over the years?
5  **A.**  Fine.
6  **Q.**  Were you friends?
7  **A.**  The same thing, you know, hi.
8  **Q.**  And prior to coming to know Michelle
9 Kennedy, did you know any of her other siblings or
10 parents?
11  **A.**  No.
12  **Q.**  You didn't know Joyce Tibbetts prior to
13 knowing Michelle Kennedy?
14  **A.**  No.
15  **Q.**  What about with respect to Brian Kennedy,
16 when did you first come to know Brian Kennedy?
17  **A.**  The same memory, just somewhere along the
18 line I guess, I don't know.
19  **Q.**  Was it at the same time that you came to
20 know Michelle Kennedy?
21  **A.**  I don't recall. I don't know the exact
22 time I can say that I met Brian.
23  **Q.**  Did you know Brian Kennedy when he was in
24 high school?

**30**

1  **A.**  No.
2  **Q.**  Did you know any of Brian Kennedy's
3 family prior to coming to know Brian Kennedy?
4  **A.**  Yes.
5  **Q.**  And who did you know?
6  **A.**  Sharon Kennedy, his sister.
7  **Q.**  How did you know Sharon?
8  **A.**  She attended high school with me.
9  **Q.**  How would you describe your relationship
10 with Sharon Kennedy?
11  **A.**  Friendly.
12  **Q.**  Are you still friendly with her today?
13  **A.**  I don't see her.
14  **Q.**  Anybody else from Brian Kennedy's family
15 that you knew prior to knowing Brian Kennedy?
16  **A.**  No.
17  **Q.**  Do you know if Brian or Michelle Kennedy
18 were ever the subject of a narcotics investigation
19 by the Billerica Police Department?
20  **A.**  I don't know.
21  **Q.**  Did you ever hear that rumor?
22  **A.**  Yes.
23  **Q.**  Where did you hear that?
24  **A.**  Somewhere in the station.

**31**

1  **Q.**  What did you hear about that?
2  **A.**  That there was some kind of investigation
3 going on about narcotics dealings.
4  **Q.**  Do you know when that was?
5  **A.**  No, I don't.
6  **Q.**  Would it have been after you came to know
7 who Michelle Kennedy was?
8  **A.**  I don't know.
9  **Q.**  You don't know who within the department
10 it was that told you about this investigation?
11  **A.**  No, sir.
12  **Q.**  Did you ever speak with Frank MacKenzie
13 about this investigation?
14  **A.**  No, sir.
15  **Q.**  Were you working within the Criminal
16 Bureau when you heard of this investigation?
17  **A.**  I don't remember if I was a detective or
18 a patrolman.
19  **Q.**  Do you know if you heard about the
20 investigation at the time when it was ongoing or
21 after it had concluded?
22  **A.**  I don't know.
23  **Q.**  Do you know if either Brian or Michelle
24 Kennedy were ever arrested for any narcotics

**32**

1 offenses?
2   **A.** I don't know.
3   **Q.** I believe you indicated the first time
4 you were in the Criminal Bureau as a detective was
5 1988, correct?
6   **A.** Somewhere in there, yes.
7   **Q.** You don't recall whether or not it was
8 during that time that you learned of the alleged
9 narcotic activity engaged in by the Kennedy's?
10   **A.** No, sir.
11   **Q.** What do you know about any problems the
12 Kennedy's have had with anybody from the Reslow
13 family?
14   **A.** What do I know?
15   **Q.** Yes.
16   **A.** There was some animosity back, I couldn't
17 tell you when, but there was, there was animosity
18 between the Kennedy's and the Reslow's.
19   **Q.** What more do you know about it than that?
20   **A.** That's all I know.
21   **Q.** Do you know if there was any, well -- let
22 me strike that.
23     What was the source of your knowledge
24 about the animosity between the Kennedy's and the

**33**

1 Reslow's?
2   **A.** Just again, at the police station.
3   **Q.** Did you ever speak to the Reslow's about
4 the Kennedy's?
5   **A.** Me personally?
6   **Q.** Yes.
7   **A.** No.
8   **Q.** What about the relationship or the
9 history of any problems between the Kennedy's and
10 the Oblenis family?
11   **A.** Along the same vein, just a general
12 disliking I guess. I don't know if it's a
13 neighborhood thing, or.
14   **Q.** Did you ever speak to anybody from the
15 Oblenis family about the Kennedy's?
16   **A.** No, sir.
17   **Q.** If I could direct your attention back to
18 the early 90's, specifically 1991, do you recall
19 what officer or what Lieutenant MacKenzie's
20 relationship was with Ms. Kennedy?
21   **A.** None that I am aware of.
22   **Q.** Are you ever aware of Lieutenant
23 MacKenzie ever having a friendship with Michelle
24 Kennedy?

**34**

1   **A.** Describe friendship.
2   **Q.** Did you ever see him socialize with her?
3   **A.** No.
4   **Q.** Did he ever tell you that he socialized
5 with her?
6   **A.** Never.
7   **Q.** Do you know if he ever spoke with her on
8 the telephone?
9   **A.** I don't know.
10   **Q.** What do you know of any relationship that
11 they had together?
12   **A.** None.
13   **Q.** Did you ever see him speak with her in
14 person?
15   **A.** Yes.
16   **Q.** Where?
17   **A.** Maybe at the Concord Shores establishment
18 that was in Billerica that is no longer there
19 anymore.
20   **Q.** Is that an establishment that you used to
21 frequent?
22   **A.** From time to time, yes.
23   **Q.** And would you go there with Officer
24 MacKenzie?

**35**

1   **A.** And others, yes.
2   **Q.** Did you see Michelle Kennedy there on
3 occasion?
4   **A.** Yeah.
5   **Q.** And on the occasions that you were there
6 with officer, with Lieutenant MacKenzie, did you
7 ever see him dance with her?
8   **A.** No.
9   **Q.** Was it a dance club?
10   **A.** They had bands, I don't know if they had
11 a DJ. They had a little dance floor, small dance
12 floor, yeah.
13   **Q.** But that's where you would have seen him
14 speaking with her?
15   **A.** Yes.
16   **Q.** Did you ever talk with or speak with
17 Lieutenant MacKenzie about his interest in
18 Michelle Kennedy?
19   **A.** Never.
20   **Q.** He never expressed an interest in
21 pursuing a romantic or sexual relationship with
22 her?
23   **A.** Never.
24   **Q.** Did you ever witness Lieutenant MacKenzie

**36**

1 ever purchase any gifts for Michelle Kennedy?
2   **A.** No, sir.
3   **Q.** Are you aware of Lieutenant MacKenzie
4 ever having any marital problems back in the early
5 90's?
6   **A.** Yes, sir.
7   **Q.** What time frame was that that you recall
8 he was having marital problems?
9   **A.** I don't know what the dates were or what
10 year it was, I don't recall that.
11   **Q.** How long do you recall that he was having
12 marital problems in the early 90's?
13   **A.** I don't know.
14   **Q.** Was it longer than a year?
15   **A.** I don't know.
16   **Q.** Do you know what the source or did you
17 ever hear what the source of the problem was
18 relative to his marriage?
19   **A.** No.
20   **Q.** Did he ever speak to you about his
21 marital problems?
22   **A.** No.
23   **Q.** How did you learn about his marital
24 problems?

**37**

1   **A.** Again, at work, in the hallways, people
2 saying things.
3   **Q.** Are you aware of him ever having moved
4 out of his house in the early 90's?
5   **A.** No.
6   **Q.** Are you aware of him ever having taken a
7 room at the Burlington Sheraton during the early
8 90's?
9   **A.** No, sir.
10   **Q.** Have you ever heard that Michelle Kennedy
11 had a meeting with Kim MacKenzie at any point in
12 the early 90's?
13   **A.** No, sir.
14   **Q.** Do you know an individual by the name of
15 David Algier?
16   **A.** No, sir.
17   **Q.** Do you know any Algier's from Billerica?
18   **A.** I don't think it's David, it's, there's a
19 Leo Algier, and well, maybe his name is David. I
20 think they're brothers.
21   **Q.** Are you familiar with any of the Algier's
22 who were friendly with Brian Kennedy?
23   **A.** I don't know what their relationship is.
24   **Q.** Did you ever speak with Mr. Algier, any

**38**

1 of the Algier's that you know regarding the
2 Kennedy's?
3   A.   No, sir.
4   Q.   Were you ever with Frank MacKenzie when
5 he went to Michelle Kennedy's home on Leicester
6 Street?
7   A.   No, sir.
8   Q.   Are you aware of an incident in September
9 of 1991 when Brian Kennedy's pickup truck was fire
10 bombed?
11   A.   Am I aware of it?
12   Q.   Yes.
13   A.   Yes, sir.
14   Q.   Were you made aware of it at the time
15 that it happened?
16   A.   Sometime later on, yes.
17   Q.   And how were you made aware of it?
18   A.   Again, through people at the station just
19 talking.
20   Q.   And what did you hear regarding that
21 incident particularly as to whether or not it was
22 an arson?
23   A.   That the incident, Brian's truck was a
24 loss, Tewksbury investigated it, and somewhere

**39**

1 along the line, the Reslow's, the Reslow's name
2 come up that they were a responsible party.
3   Q.   Do you know why it was that Tewksbury
4 investigated the incident?
5   A.   The Kennedy's residence was in the Town
6 of Tewksbury.
7   Q.   Did you ever speak with anybody from the
8 Tewksbury Police Department regarding that arson
9 investigation?
10   A.   No, sir.
11   Q.   Are you aware if Billerica engaged in any
12 investigation into that arson?
13   A.   I think a Billerica guy showed up that
14 night originally.
15   Q.   Beyond that, are you aware of any
16 investigation undertaken by the Billerica Police
17 Department?
18   A.   No, sir.
19   Q.   How is it that you learned that the
20 Reslow's name came up in connection with that
21 arson?
22   A.   I don't know if the Reslow's were
23 interviewed.  Again, it was somewhere at the
24 station.

**40**

1   Q.   Did you ever hear Frank MacKenzie's name
2 come up in connection with that arson?
3   A.   No, I haven't.
4   Q.   Have you ever heard an allegation that
5 Michelle Kennedy made that it was Officer
6 MacKenzie that had something to do with the arson?
7   A.   Not that I am aware of, no, sir.
8   Q.   Did you read the complaint that was filed
9 in connection with this case?
10   A.   Briefly, primarily looked at my, my
11 involvement with this.
12   Q.   Okay.  Do you recall reading anything
13 about the arson that we're talking about in that
14 complaint?
15   A.   Yeah, there must be something in there,
16 yes.
17   Q.   Do you know if you were working at the
18 time that this arson occurred?
19   A.   What time was it?
20   Q.   It was alleged to have occurred at 2:45
21 in the morning.
22   A.   Was I on duty then?
23   Q.   Yes.
24   A.   No, sir.

**41**

1   Q.   How is it you can say that with
2 certainty?
3   A.   Because I worked the C shift, four to
4 twelve shift for a good many years.
5   Q.   So, during the time frame of the early
6 90's, you were working the four to twelve shift?
7   A.   Yes.
8   Q.   Do you know what shift Officer MacKenzie
9 was working at that time?
10   A.   I don't.
11   Q.   How would you describe your relationship
12 with Officer MacKenzie?
13   A.   Friendly.
14   Q.   Is he one of your closest friends on the
15 department?
16   A.   I have a lot of friends on the police
17 department.
18   Q.   Do you have varying degrees of friendship
19 with members of the police department?
20   A.   Sure, yes.
21   Q.   Would you consider him one of your closer
22 friends?
23   A.   He's a friend.
24   Q.   In terms of varying degrees of friendship

**42**

1 that you have with members of the police?
2   A.   Moderately friendly.
3   Q.   And do you have somebody who you are
4 extremely friendly with?
5   A.   Not really.
6   Q.   What is the highest level of friendship
7 you have with any member of the department?
8   A.   Moderately friendly.
9   Q.   And Officer MacKenzie would fall into
10 that category?
11   A.   Yes, sir.
12   Q.   Who else would fall into that category?
13   A.   There's a lot of guys.
14   Q.   Who else?
15   A.   Doyle, Rohnstock, R-O-H-N-S-T-O-C-K,
16 Balboni, Loranger, Nestor, Casey, pretty much just
17 generally friendly with everybody.
18   Q.   Do you recall whether or not back in the
19 early 90's you were riding two in a car on patrol,
20 or was it one in a car?
21   A.   Some nights it was one, some nights it
22 was two.
23   Q.   Do you know what dictated whether or not
24 it was one or two?

**43**

1   A.   The manpower and cruisers were running
2 and the cruisers were in maintenance, it would
3 vary.
4   Q.   Did you ever at any time have a
5 particular partner assigned to work with you over
6 a period of time?
7   A.   It would vary, it would fluctuate
8 depending on the manpower or what shifts if you're
9 in different groups.
10   Q.   At any given time during your eighteen
11 years with the Billerica Police Department, did
12 you ever have a partner assigned to you beyond
13 just that shift so you knew coming in the next day
14 this was my partner who was my partner yesterday
15 and who will be my partner tomorrow?
16   A.   We didn't have assigned partners, we'd
17 show up at roll call, and the boss would tell you
18 where to go.
19   Q.   Okay.  At the time that Mr. Kennedy's
20 pickup truck was the subject of the arson, did you
21 know whether or not it was insured?
22   A.   No, sir.
23   Q.   Did you ever speak with Deputy Chief
24 Conners about this arson?

**44**

```
 1    A.   No, sir.
 2    Q.   Did you ever see Mr. Kennedy's pickup
 3 truck after it had been set afire?
 4    A.   Yes, I did.
 5    Q.   And when was that?
 6    A.   I have, I don't know what day it was, I
 7 remember it going by on a flatbed.
 8    Q.   And who was operating the flatbed; do you
 9 remember?
10    A.   I don't recall.
11    Q.   And were you on patrol at the time?
12    A.   Yes, I was.
13    Q.   And do you recall who you were with at
14 the time?
15    A.   I do not.
16    Q.   Was it Officer MacKenzie?
17    A.   I don't recall.
18    Q.   Do you recall if you had a partner with
19 you at that time?
20    A.   I don't.
21    Q.   What else do you recall, was there a stop
22 of the flatbed?
23    A.   I don't remember, I remember, I remember
24 the truck being on the flatbed, and I remember
```

**45**

```
 1 being in a cruiser, I want to say North Billerica
 2 somewhere, but I don't remember where.
 3    Q.   Do you remember having any conversation
 4 with Mr. Kennedy at that time when the pickup
 5 truck was on the flatbed?
 6    A.   I don't.
 7    Q.   Do you recall if Officer MacKenzie had
 8 any conversation with Mr. Kennedy at that time?
 9    A.   I don't.
10    Q.   Do you know a Mr. Herb Vacca?
11    A.   I know the Vacca family from Wilson
12 Street.  I don't know if that's the same family or
13 not.
14    Q.   Do you know if the Vacca family or
15 someone within the Vacca family is involved in the
16 towing business or was?
17    A.   Yeah, I was going to say maybe many years
18 ago, it's a long time ago.
19    Q.   Having said that name, does that refresh
20 your memory as to who was operating the flatbed?
21    A.   No.
22    Q.   Do you recall a traffic stop of Brian
23 Kennedy and any Lieutenant MacKenzie a few days
24 before Mr. Kennedy's pickup truck was set afire?
```

**46**

```
 1    A.   No.
 2    Q.   Did you ever hear Lieutenant MacKenzie
 3 threaten Brian Kennedy?
 4    A.   No.
 5    Q.   Do you know a Tracy Heffernan?
 6    A.   Yes.
 7    Q.   What do you know about her?
 8    A.   Resident of North Billerica.
 9    Q.   Do you know anything more than that?
10    A.   No.
11    Q.   Has she had any involvement with the
12 Billerica Police Department that you are aware of?
13    A.   I believe she did.
14    Q.   What information do you have relative to
15 that?
16    A.   Nothing specific, I know the name and I
17 know there was some dealings.
18    Q.   Have you ever had a conversation with
19 Tracy Heffernan?
20    A.   Yes.
21    Q.   And when was that?
22    A.   No idea.
23    Q.   What was it regarding?
24    A.   No idea.
```

**47**

```
 1    Q.   How is it you have a memory of it?
 2    A.   I don't have a memory of it, I'm assuming
 3 over fifteen years being back there between her
 4 brother, her sister and her, somewhere along the
 5 lines, I'm trying to be forthcoming here, I'm sure
 6 there was a conversation somewhere.
 7    Q.   When you say, when you refer to back
 8 there, what are you referring to?
 9    A.   Fifteen years ago, sixteen years ago.
10    Q.   Did her family have a lot of involvement
11 with the Billerica Police Department?
12    A.   Yeah.
13    Q.   Did you ever speak with Lieutenant
14 MacKenzie about Tracy Heffernan?
15    A.   No, sir.
16    Q.   Are you aware that Ms. Heffernan made a
17 complaint at one point in time that she was, had a
18 conversation with Officer MacKenzie wherein he
19 offered to pay her money to injure Michelle
20 Kennedy?
21    A.   No, sir.
22    Q.   You have never heard of that allegation?
23    A.   No, I have not.
24    Q.   Do you know an individual by the name of
```

**48**

```
 1 Paul Parent?
 2    A.   Yes, I do.
 3    Q.   How do you know Mr. Parent?
 4    A.   He is, he was or is an instructor for the
 5 Criminal Justice Council.
 6    Q.   When was the last time that you are aware
 7 he was an instructor for the Mass. Criminal
 8 Justice Council?
 9    A.   Three or four years ago.
10    Q.   Do you know what areas he teaches?
11    A.   No, sir, I don't.
12    Q.   Do you know if he still lives in
13 Billerica?
14    A.   I don't know.
15    Q.   How is it you learned he was an
16 instructor for the Mass. Criminal Justice Council?
17    A.   I think one of the recruits, I don't know
18 which one, one of the recruits went through an
19 academy and said there was an instructor that was
20 friendly with a couple Billerica guys.
21    Q.   Who was he friendly with?
22    A.   I don't know.
23    Q.   Were you one of the ones he was friendly
24 with?
```

**49**

```
 1    A.   Yes.
 2    Q.   Are you still friends with him today?
 3    A.   No.
 4    Q.   When was the last time you would consider
 5 yourself to have been friends with Paul Parent?
 6    A.   I probably haven't talked to him in a
 7 couple years.
 8    Q.   Who else did he indicate he was friendly
 9 with from the Billerica Police Department besides
10 you?
11    A.   No one.
12    Q.   Didn't you say he was friendly with a
13 couple of the guys?
14    A.   He said he was friendly with a couple
15 Billerica guys, and I said, "I know Paul Parent,
16 played football for U Lowell twenty years ago."
17    Q.   Did you play football for U Lowell?
18    A.   No, I had a friend of mine that played
19 there.
20    Q.   In the early 90's then, would you
21 consider yourself to have been friends with Paul
22 Parent?
23    A.   Sure.
24    Q.   Did you socialize with him?
```

50

1   **A.**   From time to time, yes.
2   **Q.**   On any of those occasions that you
3 socialized with him, do you know if you went to
4 the Concord Shores?
5   **A.**   Yes.
6   **Q.**   Do you recall an incident at the Concord
7 Shores in 1991 that led to the arrest of Paul
8 Parent?
9   **A.**   They arrested Paul Parent, no, sir.
10   **Q.**   Have you ever been made aware that Paul
11 Parent was arrested in connection with an assault
12 and battery on Brian Kennedy?
13   **A.**   Yes, I was.
14   **Q.**   What information do you have relative to
15 that?
16   **A.**   I don't know what the outcome, I don't
17 know what the legal standing is, I don't know if
18 it was a hearing, an arrest, but it was a pushing
19 match with Mr. Parent and Brian Kennedy, and then
20 everybody went outside, and I never went outside,
21 so, I didn't know the outcome until a couple days
22 later.
23        I still don't know if it was a hearing or
24 an arrest.

51

1   **Q.**   So, you were present at the time of this
2 pushing match?
3   **A.**   Yes, I was.
4   **Q.**   And where were you?
5   **A.**   At the Concord Shores.
6   **Q.**   And who were you present with that
7 evening?
8   **A.**   I don't recall who was there.
9   **Q.**   Were you with Paul Parent that evening?
10   **A.**   No.
11   **Q.**   Do you recall if Lieutenant MacKenzie was
12 with you that evening?
13   **A.**   I don't recall.
14   **Q.**   Do you recall having any conversation
15 with Mr. Parent that evening?
16   **A.**   No.
17   **Q.**   Do you know who the officer was who was
18 working the detail that evening for the Billerica
19 Police Department?
20   **A.**   Officer Loranger.
21   **Q.**   Do you know if Officer Loranger ever
22 conducted an investigation into this matter?
23   **A.**   I don't know.   It all went outside, so.
24   **Q.**   Did you see Officer Loranger get involved

52

1 when this pushing match took place between
2 Mr. Kennedy and Mr. Parent?
3   **A.**   It was more of a whole group, just, you
4 know, separating people and taking people out the
5 door to get them outside.
6   **Q.**   Were you part of that group separating
7 people?
8   **A.**   No.
9   **Q.**   Do you know who was part of that group?
10   **A.**   No, it was just the whole, whole group of
11 people, you know, just intervening, getting
12 between them and just separating them.
13   **Q.**   What did you observe Mr. Kennedy doing
14 prior to the incident with Mr. Parent that
15 evening?
16   **A.**   I didn't observe Brian doing anything.
17   **Q.**   Did you see how this altercation between
18 Mr. Kennedy and Mr. Parent started?
19   **A.**   No, I did not.
20   **Q.**   When you said they went outside, who went
21 outside that you know?
22   **A.**   Mr. Parent, Mr. Kennedy, Officer
23 Loranger, and several other patrons.
24   **Q.**   Do you know if any other officers,

53

1 whether they were on duty or off, whether they
2 went outside?
3   **A.**   I don't.
4   **Q.**   And you don't know whether or not Paul
5 Parent was prosecuted for this event?
6   **A.**   I don't know.
7   **Q.**   At any time did you speak to any
8 witnesses to this incident after the incident took
9 place?
10   **A.**   Me personally?
11   **Q.**   Yes.
12   **A.**   No, sir.
13   **Q.**   Did you ever speak to Paul Parent after
14 this incident took place?
15   **A.**   No, sir.
16   **Q.**   Did you remain friends with Mr. Parent
17 after this incident?
18   **A.**   When I'd see him, sure.
19   **Q.**   Do you know if Mr. Parent had any
20 involvement with the Billerica Police Department
21 prior to this incident?
22   **A.**   No, sir.
23   **Q.**   Do you know an individual by the name of
24 David Lumbert?

54

1   **A.**   Yes.
2   **Q.**   How do you know Mr. Lumbert?
3   **A.**   Through the job.
4   **Q.**   Could you be more specific as to how you
5 got to know Mr. Lumbert through your job?
6   **A.**   I'm trying to think if this was the
7 Lumbert that was a bartender or bar back, if
8 that's the right Lumbert at the Concord Shores.
9   **Q.**   Okay, and did you work details at the
10 Concord Shores?
11   **A.**   Yes.
12   **Q.**   And do you ever recall speaking with
13 Mr. Lumbert regarding the incident between
14 Mr. Parent and Mr. Kennedy?
15   **A.**   No, sir.
16   **Q.**   Did you ever speak with Detective Howe at
17 any time regarding the incident that took place at
18 the Concord Shores involving Mr. Kennedy and
19 Mr. Parent?
20   **A.**   Not that I am aware of.
21        MR. GILGUN:  Can I have you mark this
22 for identification as the next exhibit.
23        (Exhibit No. 15, Statement of David
24 Lumbert, marked for identification.)

55

1 BY MR. GILGUN:
2   **Q.**   Sergeant, can you take a look at what's
3 been marked as Exhibit No. 15, and once you've had
4 a chance to review that, if you would let me know.
5   **A.**   Okay.
6        (A short break was taken.)
7 BY MR. GILGUN:
8   **Q.**   Sergeant, you had an opportunity to
9 review that Exhibit No. 15?
10   **A.**   Yes, sir.
11   **Q.**   Have you ever seen that document before?
12   **A.**   No, sir.
13   **Q.**   Okay.  Do you see it appears to be a
14 report prepared by Detective Richard Howe?
15   **A.**   Yes, sir.
16   **Q.**   Okay, and do you see in the last
17 paragraph on the first page in the first sentence,
18 it states that "Mr. Lumbert then stated that the
19 night before this case was to go to trial, Officer
20 Elmore came to the Concord Shores to remind him he
21 had to be in court as a witness the next day."
22        Do you see that statement?
23   **A.**   Yes, sir.
24   **Q.**   Is it still your position that you never

**56**

1 spoke to any witnesses regarding the altercation
2 between Paul Parent and Brian Kennedy that took
3 place back at the Concord Shores back in 1991?
4     MR. SILVERFINE: Objection as to
5 form. You can answer.
6 BY MR. GILGUN:
7     A.   Reminding him that he had a court date?
8     Q.   Do you remember that, sir?
9     A.   I don't remember, I don't know if it was
10 a summons service or what.
11     Q.   You have no memory of speaking to
12 Mr. Lumbert about his need to go to court in
13 regard to his involvement in the altercation
14 between Paul Parent and Brian Kennedy?
15     A.   No, sir.
16     Q.   When you just talked about summons
17 service, are there occasions when you are required
18 as a police officer to speak to witnesses that
19 need to go to court?
20     A.   It's, I wouldn't define it as having
21 speaking or conversations with them, it's a
22 summons service from district court that they are
23 to appear.
24     Q.   Have you had occasion as a police officer

**57**

1 to serve summonses on people?
2     A.   Lots of times.
3     Q.   In connection with their appearance as a
4 witness for a trial?
5     A.   Yes, sir.
6     Q.   Do you know typically when the summons is
7 served in relationship to the time they are needed
8 to appear?
9     A.   Depending upon the availability of the
10 subject, if they are transient or if they are
11 working crazy hours, it's normally when you can
12 get to him.
13     Q.   Who is it that determines who within the
14 department gets assigned to serve a particular
15 summons?
16     A.   It's usually the shift commander will
17 assign to the sector cars geographically. If
18 there is a summons to be served in North
19 Billerica, you'd give it to the north car or vice
20 verse, the south car, or.
21     Q.   Do you know a Mr. Teddy Gallinaro?
22     A.   Yes, I do.
23     Q.   How do you know him?
24     A.   Again, through the job, through a big

**58**

1 family.
2     Q.   Has he ever had any involvement with the
3 Billerica Police Department that you are aware of?
4     A.   Yes, sir.
5     Q.   Can you tell me the extent of his
6 involvement with the Billerica Police Department?
7     A.   I couldn't specify.
8     Q.   Does he have a lengthy criminal history?
9     A.   He has a history.
10     Q.   Have you ever been involved in either
11 investigating or arresting Mr. Gallinaro?
12     A.   I can't say for sure, somewhere along the
13 lines of possibly. I'd have to go back and look
14 at the arrest records to see.
15     Q.   Did you ever hear that Mr. Gallinaro gave
16 a statement to the Billerica Police Department
17 that Mr. Parent had mentioned Lieutenant
18 MacKenzie's name in connection with his
19 involvement with Brian Kennedy on the evening in
20 December 1991 when he was involved in that
21 altercation with Mr. Kennedy?
22     A.   The question is did I ever hear Teddy
23 Gallinaro tell?
24     Q.   Make a statement.

**59**

1     A.   To whom?
2     Q.   To the Billerica Police Department?
3     A.   No, sir, I am not aware of that.
4     Q.   Did you ever speak with Lieutenant
5 MacKenzie about Brian Kennedy for any reason?
6     A.   Sure.
7     Q.   Do you recall the subject of the
8 conversations that you had with Lieutenant
9 MacKenzie relative to Brian Kennedy?
10     A.   No, sir.
11     Q.   Did Lieutenant MacKenzie ever express any
12 animosity towards Mr. Kennedy?
13     A.   Not to me, no.
14     Q.   Did you ever hear him express that to
15 anybody?
16     A.   No, sir.
17     Q.   Did you ever hear anybody tell you that
18 Lieutenant MacKenzie had expressed any sort of
19 animosity toward Brian Kennedy?
20     A.   Again, at the station, there was some
21 sort of altercation at the MacKenzie house.
22 Again, I'm not really privy to it.
23     Q.   Can you tell me more specifically about
24 an altercation that occurred at Lieutenant

**60**

1 MacKenzie's house?
2     A.   Just Mr. Kennedy had gone to
3 Mr. MacKenzie's house and there was some kind of
4 encounter. I don't know what date that was or
5 when it was or what it was regarding, but.
6     Q.   Do you know who you heard this from?
7     A.   No, I don't.
8     Q.   When you say there was an altercation,
9 did you hear it involved any type of physical
10 contact between the two?
11     A.   No, sir.
12     Q.   Did you ever hear there were any threats
13 made between the two?
14     A.   No, sir.
15     Q.   What else do you recall about the type of
16 encounter that took place between Mr. Kennedy and
17 Officer MacKenzie?
18     A.   Just that there was some kind of
19 encounter that Mr. Kennedy had gone to MacKenzie's
20 home.
21     Q.   And again, you don't know the time frame
22 for this?
23     A.   No, I don't know.
24     Q.   In relationship to the incident that

**61**

1 happened at the Concord Shores between Paul Parent
2 and Mr. Kennedy, do you know if this happened
3 before or after?
4     A.   I don't, I don't know.
5     Q.   Did you ever hear either Brian or
6 Michelle Kennedy had ever gone to Chief Barretto
7 to complain about Lieutenant MacKenzie?
8     A.   No, sir.
9     MR. SILVERFINE: While you're
10 breaking, I'll just take a quick moment.
11     MR. GILGUN: Sure.
12     (A short break was taken.)
13 BY MR. GILGUN:
14     Q.   Sergeant, do you know a Kenneth Caron?
15     A.   Yes, sir.
16     Q.   How do you know him?
17     A.   Through the job.
18     Q.   And has he had any involvement with the
19 Billerica Police Department that you are aware of?
20     A.   Yes, he has.
21     Q.   Does he have a long criminal history?
22     A.   Yes.
23     Q.   Have you ever been involved in any
24 arrests or investigations of Mr. Caron?

**62**

1    A.   Yes.
2    Q.   On how many occasions?
3    A.   I couldn't tell you off the top of my
4 head. Again, I'd have to check the arrest records
5 again.
6    Q.   Would it be more than three?
7    A.   That would be safe to say, yes.
8    Q.   Did you ever learn that Mr. -- strike
9 that.
10       Do you know what if any relationship
11 Mr. Caron had with Brian Kennedy?
12    A.   I think he was an employee at one time.
13 I don't know when or how or how long.
14    Q.   Are you aware of a complaint that was
15 made by Mr. Caron against Lieutenant MacKenzie
16 back in the early 90's?
17    A.   No, sir.
18    Q.   Do you know if Mr. Caron ever made a
19 complaint to anybody within the Billerica Police
20 Department concerning you?
21    A.   No, sir.
22    Q.   Do you know a Mr. Craig Pickering?
23    A.   Yes, sir.
24    Q.   How do you know him?

**63**

1    A.   Through the job.
2    Q.   And does he have a history of criminal
3 involvement with the Billerica Police Department?
4    A.   Yes.
5    Q.   Have you ever been involved in the
6 investigation or arrest of Craig Pickering?
7    A.   I don't recall.
8    Q.   Have you ever been made aware
9 Mr. Pickering made a complaint against you for
10 harassing him?
11    A.   No, sir.
12       MR. GILGUN: If you could just mark
13 this as the next exhibit, please.
14       (Exhibit No. 16, Statement of Craig
15 Pickering, marked for identification.)
16 BY MR. GILGUN:
17    Q.   Sergeant, can you take a look at what has
18 been marked as Exhibit 16 and let me know when you
19 have finished reviewing that. Have you had a
20 chance to review that?
21    A.   Yes, sir.
22    Q.   Have you ever seen that document before?
23    A.   No, sir.
24    Q.   Has anybody ever discussed the substance

**64**

1 of the information that is in that document to
2 you before?
3    A.   No, sir.
4    Q.   What is your reaction to what is reported
5 in that document?
6    A.   I don't have a reaction.
7    Q.   All right. Are you surprised?
8    A.   It's a report, I don't know who took it
9 or when they took it, or.
10    Q.   Is there any truth to the allegations
11 made in that complaint as far as you know?
12    A.   No.
13    Q.   Or that report?
14    A.   No, sir.
15    Q.   You don't recall being involved in three
16 traffic stops of Mr. Pickering in or around
17 November of 1991?
18    A.   No, sir.
19    Q.   Do you know Joanne Gordon?
20    A.   No, sir.
21    Q.   Do you know a Charles Nickonchuk,
22 N-I-C-K-O-N-C-H-U-K?
23    A.   No, sir.
24    Q.   Do you know why, do you have any reason

**65**

1 to believe why Mr. Pickering would have made such
2 a statement?
3    A.   No, sir.
4    Q.   Did you ever see Lieutenant MacKenzie
5 speak with Mr. Pickering?
6    A.   No, sir.
7    Q.   Do you know that Michelle Kennedy's motor
8 vehicle was vandalized at a time in April of 1993
9 when it was at the Gagnon Auto Body Shop?
10    A.   No, sir.
11    Q.   Are you aware of an incident in May of
12 1993 involving Lieutenant MacKenzie and Brian
13 Kennedy that took place at a Mr. Tipps
14 establishment?
15    A.   No, sir.
16    Q.   You never heard about any such incident?
17    A.   No, sir.
18    Q.   Is that an establishment that you
19 frequented socially?
20    A.   Yes, sir.
21    Q.   Would you socialize with other off duty
22 police officers at Mr. Tipps?
23    A.   Yes, sir.
24    Q.   Did you ever go there with Lieutenant

**66**

1 MacKenzie?
2    A.   At some point, yes, sir, I am sure.
3    Q.   Did you ever hear an allegation that
4 Lieutenant MacKenzie spit in the face of Brian
5 Kennedy?
6    A.   No, sir.
7       MR. GILGUN: If I can have this
8 marked as the next exhibit, please.
9       (Exhibit No. 17, Investigative Action
10 Report, marked for identification.)
11 BY MR. GILGUN:
12    Q.   Sergeant, can you look at what's been
13 marked as Exhibit No. 17, please, and just let me
14 know when you have finished reviewing that,
15 please. Have you ever seen that document before?
16    A.   No, sir.
17    Q.   And have you ever heard from anybody any
18 of the contents that's a part of that report?
19    Q.   Any of the contents?
20    Q.   Yes.
21    A.   I, yes.
22    Q.   What do you recall hearing?
23    A.   Inside, inside the lounge some words were
24 exchanged between the two parties.

**67**

1    Q.   So, now having reviewed that document,
2 you do have a memory there was an incident
3 involving Brian Kennedy and Lieutenant MacKenzie
4 at the Mr. Tipps establishment, is that what
5 you're saying?
6    A.   Yes, sir.
7    Q.   Okay, and were you present at the time
8 that these words were exchanged?
9    A.   Inside the establishment, yes.
10    Q.   Were you with Lieutenant MacKenzie at the
11 time that these words were exchanged?
12    A.   Close proximity.
13    Q.   And how close would you say you were to
14 Lieutenant MacKenzie when he was having this
15 exchange of words with Mr. Kennedy?
16    A.   Ten feet.
17    Q.   Do you know if you went to the
18 establishment with Lieutenant MacKenzie that
19 evening?
20    A.   I don't recall.
21    Q.   And you were off duty that evening,
22 correct?
23    A.   I don't recall.
24    Q.   Did you ever see Lieutenant MacKenzie

**68**

```
 1  spit at Mr. Kennedy?
 2      A.  No, sir.
 3      Q.  And did you ever see Lieutenant MacKenzie
 4  and Mr. Kennedy leave the inside of Mr. Tipps that
 5  evening together?
 6      A.  I don't, I don't have a memory of that
 7  other than what I am reading, but I don't remember
 8  that.
 9      Q.  Did you ever speak with Officer Munn or
10  Sergeant Munn regarding this incident?
11      A.  Yes, sir.
12      Q.  When in relation to the incident did you
13  speak with Sergeant Munn?
14      A.  I don't remember.  Again, other than this
15  report saying I spoke to him, I don't remember
16  having a conversation with Sergeant Munn.
17      Q.  So, you don't have a memory of speaking
18  with him, you're just relying on what the report
19  says?
20      A.  I have a memory of speaking to him but no
21  memory of what time frame, is that what you're
22  asking me?
23      Q.  Yes.
24      A.  Okay, I don't have a memory of a time
```

**69**

```
 1  frame.
 2      Q.  What did you speak with Sergeant Munn
 3  about?
 4      A.  The incident.
 5      Q.  And you told him what you had observed?
 6      A.  Right.
 7      Q.  And do you know if it was within a few
 8  days of the incident that you spoke to him?
 9      A.  I don't, I don't have a memory of that.
10      Q.  Do you remember if he came to you or you
11  went to him when you had this conversation?
12      A.  I don't recall the, you know, the
13  beginning of it.
14      Q.  Do you know if Officer MacKenzie ever
15  spoke to Sergeant Munn about this incident?
16      A.  I don't know, sir.
17      Q.  Did you ever speak with Lieutenant
18  MacKenzie about this incident?
19      A.  No, sir.
20      Q.  You didn't alert him to the fact that
21  Sergeant Munn spoke to you about what had happened
22  that evening?
23      A.  No, sir.
24      Q.  Based on that report, does it appear
```

**70**

```
 1  there was an investigation into the conduct of
 2  Lieutenant MacKenzie by Sergeant Munn?
 3      A.  If he was asking people present, I'd say
 4  that was some kind of investigatory effort on his
 5  part, yes.
 6      Q.  And you wouldn't have told Lieutenant
 7  MacKenzie that Sergeant Munn was conducting an
 8  investigation into his conduct?
 9      A.  Sergeant Munn may have spoken to
10  Lieutenant MacKenzie prior to speaking to him.  I
11  don't, I don't know how the order went or the time
12  frame on it, so, I have no memory of that.
13      Q.  Did you speak with anybody else about
14  this incident?
15      A.  No, sir.
16      Q.  Did you ever speak with the Chief about
17  it?
18      A.  Not that I can recall, no.  Who was the
19  Chief?
20      Q.  This was 1993, do you know who the Chief
21  was at the time?
22      A.  That would be Chief Barretto.
23      Q.  And you don't recall speaking with Chief
24  Barretto about this incident, correct?
```

**71**

```
 1      A.  No, I don't.
 2      Q.  Do you recall an incident in June of 1993
 3  where Michael Kennedy, Brian's brother, was
 4  arrested?
 5      A.  You have to be more specific than that.
 6      Q.  How many times -- strike that.
 7          Are you aware that Michael Kennedy has
 8  been arrested on more than one occasion?
 9      A.  Yes.
10      Q.  And on one of those occasions, do you
11  recall that Michael Kennedy was arrested in
12  connection with an assault and battery relating to
13  the Algier's?
14      A.  No, sir.
15      Q.  Were you ever involved in any of the
16  arrests of Michael Kennedy?
17      A.  I investigated Michael Kennedy that I
18  know of for attempting to burn his neighbor's car,
19  and I'd have to go back and look.  He and a fellow
20  named Lawrence were charged with some kind of
21  Molotov cocktail, but I'd have to go back and look
22  at it, but that's my one major recollection of
23  Michael.
24      Q.  And you don't recall being involved in an
```

**72**

```
 1  arrest of Michael Kennedy in connection with an
 2  assault and battery case then?
 3      A.  Do you know who the victim was?
 4      Q.  Like I said, involving the Algier's,
 5  Dennis or Leo Algier.
 6      A.  I'd have to look, if there is a report on
 7  it or arrest, it would be there.
 8      Q.  But you have no memory of it?
 9      A.  I don't have a recollection of it, no,
10  sir.
11      Q.  Did you ever hear of an allegation made
12  by Michael Kennedy that he had been beaten by
13  Lieutenant MacKenzie?
14      A.  No, sir.
15      Q.  Are you aware of an arrest of Michelle
16  Kennedy in June of 1993 by Officer Nestor for
17  allegedly committing an assault and battery
18  against Officer Nestor?
19      A.  I know about it or I know of it, I don't
20  know any of the particulars of it.
21      Q.  How did you learn of it?
22      A.  Through the station, guys talking.
23      Q.  What did you hear through your
24  conversations with people in the station about
```

**73**

```
 1  that incident?
 2      A.  Some kind of encounter, I don't know who
 3  was present, I know Mrs. Kennedy, and it was
 4  Michelle and Ricky Nestor.
 5      Q.  Do you know what the alleged assault was?
 6      A.  I can't say for sure, I don't know if he
 7  got spit on or if he got hands raised to him.  I
 8  don't recall, I'd have to look at the report.
 9      Q.  Were you present for that incident?
10      A.  No.
11      Q.  Did you ever speak to Officer Nestor
12  about that incident?
13      A.  I may have, I don't recall having a
14  conversation with him about it.
15      Q.  Did you have any reaction to learn that
16  Ms. Kennedy had been arrested on that charge?
17      A.  No, sir.
18      Q.  Did you know she was found not guilty in
19  connection with that case?
20      A.  Yes, sir.
21      Q.  Do you recall Officer Nestor's reaction
22  to learning that she was found not guilty?
23      A.  No, sir.
24      Q.  Are you familiar with an incident that
```

**74**

1 took place in August of 1997 involving a claim for
2 malicious destruction of property owned by a
3 Christine Kaiser?
4    A.   No.
5    Q.   Do you recall being involved in an
6 investigation of an incident where children in the
7 trailer park were alleged to have thrown rocks at
8 another trailer?
9    A.   Yes, sir.
10    Q.   Okay, and do you recall who the owner of
11 that trailer was?
12    A.   No, sir.
13    Q.   What was your involvement in that
14 investigation into that incident?
15    A.   I'd have to go back and look at the
16 report. There was, I think the original complaint
17 was taken by one officer, it might have gone to
18 the juvenile officer, and somehow or other ended
19 up with me.
20    Q.   Who was the juvenile officer in 1997, do
21 you know?
22    A.   It may have been Danny Rosa.
23    Q.   What are the responsibilities of the
24 officer who is designated the juvenile officer,

**75**

1 what is his responsibility?
2    A.   Probably a majority but not all juvenile
3 matters, if it was something that needed social
4 services or CHINS or something along those lines
5 maybe one of the line guys may have needed
6 assistance for.
7    Q.   Do you know who else was involved in the
8 investigation into this claim for malicious
9 destruction of property?
10    A.   Do you have the report?
11    Q.   Answer my question, please.
12    A.   I don't have the specific, I want to say
13 one guy did it and then went to the juvenile guy
14 and somehow it got to me.
15    Q.   And do you remember again what your
16 involvement was, what did you do to investigate?
17    A.   I mediated.
18    Q.   Okay, and did that involve speaking with
19 the owner of the property?
20    A.   Yes.
21    Q.   And what other parties did you speak with
22 aside from the owner of the property?
23    A.   I don't recall if it was Brian or
24 Michelle that I spoke to. I think there was a

**76**

1 monetary number that was agreed on that the woman
2 would be happy with that and not go to court.
3    Q.   Okay. So, you remember that it involved
4 one of the Kennedy children?
5    A.   Yes, throwing rocks at a trailer.
6    Q.   Okay, and --
7    A.   At a house.
8    Q.   When you spoke with the victim, do you
9 know if it was a male or female?
10    A.   Female.
11    Q.   But you don't remember the name?
12    A.   I don't, no, sir.
13    Q.   And it's your memory through speaking
14 with this victim and the Kennedy's that you were
15 able to work out a payment of money by the
16 Kennedy's to this woman to have the matter
17 resolved, is that fair to say?
18    A.   That is fair to say.
19    Q.   Okay.
20        MR. GILGUN: Can you mark this as the
21 next exhibit, please.
22        (Exhibit No. 18, Investigative Action
23 Report, marked for identification.)
24

**77**

1 BY MR. GILGUN:
2    Q.   Can you look at that document and let me
3 know when you have finished.
4    A.   Counsel, do you have that report there
5 (indicating)?
6    Q.   Let me ask you questions, we're probably
7 going in the same direction.
8    A.   Sure.
9    Q.   Have you reviewed Exhibit 18?
10    A.   Yes, I have.
11    Q.   Have you ever seen that report before?
12    A.   Yes, sir.
13    Q.   Actually, it's, it's two reports, isn't
14 it, three pages, and it's two reports?
15    A.   Yes.
16    Q.   And the first report, the reporting
17 officer is identified as Officer McNulty, correct,
18 the one that is on top?
19    A.   Well, that's (indicating) the car that
20 would have been originally assigned there where
21 I'm pointing, McNulty, but it looks like the
22 author of this report is Rosa.
23    Q.   Okay.
24    A.   So, McNulty may have had nothing to do

**78**

1 with it, I don't know.
2    Q.   Okay.
3    A.   Sometimes if a car is, you know, if they
4 dispatch a car, and midstream another car might
5 say I'm closer or I'm familiar with that, I'll go
6 there, so, that car is logged to that report, so,
7 I don't know, I can't say for certain if it was
8 McNulty.
9    Q.   Okay. In any event, it seems clear the
10 incident happened on August 1 of '97?
11    A.   Yes, sir.
12    Q.   On the second page beneath Sergeant
13 Daniel Rosa, Jr.'s name, date of 2/20/98, serial
14 port No. 128762 for more information, and it says
15 S.F. Elmore, what does that refer to?
16    A.   That would reference our case numbers for
17 more information.
18    Q.   Is there a case number assigned to this
19 investigation that we can determine from this
20 report?
21    A.   Yes, sir, in the upper left-hand corner,
22 123911.
23    Q.   So, when it says serial port 128762, that
24 is referring to a different case, correct, this

**79**

1 investigation into the rock throwing at the Kaiser
2 home?
3    A.   Yes, sir, yes, sir.
4    Q.   And do you know what the case No. 128762
5 referred to?
6    A.   Not without looking at it, no, sir.
7    Q.   Does that indicate you would have been
8 the party that prepared that report?
9    A.   Yes, that's the way I usually end my
10 reports.
11    Q.   Okay.
12    A.   So, if anyone else was looking, they
13 could figure out it was me.
14    Q.   By the fact it says 2/20/98, does that
15 indicate your report is dated February 20, '98?
16    A.   It might, I'd have to look at the report
17 to tell you what its contents are or whether it
18 has any bearing on this.
19    Q.   Having reviewed this report, does it
20 refresh your memory as to whether or not you were
21 involved in this investigation in the early going,
22 that is, at the time that the alleged malicious
23 destruction took place or within a week or two
24 after?

80

1   **A.**  No, I'd say it would indicate it was a
2 latter involvement than the initial.
3   **Q.**  Do you know how you became involved in
4 this case?
5   **A.**  I don't recall, I don't know how or why I
6 was there, but.
7   **Q.**  Do you recall at the same time that
8 Mr. and Mrs. Kennedy were being investigated
9 concerning a larceny of property from then
10 Lieutenant Conners?
11   **A.**  On August 1st of '97 or on 2/20 of '98?
12   **Q.**  Well, I will ask you.
13   **A.**  I'd have to look at the report again, I
14 don't know.
15   **Q.**  Okay.  Did you speak with any witnesses
16 to the alleged malicious destruction of property
17 that is claimed as part of this report under case
18 No. 123911?
19   **A.**  I think, I think in the other report, I
20 think there is some reference to some neighborhood
21 kids.
22   **Q.**  So, you have some memory speaking to some
23 neighborhood kids?
24   **A.**  Oh, sure, yes, sir.

81

1   **Q.**  What information did you learn from
2 speaking with those kids about Brian Kennedy,
3 Jr.'s involvement in this incident?
4   **A.**  I don't know if I actually got to speak
5 to any of the kids.  Again, without having the
6 report in front of me, one kid lived far away, he
7 was visiting, and another kid, it was late, he had
8 to go home or couldn't find his mother, but I
9 believe it's reflected in the report though.
10   **Q.**  Without reviewing the report, you don't
11 have a memory of any information you obtained from
12 any of the witnesses to this alleged malicious
13 destruction of property?
14   **A.**  No.
15   **Q.**  Okay, and you don't know the connection
16 between case No. 123911, which is the malicious
17 destruction property case, and case No. 128762?
18   **A.**  No.  Again, I'd have to look at both
19 reports to try to help bridge that.
20   **Q.**  Did you ever speak with then Sergeant
21 Rosa regarding the investigation on the malicious
22 destruction of property case?
23   **A.**  I don't recall.
24   **Q.**  Do you ever recall speaking with Officer

82

1 McNulty about this malicious destruction of
2 property?
3   **A.**  No, sir.
4   **Q.**  Okay.  Do you know a Ms. Judy Bennett?
5   **A.**  Yes.
6   **Q.**  How do you know her?
7   **A.**  Through the job.
8   **Q.**  And does she have a history of criminal
9 activity in Billerica?
10   **A.**  I can't say for certain.
11   **Q.**  How is it that you know her through the
12 job then?
13   **A.**  Either her brother or her husband had
14 some involvements with us, and that used to be an
15 address that he would stay at.
16   **Q.**  Do you know at any point in time whether
17 she worked at the Concord Shores?
18   **A.**  I believe she did.
19   **Q.**  Do you know if you ever spoke with
20 Ms. Bennett in connection with the investigation
21 of the malicious destruction of property claim
22 against Brian Kennedy, Jr.?
23   **A.**  I may have.
24   **Q.**  Do you know what she told you about it?

83

1   **A.**  Not without looking at the report, if
2 it's in the report.
3   **Q.**  Do you know if at the time you spoke with
4 Ms. Bennett her license to operate a motor vehicle
5 was under suspension of revocation?
6   **A.**  I don't know.
7   **Q.**  Do you know if Brian Kennedy, Jr. was
8 ever charged with any crimes in connection with
9 the malicious destruction of property that took
10 place on August 1 of 1997?
11   **A.**  I don't know.
12   **Q.**  Do you know if he was ever the subject of
13 a show cause hearing in connection with that
14 malicious destruction of property claim?
15   **A.**  I don't know.
16   **Q.**  Do you remember ever going to court in
17 connection with any proceedings against Brian
18 Kennedy, Jr. relative to the malicious destruction
19 of property claim?
20   **A.**  I don't have any memory of that.
21   **Q.**  Okay.  With respect to the incident
22 during which Lieutenant Conners' property was
23 stolen, did you have any involvement into the
24 investigation of that matter?

84

1   **A.**  Yes, I did.
2   **Q.**  And what did you do?
3   **A.**  I think this report, if I may, I think
4 this report that is missing would probably bridge
5 between the two, there is a, I can't tell you what
6 the date is, and if in fact it's that February
7 date, Brian Kennedy, big Brian, called the
8 Billerica Police station and requested me
9 personally to come down to his house to meet with
10 him regarding the matter with his son.
11   **Q.**  Okay, and what happened, did you go?
12   **A.**  Yes, I did.
13   **Q.**  And what happened?
14   **A.**  Brian met me outside, we had a
15 conversation regarding his son, and I'm assuming
16 it's this matter (indicating).  You know, at the
17 time young Brian is probably, I don't know,
18 eleven, twelve years old.
19       We had a brief conversation, talking
20 about, as I'm sitting here now, I thought it was
21 under the impression there would be restitution,
22 and I think my statement to Brian was an
23 eleven-year-old doesn't really belong in the
24 criminal justice system.

85

1       I had a brief conversation with Brian,
2 and I said to Brian, "We'll see what we can do
3 about this," with an eleven or twelve-year-old at
4 the time, young Brian, and I said, "While I'm
5 here," I said, "Do you know anything about the
6 missing property from Tommy Conners?"
7       Brian said, "No," and I said, "Do you
8 know if Billy Ashton" who I believe was residing
9 at the Kennedy house "had any involvement with
10 this?" and Brian Kennedy told me, "No," so, I
11 said, "Okay."
12       I said, "I'm talking to you now," and
13 Brian and I had a pretty good relationship.  I
14 said, "You called me down here for this and now
15 I'm asking you for that," and he said, "I don't
16 know anything about it."
17       I said, "I'm going to Ashton's house
18 right now," the brother Scott was involved, and I
19 said, "The two of them were involved, and I'm
20 going to Scott Ashton's house right now," and as I
21 was leaving, Brian said, "I'll tell you what's
22 going on," and I said, "You told me you didn't
23 know anything about it."
24       I went to the next street to the Ashton

**86**

1 house, knocked on the door, Scott Ashton was at
2 home, asked him to go to the police station to
3 speak to Sergeant, Lieutenant Conners, whatever he
4 was at the time regarding his missing property.
5     Q.  So, did you say Brian Kennedy decided to
6 tell you he was ready to give a statement when you
7 were leaving to go to the Ashton house?
8     A.  Once he discovered I was going to Scott
9 Ashton's house.
10     Q.  And you didn't listen to his statement?
11     A.  No, I didn't.
12     Q.  Why not?
13     A.  Because he wasn't being forthcoming.
14     Q.  What makes you say that?
15     A.  Because he didn't admit it prior to that,
16 and once he discovered I was going to Scott
17 Ashton's house, Brian threw out there, "Oh, I'll
18 tell you who did it," so, I didn't think Brian was
19 going to be truthful.
20     Q.  What caused you to go to Scott Ashton's
21 house?
22     A.  Again, guys at the station talking, who
23 was involved, maybe, I'm guessing it had probably
24 been three weeks from the incident, you know,

**87**

1 again, guys sitting around at roll call, the
2 Ashton's are involved.
3     Q.  What did Scott Ashton tell you when you
4 went to his home that day?
5     A.  I knocked on the door, spoke to,
6 Mrs. Ashton I believe answered the door, I asked
7 if Scott was home, and she said yeah.
8     I said, "Scott, will you come to the
9 station to speak to Tom Conners about his missing
10 property voluntarily?" and he said, "Yes, I'll
11 come up."
12     Q.  Did Lieutenant Conners ask you to go out
13 and speak to Mr. Ashton about coming to the police
14 station that day?
15     A.  No, he did not.
16     Q.  Was it just learned that day by you that
17 Mr. Scott Ashton might have been involved in that
18 larceny?
19     A.  I don't recall the exact time, you know,
20 that that story came up.
21     Q.  When you were having that discussion at
22 roll call, was there any discussion about who
23 would go to speak with Scott Ashton relative to
24 this larceny?

**88**

1     A.  No.
2     Q.  When you were going to respond to
3 Mr. Kennedy's request that you speak with him
4 about Brian, Jr.'s matter, were you going with the
5 intention of raising the larceny of Lieutenant
6 Conners' property with him?
7     A.  No.
8     Q.  Who was the one that raised that issue
9 during your discussion with Mr. Kennedy, you or
10 Mr. Kennedy?
11     A.  The issue of Conners' property?
12     Q.  Correct.
13     A.  Me.
14     Q.  And when you brought Mr. Ashton to see
15 Lieutenant Conners, did you have any discussion
16 with him about the larceny on the way to the
17 police station?
18     A.  No, I did not.
19     Q.  And were you present when he spoke with
20 Lieutenant Conners?
21     A.  No, sir, I wasn't.
22     Q.  What did you learn was the result of the
23 conversation between Lieutenant Conners and Scott
24 Ashton that day?

**89**

1     A.  I'd have to look again at the reports. I
2 believe there was some kind of admission.
3     Q.  At some point did you learn that
4 Mr. Ashton made any accusations that concerned the
5 Kennedy's?
6     A.  I'd have to look at the report, I don't
7 recall that.
8     Q.  Going back to the malicious destruction
9 of property claim, you indicated initially you
10 more or less brokered a deal between the victim
11 and the Kennedy's to pay the restitution and that
12 the matter would be resolved, is that your memory?
13     A.  Yes.
14     Q.  And when in relationship to the time that
15 you spoke with Mr. Kennedy, the same day that you
16 went to see Mr. Ashton did you speak with the
17 owner of the property that was victimized?
18     A.  I don't recall.
19     Q.  What else did you do in connection with
20 the investigation into the larceny of Lieutenant
21 Conners' property?
22     A.  I had a chance to go to the Billerica
23 House of Correction and speak with an inmate
24 there.

**90**

1     Q.  And who was that?
2     A.  Dan Dufault, D-U-F-A-U-L-T.
3     Q.  And how did you come upon that chance?
4     A.  I'd have to again go back and look. I
5 don't know if Ashton wrote it in his statement
6 that Dufault was involved or Dufault had further
7 knowledge regarding the location of the property.
8     I'd have to go back and look. I don't
9 recall right off the bat.
10     Q.  Do you know when in relation to the time
11 when you spoke with Scott Ashton or picked up
12 Scott Ashton to take him to Lieutenant Conners was
13 it that you spoke with Daniel Dufault, was it
14 after?
15     A.  It was after the Ashton thing, yes.
16     Q.  Okay. In terms of the resolution of the
17 malicious destruction of property claim, when was
18 your memory that was resolved on that day that you
19 spoke with Mr. Brian Kennedy?
20     A.  No, no.
21     Q.  When was it resolved in relation to that
22 time?
23     A.  I don't know, I don't know if it was a
24 communication snafu, I don't know if it was the juvenile court or

**91**

1 officer. I had been under the impression there
2 had been a verbal agreement on the damages, but I
3 think, I don't know, I'd have to go back and look,
4 I think the Kennedy boy ended up going to court on
5 it anyway.
6     Q.  So, am I understanding you to say that
7 you thought that the matter was resolved prior to
8 any need for young Mr. Kennedy to appear in
9 connection with any proceedings in connection with
10 the charges brought against him?
11     A.  Yes, sir.
12     Q.  And at some point, you learned in fact he
13 did have to go to court?
14     A.  I'm not sure if he formally ended up
15 going to juvenile court.
16     Q.  Were you involved in any way after
17 learning that there was some formal process being
18 instituted against Brian Kennedy, Jr.?
19     A.  Young Brian?
20     Q.  Yes.
21     A.  I don't remember me getting involved. If
22 you had a copy of the complaint, I don't know if
23 Rosa filled the complaint out, I'm not really sure
24 what happened.

92

1    **Q.**  Do you remember the Kennedy's calling to
2 tell you that the hearing on Brian, Jr.'s case for
3 malicious destruction of property had been
4 continued?
5    **A.**  I don't remember that.
6    **Q.**  Do you ever remember in your conversation
7 with Brian Kennedy that day when you were at his
8 home discussing Brian, Jr.'s case suggesting to
9 him that if he were able to provide you
10 information regarding Lieutenant Conners' stolen
11 property, that you could assist him in having the
12 complaint against his son being dropped?
13    **A.**  No.
14    **Q.**  With respect to this chance meeting that
15 you had with -- strike that.
16        With respect to the meeting you had with
17 Mr. Dufault, that took place at the Billerica
18 House of Correction, correct?
19    **A.**  Yes, sir.
20    **Q.**  And when -- you already said that.  I
21 think you said that was after you had the meeting
22 with Brian Kennedy and after you brought Mr. Scott
23 Ashton to the police department, correct?
24    **A.**  That's right.

93

1    **Q.**  And who was present with you during this
2 meeting with Daniel Dufault?
3    **A.**  Inspector Billy West.
4    **Q.**  Anybody else present with you?
5    **A.**  No, sir.
6    **Q.**  And you believe it was information
7 obtained from Scott Ashton that led you to
8 Mr. Dufault, correct?
9    **A.**  Correct.
10    **Q.**  Why were you the officer that went to
11 speak with Daniel Dufault?
12    **A.**  I believe the complaints that were sought
13 in Lowell District Court were signed by Conners,
14 the original complaints.
15        I don't know what the time frame is, I'm
16 trying to explain this to you.  Lowell District
17 Court said they wouldn't allow Conners to be the
18 victim and the complainant.
19    **Q.**  Okay.  What complaints are you referring
20 to, complaints against whom?
21    **A.**  Against the Ashton's.
22    **Q.**  Is your understanding of the sequence of
23 events that both Scott and Billy Ashton had
24 complaints brought against them in connection with

94

1 the stolen property from Lieutenant Conners prior
2 to you going to see Daniel Dufault at the House of
3 Correction?
4    **A.**  I'd have to go back and look at the
5 report.  Between Scott Ashton coming in,
6 conversation with Dufault, Dufault recanting his
7 statement, a warrant being issued for Billy
8 Ashton, Dufault making statements that Kennedy is
9 wearing the police badge walking around the
10 trailer park claiming he is a Billerica Police
11 officer, it's within that period of time.  I'd
12 have to look at the dates.
13    **Q.**  Without looking at the dates or the
14 reports, do you have any memory of what led you as
15 opposed to another officer going to see Daniel
16 Dufault at the Billerica House of Correction on
17 the first occasion you saw him?
18    **A.**  Say it again?
19    **Q.**  How many times did you see Mr. Dufault at
20 the Billerica House of Correction?
21    **A.**  Twice.
22    **Q.**  So, my question relates to the first time
23 you saw Mr. Dufault.  What was it that led you,
24 specifically you as opposed to other officers to

95

1 go to visit with Mr. Dufault?
2    **A.**  Because I brought Ashton in.
3    **Q.**  Okay, and was that something that
4 Lieutenant Conners requested that you do?
5    **A.**  He may have.
6    **Q.**  Was there a reason why Officer West or
7 Inspector West went with you, was he involved in
8 this investigation in any other way?
9    **A.**  I think Billy West may have been the guy
10 that was trying to track this down.
11    **Q.**  And when you met with Mr. Dufault the
12 first time, what did he tell you relative to the
13 stolen property?
14    **A.**  That Billy and Scott Ashton had broken
15 into Conners' car, the stolen property was being
16 kept with their knowledge underneath the back
17 porch of the Kennedy house, that Brian Kennedy had
18 been out in public with a sergeant or lieutenant,
19 whatever he was at the time, Brian was wearing his
20 hat, he had taken Tommy Conners' real badge
21 believing it to be real gold and broke it in half
22 in the hopes of melting it down and get rid of the
23 gold.
24    **Q.**  Based on that information, what did you

96

1 do?
2    **A.**  We asked Dufault where the badge was if
3 it was still in their possession, and Dufault drew
4 out a map of the location where Kennedy had buried
5 Conners' broken badge.
6    **Q.**  How long had Dufault been incarcerated at
7 the Billerica House of Correction when you went to
8 visit him?
9    **A.**  I don't know.
10    **Q.**  Who did Dufault claim as the source of
11 his information regarding Billy and Scott Ashton's
12 information in this larceny?
13    **A.**  I'd have to look at the report, but I
14 think it's firsthand.
15    **Q.**  That is, Mr. Dufault saw Billy and Scott
16 Ashton, he saw them take the belongings from
17 Lieutenant Conners' car?
18    **A.**  Yes, he was present, or it was my belief
19 this was firsthand knowledge.
20    **Q.**  And you indicated he drew a map, and what
21 did you do with the map?
22    **A.**  I brought it back to the Billerica Police
23 station, and the next day, I'm assuming it's the
24 next day, I don't have the dates in front of me,

97

1 but due to the fact that the mobile park sits on
2 the border of the Town of Tewksbury and Billerica,
3 I got a Tewksbury detective, and from the map from
4 what Dufault had said, the homeowner was asked to
5 sign a release with the Tewksbury cops, the
6 detectives, I don't recall which ones were there,
7 and give them permission to go on her property and
8 try to follow the map you're holding in your hand
9 there that originated from the House of Correction
10 with Dufault, and we followed that map with the
11 directions through the woods.
12    **Q.**  So, who did Daniel Dufault during this
13 conversation claim owned the property where the
14 badge was located?
15    **A.**  The Kennedy's.
16    **Q.**  And he indicated that it was under their
17 stairs, is that what he said?
18    **A.**  Right, and that's why the Kennedy's were
19 charged with receiving stolen property because
20 allegedly Brian was wearing the hat, Brian broke
21 the badge, Brian buried the badge, and that's why
22 Brian was charged.
23        Brian and Michelle had knowledge the
24 stuff was being kept under their porch or stairs

98

1 or wherever Danny said it was.
2  Q.  Can you take a look at Exhibit No. 5, and
3 is that the map that Daniel Dufault drew for you
4 at the Billerica House of Correction relative to
5 the location of the badge?
6  A.  It appears to be.
7  Q.  Okay, and there is writing on it, it says
8 "Badge and aluminum foil" and arrows pointing to a
9 location on that map, right?
10  A.  Yes, sir.
11  Q.  Is that supposed to be a location under
12 the stairs of the property owned by the Kennedy's?
13  A.  What is this map regarding or
14 referencing, is that your question?
15  Q.  My question is where the badge is located
16 on that map, is that supposed to be a location
17 under the stairs of the Kennedy property?
18  A.  No, sir.
19  Q.  Okay.  Did Mr. Dufault indicate that the
20 badge was moved from under the Kennedy stairs at
21 some point?
22  A.  Yes, when it was discovered it wasn't
23 real gold.
24  Q.  What did he tell you relative to the

99

1 location of the badge after it was removed from
2 underneath the Kennedy stairs?
3  A.  It was wrapped in aluminum foil, taken
4 across the street by Brian Kennedy, and buried
5 under an engine block.
6  Q.  Okay.  Did you actually follow-up the
7 pursuit of this badge, vis-a-vis this map and
8 locate the badge?
9  A.  Yes, I did.
10  Q.  Where was it located, what property
11 address?
12  A.  I think the lady signed a release from
13 Tewksbury.  I can't tell you off the top of my
14 head what it was, but she signed a release saying
15 we could go on the property.
16  Q.  Was it found on the Kennedy property?
17  A.  No, sir.
18  Q.  So, again, you were telling me the
19 reasons why the Kennedy's were charged with
20 receiving stolen property was based on Daniel
21 Dufault's statement that the Kennedy's had stored
22 the badge under their front stairs and Brian
23 Kennedy was parading around pretending to be a
24 Billerica Police officer, correct?

100

1  A.  That's correct.
2  Q.  Are you aware of any other evidence in
3 connection with the charges of receiving stolen
4 property against the Kennedy's?
5  A.  Other than Danny's statement?
6  Q.  Yes.
7  A.  I think it's just Danny's statement.
8  Q.  Who was it that made the decision to seek
9 warrants for the arrest of the Kennedy's in
10 connection with those charges?
11  A.  I don't know if it was the prosecutor, I
12 don't know.
13  Q.  When you say the prosecutor, are you
14 referring to the police prosecutor?
15  A.  Yes.
16  Q.  And that would be Officer McNulty?
17  A.  Captain McNulty, yes.
18  Q.  Was it your decision to seek warrants for
19 the arrests of Brian and Michelle Kennedy in
20 connection with receiving stolen property of
21 Lieutenant Conners' badge?
22  A.  This may have been at the point where the
23 complaints were done by Conners and they were
24 returned, so, it may have been Conners that filled

101

1 out the complaints.
2  Q.  I'm talking about the decision making
3 process, someone at some point makes a decision
4 they should seek warrants against the Kennedy's?
5  A.  You can see X for a summons, warrant, or
6 what have you.
7  Q.  Can you tell me who it was that made the
8 decision regarding the Kennedy's?
9  A.  I don't recall.
10  Q.  Was it you?
11  A.  Again, the original paperwork may have
12 been checked off for a warrant, it may have been
13 Conners that originated the first complaint.
14    When the court said you can't be the
15 complainant and victim, it might have been my
16 signature on it, and when the summons or warrants
17 come back, it will say complainant, and because I
18 signed it, my name would come up as the
19 complainant, but it may have been, it might have
20 been the prosecutor, it could have been Conners
21 that did it himself.
22  Q.  When you went to speak with Mr. Dufault,
23 what did you tell him you were there for?
24  A.  We were investigating the theft of

102

1 Conners' law enforcement property.
2  Q.  And did he immediately provide you with
3 this information regarding the Kennedy's
4 involvement, or was there another discussion you
5 had with him with regard to him volunteering that
6 information?
7  A.  No, he was very forthcoming.
8  Q.  No promises were made to him by you
9 regarding his sentence at the Billerica House of
10 Correction?
11  A.  No, sir.
12  Q.  Nor Inspector West, no promises were made
13 by Inspector West?
14  A.  No, sir.
15  Q.  Do you recall when Billy Ashton was
16 arrested in connection with this matter, was it
17 before or after the Kennedy's?
18  A.  I don't recall.  If you had the arrest
19 log, you can look and find out dates and times.  I
20 don't know as I'm sitting here.
21  Q.  Were you involved in the arrest of Billy
22 Ashton in connection with this?
23  A.  Yes, sir.
24  Q.  So, you actually -- well, was he arrested

103

1 on a warrant?
2  A.  Yes, sir.
3  Q.  Were you one of the officers that were
4 present to pick him up on the warrant?
5  A.  Yes, sir.
6  Q.  Who else was present with you?
7  A.  I don't recall who was with me.
8  Q.  Was it your arrest?
9  A.  Probably down on the arrest sheet, yes.
10  Q.  Do you recall how long Billy Ashton was
11 incarcerated?
12  A.  No, sir.
13  Q.  Do you recall he was incarcerated all
14 weekend?
15  A.  No, sir.
16  Q.  Did you ever see Deputy Chief Conners in
17 the presence of Billy Ashton when he was
18 incarcerated at the Billerica House of Correction
19 in connection with questioning regarding receiving
20 the stolen property?
21  A.  No, sir.
22  Q.  Did you ever notify Deputy Chief Conners
23 that Mr. Ashton had been placed under arrest on
24 the warrant?

**104**

1    A.    I did not, no, sir.
2    Q.    Do you know if he was working out in the
3 facility upstairs in the police station when
4 Mr. Ashton was brought into the station on this
5 warrant?
6    A.    I don't know where he was.
7    Q.    Did Mr. Ashton suffer any injuries during
8 the course of the arrest that you made of him on
9 this warrant?
10    A.    No, sir.
11    Q.    Do you know when he was discharged from,
12 well -- strike that.
13         Do you know when he ultimately was
14 released after this arrest, whether or not he had
15 any injuries?
16    A.    No, sir.
17    Q.    You don't know?
18    A.    No, sir.
19    Q.    Is that no, he didn't or you don't know?
20    A.    Didn't you just ask me if I had any
21 knowledge?
22    Q.    Yes.
23    A.    I have no knowledge if he had any
24 injuries after he was released from his stay.

**105**

1    Q.    Okay. When you spoke with the woman who
2 was the complainant, the victim in the malicious
3 destruction of property case, did she indicate to
4 you she saw Brian Kennedy, Jr. throw rocks at her
5 trailer?
6    A.    I can't say 100 percent. I believe that
7 was the conversation, yes.
8    Q.    Do you recall in May of 2004 being
9 involved in an investigation into a school break
10 where Mitchell Kennedy was questioned?
11    A.    I have a memory of a break at the
12 Marshall Middle, I have no knowledge of Mitchell
13 Kennedy being interviewed, or.
14    Q.    Do you remember who if anybody was the,
15 was a suspect in connection with that break?
16    A.    No, sir.
17    Q.    How were you involved in that
18 investigation?
19    A.    I was on duty when they reported a theft
20 of money from the school.
21    Q.    What more did you do in connection with
22 that crime?
23    A.    Went down and I think took photographs of
24 the roof I think.

**106**

1    Q.    And what was the purpose of taking
2 photographs of the roof?
3    A.    There were some footprints that were
4 transferred from dust on to the rubber roof of the
5 school, so there were footprints across the roof.
6    Q.    And what else did you do in connection
7 with that investigation?
8    A.    Nothing.
9    Q.    What did you do with the photographs of
10 the footprints?
11    A.    They must still be at the station
12 somewhere in our photo evidence.
13    Q.    Is there a reason why you didn't do
14 anything further with this investigation?
15    A.    There wasn't really much to go on.
16    Q.    Do you know if any other officer within
17 the department followed up on this investigation?
18    A.    I don't know.
19    Q.    Did you ever speak with anybody within
20 the department about this investigation?
21    A.    Maybe the fact that it happened, but I
22 don't recall any conversation of specific
23 individuals or leads. I don't know if the
24 juvenile officer might have picked it up because

**107**

1 it's the school, the school resource officer.
2    Q.    Do you know if Detective Casey ever
3 became involved in this investigation?
4    A.    What is the date on it?
5    Q.    If I were to tell you the alleged theft
6 took place in May of '04, does that refresh your
7 memory?
8    A.    No, I'm still in the Criminal Bureau, I'm
9 trying to figure out who I am in charge of and
10 what capacity I'm working at the police
11 department.
12    Q.    So, my question is do you know if
13 Detective Casey ever became involved in this
14 investigation?
15    A.    I don't know.
16    Q.    Was Detective Casey assigned to the
17 Criminal Bureau in May '04?
18    A.    Yes.
19    Q.    And that's where you were assigned at
20 that time?
21    A.    Correct, yes.
22         MR. GILGUN:  If I can have this
23 two-page document marked as the next exhibit.
24

**108**

1         (Exhibit No. 19, Investigative Action
2 Report, marked for identification.)
3 BY MR. GILGUN:
4    Q.    If you could take a look at that
5 document, do you recognize that document,
6 Sergeant?
7    A.    Yeah, it's a police report.
8    Q.    Is that a police report in connection
9 with the school break we were just talking about?
10    A.    Yes, sir.
11    Q.    Who was it that is the author of that
12 report?
13    A.    Sergeant Frank Mirasolo.
14    Q.    Was he in the Criminal Bureau in May of
15 '04?
16    A.    Yes, he was.
17    Q.    Do you know if you filled out any report
18 in connection with this incident?
19    A.    Not that I recall, no.
20    Q.    Can you tell from that report what
21 investigation was conducted by Officer Mirasolo?
22    A.    It looks like an initial report of what
23 happened and a report of the incident.
24    Q.    Okay.

**109**

1         MR. GILGUN:  Can you mark that,
2 please.
3         (Exhibit No. 20, Investigative Action
4 Report, marked for identification.)
5 BY MR. GILGUN:
6    Q.    Have you seen that document before?
7    A.    No, sir.
8    Q.    Does that appear to be a report in
9 connection with the same break in to the Marshall
10 Middle School?
11    A.    Yes, sir.
12    Q.    Okay, and can you tell who the author is
13 of that report?
14    A.    Well, it looks like you've got one report
15 on two different pages here. The initial that is
16 done would not be Sergeant Mirasolo, it would be
17 Officer McGecken if I am looking at page 1, 2, and
18 3, you had page 1 and 3 together and page 1 and 2
19 here together (indicating).
20    Q.    Okay.
21    A.    So, the original author of that statement
22 (indicating) would be Officer McGecken, and it
23 would look like this follow-up portion from the
24 Criminal Bureau (indicating) would be Sergeant

**110**

1 Mirasolo, so, I don't know if that changes your
2 19 and 20, or.
3     **Q.**    Just keep them the way they were, it's
4 the way we received them.
5     **A.**    Okay.
6     **Q.**    On the follow-up report from Officer
7 Mirasolo, does he indicate he took photographs of
8 footprints or something?
9     **A.**    Took photos of shoe prints on rubber
10 roof.
11     **Q.**    Is that the same activity that you
12 engaged in with this investigation?
13     **A.**    Yes, sir.
14     **Q.**    Were you present with Detective Mirasolo?
15     **A.**    Yes, I was.
16     **Q.**    Did you ever interview Mitchell Kennedy
17 in connection with this matter?
18     **A.**    No, I did not.
19     **Q.**    Were you ever present with Detective
20 Casey when he interviewed Mitchell Kennedy in
21 connection with this matter?
22     **A.**    No.
23     **Q.**    Did you ever hear Mitchell Kennedy was
24 involved in this matter in any way?

**111**

1     **A.**    No, sir.
2     **Q.**    Okay.  Aside from the matters we have
3 already discussed today, in what other matters or
4 incidents involving the Kennedy's have you been
5 involved?
6     **A.**    I've been at the house to serve
7 summonses, both at the mobile home park and on
8 Bridge Street.
9     **Q.**    Can you remember anything else?
10     **A.**    No, I don't believe I had any
11 involvements with any of the children.
12     **Q.**    On any of the occasions that you served
13 summonses, did you have any problems with the
14 Kennedy's?
15     **A.**    No.
16     **Q.**    Did you ever hear of a matter involving
17 Mr. and Mrs. Kennedy and Officer Micciche that
18 took place in August of 1999 that resulted in a
19 threats complaint being taken out by Mr. and
20 Mrs. Kennedy?
21     **A.**    Yes, sir.
22     **Q.**    What did you hear about that?
23     **A.**    Again, just stuff at the station, Dunkin'
24 Donuts or Cumberland Farms in Lowell, words back

**112**

1 and forth between Micciche and the Kennedy family.
2     **Q.**    And who was the source of that
3 information, do you know?
4     **A.**    I don't know.
5     **Q.**    What about, did you ever hear of an
6 incident for which Brian and Michelle Kennedy were
7 charged with malicious destruction of property, of
8 property owned by Tina Huber, did you ever hear of
9 that?
10     **A.**    I never heard of it.
11     **Q.**    What about, have you ever heard of an
12 incident for which Michelle and Brian Kennedy and
13 Mitchell Kennedy were arrested and charged with
14 assault and battery with a dangerous weapon in
15 amongst others a Deann Masone in November 2001?
16     **A.**    I don't know anything about it.
17     **Q.**    Do you recall an incident where the
18 Kennedy's were alleged to have used bats to have
19 vandalized a vehicle in their neighborhood in
20 November of '01?
21     **A.**    There was an incident, I don't know if
22 it's the same one, bats and somebody's friend of
23 theirs or somebody's ex-girlfriend or some
24 incident that happened.  I don't know what the

**113**

1 date of it is on it.
2     **Q.**    Were you present at the scene of that
3 incident?
4     **A.**    No, sir.
5     **Q.**    Were you involved in the investigation of
6 that incident in any way?
7     **A.**    No, sir.
8     **Q.**    Are you familiar or have you heard about
9 the threats complaint brought against Michelle
10 Kennedy by Officer Tsoukalas in March of '03?
11     **A.**    No, sir.
12     **Q.**    Are you or have you heard any information
13 regarding the assault charges brought against
14 Michelle Kennedy for allegedly assaulting a Donna
15 Hawks in July of '03?
16     **A.**    Yes, sir, I was down on that, I think
17 that's the involvement, I did a report on it.
18     **Q.**    Do you recall what the allegations were
19 that were made by Donna Hawks?
20     **A.**    I'd have to look at my report, I don't.
21     **Q.**    Do you recall if you arrested Michelle
22 Kennedy in connection with the alleged incident
23 involving Ms. Hawks that you investigated?
24     **A.**    No, sir.

**114**

1     **Q.**    Do you recall if a criminal complaint was
2 ever brought forward against Michelle Kennedy in
3 connection with that matter?
4     **A.**    I'd have to go back and look.
5     **Q.**    What do you remember about any
6 investigation you conducted?
7     **A.**    Hawks calling from their residence which
8 is Billerica, I don't know if it was Berkeley
9 Street or what street it is over there, claiming
10 that she was in her driveway, I think she claimed
11 Mrs. Kennedy came down, there were some words or
12 Mrs. Kennedy drove up or walked down, I forget,
13 and there was some allegations that the Hawks had
14 damaged the Kennedy's car, there was a question of
15 where it happened, the whole incident, so.
16     **Q.**    Do you remember if you did any follow-up
17 investigation, speak to any witnesses?
18     **A.**    I'd have to go back and look at my
19 report.  I think I did a pretty thorough report,
20 but I'd have to go back and look at it.  I think
21 there was a question of jurisdiction.
22     **Q.**    Do you recall speaking with the Tewksbury
23 Police Department regarding this matter?
24     **A.**    Yeah, Officer Shippey.

**115**

1     **Q.**    What do you recall about the conversation
2 you had with Officer Shippey?
3     **A.**    Just trying to determine where it
4 happened, and I know that in regards to damage to
5 Mrs. Kennedy's car, I think it's in the report
6 that Michelle made a statement that her car was
7 parked in Tewksbury because if anything ever
8 happens, the Tewksbury guys treat her right and
9 the Billerica guys don't, so, she leaves her car
10 parked in Tewksbury in case there is an incident.
11     I think I reflected that statement in the
12 report which to me would have put Tewksbury in
13 charge of that investigation.
14     I think there was something about their
15 car was damaged with rocks or some kind of
16 vandalism to the car.  I'd have to look at the
17 report.
18     **Q.**    What do you know about an arrest of
19 Mitchell Kennedy for assault and battery on
20 Officer Tsoukalas in February of '04?
21     **A.**    Nothing.
22     **Q.**    You never heard of it?
23     **A.**    No.
24     **Q.**    How would you describe your relationship

**116**

1 with Sergeant Munn?
2   A.  Again, just one of the guys, friendly.
3   Q.  How would you describe your relationship
4 with Deputy Chief Conners?
5   A.  Just again, moderate friends, moderately
6 friendly.
7   Q.  What about with respect to Officer
8 Nestor?
9   A.  Same thing.
10   Q.  And Sergeant Weston?
11   A.  Same thing.
12   Q.  Are you still friendly with Sergeant
13 Weston today?
14   A.  I don't see too much of him, a hello in
15 traffic if I'm working a detail.
16   Q.  Have you ever heard the term retribution
17 gang used to describe a group of officers in the
18 Billerica Police Department?
19   A.  No, sir.
20   Q.  What about the term choir practice, have
21 you ever heard that in connection with any
22 activities engaged by members of the Billerica
23 Police Department?
24   A.  Billerica Police Department, yes.

**117**

1   Q.  What has it been referred to as?
2   A.  A social gathering.
3   Q.  A social gathering where the off duty
4 police officers were drinking?
5   A.  Yeah.
6   Q.  And they refer to that as choir practice?
7   A.  It's a common, a common usage in law
8 enforcement.
9   Q.  What about, have you ever heard anybody
10 use the expression little present to describe
11 tickets given to people for motor vehicle
12 citations?
13   A.  No, sir.
14   Q.  Were you ever aware of Sergeant Weston
15 soliciting involvement of members of the Billerica
16 Police Department for specifically targeting
17 individuals for purposes of issuing them
18 citations?
19   A.  No, sir.
20   Q.  What have you heard about any member of
21 the Billerica Police Department harassing the
22 Kennedy's aside from what you have heard in this
23 complaint?
24   A.  Nothing.

**118**

1   Q.  You never heard any talk around the
2 police station about that?
3   A.  No, sir.
4   Q.  Have you ever heard any, what have you
5 heard about any member of the Billerica Police
6 Department intimidating the Kennedy's?
7   A.  Nothing.
8   Q.  Are you aware of any directives or
9 memoranda issued by any supervisory officer within
10 the police department relative to the Kennedy's?
11   A.  Yes, sir.
12   Q.  How many?
13   A.  Two.
14   Q.  Can you tell me what those were, were
15 they memoranda, directives, what were they?
16   A.  I, they were, I don't know if they came
17 out on paper or on our bulletin board. They might
18 have been on paper. They, I want to say they
19 might have been on paper.
20   Q.  What is the difference between being on
21 paper and being on the bulletin board, what is the
22 difference?
23   A.  The bulletin board will just be like a
24 message.

**119**

1   Q.  Like a marker or something on a bulletin
2 board?
3   A.  Yeah, yes.
4   Q.  What do you recall of the substance of
5 the documents that you saw that you considered to
6 be the directives on memoranda?
7   A.  I think one was, and I'd have to go, one
8 was not to talk to the media about the Kennedy's.
9   Q.  Okay, and do you recall what the other
10 one was?
11   A.  The other one was any call involving the
12 Kennedy family that a patrolman should ask for a
13 supervisor to be present prior to any engagement
14 with the, with any members of the family.
15   Q.  Okay. I just want to show you some
16 drawings and ask you if you have ever seen them
17 before, these are Exhibits 8, 9, and 10. Can you
18 take a look at those and tell me if you have ever
19 seen those before?
20   A.  No to 8, no to 9, and I have seen that
21 one (indicating).
22   Q.  So, you have seen Exhibit No. 10?
23   A.  No. 10.
24   Q.  Where have you seen it?

**120**

1   A.  It might have been hanging on the door to
2 the communication room.
3   Q.  Do you know when?
4   A.  I don't recall.
5   Q.  Do you know who the author is of that
6 diagram?
7   A.  No, I don't.
8   Q.  Do you know anybody in the Billerica
9 Police Department that has the artistic ability to
10 create those drawings?
11     MR. SILVERFINE:  Objection as to
12 form. Go ahead.
13 BY MR. GILGUN:
14   A.  I don't.
15   Q.  Has anybody ever drafted any sketches or
16 caricatures in the past within the department that
17 you are aware of?
18   A.  From time to time, there is stuff that
19 hangs up, yeah.
20   Q.  Whose been the author of that?
21   A.  I don't know.
22   Q.  Did you draw those?
23   A.  No, sir.
24   Q.  Okay.

**121**

1   A.  I'm lucky I can draw stick figures.
2   Q.  Did you ever speak to anybody about the
3 drawing that you did observe?
4   A.  No, no, sir.
5   Q.  Did you ever hear any conversation around
6 the department about any drawings purportedly
7 depicting Officer Royston?
8   A.  No, sir.
9   Q.  Are you aware of any allegations of
10 Detective Casey ever using illegal drugs?
11   A.  No, sir.
12   Q.  Have you ever used any illegal drugs?
13   A.  No, sir.
14     MR. GILGUN:  Do you have any
15 questions, Attorney Silverfine?
16     MR. SILVERFINE:  No.
17     MR. GILGUN:  Okay. We agree we'll
18 suspend at this time.
19     MR. SILVERFINE:  Yes.
20     MR. GILGUN:  Thank you, sir.
21     THE WITNESS:  Thank you.
22     (Whereupon, the deposition suspended
23 at 4:20 p.m.)
24

122

```
1        I, Steven Elmore, having read the
2   foregoing transcript of my testimony, do hereby
3   certify under the pains and penalties of perjury
4   the same contains a true and accurate record of my
5   answers to the questions herein set forth,
6   together with correction pages, if any, attached.
7
8
9
10
11         ————————————————
           STEVEN ELMORE
12
13
14
15
16
17
18
19
20
21
22
23
24
```

123

```
1                ERRATA SHEET
2
    PAGE LINE              DESCRIPTION
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

124

```
1           C E R T I F I C A T E
2
3   COMMONWEALTH OF MASSACHUSETTS
    SUFFOLK, SS.
4
5
6
7        I, Julie A. Healey, Certified Shorthand
8   Reporter, Registered Professional Reporter, and
9   Notary Public in and for the Commonwealth of
10  Massachusetts, do hereby certify:
11       That STEVEN ELMORE, the witness whose
12  testimony is hereinbefore set forth, was duly
13  sworn by me and that such testimony is a true and
14  accurate record of my stenotype notes taken in the
15  foregoing matter, to the best of my knowledge,
16  skill and ability.
17       IN WITNESS WHEREOF, I have hereunto set
18  my hand and Notarial Seal this 22nd day of
19  November, 2005.
20
21         ————————————————
           Julie A. Healey
22         CSR, RPR
           Notary Public
23
24  My Commission Expires:  March 26, 2010
```

**1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04CV12357-PBS

BRIAN KENNEDY AND MICHELLE KENNEDY, Individually
and as mother and next friend of BRIAN KENNEDY, JR.,
MITCHELL KENNEDY and DYLAN KENNEDY,
            Plaintiffs,
vs.
TOWN OF BILLERICA, DANIEL C. ROSA, JR., Individually
and as Chief of the Billerica Police Department, JOHN
BARRETTO, Individually and as former Chief of the
Billerica Police Department, PAUL W. MATTHEWS,
Individually and as former Chief of the Billerica
Police Department, ROBERT LEE, Individually and as
former Deputy Chief of the Billerica Police
Department, THOMAS CONNORS, FRANK A. MACKENZIE,
RICHARD RHONSTOCK, ROBERT BAILEY, JOHN ZARRO, MARK
TSOUKALAS, TARA CONNORS, MARTIN E. CONWAY, ANDREW
DEVITO, RICHARD HOWE, STEVEN ELMORE, WILLIAM MCNULTY,
DONALD MACEACHERN, MICHAEL A. CASEY, RICHARD NESTOR,
ROBERT BROWN, WILLIAM G. WEST, GREGORY KATZ, GERALD B.
ROCHE, BRIAN MICCICHE, WILLIAM MACDONALD, SCOTT
PARKER, ALAN MUNN, TIMOTHY F. MCKENNA and JOHN DOE,
            Defendants.
                  **********

DEPOSITION OF STEVEN ELMORE, a witness

called on behalf of the plaintiffs, taken pursuant to

the applicable provisions of the Massachusetts Rules

of Civil Procedure at the Offices of Nicholson, Sreter

& Gilgun, 33 Bedford Street, Lexington, Massachusetts

on July 19, 2006, commencing at 2:10 p.m.

                  ********
REPORTER: JOYCE E. ROMANOW
Professional Court Reporter and Notary Public
Copley Court Reporting, Inc.
101 Tremont Street, Boston, MA 02108
(617) 423-5841
www.copleycourt.com

**2**

APPEARANCES

FREDERICK V. GILGUN, JR., ESQ.
    Nicholson, Sreter & Gilgun, P.C.
    33 Bedford Street
    Lexington, Massachusetts 02420
    (781)861-9160
    For Plaintiffs

JEREMY I. SILVERFINE, ESQ.
    Brody Hardoon Perkins & Kesten, LLP
    One Exeter Plaza
    Boston, Massachusetts 02116
    (617)880-7100
    For Defendants

**3**

I N D E X

DEPOSITION OF          STEVEN ELMORE

EXAMINATION BY MR. GILGUN ............. 4


E X H I B I T S

No.  Description              Page

21   Police officer report dated 12-17-05  41

**4**

P R O C E E D I N G S

(Begins 2:10 p.m.)

(STEVEN ELMORE, sworn.)

MR. GILGUN:  And Attorney Silverfine,

can we agree that the same stipulations from the first

deposition apply?

MR. SILVERFINE:  Yes.

MR. GILGUN:  Okay.

EXAMINATION BY MR. GILGUN:

Q.    It's Lieutenant; isn't it?

A.    Sergeant.

Q.    Sergeant, you remember from the first time,

if you don't understand any of the questions I ask, if

you can just let me know that, I'll be happy to try

and rephrase the question for you so you understand

it.  If you can just let me know that.  And then if

you need to take a break or speak to your attorney,

just let me know that as well.

A.    Certainly.

Q.    Okay.  Following your deposition which took

place on November 7, 2005, have you spoken with

anybody other than your attorneys in preparation for

this deposition?

5

1    A.    No.

2    Q.    And did you speak with anybody about your

3    deposition following your deposition on November 7,

4    2005?

5    A.    Yes, I did.

6    Q.    Who did you speak with?

7    A.    Several members of the police department

8    that I work with.

9    Q.    And when I ask that, I'm not asking any

10    questions -- I'm not looking to get into any

11    conversations you had with your attorney. Okay. And

12    with whom from the police department did you speak

13    about your deposition?

14    A.    Lieutenant MacKenzie, Deputy Chief Connors,

15    Sergeant Zarro, Lieutenant Rhonstock, Chief Rosa.

16    Q.    Do you recall anybody else you spoke with

17    about your deposition?

18    A.    There may have been others, but that's just

19    the general.

20    Q.    When you spoke with these officers, was it

21    in a group or was it separately?

22    A.    Passing by in the hallway or in the squad

23    room or in the communication area.

24    Q.    Do you remember what you spoke about when

6

1    you spoke with these officers about your deposition?

2    A.    Just the line of questioning or how many

3    questions, the duration. Just the experience.

4    Q.    And did some of these other officers share

5    with you their experience during their deposition?

6    A.    Yes.

7    Q.    In speaking with anybody did you learn

8    anything about the allegations or the incidences

9    involved in this case that you were unaware of or had

10    not heard about prior to speaking with these people

11    following your deposition?

12        MR. SILVERFINE: Do you understand his

13    question?

14    A.    No, it's kind of lengthy.

15    Q.    Well, following the deposition you had

16    conversations with several police officers. My

17    question is, did you learn anything in these

18    conversations that you had with these officers

19    following your deposition in November of 2005 that

20    provided you with more information about the

21    allegations in the complaint or the incidences that

22    are alleged in the complaint?

23    A.    No, not really.

24    Q.    Did you review any documents following your

7

1    deposition in November of 2005 relating to the

2    incidences that are alleged in the complaint?

3    A.    No.

4    Q.    Did you review your deposition transcript

5    from your first transcript?

6    A.    Yes, I did.

7    Q.    Did you make any corrections or notations

8    as to errors in that deposition transcript?

9    A.    I don't believe so. Can I ask a question?

10    Did my response or that form letter go to you or to

11    you?

12        MR. SILVERFINE: If it went to me, it

13    went to them.

14    A.    We had to sign the thing saying do you

15    agree with this.

16    Q.    An errata sheet. Was that sent to me?

17    A.    Yeah. I signed that. It was -- I don't

18    believe there was any corrections. I just -- that's

19    it.

20    Q.    Did you review anybody else's transcript

21    from their deposition, that is, the other police

22    officers prior to coming today?

23    A.    No, I haven't.

24    Q.    Did you undertake any investigation into

8

1    any of the matters that were discussed at your

2    deposition on November 7, 2005?

3    A.    Prior to the deposition?

4    Q.    After. Following. So you're at the

5    deposition November 7, 2005. You understand what you

6    were called upon to testify about.

7    A.    Right.

8    Q.    Following that, did you go out and

9    investigate anything that you testified about?

10    A.    No, sir.

11    Q.    Did you listen to any tape recordings prior

12    to coming to today about this case?

13    A.    No, sir.

14    Q.    Did you review any videotapes?

15    A.    No, sir.

16    Q.    Did you review the Billerica Police

17    Department policies and procedures manual in

18    preparation for coming today?

19    A.    No, I did not.

20    Q.    When was the last time you reviewed that?

21    A.    Entirely?

22    Q.    That's a good question. When is the last

23    time you reviewed the entire policies and procedure

24    manual?

9

1   A.   1988.

2   Q.   Why is that date significant?

3   A.   It was a year after I started.  It may have

4   been something I read back then.  There's no

5   definitive date on it, but it's been sometime.

6   Q.   Okay.  And when was the last time you

7   reviewed any of the policies or procedures from the

8   Billerica Police Department manual?

9   A.   In the last two months.

10  Q.   And what policy and/or procedure were you

11  reviewing at that time?

12  A.   High speed pursuit policy.

13  Q.   And were you reviewing any other policies

14  and procedures at that time when you reviewed the high

15  speed pursuit policy?

16  A.   I think there's two or three of them that

17  have just recently been updated.  And I couldn't tell

18  you.  I know high speed pursuit is one of them.

19  Q.   So there were -- I'm sorry.

20  A.   No, I was going to say if they were in

21  front of me, I've heard of that one, that one and that

22  one.  I think there was three of them that they've

23  just recently done.

24  Q.   And did they amend the policies and

10

1   procedures that were in place or were they adding new

2   policies and procedures?

3   A.   In place, modifying.

4   Q.   And you know that one of them related to

5   high speed pursuit, correct?

6   A.   That's correct.

7   Q.   And you don't know what the other two

8   related to at this time?

9   A.   I do not.

10  Q.   And how did you become aware that there

11  were changes to the policies and procedures relative

12  to these three issues?

13  A.   They're changing them from hard copy to the

14  -- they're going to be on the, I think they call it

15  Intranet, which was an internal computer stuff at the

16  station.

17  Q.   So is the Billerica Police Department in

18  the process of converting the physical typed manual of

19  policies and procedures into a computerized record of

20  the policies and procedures; is that correct?

21  A.   That's right.

22  Q.   And you said that's how you became aware of

23  the modifications to, for example, the high speed

24  pursuit?

11

1   A.   That's right.

2   Q.   Was there a memorandum that was circulated

3   about the change to the computerized maintenance of

4   the policies and procedures manual or how did you

5   become aware?

6   A.   I don't know if it was a memo.  Sergeant

7   Gregory Katz, K-A-T-Z, and Lieutenant Ron Balboni,

8   B-A-L-B-O-N-I are upstairs.  They do all the computer

9   stuff.  They have been working to bring them from the

10  hardcopy to the computer.  And they hook them down --

11  Sergeant Katz will come to roll call and he'll come in

12  and say, We just recently have amended or updated,

13  whatever the word is, be aware of this.  And it will

14  be put on the Intranet.

15  Q.   So prior to these most recent amendments to

16  the policies and procedures, how did the police

17  department notify the officers of any changes to the

18  policies and procedures?

19  A.   Usually there's a memorandum sent.

20  Q.   And would the memorandum typically include

21  the actual change to the policy?

22  A.   Yes.

23  Q.   How many times do you recall receiving

24  memorandum relating to changes in the policies and

12

1   procedures of the Billerica Police Department since

2   1988?

3   A.   I don't know.

4   Q.   Would you say a handful of times?

5   A.   Possibly.

6   Q.   Was it less than 10?

7   A.   That would be safe to say.

8   Q.   Do you have a copy of the Billerica Police

9   Department policies and procedures?

10  A.   I do.

11  Q.   Where is that?

12  A.   In my locker.

13  Q.   And it's been there since 1988?

14  A.   That's been there since 1987.

15  Q.   And that's when you first became employed

16  as a full-time police officer for the Billerica Police

17  Department?

18  A.   Yes, sir.

19  Q.   What about the rules and regulations for

20  the Billerica Police Department, do you have a copy of

21  those?

22  A.   I don't have them.  Those are not with the

23  policy and procedure.  I don't have a copy of them.

24  Q.   Did you recall receiving a copy when you

13

1  first became a police officer?

2      A.    I don't recall that.

3      Q.    Do you recall ever having a copy of the

4  rules and regulations?

5      A.    I don't recall that, no.

6      Q.    If you needed to review the rules and

7  regulations, how would you access them?

8      A.    If I were to ask right now today?

9      Q.    Yes.

10      A.    I would probably approach Lieutenant

11  Balboni.

12      Q.    And how would he be able to provide you

13  access to them?

14      A.    He is -- his function, I believe his title

15  is administrative lieutenant.  So he's upstairs, not

16  necessarily dealing with day-to-day operations but it

17  would be day-to-day operations.  He's not so much in

18  the main flow, he's upstairs with the policies and

19  procedures, grant writing, budgets.  He does

20  administrative stuff.

21      Q.    Have you had the occasion over the years to

22  ever request to see copies of the Billerica Police

23  Department rules and regulations?

24      A.    I don't recall.

14

1      Q.    Do you know what topics are covered in the

2  Billerica Police Department rules and regulations?

3      A.    No, sir.

4      Q.    I know we talked about this a little bit

5  last time, but I want to go into a little more detail

6  this time.  And that relates to the policies and

7  procedures that relate to the handling of civilian

8  complaints.  Can you tell me what your understanding

9  is as to the handling of civilian complaints pursuant

10  to the Billerica Police Department policies and

11  procedures?

12      A.    Say that again.

13      Q.    Can you tell me what your understanding is

14  as to the handling of civilian complaints pursuant to

15  the Billerica Police Department policies and

16  procedures?

17      A.    In my capacity as a supervisor, is that

18  what you're asking me?

19      Q.    No.  I'm saying does the policy and

20  procedure have a section relating to handling civilian

21  complaints?

22      A.    I'd have to review that.

23      Q.    So you don't even know?

24      A.    I don't know.

15

1      Q.    Then let's talk about in practice how you

2  understand civilian complaints are handled within the

3  department.

4      A.    Okay.

5      Q.    If a civilian makes a complaint about a

6  police officer for misconduct by that police officer,

7  how is it that you understand that complaint is

8  handled within the department?

9      A.    My understanding would be -- the initial

10  contact with the complainant, is that what you're

11  asking me to explain, how I would handle a complaint

12  as a boss?

13      Q.    Yeah.  How you understand that they handle

14  them.  Do you handle it the way you believe the

15  department requires you to handle it?

16      A.    I believe so, yes.

17      Q.    Okay.  So why don't you tell me how you

18  would handle it then.

19      A.    It would be the initial contact or

20  interview or meeting with the complainant to find out

21  if the complaint -- the nature of the complaint.

22      Q.    Okay.

23      A.    There would be the interviewing of the

24  complainant.  And normally this meeting is right in

16

1  the police lobby.  Of course it would be -- it would

2  weigh as to what the complaint or the behavior or the

3  action.  If it was as simple as the officer being not

4  professional or it if it was something that, somebody

5  came in and made an allegation the officer was doing

6  something criminal.  There is varying ways it would

7  go.  Which chair you would -- I would probably say

8  that the majority of the complaints that I've handled

9  as a supervisor in six years have been minor in

10  nature, where it's a lot of times the people just want

11  to come in, voice their displeasure and you tell them

12  that you'll have a talking with that officer about the

13  incident, because I wasn't there.  Normally the

14  supervisor is not there.

15      Q.    Right.

16      A.    So we know there's three sides to every

17  story.  So I can't just, you know, discipline an

18  officer or kick it up to a ranking officer without at

19  least speaking to the officer, getting his side,

20  speaking to the people.  Most times people just want

21  to come in and just voice their displeasure with the

22  officer's behavior.  And once you tell them that

23  you'll speak to the officer, you know, about their

24  practices, most of the time the people are quite

17

1    content with that and they go on their way.

2        Q.    Okay.  And is there a person within the

3    department on a shift that is responsible for handling

4    these complaints that you've just described, which

5    would be someone coming into the police station

6    voicing their complaint about a police officer and

7    their professionalism?

8        A.    That would fall on the shift commander

9    because he's responsible for the entire shift.

10       Q.    So the shift commander would handle the

11   complaint.  And you indicated that it would be your

12   practice to interview the complainant if you're the

13   shift commander?

14       A.    Always.

15       Q.    And then also to interview the police

16   officer, correct?

17       A.    That's right.

18       Q.    And in those cases where the complainant

19   indicated they would be satisfied with that as the shift

20   supervisor spoke to the officer about it, then that

21   would be the extent of your involvement, fair to say?

22       A.    That's fair to say.

23       Q.    In those cases where the complainant did

24   not indicate that they would be satisfied with that

18

1    response, what else would be included in your

2    responsibilities for handling that complaint as a

3    shift supervisor?

4        A.    It would just be get to the next tier, a

5    superior officer to myself, either the lieutenant or

6    the -- ultimately Lieutenant Glavin is the shift

7    commander, line commander who is in charge of

8    operations.

9        Q.    Okay.  So if it weren't something that you

10   could satisfy the complainant with, that is, that they

11   accepted your position of just talking to the police

12   officer but they wanted more action, then you would

13   then refer it up to the line commander, correct?

14       A.    That's right.

15       Q.    Going back to the ones you're able to

16   resolve, if you will, without having to forward it

17   along.  Would you typically prepare any report on that

18   complaint?

19       A.    I've never had the opportunity to do one.

20       Q.    And what would provide you with the

21   opportunity to do one?

22       A.    Just as you just stated.  If I couldn't

23   speak to someone and come to some kind of resolution

24   and let them express what their frustration or

19

1    displeasure is, then it would probably be orally

2    related to the shift commander, the line commander,

3    Glavin.  And he may come down and ask for a report.

4    More than likely, he's going to go to the officer

5    that's involved, not with me.  I'm just carrying the

6    ball to someone that may sit down with the complainant

7    and see if there is something else there.

8            But as far as me writing a report, that you

9    come in the lobby and you didn't like what Officer X

10   was saying on the street and I couldn't pacify you by

11   mediating, then I would go to the shift commander and

12   I'd say, Look it, I tried to help this fellow out and

13   he's not happy with it.  He wants -- a lot of times

14   people will say, Well, I want to talk to your boss,

15   even though I am a boss but they want to just continue

16   on up.  So Lieutenant Glavin ultimately in our police

17   department would be the stop guy.  He'd be the last

18   stop.

19       Q.    Okay.  Focusing on the ones that you're

20   able to resolve.

21       A.    Um-hum.

22       Q.    Would you ever prepare a report to document

23   the complaint that was made and following that up with

24   the resolution you were able to come to?

20

1        A.    I have not.

2        Q.    As far as you know, there's no procedure in

3    place within the department that dictates that all

4    complaints of civilians should be documented, right?

5        A.    Not that I'm aware of.

6        Q.    And did I understand you correctly that in

7    your years as a shift supervisor, you've never had the

8    occasion to forward a complaint to the line commander

9    because you have been able to resolve all the

10   complaints that you've received; is that fair to say?

11       A.    That would be fair to say.

12       Q.    Okay.  Are you aware what the practice is

13   within the department when there is a complaint that

14   the shift's commander is unable to resolve and is

15   required to follow it along to the line commander

16   concerning the documentation or documenting that

17   particular complaint?

18       A.    I'm not.

19       Q.    So again, I know your personal experience

20   has been that you haven't had that situation.  But to

21   the extent that you're aware of other shift commanders

22   having complaints that they were unable to resolve, do

23   you know whether or not they have documented the

24   complaint as part of either forwarding it along to the

21

1  lieutenant or just noting their involvement in the

2  complaint?

3      A.    I don't.

4      Q.    And you indicated that the line commander

5  is the last stop.  Do any of them ever reach the

6  chief?

7      A.    I'm assuming so, yes.  That's probably the

8  wrong statement.  The chief would be the final stop.

9  But as far as elevating, these are buffers that are

10 put in place.  These are -- that's his job.  As

11 operations manager he's, you know, if it's something

12 that he can't or if it's something that would rise to

13 the Chief's attention, I'm assuming it would get to

14 the chief's office.  I'm sure they have talks every

15 day.

16     Q.    How many civilian complaints do you think

17 you've handled as a shift supervisor?

18     A.    Maybe 15.

19     Q.    How many years has it been you've been a

20 shift supervisor?

21     A.    A little over six years.

22     Q.    And in any of those cases did you form the

23 opinion that the officer had acted unprofessionally?

24     A.    Again, because I'm not on the street, I

22

1  don't know.  I can't 100 percent say whether the

2  officer was acting inappropriately or if this person

3  is just frustrated, upset that perhaps they were given

4  a ticket or maybe the officer yelled at them at a

5  traffic post, you know, with heavy traffic.  I can't

6  form that opinion because I've been very fortunate.

7  When I speak to the civilian and I say, Look it and I

8  take the time and I listen to them and they air it

9  out.  And I bring the officer in later on you, you know,

10 and say, "Mr. Jones came in and said you were rude to

11 him telling him to move his car along."  It really

12 doesn't rise to whether or not the officer is wrong or

13 not.  There are interactions, we know things do

14 happen, but as far as do I form an opinion?  No.

15     Q.    So you really, in the situations you've

16 handled, your position with respect to the police

17 officer wasn't -- well, strike that.

18         Your approach wasn't to get to the bottom of

19 the allegation to determine whether or not it was

20 true, it was more to just make sure the civilian was

21 satisfied with your suggestion that you would speak to

22 the officer?

23         MR. SILVERFINE:  Object to the form.

24     Q.    Is that fair to say?

23

1      A.    No, that's not fair to say.

2      Q.    Okay.  Was your objective to determine

3  whether or not there was validity to what the

4  complainant was saying?

5      A.    Yes.

6      Q.    In all cases?

7      A.    Yes.

8      Q.    And did you form an opinion in those cases

9  as to whether or not the complaint was valid?

10     A.    No.

11     Q.    In all 15 cases your objective was to

12 determine whether or not there was validity to the

13 complaint.  But in all 15 cases you were unable to

14 come to an opinion as to whether or not there was

15 validity to the complaint?

16     A.    My purpose when I speak to civilians -- and

17 I have found that due to the fact that a lot of people

18 would really like to tell the police officer what they

19 think of them, they don't.  So they take the next

20 step.  They come to see the supervisor.  And I'm a

21 very good listener and a very good communicator.  And

22 after I let them rant and rave for 15 or 20 minutes, I

23 have been very fortunate that these people have said,

24 Now, I don't want someone else to get yelled at.  I

24

1  don't want somebody's mother to get yelled at.  And I

2  tell them, You know what, I'm going to bring that

3  officer in here.  And I do, and I speak to them.

4      Q.    When you --

5      A.    And that's not forming an opinion.  That's

6  just the way that I handle civilian complaints on the

7  low level.

8      Q.    Right.  And then you call the officer in

9  and what do you do?

10     A.    I say, Joe, what happened?  A guy in a

11 green SUV came in and said he didn't see you with your

12 hand up.  He says you yelled at him.

13         Now do I know if he yelled at him?  I don't

14 know.  You know.  Do I think that Joe may have raised

15 his voice?  Yeah.  Sometimes when someone is about to

16 run you over, we get excitable sometimes.  When

17 there's going to be a collision, you know, there's an

18 adrenalin.  And the police officers do, you know,

19 they're human beings.  They do yell out.  They do

20 whistle.  They do yell.

21         Is it forming an opinion that I'm siding with

22 a police officer?  No.  I keep it very open minded.

23 And as I just stated earlier, I'm a very good

24 communicator.

25

1    Q.    And again, your objective is to communicate
2  as opposed to make a determination as to what happened
3  out there because you weren't there.
4    A.    That's right.
5    Q.    Right?
6    A.    Right.
7    Q.    And is that pretty much the way you handled
8  all of the complaints that you believed to number
9  around 15 in your six years?
10   A.    Yes. All minor complaints, you know.
11 People come in, you say to them, what do you want to
12 see happen to this? You got a speeding ticket, you
13 don't agree with it. I'll sit down and I'll show you
14 how you can seek relief, what avenues you can pursue.
15 Do you go to a judge's hearing or a clerk's hearing.
16 I'm not going to suspend the officer. I'm not going
17 to discipline the officer because he looked at his
18 radar gun and it said you're going 47. You want to
19 say No, I was going 33 and my drawer dropped an ice
20 cream. You know. There's people that truly believe
21 that they've been wronged. Is the officer wrong? No.
22   Q.    Let's focus on the complaints that didn't
23 deal with a question of, you know, fact as to whether
24 or not the officer was correct in issuing a citation

26

1  but more on the, which I think you said was
2  allegations that the officer was unprofessional. So
3  not that the officer got it wrong in the radar, but
4  those complaints that concern allegations that the
5  officer's conduct was improper in that he was acting
6  unprofessional. In those situations, was it your
7  strategy to be a communicator, that is, to receive the
8  complaint, be a good listener, pacify the civilian
9  that you would – to the extent that you were going to
10 speak to the officer about it, and then convey that
11 message to the officer. Was that your strategy in
12 handling the complaint?
13   A.    To make sure that the consumer is
14 satisfied. To make sure the civilian walking out of
15 the police station says, I came to the boss, he's
16 going to talk to that guy and it's not going to happen
17 again. That's my philosophy.
18   Q.    When you went to the police officer in
19 those situations, it was to convey the message that
20 this was what they said, but not necessarily to make a
21 judgment on whether what they said was true; isn't
22 that fair to say?
23   A.    That would be fair to say.
24   Q.    But to let them know, if this was true, it

27

1  was improper and don't do it again. Is that more or
2  less what your strategy was?
3    A.    Yes.
4    Q.    Okay. Did you ever have the occasion to
5  further investigate any complaint by way of speaking
6  to other witnesses? I'm talking about complaints made
7  by civilians against police officers for misconduct.
8    A.    No.
9    Q.    And I apologize if I asked this already.
10 But so in every one of the complaints that you had
11 where a civilian alleged that the officer engaged in
12 some sort of misconduct or unprofessionalism, the
13 complainant left your meeting with them satisfied that
14 you would speak to the officer and the matter would be
15 resolved?
16   A.    That's correct.
17   Q.    And they weren't demanding that you
18 determined that they were telling the truth or
19 anything like that?
20   A.    No, sir.
21   Q.    In the event that you had a situation where
22 a complainant wasn't simply looking to vent and have
23 you speak to the officer but wanted a resolution, that
24 is, an investigation into their complaint and a

28

1  resolution or a determination as to whether or not it
2  was founded. If you were called upon to conduct that
3  type of investigation, what would be the burden of
4  proof that you would apply to determining whether or
5  not the complaint should be founded? This is all
6  pursuant to your understanding as to the practices or
7  policies and procedures within the department.
8    A.    I don't believe in my position at this
9  police department that that would be my position. I
10 understand what you're saying and I understand the
11 question. The proof, the burden, it would be if,
12 again, if it's more than just the simple complaint,
13 it's going up.
14   Q.    And it's really, if it's more than a
15 complaint where you can't have the civilian walk away
16 satisfied that you're going to convey the message,
17 then you're not going to get into, as a shift
18 supervisor, determining who is telling the truth and
19 what the burdens of proof are. You're pushing that
20 along to the higher level; is that fair to say?
21   A.    Right. Again, gauged on the seriousness of
22 the complaint.
23   Q.    But let's talk about a nonserious
24 complaint. Again, if there's a nonserious complaint

29

1  and it's still, the complainant is insistent upon a
2  resolution and not satisfied just walking away knowing
3  that you're going to speak to the officer.
4        A.    It would move on, yeah.
5        Q.    So again, all the ones that you can't --
6  let me just rephrase it, say it one more time, see if
7  we can nail this down.
8        A.    Yup.
9        Q.    In any case where a civilian makes a
10  complaint that you are unable to resolve by simply
11  informing them that you will notify the officer of
12  their complaint and speak to him about it, you would
13  forward the complaint along to the line commander and
14  you believe that practice to be pursuant to the
15  practices within the department?
16        A.    Correct.
17        Q.    All right.  Is there any way within the
18  department to keep track of the number of complaints
19  that are made against a police officer?
20        A.    The line commander would have that answer.
21        Q.    But if you don't log in the complaints that
22  you receive about a police officer, how would the line
23  commander ever know about it?
24        A.    The ones that are settled in the lobby?

30

1        Q.    Correct.
2        A.    There would be no way of tracking that.
3        Q.    Did you ever receive any specific training
4  concerning the handling of civilian complaints against
5  police officers?
6        A.    Not that I'm aware of, no.
7        Q.    Have you ever worked in the criminal
8  bureau?
9        A.    Yes, I have.
10        Q.    Did you receive any training specifically
11  related to your responsibilities in the criminal
12  bureau?
13        A.    No, I did not.
14        Q.    What was the first training you received as
15  a police officer?
16        A.    The academy, police academy.
17        Q.    And aside from your training at the
18  academy, what other training have you received since
19  you became a police officer?
20        A.    We go back annually to receive 40 hours of
21  update.  In-service, they call it.
22        Q.    So you do your annual in-service training.
23  And aside from that, have you received any other
24  training since you became a police officer?

31

1        A.    I've gone to several seminars, yes.
2        Q.    And the seminars that you went to, was that
3  at the direction of the department, the suggestion of
4  the department or on your own request?
5        A.    Both.
6        Q.    And which ones were you either recommended
7  that you attend by the department or directed to
8  attend by the department?
9        A.    Martha Coakley put a seminar on for, may
10  have been domestic violence.  I was told that I was
11  going to that one.  That's the only one I really
12  recall.
13        Q.    Do you know why you were told to go to that
14  one?
15        A.    Several of us went.  I don't know why.
16        Q.    And what training courses did you request
17  that you be able to attend?
18        A.    I went to a death investigation school.
19  I've gone to criminal law seminars put on by Pat
20  Rodgers.  I've gone to class for the satanic cults.
21  I've gone to narcotic seminars.
22        Q.    Do you recall any others?
23        A.    No.
24        Q.    Aside from the one that Martha Coakley put

32

1  on for domestic violence, these other ones you made a
2  request that you be able to go to them, correct?
3        A.    Yes.  There is a whole school file on the
4  computer and the police officers can look at it, see
5  if there's a class.  If you see something interesting,
6  you say, you know, can I go.
7        Q.    Have you ever been turned down on a request
8  that you made to attend training?
9        A.    No.
10        Q.    Why did you go to the satanic cults
11  seminar?
12        A.    It was there.  It was interesting.
13        Q.    Was that an issue in town?
14        A.    No, it was just a class.  It was down in
15  Warwick, Rhode Island.
16        Q.    Have you ever failed any courses that
17  you've taken?
18        A.    No, sir.
19        Q.    At your deposition last time you indicated
20  that you had handled a civilian complaint made by
21  Officer Royston's ex-wife.  Do you recall that?
22        A.    Yes.
23        Q.    What was that complaint that she made?
24        A.    It wasn't a complaint.  It was more of a --

33

1  she was asking for advice how to get a restraining

2  order.

3      Q.    When was that?

4      A.    I don't recall the dates on it.

5      Q.    What year, do you know?

6      A.    '03 maybe. I don't recall.

7      Q.    Did you know her prior to her coming in

8  seeking this information?

9      A.    Yes, I did.

10     Q.    How well did you know her?

11     A.    I knew her by face and what her name is and

12 to say hi.

13     Q.    Did she seek you out specifically for this?

14     A.    No.

15     Q.    How is it you came to handle it?

16     A.    I was in the station relieving the

17 lieutenant for dinner.

18     Q.    And do you recall what happened after you

19 had spoken with Officer Royston's ex-wife regarding

20 her complaint or her request for information regarding

21 a restraining order?

22     A.    After I explained everything to her about

23 how to obtain a restraining order, what was involved,

24 she declined to seek a restraining order.

34

1      Q.    And did you make any log entry or prepare

2  any documents relative to that?

3      A.    I don't think so. The lieutenant was

4  Lieutenant Greenhall that night. And the lieutenant

5  and Officer Royston are personal friends. I believe

6  at that time the lieutenant was in touch, in contact

7  with Officer Royston.

8      Q.    So Lieutenant Greenhall and Officer Royston

9  at the time were personal friends?

10     A.    That's right.

11     Q.    What makes you think that Lieutenant

12 Greenhall had contact with Officer Royston that night?

13     A.    His wife, Joyce, had told me that he had.

14     Q.    Why don't you tell me -- how many

15 conversations did you have with Joyce that evening?

16     A.    Just one.

17     Q.    And by the time she spoke to you, she had

18 already indicated that Lieutenant Greenhall had spoken

19 with Officer Royston?

20     A.    She may have been in the station before I

21 arrived to relieve the lieutenant. She may have been

22 in there. But when the lieutenant left, she appeared

23 in the front lobby and said, "How do I go about

24 getting a retraining order? What's involved with it?

35

1  And I went dah, dah, dah, dah. And she said, Tommy is

2  talking to Dean. Tommy Greenhall is talking to Dean

3  Royston. So there must have been some kind of

4  conversation that I'm not privy to.

5      Q.    And was it because Lieutenant Greenhall was

6  involved in speaking with Officer Royston about this

7  alleged complaint that you did not prepare a report or

8  a log entry concerning his ex-wife's complaint?

9      A.    Right. Because he's the boss and he's

10 involved and --

11     Q.    Would you have -- I'm sorry.

12     A.    No, he was there.

13     Q.    Would you have otherwise prepared a report

14 on it?

15     A.    Something of that magnitude, that is part

16 of our thing. If there's any restraining orders

17 within the police department by a member of our police

18 department, the chief is to be notified of any

19 domestic issues.

20     Q.    So the chief is to be notified of any

21 domestic issues involving a police officer?

22     A.    That's right.

23     Q.    Is it that broadly defined to say any

24 domestic issue or does it have to be a complaint

36

1  requesting a restraining order?

2      A.    No. I don't know what the exact verbiage

3  is. But it's, again, that's something that would

4  escalate to a serious complaint or a problem where

5  myself as a sergeant wouldn't just say, okay, I'm

6  going to hold onto this. It would go to your boss.

7  And Lieutenant Greenhall was the boss. And I don't

8  think at that time there was a position of a line

9  commander. So there was a void there between the line

10 lieutenant. And then if it would go to the deputy

11 chief or the chief. I don't believe there was a line

12 commander position at the time of that.

13     Q.    So pursuant to your understanding of the

14 policies and procedures that were in place at the time

15 that Officer Royston's wife was in the department

16 inquiring about a retraining order against him,

17 Lieutenant Greenhall should have prepared a report to

18 the chief about that?

19     A.    Yeah. Yes.

20     Q.    At the first deposition I had asked you,

21 Have you ever received a complaint from a civilian

22 concerning police misconduct of another police

23 officer. And the answer was yes. I asked, On how

24 many occasions, you said, Once. And I said, Who was

37

1 that officer. You said, Officer Royston. And the
2 question was, Who was the civilian that made the
3 complaint. his ex-wife. And that's the incident
4 we've just talked about?
5     A.    That's right.
6     Q.    So when you answered that question on the
7 last occasion, you didn't include the other times when
8 you had people come into the department to complain
9 about police misconduct that you were able to resolve
10 by telling them you would speak to the officer,
11 correct?
12     A.    That's right.
13     Q.    Why didn't you include that last time in
14 response to the question how many times had you
15 received a complaint from a civilian concerning police
16 misconduct of another police officer?
17     A.    Because my interpretation of that is
18 basically it's just a matter of opinion. If you think
19 that an officer has been rude --
20     Q.    Okay.
21     A.    That's my own interpretation of that. You
22 come in and start talking to me about restraining
23 orders or something that's getting into the criminal
24 end of it, again, that's on the radar screen. That's

38

1 going to escalate to, you know, a formal report, log
2 entry, going to a superior officer.
3     Q.    For police misconduct in the form of
4 rudeness, in your opinion is just a matter of opinion?
5     A.    Of your opinion.
6     Q.    Meaning the civilian's opinion?
7     A.    Correct. You know, they obviously may say
8 yeah, I whistle all the time. You may find that
9 offending and you're going to come in and say that
10 officer was whistling at me like I'm a dog.
11     Q.    But there are some types of conduct that
12 you would agree are unprofessional pursuant to the
13 rules and regulations of the department or just by
14 what your own standards would be for a police officer,
15 such as using profanity, for example.
16     A.    Yes.
17     Q.    And that's not a matter of opinion,
18 correct?
19     A.    That's correct. But I've been fortunate
20 not to have had to field a complaint where someone has
21 come in saying, That cop called me an f-ing a-hole.
22 I've never -- I haven't experienced that. I've been
23 very fortunate. We've got a good bunch of guys. And
24 we just, I've been fortunate. If there is a Billerica

39

1 police officer that carries himself like that, he
2 hasn't done it on my watch, he hasn't done it while
3 I'm the boss. I haven't had to field that.
4     Q.    What's the most serious allegation you've
5 had to handle?
6     A.    Traffic incidents.
7     Q.    When you say traffic incidents, was it rude
8 conduct that came out of the traffic incident or
9 someone yelling at me, is that the most serious thing?
10     A.    It's a ticket that's come out of it. The
11 majority of the complaints that people get mad,
12 they've been issued a citation. And they don't
13 understand. They want a pound of flesh. They don't
14 want to turn the back of the citation over and say, I
15 am going in for a hearing and I'm going to take care
16 of you. They want to come in and they want a pound of
17 that police officer's flesh. They want him in -- you
18 know, he shouldn't have given me that ticket. That's
19 been the majority of my involvements as a Billerica
20 police sergeant -- it's been citations. People
21 don't want to get citations with the six-year
22 surcharge and paying the ticket.
23     Q.    And you don't get into any investigation
24 into the validity of the complaint that it was

40

1 improperly issued, an improperly issued citation, do
2 you?
3     A.    No. Again, I just try to direct them. I
4 try to appease them, calm them down and say, this is
5 how you can seek relief. You know, if you feel the
6 officer was out of line, I'd be more than happy to
7 talk to him and find out what was going on out there.
8 And I leave the option, if you want to call me back.
9 Are you satisfied with that? Yes, I am. And out they
10 go. And I'll call in Joe and I'll say, Listen Harry,
11 what happened with the guy with the Bronco? And Well,
12 you know, he was doing this and he was adamant that he
13 wasn't doing that. And I can't get in an argument
14 with everyone I stop on the street. We have guys that
15 stop 25 cars a night, you know.
16     Q.    In any of the complaints that were made by
17 the civilians, did they ever claim that they didn't
18 violate the particular ordinance that the officer was
19 citing them for?
20     A.    Sure.
21     Q.    And again, your practice -- you didn't get
22 into investigating the merits of that complaint, you
23 referred them to their options to pursue an appeal of
24 the ticket, correct?

41

1    A.    If I can just simply put it to you. If I'm
2    in the station and you say the light was yellow and he
3    said it was red, I can't tell you you're right, the
4    light was yellow. I'll take care of that ticket for
5    you. It doesn't happen that way.
6        Q.    Did any of the complaints that you received
7    on these traffic citations, did the complainant ever
8    suggest that the officer was motivated for personal
9    reasons in issuing the citations to them?
10   A.    No.
11           MR. GILGUN: Can we please have this
12   marked as the next exhibit.
13           (Exhibit 21 marked.)
14       Q.    Sergeant, if you can take a look at Exhibit
15   21. Take your time and review that.
16   A.    (Looks.) Yes, sir.
17       Q.    Now Exhibit Number 21 is a police report
18   dated December 17, '05, correct?
19   A.    Yes, sir.
20       Q.    And did you prepare that report?
21   A.    Yes, I did.
22       Q.    If you look in the upper right-hand corner,
23   it says, Reported Friday 12-16-05, 22:48?
24   A.    Um-hum.

42

1        Q.    What is the time and date reference to in
2    that report on that line, what does it refer to?
3    A.    The time that the call was -- the complaint
4    was logged at the station.
5        Q.    Who logged the complaint at the station?
6    A.    I don't know who the dispatcher was, but
7    Mrs. Ashton.
8        Q.    So it would have been the time that Miss
9    Ashton called in a complaint to the police station,
10   correct?
11   A.    That's right.
12       Q.    This report doesn't indicate anywhere what
13   time the officers responding to that call were
14   dispatched, does it?
15   A.    Not in this report. But you can get it on
16   the log run, on the -- there's another screen you can
17   go to to show when you're called, when you arrive and
18   when you're clear.
19       Q.    If you can look on the line where it says
20   "defendant," it gives a number and then it says,
21   Ashton, William R.
22   A.    Yup.
23       Q.    Do you see that?
24   A.    Yes.

43

1        Q.    Do you see that address of 1248 Gorham
2    Street?
3    A.    Yes.
4        Q.    Did you complete that information when you
5    filled out this report?
6    A.    I don't recall.
7        Q.    If you didn't, who would have?
8    A.    If someone has had a dealing with him, with
9    Mr. Ashton at some point, what we do is we go into the
10   computer. And I would, we master name it. And if
11   William Ashton is there, yes, you just hit "Y." I
12   don't get into changing. So he appears in the master
13   name as 1248 Gorham Street in Lowell.
14       Q.    And that's as of December of '05?
15   A.    That's whenever you'd have to go look at
16   the last involvement to see who put him in there. I
17   do not believe -- I don't have a specific memory of
18   putting him in that night. I don't know if his mother
19   told me that's where he lives or if someone else had
20   had an involvement with him from the time he lived
21   there until whenever, wherever he lives now, it would
22   just show up as the master name. Or if I don't know
23   where he's living and that's how he's in the computer,
24   he just gets -- the word I'm looking for is attached.

44

1    He just gets attached to the report.
2        Q.    And following your involvement in this
3    complaint by Mrs. Ashton, did you forward the package
4    to the Lowell district court where a complaint was
5    filled out and an arrest warrant requested?
6    A.    Yes.
7        Q.    Did you do that paperwork?
8    A.    I did.
9        Q.    Was Mr. Ashton ever arrested for this
10   incident?
11   A.    I don't know.
12       Q.    When an arrest warrant issued at the
13   request of an officer, is the officer notified by the
14   court that the warrant is issued?
15   A.    No.
16       Q.    Is it the officer's responsibility to
17   follow up on the warrant?
18   A.    No.
19       Q.    What is the department's procedure for
20   following up on a warrant requested by a Billerica
21   police officer?
22   A.    None that I'm aware of.
23       Q.    Do you know why that is?
24   A.    No, sir.

45

1     Q.   What is the procedure when a warrant is

2 requested, issued and the defendant is arrested by

3 another police officer from within the department for

4 notifying the officer who requested the warrant?

5     A.   What is the policy?

6     Q.   The procedure.

7     A.   There isn't one.

8     Q.   So if Officer MacKenzie had made an arrest,

9 for example, on this warrant request that you had

10 made, there is no procedure or practice for him

11 notifying you that he picked up Mr. Ashton?

12     A.   None. The warrants come out of something

13 called warrant management system now, which comes out

14 of the district courts where we have no communication

15 with them. So the only way you're going to find out

16 is if you were coming in for your next tour of duty or

17 the next time you come in and you check Mr. Ashton for

18 a warrant to see if it was there.

19     Q.   Let me ask you about that then. Is the

20 department notified when warrants are issued for

21 individuals who reside in Billerica?

22     A.   Yes.

23     Q.   How is that notification received by the

24 department?

46

1     A.   That comes over teletype that we run all

2 our warrant inquiries and the registry information.

3 And it -- they're sent by the warrant management

4 people. It comes to our police department with no

5 bells or whistles. It just comes up. So you might

6 have information coming out of Oklahoma City on a

7 homicide and right behind it might come up a warrant

8 on William Ashton. And if nobody picks up on it and

9 it gets ripped off and thrown in the shredder. Or if

10 they're on top of their game they take it over and

11 they put it over in the file for the girls in records.

12     Q.   In records?

13     A.   Records.

14     Q.   Okay. Just so I understand what comes

15 across this -- what did you call it, a wire?

16     A.   It's a teletype, yeah.

17     Q.   You receive information regarding warrants

18 across the country?

19     A.   We can communicate with any agency in the

20 country.

21     Q.   Right.

22     A.   And what they do is, when they -- from time

23 to time, like if we have a boat stolen, we can put out

24 to New England states, you know, be on the lookout for

47

1 a bass tracker. And it will ring up in every

2 department in New England. Sometimes we get

3 information on terrorist activity or FBI will send

4 stuff out, New Jersey state police will be looking for

5 so and so.

6     So there nothing -- it just comes up with

7 every day. And if somebody is not looking and reading

8 every teletype that comes up, they pile up and someone

9 will come along and they just clean up the room and

10 they'll shred it. It doesn't mean that it nullifies

11 the warrant for Mr. Ashton. It's there. You know,

12 you'd have to have somebody watching 24 hours a day

13 reading every teletype that comes up. And a lot of

14 times it will be printing out. Or if I run a warrant

15 query on you and somewhere in the national

16 intelligence there's an illegal refugee with 25

17 aliases, you're going to have teletypes that print out

18 like this on a simple traffic stop in Billerica and

19 they're looking for somebody in Los Angeles. You know

20 what I mean? It's simple but it's complex.

21     Q.   So is anybody in the department assigned

22 responsibility for reviewing the teletype?

23     A.   Not to review them, no. It's just -- if

24 you're cognizant you pick it up and you read it. A

48

1 lot of times it's interesting. A lot of times it will

2 have information from all over the country, you know,

3 found bodies or so and so is wanted on a triple

4 homicide or, you know.

5     Q.   Pertaining to a Billerica man, you mean?

6     A.   No, it will just come up. So if you don't

7 get in the habit of reading all of these, you know, we

8 used to have stolen cars. We used to just pick the

9 phone up and call Lawrence and say, Yeah, we recovered

10 this car. Well, now they want everything in a

11 teletype and things have changed a little bit. But

12 you've got to really sit there and read every single

13 bulletin that comes out.

14     Q.   Okay. Again, where you had requested a

15 warrant, you would have no obligation or

16 responsibility for following up with the teletype to

17 see if that warrant came through?

18     A.   No, sir.

19     Q.   What was the basis for your belief that

20 Mr. Ashton had violated a restraining order when you

21 filed this complaint and request for an arrest

22 warrant?

23     A.   On his mother's say so.

24     Q.   What specifically did she say that you

49

1  believe constituted a violation of the restraining
2  order?
3      A.    What specifically?
4      Q.    Yeah.
5      A.    Probably the part where Mrs. Ashton was
6  quite shaken by this conversation, is quite concerned
7  for her and her family's safety.
8      Q.    Okay. How does that statement by Miss
9  Ashton constitute a violation of a restraining order
10  issued against William Ashton?
11      A.    He's not to have any contact with her. He
12  called her. It's a violation.
13      Q.    The violation is the no contact, correct?
14      A.    Correct.
15      Q.    Not the fact that she's shaken by it. It's
16  the fact that there was contact. Isn't that what
17  constitutes the violation?
18      A.    Yeah.
19      Q.    And you reviewed the retraining order after
20  speaking with Miss Ashton, didn't you?
21      A.    Um-hum, yes.
22      Q.    And in your paragraph Number 2 in the
23  second page, it says, "The RO docket Number blah,
24  blah, blah is active with no expiration date." But it

50

1  goes on to say, Number 2, "No contact. Stay at least
2  100 yards." Does that mean that there is supposed to
3  be no telephone communication?
4      A.    No contact.
5      Q.    And you understand when it says no contact,
6  stay at least 100 yards, you understand that to mean
7  there should be no telephone call?
8      A.    No contact.
9      Q.    Does a telephone call constitute contact?
10      A.    Yes, it does.
11      Q.    So that would be in violation of Section 2
12  of that restraining order?
13      A.    Yes, sir.
14      Q.    In the second-to-the-last paragraph on that
15  second page it says, "Mrs. Ashton feels that her son
16  William is trying to get her to change her story in
17  which Mrs. Ashton is being called to testify in the
18  deposition stages of this lawsuit in which the Kennedy
19  family is attempting to sue members of this police
20  department." Did Ms. Ashton tell you what her story
21  was?
22      A.    What her story was?
23      Q.    Yes.
24      A.    I don't understand the question.

51

1      Q.    Well, you say in here that she reported to
2  you that she feels that her son is trying to get her
3  to change her story.
4      A.    That's right.
5      Q.    Did she say what her story was and how he
6  was trying to change it?
7      A.    No.
8      Q.    You didn't ask her about?
9      A.    How is she trying to change her story?
10      Q.    You didn't ask her -- well, let me ask
11  another question.
12      Did you speak with Ms. Ashton about what she and
13  her son were talking about?
14      A.    Yeah. I put it in the report here, I
15  think.
16      Q.    They were talking about the complaint that
17  was filed in this case, correct, by the Kennedys?
18      A.    Correct.
19      Q.    And Miss Ashton, according to this report,
20  had a story that relates to this complaint, correct?
21      A.    Did she come in here and testify? Is she
22  on your list? I know I'm not supposed to ask you
23  questions.
24      Q.    Yeah. I'm asking the questions.

52

1      A.    I'm a little confused here.
2          MR. SILVERFINE: You can tell him -- if
3  you're confused by the question, you have to tell him.
4      A.    I don't understand what you're trying to
5  get at.
6      Q.    Let's talk about what Miss Ashton told you
7  that night. Aside from what she said took place in
8  her telephone call with William Ashton, did she tell
9  you what information she had concerning the Kennedy
10  complaint in this case?
11      A.    No, sir.
12      Q.    You didn't get into that with her?
13      A.    No, sir.
14      Q.    Okay.
15          MR. GILGUN: I have nothing further.
16          MR. SILVERFINE: Thank you. Okay.
17  Let's go.
18          (Ends 3:05 p.m.)
19
20
21
22
23
24

53

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF MIDDLESEX

I, Joyce E. Romanow, a Professional
Shorthand Reporter and Notary Public in and for the
Commonwealth of Massachusetts, do hereby certify that
Steven Elmore, the witness whose deposition is herein
set forth, was identified and duly sworn by me and
that such deposition is a true record of the testimony
given by the witness on July 19, 2006 to the best of
my skill and ability.

I further certify that I am neither
related to nor employed by any of the parties in or
counsel to this action, nor am I financially
interested in the outcome of this action.

In witness whereof, I have hereunto set
my hand and seal this 9th day of August, 2006.

_____

Joyce E. Romanow, Notary Public

My Commission Expires:  July 6, 2012

54

**CERTIFICATE**

I, Steven Elmore, do hereby certify that I
have read the foregoing transcript of my testimony
given on July 19, 2006, and I further certify that
said transcript is a true and accurate record of said
testimony (with the exception of the following
corrections listed below):

PAGE   LINE   CORRECTION        REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

SIGNED UNDER THE PAINS AND PENALTIES OF
PERJURY, and executed this _____ day of _____, 2006.

_____

STEVEN ELMORE