# EXHIBIT 1

```
                    VOLUME:  1
                    PAGES:  1 - 101
                    EXHIBITS: See Index


            UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS


* * * * * * * * * * * * * * * * * * * *
BRIAN KENNEDY, et al.,          )
             Plaintiffs,  )
     vs.                        )    No. 04-CV-12357-PBS
TOWN OF BILLERICA, et al.,      )
             Defendants.  )
* * * * * * * * * * * * * * * * * * * *


     DEPOSITION OF MARTIN CONWAY, a witness called by and on
behalf of the Defendant, taken pursuant to the applicable
Federal Rules of Civil Procedure, before Vincent Martino,
A Notary Public within and for the Comm. Of Massachusetts,
held at the Offices of Jason & Fischer, 47 Winter Street,
Boston, MA 02108, on Monday, November 27, 2006, commencing
at 10:15 a.m.
        COPLEY COURT REPORTING - (617) 423-5841
```

```
                  I N D E X

Witness          Direct    Cross    Redirect    Recross
Martin E. Conway      3


                  E X H I B I T S

Exhibit Number                              Page
1     Police Identification                  15
2     Retraction Statement                   95
3     Photographs                            99



        COPLEY COURT REPORTING - (617) 423-5841
```

```
                    Stipulations
     It is agreed by and between counsel for the
respective parties, that the witness will read and sign the
deposition, but notarization and filing of the deposition
are hereby waived.
     It is further agreed that all objections, except as
to form, and motions to strike are reserved until the time
of trial.
     MARTIN E. CONWAY, of lawful age, being first
properly identified and duly sworn, deposes and says as
follows in answer to direct interrogatories by Attorney
Fischer:
     MR. FISCHER: Let's mark the police identification
as Exhibit Number 1.
     MR. SILVERFINE: I object.
     MR. FISCHER: Can I see your identification, sir?
     MR. SILVERFINE: I don't think he has to show it to
you. It is for the notary, not you.
     MR. FISCHER: I will ask the notary ---
     MR. SILVERFINE: He has already seen it.
     MR. FISCHER: Are you having him refuse to produce
it?
     MR. SILVERFINE: He has already shown it to the
notary.
     MR. FISCHER: Then let's mark it as Exhibit 1.
        COPLEY COURT REPORTING - (617) 423-5841
```

```
     MR. FISCHER: Would you produce it, please?
     MR. SILVERFINE: I don't think he has to produce it.
     MR. FISCHER: He has to produce it. He has already
produced it once. I want it to be part of the record.
     MR. SILVERFINE: I respectfully disagree.
     MR. FISCHER: If we have to go to Court to compel
it, I'm going to seek costs against the witness and against
you for instructing him not to produce it.
     MR. SILVERFINE: Okay. Very good.
     MR. FISCHER: Mark this portion of the record.
Q.   Sir, can you tell us your name?
A.   Martin Conway.
Q.   How do I know you are Martin Conway?
A.   I don't know.
Q.   Your lawyer is interfering with my ability to
verify that. Now you have verified that with the Court
Reporter?
A.   Yes.
Q.   You have produced verification of that?
A.   Yes.
Q.   Would you show me that verification?
     MR. SILVERFINE: No.
     THE WITNESS: I believe I have already produced it.
Q.   Can I see what you have produced?
        COPLEY COURT REPORTING - (617) 423-5841
```

```
A.   I already produced my ID, sir.
Q.   What did you produce?
A.   My police department ID, sir.
Q.   Can I see it?
A.   I believe I have already produced it for the
record.
     MR. FISCHER: You haven't produced it for the record
because I'm trying to mark it for the record. If you have
produced it for the record let's mark it as Exhibit Number
1.
     MR. SILVERFINE: Let's not play games. He produced
it to the notary.
     MR. FISCHER: You are the one playing games. I'm
entitled to have it marked as an Exhibit.
     MR. SILVERFINE: You are not.
     MR. FISCHER: Tell me where I'm not. Where does the
rule say that?
     MR. SILVERFINE: That's okay. Let's go on. You have
already made your point.
     MR. FISCHER: We will go on after we have marked it.
     MR. SILVERFINE: You have made your point. Move on.
Q.   Can you tell us your address, please.
A.   You are talking about my home address?
Q.   Yes.
A.   Respectfully, for my safety, if you need to contact
        COPLEY COURT REPORTING - (617) 423-5841
```

```
me you can contact me through the police department, sir.
Q.   How is your safety jeopardized by telling me your
home address?
A.   I don't give out my home address, sir.
Q.   You have refused to identify yourself, now you are
refusing to give your home address?
A.   I have identified myself but ---
Q.   No you haven't. Not to me.
A.   Respectfully, sir, I believe I have.
Q.   Do you have a driver's license?
A.   Yes.
Q.   Can I see your driver's license?
A.   I don't know if I brought it with me, sir.
Q.   Do you have any photo identification?
A.   I produced my department ID, sir.
     MR. FISCHER: No, you haven't.
     MR. SILVERFINE: He has.
     MR. FISCHER: He hasn't. If he has produced it I
would be able to see it.
     MR. SILVERFINE: He has produced it to the notary.
     MR. FISCHER: Let the notary mark it as an Exhibit.
I will make a compromise. I'm willing to not look at it.
Let's mark it as an Exhibit so we have a record as to what
was produced.
     MR. SILVERFINE: During the break I will take a look
        COPLEY COURT REPORTING - (617) 423-5841
```

**7**

1 and see. Move on and I will take a look and see what it is.
2 Q. My name is Andrew Fischer and I represent Brian
3 Kennedy and Michelle Kennedy and their three sons in a
4 lawsuit.
5 Now in that capacity, I am entitled to ask you
6 questions under oath and contrary to what your attorney has
7 instructed you already, you are obliged to answer the
8 questions. If you don't answer the questions, you can be
9 subject to sanctions in Court which I shall seek.
10 MR. SILVERFINE: Objection as to form.
11 MR. FISCHER: I haven't asked a question yet.
12 MR. SILVERFINE: I want to make sure the record is
13 clear.
14 Q. Do you understand what I have said so far?
15 A. Yes, sir.
16 Q. You are obliged not only to answer the questions,
17 but you are obliged to answer them verbally. You can't nod
18 or shake your head. Do you understand that?
19 A. Yes.
20 Q. If at some point you don't understand me or my
21 question is not clear, I would ask that you say that you
22 don't understand the question, otherwise which we will
23 assume you understood the question and you are answering
24 the questions that I have asked. Is that clear?
25 A. Yes, sir.
COPLEY COURT REPORTING - (617) 423-5841

**10**

1 his obligation to answer questions.
2 MR. SILVERFINE: We have been through this before.
3 In fact you and I have already agreed for instance on the
4 personnel records, we weren't going to give out any
5 personnel information so this is consistent ---
6 MR. FISCHER: We never agreed to that, sir.
7 MR. SILVERFINE: Yes, we did.
8 MR. FISCHER: We never agreed that home addresses
9 are private, we never agreed that I'm not entitled to
10 identifying who the witness is and you know that the rules
11 require that a witness answer every question unless there
12 is an objection as to privilege and there is no objection
13 as to privilege.
14 MR. SILVERFINE: I think the witness has answered
15 your question and you are certainly entitled as you seem to
16 be bent on, to preserve your record. I think this is not
17 relevant but you certainly can preserve your record and
18 move on.
19 MR. FISCHER: I'm entitled to know who the witness
20 is.
21 Q. Can you tell us your mother's name?
22 A. Respectfully, sir, I'm not giving that out.
23 Q. Tell us your father's name?
24 A. Again, I'm not giving that out.
25 Q. Are you married?
COPLEY COURT REPORTING - (617) 423-5841

**8**

1 Q. Okay. From time to time Mr. Silverfine may say
2 objection. If he says objection, you are still obliged to
3 answer the question. He is saying that so he and I can
4 continue our dispute in front of a Judge and there is a
5 record that he objected.
6 A. Okay.
7 Q. From time to time Mr. Silverfine may also instruct
8 you not to answer a question. In that event you are also
9 obliged to answer the question although I would expect in
10 that situation your answer would be you are not answering
11 the question on the advice of your attorney. Is that
12 understood?
13 A. Yes, sir.
14 Q. Now can you tell us your name?
15 A. Martin E. Conway.
16 Q. What is your middle initial or middle name?
17 A. Eugene.
18 Q. What is your date of birth?
19 A. 8-6-61.
20 Q. What is your social security number?
21 A. Respectfully, sir, I don't give that out.
22 Q. Where were you born?
23 MR. FISCHER: My objection. Can you note the
24 question that he is refusing to answer.
25 Q. Are you refusing to answer the question?
COPLEY COURT REPORTING - (617) 423-5841

**11**

1 A. Yes.
2 Q. What is your wife's name?
3 A. Kimberly.
4 Q. Kimberly what?
5 A. Conway.
6 Q. What is her maiden name?
7 A. A-l-l-e-n.
8 Q. Do you have children?
9 A. Yes.
10 Q. What are their names and ages?
11 A. Respectfully, sir, I don't give that out.
12 Q. How many children do you have?
13 A. Two.
14 Q. How old are they?
15 A. Fifteen and seven.
16 Q. Has anyone ever threatened your wife or your
17 children?
18 A. To the best of my recollection, no.
19 Q. Has anyone ever threatened your mother?
20 A. Not while I have been present. Not to the best of
21 my recollection, no.
22 Q. Has anyone threatened your mother in your absence
23 that you are aware of?
24 A. Yes.
25 Q. Who threatened your mother in your absence?
COPLEY COURT REPORTING - (617) 423-5841

**9**

1 A. Yes, sir.
2 Q. Where were you born?
3 A. Lowell, Massachusetts.
4 Q. In a hospital?
5 A. Yes.
6 Q. What hospital?
7 A. I'm not sure what the name was back then. I don't
8 remember exactly the name of the hospital.
9 Q. What is the name of the hospital now?
10 A. I believe it is Saints Memorial.
11 Q. What is your mother's name?
12 A. Respectfully, sir, I don't see the need.
13 MR. FISCHER: It's not up to you to decide what
14 questions to answer. You are obliged to answer all the
15 questions.
16 Q. Tell us your mother's name, please?
17 MR. SILVERFINE: He has already answered that.
18 THE WITNESS: I believe I did.
19 MR. FISCHER: He said he doesn't have to answer the
20 question. So are you instructing him not to answer the
21 question?
22 MR. SILVERFINE: No. He is doing a perfectly fine
23 job.
24 MR. FISCHER: I'm going to ask Mr. Silverfine as an
25 officer of the Court that you speak with your client about
COPLEY COURT REPORTING - (617) 423-5841

**12**

1 A. I don't know, sir. It was at her work.
2 Q. I'm sorry?
3 A. It was at her work.
4 Q. Did it have anything to do with your job as a
5 police officer?
6 A. It could have.
7 Q. Would you describe how it could have?
8 A. Just she worked as a teachers aid several years
9 ago.
10 Q. Who threatened her?
11 A. Again, I don't know the person's name.
12 Q. What do you know about what happened?
13 A. Not that much. She said it one time in passing.
14 Q. What makes you think it may have had something to
15 do with your job as a police officer?
16 A. I believe the person mentioned that I was a police
17 officer.
18 Q. Where did your mother work as a teachers aid?
19 A. She worked for the town of Billerica school system.
20 She worked in several schools. I don't remember which one
21 it was at.
22 Q. You are refusing to tell me her name?
23 A. Yes, sir.
24 Q. When did she work in the Billerica school system?
25 A. The seventies and eighties.
COPLEY COURT REPORTING - (617) 423-5841

**Page 13**

```
 1      Q.   When did you begin as a Billerica police officer?
 2      A.   Late eighties.
 3      Q.   What year did you begin as a Billerica police
 4  officer?
 5      A.   I was hired in December of 1987.
 6      Q.   When did your mother stop working as a teachers aid
 7  in the Billerica schools?
 8      A.   I believe she actually may have retired in the
 9  nineties, sir.
10      Q.   You don't know when she stopped working there?
11      A.   I'm not sure of the exact date, no, sir.
12      Q.   Do you know if she was ever a teachers aid in a
13  school where any of the Plaintiffs children attended
14  school?
15      A.   I don't know. I don't know where she went to
16  school.
17      Q.   You don't know where they went to school?
18      A.   No.
19      Q.   Well, do you know if any other relatives of other
20  Defendants had interactions that are part of this lawsuit
21  as a result of their jobs in the Billerica schools?
22           MR. SILVERFINE: Objection to form.
23           MR. FISCHER: I'm trying to telegraph a message to
24  you, Mr. Silverfine, as to the potential relevance of his
25  mother's identification.
         COPLEY COURT REPORTING - (617) 423-5841
```

**Page 14**

```
 1           MR. SILVERFINE: I don't understand your question so
 2  that as you pointed out my objection is to the form of the
 3  question.
 4           MR. FISCHER: I will withdraw the question.
 5           MR. SILVERFINE: I don't understand the question so
 6  if there is something you need to tell me, we can go on or
 7  off the record but I didn't understand the question.
 8           MR. FISCHER: I'll withdraw the question and state
 9  for the record and remind you for the record that there
10  are allegations in the complaint regarding one Defendant's
11  daughter who is a teacher in the school, there are other
12  incidents relating to the schools involving relatives of
13  Defendants and I would suggest to you that the identity of
14  Mr. Conway's mother may well lead to admissible information
15  and I would ask that you speak to your client and instruct
16  him to answer the question. I will step out.
17           MR. SILVERFINE: Well, you can sit down and we can
18  continue the deposition because I respectfully as you walk
19  out of the room -- I would respectfully disagree with your
20  interpretation of the case and I don't think your mother or
21  where you live or your kids names have anything to do with
22  this case.
23           MR. FISCHER: I'm entitled to seek the identity of a
24  witness whose may have admissible or relevant information.
25           MR. SILVERFINE: Well, I think you are trying to
         COPLEY COURT REPORTING - (617) 423-5841
```

**Page 15**

```
 1  intimidate this witness in some obscure way which I don't
 2  understand the relevancy at all. You are free to ask him
 3  any questions. He is here. I don't understand this at all
 4  except the fact that you are trying to bully him.
 5           MR. FISCHER: I'm not free to ask any question, I'm
 6  free to ask the questions that your witness and you deem
 7  relevant. You are deeming this question not relevant and
 8  that is not appropriate conduct under the rules.
 9           MR. SILVERFINE: Okay.
10           MR. FISCHER: Let's go off the record.
11           (Off the Record at 10:45 a.m.)
12           (Back on the Record at 11:00 a.m.)
13           MR. FISCHER: Back on the record. Let's mark the
14  police identification as Exhibit 1 for Identification.
15           (Marked Exhibit Number 1,
16           Police Identification.)
17      Q.   Can you tell me where you went to school?
18      A.   Billerica High School.
19      Q.   Before that?
20      A.   Well, elementary and middle school.
21      Q.   In Billerica?
22      A.   Yes, sir.
23      Q.   You grew up in Billerica?
24      A.   Yes, sir.
25      Q.   All right. Did you know Brian Kennedy when you were
         COPLEY COURT REPORTING - (617) 423-5841
```

**Page 16**

```
 1  growing up?
 2      A.   No.
 3      Q.   Did you know Michelle Kennedy when you were growing
 4  up?
 5      A.   No.
 6      Q.   When did you graduate from high school?
 7      A.   1979.
 8      Q.   What did you do after you graduated from high
 9  school?
10      A.   Worked.
11      Q.   Where did you work?
12      A.   Purity Supreme.
13      Q.   What did you do there?
14      A.   Several jobs.
15      Q.   What jobs?
16      A.   Overnight clerk. Deli. Dairy.
17      Q.   How long did you work there?
18      A.   Until 1984.
19      Q.   What happened in 1984?
20      A.   I got another job.
21      Q.   What was the other job?
22      A.   I worked as a police officer at Tewksbury Hospital.
23      Q.   As a police officer or security guard?
24      A.   They were actually campus police, sir.
25      Q.   You say they are campus police. What do you mean by
         COPLEY COURT REPORTING - (617) 423-5841
```

**Page 17**

```
 1  that?
 2      A.   They are licensed. You have to be licensed as a
 3  special state police officer.
 4      Q.   What training do you have to have to be licensed as
 5  a special state police officer?
 6      A.   Massachusetts criminal justice training.
 7      Q.   What did that consist of?
 8      A.   You have to attend a reserve officer academy.
 9      Q.   How long is the course of study at the reserve
10  officer academy?
11      A.   I don't remember.
12      Q.   Is it the same as the Massachusetts criminal
13  justice training that one undergoes before becoming a
14  regular police officer with a municipal police department?
15      A.   No.
16      Q.   Is it more or less?
17      A.   Less.
18      Q.   How much less?
19      A.   I'm not sure to be honest with you.
20      Q.   You don't recall what the training was?
21      A.   I recall what the training was.
22      Q.   What was the training?
23      A.   Training in regards to criminal procedure, criminal
24  law and defense tactics.
25      Q.   What do you mean by defense tactics?
         COPLEY COURT REPORTING - (617) 423-5841
```

**Page 18**

```
 1      A.   Just how to defend yourself and how to place
 2  handcuffs on people, that kind of stuff.
 3      Q.   Anything else?
 4      A.   I'm sure there is. I don't recall.
 5      Q.   What do you recall about the length of the
 6  training?
 7      A.   It went a couple of nights a week for several
 8  weeks.
 9      Q.   Then you were licensed as a special reserve -- I'm
10  sorry -- tell me what you were licensed as?
11      A.   As a special state police officer.
12      Q.   What did that authorize you to do?
13      A.   On state grounds, you had the power of arrest.
14      Q.   Only on state grounds?
15      A.   Yes, sir.
16      Q.   That allowed you to be a campus police officer at
17  Tewksbury Hospital?
18      A.   Yes, sir.
19      Q.   You did that full-time?
20      A.   Yes, sir.
21      Q.   Starting in 1984?
22      A.   Yes, sir.
23      Q.   How long did you do that?
24      A.   Until the spring of 1988.
25      Q.   What happened in the spring of 1988?
         COPLEY COURT REPORTING - (617) 423-5841
```

**19**

```
1      A.  I went full-time with the Billerica Police
2  Department.
3      Q.  I think you told me before you started, that you
4  were hired as a Billerica police officer in December of
5  1987?
6      A.  Yes, sir.
7      Q.  And why do you say you started in the spring of
8  1988?
9      A.  That's when the academy was, sir.
10     Q.  You were hired subject to your completing the
11 academy?
12     A.  Well, I was hired as a Billerica police officer in
13 December of 1987 and I went to the academy in the spring of
14 1988.
15     Q.  When did you complete the academy?
16     A.  In the fall of 1988.
17     Q.  That is when you began as a Billerica police
18 officer full-time?
19     A.  Yes, sir.
20     Q.  How long was the police academy?
21     A.  I believe that was fourteen weeks.
22     Q.  You covered more than you did in the reserve
23 training?
24     A.  Yes, sir.
25     Q.  What else did you cover?
        COPLEY COURT REPORTING - (617) 423-5841
```

**20**

```
1      A.  Motor vehicle laws. How to do a traffic stop. First
2  responder. Courtroom testimony. Just a variety of things.
3  Police training.
4      Q.  Anything else you can remember from the training?
5      A.  Not off the top of my head.
6      Q.  Have you had any other formal education?
7      A.  Yes.
8      Q.  Can you tell us about that?
9      A.  I have gotten my Masters Degree.
10     Q.  Did you get an undergraduate degree?
11     A.  Yes, sir.
12     Q.  When did you get that?
13     A.  It was the late nineties.
14     Q.  Where did you get your undergraduate degree?
15     A.  Western New England College.
16     Q.  You attended there part-time?
17     A.  Yes, sir.
18     Q.  Nights?
19     A.  Yes, sir.
20     Q.  Where is the campus?
21     A.  There were several campus locations.
22     Q.  Where did you attend?
23     A.  Hanscom Air Force Base. Out at Fort Devens there
24 was a facility. In Lowell there was also a facility.
25     Q.  What did you study?
        COPLEY COURT REPORTING - (617) 423-5841
```

**21**

```
1      A.  Criminal justice.
2      Q.  When did you receive your Bachelors Degree?
3      A.  I'm not sure of the exact date to be honest with
4  you.
5      Q.  You think it was the late nineties?
6      A.  Maybe 2000.
7      Q.  Since then you have gotten a Masters Degree?
8      A.  Yes, sir.
9      Q.  This was also in criminal justice?
10     A.  Yes, sir.
11     Q.  From where?
12     A.  Also Western New England.
13     Q.  Western New England College?
14     A.  Yes, sir.
15     Q.  When did you get your Masters Degree?
16     A.  I immediately went after I got my Bachelors, I
17 continued on and got my Masters.
18     Q.  You don't recall when you completed your Bachelors?
19     A.  ---
20     Q.  I'm sorry, your Masters.
21     A.  It was 2000 or 2001. I'm not sure.
22     Q.  How long did it take you to get your Masters Degree
23 after you got your Bachelors Degree?
24     A.  I don't know. Maybe a year and a half or so.
25     Q.  Now have you had any other formal training or
        COPLEY COURT REPORTING - (617) 423-5841
```

```
1  education?
2      A.  Various police course training.
3      Q.  What police course training have you had?
4      A.  I'm certified in LIDA. Radar.
5      Q.  R-a-d-a-r?
6      A.  Yes.
7      Q.  What I LIDA?
8      A.  LIDA is using a laser -- using a laser to calculate
9  speed. It is a laser calculation instead of radar.
10     Q.  Any other training?
11     A.  It is called TOPS which stands for traffic occupant
12 protection and safety.
13     Q.  What does that acronym mean?
14     A.  Basically it is about seat belts and everything.
15     Q.  Okay.
16     A.  Also child safety seat technician.
17     Q.  Any other training?
18     A.  I'm sure there is. I just can't remember it.
19     Q.  Okay. Have you ever had your deposition taken
20 before?
21     A.  I believe so.
22     Q.  You are not sure?
23     A.  I'm not sure, no, I'm not.
24     Q.  When do you think you might have had your
25 deposition taken?
        COPLEY COURT REPORTING - (617) 423-5841
```

**23**

```
1      A.  Actually I testified before a grand jury.
2      Q.  You have testified in Court?
3      A.  Yes.
4      Q.  How many times roughly?
5      A.  I don't remember the exact number.
6      Q.  More than five?
7      A.  Yes.
8      Q.  More than ten?
9      A.  Yes.
10     Q.  More than twenty?
11     A.  Yes.
12     Q.  More than fifty?
13     A.  I'm not sure.
14     Q.  But you don't recall giving a deposition in a
15 private lawyer's office like we are doing today?
16     A.  No.
17     Q.  Have you ever been a party to a lawsuit before?
18     MR. SILVERFINE: Do you know what that means?
19     THE WITNESS: Yes. Not that I can recall.
20     Q.  Are you aware of any other lawsuits against the
21 Billerica Police Department ever?
22     A.  Yes.
23     Q.  What lawsuits are you aware of against the
24 Billerica Police Department?
25     A.  One came in the other day that Sergeant Gualietri
        COPLEY COURT REPORTING - (617) 423-5841
```

**24**

```
1  is involved in.
2      Q.  Sergeant who?
3      A.  G-u-a-l-i-e-t-r-i.
4      Q.  Do you know the nature of that lawsuit is?
5      A.  As a result of an arrest.
6      Q.  How do you know about this lawsuit?
7      A.  I was informed about it.
8      Q.  Who informed you?
9      A.  The Chief.
10     Q.  Chief Rosa?
11     A.  Yes, sir.
12     Q.  What did he inform you of?
13     A.  That he received a lawsuit involving Sergeant
14 Gualietri and the department.
15     Q.  Why did he inform you, do you know?
16     A.  Yes.
17     Q.  Why did he inform you?
18     A.  I am the President of the police union.
19     Q.  What role do you have in the lawsuit as President
20 of the police union?
21     A.  Me personally?
22     Q.  As President of the police union, what involvement
23 do you have in any lawsuit?
24     MR. SILVERFINE: Objection as to form. Go ahead.
25     THE WITNESS: As the President, I would be
        COPLEY COURT REPORTING - (617) 423-5841
```

**Page 25**

```
1   responsible for getting the officer counsel.
2       Q.   Would that be true in this lawsuit also?
3       A.   Yes.
4       Q.   Did you arrange for counsel for the various
5   individual officers that are Defendants in this lawsuit?
6       A.   Yes.
7       Q.   How did you go about doing that?
8       A.   I contacted the legal counsel of the International
9   Brotherhood of Police Officers.
10      Q.   Who is that?
11      A.   At the time it was Attorney Diane Byrnes.
12      Q.   Have you had occasion to arrange counsel for police
13  -- have you had other ---
14           MR. FISCHER: Strike that.
15      Q.   Have there been other occasions where you have had
16  to arrange counsel for Billerica police officers?
17      A.   Yes.
18      Q.   How many times?
19      A.   No idea.
20      Q.   More than once?
21      A.   Yes.
22      Q.   More than five times?
23      A.   Yes.
24      Q.   More than ten times?
25      A.   Probably.
         COPLEY COURT REPORTING - (617) 423-5841
```

**Page 26**

```
1       Q.   More than twenty times?
2       A.   Again, I don't know.
3       Q.   So maybe more than twenty, maybe not?
4       A.   Yes.
5       Q.   But more than ten times?
6       A.   I believe so.
7       Q.   For what reasons would you need to arrange for
8   counsel for Billerica police officers?
9       A.   I'm not sure if I understand your question.
10      Q.   What are the situations in which you need to
11  arrange counsel for Billerica police officers?
12      A.   If an officer is being sued or could be facing
13  disciplinary action.
14      Q.   How long have you been the President of the union?
15      A.   Approximately thirteen years.
16      Q.   In those thirteen years, how many times have
17  officers been sued?
18      A.   I'm not sure.
19      Q.   More than once?
20      A.   I believe so, yes.
21      Q.   More than five times?
22      A.   Again, I'm not sure.
23      Q.   Might it have been more than five times?
24      A.   Could be, yes.
25      Q.   Might it have been ten times?
         COPLEY COURT REPORTING - (617) 423-5841
```

**Page 27**

```
1       A.   Could be.
2       Q.   Might it have been twenty times?
3       A.   Again, I'm not sure.
4       Q.   Do you keep track of that anywhere?
5       A.   No. Generally on those occasions what I do is I get
6   in touch, again, with the legal counsel with the IBPO and I
7   turn it over to them.
8       Q.   But you are telling us that you can't -- that you
9   know that there have been more than two, perhaps as many as
10  twenty times when Billerica police officers have been sued
11  in the thirteen years you have been President of the local
12  union?
13           MR. SILVERFINE: Objection as to form.
14           THE WITNESS: No, I believe it is more than two.
15      Q.   But you believe it is more than two?
16      A.   Yes.
17      Q.   And it may be as many as twenty but you really
18  don't know?
19      A.   I don't recall all the suits, sir.
20      Q.   It is also part of your duty to obtain counsel for
21  officers, legal counsel for officers who are subject to
22  disciplinary action?
23      A.   Yes.
24      Q.   Do you know how many times roughly you have done
25  that in your thirteen years as a police officer?
         COPLEY COURT REPORTING - (617) 423-5841
```

**Page 28**

```
1       A.   No.
2       Q.   More than one or two?
3       A.   Yes.
4       Q.   More than ten times?
5       A.   No, I don't believe it to be that many times.
6       Q.   More than five times?
7       A.   I'm not sure.
8       Q.   Would it be fair to conclude based on the best of
9   your memory that you have had to obtain legal counsel for
10  officers being sued more often than for officers being
11  disciplined?
12           MR. SILVERFINE: Objection as to form.
13           THE WITNESS: I'm not sure. The best example I can
14  give is when I said about counsel, like on this case, there
15  are several officers that are being sued so I believe it is
16  over twenty so what I'm meaning there is to me, that is
17  like twenty times a lawyer has to be notified so maybe I
18  misconstrued your question but that is what I meant by the
19  attorney.
20      Q.   Okay. Let me ask it in a different way. Can you
21  tell me to your best memory how many lawsuits there have
22  been that have resulted in you getting, that you have had
23  to obtain counsel for your brother officers?
24      A.   I don't remember.
25      Q.   Again, is it more than a couple?
         COPLEY COURT REPORTING - (617) 423-5841
```

**Page 29**

```
1       A.   It could be. I really don't remember.
2       Q.   Other than this lawsuit and the recent lawsuit
3   involving Sergeant Gualietri, what other lawsuits do you
4   remember?
5       A.   I don't remember the specific lawsuits. I know that
6   I did contact counsel about some of the officers. I don't
7   remember the specifics.
8       Q.   You don't remember any specific lawsuit other than
9   those two?
10      A.   Not off the top of my head, no.
11           MR. FISCHER: Let me ask you in the course of this
12  deposition if you think of others, that you say something
13  to me, that you interrupt and say I have thought of another
14  lawsuit.
15           THE WITNESS: Okay.
16           MR. FISCHER: Will you do that?
17           THE WITNESS: Yes.
18      Q.   Now you have arranged counsel for officers who have
19  been disciplined?
20      A.   Yes.
21      Q.   Were you President of the union when Dean Royston
22  was disciplined?
23      A.   Yes.
24      Q.   Did you obtain counsel for him?
25      A.   Yes.
         COPLEY COURT REPORTING - (617) 423-5841
```

**Page 30**

```
1       Q.   How did you do that?
2       A.   Again, I contacted the chief legal counsel of the
3   IBPO and they assigned an attorney.
4       Q.   Did you have any conversations with Dean Royston
5   in the course of arranging counsel about the accusations
6   against him and the disciplinary proceedings in the course
7   of obtaining counsel for him?
8       A.   Yes.
9       Q.   What conversations did you have with him?
10      A.   I'm not sure if I understand the question.
11      Q.   I'm asking you to tell me about your conversations
12  with Dean Royston regarding his disciplinary proceedings?
13      A.   I believe that to be privileged under the union,
14  sir.
15      Q.   So that is another area -- you are asserting a
16  privilege?
17      A.   Yes, I believe that my conversation with him is
18  protected by union privilege, sir.
19      Q.   Do you know whether his disciplinary or ---
20           MR. FISCHER: Strike that.
21      Q.   Did you have conversations with other people about
22  Dean Royston's disciplinary proceedings?
23      A.   His counsel.
24      Q.   Okay. What is the basis of asserting a privilege as
25  to your conversations with Dean Royston?
         COPLEY COURT REPORTING - (617) 423-5841
```

**31**

1   A. I believe that my private conversation with him
2  regarding his union protection is privileged.
3      MR. FISCHER: I'm now going to ask the cooperation
4  of defense counsel in determining whether there is any
5  statutory or other basis for the privilege that Mr. Conway
6  is I'm sure in good faith claiming. I don't believe there
7  is such a privilege. Maybe we can work that out. Do you
8  want to talk to him for a minute?
9      MR. SILVERFINE: I don't know that I know anything
10 other than what you know.
11     MR. FISCHER: Let me ask counsel if you can provide
12 any statutory or other basis for the privilege?
13     MR. SILVERFINE: I'm not aware of any but, like
14 yourself, I'm hearing this information for the first time.
15 I don't know.
16     MR. FISCHER: Then I'm asking would you instruct
17 the witness to answer the question.
18     MR. SILVERFINE: I'm not in a position to do that
19 without ---
20     MR. FISCHER: I think you have an obligation to do
21 that.
22     MR. SILVERFINE: I could certainly seek it out. I
23 will go talk to him.
24     MR. FISCHER: Off the record.
25         (Off the Record at 11:15 a.m.)
COPLEY COURT REPORTING - (617) 423-5841

**32**

1         (Back on the Record at 11:45 a.m.)
2      MR. FISCHER: Back on the record.
3   Q. Have you had the opportunity to speak to Mr.
4  Silverfine?
5   A. Yes.
6   Q. And I believe you had the opportunity to speak with
7  other counsel by cell phone?
8   A. Yes.
9   Q. Who is that other counsel?
10  A. The law firm of Nolan and Perroni.
11  Q. N-o-l-a-n?
12  A. Yes.
13  Q. And Perroni is spelled?
14  A. P-e-r-r-o-n-i.
15  Q. Okay. Are you prepared to answer the questions or
16 are you still asserting your privilege?
17  A. I believe it is protected by union activity, sir.
18  Q. What union activity privilege is there?
19  A. It is my opinion, sir.
20  Q. It is your opinion?
21  A. Yes.
22  Q. Do you have a statutory cite for that opinion?
23  A. No.
24  Q. Do you have a case for that opinion?
25  A. No.
COPLEY COURT REPORTING - (617) 423-5841

**33**

1   Q. Do you have any legal training?
2   A. No.
3   Q. You are refusing to answer the question because in
4  your opinion it is a union communication?
5   A. Yes, sir.
6   Q. Okay. Did Dean Royston ever tell you why he thought
7  he was being disciplined?
8   A. I don't recall.
9   Q. You do recall conversations with Dean Royston?
10  A. Some.
11  Q. Tell us what you recall in your conversations with
12 Dean Royston?
13  A. I'm not sure I understand the question.
14  Q. What do you recall him telling you and you telling
15 him?
16     MR. SILVERFINE: Can we have a parameter on this or
17 is it whenever?
18  Q. How many conversations do you recall having with
19 him regarding his being disciplined?
20  A. I don't remember the exact number.
21  Q. More than one?
22  A. I believe so.
23  Q. Do you recall when they were?
24  A. No, I don't.
25  Q. Can you tell me what you recall him saying and what
COPLEY COURT REPORTING - (617) 423-5841

**34**

1  you recall yourself saying.
2   A. Well, I informed him that the Chief was going to be
3  speaking to him and that he may need union representation.
4   Q. Do you recall anything else in these conversations?
5   A. He came back and said that he needed union
6  representation.
7   Q. Do you recall providing an attorney for him through
8  the union?
9   A. Yes.
10  Q. Do you remember today who the attorney was?
11  A. Yes.
12  Q. Who was the attorney?
13  A. Attorney Diane Byrnes.
14  Q. I'm sorry?
15  A. Diane B-y-r-n-e-s.
16  Q. Was she the attorney you spoke to or was she the
17 attorney that was provided to Mr. Royston?
18  A. ---
19  Q. Or both?
20  A. Both.
21  Q. She represented him in this union or on behalf of
22 the union in this disciplinary proceeding?
23  A. Yes.
24  Q. Did he grieve that disciplinary proceeding?
25  A. I believe he did.
COPLEY COURT REPORTING - (617) 423-5841

**35**

1   Q. Did the union represent him in the grievance?
2   A. Yes.
3   Q. Do you know what the nature of the grievance was?
4   A. I honestly don't recall.
5   Q. If I suggested to you that he has testified in
6  depositions in this case that he believed he was being
7  singled out for discipline because of his friendship with
8  Michelle Kennedy, would that refresh your recollection?
9      MR. SILVERFINE: Objection as to form.
10     THE WITNESS: Yes.
11  Q. Do you recall that as being the basis for his
12 grievance?
13  A. No.
14  Q. Does that refresh your recollection as to anything?
15     MR. SILVERFINE: Objection as to form.
16     THE WITNESS: Yes.
17  Q. What does it refresh your recollection about?
18  A. Officer Royston being disciplined.
19  Q. What about him being disciplined?
20  A. I'm not sure I understand your question.
21  Q. You said it refreshes your recollection. I'm asking
22 what -- refreshing your recollection means that you are
23 remembering something now you didn't remember before this
24 reminded you. I'm asking you what do you now remember?
25  A. That he did grieve it.
COPLEY COURT REPORTING - (617) 423-5841

**36**

1   Q. Do you remember what the grievance was about now?
2   A. I believe it was in regards to the suspension, the
3  number of days itself.
4   Q. He was grieving it was too many days?
5   A. I believe so.
6   Q. What was his justification for grieving that?
7   A. I believe he thought it was excessive.
8   Q. Why did he think it was excessive?
9   A. I can't answer what he thought.
10  Q. So is there anything that is likely to refresh your
11 memory?
12  A. Possibly.
13  Q. What could possibly refresh your memory?
14  A. I don't know.
15  Q. So if Dean Royston were to testify regarding his
16 grievance, you wouldn't be in a position to agree with or
17 disagree with his testimony?
18     MR. SILVERFINE: Objection as to form.
19     THE WITNESS: I'm not sure if I understood what your
20 question was.
21  Q. If Dean Royston testified about his grievance, that
22 is something you say that you don't remember now, is that
23 correct?
24  A. No, I remember him filing a grievance.
25  Q. You don't remember any of the details about why he
COPLEY COURT REPORTING - (617) 423-5841

**37**

```
 1   thought his punishment was excessive or was wrong, you just
 2   don't remember any of that now?
 3      A.  I know that he filed a grievance and part of the
 4   grievance is to go before the Town Manager as part of the
 5   process.
 6      Q.  You are telling me what the process is and the
 7   process is the same in every grievance but there has to be
 8   a reason for why you are grieving and you don't remember
 9   that?
10      A.  I don't remember the exact thing, sir.
11      Q.  So that we are obliged to rely on Mr. Royston's
12   memory as the only memory that exists?
13          MR. SILVERPINE: Objection as to form.
14          THE WITNESS: If you are asking me why he thought it
15   was excessive, that would be his feelings.
16      Q.  If he had said something in a deposition or if he
17   said something in a trial, you are not in a position to
18   disagree with him or to agree with him?
19          MR. SILVERPINE: Objection as to form.
20          THE WITNESS: Unless I recall what he said, sir.
21      Q.  Is there any reason why you can't recall today
22   something and you will be able to recall it at trial later?
23          MR. SILVERPINE: Objection as to form.
24          THE WITNESS: I don't remember specifics. I'm sorry.
25      Q.  Did you do anything to prepare for this deposition
             COPLEY COURT REPORTING - (617) 423-5841
```

**40**

```
 1      Q.  Did you see them assault anybody?
 2      A.  No.
 3      Q.  Was anybody else arrested?
 4      A.  I don't remember. I would have to refer to my
 5   report. I don't recall.
 6      Q.  You don't remember anybody else being arrested?
 7      A.  Not off the top of my head, I don't.
 8      Q.  Tell me why you arrested Michelle Kennedy and Billy
 9   Ashton?
10      A.  I believe it was on information that we received
11   from Officer DeVito's investigation.
12      Q.  Do you know what investigation he conducted prior
13   to your arriving at the scene?
14      A.  He was talking to people that were involved that
15   had been assaulted.
16      Q.  So he didn't see the assault either?
17      A.  I don't believe so.
18      Q.  Do you know who saw the assault, the alleged
19   assault?
20      A.  I don't recall all the witnesses names.
21      Q.  But you recall arresting Michelle Kennedy and Billy
22   Ashton?
23      A.  Yes.
24      Q.  Do you recall if Brian Kennedy was also arrested?
25      A.  No at the scene, no, sir.
             COPLEY COURT REPORTING - (617) 423-5841
```

**38**

```
 1   today?
 2      A.  Yes.
 3      Q.  What did you do to prepare for the deposition?
 4      A.  I was notified several months ago in regards to a
 5   date for a deposition at which time I looked up -- I was
 6   involved in an arrest involving the Kennedy's and I looked
 7   at the report but again, that was several months ago.
 8      Q.  What arrest was that?
 9      A.  It was down the trailer park.
10      Q.  Do you recall the date of the arrest?
11      A.  It was November of 2001. I don't remember the exact
12   date.
13      Q.  Was it your arrest?
14      A.  I was involved in the arrest, yes, sir.
15      Q.  Do you know who was arrested?
16      A.  Michelle Kennedy and Billy Ashton.
17      Q.  Do you recall if anyone else was arrested?
18      A.  Not off the top of my head, no, I don't.
19      Q.  Now do you recall what the reason for arresting
20   Michelle Kennedy or the reason was for arresting Michelle
21   Kennedy and Billy Ashton?
22      A.  Yes.
23      Q.  What was the reason for arresting them?
24      A.  Assault and battery by means.
25      Q.  By means of what?
             COPLEY COURT REPORTING - (617) 423-5841
```

**41**

```
 1      Q.  Do you know if he was also arrested because of
 2   charges?
 3      A.  I believe later on he was.
 4      Q.  When you say later on, when do you mean?
 5      A.  I believe a warrant was obtained for his arrest and
 6   he was arrested subsequent to the ---
 7      Q.  How long after the ---
 8          MR. FISCHER: Strike that.
 9      Q.  You say this occurred on November 9, 2001?
10      A.  I said November of 2001. I don't know if that is
11   the date.
12      Q.  If I suggested to you November 9, would you have
13   any way of knowing whether that was ---
14      A.  That could be right.
15      Q.  That sounds about right?
16      A.  Yes, sir.
17      Q.  Do you recall what day of the week it was?
18      A.  I believe it was Thursday into Friday, midnight
19   Thursday but I was working the night shift so it was
20   Friday.
21      Q.  Friday morning Thursday night?
22      A.  I believe so, yes.
23      Q.  Do you know how soon after that Friday morning
24   Brian Kennedy was arrested?
25      A.  No, I do not.
             COPLEY COURT REPORTING - (617) 423-5841
```

**39**

```
 1      A.  Dangerous weapon.
 2      Q.  Who did they assault?
 3      A.  I don't remember all the parties names. I remember
 4   one was a Masone I believe is her name.
 5      Q.  Do you recall what the alleged dangerous weapon
 6   was?
 7      A.  Baseball bats, I believe.
 8      Q.  Did you at the scene see any baseball bats?
 9      A.  Yes, sir.
10      Q.  Where did you see the baseball bats?
11      A.  It was to the rear of a trailer but I'm not sure of
12   the exact address on Leicester Street.
13      Q.  Whose trailer was it?
14      A.  I believe it was the Kennedy's.
15      Q.  Did you know the Kennedy's at that time?
16      A.  Yes.
17      Q.  Did you know whether they had sons?
18      A.  Yes, I believe they had kids, yes.
19      Q.  Do you know how old their kids were?
20      A.  No.
21      Q.  Old enough to play baseball?
22      A.  They could be. I don't know their ages, sir.
23      Q.  Did you see Michelle Kennedy or Billy Ashton hold
24   any baseball bats?
25      A.  No.
             COPLEY COURT REPORTING - (617) 423-5841
```

**42**

```
 1      Q.  Was he arrested before the weekend?
 2      A.  I don't know, sir.
 3      Q.  Do you recall whether that was an issue?
 4          MR. SILVERPINE: Objection as to form.
 5          THE WITNESS: I'm not sure I understand what you
 6   mean.
 7      Q.  You told us already you know Brian Kennedy has
 8   children, Brian and Michelle had children?
 9      A.  Yes.
10      Q.  And you didn't recall how old they were five years
11   ago in November of 2001?
12      A.  Correct, yes.
13      Q.  Michelle Kennedy had been arrested early Friday
14   morning?
15      A.  Yes.
16      Q.  Late Thursday night?
17      A.  Yes.
18      Q.  And do you recall whether that was an issue of who
19   would take care of the children if Brian Kennedy was also
20   arrested?
21      A.  I'm not sure what you mean by an issue.
22      A.  As a police officer, would you agree it is not
23   safe -- not only as a police officer as an adult -- would
24   you agree it is not safe to leave three young boys without
25   a parent, without a parent or other adult to watch them?
             COPLEY COURT REPORTING - (617) 423-5841
```

**43**

```
1        MR. SILVERFINE: Objection as to form.
2        THE WITNESS: Yes.
3   Q.   If you arrest both parents or if it is a single
4  parent home and you arrest the one parent, do you leave the
5  children there?
6   A.   No, sir.
7   Q.   Why not?
8   A.   For their safety.
9   Q.   So what do you do when as a result of an arrest a
10 young child is left without an adult to care for them?
11  A.   We would generally call Child Services.
12  Q.   Did that became an issue when Brian Kennedy was
13 arrested over the weekend that began Friday, November 9,
14 2001?
15  A.   I don't know.
16  Q.   In fact wasn't that the reason that Brian Kennedy
17 was arrested?
18       MR. SILVERFINE: Objection as to form.
19       THE WITNESS: I'm not sure I understand your
20 question, sir.
21  Q.   Okay. Do you recall being in the police station the
22 night that Michelle Kennedy was -- that night November 9th
23 when Michelle Kennedy was brought in and arraigned?
24  A.   When she was brought to the station?
25  A.   Yes.
            COPLEY COURT REPORTING - (617) 423-5841
```

**44**

```
1   A.   Very briefly.
2   Q.   Do you recall bail being an issue?
3   A.   No, I don't.
4   Q.   Let me ask you if I suggest to you that Michelle
5  Kennedy was threatened that she was going to spend the
6  weekend in Framingham State and Brian would be arrested
7  and that would leave the kids unattended and subject to
8  being taken by protective services ---
9        MR. SILVERFINE: Objection as to form.
10       THE WITNESS: I don't recall hearing anything like
11 that, sir.
12  Q.   You don't recall anything like that?
13  A.   No, sir.
14  Q.   Who do you recall being in the police station at
15 the time of Michelle Kennedy's arrest and booking?
16  A.   I actually don't know who was in the police station
17 when she got arrested. I was at the scene.
18  Q.   Who brought her to the police station?
19  A.   I don't recall who transported, sir.
20  Q.   Why did you remain at the scene?
21  A.   I was gathering all the information.
22  Q.   What information did you gather?
23  A.   Just to see if there were any witnesses or anything
24 like that.
25  Q.   Wouldn't you gather the information before you made
            COPLEY COURT REPORTING - (617) 423-5841
```

**45**

```
1  the arrest normally?
2   A.   Again, we acted on information that Officer DeVito
3  had gathered, sir.
4   Q.   How long had Officer DeVito been there before you
5  arrived?
6   A.   Been where, sir?
7   Q.   I'm sorry?
8   A.   Been where, sir?
9   Q.   You said he was gathering information?
10  A.   Yes.
11  Q.   I'm assuming that he was gathering information at
12 the scene?
13  A.   There were actually two scenes.
14  Q.   What were the two scenes?
15  A.   Oak Street.
16  Q.   I'm sorry?
17  A.   Oak Street.
18  Q.   Is that where Michelle Kennedy was arrested?
19  A.   No, sir.
20  Q.   Where was Michelle Kennedy arrested?
21  A.   Leicester Street.
22  Q.   What was there on Oak Street?
23  A.   Oak Street is where I initially came upon a motor
24 vehicle that had the window smashed out and some of the
25 occupants were bleeding and then Officer DeVito pulled up
            COPLEY COURT REPORTING - (617) 423-5841
```

**46**

```
1  after.
2   Q.   Pulled up on Oak Street after you did?
3   A.   Yes, sir.
4   Q.   Then what happened?
5   A.   Again, I don't remember all the occupants in the
6  vehicles names. I'd have to look at my report to refresh my
7  memory.
8   Q.   Okay.
9   A.   I do remember I believe it is Deann Masone.
10  Q.   D-e-a-n-n-n?
11  A.   Yes, who had swelling on her face, I believe she
12 was bleeding from her face. I called for an ambulance and
13 Office DeVito stayed with them.
14       They stated that they were at the Kennedy house
15 when this had happened or out on the roadway in front of it
16 and I proceeded down to that location.
17  Q.   Did they say anything else that you can remember?
18  A.   I would have to look at my report, sir. I don't
19 remember off the top of my head.
20  Q.   Did they say who assaulted them?
21  A.   I believe they did but I would have to look at my
22 report.
23  Q.   So from there you went to the scene at Leicester
24 Street?
25  A.   I went down to Leicester Street, yes.
            COPLEY COURT REPORTING - (617) 423-5841
```

**47**

```
1   Q.   What did you do when you got there?
2   A.   To the best of my recollection I remember pulling
3  up, I saw four individuals running from out at and I am not
4  sure of the exact address on Leicester, I don't know if it
5  is 160, it is in the vicinity of 160 or could maybe be 160
6  something, I don't remember the exact address number.
7   Q.   Okay.
8   A.   They ran to the rear of it, of the trailer.
9   Q.   You followed them and ---
10  A.   Yes.
11  Q.   Who were those individuals?
12  A.   I don't remember all the individuals involved. I
13 remember I believe one was an Amy Baum and the other ones I
14 believe was Cimmino's but I'm not sure of everyone's name.
15 I would have to refer to my report.
16  Q.   Michelle Kennedy wasn't one of those people?
17  A.   No, sir.
18  Q.   Did you arrest any of those people, Amy Baum or the
19 Cimmino's?
20  A.   No, sir. I believe Ms. Baum stated she got bit by a
21 dog or something to that effect. I'm not positive if it was
22 her or not but I believe someone got bit by a dog and then
23 Mr. Cimmino stated he had been hit by a car.
24  Q.   Do you remember which Mr. Cimmino that was?
25  A.   I think it is John but I'm not sure. I would have
            COPLEY COURT REPORTING - (617) 423-5841
```

**48**

```
1  to again refer to my report.
2   Q.   Do you remember the other Cimmino's name?
3   A.   No, sir, I don't off the top of my head.
4   Q.   Could it be Louis Cimmino?
5   A.   I believe it could be.
6   Q.   And do you know whether it was John or Louis who
7  claimed to be bitten by a dog or hit by a car, sorry?
8   A.   I believe -- I'm not sure. I would have to look at
9  my report.
10  Q.   Did you obtain medical assistance for these or what
11 did you do with respect to the two Cimmino's and Amy Baum?
12  A.   I radioed in that we needed another ambulance.
13  Q.   Do you know if they were arrested?
14  A.   I don't recall.
15  Q.   Do you know if anyone was taken to the hospital?
16  A.   Again, I'm not sure which Cimmino it was but I
17 believe the Towksbury Fire Ambulance took one of them to
18 the hospital.
19  Q.   Do you know if the other Cimmino and Ms. Baum were
20 arrested?
21  A.   Off the top of my head I don't remember.
22  Q.   Do you recall what happened next?
23  A.   I'm not sure where we are starting from when you
24 say next.
25  Q.   You apprehended these three people. You called for
            COPLEY COURT REPORTING - (617) 423-5841
```

**49**

```
1   emergency medical assistance?
2      A.   Yes.
3      Q.   Then what happened?
4      A.   I believe, I think Ms. Baum stated that she was bit
5   by a dog. She stated she was watching the Kennedy children,
6   she was baby-sitting at the Kennedy home and she then went
7   back there to the Kennedy residence which was the next
8   trailer over.
9          I believe she stated that she had a baby she was
10  watching there also but I'm not positive. Again, I would
11  have to look at my report. It has been a while since I
12  looked at it.
13     Q.   You looked at it several months ago in anticipation
14  of this deposition?
15     A.   I want to say it was back in August I believe I was
16  supposed to come.
17     Q.   But you haven't looked at it since then?
18     A.   No.
19     Q.   Let me go back to the scene. Ms. Baum told you she
20  was baby-sitting the Kennedy children?
21     A.   I believe so.
22     Q.   At this point have you seen Ms. Kennedy, Michelle
23  Kennedy yet?
24     A.   No.
25     Q.   Have you seen Brian Kennedy yet?
         COPLEY COURT REPORTING - (617) 423-5841
```

**50**

```
1      A.   No.
2      Q.   Did you have any reason to think they were involved
3   in any crime?
4      A.   At that point, no.
5      Q.   What happened next?
6      A.   Ms. Baum went back over to the Kennedy trailer.
7      Q.   You let her do that?
8      A.   Yes. She said she was baby-sitting.
9      Q.   You still hadn't seen Michelle Kennedy yet?
10     A.   Ms. Baum I believe stated that the Kennedy's had
11  gone out for the evening and that's why she was
12  baby-sitting.
13     Q.   At some point did you see Michelle Kennedy?
14     A.   Yes.
15     Q.   When was that?
16     A.   We were out in the driveway, I believe we had asked
17  Ms. Baum -- we were trying to see about the safety of the
18  children involved because there was a lot of broken glass
19  out on Leicester Street and then there was several blood
20  drops that went right up to the Kennedy door.
21     Q.   Did you make any or form any suspicions based on
22  these blood drops?
23     A.   I wanted to make sure that the person whose blood
24  that was, that they were all set.
25     Q.   So what did you do?
         COPLEY COURT REPORTING - (617) 423-5841
```

**51**

```
1      A.   I asked Ms. Baum if we could go inside. I asked her
2   whose blood this was.
3      Q.   What did she say?
4      A.   She would not let us inside. She stated she did not
5   know whose blood it was.
6      Q.   What did you do?
7      A.   At that time I believe there were other officers
8   arriving, the ambulances were arriving, Lieutenant Rosa
9   arrived on scene and then at some point I don't remember
10  the exact timing, but Michelle Kennedy, Brian Kennedy and
11  Billy Ashton came out of the trailer.
12     Q.   Then what happened?
13     A.   They began yelling at us, telling us to leave. We
14  asked what happened out in front of their house and they
15  said they had no idea.
16     Q.   At this point there wasn't anything happening at
17  their house?
18          MR. SILVERFINE: Objection as to form.
19     Q.   There wasn't any criminal activity happening at the
20  house?
21     A.   I'm not sure what you mean by that.
22     Q.   Was there any criminal activity happening at that
23  time?
24     A.   In my presence?
25     Q.   Yes.
         COPLEY COURT REPORTING - (617) 423-5841
```

**53**

```
1      A.   Not that I could see.
2      Q.   From the time you arrived there?
3      A.   I don't know what was going on inside the trailer.
4      Q.   But you didn't observe anything suspicious other
5   than Ms. Baum and the two Cimmino's fleeing if that is
6   suspicious?
7          MR. SILVERFINE: Objection as to form.
8          THE WITNESS: That is not true.
9      Q.   What did you observe that was suspicious?
10     A.   I believe I told you about the large amount of
11  glass out in the road, the blood, I found two -- several
12  and I don't remember exactly how many baseball bats that
13  were to the rear of the Kennedy trailer. We had all kinds
14  of broken glass all over.
15     Q.   How many other trailers were there in that
16  vicinity?
17     A.   There are several trailers. It is a trailer park.
18  It is all trailers.
19     Q.   So the glass wasn't just in the Kennedy vicinity,
20  it was in the vicinity of various trailers?
21          MR. SILVERFINE: Objection as to form.
22          THE WITNESS: It was right out in front of their
23  driveway as far as I can remember.
24     Q.   At this point did you have any reason to think they
25  had anything to do with the alleged crime that you were
         COPLEY COURT REPORTING - (617) 423-5841
```

(second 53)

```
1   investigating?
2      A.   At that point I was told they weren't home.
3      Q.   Then they came outside?
4      A.   That's when I ---
5      Q.   Did you know Michelle Kennedy ---
6          MR. SILVERFINE: Did you let the witness answer the
7   last question?
8          MR. FISCHER: I asked did they come outside and he
9   said yes.
10         MR. SILVERFINE: I didn't think he had a chance to
11  answer.
12         THE WITNESS: That's when I realized they were home.
13     Q.   Did you know them before that night?
14     A.   Yes.
15     Q.   How do you know them?
16     A.   Just from being around Billerica.
17     Q.   What did you know their reputation to be?
18     A.   I know they had been in some trouble.
19     Q.   What kind of trouble did you know they had been in?
20     A.   I know they had been arrested.
21     Q.   What arrests did you know about?
22     A.   I believe some was motor vehicle. I don't know. I
23  personally didn't have much interaction with them.
24     Q.   Did you know Billy Ashton?
25     A.   Just by name. I didn't -- I don't really know him.
         COPLEY COURT REPORTING - (617) 423-5841
```

**54**

```
1      Q.   You knew I think it was then Sergeant Connors?
2          MR. SILVERFINE: I don't understand the question.
3   Objection to form.
4          THE WITNESS: I'm not sure. There are several
5   Connors.
6      Q.   He is now Deputy Chief Connors.
7      A.   Do I know him? Yes.
8      Q.   Were you aware that his badge and other things,
9   cell phone and hat and other things had been stolen from
10  his car?
11     A.   I had heard something around the station that his
12  car got broken into.
13     Q.   Was there any discussion in the station about who
14  had to do with that?
15         MR. SILVERFINE: Objection as to form.
16         THE WITNESS: There could have been. I don't recall.
17     Q.   You don't recall any discussion about Sergeant
18  Connors having his badge and hat stolen?
19     A.   I remember it was said his car got broken into.
20     Q.   It's a pretty unusual thing for a police officer to
21  have his badge and hat stolen, would you agree?
22     A.   I'm not sure what you mean which that.
23     Q.   Well, you have been a police officer a long time
24  now?
25     A.   Yes.
         COPLEY COURT REPORTING - (617) 423-5841
```

**55**

```
1    Q.   Nineteen years?
2    A.   Yes.
3    Q.   In that time, how many crimes have you -- it is
4  fair to say that you have encountered hundreds, perhaps
5  thousands of crimes?
6    A.   Yes.
7    Q.   Of all those crimes, how many other times have you
8  encountered a police officer having his badge and his hat
9  stolen?
10   A.   A few times.
11   Q.   It is an unusual thing to happen, would you agree
12 with that?
13        MR. SILVERFINE:  Objection as to form.
14        THE WITNESS:  It is not an every day occurrence if
15 that is what you mean.
16   Q.   It is embarrassing to the officer to whom it
17 happens, is that fair to say?
18   A.   No.
19   Q.   It is not embarrassing?
20   A.   It is not fair to say.
21   Q.   Was Mr. Connors embarrassed at having his badge and
22 hat stolen?
23        MR. SILVERFINE:  Objection as to form.
24        THE WITNESS:  I have no idea.
25   Q.   You are not aware of any discussion about helping
          COPLEY COURT REPORTING - (617) 423-5841
```

**56**

```
1  him recover his badge and hat at all in the station?
2        MR. SILVERFINE:  Objection as to form.
3        THE WITNESS:  Not to me, no.
4    Q.   You don't recall anyone ever talking about that?
5    A.   I can remember it was mentioned that he, I believe
6  his motor vehicle was broken into.
7    Q.   You don't recall any discussion ever about why the
8  Kennedy's might have had a motive to do that?
9    A.   No.
10   Q.   In fact you are saying you don't recall any
11 discussion at all about the badge or hat being stolen?
12   A.   I remember hearing his car got broken into.
13   Q.   Did you know Amy Baum before that night?
14   A.   No.
15   Q.   Have you known her since that night?
16   A.   Just as this went to trial. I remember seeing her
17 there.
18   Q.   Do you recall what happened with her case?
19   A.   No.
20   Q.   Do you recall what happened with any of the cases?
21   A.   I believe they were found not guilty.
22   Q.   When you say they, who are you referring to?
23   A.   The Kennedy's and Ashton.
24   Q.   What about Amy Baum?
25   A.   I don't know what happened with that case.
          COPLEY COURT REPORTING - (617) 423-5841
```

**57**

```
1    Q.   What about the Masone girl?
2    A.   I'm not sure.
3    Q.   Was she charged with anything?
4    A.   I don't recall.
5    Q.   If I suggested to you that there was an allegation
6  that she deliberately drove the car into Louis Cimmino and
7  that is what triggered the whole incident, would that
8  refresh your recollection?
9    A.   I remember that she did state that she hit
10 somebody. I believe it could have been Louis, yes.
11   Q.   Did you ever ask or did any Billerica officer ask
12 what she was doing on Leicester Street at two o'clock in
13 the morning on a Thursday night Friday morning?
14        MR. SILVERFINE:  Objection as to form.
15        THE WITNESS:  I believe they said they had gone out
16 to Lowell, that they had been in Lowell.
17   Q.   Leicester Street isn't in Lowell, is it?
18   A.   There could be one. I couldn't tell you.
19   Q.   You know the trailer park on Leicester Street?
20   A.   Yes.
21   Q.   That is not in Lowell?
22   A.   No.
23   Q.   You wouldn't go there if you were going to Lowell?
24        MR. SILVERFINE:  Objection as to form.
25        THE WITNESS:  No.
          COPLEY COURT REPORTING - (617) 423-5841
```

**58**

```
1    Q.   So if you were to ask Ms. Masone and her companions
2  what were you doing on Leicester Street and they were to
3  answer we were going out to Lowell for the night, that
4  would raise even more suspicion, wouldn't it?
5        MR. SILVERFINE:  Objection as to form.
6        THE WITNESS:  I believe I said they had been in
7  Lowell and they ended up back there.
8    Q.   Do you know why they went there?
9    A.   No, I don't.
10   Q.   Do you think that was relevant to your
11 investigation of a possible crime?
12   A.   I believe they stated why they were there. I don't
13 recall what the reason was.
14   Q.   You said earlier that Lieutenant Rosa appeared at
15 the scene?
16   A.   Yes.
17   Q.   Do you know why he came to the scene?
18   A.   He was the shift supervisor.
19   Q.   Is there any reason why the shift supervisor came
20 to the scene?
21   A.   I can't answer for him. I can only assume that the
22 fact that we had people injured and we were calling for two
23 ambulances, that drew his attention.
24   Q.   Does the shift supervisor normally come to the
25 scene when two people are injured?
          COPLEY COURT REPORTING - (617) 423-5841
```

**59**

```
1    A.   Depending upon the circumstances, yes.
2    Q.   What circumstances were there here that made it
3  appropriate for the shift supervisor to come to the scene?
4    A.   The motor vehicle that was out on Oak Street that
5  had all its windows smashed out. The people, parties there
6  were injured. Then we had other parties stating they
7  were had been hit by a car so, yes, that would draw the
8  supervisor's attention to respond.
9    Q.   That would draw the supervisor to come to the
10 scene?
11   A.   I would think so, yes.
12   Q.   I'm going to show you three pages that are Bates
13 stamped 0435, 0436 and 0437. I believe they are out of
14 order but I apologize for that. I didn't put them in order
15 or number them this way.
16   A.   Okay.
17   Q.   Tell me if you can identify them as the incident
18 report for the arrest that night?
19   A.   ---
20   Q.   I'm just asking you if you can identify it as the
21 police report?
22   A.   Yes, this is part of the police report.
23   Q.   What else is there?
24   A.   There should be a -- this is Officer DeVito's
25 narrative. He put in the parties involved here. I may have
          COPLEY COURT REPORTING - (617) 423-5841
```

**60**

```
1  also entered some of them.
2    Q.   Okay.
3    A.   He put them in that and that is his narrative.
4    Q.   His narrative starts on 0436 and continues on to
5  0437?
6    A.   Well, it actually starts on 0437.
7    Q.   That's what I mean. I'm sorry.
8    A.   Then it continues on to 0436. There is more to
9  this.
10        MR. FISCHER:  Let's go off the record.
11             (Off the Record)
12        MR. FISCHER:  Back on the record.
13   Q.   Let me show you what is numbered 0438, 0439 and
14 0440. I ask if that is the remainder of the report?
15   A.   Yes.
16   Q.   Let me ask you anywhere there if it says anywhere
17 about the reason these young ladies, Ms. Masone and her
18 companions were on Leicester Street?
19   A.   Yes.
20   Q.   What does it say?
21   A.   I don't know if you want the page but 0436, under
22 Officer DeVito's narrative, it states that Ms. Minervini
23 and Ms. Gilpatrick also provided comments stating they were
24 dropping off Louis Cimmino at the Kennedy home and Michelle
25 Kennedy ran out screaming at Deann Masone.
          COPLEY COURT REPORTING - (617) 423-5841
```

**61**

1     Q. Okay. So the reason they were there was to drop off
2 Louis Cimmino?
3     MR. SILVERMAN: Objection as to form.
4     THE WITNESS: According to this.
5     Q. Did you then find that to be credible?
6     A. Yes, I believe they were credible.
7     Q. Did you find that to be credible?
8     A. Yes.
9     Q. Do you still believe they were dropping Louis
10 Cimmino off?
11     A. To the best of my recollection, yes.
12     Q. Do you believe that they hit Louis Cimmino with the
13 car?
14     A. I believe Ms. Masone stated that she hit him with
15 the car. I would have to look at my report. I believe that
16 she stated something to that effect.
17     Q. Do you know what the relationship between Ms.
18 Masone and the Cimmino brothers is?
19     A. I don't currently recall. I know that there is
20 something there. I don't remember exactly what it is.
21     Q. If I suggested to you that John Cimmino is the
22 father of Deann Masone's child ---
23     A. That could be it, yes.
24     Q. If I suggested to you that the two of them don't
25 have a good relationship and if I suggested to you that
COPLEY COURT REPORTING - (617) 423-5841

**62**

1 don't have a good relationship, would that refresh your
2 recollection as to anything?
3     A. No.
4     Q. Okay.
5     A. I'm not aware of their relationship.
6     Q. The reason she was there on Leicester Street --
7 isn't it true the Cimmino's live there also?
8     A. No.
9     Q. Do you know where they live?
10     A. I believe they lived on the next street over.
11     Q. In the trailer park?
12     A. Yes.
13     Q. When I say there, I mean in the trailer park?
14     A. Yes. I'm assuming that, I guess. I don't know.
15     Q. They live at 144 Ipswich Street?
16     A. I believe that is the address.
17     Q. That is in the trailer park?
18     A. Yes.
19     Q. Did you conduct any further investigation?
20     A. Yes.
21     Q. What did you learn in the further investigation?
22     A. I went to Lahey Clinic and got a statement from Ms.
23 Masone.
24     Q. What did she tell you in that statement?
25     A. I would have to look at the statement. I don't
COPLEY COURT REPORTING - (617) 423-5841

**63**

1 remember exactly.
2     Q. Did you speak with anyone else?
3     A. I believe the other occupants of the car were with
4 her there.
5     Q. Did you speak to anyone on the other side of the
6 altercation?
7     A. I'm not sure I'm following you when you say the
8 other side.
9     Q. Well, in a fight there are usually two sides?
10     A. Yes.
11     Q. And as a police officer if you don't witness the
12 fight, you don't know who started it or who instigated it
13 or provoked the violence, do you?
14     A. I believe that had already been determined.
15     Q. Who determined it?
16     A. Again, I believe Officer DeVito had radioed the
17 information.
18     Q. What information did he radio?
19     A. That I believe it was Brian, Michelle, Billy Ashton
20 who had broken the windows on the motor vehicle and struck
21 the people with the bats.
22     Q. That is what Ms. Masone -- what was the source of
23 that information?
24     A. I believe it was the people in the motor vehicle.
25     Q. Ms. Masone and her two passengers?
COPLEY COURT REPORTING - (617) 423-5841

**65**

1     A. Yes.
2     Q. There were a number of people there at the scene,
3 correct?
4     A. ---
5     Q. On Leicester Street.
6     A. There were two scenes.
7     Q. You indicated that after the arrest you went to the
8 scene at Leicester Street?
9     A. There were actually two scenes on Leicester Street.
10     Q. What were the two scenes?
11     A. One was where the people were running behind the
12 trailer and the other was next door at the Kennedy
13 residence.
14     Q. Were there people there?
15     A. At the Kennedy residence?
16     Q. Yes.
17     A. I believe Amy Baum was there because she stated she
18 was baby-sitting and there were numerous police officers on
19 the scene from both Billerica and Tewksbury.
20     Q. Were there other civilians there?
21     A. Not right at the Kennedy's that I remember.
22     Q. Did you speak to the other civilians?
23     A. Initially when I stopped there.
24     Q. Mr. Cimmino told you that he was hit by the car?
25     A. Yes.
COPLEY COURT REPORTING - (617) 423-5841

**66**

1     Q. Didn't he tell you why he was hit by the car?
2     A. No. Initially he gave me a completely different
3 description of the motor vehicle that he stated struck him.
4     Q. What description did he give you?
5     A. A blue -- I'm not sure. I believe that it is in my
6 report. He gave me a different description of the color of
7 the motor vehicle that he stated struck him.
8     Q. Is that unusual?
9     A. I'm not sure I understand what you mean.
10     Q. It was two o'clock in the morning?
11     A. Approximately.
12     Q. It was dark?
13     A. That street does have street lights.
14     Q. Even with street lights it wasn't brightly lit, is
15 that fair to say?
16     A. No, it is not ---
17     Q. It is two o'clock in the morning?
18     A. It is no different than any other road in town with
19 street lights.
20     Q. Okay. Is it unusual for someone hit by a car at two
21 o'clock in the morning in the dark to not be able to tell
22 you the color or the make or model of the car with great
23 specificity?
24     MR. SILVERMAN: Objection as to form.
25     THE WITNESS: I thought it was unusual he had just
COPLEY COURT REPORTING - (617) 423-5841

**66**

1 run away from the scene but then upon me catching him he
2 was hit by a car. I thought that was unusual.
3     Q. Had you formed an opinion at that point as to who
4 had smashed the car with objects, with bats or with similar
5 objects?
6     A. At which point, sir?
7     Q. At the point that you were talking, that you were
8 at Leicester Street talking to or after you had talked to
9 the Cimmino's and Amy Baum.
10     A. I personally was still trying to determine what had
11 taken place.
12     Q. At what point did you form an opinion as to who
13 struck or had damaged the car?
14     A. I believe that Officer DeVito came to the Leicester
15 Street scene after the girls were placed in the ambulance
16 at which time he, to the best of my recollection -- I was
17 talking with Michelle and Brian Kennedy in the driveway, I
18 was trying to obtain what had happened from them.
19     Q. Okay.
20     A. Officer DeVito I believe was talking to Lieutenant
21 Rosa.
22     Q. And at some point did you form an opinion as to who
23 had committed the crimes?
24     A. Lieutenant Rosa to the best of my recollection
25 stated that Michelle Kennedy and Billy Ashton, that they
COPLEY COURT REPORTING - (617) 423-5841

**67**

```
1   were involved and placed them under arrest and Brian
2   Kennedy ran back into the trailer.
3       Q.   Do you know why he ran back into the trailer?
4       A.   I can only assume.
5       Q.   Did you assume anything?
6       A.   He probably didn't want to get arrested.
7       Q.   Do you know why he didn't want to get arrested?
8       A.   I can only assume he was involved and knew he was
9   going to get arrested.
10      Q.   Are you aware that the Kennedy's made complaints
11  about being harassed and falsely arrested prior to November
12  9, 2001?
13      A.   Yes.
14      Q.   Why didn't you assume that they were afraid that
15  they were going to be wrongfully charged?
16           MR. SILVERFINE: Objection as to form.
17           THE WITNESS: The thought never entered my mind.
18      Q.   Did the thought ever enter your mind that he was
19  concerned about his three minor children and who was going
20  to care for them if he and his wife were both arrested?
21      A.   I'm assuming that is why Lieutenant Rosa made the
22  determination not to go after Brian and left him home.
23      Q.   This brings me to the next question I wanted to ask
24  you. From what you said in the last couple of minutes, is
25  it fair to conclude that it was Lieutenant Rosa's decision
              COPLEY COURT REPORTING - (617) 423-5841
```

**68**

```
1   to arrest Michelle Kennedy and Billy Ashton?
2       A.   I believe on the information he received from
3   Officer DeVito, that was his determination, yes.
4       Q.   That was his determination, not yours or Officer
5   DeVito?
6       A.   Lieutenant Rosa stated that to me, I think, I don't
7   remember his exact words but I believe he stated Michelle
8   was involved so I placed her under arrest.
9       Q.   You did that upon the order of Lieutenant Rosa?
10      A.   No, there was no order.
11      Q.   It was not under the direction of Lieutenant Rosa?
12      A.   There is a difference.
13      Q.   What is the difference between under the direction
14  of and on the order of?
15      A.   An order would be just that, ordering me to do
16  something. He gave me information and I placed her under
17  arrest.
18      Q.   So he was the person responsible for Michelle being
19  arrested that night?
20      A.   I'm not following what you mean by that.
21      Q.   You told me you were conducting an investigation
22  and seeking information?
23      A.   Yes.
24      Q.   At several points I asked you whether you formed a
25  conclusion as to whether anyone committed a crime and you
              COPLEY COURT REPORTING - (617) 423-5841
```

**69**

```
1   answered that you were still investigating?
2       A.   Yes.
3       Q.   From that I'm reasonably concluding that you hadn't
4   made a determination as to who had committed a crime or who
5   to arrest?
6           MR. SILVERFINE: Objection as to form.
7           MR. FISCHER: Because you were still investigating.
8           THE WITNESS: Yes, it was under investigation.
9       Q.   Then based upon what Lieutenant Rosa told you, you
10  arrested Michelle Kennedy and Billy Ashton?
11      A.   I arrested Michelle Kennedy.
12      Q.   So you did that under the supervision of Lieutenant
13  Rosa?
14      A.   He was the Lieutenant there so yes.
15      Q.   And ---
16      A.   He was the supervisor.
17      Q.   He provided you information that led you to come to
18  the conclusion that she should be arrested for a crime?
19      A.   That he received from Officer DeVito, yes.
20      Q.   And he was supervising you?
21      A.   He was the supervisor on the scene, yes.
22      Q.   He was responsible for who you arrested and didn't
23  arrest?
24      A.   Ultimately that is my decision.
25      Q.   Well, when he provided you this information that
              COPLEY COURT REPORTING - (617) 423-5841
```

**71**

```
1       A.   I would say her actions were responsible for her
2   being arrested.
3       Q.   What were her actions that led her to be arrested?
4       A.   Striking the individuals with a baseball bat.
5       Q.   And who did she strike with the baseball bat?
6       A.   I believe it was Ms. Masone.
7       Q.   Did anyone see Michelle Kennedy strike Deann Masone
8   with a baseball bat?
9           MR. SILVERFINE: Objection.
10          THE WITNESS: I believe so.
11      Q.   Who do you believe saw her do that?
12      A.   The witnesses that were there.
13      Q.   Who were the witnesses that were there?
14      A.   The ones in her motor vehicle.
15      Q.   Do you know if the witnesses who were there ever
16  retracted their initial statements?
17      A.   I remember hearing something at the end of the
18  trial about that, yes.
19      Q.   When what do you mean at the end of the trial?
20      A.   Afterwards when it was not guilty.
21      Q.   You never heard that before the trial?
22      A.   No.
23      Q.   Did you take any photographs at the scene?
24      A.   No, I didn't.
25      Q.   Did anyone take any photographs at the scene?
              COPLEY COURT REPORTING - (617) 423-5841
```

**72**

```
1       A.   Not to my knowledge.
2       Q.   Not to your knowledge?
3       A.   No.
4       Q.   Did you testify before the grand jury in this case?
5       A.   Yes.
6       Q.   In your testimony before the grand jury, isn't it
7   fair to say through your testimony a number of photographs
8   were introduced before the grand jury?
9       A.   I'm not sure if I am following your line of
10  questioning, sir.
11      Q.   When you testified before the grand jury, were
12  there photographs that were introduced to the grand jury?
13      A.   Yes.
14      Q.   And they were introduced through your testimony, is
15  that fair?
16      A.   Yes. I don't know if it was my testimony or not but
17  there were photographs taken.
18      Q.   Do you recall the photographs that were taken?
19      A.   I didn't take them but I believe they were taken of
20  Deann Masone and possibly her vehicle. I don't recall. I
21  know that I asked her to come to the station later on that
22  morning to have pictures taken of her and I believe she did
23  that.
24      Q.   I'm going to show you minutes of the grand jury and
25  it says Mark Conway's testimony between Pages 53 and 73?
              COPLEY COURT REPORTING - (617) 423-5841
```

**70**

```
1   led to your arrest of Michelle Kennedy, were you free to
2   not arrest Michelle Kennedy at that point?
3       A.   A crime had been committed. I arrested her.
4       Q.   You hadn't witnessed a crime being committed?
5       A.   No.
6       Q.   Lieutenant Rosa was your supervising officer?
7       A.   Yes.
8       Q.   You knew the only information a crime had been
9   committed was what he told you?
10          MR. SILVERFINE: Objection as to form.
11          THE WITNESS: The information that Officer DeVito
12  had obtained from the victims.
13      Q.   You didn't obtain that information?
14      A.   Not all of it, no sir.
15      Q.   You didn't know it except Lieutenant Rosa conveyed
16  it to you?
17      A.   And Officer DeVito.
18      Q.   And it is fair to say they conveyed it to you for
19  the purpose of having you arrest Ms. Kennedy?
20      A.   Yes.
21      Q.   So Lieutenant Rosa was responsible for Ms. Kennedy
22  being arrested?
23          MR. SILVERFINE: Objection as to form.
24          THE WITNESS: No.
25      Q.   He was not responsible for her being arrested?
              COPLEY COURT REPORTING - (617) 423-5841
```

73

```
 1    A.   Yes.
 2    Q.   I will show you Page 53, has at the top of the page
 3  Martin Conway sworn -- your testimony begins then?
 4    A.   Yes.
 5    Q.   And it continues to Page 72 where it says witness
 6  excused?
 7    A.   Yes.
 8    Q.   And then a list of Exhibits, Exhibits 17 through 23
 9  are all photographs that were introduced on Page 69?
10    A.   Okay.
11    Q.   So it is fair to say that those photographs were
12  introduced through your testimony?
13    A.   Apparently, yes.
14    Q.   Do you know what those photographs were?
15    A.   I don't recall.
16    Q.   Do you know whether those photographs exist today?
17    A.   I don't know.  Again, I did not take the
18  photographs.
19    Q.   Okay.  Do you know what happened to the photographs
20  after the trial?
21    A.   No, I do not.
22    Q.   Do you recall how long Michelle Kennedy was held
23  after she was arrested?
24    A.   No.
25    Q.   Do you recall whether she had issues with bail?
         COPLEY COURT REPORTING - (617) 423-5841
```

74

```
 1    A.   No, I don't recall.
 2    Q.   Do you recall anything else about this arrest or
 3  criminal prosecution that you haven't told us about?
 4    A.   Not really.
 5    Q.   Do you recall Michelle Kennedy going to Framingham?
 6    A.   I don't.
 7    Q.   Do you recall anything about the bail arrangements
 8  that Friday or the weekend?
 9    A.   No.
10    Q.   I'm going to show you two pages that have been
11  Bates stamped 1568 and 1569.
12    A.   Okay.
13    Q.   I ask if you can identify them?
14    A.   It says I received from Brian Kennedy it looks like
15  $1,785 cash in the police department at Billerica and it is
16  signed Thomas Mixon.
17    Q.   Do you know who Thomas Mixon is?
18    A.   Yes, he is an attorney.
19    Q.   Do you know if he ever represented the Kennedy's?
20    A.   Yes, I believe he has.
21    Q.   Do you know whether he came to the police station,
22  the Billerica police station the weekend of November 9th,
23  2001?
24    A.   I'm assuming that he did because it is dated
25  November 11, 2001.
         COPLEY COURT REPORTING - (617) 423-5841
```

75

```
 1    Q.   Does this refresh your recollection in any way as
 2  to there being a bail issue that weekend?
 3    A.   No.  I worked midnights.  I wasn't involved with the
 4  bail or anything like that so no.
 5    Q.   Did you work the next night?
 6    A.   I don't recall.
 7    Q.   Did you work that weekend at all?
 8    A.   I don't recall.  I would have to look it up.  I don't
 9  recall.
10    Q.   Okay.
11    A.   I don't remember what my schedule was.
12    Q.   You don't recall coming back and seeing Michelle
13  Kennedy and Brian Kennedy in custody over the weekend and
14  that being an issue?
15    A.   No.
16    Q.   Let me break it down.  Do you recall Michelle still
17  being in custody over the weekend and that being an issue?
18    A.   No.  I returned from the Lahey Clinic about six in
19  the morning approximately and I did my reports.  That was
20  it.  I didn't go down to the booking area or anything like
21  that that I recall.
22    Q.   You didn't have anything to do with booking?
23    A.   No.
24    Q.   Do you recall Officer Connors being there?
25    A.   No, I don't.
         COPLEY COURT REPORTING - (617) 423-5841
```

76

```
 1    Q.   You don't recall hearing him say anything about the
 2  bail issue?
 3    A.   No.
 4    Q.   So if there were testimony to the effect that he
 5  was threatening to keep her over the weekend in Framingham,
 6  you wouldn't be able to corroborate or refute that?
 7         MR. SILVERFINE:  Objection as to form.
 8         THE WITNESS: No.
 9    Q.   Did you look at the second paper here, Page 1569,
10  underneath the note from Mr. Mixon?
11    A.   Okay.
12    Q.   Can you identify it?
13    A.   It is a handwritten note, it says Brian Kennedy has
14  turned $800 over to Amy Baum on 11-10-01 at 1108 hours in
15  the presence of Sergeant Opland and Officer Scott Parker
16  and it's signed by Amy Baum and it looks like Brian
17  Kennedy.
18    Q.   Can you tell us what is under that, Number 1570?
19    A.   Yes, it is a prisoners rights Miranda warning.  It
20  is part of the booking procedure.
21    Q.   There is a date in the upper left-hand corner, it
22  says 11-9-01, is that fair?
23    A.   I believe so.
24    Q.   And these three pieces of paper are numbered
25  sequentially?
         COPLEY COURT REPORTING - (617) 423-5841
```

77

```
 1    A.   Yes.
 2    Q.   Can you provide any clue as to why these pieces of
 3  paper are next to each other?
 4    A.   I don't know.
 5    Q.   You have no idea what these three pieces of paper
 6  are?
 7    A.   I know what they are.  It says they turned over
 8  money and this is part of the booking sheet.
 9    Q.   Is this or does this refresh your recollection at
10  all as to any bail issue that became an issue after Brian
11  Kennedy was arrested?
12         MR. SILVERFINE:  Objection as to form.
13         THE WITNESS: No.
14    Q.   As President of the union, you have to be elected
15  President of your local?
16    A.   Yes.
17    Q.   It is fair to say you must be a fairly popular
18  officer if you are elected thirteen years?
19    A.   That or no one else wants it.
20    Q.   That's fair.  You are familiar with the other
21  officers on the force?
22    A.   Yes.
23    Q.   Are you familiar with an Officer McKenzie?
24    A.   Yes.
25    Q.   He is now Lieutenant McKenzie?
         COPLEY COURT REPORTING - (617) 423-5841
```

78

```
 1    A.   Yes.
 2    Q.   Is he still able to be in the union if he is a
 3  Lieutenant?
 4    A.   Yes.
 5    Q.   Are you aware of any involvement he had with
 6  Michelle Kennedy?
 7    A.   I'm not sure what you mean.
 8    Q.   Romantic involvement.
 9    A.   Personally no, I don't know of anything.
10    Q.   When you say personally, what about other than
11  personally or second hand?
12    A.   Rumors.
13    Q.   What rumors have you heard?
14    A.   Allegedly years ago they may have been involved.
15    Q.   And do you know if anything came out of that?
16    A.   I'm not sure I understand your question.
17    Q.   Was there any hostility between Officer McKenzie
18  and Brian Kennedy as a result of that alleged relationship?
19    A.   I don't personally know.
20    Q.   Are you familiar with a place called the Concord
21  Shores?
22    A.   Yes.
23    Q.   Can you tell us what it is?
24    A.   It was a barroom in Billerica.
25    Q.   It no longer exists?
         COPLEY COURT REPORTING - (617) 423-5841
```

**79**

```
 1    A.  No, sir.
 2    Q.  Did you ever go there?
 3    A.  Yes.
 4    Q.  Frequently?
 5    A.  Yes.
 6    Q.  Are you familiar with a term called choir practice?
 7    A.  Yes.
 8    Q.  Tell us what that is?
 9    A.  It is a term, well, when officers go drinking after
10  work.
11    Q.  And is Concord Shores one of the places where the
12  officers would go?
13    A.  I don't think that was one of the places that was
14  frequented that often, no.
15    Q.  It was a place where officers would go?
16    A.  Yes. Anyone could go.
17    Q.  You would go there?
18    A.  Yes.
19    Q.  And do you know if there was ever an incident there
20  involving Brian Kennedy?
21    A.  Yes, I believe there was something there.
22    Q.  What do you know about that incident?
23    A.  I believe there was a fight or something. I'm not
24  positive.
25    Q.  Do you know whether there were other police
           COPLEY COURT REPORTING - (617) 423-5841
```

**80**

```
 1  officers in the bar at the time the fight took place?
 2    A.  No, I don't.
 3    Q.  Do you know what came out of that incident?
 4    A.  No.
 5    Q.  Do you know when that incident took place?
 6    A.  No.
 7    Q.  If I told you it occurred in 1991, would you have
 8  any reason to agree or disagree with that?
 9    A.  No.
10    Q.  In 1991 were you President of the union yet?
11    A.  No.
12    Q.  So you wouldn't know if any officer was disciplined
13  in 1991 as a result of ---
14    A.  No, I wouldn't.
15    Q.  As a result of that incident.
16    A.  No.
17    Q.  As President of the union, are you aware of any
18  officers getting in trouble for drug usage?
19    A.  Yes.
20    Q.  What officers do you know who are accused of drug
21  usage?
22    A.  Officer Royston.
23    Q.  Any others?
24    A.  Not while I was President of the union.
25    Q.  Are you aware of any other officers getting in
           COPLEY COURT REPORTING - (617) 423-5841
```

**81**

```
 1  trouble for drug usage at all ever?
 2    A.  Yes.
 3    Q.  What officers?
 4    A.  There was Detective Burke.
 5    Q.  Burke?
 6    A.  Yes.
 7    Q.  B-u-r-k-e?
 8    A.  Yes.
 9    Q.  Any other officers?
10    A.  Not that I can think of.
11    Q.  Were you ever partners with Officer Casey?
12    A.  I may have ridden with him a couple of times. We
13  might have been doubled up. Not on a permanent basis or
14  anything like that.
15    Q.  Do you know if anyone has ever accused him of using
16  cocaine in his police car?
17    A.  No, I don't.
18    Q.  You never heard of such an accusation?
19    A.  No.
20    Q.  Do you know if he has ever been accused of using
21  drugs at all?
22    A.  I don't know.
23    Q.  This is the first you have ever heard of something
24  like this?
25    A.  Yes.
           COPLEY COURT REPORTING - (617) 423-5841
```

**82**

```
 1    Q.  Are you aware of he has ever been accused of
 2  having an alcohol problem?
 3    A.  Yes.
 4    Q.  What do you know about that?
 5    A.  He stopped drinking several years ago.
 6    Q.  Do you know why he stopped drinking?
 7    A.  I can only assume it is because he thought he may
 8  have had a problem with alcohol.
 9    Q.  Do you know if he ever drank on the job?
10    A.  No, I don't.
11    Q.  Do you know if he was ever accused of drinking on
12  the job?
13    A.  No, I do not know.
14    Q.  Do you know if that is one of the reasons that he
15  stopped drinking?
16    A.  No idea.
17    Q.  Has he ever been disciplined as a police officer?
18    A.  I don't know.
19    Q.  Is this one of these you may have had to seek
20  counsel for him but you don't remember?
21    A.  I don't remember Officer Casey needing counsel.
22    Q.  But you did say earlier that you don't remember all
23  the situations where you ---
24    A.  I did say that.
25    Q.  Typically that is not something that you would pay
           COPLEY COURT REPORTING - (617) 423-5841
```

**83**

```
 1  attention to?
 2    A.  That is not what I said.
 3    Q.  That is what I took from your testimony. Is it fair
 4  to infer that?
 5         MR. SILVERFINE: Objection as to form.
 6         THE WITNESS: It is not fair to infer that.
 7    Q.  But you did say it was your job to obtain counsel
 8  and not to be involved otherwise?
 9    A.  ---
10    Q.  Did you say that?
11    A.  I don't believe I said that.
12    Q.  What did you say about obtaining counsel?
13    A.  I believe I said that I have gotten them counsel.
14    Q.  You don't remember who or how many times?
15    A.  I don't remember everyone, no, I don't.
16    Q.  But you remember some people that you got counsel
17  for?
18    A.  Yes.
19    Q.  Who do you remember getting counsel for?
20    A.  Officer Royston. The ones involved in this case.
21    Q.  Anybody else?
22    A.  Officer Gualietri, the case I told you about
23  recently.
24    Q.  Anybody else?
25    A.  Not off the top of my head, no.
           COPLEY COURT REPORTING - (617) 423-5841
```

**84**

```
 1    Q.  Do you know when the case went to trial regarding
 2  the alleged assaults alleged by Ms. Masone?
 3    A.  I don't remember the exact date.
 4    Q.  But you say you did not see any retraction until
 5  after the trial by any of the witnesses?
 6    A.  That I heard about.
 7    Q.  Do you know if any other police officers involved
 8  in the case heard about it before the end of the trial?
 9    A.  I don't know.
10    Q.  How did you hear about it?
11    A.  I'm trying to think. It was after the case. It was
12  in the paper that they were found not guilty. I'm not sure
13  if it was Officer DeVito.
14         One of the officers stated they had spoken with the
15  ADA who stated that some of the people had retracted their
16  statements.
17    Q.  Isn't it fair to say that they not only retracted
18  their statements but they said they didn't want to press
19  charges against William Ashton, Brian Kennedy and Michelle
20  Kennedy?
21    A.  I don't know.
22    Q.  That in fact they were in the car and shielding
23  their heads, shielding their faces from the blows and
24  didn't see at all who did anything?
25    A.  I don't know.
           COPLEY COURT REPORTING - (617) 423-5841
```

**85**

```
 1    Q.  Let me show you a document and ask you if you have
 2  seen it before?
 3    A.  No, I have never seen this before.
 4    Q.  It is fair to say that is one of the retractions
 5  that we are discussing?
 6        MR. SILVERFINE: Objection as to form.
 7        THE WITNESS: Yes.
 8    Q.  You say you have never seen this before?
 9    A.  No, I have never seen that before.
10        MR. FISCHER: Let's mark this as Exhibit Number 2,
11  please.
12            (Marked Exhibit Number 2,
13            Retraction Statement.)
14    Q.  Have you spoken with John Cimmino, Louis Cimmino,
15  Deann Masone or any of the other people involved in the
16  incident since the trial in 2002?
17    A.  No.
18    Q.  Have you spoken to anybody regarding this case
19  since this lawsuit was filed?
20        MR. SILVERFINE: Other than counsel?
21        MR. FISCHER: Other than counsel.
22        MR. SILVERFINE: You mean this case in November of
23  2001 or this case being the entire case?
24        MR. FISCHER: The federal civil rights case of
25  Kennedy, et al., versus Town of Billerica, et al.
          COPLEY COURT REPORTING - (617) 423-5841
```

**88**

```
 1    Q.  This was a recent speeding ticket?
 2    A.  Yes. I don't remember the exact date.
 3    Q.  Within the last year or two?
 4    A.  Approximately.
 5    Q.  Have you had any other involvement with Michelle
 6  Kennedy?
 7    A.  Not that I can think of.
 8    Q.  Have you had any involvement with Brian Kennedy?
 9    A.  Not that I can think of.
10    Q.  Have you had any involvement with Mitchel Kennedy
11  or Dillon Kennedy or Brian Kennedy, Jr.?
12    A.  No.
13    Q.  Let me ask you with regard to the speeding ticket,
14  do you know anything about or have you ever heard of the
15  retribution gang or retribution squad?
16    A.  No.
17    Q.  Do you know if there was ever any group of officers
18  that was organized by Sergeant Weston?
19    A.  No.
20    Q.  Why do you laugh when you answer?
21    A.  This is the first I have heard of it. I never heard
22  of this.
23    Q.  Laughter doesn't come from some sort of recognition
24  of something?
25    A.  I think it is silly.
          COPLEY COURT REPORTING - (617) 423-5841
```

**86**

```
 1        THE WITNESS: Yes.
 2    Q.  Who have you spoken with about this lawsuit?
 3    A.  The Chief and Deputy Chief.
 4    Q.  What conversations have you had with the Deputy
 5  Chief?
 6    A.  That my deposition kept getting postponed.
 7    Q.  Any other conversations?
 8    A.  Not that I recall.
 9    Q.  Did you have any conversations about your
10  involvement in the case or why you were a party?
11        MR. SILVERFINE: Other than counsel.
12        THE WITNESS: Yes, I believe I made the statement,
13  yes.
14    Q.  What statement did you make?
15    A.  That I arrested them down the trailer park, that's
16  probably why I was involved.
17    Q.  And this is the arrest involving the Masone Cimmino
18  incident?
19    A.  Yes.
20    Q.  Have you had any other involvement with Michelle
21  Kennedy or Brian Kennedy in the time you have been a police
22  officer?
23    A.  Yes.
24    Q.  What other involvement have you had with them?
25    A.  I don't remember the exact date but I wrote
          COPLEY COURT REPORTING - (617) 423-5841
```

**89**

```
 1    Q.  With respect to the Masone incident, you said there
 2  was blood going to the Kennedy house?
 3    A.  Yes.
 4    Q.  Did you investigate the source of that blood?
 5    A.  I'm not sure what you mean by investigate.
 6    Q.  Did you ask the Kennedy's about the blood?
 7    A.  Yes.
 8    Q.  What did they say?
 9    A.  Brian stated that he had had a tooth pulled, I
10  believe.
11    Q.  Okay.
12    A.  I would have to -- it could have been that. Some
13  dentistry work. I thought he said a tooth pulled. I could
14  be incorrect in regards to that.
15    Q.  In fact they verified that, didn't they?
16        MR. SILVERFINE: Objection as to form.
17        THE WITNESS: Not with me.
18    Q.  Do you know if they verified it with anyone?
19    A.  No, I don't.
20    Q.  Let me show you a photograph. I ask you if you have
21  seen it before?
22    A.  No, I have not.
23    Q.  Can you tell me what it is a photograph of?
24    A.  It looks like a pillow.
25    Q.  Let me show you the next page. The next two pages.
          COPLEY COURT REPORTING - (617) 423-5841
```

**87**

```
 1  Michelle a speeding ticket.
 2    Q.  Do you recall when and what that was about?
 3    A.  I don't remember the exact date. It was for
 4  speeding.
 5    Q.  Do you recall what led to you write the speeding
 6  ticket?
 7    A.  Yes.
 8    Q.  What was that?
 9    A.  She was speeding.
10    Q.  Where and what were the circumstances, how fast was
11  she going and where was she going?
12    A.  It was on Lowell Street and to the best of my
13  recollection I believe she was doing forty-nine in a
14  thirty.
15    Q.  Do you know what happened with the ticket?
16    A.  No.
17    Q.  You didn't go to Court for it?
18    A.  She appealed it to a Clerk Magistrate hearing. I
19  was there for that.
20    Q.  And what happened in that appeal?
21    A.  She was found responsible.
22    Q.  And what happened after that?
23    A.  They appealed it to a Judge.
24    Q.  Do you know what happened with that appeal?
25    A.  No. I'm waiting for notification on it.
          COPLEY COURT REPORTING - (617) 423-5841
```

**90**

```
 1  Can you identify them?
 2    A.  It says Lyons Dental Associates. It says oral
 3  surgery Brian Kennedy.
 4    Q.  What is the date of the oral surgery?
 5    A.  11-8-01.
 6    Q.  That would have been that day?
 7    A.  Yes.
 8    Q.  It is your testimony you have never seen these
 9  before?
10    A.  Seen which things?
11    Q.  The bloody pillow.
12    A.  No.
13    Q.  Did you go into the house that night?
14    A.  No.
15    Q.  Did the Kennedy's offer to show you the bloody
16  pillow that night?
17    A.  No.
18    Q.  Did they tell you there was a bloody pillow?
19    A.  No.
20    Q.  Do you know who Robin B-e-n-s-h-i-m-o-l is?
21    A.  No, not off the top of my head.
22    Q.  When was the last time that you spoke with Amy
23  Baum?
24    A.  The night of this incident.
25    Q.  You haven't spoken to her since?
          COPLEY COURT REPORTING - (617) 423-5841
```

**91**

```
1    A.   No.
2    Q.   When was the last time that you spoke to Louis or
3  John Cimmino?
4    A.   The same.
5    Q.   Do you know if any Billerica police officers spoke
6  with any of them as a result of this lawsuit being filed?
7    A.   I don't, no.
8    Q.   Do you know if any photographs of Michelle Kennedy
9  have ever been posted on the bulletin board in the
10 Billerica police station?
11   A.   I don't, no.
12   Q.   Do you know if any cartoons of Michelle Kennedy
13 have ever been posted in the Billerica Police Department?
14   A.   No.
15   Q.   Do you know if there are any allegations of a
16 relationship between Dean Royston and Michelle Kennedy?
17   A.   Yes.
18   Q.   What do you know about that?
19   A.   Allegedly they had been together.
20   Q.   Is that similar to what the rumors were you heard
21 about Officer McKenzie?
22   A.   Yes.
23   Q.   Do you know if Officer Royston was disciplined for
24 this?
25   A.   For?
           COPLEY COURT REPORTING - (617) 423-5841
```

**92**

```
1    Q.   For being friends with Michelle Kennedy.
2    A.   Disciplined for being friends?
3    Q.   Yes.
4    A.   No.
5    Q.   Do you know if he was ever told to not associate
6  with Michelle Kennedy?
7    A.   Yes.
8    Q.   Was he?
9    A.   Yes.
10   Q.   What work rule did that violate?
11   A.   I can't remember the wording off the top of my
12 head.
13   Q.   Can you tell me generally what the rule is that he
14 violated?
15   A.   We all received a notice not to be associating with
16 the Kennedy's.
17   Q.   What was the basis of that?
18   A.   It's under rules and regulation, I believe, just --
19 I believe it is an undesirable character. I don't remember
20 the exact wording.
21   Q.   Who designated Michelle Kennedy and Brian Kennedy
22 as undesirable characters?
23        MR. SILVERFINE: Objection as to form.
24        THE WITNESS: I believe the order was from Chief
25 Rosa.
           COPLEY COURT REPORTING - (617) 423-5841
```

**93**

```
1    Q.   Do you know what the basis of that order was?
2    A.   No. He gave out an order.
3    Q.   Do you know what the Kennedy's did that made them
4  undesirable?
5        MR. SILVERFINE: Objection as to form.
6        THE WITNESS: I'm not sure how the Chief came up
7  with this determination.
8    Q.   You just followed your orders?
9    A.   Yes.
10   Q.   Has there ever been an order about anyone else like
11 that?
12   A.   I don't know.
13   Q.   You can't think of any?
14   A.   I don't know if any order like that has ever been
15 given out.
16   Q.   You certainly don't know of any?
17   A.   No.
18   Q.   That is what I meant by you can't think of any?
19   A.   Correct.
20   Q.   When did this order issue to not associate with
21 Michelle or Brian Kennedy?
22   A.   I don't remember the exact date.
23   Q.   Roughly?
24   A.   I couldn't tell you. I don't know the exact date. I
25 remember we received it, the department received it.
           COPLEY COURT REPORTING - (617) 423-5841
```

**94**

```
1    Q.   Was it before or after the Masone incident?
2    A.   I believe it was after.
3    Q.   Is there anything that happened with respect to the
4  Kennedy's that might have given you a clue as to why this
5  order to stay away from the Kennedy's issued?
6        MR. SILVERFINE: Objection as to form.
7        THE WITNESS: I don't know why the Chief did it.
8    Q.   As far as you know there is nothing that happened
9  that caused this, that caused the Chief to issue such an
10 order?
11   A.   You are asking me why the Chief came up with the
12 order.
13   Q.   If you know.
14   A.   I personally do not know.
15   Q.   Who are your friends on the police department?
16   A.   I would like to think they are all my friends.
17   Q.   Well, who are the ones you spend the most time with
18 as friends.
19   A.   Probably Troy O-p-l-a-n-d. Dan O'Leary. Brian West.
20 Jay Hickey.
21   Q.   Do you know if Michelle Kennedy was ever injured as
22 a result of an assault?
23   A.   No, I don't.
24   Q.   Do you know if there were ever pictures taken of
25 her being injured in an assault?
           COPLEY COURT REPORTING - (617) 423-5841
```

**95**

```
1    A.   Actually I stand corrected. I remember reading
2  something in the paper. Something happened in Lowell or
3  something involving her. It was in the paper.
4    Q.   What do you recall happening in Lowell that
5  involved her?
6    A.   She was choked or something by -- I don't remember
7  the exact thing. I remember there was an allegation that
8  she had been choked by somebody.
9    Q.   Do you recall anything else about that?
10   A.   No. It was in the paper. I remember reading it in
11 the paper.
12   Q.   Do you know Tracy Heffernan?
13   A.   I know the name. I don't personally know her.
14   Q.   How do you know the name?
15   A.   Or him. I don't know. They live on Oak Street.
16   Q.   Okay.
17   A.   The Heffernans.
18   Q.   How far is Oak Street from Leicester Street?
19   A.   To get into Leicester you have to come down Oak
20 Street.
21   Q.   And how do you know Tracy Heffernan's name?
22   A.   I just heard the name. I can't pinpoint why but I
23 have heard the name.
24   Q.   Do you know if she has ever been involved in any
25 criminal activity?
           COPLEY COURT REPORTING - (617) 423-5841
```

**96**

```
1    A.   ---
2    Q.   Or the subject of any criminal investigation.
3    A.   Not off the top of my head, no, I don't.
4    Q.   Do you know if she has had any involvement with
5  Brian Kennedy or Michelle Kennedy?
6    A.   Yes, I believe there have been some problems I have
7  heard of. I never dealt with it myself.
8    Q.   Problems between them?
9    A.   I believe so, yes.
10   Q.   What do you know to have been problems between
11 them?
12   A.   From what I heard, they didn't get along.
13   Q.   Did you hear the reason they didn't get along is
14 because a Billerica police officer offered to pay Tracy
15 Heffernan to beat Michelle Kennedy up?
16        MR. SILVERFINE: Objection as to form.
17        THE WITNESS: I never heard that.
18   Q.   You never heard that?
19   A.   No.
20   Q.   You were served a complaint in this case?
21   A.   I'm sorry?
22   Q.   You were served in this case with papers?
23   A.   A notice to appear here?
24   Q.   No. A notice that said you are a Defendant in this
25 lawsuit.
           COPLEY COURT REPORTING - (617) 423-5841
```



97

```
1     A.   Yes.
2     Q.   There was something called a complaint, it was a
3   lengthy many page document that spelled out all the charges
4   that the Kennedy's are making against you and all the other
5   officers.
6     A.   Yes.
7     Q.   Do you remember receiving that?
8     A.   Yes.
9     Q.   Did you read it?
10    A.   Not all of it, no.
11    Q.   Do you know who Teddy Galinaro is?
12    A.   Yes.
13    Q.   And who is he?
14    A.   There are a whole bunch of Galinaro's. I think I
15  know which one is Teddy. They grew up on Rodgers Street in
16  North Billerica.
17    Q.   Do you know what his involvement is with Brian or
18  Michelle Kennedy?
19    A.   No.
20    Q.   Do you know him personally?
21    A.   I know I've met him. There are several Galinaro's.
22  I could probably pick him out, which one is which but there
23  is John and I can't remember all of them but there is a lot
24  of them.
25    Q.   Have you spoken to either of them regarding this
          COPLEY COURT REPORTING - (617) 423-5841
```

98

```
1   lawsuit?
2     A.   No.
3     Q.   Do you know if anyone has spoken with them
4   regarding this lawsuit?
5     A.   No idea.
6          MR. FISCHER: Let's take a short recess. Off the
7   record.
8                    (Off the Record)
9          MR. FISCHER: Back on the record.
10    Q.   Do you recall on the morning of November 9, you had
11  some discussion -- you said that you spoke with Lieutenant
12  Rosa, he was then Lieutenant Rosa and is now Chief Rosa?
13    A.   Yes.
14    Q.   As a result of your conversation with Lieutenant
15  Rosa, you ended up arresting Michelle Kennedy and Billy
16  Ashton?
17    A.   I arrested Michelle Kennedy.
18    Q.   Do you recall whether before that ---
19         MR. FISCHER: Strike that.
20    Q.   Before arresting Michelle Kennedy, you had
21  conversation with Lieutenant Rosa?
22    A.   Yes.
23    Q.   And do you recall whether Lieutenant Rosa spoke to
24  anyone else just before speaking to you?
25    A.   I believe it was Officer DeVito.
          COPLEY COURT REPORTING - (617) 423-5841
```

99

```
1     Q.   Did he call the station or speak to anyone or did
2   he call anyone else in that time frame?
3          MR. SILVERFINE: Objection as to form.
4          THE WITNESS: When you say he, you mean Lieutenant
5   Rosa?
6     Q.   Yes.
7     A.   I don't recall. I was talking to the Kennedy's. He
8   could have. I don't recall.
9     Q.   So you don't know if he made a cell phone call to
10  anyone in the station?
11    A.   I don't know.
12         MR. FISCHER: I have no other questions at this
13  point. I'm going to suspend subject to the resolution of
14  questions to which I reserved earlier.
15         MR. SILVERFINE: Okay.
16         MR. FISCHER: Before we suspend, I would like to
17  mark these photographs as Exhibit Number 3.
18                    (Marked Exhibit Number 3,
19                     Photographs.)
20         MR. FISCHER: We can suspend at this point.
21                    (Whereupon at 1:40 p.m., the
22                     Deposition was Suspended.)
23
24
25
          COPLEY COURT REPORTING - (617) 423-5841
```

100

```
1     I, MARTIN E. CONWAY, do hereby certify that I have read
2   the foregoing transcript of my testimony given on November
3   27, 2006, and I further certify that said transcript is a
4   true and accurate record of said testimony (with the
5   exception of the following corrections listed below):
6
7
8   Page          Line          Correction
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
20     Dated at _____, this _____
21  day of _____, 2006.
22
23                    MARTIN E. CONWAY
24
25     Signed under the pains and penalties of perjury.
          COPLEY COURT REPORTING - (617) 423-5841
```

101

```
1
2
3
4                    CERTIFICATE
5
6   COMMONWEALTH OF MASSACHUSETTS
7   SUFFOLK, SS.
8
9        I, Vincent R. Martino, Shorthand Reporter and
10  Notary Public within and for the Commonwealth of
11  Massachusetts, do hereby Certify;
12       That MARTIN E. CONWAY, the witness whose deposition
13  is hereinbefore set forth, was duly sworn by me and that
14  such deposition is a true record of the testimony given by
15  the said witness to the best of my skill and ability.
16       IN WITNESS WHEREOF, I have hereunto set my hand and
17  Notarial Seal this 30th day of November, 2006.
18
19
20                    Vincent R. Martino
21                    Shorthand Reporter
22
23
24
25
          COPLEY COURT REPORTING - (617) 423-5841
```