# EXHIBIT 1A

## Page 230

VOLUME II - 230

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. NO.: 04-CV-12357-PBS
* * * * * * * * * * * * * *
BRIAN KENNEDY AND MICHELLE )
KENNEDY, Individually and as )
mother and next friend of BRIAN )
KENNEDY, Individually and as )
mother and next friend of BRIAN )
KENNEDY, JR., )
          Plaintiffs, )
                                 )
vs. )
                                 )
TOWN OF BILLERICA, DANIEL C. )
ROSA, JR., Individually and as )
Chief of the Billerica Police )
Department, JOHN BARRETTO, )
Individually and as former )
Chief of the Billerica Police )
Department, PAUL W. MATTHEWS, )
Individually and as former )
Chief of the Billerica Police )
Department, ROBERT LEE, )
Individually and as former )
Deputy Chief of the Billerica )
Police Department, THOMAS )
CONNORS, FRANK A. MACKENZIE, )
RICHARD RHONSTOCK, ROBERT )
BAILEY, JOHN ZARRO, MARK )
TSOUKALAS, TARA CONNORS, MARTIN )
E. CONWAY, ANDREW DEVITO, )
RICHARD HOWE, STEVEN ELMORE, )
WILLIAM MCNULTY, DONALD )
MACEACHERN, MICHAEL A. CASEY, )
RICHARD NESTOR, ROBERT BROWN, )
WILLIAM G. WEST, GREGORY KATZ, )
GERALD B. ROCHE, BRIAN )
MICCICHE, WILLIAM MCNULTY, )
SCOTT PARKER, ALAN MUNN, )
TIMOTHY F. MCKENNA AND JOHN )
DOE, )
          Defendants. )
* * * * * * * * * * * * * *

## Page 231

1  CONTINUED DEPOSITION OF BRIAN G.
2 KENNEDY, a witness called on behalf of the
3 Defendants pursuant to the Federal Rules of
4 Civil Procedure before Jo Anne M. Shields,
5 Professional Shorthand Reporter and Notary
6 Public in and for the Commonwealth of
7 Massachusetts, at the offices of Brody,
8 Hardoon, Perkins & Kesten, LLP, One Exeter
9 Plaza, Boston, Massachusetts, on Monday,
10 January 8, 2007, commencing at 10:38 a.m.
11
12
13
14
15
16
17
18
19
20
21
22
   DUNN & GOUDREAU COURT REPORTING SERVICE, INC
23      One State Street
      Boston, Massachusetts 02109
24      Telephone (617) 742-6900

## Page 232

1 APPEARANCES:
2
   ANDREW M. FISCHER, ESQUIRE
3   JASON & FISCHER
      47 Winter Street, 4th Floor
4   Boston, Massachusetts 02108
      (617) 423-7904
5   For the Plaintiffs
6
   JEREMY SILVERFINE, ESQUIRE
7  KAREN W. PETERS, ESQUIRE
      BRODY, HARDOON, PERKINS & KESTEN, LLP
8   One Exeter Plaza
      Boston, Massachusetts 02116
9   (617) 880-7171
      For the Defendants
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 233

1           INDEX
2 Deposition of:      Direct      Cross
3 BRIAN G. KENNEDY
4   By Mr. Silverfine      234
5
6
7           EXHIBITS
8 No.                    Page
   3 Answers to interrogatories      238
9
   4 Handwritten notes            304
10
   5 Videotape               352
11
   6 Videotape               353
12
   7 Videotape               367
13
   8 Videotape               371
14
   9 Videotape               376
15
   10 Videotape               390
16
17
18      QUESTIONS MARKED AND RESERVED
19 Page 263, line 17
20 Page 266, line 20
21 Page 269, line 14
22 Page 295, line 15
23 Page 296, line 6
24 Page 391, line 20

**Page 234**

1       S T I P U L A T I O N
2       BRIAN G. KENNEDY appears before us today
3   for his deposition.
4       This witness does not at present have
5   adequate documentation attesting to his
6   identity that satisfies the standards
7   required by the Commonwealth of
8   Massachusetts for Notaries Public in
9   administering oaths.
10      The parties in this action therefore
11  stipulate and agree to hold harmless this
12  Notary Public if this witness is later
13  discovered to have falsified his identity.
14      P R O C E E D I N G S
15      MR. SILVERFINE: All right. Here we go.
16  Could we use regular stipulations on this?
17      MR. FISCHER: Whatever Fred agreed to.
18  I--I...
19      MR. SILVERFINE: Okay. All right.
20      DIRECT EXAMINATION
21  BY MR. SILVERFINE:
22  Q. Mr. Kennedy, we're here to continue your
23      deposition, which we last left off on
24      August 31st, 2006. The same ground rules

**Page 235**

1   apply, which are, essentially, you need to
2   allow me to finish my question. Hopefully,
3   I'll allow you to finish your answer so the
4   court stenographer can take down one voice.
5       You need to let me know if you don't
6   understand my question. If, for any reason,
7   after answering a question, you need to talk
8   to your attorney, also please advise me; and
9   we'll allow you time to do so. Now, you
10  understand?
11  A. Yes.
12  Q. Okay. Any questions you have before we
13      resume today?
14  A. No.
15  Q. Okay. All right. Could you just tell us
16      where you live?
17  A. 7 Bridge Street, Billerica.
18  Q. And how long have you lived at 7 Bridge
19      Street?
20  A. September of 2006.
21  Q. Okay. And have you been living there
22      continuously since September 2006?
23  A. Yes.
24  Q. And who do you live there with?

**Page 236**

1   A. Brian, Jr., Mitchell, and my son Dillon.
2   Q. Okay. Where does your wife live?
3   A. 1248 Gorham Street, Lowell.
4   Q. All right. Are you currently separated from
5       her?
6   A. No.
7   Q. Okay. Why isn't it that you're living with
8       her at 1248 Gorham Street in Lowell?
9   A. We're doing it for school purposes.
10  Q. And does Mr. Ashton still live with you?
11  A. Yes.
12  Q. At 7 Bridge Street?
13  A. Yes.
14  Q. And do you own that place?
15  A. No.
16  Q. Who owns the place?
17  A. Donald St. John.
18  Q. All right. And is Donald St. John related
19      to your wife?
20  A. Yes.
21  Q. And what is the relation?
22  A. Brother.
23  Q. Okay. And do you live there full time?
24  A. Yes.

**Page 237**

1   Q. Okay. And the children live there full
2       time?
3   A. Four days a week.
4   Q. I'm going to start off, if I could. You
5       had -- oh, I'm sorry. The court
6       stenographer's reminded me I'm supposed to
7       put you under oath. So if you don't mind,
8       she's going to swear you in. And that's --
9       I apologize.
10                  * * *
11      BRIAN G. KENNEDY, a witness
12  called for examination by counsel for the
13  Defendants, having been duly sworn,
14  testified as follows:
15                  * * *
16  BY MR. SILVERFINE:
17  Q. Okay. And just so the record's clear, what
18      you told us has been under the pains and
19      penalties of perjury per this court
20      affirmation that was just given to you by
21      the steno- -- stenographer, the beginning
22      part of this?
23  A. Okay.
24      MR. FISCHER: He identified himself the

Page 238

1  first deposition. I assume you recognize
2  him.
3      MR. SILVERFINE: And I'm taking
4  counsel's representation that this is Mr.
5  Kennedy. It's the same gentleman who
6  appeared on August 31st, 2006.
7      MR. FISCHER: He has no twin that I'm
8  aware of.
9  Q. Okay. What I'd like to do, first off, is
10  ask you some questions to some inter ogatory
11  answers that you filed in this case. Okay?
12  A. Okay.
13      MR. SILVERFINE: So we're going to mark
14  this as the next exhibit, which is Exhibit
15  3; and I'll give a copy -- a courtesy copy,
16  even though these are yours, to you.
17      (Answers to interrogatories marked as
18      Kennedy Exhibit No. 3.)
19  Q. Mr. Kennedy, showing you what's been marked
20  Exhibit 3, I'd ask you, first, if you go to
21  the last page of Exhibit 3, does that -- is
22  that your signature signed under the pains
23  and penalties of perjury October 5th, 2006?
24  A. Yes.

Page 239

1  Q. Okay. You recognize your signature there?
2  A. Yes. I do.
3  Q. All right. In -- in Exhibit 3, Question 1,
4  you answered, at the bottom of page 1,
5  "December 1991, I sustained injuries from a
6  beating at Concord Shores restaurant." Do
7  you see that, where your answer is?
8  A. Yes.
9  Q. What kind of injuries did you sustain?
10  A. This time, I'm not sure what the injuries
11  were.
12  Q. All right. Do you have some record of these
13  injuries somewhere?
14  A. I might have them. I'm not sure.
15  Q. Okay. You understand we're in the latter
16  stages of a --
17  A. Yes. I know that.
18  Q. -- of a suit that you filed that you've
19  alleged certain things happened. And, to
20  date, you have not produced any records
21  relative to any injuries sustained back in
22  December 1991.
23  A. Okay.
24  Q. I'm just -- is -- is there anywhere else

Page 240

1  that you say you have produced such records?
2      MR. FISCHER: Objection. Do you
3  understand the question?
4  A. Could you say it again?
5  Q. Sure. Is there anywhere that you say in
6  your production of documents you have
7  produced such records of your injuries that
8  you allege in this initial answer?
9      MR. FISCHER: Objection.
10  Q. You have to answer.
11  A. If I have anything, then I'll -- I'll look
12  for it or -- that's all I can say.
13  Q. Okay. And you have no recollection, as you
14  sit here today, what injuries you sustained.
15  Correct?
16  A. No. I don't remember what they were.
17  Q. All right. Let's move on to that bottom
18  paragraph. It says, "On November 17, 2001,
19  I was treated for bruises and wounds." Do
20  you see that?
21  A. Okay. Yes. I see it.
22  Q. Okay. "That occurred on November 9, 2001."
23  Do you see that?
24  A. November 17th, 2001?

Page 241

1  Q. Right.
2  A. Okay.
3  Q. All right. You said, "for an event that
4  occurred on November 9, 2001." Do you see
5  that right below that? Just let me --
6  "November 17th." And, right below, the line
7  below, you said "for injuries occurred on
8  November 9."
9  A. Okay. Yes. I see that.
10  Q. Okay. First of all, what injuries did you
11  receive on November 9, 2001?
12  A. Again, I don't remember the injuries that I
13  received.
14  Q. Okay.
15      MR. FISCHER: Perhaps if you reference
16  the incident as opposed to just a date, it
17  might even help his memory.
18      MR. SILVERFINE: Okay. I'll try.
19  Q. This was an incident, according to your
20  Complaint -- well, as best I can -- because
21  this is your answer; and I don't want to put
22  words in your mouth. This in-- -- this --
23  the answer -- the interrogatory asks for any
24  injuries you suffered from 1991 through

4 (Pages 242 to 245)

Page 242

1  present that relat- -- that relates to your
2  Complaint.
3      And you've answered first,
4  "December 1991." In the second paragraph,
5  you said that you, again, were treated for
6  bruises and wounds sustained in an incident
7  on November 9th, 2001. So I'm asking you
8  what your memory of the -- first of all, the
9  incident of November 9, 2001 is?
10 A. I'm not sure of the -- the incident right
11    now.
12 Q. Okay. You said you "sustained in a beating
13    by police officers on November 9, 2001."
14    Does that refresh your memory at all? And,
15    again, I'm reading from your -- your answers
16    to interrogatories.
17 A. I don't know which beating it was. I -- I
18    don't know what --
19 Q. Okay. Well, you've only -- just so I'm
20    clear -- you've only, in your answers to
21    interrogatories -- and you correct me if I'm
22    mistaken -- have listed three events. The
23    first one was December 1991. The second one
24    was the one we're talking about now. The

Page 243

1  third one is July -- excuse me -- June 11,
2  2003. So I'm asking you about this
3  November 9, 2001 incident.
4      MR. FISCHER: Excuse me. You --
5  objection. He only listed three events in
6  which he sought medical care. That's
7  different than events in which he was
8  beaten.
9  Q. Okay. Do you understand the question?
10 A. Yes. I understand the question. But I
11    don't know what event -- what happened that
12    required me to get medical attention on
13    this -- on this date.
14 Q. Okay. All right. If I -- if I suggested,
15    from your Complaint, that this was an
16    allegation relating to Deann Masone, would
17    that ring a bell?
18 A. Oh. Yes, it would. Yes.
19 Q. Okay. First of all, tell me the details of
20    how you allege you were beaten by police
21    officers on November 9, 2001.
22 A. I'm sorry, but I don't remember being beaten
23    by police officers in 2001.
24 Q. Okay. Again -- and I'm not putting words in

Page 244

1  your mouth, and I'm just asking you for
2  your -- your recollection. And I'm just
3  quoting your answer in Exhibit 3. You
4  said --
5  A. Okay.
6  Q. -- "sustained in a beating by defendant
7     police officers." That's what you wrote.
8     Is that incorrect?
9  A. No. It's correct.
10 Q. Okay. So tell me the details of how you
11    were beaten by police officers.
12 A. Okay. I just remembered the incident. I
13    was coming back from a jail that my wife was
14    in in Framingham, and I was going there to
15    bail her out. And I want- -- when I ar- --
16    arrived there, I was too late to post bail.
17      So when I was on my way back home, I
18    was -- I went through the interactions at my
19    house and was followed by the Billerica
20    police. And there was approximately three
21    cruisers there, I believe.
22      Upon stopping, there was a police
23    officer in front of me and one in back of me
24    in cruisers. And I was pulled out of the

Page 245

1  car from the police officer that was in --
2  in the back of me. And from there, I was
3  just kicked, punched, thrown to the ground
4  by all. I believe it was five police
5  officers from Billerica.
6  Q. What time of day was this?
7  A. It was -- it was at night. Approximately,
8     eleven o'clock maybe.
9  Q. Eleven o'clock at night? Was anyone with
10    you in your car?
11 A. Yes.
12 Q. Who was that?
13 A. The driver was Farkowski.
14 Q. I'm sorry. Who?
15 A. His -- his last name's Farkowski.
16 Q. Okay. And what's his first name?
17 A. David.
18 Q. Okay. Anyone else in the car with you?
19 A. There was Amy Baum and her boyfriend. And I
20    don't recall his -- his name.
21 Q. Okay. So four of you altogether?
22 A. Yes.
23 Q. And what was the intersection you were at
24    when you say the three cruisers pulled up?

Page 246

1   A.   As you went to the -- the mobile home park,
2        you come to a -- an intersection. And there
3        was two cruisers on one side of the
4        intersection and one on the other --
5   Q.   Okay.
6   A.   -- as I went through it.
7   Q.   What's the names of the police officers who
8        did this event, as you describe it?
9   A.   The only one that stands out in my mind was
10       Officers Tsoukalas.
11  Q.   Okay. Who else?
12  A.   The others, I don't recollect their names.
13  Q.   Okay. You've had numerous interventions or
14       interactions, I should say, with Billerica
15       police officers throughout the years. Is it
16       your testimony you don't recall any of the
17       other police officers who allegedly did this
18       to you?
19       MR. FISCHER:   Objection.
20  A.   I do know them. But, at this time, I can't
21       remember the names of them.
22  Q.   Okay. Did you write their names down
23       anywhere?
24  A.   I believe I did. Yeah.

Page 247

1   Q.   Where did you write their names down?
2   A.   I think it's in one of the notes that were
3        forwarded to your office.
4   Q.   Okay. And you're saying, under -- on or
5        about this time would be an indication of
6        the names of all those officers?
7   A.   I believe so. Yes.
8   Q.   And it was written by you?
9   A.   Yes.
10  Q.   Okay. And if it's not there, you don't know
11       who they are?
12  A.   I could probably get them from court
13       records.
14  Q.   But you have no memory as to the other
15       officers?
16  A.   I remember them by face. But, by name right
17       now, at this time, I don't know what their
18       names --
19  Q.   Okay.
20  A.   -- are.
21  Q.   When were you -- you say you were arrested;
22       is that correct?
23  A.   Yes.
24  Q.   And that was for an outstanding warrant you

Page 248

1        had?
2   A.   As -- after -- when I got -- when I was
3        arrested, I -- it was -- they told me it was
4        for a warrant.
5   Q.   Okay. And when were you released from that
6        arrest, if you recall at this time?
7   A.   The arrest happened on a Friday night; and I
8        was released from the Billerica police
9        station at Tuesday, eight o'clock in the
10       morning.
11  Q.   Okay. And did you seek -- or strike that.
12       Did you complain about injuries between the
13       time you were arrested till the time you
14       were released?
15  A.   The -- the injuries were obvious. As far as
16       complaining, there's nothing that would have
17       been done for me. So I just didn't complain
18       about it. I --
19  Q.   All right. So is the answer, you didn't
20       complain about any injuries?
21  A.   No.
22  Q.   Okay. Did you ask for any medical attention
23       between the time you were arrested until the
24       time you were released on that Tuesday?

Page 249

1   A.   No.
2   Q.   Okay. Later on in your interrogatories,
3        you've indicated that you -- or I should
4        say, in this interrogatory -- you indicated
5        that you sought medical attention on
6        November 17th, 2001. Do you see that?
7   A.   Yes. I see it.
8   Q.   Okay. So why was it that you did not seek
9        medical attention until some eight days
10       later between the time of your -- the
11       injuries until the 17th?
12  A.   Could you rephrase that question --
13  Q.   Sure.
14  A.   -- please?
15  Q.   I'm asking you, what was the reason why you
16       did not seek medical attention until
17       November 17th if you allege that you were
18       beaten on November 9th?
19  A.   Again, I'm not sure about that. I really .
20        . .
21  Q.   And exactly -- exactly what did the officers
22       do to you on that day of November 9th in
23       which you say you were beaten? Exactly who
24       did what?

Page 250

1  A.  It was hard to say who did what because I --
2      I was kicked and punched by all of them.
3      They were all trying to hold me down to the
4      ground or do some crazy police tactics on
5      me. I -- I don't know. But it was -- they
6      were all surrounded me. And I -- and I just
7      felt them all kicking me and punching me.
8  Q.  When the car was stopped, did they ask you
9      to exit from the car?
10 A.  No.
11 Q.  What did -- well, how did you get out of the
12     car?
13 A.  The police officer that was from behind me
14     ran up to the dri- -- passenger's side of
15     the car and pulled me out of the car.
16 Q.  Where were you seated?
17 A.  The passenger's side of the car.
18 Q.  The front --
19 A.  Right.
20 Q.  -- front passenger?
21 A.  Yes.
22 Q.  And what was his name, this officer?
23 A.  I -- I don't know his name.
24 Q.  Okay. And what happened after you -- you

Page 251

1      say you were pulled from the car?
2  A.  I was pulled from the car, and I was
3      approached. I was on a hill. So the police
4      car that was in front of me, they were
5      coming towards me as I was out of the car at
6      the bottom of the hill. So I was -- I was
7      met by all the police officers in one spot.
8  Q.  And who did what to you at that point?
9  A.  I was thrown to the ground and kicked and
10     punched.
11 Q.  And what were you doing during this part --
12     this period --
13 A.  I was --
14 Q.  -- of time?
15 A.  -- covering up.
16 Q.  Okay. Anything else?
17 A.  No.
18 Q.  Did you say anything to the officers?
19 A.  Yes.
20 Q.  What did you say?
21 A.  They said, he had something in his hand; he
22     has something in his hand. And they kept
23     repeating that. And I was trying to explain
24     to them it was a cell phone.

Page 252

1  Q.  Okay. What -- and what did you ex- -- when
2      you say -- what did you say?
3  A.  I said, It's my cell phone; it's my cell
4      phone.
5  Q.  Okay. And what happened next?
6  A.  They just kept kicking and punching me.
7  Q.  And, at some point, you were placed under
8      arrest?
9  A.  I was picked up by Officer Tsoukalas on one
10     side of me and another officer on the other
11     side. And I was picked up on -- they picked
12     me up on each side of my arm and threw me
13     into the front of the police cruiser.
14 Q.  Okay. Who was the other officer's name?
15     MR. FISCHER: Objection. Asked and
16     answered. You can answer.
17 A.  I don't recall the name. I don't.
18 Q.  Okay. What happened next?
19 A.  I was handcuffed, and they just had me
20     standing there for a minute.
21 Q.  When you entered the hospital on
22     November 17th, 2001, did you tell them you
23     had sustained your injuries from being
24     beaten by officers?

Page 253

1  A.  I'm not sure.
2  Q.  Do you recall what you said to them?
3  A.  No.
4  Q.  You also, in -- on page 2 of Exhibit 3, in
5      response to the interrogatory, you said, on
6      June 11, 2003, you received treatment at
7      Saints Memorial for injuries suffered to
8      your right ankle. Do you see that?
9  A.  What page was that?
10 Q.  Page 2, top.
11 A.  Excuse me. Yes. I see it.
12 Q.  Okay. When you went to Saints Memorial for
13     treatment of your right ankle as a result of
14     the assault by Mike Mullen, did you tell
15     them that you had been attacked by police
16     that night?
17 A.  No. I hadn't.
18     MR. FISCHER: Objection.
19 Q.  What did you tell them?
20 A.  I told them that I slipped on a stair coming
21     out of the house.
22 Q.  And you did slip on a stair, did you not?
23 A.  I -- I did. Yes.
24 Q.  Okay. Had you filed any Complaint besides

Page 254

1  this lawsuit relative to the June 11,
2  2003 -- the incident as you described with
3  Michael Mullen -- anywhere?  With any police
4  department?  Any agency?
5  A.  No.
6  Q.  And as you sit here today, in your
7    interrogatory, you wrote, "I don't recall
8    any other time when" you "received medical
9    treatment for any injury or illness."  Is
10   there anything different than you answered
11   in this interrogatory at this point, as you
12   sit here today?
13  A.  No.
14  Q.  A few pages over on your answer to
15   Interrogatory No. 5, do you see that?
16   It's -- appears to be, I think, the fifth
17   page.  Do you see that?  Want me to direct
18   you?
19  A.  Page 5 is -- they're not labeled.
20  Q.  Look, if you just count.  In the middle of
21   the page --
22  A.  Sure.
23  Q.  -- on your answer to, "Have you sought
24   treatment of substance abuse from 1991 to

Page 255

1  the present," do you see that?
2  A.  Yes.
3  Q.  For what treatment have you sought for
4    substance abuse?
5  A.  What -- could you rephrase that?
6  Q.  Sure.  For what -- for what substance abuse
7    problem have you sought treatment for that
8    you answered in Answer No. 5?
9  A.  Okay.  This was from the injuries that I
10   sustained on the Mike Mullen incident.
11  Q.  You were being treated at Habitat (sic)
12   Management Institute for injuries you
13   suffered from the incident with Mike Mullen?
14  A.  Yes.
15  Q.  They're a medical facility?
16  A.  No.  Actually, when my ankle was broken,
17   they placed me on painkillers.  And I didn't
18   want to take the painkillers anymore.  So I
19   seek this Habit Management to -- so -- so I
20   didn't have to take the pain medication
21   anymore.
22  Q.  All right.  Did you -- did you develop a
23   problem with substance abuse at some point,
24   even if it's, you say, due to the Mike

Page 256

1  Mullen incident, that you sought treatment
2    for?
3  A.  Yeah.  Well, after, when I was on the
4    medication, I was -- I -- I took too much of
5    the medication.  And I was -- I didn't want
6    to take it anymore.
7  Q.  What medication is that?
8  A.  It was painkillers.
9  Q.  What -- what kind of painkillers?
10  A.  I'm not sure of the name, what -- what they
11   had me on.
12  Q.  Did you have difficulty or problems with
13   OxyContin?
14  A.  No.
15  Q.  How about Percocets?
16  A.  That might have been the name.  Yes.
17  Q.  Okay.  And had you had a substance abuse
18   problem prior to this injury you say you
19   suffered in June 2003?
20  A.  No.  I did not.
21  Q.  All right.  Are you still being treated for
22   substance abuse problems?
23  A.  I -- yes.  I am.
24  Q.  And are you still being treated at the Habit

Page 257

1  Management Institute in Lowell,
2    Massachusetts?
3  A.  Yes.
4  Q.  And whom do you see there?
5  A.  A doctor named Dr. Parson.
6  Q.  What's his first name?
7  A.  Wayne.
8  Q.  And you've been seeing him since what time,
9    what period of time?
10  A.  I want to say, October of 2004, maybe.
11  Q.  All right.  Is this the same institution
12   that your wife is also being treated for a
13   substance abuse?
14  A.  Yes.
15  Q.  Did you go there at the same time together,
16   October 2004?
17  A.  Yes.
18  Q.  And what -- what is -- what substance abuse
19   issue does she suffer from?
20  A.  That, I'm not sure.  You might want to take
21   that up with her.  Her -- ask her.
22  Q.  Well, I'm asking you.  You don't -- you're
23   saying you don't --
24  A.  I don't recall.

8 (Pages 258 to 261)

Page 258

1  Q. -- you don't know what -- you're saying you
2      don't know what substance abuse issue your
3      wife is suffering --
4  A. Yes.
5  Q. -- from?
6  A. She's my wife.  Yes.
7  Q. Okay.  Do you travel there together?
8  A. Yes.
9  Q. And you travel back together?
10 A. Yes.
11 Q. And so it's your testimony here under oath
12     that you don't know what substance abuse
13     issues she's having that she needs treatment
14     at the Habit Management Institute?
15 A. Yes.
16 Q. Okay.  And what are they doing for you
17     there?
18 A. I receive a -- a dose of medication.
19 Q. Okay.  What kind of medication?
20 A. Methadone.
21 Q. All right.  How long have you been on
22     methadone?
23 A. October 2004.
24 Q. All right.  And what's the kind of

Page 259

1      medication -- what's the dosage that you
2      take that you're --
3  A. I'm on a very low dose.  It's 25 milligrams.
4  Q. Per day?
5  A. Yes.
6  Q. Okay.  And do you have regular re- --
7      reporting requirements?
8  A. Yes.  I go to a class once a week.
9  Q. Okay.  And where is that held?
10 A. The same address as where I receive the
11     medication.
12 Q. All right.  And is that classes on the
13     dangers of narcotics and things of that
14     nature or substance abuse issues?
15 A. Basically, on, yes, problems with any -- any
16     of -- any things that you might have.
17 Q. Okay.  Have you -- have you fallen off the
18     wagon, so to speak, between the time of
19     October 2004 to present?
20 A. No.  I have not.
21 Q. Are you taking other medication besides
22     methadone presently?
23 A. No, sir.
24 Q. Okay.  Have you used narcotics during this

Page 260

1      period of time?
2  A. No.
3  Q. Have you ever used narcotic substances prior
4      to October 2004 besides what's been
5      prescribed by any physician?
6  A. Only if I -- only if I was prescribed it by
7      a physician for maybe, say, a -- a tooth
8      pulled or -- or something like that that I
9      really needed it for the pain or -- so to
10     speak -- or of any kind of antibiotics, no,
11     I haven't.
12 Q. In some of the records that you've produced
13     through counsel, there's indications you've
14     gone to an emergency room several times for
15     pain relative to your teeth.  Do you recall
16     that?
17 A. Yes.
18 Q. Okay.  Why is it you go to the emergency
19     room rather than a -- a dentist?
20 A. Sometimes, it's money issues.
21 Q. When you say "money issues," what do you
22     mean by that?
23 A. Well, I, sometime- -- a couple of times, I
24     couldn't afford to have my teeth fixed.  And

Page 261

1      I would ge- -- go to the hospital for
2      antibiotics and anything else they might
3      prescribe for me for my tooth.  And,
4      hopefully, it would -- it would go away in
5      time until I had enough money to fix my
6      tooth.
7  Q. All right.  And did that include also
8      getting pain medication from the hospital,
9      like Percocets?
10 A. Like I said, whatever the doctor would
11     prescribe at the time of the -- when I saw
12     him, whatever it might have been.
13 Q. Right.  And some of the records you, again,
14     produced indicate you had gotten Percocets
15     and other pain medication.  Right?
16 A. Then that would be it.  Yes.
17 Q. All right.  And is that part of the reason
18     what led you to sign up for the Habitat
19     (sic) Institute?  I'm sorry.  Not the
20     Habitat, the Habit -- Habit Management
21     Institute.
22 A. No.  It's not.
23 Q. It's not?
24 A. No.

Page 262

1   Q.  Okay. The only -- the -- well, tell me what
2       the on- -- the reason you signed up for the
3       Habit Management Institute.
4   A.  Well, I was laid up with a broken ankle that
5       they have plates and titanium screws and --
6       in my ankle, holding my bones together. And
7       I was laid up for quite a while. And I was
8       taking the pain medication. I didn't --
9       it's -- I didn't want to take the medication
10      anymore. It's an opiate. So I didn't want
11      to take it anymore.
12         And I found myself, when -- when a
13      problem would happen with the police or my
14      wife got followed by the police or anything
15      might happen in -- in that aspect, I would
16      take another pain medication; and it would
17      help me deal with it. And I didn't want to
18      do that anymore. So I -- nobody signed me
19      up for this place. I did it on my own.
20  Q.  And when you say you did it on your -- you
21      did it with your -- the same time with your
22      wife. Correct?
23  A.  Yes. I did it with her. Yes.
24  Q.  All right. And it's your testimony you

Page 263

1       don't know what your wife has difficulty
2       with in terms of substance abuse?
3   A.  No.
4   Q.  And, to your knowledge, has your wife ever
5       used narcotics?
6   A.  No.
7   Q.  Is she presently on methadone?
8   A.  Yes.
9   Q.  And has she been on methadone at the same
10      time you've been on, since October 2004?
11  A.  Yes.
12  Q.  Did she go on earlier? Or is that -- was
13      that the time period you both went on?
14  A.  The time period we both went on. Yes.
15  Q.  Your employment status presently is what?
16  A.  I'm working.
17  Q.  Okay. Where are you working presently?
18         MR. FISCHER: We folks spoke about this.
19      Mr. -- Mr. Kennedy doesn't want to disclose
20      the location or -- or name of his employer
21      for fear of further harassment.
22  Q.  Okay. I guess the question is, are you
23      refusing to answer that question?
24         MR. FISCHER: He's not going to answer

Page 264

1       that question.
2          MR. SILVERFINE: Okay. So I need to --
3          MR. FISCHER: -- subject to an
4       appropriate protective order.
5          MR. SILVERFINE: I thought we were
6       already in a protective order. I'm going to
7       reserve and not close the deposition today.
8       And just note, that particular question, I'd
9       like to reserve on that.
10  Q.  All right. So Mr. Kennedy, you are going to
11      refuse to -- just so I understand it -- on
12      the advice of counsel, refuse to answer any
13      questions that relate to your employ- --
14      your current employment status?
15  A.  Yes.
16  Q.  All right. Including where you're working,
17      how much you're making --
18  A.  Yes.
19  Q.  -- who you work with?
20         MR. FISCHER: I -- I think you can
21      answer how much you're making, what you're
22      doing --
23         THE WITNESS: Oh, okay.
24         MR. FISCHER: -- and --

Page 265

1          THE WITNESS: Okay. But just the
2       identity and location.
3          MR. SILVERFINE: All right. And, again,
4       I'm reserving on that.
5   Q.  What -- what kind of work are you doing
6       presently?
7   A.  It's -- I'm involved in building.
8   Q.  Okay. And are you running -- are you
9       running your own company, or are you working
10      for someone?
11  A.  I'm working for somebody.
12  Q.  Okay. And you're refusing to give us the
13      name of the person you work for?
14  A.  Yes.
15  Q.  All right. Are you working full time?
16  A.  Yes.
17  Q.  All right. And how much are you earning
18      presently?
19  A.  Starting pay is $25 an hour.
20  Q.  Okay. And how long have you been working
21      at -- at this particular position?
22  A.  A little -- about two weeks.
23  Q.  Two weeks. Okay. Prior to the two -- this
24      is two weeks from this point in time right

Page 266

1   here?
2   A.  Yes.
3   Q.  Okay.  Prior to the two weeks ago, were you
4       working then?
5   A.  Part time.
6   Q.  Okay.  And who were you working for part
7       time at that point?
8   A.  The same person.
9   Q.  All right.  And why is it that your job
10      status changed two weeks ago?
11  A.  He received more work, and I -- he can use
12      me full time now.
13  Q.  All right.  From August 31, 2006 up until
14      two weeks ago, were you working for the same
15      person?
16  A.  Could you say that again?
17  Q.  Sure.  The last time we were here was
18      August 31st --
19  A.  Okay.
20  Q.  -- 2006.  And I'm asking you, since that
21      time up until two weeks ago, were you
22      working for that same person?
23      MR. FISCHER:  I'm not sure he can answer
24      that question without disclosing where he's

Page 267

1   working.
2   Q.  All right.  You're refusing to answer that
3       as well?
4       MR. FISCHER:  And -- and if you recall,
5       we've made a -- your associate, Mr. Kesten,
6       has asked that we bring to your attention
7       complaints.  We have brought to your
8       attention complaints regarding several of
9       the defendants, including the chief of the
10      Department, driving by the work site.
11      MR. SILVERFINE:  Okay.  So -- so besides
12      making a --
13      MR. FISCHER:  And -- and --
14      MR. SILVERFINE:  -- a speech, Andrew --
15      MR. FISCHER:  And we -- no.  No.  I
16      think this is --
17      MR. SILVERFINE:  No.  I think --
18      MR. FISCHER:  -- relevant to the record.
19      MR. SILVERFINE:  No.  I think it's --
20      MR. FISCHER:  And -- and to this, as
21      with other issues of harassment that
22      we've -- that -- that defense counsel has
23      asked that we bring to the -- to your
24      attention, there's been no adequate

Page 268

1   response; in fact, no response at all.
2       MR. SILVERFINE:  Well, I think that's,
3       No. 1, false.  As you know, we've responded
4       to each of the -- each of your claims in
5       writing either through mail or e-mail, each
6       of your responses.  That's No. 1.
7       No. 2 is -- for the record, so I can
8       make the record clear -- is he refusing, on
9       advice of counsel, to answer the question?
10      So I can make a record.
11      MR. FISCHER:  Do you want to confer with
12      counsel about that?
13      THE WITNESS:  Yes.
14      MR. SILVERFINE:  Okay.  Why don't you
15      step out, and we'll give you a couple of
16      minutes.
17      (Brief recess taken.)
18  BY MR. SILVERFINE:
19      MR. FISCHER:  I'm instructing the
20      witness to not -- that he not answer the --
21      this question on the same basis as -- as the
22      prior questions.
23      MR. SILVERFINE:  Okay.  We'll just mark
24      that as well and reserve.  All right.

Page 269

1       Mr. Fischer, do you want additional time to
2       talk to your client?
3       MR. FISCHER:  No.
4       MR. SILVERFINE:  Because, as you know,
5       you can't instruct the client or coach the
6       client.  If you want more time --
7       MR. FISCHER:  We're fine.  Go ahead.
8       MR. SILVERFINE:  -- I'll be happy to do
9       it.  But I -- I think coaching is improper.
10  Q.  Just so we're clear, so you're going to
11      take -- you're taking an attorney's advice
12      not to answer that question; is that right?
13  A.  Yes.  I am.
14  Q.  Okay.  Let me ask you this a different way.
15      Are there any other employers that you've
16      worked for since the last time you were here
17      taking your deposition until today?
18      MR. FISCHER:  I'm going to instruct you
19      not to answer that question either.
20  Q.  Okay.  And, Mr. Kennedy, just so the
21      record's clear, you are taking advice of
22      counsel not to answer that question?
23  A.  Yes.  I am.
24      MR. SILVERFINE:  Okay.  Again, we'll

Page 270

1    reserve on that appropriately.
2  Q.  Besides, you said, Percocet, are there any
3      other drugs that you have had problems with
4      over the last few years?
5      MR. FISCHER: Objection. Asked and
6  answered.
7  Q.  You can answer.
8  A.  No.
9  Q.  Okay. I didn't ask you this earlier. But
10     just to make the record clear, is there
11     anything you reviewed in preparation for
12     your dep- -- this continued deposition
13     today?
14  A.  I never had a chance to review my copy.
15  Q.  Okay. You'll have to take that up with
16     counsel. I'm just ask- -- the only
17     question --
18  A.  No.
19  Q.  -- the only question I asked was, just so
20     it's clear, is, did you read or do anything
21     in preparation besides talking to Mr.
22     Fischer? I'm not asking for your
23     conversation with Mr. Fischer. Did you do
24     anything in preparation for today? That's

Page 271

1      my question.
2  A.  No. I did not.
3  Q.  Okay. You can take it up with your counsel
4      as to whatever -- your transcript.
5  A.  Okay.
6  Q.  Okay? Since August -- well, strike that.
7      Let me start it dif- -- different. In your
8      documents that you presented to us, there's
9      indication that you've been on welfare a
10     number of times during the per- -- the
11     pendency of this Complaint, the allegations.
12     Are you -- you aware of that?
13  A.  Yes.
14  Q.  Okay. How many times have you and your
15     family been on welfare?
16  A.  When I broke my ankle in 2003, I went on
17     welfare.
18  Q.  Okay. How long a period of time did you go
19     on welfare for?
20  A.  Until I recovered. I don't -- I'm not sure
21     of the dates. I'm sorry.
22  Q.  Give me your best estimate in terms of when
23     you got off welfare.
24  A.  I'm sorry. But I don't know any date.

Page 272

1  Q.  Could you tell me when you returned to work?
2  A.  I'm not sure of the date. I'm sorry.
3  Q.  Okay. At a certain point after, you had
4      gone off welfare and returned to work.
5      Correct? You went to work in --
6  A.  Yes.
7  Q.  -- the summer --
8  A.  Yes.
9  Q.  -- for who you're --
10  A.  Yes.
11  Q.  -- respectfully declining to answer. When
12     did you go off welfare and begin to work
13     again this last part -- portion?
14  A.  I'm not sure of the date. I'm sorry.
15  Q.  All right. Prior to the time you broke your
16     ankle in June of 2003, had you been on
17     welfare prior to that?
18  A.  No.
19  Q.  All right. Your testimony today, just so
20     I'm clear, is, prior to June 2003, you and
21     your family had never been on welfare prior
22     to June 2003?
23  A.  Not that I can remember, no.
24  Q.  Okay. At any point in time, it's -- your

Page 273

1      testimony is, you've never been on welfare?
2  A.  That I can remember, no.
3  Q.  Have you --
4      THE WITNESS: Do you want to talk to --
5  Q.  Feel free. If you need to speak, that's
6      what he's here for.
7  A.  I'm sorry. I just --
8  Q.  No, no.
9  A.  I just --
10     MR. FISCHER: Let's go outside for a
11  second.
12     MR. SILVERFINE: Go ahead. Talk to him.
13     (Brief recess taken.)
14  BY MR. SILVERFINE:
15     MR. FISCHER: What Mr. Kennedy indicated
16  to me was that he recalled some further
17  information and wants to correct the answer
18  to the last question.
19     MR. SILVERFINE: Okay.
20  Q.  Mr. Kennedy --
21     MR. FISCHER: He wasn't sure how to do
22  it, and that's why he asked me.
23     MR. SILVERFINE: Fair enough.
24  Q.  Mr. Kennedy, having spoken to Mr. Fischer

Page 274

1    for a moment, returned, would you like to
2    correct the last answer?
3  A.  Yes. Yes, I do.
4  Q.  Okay. Why don't you tell us what
5    information you want to correct.
6  A.  Okay. You asked -- you asked if I was -- my
7    family ever was on assistance.
8  Q.  Correct.
9  A.  And there was another time that I recall.
10    When I was incarcerated, my wife went on
11    assistance.
12  Q.  Okay. What period of time was that?
13  A.  The date that -- the time that I was
14    incarcerated, I'm try- -- I'm not sure of
15    the date exactly.
16  Q.  Okay. How long a period of time was that?
17  A.  A little over three months.
18  Q.  Okay. Any other time that you can recall
19    your family was on --
20  A.  No.
21  Q.  -- assistance or welfare?
22  A.  No.
23  Q.  Okay. Since August 31st, 2006, have you
24    spoken to Tracy Heffernan?

Page 275

1  A.  What was the date?
2      MR. FISCHER:  I'm sorry.
3  Q.  Since the last time we were here,
4    referencing your last deposition. Do you
5    recall that?
6  A.  Yes.
7  Q.  Okay. Have you spoken to Tracy Heffernan?
8  A.  No.
9  Q.  Okay. Has your wife spoken to Tracy
10    Heffernan?
11  A.  I'm not sure.
12  Q.  Okay. So is it your testimony that, even
13    right after the deposition on August 31st,
14    2006, you did not speak to Tracy Heffernan?
15  A.  No. I did not.
16  Q.  Okay. And your wife did not speak to Tracy
17    Heffernan since that time?
18  A.  I'm not sure if she did or not. If she did,
19    she didn't tell me.
20  Q.  I'm just trying to ask some follow-up
21    questions from our last deposition. And can
22    you tell us if there are any police officers
23    that either work currently at Billerica or
24    in the past that worked at Billerica who

Page 276

1    have told you that there is some type of
2    conspiracy to get you and your wife,
3    Michelle Kennedy?
4  A.  Yeah. There was one police officer that
5    told me. Yes.
6  Q.  Okay. Who was that?
7  A.  Michelle Farrington.
8  Q.  I'm sorry. Michelle?
9  A.  Farrington.
10  Q.  Farrington?
11  A.  Yes.
12  Q.  How do you spell that?
13  A.  I'm not sure of the spelling.
14  Q.  Okay. When did she tell you that?
15  A.  It would have to have been in 2003 sometime.
16  Q.  Okay. And what did she say?
17  A.  There was a place where the Billerica police
18    gather after work. It's in back of the
19    police station, a spot back there by the ice
20    rink. And she said they gathered there.
21    And she just told me that some of the things
22    they say are unbelievable. And she -- she
23    didn't elaborate on the -- on the -- on what
24    they said. But . . .

Page 277

1  Q.  Okay. Well, tell us exactly what she told
2    you.
3  A.  I'm not exactly sure what she exactly told
4    me. But she did tell me that they talked
5    about me in -- in different ways that
6    weren't good.
7  Q.  Okay.
8  A.  I'm just not sure of the exact words.
9  Q.  If I suggested that this officer's name was
10    Michelle Farren, would that . . .
11  A.  That -- that might be the --
12  Q.  Is that the name?
13  A.  That might be it, the last name.
14  Q.  Okay. What's the -- what's your
15    relationship with Michelle Farren?
16  A.  I -- there's no relationship.
17  Q.  How is it you got to talking to Michelle
18    Farren about other Billerica police
19    officers' atti- -- attitude towards you?
20  A.  She was in the trailer park, mobile home
21    park, one day; and I was walking down the
22    street. And she just happened to pull over
23    and -- and -- and have small talk with me.
24  Q.  Okay. And she just mentioned that Billerica

Page 278

1    police officers do what or say what about
2    you?
3  A.  Say not pleasant things.  I -- I'm not sure
4    exactly the things that they said, but they
5    weren't pleasant.
6  Q.  All right.  When you say -- I'm -- I'm --
7    I'm just asking you for your memory of what
8    she said.  In other words, do they say
9    you're a criminal?  Do the -- what do they
10   say about you?
11 A.  Again, I'm not sure of the exact wording.
12 Q.  All right.  And -- and this to- -- this
13   conversation took place where?
14 A.  The mobile home park.
15 Q.  And when did it take place?
16 A.  I believe it was around 2003.
17 Q.  What month?
18 A.  It was in the summertime.  It was warm.
19 Q.  Who else was present?
20 A.  Myself.
21 Q.  Okay.  And besides these general things
22   about yourself, anything else you can recall
23   about the conversation?
24 A.  She didn't think it was right that they

Page 279

1    would be saying, you know, things like that.
2    But that was it.
3  Q.  Okay.  Any other officer that you're aware
4    of?
5  A.  No.
6  Q.  Okay.  We had talked a moment ago about the
7    Deann Masone incident.  Do you remember
8    that?  We just -- we just talked about
9    you -- talked about the injuries you said
10   occurred because of that.
11 A.  Yes.
12 Q.  All right.  I asked you some questions at
13   the last deposition.  I'm just going to
14   follow up with a couple more so I can be
15   clear on it.  Did you see anyone with either
16   baseball bats or pipes that night?
17 A.  No.  I did not.
18 Q.  Okay.
19       MR. FISCHER:  Objection.  Objection.  By
20   what night?
21 Q.  The night of November 9th, 2001, the
22   incident alleged in your paragraph, I think
23   it's 57 or so; 59, thereabouts.  At no time,
24   even when you came out -- you told us you

Page 280

1    came out at one point to tell the police.
2    Do you remember this?
3  A.  Yes.
4  Q.  Okay.  Did you see any baseball bats or
5    pipes at all that night?
6  A.  No.
7  Q.  All right.  Did you yourself have a baseball
8    bat or a pipe in your hand at any point that
9    night?
10 A.  No.  I did not.
11 Q.  All right.  Did you strike anyone with a
12   pipe or anything with a pipe or a baseball
13   bat?
14 A.  No.
15 Q.  All right.  Did you strike anyone with
16   anything at all that night, including your
17   hands?
18 A.  No.
19 Q.  Did you see anyone else strike somebody else
20   with a pipe, baseball bat, or any other
21   object?
22 A.  No.
23 Q.  And when was the first time you noticed
24   glass in your front yard in around the

Page 281

1    street?
2  A.  I didn't notice glass.
3  Q.  You never noticed glass?
4  A.  No.
5  Q.  So just so I'm clear, when you came out, you
6    say, of your trailer, you said you were
7    talking to the police.  You didn't see any
8    glass.  You didn't notice any glass at all?
9  A.  No.  I did not.
10 Q.  How about when you came out the next
11   morning?
12 A.  No.  I didn't.
13 Q.  You didn't notice any glass at all in the --
14   whether it be in the yard -- your yard -- or
15   the street right in front of you?
16 A.  When I exited my mobile home, there wasn't
17   any glass.  I didn't see any.  No.
18 Q.  Okay.  When you had mentioned earlier about
19   Amy Baum being in the car with you right
20   after the November 9th, 2001 incident when
21   the police took you, you say, out of the
22   car, do you remember that?
23 A.  Yes.
24 Q.  Okay.  Was she living with you and Michelle

14 (Pages 282 to 285)

**Page 282**

1   at the time?
2   A.  No.
3   Q.  Where was she living at the time?
4   A.  I don't -- I'm not sure of her address.
5   Q.  All right.  What period of time was she
6     living with you and Michelle in the trailer
7     park?
8   A.  I'm sorry.  But I don't know the dates.
9   Q.  All right.  You remember she did live with
10    you for a period of time?
11  A.  Yes.
12  Q.  Okay.  How long a period of time did she
13    live with you?
14  A.  A short period.
15  Q.  When you say "short," was it weeks?  Was it
16    months?
17  A.  I would be guessing.  A couple of months.
18  Q.  And were there different periods of time
19    where she lived with you?  Like, she lived
20    with you for a couple of months here, then a
21    couple of months later?
22  A.  I believe it was only one time.
23  Q.  Okay.  Did you see -- do you know Lou
24    Cimino?

**Page 283**

1   A.  Yes.
2   Q.  Did you see Lou Cimino get run over by Deann
3     Masone that night?
4   A.  No.
5   Q.  At any point in time, did you command the
6     two Dobermans you had to go after anyone
7     that night?
8   A.  No.
9   Q.  Did you command your two Dobermans to go
10    after Deann Masone that night?
11  A.  No.  I did not.
12  Q.  Again, I'm not meaning to -- I'm just
13    jumping -- I'm not -- I'm jumping around not
14    to confuse you.
15  A.  I understand.
16  Q.  But I -- so if there's anything I ask you
17    you're confused, please let me know.  Did
18    Amy Baum, during this period of time,
19    provide money towards getting Michelle
20    Kennedy bailed during this incident of
21    November 9th, 2001?
22  A.  I don't believe so.
23  Q.  Okay.  Did she provide, either to you
24    directly, through your lawyer, through

**Page 284**

1   Michelle, $520.00 toward Michelle's bail
2     during that period of time?
3   A.  I don't think so.  No.
4   Q.  Okay.  Just give me a second.  Just
5     returning to the Exhibit 3, which is in
6     front of you, and I just have a couple of
7     questions on your answers to
8     interrogatories; just give me a second now.
9     On page 2, where you talk about the June 11,
10    2003 Mike Mullen incident, do you know
11    any -- of a relationship between Michael
12    Mullen and Mark Tsoukalas?
13  A.  I -- I don't know if there was any
14    relationship with them.
15  Q.  Okay.  Have you learned of any relationship
16    between them?
17  A.  Just as what he said.  He . . .
18  Q.  And exactly what did he say?
19  A.  He -- he said to me something as to this --
20    still messing with my buddy, Tsouk,
21    something to that aspect.  He was under the
22    influence of alcohol.
23  Q.  And how do you know that?
24  A.  I -- just by the way he was talking and his

**Page 285**

1   appearance.
2   Q.  Okay.  And what about his appearance led you
3     to that opinion?
4   A.  I just -- he just appeared to be drinking.
5   Q.  Okay.  Were you drinking with him?
6   A.  No.  I was not.
7   Q.  All right.  Michael Mullen had been a friend
8     of yours up until this time?
9   A.  No.  He has not.
10  Q.  Well, how did you know Michael Mullen?
11  A.  I don't know Mike Mullen.
12  Q.  All right.  Well, how did you learn his
13    name?
14  A.  I'm not sure how I came about his name.
15  Q.  Okay.  As a result of this interaction, you
16    say you -- you slipped down the steps and
17    fractured your ankle.  Correct?
18  A.  Well, actually -- actually, what -- after --
19    after the -- excuse me -- after the attack
20    happened, I -- I got a chance to take my
21    shoe off; and it was obvious that my ankle
22    was -- was swollen.  As I tried to exit the
23    house, I did slip down, you know, a stair
24    and . . .

Page 286

1  Q.  All right. So your testimony is, you took
2      your -- your shoe off before you went down
3      the steps?
4  A.  Yes.
5  Q.  So before you went down the steps, you took
6      your shoe off to look at your ankle?
7  A.  Yes.
8  Q.  And Mike Mullen's still there?
9  A.  No.
10 Q.  Mike Mullen left.
11 A.  Yes.
12 Q.  And why did Mike Mullen leave?
13 A.  I --
14      MR. FISCHER: Objection.
15 A.  -- don't know.
16 Q.  Okay. Who else was there with you when Mike
17      Mullen was having this conversation with
18      you?
19 A.  I believe Danny Donlan was there.
20 Q.  Okay. And Danny Donlan's a friend of yours?
21 A.  No. He's not.
22 Q.  All right. How do you know Danny Donlan?
23 A.  He's an associate.
24 Q.  He's an associate?

Page 287

1  A.  Yes.
2  Q.  He works with you?
3  A.  No. I just know him from -- he's not a
4      friend, but I know who he is.
5  Q.  What -- what do you mean by "associate"?
6  A.  Well, I'm just associated him, just -- I'm
7      not sure what I meant by that. But I
8      just -- I -- I don't know him as a -- I'm
9      not that friendly with him, but I know who
10     he is.
11 Q.  Well, how do you know who he is?
12 A.  I just know him from being around.
13 Q.  Well, who did you go to -- who did you go to
14     New Hampshire to see when you -- when you
15     ran into Michael Mullen?
16 A.  Danny Donlan.
17 Q.  So you went there for the specific purpose
18     of visiting with your associate?
19 A.  Well, I --
20     MR. FISCHER: Objection.
21 A.  -- I went there to drop off a set of keys.
22 Q.  And that was Danny Donlan's keys?
23 A.  Yes.
24 Q.  So you went there purposely to hand him back

Page 288

1      keys?
2  A.  Yes.
3  Q.  And you had worked for him back then?
4  A.  Yes. I did a couple of jobs for him.
5  Q.  Right. And you were returning the keys to
6      one of these jobs?
7  A.  Yes.
8  Q.  All right. And that's when you got into
9      this discussion with Michael Mullen?
10 A.  Yes.
11 Q.  And who else was present besides Danny
12     Donlan, Michael Mullen, and yourself?
13 A.  There was another person, but I'm not sure
14     who it was.
15 Q.  What's that person's name?
16 A.  I don't know.
17 Q.  And when did you go to the hospital relative
18     to your right ankle that was involved in
19     this Michael Mullen incident?
20 A.  Right after the incident.
21 Q.  That same day?
22 A.  Yes.
23 Q.  Okay. And did you tell the people at the
24     hospital about this fight you got into with

Page 289

1      Michael Mullen?
2  A.  No. I did not.
3  Q.  Any reason?
4  A.  Yes.
5  Q.  Why?
6  A.  I was afraid to -- to report it.
7  Q.  Afraid to report that you got beaten up by
8      Michael Mullen?
9  A.  Yes.
10 Q.  And why is that?
11 A.  Well, in the past, I've always -- anything
12     that ever happened to me always got turned
13     around; and I ended up getting char- --
14     charged for it, even trying to defend
15     myself.
16 Q.  Did you hit Michael Mullen?
17 A.  No.
18 Q.  Did Michael Mullen take charges against you?
19 A.  No.
20 Q.  Did Danny Donlan?
21 A.  No.
22 Q.  And did you ever see Michael Mullen again?
23 A.  No.
24 Q.  How about Danny Donlan?

16 (Pages 290 to 293)

Page 290

1  A.  No.
2  Q.  But he's a friend/associate of yours?  Danny
3      Donlan?
4          MR. FISCHER:  Objection.
5  A.  He's not a friend of mine.
6  Q.  Where does Danny Donlan live?
7  A.  I'm not sure.
8  Q.  How about Michael Mullen?
9  A.  I have no idea.
10 Q.  In the interrogatories, again, on the same
11     page as Answer No. 5, right above it, the
12     paragraph, do you -- do you see where it
13     says, "In addition" at the top?  Here, I'll
14     point it out.  If you want to just slide it
15     over, I'll help you find it.
16         MR. FISCHER:  I can give it to him.
17         MR. SILVERFINE:  Okay.
18 Q.  You see that?
19 A.  Yes.
20 Q.  And this was a question asking you for, "As
21     a result of your injuries, what" -- I'm
22     sorry -- "On each and every occasion that
23     you notified, you sent notice."  In the last
24     one, you wrote something to the effect of,

Page 291

1      "There was an incident in either 2004 or
2      2005 when my son Dillon called the town
3      manager to report that Defendant Brown had
4      broken into their home and was going through
5      the rooms of our house."  Do you see that?
6  A.  Yes.
7  Q.  Okay.  Are you referring to an officer named
8      Brown?
9  A.  There is an Officer Brown.  Yes.
10 Q.  Okay.  And what allegation are you making
11     about Officer Brown breaking into whose
12     home?
13 A.  I don't recall this incident.  I -- I do
14     recall Officer Brown entering a house that
15     was on 7 Bridge Street.
16 Q.  Okay.
17 A.  But I don't know -- I don't recall if my son
18     Dillon called the town manager.
19 Q.  Okay.  Do you -- do you -- are you -- it
20     says here in your in-- answers to
21     interrogatories, "Brown had broken into
22     their home."  Whose home are you referring
23     to?
24 A.  I don't -- I don't -- I honestly don't

Page 292

1      remember this incident.
2  Q.  Okay.  And you don't remember this incident
3      at all?
4  A.  Well, I do remember Officer Brown walking
5      into a -- a house on 7 Bridge Street
6      without -- without knocking or anything.  He
7      just walked into my house.  But I don't
8      remember -- I don't remember my son Dillon
9      calling the town manager or -- or anything
10     like that.
11 Q.  All right.  So when you say "broken into
12     their home," are you referring to your home
13     or somebody else's home?
14 A.  Well, if this is -- it happened on 7 Bridge
15     Street, that would have been owned by Donald
16     St. John.
17 Q.  Okay.  Well, I'm asking you; 'cause this
18     is -- I'm reading what you wrote here.  You
19     tell --
20 A.  I --
21 Q.  -- me.
22 A.  I didn't write this.
23 Q.  Well, you signed this under the pains and
24     penalties of perjury on October 5, 2006, did

Page 293

1      you not, sir?
2  A.  Yes.  I did.
3  Q.  Okay.  So you -- you've -- you've indicated
4      that this is truthful and accurate.  And I'm
5      asking you what you mean by this -- this
6      line in here.  And I'm asking you exactly
7      what you mean by "Defendant Brown had broken
8      into their home."  Is that not accurate?
9  A.  The only incident I remember Officer Brown
10     was, he walked into my house on 2 -- on 7
11     Bridge Street.  That's all I remember about
12     that incident.
13 Q.  And what date was this incident that you say
14     Officer Brown was involved in?
15 A.  The date, I'm not sure of the date.  But it
16     was -- it was in 2005.
17 Q.  What did he do?
18 A.  He walked right into my house unannounced,
19     walked right -- right into my house into the
20     sta-- looking through the rooms.  He went
21     upstairs into the -- I -- I got up.  And I
22     says, What are you doing?  And he -- and he
23     ended up walking out of the house.
24 Q.  And that was the entire conversation you had

Page 294

1      with Officer Brown?
2  A.  That I remember, yes.
3  Q.  Now, at some point in time, were you evicted
4      from the trailer park that you were living
5      in in Leicester Street in Billerica?
6  A.  I owned two mobile homes on Leicester in
7      Billerica. Which one are you referring to?
8  Q.  Well, either one. Were you evicted from
9      either Mobile Homes 129 and 163, I think are
10     the numbers?
11 A.  Yes. The first one was 129.
12 Q.  Okay. Were you evicted from that place?
13 A.  Evicted, yes.
14 Q.  Okay. And when were you evicted?
15 A.  I'm not sure of the date.
16 Q.  All right. And did you move somewhere as a
17     result of being evicted from 129 Leicester
18     Street?
19 A.  Yes. I paid the back rent on the mobile
20     home, and I moved next door to 162
21     Leicester.
22 Q.  All right. And the reasons for being
23     evicted were for nonpayment of rent?
24 A.  I believe so. Yes.

Page 295

1  Q.  All right. I thought you just said you
2      owned the trailer?
3  A.  Yes. I ow- -- I own the -- we own the
4      mobile home, but there is a -- a land fee.
5      And when I was incarcerated, I got behind on
6      that land fee. It's a lot fee.
7  Q.  Okay. Were you evicted from 163 as well?
8  A.  No.
9  Q.  Okay. You left 163?
10 A.  Yes.
11 Q.  All right. Any other reasons why you were
12     evicted besides nonpayment of rent? Or did
13     I --
14 A.  No.
15 Q.  Okay. At any point in time, have you dealt
16     coke yourself?
17 A.  Excuse me?
18 Q.  At any point in time, have you dealt coke?
19     MR. FISCHER: Objection. I'm going to
20  instruct him not to answer that question.
21     MR. SILVERFINE: Okay. Just reserve on
22  that as well.
23     MR. FISCHER: He has a right under the
24  Fifth Amendment not to incriminate himself.

Page 296

1      MR. SILVERFINE: Well, that may be true;
2  and it may not be true.
3  Q.  But are you -- you're refusing to answer
4      that question on the advice of counsel?
5  A.  Yes.
6  Q.  Okay. And, likewise, at any point in time,
7      have you dealt coke with Michelle Kennedy?
8  A.  No.
9      MR. FISCHER: The same -- the same --
10  I'm going to instruct you not to answer --
11     MR. SILVERFINE: All right.
12     MR. FISCHER: -- for the same reason.
13     MR. SILVERFINE: The same reservation.
14     MR. FISCHER: Well, he's already
15  answered. So it's too late.
16 Q.  Have you ever --
17     MR. FISCHER: His answer was no.
18     MR. SILVERFINE: Okay. So you're
19  withdrawing your --
20     MR. FISCHER: No. He answered before I
21  could make the objection.
22     MR. SILVERFINE: All right. Just for
23  the record, I -- I'm not sure if the -- the
24  reservation number's already on that.

Page 297

1  Q.  Have you ever told people to lie for you
2      relative to this case?
3  A.  No.
4  Q.  Have you ever heard Michelle Kennedy say to
5      anyone that people should lie for her and
6      you in this case?
7  A.  No.
8  Q.  Jumping back a little bit, do you remember
9      the incident involving then Lieutenant
10     Connors' badge?
11 A.  Yes.
12 Q.  Okay. I think it was somewhere in
13     February 1998 or so. I think that's,
14     roughly, the time period. What did you say
15     to Scott Ashton about talking to the police
16     about that incident?
17     MR. FISCHER: Objection. You can answer
18  if you know what he's talking about or
19  what . . .
20 A.  I don't know what you are referring to.
21 Q.  Okay. You met -- you know Scott Ashton?
22 A.  Yes.
23 Q.  And, at the time, he was living in the same
24     community you were?

18 (Pages 298 to 301)

Page 298

1  A.  Yes.
2  Q.  And, at the time, Billy Ashton was living
3      with you.  Do you remember that?
4  A.  Yes.
5  Q.  All right.  Did you have conversations with
6      Scott Ashton about the incident of the theft
7      of Lieutenant Connors' badge back in that
8      time period?
9  A.  No.
10  Q.  Okay.  Did you ever tell Scott Ashton not to
11      talk to the police?
12  A.  No.
13  Q.  Did you ever break the windows at Diane
14      Ashton's house?
15  A.  No.
16  Q.  Have you ever been involved in any other
17      fights where people have jumped you other
18      than what you've indicated in your answers
19      to interrogatories?
20  A.  I'm not sure.
21  Q.  You're not sure?
22  A.  I'm just not sure of the question.  No.
23  Q.  Sure.  Have you ever been involved in any
24      incident where you claim you were jumped by

Page 299

1      individuals and beaten?
2  A.  Yes.
3  Q.  Okay.  What other incidents?
4  A.  There was an incident at the Concord Shores.
5      I was jumped by a -- a guy named Paul
6      Parent.
7  Q.  But that's the one -- again, I'm saying I --
8      I believe, just so I'm clear, I think you
9      reference that in your answer to
10      interrogatory.  You're saying that's the
11      December of 1991 incident.  Correct?
12  A.  Oh.  Yes.
13  Q.  All right.  Any other -- anything -- any
14      other that you've not listed here?
15  A.  No, not that I can think of.
16  Q.  Okay.  Were you ever attacked by a bunch of
17      guys and had to go to the hospital to
18      be treated that weren't related to this
19      incident or these complaints on the
20      Billerica Police Department?
21  A.  Are you referring to the police officers
22      on -- that attacked me on 1 Leicester
23      Street?
24  Q.  No.  I'm just asking you, are there any

Page 300

1      other incidents where you have been jumped
2      by a group of people that didn't involve the
3      Billerica Police Department?
4  A.  Oh.  No.
5      MR. FISCHER:  I'm not sure you're
6      understanding the question.
7  A.  I don't -- no.  The answer's, I don't -- I
8      don't believe so.
9      MR. FISCHER:  Have you ever been
10      involved in -- I'm just trying to --
11      MR. SILVERFINE:  All right.  You can't
12      coach the witness unless he asks for your
13      help.  You know, I mean . . .
14      MR. FISCHER:  All right.  I won't say
15      anything.
16      MR. SILVERFINE:  If he wants -- I mean,
17      you're welcome to talk to him.
18  Q.  But you've ans- -- you've understood my
19      question.  Right?
20  A.  Okay.  Could you say it one more time for
21      me, please?
22      MR. SILVERFINE:  I'll let you read it
23      back, 'cause I . . .
24      (Question and Answer read back.)

Page 301

1  A.  Oh, that did not involve the Billerica
2      police?
3  Q.  Correct.
4  A.  Yes.  One incident.
5  Q.  What incident is that?
6  A.  An incident happened in -- I'm sorry.  I
7      forget the name of the -- town it was
8      in.
9  Q.  Outside of Billerica?
10  A.  Yes.
11  Q.  And when did this happen?
12  A.  I want to say, 2004, '5 maybe.
13  Q.  Okay.  And te- -- describe for us, if you
14      would, the details of that.
15  A.  It was a talent show.  My son is a -- he's
16      a -- he's an artist, and he writes songs.
17      And we went to a talent show.  And he
18      ultimately won the show.  And there was a
19      couple of -- there was another group there
20      that may be in their early 20s that didn't
21      like this.  They weren't -- they weren't
22      happy for my son.  And they approached me on
23      it.
24  Q.  Okay.  And what happened?

Page 302

1  A.  Well, there was two of them and one of me.
2      And they -- they overpowered me, and it was
3      just -- there was a fight.
4  Q.  Okay.  Did you seek medical attention for
5      that?
6  A.  Yes.  I did.
7  Q.  Okay.  And what kind of medical attention
8      did you receive for that incident?
9  A.  I just had an X-ray of my jaw, I believe.
10 Q.  Okay.  And what was the result of the X-ray?
11 A.  There was no fractures.
12 Q.  Okay.  And did you report this to the police
13     anywhere?
14 A.  No.  I did not.
15 Q.  Okay.  Any other incident where you were
16     jumped by a group of people?
17 A.  No.
18 Q.  Fair to say you've been involved with other
19     fights not involving people who are involved
20     with the Billerica Police Department.
21     Correct?
22     MR. FISCHER:  Objection.
23 A.  Not fights.  Maybe some arguments.
24 Q.  Okay.  Excluding your wife, Michelle

Page 303

1      Kennedy, for the moment, have there been
2      other incidents where you've re- -- you've
3      gone to the hospital for injuries suffered
4      as a result of fights you've had with other
5      people?
6  A.  Not that I know of at this time.
7  Q.  Have you ever attained a -- attended an
8      anger management course?
9  A.  No.
10 Q.  Okay.  Is it your testimony that, sometime
11     in October 2002, you did not attend an anger
12     management course?
13 A.  Not that I can remember.
14 Q.  Okay.  Has your wife attended an anger
15     management course?
16 A.  Not that I remember, no.
17 Q.  Okay.  I'm going to ask you some questions.
18     Some documents were produced to us through
19     your counsel relative to notes.  And I'm
20     going to ask you what the -- certain of
21     these notes mean.  And if you can tell us,
22     that would be appreciated.  If you can't,
23     you also have to let me know.  Okay?
24 A.  Okay.

Page 304

1  Q.  So I'm going to show you -- I made
2      photocopies of these notes, which are Bates
3      stamped by your counsel; and I'm referring
4      to those.  And, hopefully, I'm just going to
5      ask you questions about what it means.
6  A.  Okay.
7  Q.  Okay?  And I'll give a copy to you and to
8      your lawyer.
9  A.  Okay.
10     MR. SILVERFINE:  We'll mark this as a
11     whole as the next exhibit.  Okay?  And these
12     are particular documents.
13     THE WITNESS:  Are they written by
14     myself?
15     MR. SILVERFINE:  That's what I'm going
16     to ask you.  That's part of the questioning.
17     THE WITNESS:  Okay.  So I'm going to do
18     my best to answer it.  Right.
19     MR. SILVERFINE:  That's all you can do.
20     THE WITNESS:  Okay.
21     (Handwritten notes marked as Kennedy
22     Exhibit No. 4.)
23     (Brief recess taken.)
24     BY MR. SILVERFINE:

Page 305

1      MR. SILVERFINE:  We're back on the
2      record.
3  Q.  Mr. Kennedy, I'm going to ask you -- I
4      placed before you just -- photocopies of
5      certain documents which were produced by
6      your counsel as to notes ostensibly taken by
7      you, your wife, and other family members.
8      So I'm going to ask you certain questions.
9      And, again, you do the best you can in terms
10     of answering information.  Okay?
11 A.  Yes.
12 Q.  Right before I got -- I get there, have you
13     been involved in any probate matters
14     yourself that you recall?
15     MR. FISCHER:  Objection.
16 A.  No.
17 Q.  Okay.  Have you been involved in any care
18     and custody issues with your children?
19 A.  No.
20 Q.  Okay.  How about DSS?  Has DSS ever moved
21     relative to the care of your children?
22 A.  There was a time when a Billerica police by
23     the name of DeVito called DSS on my
24     children.  I think it was around the Deann

Page 306

1    case time.  And -- but that -- but that
2    matter was closed --
3  Q.  Okay.
4  A.  -- in a relatively short period of time.
5  Q.  All right.  Deann Masone?
6  A.  Masone case, yes.
7  Q.  Okay.  I don't have a copy of it in front of
8      me.  But there was some note, Bates No. 265,
9      of the documents you produced where there
10     was a notation, "court from New Hampshire,
11     8:30, filings at the mall in Rockingham
12     Plaza."  Do you know what that is in regards
13     to?
14 A.  Where -- what page was that?
15 Q.  It's not on a page in front of you.  I'm
16     just reading off a note I made on Bates
17     No. 265.  It's a large sheet.  And it says
18     "October 19th, 1999, court for New
19     Hampshire."  Do you know anything about
20     that?
21 A.  No.  I don't.
22 Q.  Okay.  All right.  Let's look at what's in
23     front of you, which has been marked
24     Exhibit 4, I believe.  The first page, it

Page 307

1      says, "Brian's leg broke."  Do you see that?
2      Are those your notes?
3  A.  No.  They're not.
4  Q.  Whose handwriting is this?
5  A.  It appears to be my wife's handwriting.
6  Q.  All right.  Was there some -- it says, right
7      below it, "no honeymoon ten years 'cause he
8      went to jail.  Brian going to jail.  Got
9      late on my" -- I'm just trying to read
10     this -- "park rent."
11 A.  Yeah.
12 Q.  Do you see that?
13 A.  That's what it says.  Yes.
14 Q.  All right.  What -- what is -- is your
15     understanding?  What does that mean or refer
16     to?
17 A.  As far as "no honeymoon ten years," it was
18     when I was incarcerated.
19 Q.  Okay.
20 A.  I was in- -- incarcerated on the month of
21     October.  That would have been my ten-year
22     anniversary.  My wife and I had planned to
23     renew our vows on that day.
24 Q.  Okay.  It says "got late on park rent."  Is

Page 308

1      that the trailer park rent?
2  A.  Yes.
3  Q.  All right.  "Had to sell trailer plus"?
4  A.  That's what it says.  Yes.
5  Q.  Okay.  Is that when you sold the 129
6      Leicester Street address?  Or was that -- I
7      should ask you, what does that refer to?
8  A.  The way I'm looking at it is, because I was
9      incarcerated, I missed out on a ten-year
10     honeymoon to renew my vows with my wife.  We
11     got late on the park rent because of going
12     to jail.  And we had to sell the trailer
13     because of -- all because of the
14     incarceration.
15 Q.  All right.  Did this cause any dispute
16     between you and your wife?
17 A.  No.  It did not.
18 Q.  Okay.  So you -- you and your wife never had
19     any issues because you were going to jail?
20 A.  Could you rephrase that question?
21 Q.  Sure.  I'll try.  You and your wife never
22     had any disagreement about the fact that you
23     were now incarcerated versus being home for
24     your tenth anniversary?

Page 309

1  A.  Well, obviously, we were both upset about
2      it.
3  Q.  All right.  But you -- was that between the
4      two of you?  In other words, did the anger
5      or -- was there any anger between you and
6      your wife --
7  A.  No.
8  Q.  -- over this?  Okay.  The next page of --
9      of -- which is Bates stamped, if you flip
10     over Exhibit 4, 2- -- 279.  In the middle
11     there, it says, "BK, Jr. has had over 20
12     detention in one school year."  Do you see
13     that?
14 A.  Yes.
15 Q.  All right.  And right below, it says
16     "because I tried messing with her husband."
17     Am I reading that right?
18 A.  I can't read her handwriting.
19 Q.  Do you know what that means?
20 A.  I don't know what that's referring to.  No.
21 Q.  Okay.  Do you know who this note refers to?
22     Brian -- was Brian --
23 A.  Oh, Brian K. -- Brian, Jr. is --
24 Q.  Is your son?

Page 310

1  A.  -- is my son.
2  Q.  All right.  Did he have 20 detentions in the
3      school year?
4  A.  If it's written down here.  I don't recall
5      that many detentions.  But li-- then,
6      again, I didn't write this.
7  Q.  All right.  This is, again, Michelle
8      Kennedy's handwriting?
9  A.  Yeah.  I believe it is.  Yes.
10 Q.  All right.  And do you know what the
11     reference to Brian, Jr. having over 20
12     detentions in one school year refers to?
13     Okay.
14 A.  I -- no.  I don't.
15 Q.  Are you aware of whether your wife and you
16     were blaming someone for the 20 detentions
17     at this point?
18 A.  I'm not sure of that right now.
19 Q.  Okay.  The next page, if you turn over, the
20     Bates stamp 282, the next page, if you flip
21     it.
22 A.  I'm sorry.  Could we get back to this
23     question here?  I'm just looking down, and I
24     didn't see the parentheses around this.

Page 311

1  Q.  Okay.  You tell me what -- if you want to
2      add to your answer, absolutely.
3  A.  Okay.  Now I'm looking down below where it
4      says "husband's job and looking further into
5      that."  And it says, "Mrs. Connors told me
6      she was going to make BK's -- BK, Jr.'s
7      school year very difficult."  Okay.  Now,
8      this incident here is re-- referring to,
9      Mrs. Connors is a secretary at my son
10     Brian's school.
11 Q.  Okay.  And what -- what happened between
12     Mrs. Connors and either you or your wife?
13 A.  Mrs. Connors is -- she's the wife -- she's
14     the wife of Sergeant Connors --
15 Q.  Okay.
16 A.  -- from Billerica police station.
17 Q.  All right.
18 A.  And she's in charge of handing out
19     detentions --
20 Q.  Okay.
21 A.  -- I believe, something like that, that
22     area.  Okay.  That's what -- that's all --
23 Q.  All right.  So you --
24 A.  -- just trying to clarify that.

Page 312

1  Q.  All right.  That's fine.  So Mrs. Connors
2      told you or your wife that she was going to
3      make Brian Kennedy, Jr.'s school year very
4      difficult; is that right?
5  A.  I -- I would think that it would -- it was
6      made to my son.  And my son referred it to
7      my wife, which she wrote down.
8  Q.  Okay.  All right.
9  A.  That's how -- that's how I'm understanding
10     it.
11 Q.  Okay.  The next page, if you turn over to
12     00282 at the top, whose handwriting is that?
13     Do you recognize that handwriting?
14 A.  It's -- I believe it's my wife's again.
15 Q.  Okay.  At the top, it says -- and I'll read
16     it as best I can -- "All people we fight
17     with were, at one time, very good friends of
18     ours."
19 A.  Okay.
20 Q.  What does that mean?
21 A.  After the -- the incident with the badge
22     being stolen, the Billerica police just went
23     through my neighborhood.  And -- and they
24     were talking bad about us to other people.

Page 313

1  Q.  Okay.  Who specifically was talking bad
2      about you to other people?
3  A.  I'm not sure who -- who was doing the
4      talking.  Just in -- it was, in general, the
5      Billerica police.
6  Q.  Okay.  Anybody -- nobody in particular?
7  A.  Not that I know of.
8  Q.  But it says "all people we fight with."  I
9      mean, who are you fighting with at the time
10     this was written back in June 2001?
11 A.  I'm not sure.  I'm not sure of the . . .
12 Q.  Well, who were good friends of yours back in
13     June 2001 that you were then fighting with?
14     MR. FISCHER:  Objection.
15 A.  Again, I'm not sure who -- who I was arguing
16     with at that time.
17 Q.  A cast of characters?
18 A.  Excuse me?
19     MR. FISCHER:  Objection.
20 Q.  A cast of characters you can choose from?
21     Okay.  All right.  Next page, if you turn
22     over on 00302, same exhibit, you -- is that
23     your handwriting?
24 A.  No.  It's not.