Reginald F  Jr.

13th Juror, LLC
Police Consultant
350 Rockwood Drive
Southington, Connecticut 06489
Tel # (860) 621-1013 Fax # (860) 621-1013
E-mail: 13thjuror@cox.net
Web page: http://www.expertcop.com
Web page: http://www.13thjuror.com

August 7, 2006

### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS
### NO. 04-CV-12357-PBS
### Kennedy v Billerica Police Department et al

Jason & Fischer
ANDREW M. FISCHER, ESQ.
47 Winter Street, 4th Floor
Boston, Massachusetts 02108
FREDERICK V. GILGUN, JR.
Nicholson, Sreter & Gilgun, P.C.
BBO # 551477
33 Bedford Street, Suite 4
Lexington, MA 02420

### Reginald F. Allard, Jr.
### Expert Opinion Report

For purposes of identification, my full name is Reginald F. Allard, Jr. I am currently employed by the State of Connecticut as a Training Officer for the Police Officer Standards & Training Council (P.O.S.T.C.) located at the Connecticut Police Academy, having held this position for the past 23 years. Previous to this sworn peace officer position, I was a police officer with the New Britain, Connecticut Police Department for 11 years, having attained the ranks of Detective and Sergeant. While being employed by the Connecticut Police Academy, I was granted a leave of absence and became a police lieutenant for the Woodbridge, Connecticut Police Department in 1989. My tenure as a sworn police officer has spanned 33 years. During this time, I have trained in excess of 13,000 police officers, acquired a Masters degree in Criminal Justice, and have experienced the broad breadth of practical police experience as a police officer, police supervisor, and police trainer. My primary pertinent duties at the Connecticut Police Academy encompass training recruit and in-service police personnel in Laws of Arrest, Police Discretion/Decision-Making, Officer Safety, and use of deadly and non-deadly force, federal and statutory laws that allow police officers to effect reasonable seizures using necessary force. During the past 18 years, I have been retained, on 138 instances, as a consultant or as an expert witness for State and Federal police procedures litigation as to the appropriate standard of care law enforcement officers used or failed to use during police-citizen encounters in Connecticut, Massachusetts, Rhode Island, Vermont, Maine, New York, New Jersey, Pennsylvania, Texas, Ohio, Missouri, Kentucky, North Carolina, and California. Attached in *Appendix A* are my current CV, Expert Witness Case History for the past 4 years, and Fee Structure.

*Bibliography Support Material*
1. IACP Model Policy: Use of Force Effective Date: August 2001 Reevaluation Date: August 2002 IACP; IACP Model Policy Use of Force January 31, 1990; IACP Model Policy: Use of Force Effective Date: August 2001 Reevaluation Date: August 2002; IACP Model Policy – Reporting Use of Force February 1, 1997; IACP National Law Enforcement Policy Center Reporting Use of Force Concepts and Issues Paper August 2000; IACP National Law Enforcement Policy Center Executing Search Warrants Concepts and Issues Paper June 1, 1990; IACP National Law Enforcement Policy Center Obtaining a Search Warrant; Concepts and Issues Paper October 1, 1996; IACP National Law Enforcement Policy Center Field Interviews and Pat-Down Searches Concepts & Issues paper May 1993 – Revised August 2000.
2. IACP Training Keys on topics related to professional standards: #255 Police Reaction to Corruption (1978); #295 Police Ethics (1981); #296 Written Directive System (1981); #297 Police Conduct (1981); #298 The Disciplinary Process: Supervisory Role (1981); #299 The Disciplinary Process: Internal Affairs Role (1981); #475 Police Ethics: Problems and Solutions – Part I (1996); #476 Police Ethics: Problems and Solutions – Part II (1996); #503 Standards of Police Conduct – Part I (1998); #504 Standards of Police Conduct – Part II (1998); #529 Investigation of Public Complaints Part I: General (2001); #530 Investigation of Public Complaints Part II: Receiving and Processing Complaints (2001); #531 Investigation of Public Complaints Part III: The Investigation Process (2001); and #549 Personal Appearance, Off-Duty Conduct, and Free Speech (2002); # 249 Taking Prisoners into Custody;# 28 Principles of Arrest;# 550 Arrest;# 146 Meeting the Threat of Danger;# 505 Community Oriented Policing;# 506 Community Oriented Policing;# 520 Citizen Contacts & Terry Stops;# 527 Traffic Stop Protocols; Ethics Training in Law Enforcement a report by the Ethics Training Subcommittee of the IACP Ad Hoc Committee on Police Image and Ethics.
3. The FBI Law Enforcement Bulletin: "Ethics and Law Enforcement" (2002); "Making Ethical Decisions" (2002); "Institutional Integrity" (2001); "Repairing Broken Windows: Preventing Corruption" (2001); "Getting Along with Citizen Oversight" (2000); "Color of Law Investigations" (2000); "Reviewing Use of Force: A Systematic Approach" (2000); "Noble Cause Corruption and the Police Ethic" (1999); "Ensuring Officer Integrity and Accountability" (1998); "Internal Affairs Investigation: The Supervisor's Role" (1998); "Ethics and Police Integrity" (1997); "Liability Implications of Departmental Policy Violations" (1997); "Managing for Ethics: A Mandate for Administrators" (1997); "Using Automation to Apply Discipline Fairly" (1996); "Managing Relations Between the Sexes in a Law Enforcement Organization" (1995); "Police Ethics Training: A Three-Tiered Approach FBI Bulletin (1995); "Practical Written Directives" (1994); "Compelled Interviews of Public Employees" (1993); "Hiring Standards – Fitness for Duty" (1993); and "Disclosure of Personnel Information" (1992); also see, "Office of Inspector General's Review of Double Standards of FBI Discipline" (2002); Traffic Stops – Police Powers under the Fourth Amendment John Saula FBI LEB October 1989.
4. Canton v. Harris, 489 U.S. 378, 103 L. Ed. 2d 412, 109 S. Ct.1197 (1989); Walker v. City of New York, 974 F.2d 293 (2nd Cir. 09/04/1992); The First Amendment also protects the right to verbally challenge the police officers' actions. City of Houston v. Hill, 482 U.S. 451, 461, 96 L. Ed. 2d 398, 107 S. Ct. 2502 (1987) ("The First Amendment protects a significant amount of verbal criticism, challenge directed at police officers."); Malley v. Briggs, 475 U.S. 335, 341 (1986); Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978); State v. Dunn 26 Conn. App. 114 Nov. 1991. . ."You can't open a person's mind and see what he intended to do. But, you can determine what he did, and from that you can infer what he intended to do."; There is probable cause when (1) police

have "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed," (2) "by the person to be arrested." Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991); Beck v. Ohio; Henry v. United States, 361 U.S. 98 (1959). …simple "`good faith on the part of the arresting officer is not enough.' . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be `secure in their persons, houses, papers, and effects,' only in the discretion of the police."; Radke v. County of Freeborn, 694 N.W.2d 788 (Minn. 04/21/2005) – Negligent Investigation; Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (U.S. 01/12/2000); *Florida* v. *Royer,* 460 U.S. 491 (1983),… although police have the right to approach individuals and ask questions, the individual has no obligation to respond. … The person may decline to answer and simply go on his or her way, and the refusal to respond, alone, does not provide a legitimate basis for an investigative stop. In *Florida* v. *Royer*, 460 U.S. 491 (1983), where we held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. *Id*., at 498. And any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida* v. *Bostick*, 501 U.S. 429, 437 (1991); Kinan v. City of Brockton, 876 F.2d 1029 (1st Cir. 06/02/1989)

5. Terry v. Ohio, 392 U.S., 1968 at 22-27….Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.

6. Tennessee v. Garner, 471 U.S., at 8-9 …(the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

7. Graham v. Connor, 490 U.S. 386, 394, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989). … When a police officer uses force to effectuate an arrest that force must be reasonable. …the "reasonableness" of a particular seizure depends not only on when it is made, but also on how it is carried out. …The question is "whether the totality of the circumstances justifies a particular sort of . . . seizure. The reasonableness of force used is determined, not only with reference to the need for the arrest and for reducing risk to the officers and the public, but also with reference to *the manner in which the arrest is effected* (Tennessee v. Garner, 471 U.S. 1, 8, 85 L. Ed. 2d 1, 105 S. Ct. 1694 (1985). (constitutionality of seizure depends on *"how it is carried out"*)).

8. DeShaney v. Winnebago County Dep't of Social Serv., 489 U.S. 189 (1989)…definition of "custody" used in determining civil liability under §1983, is not equivalent to criminal custody standards but involves the concept of "functional" custody, (where a state merely directly or indirectly exercises some degree of control), and does not even require the physical presence of the police officers.

9. St. Hilaire v. City of Laconia, 71 F.3d 20 (1st Cir. 12/01/1995)…We first reject defendants' analysis that the police officers' actions need be examined for "reasonableness" under the Fourth Amendment only at the moment of the shooting. We believe that view is inconsistent with Supreme Court decisions and with the law of this Circuit. The Supreme Court in Brower v. Inyo, 489 U.S. 593 (1989), held that once it has been established that a seizure has occurred, the court should examine the actions of the government officials leading up to the seizure; State v. Bell 23 Conn.App 315 Sept. 1990… A person acts intentionally with respect to a result or conduct involved in an offense when his conscious objective is to cause such result or to engage in such conduct. Such intent need not be proved by direct evidence but may be inferred from all the facts and circumstances; State v. Nita 27 Conn. App 103 March 17, 1992… While the statute ( 53a-167a ) prohibits some acts of verbal resistance as well as physical resistance, the statute's requirement of intent limits its application to verbal conduct intended to interfere

with the police officer and excludes situations in which a defendant merely questions a police officer's authority or protests his or her actions; State v. Wilson, 17 Conn.App.104 (1988)…to obtain a conviction for interference with an officer, one of the essential elements that the state must prove beyond a reasonable doubt is that the defendant intended to interfere with the performance of an officer's duties. Accidental or inadvertent interference is not enough. Intent can seldom be proved directly, for no one can look into a man's mind and determine his intent at any given time, it is proper and usually necessary to infer intent. That is, determine what a person intended by determining what his words and actions were at the particular time in question. And from these words and actions infer or conclude what his intent or purpose was. A person's intentions may be inferred from the acts which he did commit.

10. UNITED STATES V. ARVIZU (00-1519) 534 U.S. 266 (2002) 232 F.3d 1241 reversed and remanded. In making reasonable-suspicion determinations, reviewing courts must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. Terry v. Ohio, 392 U.S. 1, 9 (1968); United States v. Cortez, 449 U.S. 411, 417 (1981). Because the "balance between the public interest and the individual's right to personal security," United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975), tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity " 'may be afoot,' " United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, supra, at 30). See also Cortez, 449 U.S., at 417 ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity"). This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." Id., at 418. See also Ornelas v. United States, 517 U.S. 690, 699 (1996)

11. Whren v. United States, No. 95-5841 (U.S. 06/10/1996); COMMONWEALTH vs. JOHN D. GONSALVES June 14, 1999… The fact that we do not follow Mimms in this type of case necessarily leads to the conclusion that we shall not follow Wilson either, because Wilson extends Mimms in a manner incompatible with the rights guaranteed Massachusetts citizens under art. 14; LAMARCHE v. COSTAIN, 225 F.Supp.2d 83 (D.Me. 10/07/2002)… No investigatory stop could be considered reasonable stripped of its underlying factual predicate….All subsequent reasonable suspicion and probable cause determinations by the officer must be premised on a valid stop; it is well-established that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996); United States v. Bizier, 111 F.3d 214, 217 (1st Cir. 1997) (citing Whren for the proposition that when police have "probable cause to believe a traffic violation has occurred, it is reasonable for them to stop an automobile and temporarily detain the driver"). Wilson v Town of Mendon, No. 00-1077 (1st Cir 03/19/2002)…An officer may be held liable for his failure to intervene in appropriate circumstances to protect a victim from excessive use of force by his fellow officers.

12. Mass. Gen. Laws ch 276, 23A (1998)…it is objectively reasonable for officers to seek an arrest warrant "so long as the presence of probable cause is at least arguable…the existence of probable cause is based on the facts and circumstances known at the time of the arrest rather than in hindsight…recklessness may be inferred where the omitted information was critical to probable cause determination…we must insist that the magistrate…not serve merely as a rubber stamp for the police"

13. Law Enforcement Code of Ethics; Law Enforcement Canons of Police Ethics
14. Non-actor Liability: The Duty to Not Look the Other Way – Police Chief April 1992
15. US Department of Justice – Promoting Police Integrity – January 2001
16. Citizen Complaints about Police Use of Force Bureau of Justice Statistics – June 2006
17. New York City Police department "Stop & Frisk: Practices – December 1, 1999
18. Baron v. Suffolk County Sheriff's Dep't, 402 F.3d 225 (1st Cir. 03/29/2005)… The wrongdoing Baron complained of, including officers' violations of prison policy, retaliation for breaching the code of silence, and prison officials' failure to investigate or put a stop to that retaliation, affected not only Baron and his co-workers, but also the prison inmates who were under the Department's control…"[u]nlike a 'policy,' which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up." Britton v. Maloney, 901 F. Supp. 444, 450 (D. Mass. 1995)
19. Early Intervention Systems For Law Enforcement July 17, 2006 by Steve Rothlein http://www.patc.com
20. New Challenges for Law Enforcement Professional Standards AELE Position Paper by Wayne W. Schmidt AELE Law Enforcement Legal Center.
21. The Massachusetts Chiefs of Police Assn., Municipal Police Institute: Chief's Guide to Internal Affairs," "The Chief's Guide to Progressive Discipline/Rules & Regulations," "The Chief's Guide to Civil Liability" and a "Policies & Procedures" manual. Info. at www.masschiefs.org/MPI/Manuals/mpi_manuals.html; http://www.masschiefs.org/hottopics.html
22. "Using Automation to Apply Discipline Fairly," FBI Law Enforcement Bulletin, May 1996; it is online at http://www.fbi.gov/publications/leb/1996/may965.txt  I-A software vendors include:
    a.  "IA Trak" software Institute of Police Technology and Management University of North Florida, http://www.iptm.org/
    b.  "IA Professional" software CI Technologies, http://www.iaprofessional.com/
23. National Institute of Justice document, "A systematic Early Warning Systems: Responding to the Problem Police Officer" (July 2001) available online in PDF format at www.ncjrs.org/pdffiles1/nij/188565.pdf.
24. LAW ENFORCEMENT ADMINISTRATIVE INVESTIGATIONS second edition a supervisory and agency guide to: handle citizen complaints of misconduct; conduct administrative investigations; manage the Internal Affairs function; create reasonable and defensible discipline Lou Reiter AELE Law Enforcement Legal Center First Edition, 1993 - Second Edition, 1998 Published by: Lou Reiter and Associates 99 Fort Ave. Cranston, RI 02905
25. "To …ensure that the documentation is consistent with the factual elements of the police incident…The supervisor reviewing any report should make certain that it is complete, professional and accurate….principle…no conclusions on the complaint will be reached until there has been a *thorough review of the incident.* evaluate the claim **…**agency risk management red-flag procedure…on notice…improper policies; training deficiencies; lack of proper supervision; and lack of discipline….Law enforcement executives are well- advised to conduct a thorough independent investigation of any critical police incident, irrespective of any outside investigation…policy and training issues… an agency that fails to conduct an independent internal investigation in order to review policy and training violations and/or deficiencies can expect to face this issue in a critical way during subsequent litigation….notwithstanding good written policy or training." Lou Reiter, Co-Director Legal and Liability Risk Management Institute.
26. MPI Manuals**:**  In order to prosecute successfully a criminal defendant, police officers must be aware of the elements of the criminal offenses. The Criminal Justice Training

Council is responsible for providing basic training to student officers. A major component of that program is the study of constitutional and statutory laws.

27. UNITED STATES DISTRICT COURT DISTRICT OF VERMONT ANGELA NELSON v SHERIFF CHAD SCHMIDT and DEPUTY SHERIFF CHRIS LAUZON May 1, 2005...the good faith of the officer who drafted the affidavit is at issue...Although a judge reviewing the affidavit in the initial stages of a criminal proceeding may give due deference to the officer regarding the reliability of the facts, the same may not be true in a § 1983 proceeding. "[I]f a police officer in his affidavit applying for an arrest warrant intentionally supplies the judicial authorities with untrue or deliberately misleading facts, the warrant, although facially valid, would lack probable cause." Lo Sacco v. City of Middletown, 745 F. Supp. 812, 816 (D. Conn. 1990).

***Discovery Material Reviewed:***

1. Defendant's Documents Bates # 1 – 2028 contained on a CD Disc
2. Chronology of events – June 8, 1991 – May 5, 2005
3. Complaint – November 5, 2005
4. Defendant's Trial Date Status – Issued May 26, 2006 set for October 16, 2006 – Defendants for initial trial:
    a. Chief Daniel Rosa, Jr.
    b. Deputy Chief Thomas Connors
    c. Lieutenant Frank Mackenzie
    d. Sergeant Steven Elmore
    e. Officer Mark Tsoukalas
    f. Officer Michael Casey
    g. Officer Martin E. Conway
5. Deposition of Chief Daniel Rosa – November 9, 2005
6. Deposition of Chief Daniel Rosa – July 7, 2006
7. Deposition of Dean Royston – February 13, 2006
8. Deposition of Officer Frank Mackenzie taken November 7, 2005
9. Deposition of Officer Mark Tsoukalis taken November 1, 2005
10. Deposition of Officer Thomas Connors – November 1, 2005
11. Deposition of Officer Steven Elmore November 7, 2005
12. Deposition of Michelle Kennedy – January 6, 2006
13. Deposition of Michelle Kennedy – July 12, 2006
14. Fire-vehicle Arson Report – 09/23/1991
15. Billerica Charter Revised – 1997
16. Affidavit of Deborah Grainger June 2006
17. Witness Statement of Tracey Heffernan taken 11-29-1991
18. Witness Retraction Statement of Tracey Heffernan  11-29-1991 6:35pm
19. Motion for Restraining Order – June 8, 2006
20. April 7, 2006 "Stay Away" Order Letter
21. Michelle Kennedy & Mitchell Kennedy Letter from Attorney Fischer to Roland Boucher December 8, 2005
22. General By-Laws of the Town of Billerica – May 2005
23. Defendant's Answers to Complaint – June 6, 2005
24. Michelle Kennedy Affidavit - June 1, 2006
25. Brian Kennedy's Criminal History – May 16, 2006
26. Michelle Kennedy's Criminal History  - May 16, 2006
27. Billerica Police Report – Disturbance/Bar 12/19/1991 with Follow-up 12/30/1991 – re: Paul Parent

28. June 20, 2006 letter concerning Discovery with attachments from Attorney Jeremy I. Silverfine
29. Policies & Procedures as provided by Billerica Police Department – Bates stamps 3423-3483
30. Domestic Violence Law Enforcement Guidelines January 2002 – Massachusetts Policy for Law Enforcement Response to Domestic Violence bates 3397 – 3422
31. Notes, complaints, reports from file of Billerica Police Captain West ( Bates stamped 3423-3483)
32. Billerica Police Department Rules & Regulations (Foreword). Bates Stamped 3487-3506)
33. Billerica Police Department complaint form. (Bates Stamped 3507-3508)
34. Billerica Police Department Policies & Procedures (new policies. Bates stamped 3509-3538)
35. Billerica Police Department Police Manual, policies & procedures(Bates Stamped 3539-4511)
36. May 25, 2006 letter concerning discovery with attachments from Attorney Jeremy I. Silverfine
37. Billerica Police Department Policies & Procedures Manual – Bates Stamped 4145 – 4541
38. Municipal Police Institute Police Manual - Policies & Procedures Bates Stamp 3539-4144
39. Royston Drawings(3) Car 6  MB – 5  - 162 Leicester Street

### Plaintiff's Complaint Synopsis

Brian and Michelle Kennedy commenced this civil action against the Town of Billerica, present Chief of Police Daniel Rosa, previous Chief's of Police John Barretto, Chief Paul Matthews, and Deputy Chief Robert Lee; Officers Thomas Connors, Frank MacKenzie, Richard Rhonstock, Robert Baily, John Zarro, Mark Tsoukalas, Tara Connors, Andrew Devito, Richard Howe, Steven Elmore, William McNulty, Donald Maceachern, Michael Casey, Richard Nestor, Robert Brown, William West, Gregory Katz, Gerald B. Roche, Brian Micciche, William MacDonald, Scott Parker, Alan Munn, Timothy F. McKenna and John Doe.

The claim is that the named Billerica Police Department members conducted a conspiratorial campaign of harassment, intimidation, and false arrest against Michelle Kennedy and her husband Brian Kennedy and her children since September 22, 1991 arson fire of Brian Kennedy's truck. The claim is that the agency personnel were not adequately trained or supervised and discipline resulting in gross negligence and deliberate indifference to the state and constitutional rights of the plaintiffs. Former Chief Barretto failed to properly investigate the involvement of Officer Mackenzie as a suspect in this arson fire.

Plaintiff alleges that she and her husband have been followed around the town street and Deputy Chief Lee told Mrs. Kennedy that she was a liar. Tracey Heffernan reportedly was offered $500.00 by Officer Mackenzie to put Mrs. Kennedy into the hospital. It is alleged that the truck arson and physical threats by Officer Mackenzie resulted when his sexual advances towards Mrs. Kennedy were rejected by her. It is further alleged that Paul Parent assaulted Brian Kennedy at the Concord Shores Bar at the request of Officer MacKenzie and in the presence of other off-duty officers and on-duty officer Loranger. Chief Barretto after several civilian complaint attempts reported that he "would speak with the officers". Both Mrs. Kennedy and her husband were subjected to multiple motor vehicle stops under less then justifiable reasons. Off-duty and in Lowell, Massachusetts Officer Nestor reportedly fabricated assault charges against Mrs. Kennedy, which charges were dropped. It is alleged that Officer MacKenzie assaulted Brian Kennedy and fabricated assault charges against him. Officer Nestor and Roche arrested Mrs. Kennedy for driving under suspension on September 5, 1993 in contradiction to the fact that she had a valid right to drive her vehicle. Mrs. Kennedy saw Officer Roche puncture two tires on her husband's truck while it was parked in her driveway yet there was no investigation into this

complaint. Officer McNulty failed to investigate the fight which occurred on July 21, 1997 which, without cause, ended in the arrest of Brian Kennedy although he had an alibi. Officer Casey refused to listen to alibi witnesses and told Mrs. Kennedy to "tell it to a judge". On July 22, 1997 Officer McNulty swore out a criminal complaint against Mr. Kennedy charging him with Assault and battery with a Dangerous Weapon. Officer Brown failed to follow-up on an assault threat on July 22, 1997. Officer Brown is alleged to have issued a citation to Mrs. Kennedy on October 14, 1997 without justification and falsely arrested her. Following the burglary of Lieutenant Connors vehicle in which his badge and gun were stolen both Mr. & Mrs. Kennedy were charged with receiving stolen property in contradiction to the evidence. Detective Howe, Officer Casey, Officer Micciche, and Officer Katz collaborated to intimidate and harass Brian Kennedy. Officer Elmore attempted to use his testimony for Michelle Kennedy's son (Brian Kennedy, Jr.) juvenile hearing refused to testify by not showing up at the hearing unless the "badge" information was forth-coming. It is further alleged that Officer Elmore manipulated witnesses to gain incriminating evidence concerning the where-a-bouts of the badge and police hat belonging to Lieutenant Connors. Casey Heffernan attempted to provide the information that Billy Ashton had stolen the badge and Hat but officers Elmore, Casey and MacKenzie refused to accept the information or write a follow-up report with this information. Officer Elmore and Lieutenant Connors approached Daniel Dufault in the House of Correction to gain a false affidavit from him implicating Mr. Brian Kennedy in the Lieutenant Connors stolen badge incident. It is further alleged that Billy Ashton was beaten while he was in the Billerica Police department for the week-end following his arrest for the burglary to Lieutenant Connors' private car. Both Mr. & Mrs. Kennedy were found "not guilty" for receiving stolen property on September 14, 1998. Mr. & Mrs. Kennedy claim that they were issued multiple citations by Billerica police officers for which they did not commit including Officer West. On August 5, 199, Mrs Kennedy alleges that Officer Micciche verbally abuse, threatened and cursed at her while at the Dunkin Donuts in Lowell, Massachusetts. Officer Micciche filed a criminal complaint against Mr. & Mrs. Kennedy for which they were found "not guilty". On January 22, 200 while at Tina Huber's house Mr. & Mrs. Kennedy were charged with malicious destruction of property which charges were dismissed. Several incidents further occurred with fabricated facts. Sergeant Rohnstock reportedly issued a $5,000.00 cash bail in retaliation for the incident with Brian Kennedy, Jr.'s school incident with Lieutenant's Connors' daughter (Tara Connors). It is further alleged that Brian Kennedy was assaulted by several officers including Officer Mark Tsoukalas during a traffic stop after his release from the House of Corrections. Officer Tsoukalis is alleged to have performed several Motor Vehicle stops on Mr. & Mrs. Kennedy without cause and issued citations without justification. In June 2002, Officer Munn is alleged to have seized Mrs. Kennedy at a fund raiser without cause and physically pushed her out of the building. Officer Nestor and Elmore refused to investigate an assault against her son Mitchell. Officer Casey and Zarro taunted and called Mrs. Kennedy a "pussy" and "bitch". Officer Casey threatened Mitchell Kennedy with arrest for video-taping an encounter. In September 2004, the Kennedy's moved to a new address in Billerica. On October 2nd and 3rd of 2004 Mrs. Kennedy observed Officer Tsoukalas sitting in his police car across from her home and reported this to the Town Manager. Officer McKenna fabricated a charge of resisting arrest on October 28, 2004.

It is alleged that none of the above mentioned incidents were ever investigated to conclusion by the Billerica Police Civilian Complaint Bureau. A history and pattern of police encounters with the Kennedy's occurred since 1991 through 2006. Each encounter resulted in a concerted effort by the Billerica Police to seek the arrest of Brian and Michelle Kennedy and exclude any exculpatory evidence.

*Discussion and opinions formed:*
Using my 33 years of police experience, police training, relevant law, case law review, case material reviewed, knowledge of human nature, knowledge of the motives which influence and control police practices, I have tested the reviewed plaintiff and defendant facts in this instant case according to such knowledge and render the below opinions. It is understood that these opinions are *"living opinions"*, based upon the facts and circumstances derived and disclosed to date (August 7, 2006). I reserve the right to further supplement my opinions when new discovery material becomes available. It is noted that the depositions of Officer Conway and Officer Casey will not be conducted until *after* this report is filed as well defendant's expert witness report. These opinions were formed by drawing reasonable inferences from the reviewed facts and circumstances in the light of my technical, specialized and practical police experience, training and education.

*Probable cause* to arrest exists if (1) there is probable cause to believe a *crime* has been committed; *and* (2) there is probable cause to believe that the *person to be arrested committed that crime.* Probable Cause exists when facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed. In testing the amount of evidence that supports probable cause, it is not the personal knowledge of the arresting officer but the *collective knowledge* of the law enforcement organization at the time of the arrest. Moreover probable cause for an arrest is based on the *objective facts* available to the officer at the time of the arrest rather than the subjective state of mind of the officer. Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred or is occurring. In dealing with probable cause as the very name implies, we deal with probabilities. Probable cause does not require certainty or proof beyond a reasonable doubt but, *something beyond mere suspicion is required. Strong reason to suspect is not sufficient to constitute probable cause.* Generally accepted practices and procedures taught within police training programs support the following:

- A Terry (Stop & Frisk) is justified in light of a reasonable officer's experience and training. A person's personal freedom may be interfered with to insure governmental interests in stopping crime. An investigative stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. The officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

- A Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. In justifying the particular intrusion 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant that intrusion. The police officer's decision must be based on more than hunch or speculation.

  - The reasonableness of a particular citizen seizure depends not only on when it is made, but also on how the citizen is seized. Police tactics permit a brief investigatory detention, even in the absence of probable cause, if the police have reasonable and articulable suspicion ( common law right of inquiry) that a person has committed or is about to commit a crime. Pursuant to Terry v. Ohio, 392 U.S. 1 (1968), when a police officer observes unusual conduct which leads her to reasonably conclude in light of her experience that criminal activity may be afoot and where in the course of investigating this behavior she identifies

Kennedy v Billerica Police Department et al – Allard Expert Opinion Report                    9

herself as a policeman and makes reasonable inquiries a police officer may, in appropriate circumstances and in an appropriate manner, approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. The Fourth Amendment does not require a police officer who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

- The "reasonableness" of a particular seizure depends not only on when it is made, but also on how it is carried out. The Fourth Amendment to the United States Constitution protects a person from the use of unreasonable force while being arrested by a law enforcement officer, even if the arrest is based upon probable cause. A police officer is never entitled to use more physical force than is reasonably necessary to effect an arrest or to defend himself or another. Whether the degree of force used was excessive or 'unreasonable' in the constitutional sense is to be determined in the light of all the facts and circumstances in the case. The standard is objective in nature and is based upon what a reasonable, well-trained police officer would believe to be true from the prudent and cautious standpoint of the skilled and experienced officer at the scene of the incident. Police training and the law stipulates that once probable cause or articulable suspicion is loss beyond all doubt that an officer has no right of citizen inquiry other than consensual. Reasonable suspicion must be particularized, *United States v. Cortez*, 449 U.S. 411, 417-18 (1981), and the scope and duration of the detention are evaluated for reasonableness. A "seizure" is defined as "an intentional acquisition of physical control" and "occurs when there is a governmental termination of freedom of movement through means intentionally applied"(Brower v. County of Inyo, 489 U.S. 593, 596, 597 (1989)). Once an officer looses authority to seize a citizen the officer must un-seize the person.

- Pursuant to *Florida* v. *Royer,* <u>460 U.S. 491</u> (1983), although police have the right to approach individuals and ask questions, the individual has *no obligation to respond*. The person may decline to answer and simply go on his or her way, and the refusal to respond, alone, does not provide a legitimate basis for an investigative stop. Without reasonable suspicion or probable cause, when an officer approaches an individual, the individual has a right to ignore the police and go about his/her business. Any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida* v. *Bostick,*

To avoid a betrayal of trust and abuse of power, police agencies ensure that civilian complaints are resolved with follow-through to hold individual sworn officers accountable. Accepting or initiating a complaint does not require that a civilian complaint be written or sworn. Whether anonymous or not, each civilian complaint is initially received as credible. It is the generally accepted practice within law enforcement that automatic preference is not given to the accused officer's statement over a complainant's statement. Any eventual credibility determinations require a full explanation, in writing, as the agency resolves the complaint in one of the four findings below:

1. *"Sustained*," where a preponderance of the evidence shows that misconduct or inappropriate behavior occurred.

2. *"Unfounded,"* where a preponderance of the evidence shows that misconduct or inappropriate behavior did not occur.
3. *"Not resolved,"* where there is insufficient evidence to decide what happened.
4. *"Exonerated,"* where the conduct described by the complainant or other referral source occurred, but did not violate policy.

A Police Foundation study in 1994 reported that 11 percent of the police agencies surveyed indicated that they conducted some form of *pro-active enforcement* involving police misconduct. Some agencies refer to these forms of pro-active enforcement as **integrity checks**. Police use of force and arrest seizure activity demands an agency review the discretionary and ministerial police-citizen encounters activity to avoid a "code of silence" police culture.

### Affidavit of Deborah Grainger:
As a waitress at the Concord Shores Bar in Billerica, she witnessed off-duty and on-duty activity of Billerica police officers. She witnessed excessive force during arrests and believes that Brian Kennedy was "set up" in 1991 by members of the Billerica Police Department when Mr. Parent assaulted Mr. Brian Kennedy. These allegations were never brought to a conclusion.

### Statements of Tracy Heffernan 11/29/1991
Allegations of misconduct and retraction of statements were never brought to a conclusion.

### Statements of Craig Pickering 11/30/1991
Allegations of misconduct and retraction of statements were never brought to a conclusion.

### Affidavit of Michelle Kennedy:
The plaintiff testified that she has endured a history of intimidation, threats, beatings, multiple arrests and motor vehicle citations which began in 1991 after she rejected the sexual advances of Officer Frank Mackenzie. Plaintiff's (Michelle Kennedy and Brian Kennedy) "Rap" Sheets and Citation History can attest to this fact. Defendant Connors is alleged to have intimidated and threatened Mr. Trainer to evict Brian Kennedy from his house.

### Michelle Kennedy's Motion for a Restraining Order June 8, 2006:
Mrs Kennedy testifies that after moving to her new home at 1248 Gorham Street in Lowell, Massachusetts, officers of the Billerica Police Department drove by her home and harassed her without any performance of duty justification. This event is alleged to have occurred on November 1, '05, when Deputy Conners, Officer Tsoukalas, and Officer Casey drove by their house and gave them the "finger" and gave her the "gun sign".

### Sergeant Elmore's Deposition Excerpts:
Sergeant Elmore was aware of only one (1) investigation ever having been conducted by Professional Standards Bureau. The only investigation conducted was against Officer Royston. Sergeant Elmore characterizes civilian complaints which are "low level" as staying at the front desk OIC level. Sergeant Elmore is not aware how a complaint gets forwarded to the Deputy Chief Level.

Paul Parent was or is an instructor for the Criminal Justice Council. Sergeant Elmore was off-duty and was present at the time of pushing match with Mr. Parent and Brian Kennedy, at the Concord Shores. Officer Loranger was on-duty working the Concord Shores Bar detail that night. Sergeant Elmore never related this incident to Detective Howe. Sergeant Elmore was aware that the Royston drawing was hanging on the door to the communication room.

*Deposition of Mark Tsoukalas Excerpts:*
Prior to his employment with the Billerica Police Department, officer Tsoukalis was employed by the Suffolk County Sheriff's Department From 1995 to 1999. This same agency had a "code of silence" investigation law suit filed against it (Baron v. Suffolk County Sheriff's Dep't, 402 F.3d 225 (1st Cir. 03/29/2005). Officer Tsoukalas testified that no internal affairs investigation was ever conducted by the Billerica Criminal Bureau concerning any complaints filed by Michelle Kennedy. Officer Tsoukalas characterizes Michelle and Brian Kennedy as "known criminals." liars, cheaters, thieves, who try and intimidate people. The facts concerning convictions or not, doesn't mean they are not a criminal according to Officer Tsoukalas. Officer Tsoukalas testified that he had followed both Brian and Michelle Kennedy around town in a Billerica Police vehicle because they are criminals and that is "my job to detect crime". Officer Tsoukalas testified that he would have liked to have seen Michelle Kennedy held without bail because of her alleged threats made against his family.

*Deposition of Frank Mackenzie Excerpts:*
Officer Mackenzie was never made aware, by any supervisory officer that a civilian complaint had been made against him. He was aware that Inspector Howe was in charge of putting a file together in regards to the Kennedy's 1999 FBI civil rights violation investigation.

*Deposition of Thomas Connors Excerpts:*
The Professional Standards Bureau is the bureau which conducts IA investigations but he is not aware of any harassment that any officers of the Billerica Police Department are accused of. Officer Connors never considered Officer Mackenzie a suspect of this arson of Mr. Kennedy's truck in 1991. Officer Connors is not aware that Kim Mackenzie (wife of Officer Mackenzie) audio taped a phone conversation between Officer Mackenzie and Michelle Kennedy. Officer Connors has never heard of a "retribution gang" used to describe a group of officers within the Billerica Police Department in the early nineties. Officer Connors never heard of the "little present" description to describe the practice of a Billerica police officer giving a citation to someone who didn't deserve it. There was a memorandum requiring any of the officers that had any dealings with the Kennedy's', to make sure there was a supervisor present. The Officer Royston incident was the only disciplinary finding against any Billerica Police Officer since 1991. The truck arson fire incident, the Scott & Billy Ashton incident, the Robert Reslow incident, Casey Heffernan incident, the Joyce Tibbets incident, the DuFault incident, the Brian Kennedy, Jr. incident, the Diane Mazone incident, the Amy Baum incident were never investigated to a "finding" as to the civilian complaints lodged. The drawings made that depicted the relationship between Officer Royston and the Kennedy's' was known to Lieutenant Connors but no investigation was conducted as to who drew the drawings. Officer Connors was promoted to Lieutenant in 1995 and Deputy Chief in 2003. As deputy Chief both he and Chief Rosa conduct the Disciplinary Board and decide conclusions and decisions on actions to take against officers whom they feel has acted inappropriately.

*Deposition of Chief Daniel Rosa, Jr. Excerpts:*
The Records Management System in the Billerica Police Department consisted of the Chief Rosa who would:

> (I)…look at the Complaint, and if I determine that we need to interview witnesses, or something like that, I will assign it to the Supervisor, either in the Criminal Bureau, or possibly the Lieutenant Commander to interview witnesses.

The path the Complaint follows, is it comes in at the OIC level, and if not resolved, then it goes to the Lieutenant Commander, and if not resolved reaches the Chief Level.

There exists no central filing system for open investigation into police misconduct within the Billerica Police department. The FBI had been involved in 1999 investigation for violation of Civil Rights of the Kennedy's but there exists no clearance letter from the U.S. Attorney's Office. Chief Rosa stated …"I would have to say that I would give credibility to the officer" when asked who has credibility at the inception of a civilian complaint.

***Deposition of Dean Royston Excerpts:***
Officer Parker incident…Boys Club…"you cunt, just because you're fucking that nigger doesn't mean you can get away with whatever you want"…did not have a sexual relationship with Michelle Kennedy…No.

***MPI Municipal police Institute Police manual Policies &Procedures Excerpts:***
Internal Affairs: - …It is the policy to investigate all complaints…regardless of the source…through a regulated, fair and impartial Internal Affairs program…street complaints…the officer shall direct the complainant to the Officer-in-Charge…commenced immediately…complete in 30 days…at the conclusion of any administrative investigation, a full written report shall be prepared for submission to the Chief…the complete file of records shall be kept in the office of the Officer-in-charge of Internal Affairs.

> ***Billerica Police Department – Policies & procedures Manual Excerpts…*** the information upon which an officer relies in making an arrest must be more than just rumor or mere suspicion in making an arrest…arresting officers will make a full and complete report of any arrest made…it is the duty of each officer before the commencement of his shift to familiarize himself with each warrant that is assigned to him to ensure it being valid and in effect…police interrogations must conform to legal standards and requirements…a "stop & frisk" is a "threshold inquiry"(general Laws, c.41, s.98 which requires...the Terry v Ohio standard of articulable suspicion…Civilian Complaints…investigate all reports of civilian complaints…fill out civilian complaint form…formal complaint in writing…the Officer in Charge shall interview the officer and reduce the interview to writing and incorporate it into a report by the Officer in Charge(Bates 4530)…Chief of Police may assign a "Board of Investigation"….Civilian complaints are permanent records of the department….may not be removed from the officers file…

***Opinions Expressed:***
It is my ***opinion to a reasonable degree of professional certainty*** that the Billerica Police Department's lack of tracking field "Terry-Stops" and probable cause accountability training caused a pattern of deliberate indifference to the rights of plaintiffs Michelle Kennedy and Brian Kennedy and their children. This specific deficiency in training was the "moving force" behind the plaintiff's seizures (City of Canton v. Harris, 489 U.S. 378, 388-389, 391 (1989)). The supervisory policy-making officials (Chiefs Rosa, Barretto, Matthews & Deputy Lee) through their disciplinary action and *inaction* caused an affirmative link of supervisory encouragement, condonation or acquiescence and a gross negligence amounting to deliberate indifference to Michelle and Brian Kennedy's federal and State Constitutional privileges and protections to avoid unreasonable seizure events. The atmosphere of law enforcement within the town of Billerica allowed a practice of seizures with impunity and was tolerated by the policy makers (Chief barrette, Chief Matthews, Deputy Chief Lee and Chief Rosa).

Police agencies are responsible to critically evaluate police-citizen encounters whenever they occur. It is my ***opinion to a reasonable degree of professional certainty*** that the Billerica Police Department did not make every effort to take appropriate steps to minimize the generalized acceptance of Terry-Stops or arrests without articulable suspicion and/or probable cause.

According to *Florida* v. *Royer*, <u>460 U.S. 491</u> (1983), although police have the right to approach individuals and ask questions, the individual has *no obligation to respond.* The person may decline to answer and simply go on his or her way, and the refusal to respond, alone, does not provide a legitimate basis for an investigative stop. In *Florida* v. *Royer*, <u>460 U.S. 491</u> (1983), held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. Additionally, any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida* v. *Bostick*, <u>501 U.S. 429</u>, 437 (1991). An investigative detention, no matter how brief, must be based upon an officer's "reasonable suspicion" that criminal activity has occurred or is about to occur." *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995). The infringement on personal liberty of any "seizure" of a person can only be "reasonable" under the Fourth Amendment if we require the police to possess "probable cause" before they seize a citizen. In *Terry*, the Supreme Court held that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. While "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. *United States* v. *Sokolow*, <u>490 U.S. 1</u>, 7 (1989). The officer must be able to articulate more than an "inchoate and un-particularized suspicion or 'hunch' " of criminal activity. It is my ***opinion to a reasonable degree of professional certainty*** that the defendant officers allowed rumor and malice to motivate their seizure of Michelle and Brian Kennedy.

The Billerica Police Agency failure to document both, *informal and formal complaints* led to a lost of agency credibility. It is essential that no complaint received be lost in the agency Professional Standards files. Discipline is a responsibility of supervision both at the line level (Sergeant) and upwards into the chain of command to include the Chief of Police and includes the Town Manager. A civilian complaint alleging misconduct must not be handled differently than any other police report. There is no valid reason to handle "Misconduct Complaints" or "Service Complaints" any different. They both must be handled as a clearing house for integrity compliance checks on police procedures and practices. Although not all administrative investigations need to be done at the IAU level they must be *formally documented* to "red flag" any *patterns of abuse*. When a sufficient pattern emerges and the agency's inaction condones the practice, then the agency becomes the "moving force behind constitutional violations." It is my ***opinion to a reasonable degree of professional certainty*** that the failure to discipline, promoted a pervasive atmosphere that allowed an "inference of supervisory encouragement, condonation or even acquiescence. When no-action is documented then the officer(s) behavior has been deemed appropriate. The failure by the Billerica Police Department to institute complaint misconduct "Early Warning Intervention System" led to a 15 year practice of unaccountability with "officious" and arbitrary police enforcement. The Criminal Bureau (Internal Affairs Unit) failed to maintain an official file consisting of a properly organized finished "findings" product. All interrelated report files were not condensed into one central file. An investigative working file, consisting of handwritten notes in any form generated, rough measurements, diagrams, and other materials used to produce the final product in the official file was not maintained. Video/audio tapes of interviews were not conducted and kept in the working file. All these generally accepted practices in Law Enforcement were noticeably absent from the files of the Billerica Police Department.

It is my *opinion to a reasonable degree of professional certainty* that at a minimum, Billerica's Police Chiefs and their chain of command should have analyzed arrest and motor vehicle citation activity on a quarterly, cumulative basis to detect trends in agency arrests and charging practices. This analysis should have included a review of arrests and citations issued by agency officer. Agency senior supervisors should have acted on this data to ensure that officers were bringing only appropriate charges, and are not violating other department policies or legal rules. As an example, the Billerica Police Department logged 20,649 calls for service during fiscal year 2001 of which 540 resulted in arrests and 7,147 motor vehicle citations issued.  This known accumulated information would then be evaluated to insure agency policies and procedures rather then merely reporting a bare statistic as to arrests and citations.

Complaint reception, investigation and adjudication must be transparent and performed using an objective and unbiased investigation protocol rather then an "I'll talk to the officer" resolution. Anything less then a documented investigation demonstrates that no justifiable discipline or complaint follow-up occurred. A case folder should be assigned to organize and document the event. Nothing short of "no discretion" by the IA Officer or by any Billerica line officer to refuse to accept a complaint or referral should have been accepted. Billerica Police officers had a duty to report misconduct by fellow officers either directly to the IA ( Internal Affairs) Officer or through the reporting officer's chain of command ( Line Sergeant, Officer in Charge-OIC - Lieutenant), Captain, Deputy Chief, Chief of Police, Town Manager).  Such was not the case with the in-house file system of the Billerica Police Agency. The involved officer(s) must be noticed of the complaint, interviewed, and investigated to reach a credible finding within 30 days of the receipt of the complaint. Anything less leaves the event to undocumented memory which results in an "I don't recall" response when questions are raised months and years later or in this case over 15 years later. It is established that when a complaint is filed, the complainant has no less or no more credibility then the officer who is being complained about, regardless of their past criminal history. An adequate "Complaint History" would have provided a contemporaneous narrative description of the allegations with appropriate resolution. There is in law enforcement parlance and statement used as to report writing, "If you did not document it, you did not do it."

It is my *opinion to a reasonable degree of professional certainty* that the partial complaint review, incomplete complaint review, and non performed civilian complaints review allowed a culture within the Billerica Police Department which nourished a pattern of police misconduct by the defendant officers. It is my *opinion to a reasonable degree of professional certainty* that in the absence of civilian report review, plaintiff's seizures were just as likely to have been motivated by officious conduct, contrived probable cause, and malicious, wanton and reckless motivations rather then with legitimate articulable suspicion or probable cause. Although the reviewed record does demonstrate a mixture of legitimate police activity interspersed within the complaint history, it is my *opinion to a reasonable degree of professional certainty* that a pattern of seizures by the 28 defendants demonstrate a custom or practice of arrests which specifically targeted plaintiff's Michelle Kennedy and Brian Kennedy with selective enforcement and harassment. It is my *opinion to a reasonable degree of professional certainty* that although the defendants deny each allegation as it "just did not happen", the absence of reports demonstrating "complaint findings" lead to a conclusion that credible disputes exists as to plaintiff's claims of police misuse of police authority as to justifications of plaintiff's pattern of seizures.

My fee structure is as follows: Analysis of reports and documents, inspection of involved incident and/or crime scenes, travel, research, interviews, conferences, report writing and preparation for trials, hearings, depositions, review and correction of depositions, will all be billed at the hourly rate of $150.00. <u>Out of state</u> testimony including depositions, hearings and trials will be billed for an eight-hour day at the hourly rate of $175.00 ($1,400.00) for each day or part thereof.

Additional hours will be billed to cover Deposition and Trial testimony preparation.  In state will be billed at a four hour allotted time plus expenses ($700.00). Additional testimony hours will be billed at the hourly rate of $175.00. Refer to attached fees schedule for a full description of fees.

Signed:_____

                    *Reginald F. Allard, Jr.*
                    *Dated: August 7, 2006*