UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| BRIAN KENNEDY, et al * | |
| \* | |
| Plaintiffs * | |
| \* | |
| v. * | Civil Action no. 04-12357 - PBS |
| \* | |
| TOWN OF BILLERICA, et al * | |
| \* | |
| Defendants * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR DIRECTED VERDICT**

**A.  Standard for Directed Verdict**

In ruling upon a motion for directed verdict, the Court should view the evidence and make all reasonable inferences in the light most favorable to the plaintiff. The question is whether when the evidence is seen in this light, reasonable jurors could come to but one conclusion. <u>Pittsley v. Warish</u>, 927 F.2d 3, 32 Fed. R. Evid. Serv. 544, (1st Cir., 1991), citing <u>Kinan v. Brockton</u>, 876 F.2d at 1036; <u>Kuras v. International Harvester Co.</u>, 820 F.2d 15, 17 (1st Cir.1987). <u>Wildman v. Lerner Stores Corp.</u>, 771 F.2d 605, 607 (1st Cir.1985); <u>Goldstein v. Kelleher</u>, 728 F.2d 32, 39 (1st Cir.), cert. denied, 469 U.S. 852, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

"The yardstick . . . [for] refusal to grant a directed verdict is the same as that which we apply to the denial of a judgment n.o.v. [internal cites omitted]  In conducting that exercise, [the trial judge] . . .  must examine the evidence and the inferences reasonably to be drawn therfrom in the light most favorable to the nonmovant. [internal cites omitted]

"Put another way, '[the trial judge must] take the facts as shown by the [nonmovant's] evidence and by at least such of [movant's] uncontradicted and unimpeached evidence as, under

all the circumstances, the jury virtually must have believed,'" *Wagenmann v Adams*, 829 F2d 196 (1st Cir., 1987), quoting *Karelitz v. Damson Oil Corp.*, 820 F.2d 529, 530 (1st Cir.1987), and making clear that a directed verdict may be granted "only when the evidence, viewed from this perspective, is such that reasonable persons could reach but one conclusion." Supra

In other words, the Trial Court must assume the plaintiff's evidence to the full extent supported by fact and law. The Court, in ruling on a motion for a directed verdict, must accept the evaluation of the credibility of witnesses in the light most favorable to the plaintiffs, the resolution of conflicts in testimony and the assessment of the weight of the evidence in the light most favorable to the plaintiffs unless such findings have no reasonable basis whatsoever.

**B. Argument**

**I. Malicious Prosecution and False Arrest**

**a. Defendants offer indictment is evidence of probable cause that the time of the arrest**

Defendants argue that they are entitled to a directed verdict for their arrest and prosecution of the plaintiffs from the November 9, 2001 Massone incident because the grand jury found there was probable cause to indict. In doing so, the defendants mix several separate standards. First, the claims of false arrest and malicious prosecution are distinct and separate.

A police officer may offer as a defense to a wrongful arrest that he had probable cause to justify the arrest, but he must prove that he had probable cause to arrest **at the time of the arrest**. *Sheehy v. Town of Plymouth*, 191 F.3d 15, at 19 (1st Cir., 1999) Mass.), citing *Topp v. Wolkowski*, 994 F.2d 45, 48 (1st Cir.1993)

Malicious prosecution, as the defendants correctly note, involves a criminal action that was brought "maliciously, without probable cause and has been terminated in the plaintiff's favor" [defendants' motion, citing *Wynne v Rosen*, 391 Mass. 797 (1984)]

The defendants cite no case law that suggests that a grand jury indictment is a defense to either tort, let alone to a willful civil rights violation based on the same arrest and prosecution. *Ex Parte United States*, 287 U.S. 241 (1932), the 75 year old case upon which the defendants base their argument, holds that a grand jury indictment is conclusive as to probable cause "for the purpose of holding the accused to answer", as the defendants acknowledge. Thus the binding effect of the indictment is limited to the criminal arena. The second case the defendants cite, the 57 year old *Ewing v Mytinger & Casselberry, Inc.*, 339 U.S. 594 (1950) goes no further, addressing the inviolability of a grand jury proceeding only in criminal context.

The third case the defendants cite, *Gonzalez Ricci v. U.S. I.N.S.*, 405 F3d 45 (1st Cir., 2005), is the only one involving application of a grand jury proceeding to a civil claim. Citing several other cases that form the consensus among the circuits, *Gonzalez Ricci* holds, as the defendants concede, that an exception exists to the presumption that a grand jury indictment definitively establishes probable cause, where, as here, there is evidence that the "defendants wrongfully obtained the indictment by knowingly presenting false testimony to the grand jury", id at 49. The defendants ignore the presence of just such evidence here.

The other cases which the First Circuit cites in *Gonzalez Ricci* include *Rothstein v Carriere*, 373 F3d 275 (2d Cir., 2004), in which the Second Circuit held that the presumption of probable cause established by the grand jury indictment may be overcome "by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence or otherwise acted in bad faith". Id, at 282-283, citing *Colon v City of New York*, 60 NY 2d at 82, 455 NE2d 1248 (1983)

The Third Circuit uses similar language in <u>Camiolo v. State Farm Fire & Casualty Co.</u>, 334 F3d 345 at 363 (3d Cir., 2003), holding that the grand jury indictment is no shield where the indictment is procured by "fraud, perjury or other corruption", and the Eighth Circuit completes the consensus, holding that in <u>Moran v Clarke</u>, 296 F3d 638 (8th Cir., 2002) the plaintiff had offered sufficient evidence of a "purposeful police conspiracy to manufacture, and the manufacture of, false evidence". Id, at 647

In <u>Moran,</u> the Eighth Circuit remanded for a new trial, holding that the evidence could be "read to show acts designed to falsely formulate a pretense of probable cause", there was no constitutional remedy available other than to allow the jury to determine the credibility of the allegations. Id., at 647-648

Such is the case here, where there is undisputed evidence that defendant Conway offered false testimony before the grand jury. He testified before the grand jury that there was "smashed glass" still on the baseball bats that were "seized", when the truth was that the bats were metal and could contain no glass, as confirmed by his testimony that at the criminal trial he was unable to find any such glass even with the use of a magnifying glass. He also testified about the "trail of blood" leading from the scene of the crime to the Kennedys' doorstep, embellishing the four or five drops of blood that show on the photos into a "large amount of blood" that could not have been caused by Mr. Kennedy spitting from his tooth, extracted earlier that day. This false testimony, alone, is enough to taint the indictment and defeat the presumption that probable cause existed at the time of the arrest.

Defendant Conway's testimony about the Kennedys "screaming and yelling and using a fair amount of profanity" is also not true. It is contradicted by the videotape the Kennedys took

of the incident, which shows no yelling or screaming for quite some time. Not until the defendants seize and arrest Billy Ashton does Michelle Kennedy start yelling and screaming, and the running time on the video indicates the ten minutes or longer that the Kennedys had been talking in normal voices, even if the actual words are garbled by the quality of the recording.

The defendants have conceded at this trial that the blood had nothing to do with probable cause. If that is the case, then the only reason defendant Conway had for not just presenting evidence of the "trail of blood" leading to the Kennedys' doorstep but embellishing the truth as to the amount of blood is to mislead the jury.

The presence of baseball bats at the Kennedys' door – one of them next to the hockey stick and a duffel bag containing other sports gear – is hardly evidence of a crime, given that the Kennedys had three young boys. If the bats are excluded, then there was no physical evidence tying the Kennedys to the crime to corroborate a questionable identification. The so called "identifications" by the three victims, Deann Massone, Christy Gilpatrick and Vanessa Minervina are the only basis for probable cause to arrest other than defendant Conway's prejudgment, which he acknowledged in his testimony, that the Kennedys were criminals and violent people.

As police practice expert Reginald Allard testified, police officers must not allow their preconceived opinions of the suspect to shape the evidence considered in determining probable cause. A prejudgment about a person is not a sound basis for formulating probable cause. To the contrary, they should let the plain facts lead to probable cause. The question is whether defendant Conway's decision to follow his bias against the Kennedys was willful and deliberate or merely bad police practice is for the jury.

As for the witness identifications, viewing the evidence in the light most favorable to the plaintiffs, there never was any direct identification of the Kennedys. Ms. Massone was taken from her car to the hospital. Although Ms. Gilpatrick and Ms. Minervina were taken back to the crime scene in the street near the Kennedy trailer, they were brought there, by their own testimony and according to the police reports, to identify John Cimmino, which they did.

Ms. Minervina testified that she never met the Kennedys and could not identify them. She testified that she and Ms. Gilpatrick were driven back to identify Mr. Cimmino but that she could not identify the Kennedys and, more significantly, neither she not Ms. Gilpatrick were ever asked to do so.

More troubling to the jury may be her witness statement, which states that "Brian Kennedy had two Doberman Pinchers [sic] telling the two dogs to sick [sic] her", and a reference to "Mickey", crossed out and replaced with "Michelle" as her testimony was that she never met Brian Kennedy and could not identify them if she were asked. Her "statement" also refers to "the son of Bri", with the "of Bri" crossed out and "Mitchell" written in, yet Ms. Minervina testified that she did not know if the Kennedys had a son, let alone what his name was and that she certainly could not recognize him.

Ms. Minervina's testimony at this trial was that she could not identify anyone other than John Cimmino, that both she and Ms. Gilpatrick put their heads down to avoid the glass and thus could not see who was smashing the glass of the car and that once she did look out, it was dark and she could not identify anyone in the ball of people around Ms. Massone.

Ms. Minervina could not explain the discrepancies between her testimony and how the words identifying the Kennedys got into her statement or the inconsistency between these words

in her statement and her unequivocal testimony that she could not identify the Kennedys.  This alone was basis for the jury to find that her written statement had been influenced by the defendants as part of their hostility to the Kennedys, as it is clear that someone told her to put in Mitchell Kennedy's name.

Where Ms. Massone was at the hospital and the jury could believe that the defendants separated Ms. Minervina and Ms. Gilpatrick, then a reasonable jury could find, upon the evidence that the defendants fed Ms. Minervina the Kennedys' names and their son's name, in order to frame the Kennedys for a crime they did not commit.  This would certainly defeat the presumption of probable cause under the standard established under *Ricci Gonzalez* and allow this case to proceed to the jury.

But there is more.  There are numerous other examples of the defendants altering witness statements to shift evidence against the Kennedys.  There are the forged retractions of Tracy Heffernan and Craig Pickering.  There is the police report that claims Mrs. Kaiser saw Brian Kennedy hit her trailer with a lawn chair and throwing rocks at her home and car and the criminal complaint in her name (but without her signature), contradicted by Ms. Kaiser's testimony at this trial that she never saw who was throwing rocks and did not want to press charges, in spite of defendant Rosa or Elmore saying to her that he wanted the Kennedys out of town.

There is the testimony of Ms. Gauvreau that on the night of the firebombing Michelle Kennedy was demanding to know where MacKenzie was and insisting to defendant Connors that MacKenzie was responsible, something Connors deliberately left out of his investigation and report, writing instead, falsely, that Ms. Kennedy was blaming Robert Reslow.  There is the

stolen badge that moves from one location in Scott Ashton's statement, when he confesses to taking the hat and badge, to a location in the Kennedys' home in defendant Connors' report. There is the "map" that the defendants say Danny Dufault drew that showed them where the badge was, a map Danny Dufault could not recognize and testified at trial that he had never seen before.

Finally, there are the witnesses, such as John Cimmino and Tracey Heffernan, that testified that the defendant police officers told them if they help the defendants frame the Kennedys, the defendants would help them with their pending criminal charges. "You wash my back and I'll wash yours", as Tracey Heffernan testified.

In light of this testimony, the jury could reasonable believe that any "identification" by Deann Massone was obtained by improper pressure from defendants on a mission to get the Kennedys no matter how. Ms. Massone, then 19, was drunk at the driver's wheel of her car, perhaps very drunk, when defendants Conway and Davito approached her. She had no honest explanation for what she was doing in the trailer park except that she had come there looking for a fight and got one. She had hit a pedestrian, in anger, and fled the scene. She was never charged with any crime.

The third passenger, Christy Gilpatrick, recanted her identification. Then she recanted her recantation, after defense counsel bought her dinner and paid her $200. The jury would not be unreasonable in discrediting anything she said.

The police reports are inconsistent. While Davito's report indicates an immediate identification of Brian and Michelle Kennedy – in Conway's presence –, defendant Conway contradicts this, writing in his report that he first learned of John Cimmino's involvement and

did not learn of Brian and Michelle Kennedys' involvement until some 20-30 minutes later. Yet by the next morning, there are three signed statements identifying the Kennedys – even though there was no identification ever made of the Kennedys.

Given the pattern of shaping and twisting evidence against the Kennedys, it is not unreasonable for a jury to find that the three young and drunk girls had their statements manipulated so that the defendants could pin a crime on the Kennedys, making good defendant Connors' threat that night to Michelle Kennedy that "this is war! Now, I've got one kid. Next, I'll get the others."

Given this threat and given the numerous examples of Billerica police reports that alter witness evidence against the Kennedys and given defendant Conway's false testimony before the grand jury, a jury could well find that the witness identifications were unduly influenced by the defendants in order to frame the Kennedys. This is precisely the kind of misrepresentation or false testimony that the case law in every circuit that has addressed the issue would view as defeating the presumption of probable cause established by a grand jury indictment.

## II. Intentional Infliction of Emotional Distress

It is not clear from the defendants' motion whether they seek a directed verdict merely as to defendant Casey, for the incident at the Marshall Middle School, or whether the defendants seek a directed verdict on all plaintiffs' claims for intentional infliction of emotional distress. Defendants begin this section of their motion addressing the shoe incident where Mitchell Kennedy is pulled out of class but end this section claiming that "None of the Kennedy children have introduced evidence sufficient to support such a finding against any defendant."

Plaintiffs acknowledge that looking at Mitchell Kennedy's sneaker, in and of itself, is not conduct "utterly intolerable in a civilized community" or "so severe and of a nature that no reasonable person could be expected to endure it". [*Doyle v Hasbro*, 103 F3d 186, 195, citing *Agis v Howard Johnson Co.*, 372 Mass 140, 355 NE2d 315 (1976)]

However, where the suspect is not Mitchell Kennedy and there is no basis for suspecting Mitchell Kennedy other than that he was a classmate or friend of the suspect, then the conduct begins to be called into question.  Similarly, it is not "utterly intolerable to a civilized society" to taunt someone by calling him a "pussy" and taunting that he is scared to fight.  However, a jury may well consider it beyond the bounds of civilized society for police officers, in clear abuse of the powers granted them, to bait Brian Kennedy deliberately, hoping to draw him into a fight where he can be beaten by multiple defendants, then arrested for "resisting" the beating, when done not once but many times over many years.  In this context calling him a "pussy" may well be  and afraid to fight[1] may well be behavior that no reasonable person could expect to endure. That is a question for the jury.

Similarly, a mere arrest of a parent, by itself, cannot be turned into intentional infliction of emotional distress upon the children, by itself.  However, when the defendants go out of their way to arrest a parent in her home, in front of the children, where such an arrest is not necessary, such as the arrest of Michelle Kennedy in 1993, for "assaulting" officer Nestor by allegedly spitting on him when she told him to "get a life" and stop following her and her husband, takes on a different context.

---

[1]The defendants claim that this was in response to Brian Kennedy calling defendant Casey a "Fat F–k".  The jury need not accept this version of the evidence, and, for purposes of this motion for directed verdict, the plaintiffs are entitled to have the facts viewed in the light most favorable to them, that there were two instances of such taunting and that Brian Kennedy used the phrase "Fat F–k" only in response to defendant Casey's taunts, asking him to leave.

When there are multiple such arrests, each deliberate and not for any legitimate police or law enforcement purpose, but solely to harass, intimidate and terrorize the plaintiffs, then, cumulatively such conduct may well go beyond the bounds of civilized society, in the eyes of a jury. There is evidence that these arrests involved unnecessarily aggressive entries. There is evidence that the arrests were accompanied by the defendant police banging on doors and windows and shouting threats at the three young boys, alone in their home, knowing that their parents already had been arrested and fearing that they, too, would be arrested, or taken from their parents and placed in foster care.

Where the three young boys each have vivid impressions from these arrests, ranging from tears and fear at the sound of police sirens on television to writing poetry about the police being out to get them, it is a legitimate question for a jury whether the conduct of the defendants, individually and jointly, as police officers granted a public trust not to abuse their powers to arrest, goes beyond what is acceptable behavior in a civilized society.

The defendants fail to view the evidence in the light most favorable to the plaintiffs when they claim that a single arrest cannot be turned into the intentional infliction of emotional distress. Viewing the evidence in the light most favorable to the plaintiffs requires looking not at a single, legitimate arrest, but at the multiple arrests and the related conduct surrounding the arrests. Similarly, defendant Casey was not just an individual calling names. The name calling must be viewed in light of all the evidence, and, in the context of the history between the Kennedys and Casey and his co-conspirators, there is ample evidence for a jury to find that each of the defendants intentionally inflicted emotional distress upon the plaintiffs, even Casey, although the plaintiffs are only seeking direct claims for intentional infliction of emotional distress against defendants Rosa, Connors, Conway and Tsoukalas.

III. **Conspiracy as to Elmore, McKenzie and Connors**

It is long established and well settled law that a member of an illegal conspiracy is responsible for all its doings, even if he was not aware of its entire scope, or all its details, or the identities, of all its members, and even if his own share in its activities may have been small and was actuated by motives very different from those of his fellow conspirators. *Attorney General v. Tufts*, 239 Mass. 458, 493, 494, 131 N.E. 573, 132 N.E. 322, 17 A.L.R. 274 (1921), *Martineau v. Foley*, 231 Mass. 220, 223, 120 N.E. 445, 1 A.L.R. 1145 (1918), *Lovejoy v. Bailey*, 214 Mass. 134, 153, 101 N.E. 63 (1913), *McDonnell v. United States*, 19 F.2d 801, 803 (1st Cir., 1927), *Coates v. United States*, 59 F.2d 173 (9th Cir., 1932), *Potter Press v. C.W. Potter, Inc.*, 22 N.E.2d 68, 72-73 (Mass.1939)

"'[C]ivil conspiracy' in Massachusetts is 'more akin to a theory of common law joint liability in tort.' *P & B Autobody*, 43 F.3d at 1564. Under this theory, a defendant may be held liable for actions done by others pursuant to a common design or with the defendant's substantial assistance or encouragement." *Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F.Supp.2d 236, 244 (D.Mass. 1999), citing *Kyte v. Philip Morris, Inc.*, 408 Mass. 162, 556 N.E.2d 1025, 1027 (1990) and *Kurker v. Hill*, 44 Mass.App.Ct. 184, 689 N.E.2d 833, 836-37 (1998)."

The defendants acknowledge that "claims against defendants MacKenzie, Elmore and Connors are those that they engaged in a conspiracy with the officers who allegedly violated the plaintiffs (sic) Civil Rights after November 1, 2001." Although the acts of defendant MacKenzie and Elmore May have predated November 1, 2001, their participation in the conspiracy began in 1991, with the threats of MacKenzie, in Elmore's presence to "Watch your back and keep your

wife on a leash!", that "next time you'll be sleeping in a shelter", and that "I got away with the other one and I'll get this truck next". Conduct in furtherance of the conspiracy continued at Mr. Tipps, where defendant Elmore was present when defendant MacKenzie spat on Brian Kennedy and attempted to get him to fight.

Defendant MacKenzie's involvement in the conspiracy continued through the 1990's with the multiple instances of following the Kennedys after their son's karate practice. There is also testimony that defendant MacKenzie told John Cimmino that if he helped get the Kennedys on the Massone charges, Cimmino's charges would be dropped. (Although under the case law it is irrelevant, this act was after November 1, 2001, the defendants are incorrect in claiming that all defendant MacKenzie's conduct in furtherance of the conspiracy occurred before then.)

Defendant Elmore's conduct in furtherance of the conspiracy, in addition to his presence with MacKenzie during the threats and at Mr. Tipps, included his presence with MacKenzie and several other Billerica police officers during the Paul Parent assault upon Brian Kennedy at the Concord Shores. The assailant, Parent, emerged from the group of Billerica police officers, all of whom, including defendants Mackenzie and Elmore, failed to intercede. [See *Com. v Adams*, 416 Mass. 558, 624 N.E.2d 102 (1993), which holds that officers present that witness a civil rights violation and fail to intercede are equally liable for the civil rights violation based upon the failure to intervene.]

There is also evidence that defendant Elmore, with defendant Rosa, pressed the prosecution of Brian Kennedy, Jr., for the Kaiser rock throwing incident, even though the defendants knew that Mrs. Kaiser did not see Brian, Jr., throw any rocks and had insisted that she did not want to go forward with criminal charges. In fact, there is evidence that defendant

Elmore was the officer on a motorcycle who Mrs. Kaiser testified had said "I want the Kennedys out of town so bad I can taste it."

There is also evidence from which the jury could find that defendant Connors also was involved from the outset, as there is evidence that he mis-directed the nominal investigation into the firebombing away from defendant MacKenzie. There is also evidence that defendant Connors moved his missing badge from where the culprit, Scott Ashton, placed them in his statement upon confessing to taking the items, in the Kennedys' home, in order to fabricate a basis for falsely charging them with receiving stolen property, charges that he knew would lead to and did lead to Brian Kennedy's probation surrender and 83 day incarceration.

There is also evidence of defendant Connors' involvement in the Massone frame-up, from his own words to Michelle Kennedy when she was locked up, that "This is war! Nobody takes their kid out of my daughter's class!" and "I got one kid. I'll get the others next!". This participation in the conspiracy is after November 1, 2001, although, contrary to the defendants' assertion, for purposes of liability as a con-conspirator, this is irrelevant.

"[I]t could be inferred that the defendants engaged in a joint venture with the goal of interfering with the plaintiffs' [civil] rights. As joint venturers, 'each is the agent or servant of the others, and that the act of any one within the scope of the enterprise is to be charged vicariously against the rest.' Prosser & Keeton, Torts § 72, at 517 (5th ed. 1984). _Bell v. Mazza_, 474 N.E.2d 1111, 1116 (Mass. 1985), citing _Caron v. Lynn Sand & Stone Co._, 270 Mass. 340, 346, 170 N.E. 77 (1930)  It makes no difference what time any individual participated in the conspiracy, or when any individual joined or left the conspiracy: the law is clear that all co-conspirators are fully responsible for all the acts of any co-conspirator in furtherance of the conspiracy.

**IV. <u>Monell Claim</u>**

It is well established in law that municipal liability attaches when the acts in question are officially sanctioned or ordered by the city. <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986) Liability may attach even in instances of a single decision made by municipal policymakers. <u>Id.</u> at 481. Alternatively, a municipality may be found liable for civil rights infractions caused by the acquiesence by policymaking officials in previous unconstitutional conduct. <u>Bordanaro v. McLeod</u>, 871 F.2d 1151 (1st Cir., 1989), <u>Vinyard v County of Murray</u>, 990 F2d 1207 (11th Cir., 1993), <u>Parrish v. Luckie</u>, 963 F2d 201 (8th Cir., 1992), <u>Gentile v. County of Suffolk</u>, 926 F2d 142 (2d Cir., 1991), <u>Thomas v. City of New Orleans</u>, 687 F2d 80 (5th Cir., 1982) See, also, <u>Britton v. Maloney</u>, 901 F. Supp. 444, 450 (D. Mass, 1995), where the Court explained, in language directly applicable here, cites to <u>Bordanaro</u> in explaining that "Unlike a "policy", which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up. Thus, the liability of the municipality for customary constitutional violations derives not from its creation of the custom, but from its tolerance of or acquiescence in it.

Here there is evidence to support both theories: that the harassment of the Kennedys was tolerated through acquiescence and that it was directly ordered by a supervisor and policymaker, defendant Rosa, as chief of the department and thus the person who authorized policy.

There was testimony that as far back as 1991, the plaintiffs complained to then chief Barretto of harassment by defendants MacKenzie, Elmore and others and that these complaints went unheeded. There is evidence that investigations in 1991 regarding the firebombing of the plaintiff's truck and beatings of the plaintiff were limited to exclude any investigation of the

potential complicity of any Billerica police officers.  The one investigation of alleged police misconduct was the incident at Mr. Tipps, where defendants MacKenzie and Elmore, with other defendants officers, spat on Brian Kennedy and tried to egg him into a fight, where they could justify beating him by arresting him for striking an officer.

This is augmented by the evidence of an inadequate complaint system that was set up in a way that assured there was no way to track or even document civilian complaints.  There was further evidence that when others complained about defendant MacKenzie trying to hire Tracy Heffernan to beat Michelle Kennedy or that when defendants MacKenzie and Elmore tried to pressure Craig Pickering into setting up the Kennedys for a drug arrest, that these allegations not only were never investigated but that the defendant department's "investigation" of these allegations consisted solely of faking false retractions of the accusations.

This is certainly adequate evidence, taken in the light most favorable to the plaintiffs, to support a jury finding that the town's failure to supervise or discipline its police officers delivered the message that the town tolerated behavior that violated the Kennedys' constitutional rights and acquiesced to such behavior towards the Kennedys.

Once defendant Rosa becomes chief, and the policy maker, Billerica's liability can be based not just on a passive failure to supervise but upon the direct commands of Rosa, as chief.

Defendant Rosa issued a policy that directly stated that Billerica officers were to treat the Kennedys and their associates [ie Billy Ashton] differently than anyone else.  This policy involved an order that no police officer associate with the Kennedys.  Defendants try to explain this as a particular example of the general policy that police officers avoid associating with known felons and that at the time he issued the directive, the Kennedys were facing felony

charges from the bogus Massone arrests. However, the jury need not accept this explanation, one that is contradicted by the defendant department's use of Ray Trainor, a convicted felon who admitted to over two dozen convictions, including convictions for assaults and drug use and described by defense counsel as the "muscle" of a local drug ring, as "protection" for its witness, Christy Gilpatrick.

The other part of defendant Rosa's directive was that a supervisor be summoned upon any contact with the Kennedys. While defendant Rosa tried to explain this as a "concern" based upon the Kennedys' history of complaints, a jury could find otherwise: that the defendant town, as policy, was targeting the plaintiffs, and a supervisor needed to be present to assure that there was no discretionary warning or "second chance" but that every encounter that could lead to an arrest or prosecution, even fabricated, would.

A jury could find that upon defendant Rosa's ascension to chief, his desire to get the Kennedys had become official policy. The policies of the chief of a police department became the policies of the defendant department, and thus the municipal defendant because chief is the policy maker for police policy and thus the policies set by the Department and its Chief "may be fairly said to represent official [City] policy" on police matters, _Shaw v. California Dept. of Beverage Control_, 788 F2d 600 (9th Cir., 1988), citing _Monell_, 436 U.S. at 694, 98 S.Ct. at 2037 _McKinley v. City of Eloy_, 705 F.2d 1110, 1116 (9th Cir.1983) and _Black v. Stephens_, 662 F.2d 181, 191 (3d Cir.1981)

Where the jury could find that defendant Rosa, as the chief of the department, made it an official policy of the Billerica Police Department to target the Kennedys and drive them out of town, a jury could find Monell municipal liability either on a theory of failure to discipline and supervise or upon a theory of an express policy to harass the Kennedys.

V. <u>Tsoukalas</u>

Contrary to implication in the defendants' argument, the standard for whether a police officer uses excessive force is not whether the plaintiff had visible marks or objective signs of injury 8 days later. The standard, well settled by the United States Supreme Court in <u>Graham v. Connor</u>, 490 U.S. 386, 109 S. Ct. 1865 (1989), is that a law enforcement officer may use "such force as is reasonably necessary to effect an arrest.". <u>United States v. McQueeney</u>, 674 F.2d 109, 113 (1st Cir.1982)

Contrary to what the defendants seek to imply, there is no minimum threshold of injury. Multiple kicks and blows to Brian Kennedy's midsection are clearly excessive but are not likely to leave marks or bruises. Indeed that is why the defendant police officers may have directed their blows to Mr. Kennedy's mid-section area.

There was clear evidence, in the testimony of Michelle Spaulding, that multiple officers kicked and struck Brian Kennedy after he was handcuffed, that this went on for at least five minutes and that there were so many blows that she horrified and had to turn away from her window. Given her testimony that Mr. Kennedy was already handcuffed and in custody, a single blow would have been excessive force. Ms. Spaulding's testimony of an extended beating that went on for minutes is well beyond that.

As for the argument that the officer who did the beating was "tall" and that defendant Tsoukalas was not the tallest officer on the scene, that is a red herring. In fact, when called upon by defense counsel to view defendant Tsoukalas in her testimony, she described him as tall. At any rate, the beating occurred and Tsoukalas was present and failed to intervene. Thus, he is as culpable for the beating as the officers who did the beating. ""[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of

excessive force can be held liable under [42 U.S.C. §] 1983 for his nonfeasance." *Com. v. Adams*, supra, 565, 105, citing *Gaudreault v. Salem*, 923 F.2d 203, 207 n. 3 (1st Cir.1990), *Bruner v. Dunaway*, 684 F.2d 422, 425 (6th Cir.1982), *Byrd v. Brishke*, 466 F.2d 6, 10-11 (7th Cir.1972); *Hathaway v. Stone*, 687 F.Supp. 708, 712 (D.Mass.1988) and other cases. The same principle appropriately applies under the State Civil Rights Act. *Com. v. Adams*, supra, 565, 105, citing *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 822-823, 473 N.E.2d 1128 (1985).

Thus the defendants' argument about what injuries showed in medical records of a hospital visit 8 days later goes to the question of damages, not to liability, and is not a meaningful argument for directing a verdict in the face of direct evidence that Brian Kennedy was beaten. Nor does it matter whether defendant Tsoukalas beat Brian Kennedy himself, participated in the beating or just watched his fellow officers administer the beating: in any event, the jury may find that he is liable for the violation of Brian Kennedy's civil rights caused by the beating.

Respectfully submitted,
Brian Kennedy, et al
by their counsel

Date: _____

/s/Andrew M. Fischer
Andrew M. Fischer
BB0# 167040
JASON & FISCHER
47 Winter Street
Boston, MA 02108
(617) 423-7904

kennedy/resposnemotostrike\