UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| BRIAN KENNEDY, et al    * | |
| * | |
| Plaintiffs    * | |
| * | |
| v.    * | Civil Action no. 04-12357 - PBS |
| * | |
| TOWN OF BILLERICA, et al    * | |
| * | |
| Defendants    * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
FOR JUDGMENT NOTWITHSTANDING THE VERDICT
OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

**A.   Standard for Judgment notwithstanding the Verdict**

"The standard for granting judgment n.o.v. in this circuit is well settled. Such a motion should be granted only upon a determination that the evidence could lead reasonable men to but one conclusion, a determination made without evaluating the credibility of witnesses or the weight of the evidence at trial. _DeMars v. The Equitable Life Assurance Society of the United States_, 610 F.2d 55, 57 (1st Cir. 1979). Thus, however plausible [defendants'] view of the case may be, [the district judge is] bound to review the evidence and the inferences to be drawn therefrom in the light most favorable to [the plaintiff]. _Rios v. Empresas Lineas Maritimas Argentinas_, 575 F.2d 986, 989 (1st Cir. 1978)" _Hubbard v. Faros Fisheries, Inc._, 626 F.2d 196 (1st Cir., 1980)

A jury verdict may be set aside only if "there is no legally sufficient basis" to support the jury's finding. Fed.R.Civ.P., Rule 50(a)  The trial judge "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence" but must "examine the evidence and the inferences reasonably to be drawn therefrom in the light most favorable to the nonmovant." _Wagenmann v Adams_, 829 F.2d 196 (1st Cir., 1987)

In other words, the trial Court must assume that the jury accepted the plaintiff's evidence to the full extent supported by fact and law.  The Court, in ruling on a motion to set aside a verdict, must respect the jury's evaluation of the credibility of witnesses, the jury's resolution of conflicts in testimony and the jury's assessment of the weight of the evidence unless the jury's findings have no reasonable basis.

"In order to award a new trial [a Court] must find that the jury's verdict was **so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice**." [emphasis added] _Wagenmann v Adams_, supra, citing _Valm v. Hercules Fish Products, Inc._, 701 F.2d 235, 237 (1st Cir.1983) (same); _Coffran v. Hitchcock Clinic, Inc._, 683 F.2d 5, 6 (1st Cir.), cert. denied, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982) and other cases.

Thus, in ruling upon a motion to set aside a verdict, the Court should view the evidence and make all reasonable inferences in the light most favorable to the plaintiff.  The question is whether when the evidence is seen in this light, reasonable jurors could come to but one conclusion.  _Pittsley v. Warish_, 927 F.2d 3, 32 Fed. R. Evid. Serv. 544, (1st Cir., 1991), citing _Kinan v. Brockton_, 876 F.2d at 1036; _Kuras v. International Harvester Co._, 820 F.2d 15, 17 (1st Cir.1987). _Wildman v. Lerner Stores Corp._, 771 F.2d 605, 607 (1st Cir.1985); _Goldstein v. Kelleher_, 728 F.2d 32, 39 (1st Cir.), cert. denied, 469 U.S. 852, 83 L.Ed.2d 107 (1984).

**B.  Argument**

**I.  The Jury was entitled to find that Defendant Tsoukalas falsely arrested Mitchell Kennedy, as the Court correctly instructed the jury on the elements of assault and battery on a police officer .**

The defendants first complain that the Court gave incorrect instructions as to the elements of assault and battery on a police officer.  Although the Court's initial jury instructions were

perfectly adequate, when the jury expressed concern over the elements of assault and battery on a police officer, the Court gave an appropriate supplemental instruction, drawn from a respected criminal law treatise.  This supplemental instruction was absolutely suitable.

Defendants only complain because the Court did not give the specific supplemental instruction which defendants proposed, an instruction that was far less balanced and more favorable to the defendants.  This is not a basis for setting aside a verdict.

## II. **Defendants had a full opportunity to present their case**

Defendants' second complaint is that the Court cut short their defense.  However, the defendants fail to make any offer of what additional evidence they would have presented, had they been afforded more time.  The only reference defendants make to any testimony or evidence they were not permitted to offer is that "the Court arbitrarily prevented Defendant Rosa from completing his testimony, which in part directly related to the 'Kaiser' incident".  However, the defendants do not suggest what additional evidence defendant Rosa would have provided.  This failure suggests that there is not substance to their argument.

In truth, defendant Rosa testified for the last two hours of trial and had full opportunity to offer any testimony he wanted.  This was after the Court asked defense Counsel how much time he needed for defendant Rosa's testimony.  Defense counsel answered an hour or two and was afforded this time.  At the conclusion of his two hours, the defendant complained of being cut off, and the Court asked for a proffer as to any further testimony at that time.

The Court determined, based on this proffer, that defendant Rosa had no new relevant testimony to offer.  Thus the Court fairly considered and ruled upon this issue before the jury was discharged, indeed before the defendants rested, and gave the issue full consideration.

Moreover, the plaintiffs were unable to cross examine defendant Rosa, so that his testimony was unchallenged. This provided an advantage for the defendants.

In any event, the Court has broad discretion to limit testimony. There was no abuse of this discretion and defendants had ample opportunity to offer any evidence they chose. The defendants failure to identify any evidence that they were prevented from offering because of the Court's time limits indicates that the Court's time limitations did not harm or prejudice the defendants in any way.

**III. The defendants are incorrect in claiming there is no tort of negligent supervision.**

The tort of negligent supervision is well established and has been applied specifically to a municipality's failure to supervise police officers who engage in excessive force or other police misconduct. See Judge Young's discussion at p. 95 in *Chaabouni v. City of Boston*, 133 F.Supp.2d 93 (2001) See also, e.g. *Wilson v. Town of Mendon*, 294 F.3d 1, (1st Cir. 2002), *Burke v. Town of Walpole*, Not Reported in F.Supp.2d, 2003 WL 23327539, D.Mass., Aug 05, 2003, *Carlson v. Town of Ipswich*, 61 Mass.App.Ct. 1112, 810 N.E.2d 863 (2004) or *Wilson v. City of Boston*, 421 F.3d 45, (1st Cir. 2005) Each of these decisions in addressing other issues assume what Judge Young found: that claims of negligent supervision are viable independent of the individual claim against the individual officers.

**IV. There was more than ample evidence of negligent supervision.**

The defendants next contend that there was no evidence of negligent supervision. This is simply not true. There was an admission by defendant chief Barretto that the plaintiffs complained that defendant MacKenzie was involved in the firebombing of their truck, yet there was no inquiry or investigation into this allegation. There was an admission by defendant chief

Barretto that the plaintiffs complained that defendant MacKenzie was involved in the beating of plaintiff Brian Kennedy at the Concord Shores, yet there was no inquiry or investigation into this allegation.  There was evidence that the plaintiffs complained about being threatened at Mr. Tipps restaurant and about Brian Kennedy being challenged to fight and about the investigation of this confrontation. This was the only investigation of any of the Kennedys' complaints, and it was whitewashed.  Defendant Munn, in his investigation, concluded that the witnesses could not have seen what they said they saw.

There was evidence that complaints by Craig Pickering and Tracey Heffernan were covered up by false retractions.  There was evidence that in addition to witness statements, police reports also were tampered with or altered.

There was evidence, in the testimony of the plaintiff's expert witness, Reginald Allard, that there were no adequate complaint tracking procedures, so that there was no good record of how many prior complaints had been made against any officer.  There was evidence, also in the testimony of the plaintiff's expert witness, Reginald Allard, that the practice of encouraging the line officer in charge to "resolve" complaints "orally" was inconsistent with sound police practice, as it prevented proper documentation of complaints.

There was evidence that the defendant officers told neighbors of the plaintiffs that they "wanted the Kennedys out of town so bad they could taste it."  There was evidence of tolerance of improper and offensive cartoons publicly posted and of tolerance of improper rudeness and behavior by Billerica Police Officers.  Some of this testimony came in through the admission of defendant Billerica Police Officers.

Thus the defendants have no basis to claim that there was not adequate evidence upon which a jury could find that the defendant town negligently failed to supervise and discipline its officers.

**V.  There was more than ample evidence of deliberate indifference to support a Monell claim for failure to discipline and supervise.**

It is well established in law that municipal liability attaches when the acts in question are officially sanctioned or ordered by the city.  <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986)  Liability may attach even in instances of a single decision made by municipal policymakers.  <u>Id.</u> at 481.  Alternatively, a municipality may be found liable for civil rights infractions caused by the acquiescence by policymaking officials in previous unconstitutional conduct.  <u>Bordanaro v. McLeod</u>, 871 F.2d 1151 (1st Cir., 1989), <u>Vinyard v County of Murray</u>, 990 F.2d 1207 (11th Cir., 1993), <u>Parrish v. Luckie</u>, 963 F.2d 201 (8th Cir., 1992), <u>Gentile v. County of Suffolk</u>, 926 F.2d 142 (2d Cir., 1991), <u>Thomas v. City of New Orleans</u>, 687 F.2d 80 (5th Cir., 1982)  See, also, <u>Britton v. Maloney</u>, 901 F. Supp. 444, 450 (D. Mass, 1995), where the Court explained, in language directly applicable here, cites to <u>Bordanaro</u> in explaining that "Unlike a 'policy', which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up.  Thus, the liability of the municipality for customary constitutional violations derives not from its creation of the custom, but from its tolerance of or acquiescence in it."

Here there is evidence to support both theories: that the harassment of the Kennedys was tolerated through acquiescence and that it was directly ordered by a supervisor and policymaker, defendant Rosa, as chief of the department and thus the person who authorized policy.

There was testimony that as far back as 1991, the plaintiffs complained to then chief Barretto of harassment by defendants MacKenzie, Elmore and others and that these complaints went unheeded. There was evidence that investigations in 1991 regarding the firebombing of the plaintiff's truck and beatings of the plaintiff deliberately were limited to exclude any investigation of the potential complicity of any Billerica police officers, despite allegations by the Kennedys -- and others -- of police complicity and misconduct.

There was evidence that the one actual investigation of alleged police misconduct, of the incident at Mr. Tipps, was whitewashed. There were witnesses besides the Kennedys, including waitresses and other patrons, who corroborated the Kennedys' complaint that defendants MacKenzie and Elmore, with other defendants officers, spat on Brian Kennedy and tried to egg him into a fight, where they could justify beating him by arresting him for striking an officer. This evidence was dismissed, upon the conclusion of the investigating officer, defendant Munn, that the witnesses could not have seen what they said they saw.

This evidence was augmented by the evidence of inadequate procedures for handling civilian complaints, as explained by plaintiff's expert, Reginald Allard. Mr. Allard testified that this procedure sent a message that police abuse would not be punished, that individual officers would not be held accountable.

Mr. Allard explained that the absence of a tracking system and the inadequate complaint system that was set up in a way that assured there was no way to track or even document civilian complaints prevented the possibility of early intervention or effective discipline. He also testified about the existence of an environment within the Billerica Police Department that, operated pursuant to a "blue coat", where officers protected each other, contrary to proper police goals of

effective protection of civilians. This was evident in the hesitancy of witness Dean Royston to testify against his "brother" officers, even after being removed from the force, stating in his testimony words to the effect of "cops take care of cops" and "a cop will stand by his brother cops". This was further evident in the testimony regarding the Parker incident, where Royston was chastised by his fellow officers for not standing with them against the Kennedys, but Parker was never disciplined for his unbecoming behavior and racist comments about "sleeping with the nigger".

There was further evidence that when others complained about defendant MacKenzie trying to hire Tracy Heffernan to beat Michelle Kennedy or that when defendants MacKenzie and Elmore tried to pressure Craig Pickering into setting up the Kennedys for a drug arrest, that these allegations not only were never investigated but that the defendant department's "investigation" of these allegations consisted solely of fabricating false retractions of the accusations.

This is certainly adequate evidence, taken in the light most favorable to the plaintiffs, to support a jury finding that the town's failure to supervise or discipline its police officers delivered the message that the town tolerated behavior that violated the Kennedys' constitutional rights and acquiesced to such behavior towards the Kennedys.

Once defendant Rosa becomes chief, and the policy maker, the inadequate practices and procedures for handling civilian complaints continued, without change and without compliance. This was true even though the town had adopted the uniform practices and procedures of the MPI, standards which Mr. Allard affirmed as acceptable standards.

Moreover, with defendant Rosa in command, the unwritten but accepted practice of targeting the Kenedys became official policy, as evidence by the written directive issued by defendant Rosa. Accordingly, Billerica's liability can be based not just on a passive failure to supervise but upon the direct commands of Rosa, as chief. Defendant Rosa issued a policy that directly stated that Billerica officers were to treat the Kennedys and their associates [i.e. Billy Ashton] differently than anyone else. This policy involved an order that no police officer associate with the Kennedys.

Defendants try to explain this as a particular example of the general policy that police officers avoid associating with known felons and that at the time he issued the directive, the Kennedys were facing felony charges from the bogus Massone arrests. However, the jury need not accept this explanation, one that is contradicted by the defendant department's use of Ray Trainor, a convicted felon who admitted to over two dozen convictions, including convictions for assaults and drug use and described by defense counsel as the "muscle" of a local drug ring, as "protection" for its witness, Christy Gilpatrick.

The other part of defendant Rosa's directive was that a supervisor be summoned upon any contact with the Kennedys. While defendant Rosa tried to explain this as a "concern" based upon the Kennedys' history of complaints, a jury could find otherwise: that the defendant town, as policy, was targeting the plaintiffs, and a supervisor needed to be present to assure that there was no discretionary warning or "second chance" but that every encounter that could lead to an arrest or prosecution would, even if fabricated.

A jury could find that upon defendant Rosa's ascension to chief, his desire to get the Kennedys had become official policy. The policies of the chief of a police department became

the policies of the defendant department, and thus the municipal defendant because its chief is the policy maker for police policy and thus the policies set by the Department and its Chief "may be fairly said to represent official [City] policy" on police matters, *Shaw v. California Dept. of Beverage Control*, 788 F.2d 600 (9th Cir., 1988), citing *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037 *McKinley v. City of Eloy*, 705 F.2d 1110, 1116 (9th Cir.1983) and *Black v. Stephens*, 662 F.2d 181, 191 (3d Cir.1981)

    Where the jury could find that defendant Rosa, as the chief of the department, made it an official policy of the Billerica Police Department to target the Kennedys and drive them out of town, a jury could find *Monell* municipal liability either on a theory of failure to discipline and supervise or upon a theory of an express policy to harass the Kennedys. As set forth in section IV., above, there was ample evidence of lax discipline and failure to supervise.

    Certainly a jury was well within the bounds of what is reasonable to find against the defendant town on the *Monell* failure to supervise and discipline claim. The defendants cannot meet the high standard that jury's verdict was so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice or that reasonable jurors could come to but one conclusion, that the defendant town's procedures for handling civilian complaints and internal affairs and disciplinary procedures were wholly acceptable. Such a conclusion would be wholly inconsistent with Reginald Allard's expert witness testimony, which the jury was absolutely entitled to believe.

**VI. There was ample evidence to support the Jury's findings of Intentional Infliction of Emotional Distress**

In complaining that "Chief Rosa's actions of applying for a juvenile complaint application simply cannot support a finding of intentional infliction of emotional distress", the defendants must show that reasonable jurors could come to no other conclusion. *Pittsley v. Warish*, 927 F.2d 3, 32 Fed. R. Evid. Serv. 544, (1st Cir., 1991)  The defendants cannot make such a showing here, where defendant Rosa's behavior, when taken in light of his position as a commanding officer and subsequently as chief.

While there was some question as to who made the statement to Mrs. Kaiser about wanting to run the Kennedys out of town "so bad I can taste it", it was clearly within the jury's purview to find that it was defendant Rosa who made this statement.  Defendant Rosa also admitted that he implemented a policy that singled out the Kennedys and which led to harassment of the Kennedys.  Defendant Rosa tried to justify this by claiming that the Kennedys were "known felons", there was ample evidence defendant Billerica police officers associated with other known felons, and the jury was free to find that defendant Rosa's order was intended to single out and target the Kennedys.

The testimony of defendant Tsoukalas explaining why he would turn around and follow the Kennedys and the videotapes of police cars following the Kennedys and sitting in front of their house for no apparent reason all justify a jury finding that the targeting of the Kennedys at defendant Rosa's direction and under his command.  In this light, it is not merely the filing of a criminal complaint that was the basis for the finding of intentional infliction of emotional distress in favor of Brian Kennedy, junior.

Again, the standard is not what the defendant proposed as a possible reading of the facts. The standard is whether a reasonable jury could come to no other possible conclusion than the defendants' version. It is clear from the jury's question regarding initiation of criminal process that the jury was troubled by defendant Rosa's prosecution of Brian, junior, even though Mrs. Kaiser, the supposed "victim", told him that she could not identify Brian, junior, as the boy who was throwing rocks and further told him that she did not want to pursue criminal prosecution of the boy.

Defendant Rosa proceeded, nonetheless. The jury's question about the procedure for pursuing a criminal complaint may have indicated that they wanted to find defendant Rosa liable for malicious prosecution but had some question about the process and who signed the complaint initiating criminal process. On the other hand, the testimony of Mrs. Kaiser was unequivocal that she did not. Defendant Rosa testified that she did but could not produce a complaint with her signature.

The evidence supports a finding by the jury that defendant Rosa filed the application for criminal complaint with his own signature. However, the jury may have been reluctant to make such a finding, given there was no signed complaint in evidence. This may be why the jury posed its question about initiating process and may also explain why the jury entered its finding against defendant Rosa on the infliction of emotional distress claim rather than for malicious prosecution. Such speculation is not basis to set aside a verdict, as it is a rational basis for finding that defendant Rosa deliberately advanced criminal prosecution to inflict emotional distress upon the young juvenile, Brian Kennedy, junior.

Alternatively, the jury could have found that defendant Rosa forged Mrs. Kaiser's signature in order to move forward the wrongful criminal prosecution of a young boy, intentionally inflicting emotional distress with the intention of driving the Kennedys out of Billerica. This is conduct that a reasonable jury could find "utterly intolerable in a civilized community" or "so severe and of a nature that no reasonable person could be expected to endure it". [_Doyle v Hasbro_, 103 F3d 186, 195, citing _Agis v Howard Johnson Co._, 372 Mass 140, 355 NE2d 315 (1976)]

Such a finding is not unreasonable in light of what became, by the end of the trial, a number of altered police reports or forged signatures of witnesses, many of which occurred during defendant Rosa's watch as chief of the department. While the "retractions" of Tracy Heffernan and Craig Pickering may have been dated 1991, the evidence that emerged from trial supports a jury finding that the altered "retractions" may have been fabricated under defendant Rosa's command, as part of the coverup.

There was clear evidence that extra lines were added in 2002 to defendant Connors' report of the 1991 firebombing, as the jury had two different copies of the report, both "generated" years after the original report was authored and dated. Defendant Rosa's own testimony was that after the presentment letter had been received, in February, 2002, he ordered that records be "assembled" -- not to investigate the claim, but to prepare a "defense" to the claim. The jury was entitled to find that it was at defendant Rosa's direction that these documents were altered. Indeed this is consistent with the jury's substantive finding of liability on the _Monell_ failure to supervise claim.

In this light, and in the context of the other evidence, the jury was entitled to find that defendant Rosa's claim that the unsigned application for complaint was signed and submitted by defendant Rosa to commence criminal process deliberately to inflict emotional distress. The jury's question about how criminal process was commenced suggests that the jury grappled with this issue. It is possible that the jury found that it could not find defendant Rosa liable for malicious prosecution, because it was not clear whose signature was on the complaint. Nonetheless, the jury was troubled enough by defendant Rosa's conduct in pressing the criminal prosecution that it could have found that defendant Rosa did so with the deliberate intention of inflicting emotional distress on the young Brian Kennedy, Jr.

Such a finding is well within the purview of the jury, given its findings regarding the town's negligent supervision and Monell failure to supervise, much of which occurred under defendant Rosa's command. In this light, defendant Rosa's conduct may well be seen to be "utterly intolerable in a civilized community" or "so severe and of a nature that no reasonable person could be expected to endure it". [*Doyle v Hasbro*, 103 F.3d 186, 195, citing *Agis v Howard Johnson Co.*, 372 Mass. 140, 355 N.E.2d 315 (1976)]

## VII. The verdict need not be reduced as there was no award for more than $100,000 to any plaintiff except for Brian Kennedy, Jr.

The defendants contend that the verdict has to be reduced because M.G.L., c. 258 caps damages for negligence by a municipality to $100,000. However, the cap is per plaintiff. The only plaintiff who was awarded more than $100,000 in damages for negligence was Brian Kennedy, Jr., who was awarded $10,000 for emotional distress against defendant Rosa and $190,000 for negligent supervision against the Town of Billerica.

None of the other plaintiffs were awarded more than $100,000 on any negligence claim, thus the award to Brian Kennedy, Jr., is the only claim that exceeds the cap.

### VIII. The defendants should not be permitted to "reserve" other arguments that they could assert herein.

The defendants claim to "reserve other arguments on a motion for new trial". Plaintiffs suggest that there can be no "new" arguments that the defendants are not aware of now, but that the defendants merely seek to reserve a second bite at the apple. Plaintiffs wrote to defense counsel, noting that this motion is premature, as the verdict and judgment has not yet been entered and suggesting that the defendants either withdraw this motion or waive any subsequent motion, as plaintiffs should not have to oppose two motions for Judgment NOV. [See letter faxed to defense counsel on May 16, 2007, Exhibit A, hereto]

Defendants responded with a letter stating that defendants "do not oppose the plaintiffs having to file their response only once". [See letter from defense counsel, Exhibit B, hereto] This response is meaningless unless the Court treats it as a waiver, as the defendants were invited to wait.

Plaintiffs request that the Court deem this a waiver of any "reservation" of any self claimed right to bring this motion again.

|  |  |
|---|---|
|  | Respectfully submitted,<br>Brian Kennedy, et al<br>by their counsel |
| Date: <u>May 24, 2007</u> | /s/Andrew M. Fischer<br>Andrew M. Fischer<br>BB0# 167040<br>JASON & FISCHER<br>47 Winter Street<br>Boston, MA 02108<br>(617) 423-7904 |
| kennedy/oppmodirectedverdict\ | afischer@jasonandfischer.com |