UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
BRIAN KENNEDY, et al.,        )
                              )
         Plaintiffs,          )
                              )
     v.                       )    CIVIL ACTION NO. 04-12357-PBS
                              )
TOWN OF BILLERICA, et al.,    )
                              )
         Defendants.          )
                              )
_____)
```

**MEMORANDUM AND ORDER**

August 21, 2007

Saris, U.S.D.J.

     After a month-long bitterly contested jury trial, defendants move for judgment as a matter of law under Fed. R. Civ. P. 50, or in the alternative for a new trial under Fed. R. Civ. P. 59.  The motion is **ALLOWED**, in part, and **DENIED**, in part.  I address the primary issues as follows:

     **A. JURY CHARGE**

     Defendants challenge the supplemental jury instructions on assault and battery on a police officer.  As background, plaintiff Mitchell Kennedy contended that when he was ten years old, Officer Mark Tsoukalas unlawfully arrested him for assault and battery on a police officer without probable cause in violation of his civil rights.  Tsoukalas, a large man, had maintained that Mitchell, who was small, struck him during an encounter at night at the trailer park where the Kennedy family lived.  Mitchell denied he hit Tsoukalas, claiming that Tsoukalas

was shining a flashlight directly into his eyes, and that he only pushed the flashlight aside.  Mitchell was handcuffed and taken in a cruiser to the police station.  This presented a classic credibility dispute for the jury to resolve.  The jury awarded Mitchell Kennedy $15,000 for this violation.  The court initially did not give any instruction on assault and battery on a police officer prior to jury deliberations because none was requested.

However, when the jury asked about the elements of the crime, the court read an instruction directly from the treatise entitled "Massachusetts Jury Instructions, Criminal".  William P. Homans Jr. & Stephen Hrones, <u>Massachusetts Jury Instructions, Criminal</u> (2d ed. 1996).  Again, neither side objected to the instruction.  About one hour later, counsel objected to the supplemental jury charge.  The objection was not timely.  <u>See</u> Fed. R. Civ. P. 51; <u>see also</u> <u>Azimi v. Jordan's Meats, Inc.</u>, 456 F.3d 228, 238-39 (1st Cir. 2006).  Moreover, while the instruction was complex, it accurately reflected Massachusetts law.  <u>See</u> <u>Massachusetts v. Burke</u>, 390 Mass. 480, 482-83 (1983) (citations omitted).  While counsel is correct that I was concerned that the instruction, as read, was difficult to understand, for that reason, I had it transcribed and given to the jury.

**B. <u>THE TOWN OF BILLERICA</u>**[1]

---

[1] The Court did not have a complete transcript at the time of this opinion.

Plaintiffs asserted that the Town of Billerica was liable for the violation of their civil rights under a <u>Monell</u> theory, see <u>Monell v. New York City Dep't of Social Servs.</u>, 436 U.S. 658, 694-95 (1978), and under state law for negligent supervision. The jury found that the Town "failed to properly discipline or supervise the defendant officers in a manner that was deliberately indifferent to the civil rights of the plaintiffs," but found that the deliberate indifference only resulted in a violation of Mitchell Kennedy's civil rights. The jury also found that the Town of Billerica was negligent in disciplining or supervising its police officers, thus proximately causing harm to Michelle, Brian, Jr., Mitchell, and Dylan Kennedy. It awarded $50,000 in favor of Michelle Kennedy, $100,000 in favor of Dylan Kennedy, $190,000 in favor of Brian Kennedy, Jr., and $235,000 in favor of Mitchell Kennedy. Notice that the civil rights claim involved only the defendant officers, but the negligence claim involved all Billerica officers.

## 1. Tort of Negligent Supervision

Defendants challenge this verdict on three grounds. First, they argue that there is no viable tort of negligent supervision under the Massachusetts Tort Claims Act, Mass. Gen. L. ch. 258, § 2. Defendants are wrong as a matter of law. See <u>Chaabouni v. City of Boston</u>, 133 F. Supp. 2d 93, 98 (D. Mass. 2001) (Young, J.) (refusing to dismiss a claim of negligent supervision of police officers who engaged in excessive force); <u>see also Hathaway v. Stone</u>, 687 F. Supp. 708, 711 (D. Mass. 1988)

(Caffrey, J.) (denying motion for summary judgment on plaintiff's
claim for negligent supervision against police department); Dobos
v. Driscoll, 404 Mass. 634, 650-71 (1989) (holding the state
liable for the negligent supervision of a police officer who had
a history of disciplinary problems when that officer abused a
motorist during a traffic stop).

### 2. Sufficiency of the Evidence

Next, defendants question whether there is sufficient
evidence to support the negligent supervision claim.  Neither
side thoroughly discussed this claim during closing arguments.
Plaintiffs presented evidence that various Billerica police
officers engaged in a pattern of petty harassment by tailing the
Kennedys as they drove through Billerica, issuing them some
invalid traffic citations, arresting or prosecuting them without
probable cause, sitting in cruisers outside their home for no
reason, taunting the family, impeding the posting of bail and
challenging them to physical altercations.  The jury could have
reasonably found that the family made countless complaints of
this police harassment to Billerica's Chief of Police Barretto,
Chief of Police Daniel Rosa, and to Billerica's Town Manager from
1992 to the time of suit,[2] and nothing was done to discipline the
police officers.  Specifically, plaintiffs complained to then-

---

[2] Defendants fairly point out that there was no evidence
about complaints to Chief Matthews for two or three years in the
late 1990s.  However, there was evidence of persistent complaints
to the police and town both before and after his tenure.

4

Chief Barretto that several officers harassed them, especially
Officer Frank MacKenzie, who Michelle Kennedy claimed initiated a
campaign of harassment after she spurned his sexual advances in
the early 1990s.  In addition, they complained to Barretto that
the officers investigating the firebombing of plaintiffs' truck
failed to consider the complicity of Officer MacKenzie in the
arson.  There is also evidence that Michelle Kennedy complained
to the Town Manager beginning in the late-1990s that the police
were constantly tailing them around town until the time of suit
and giving them bogus traffic citations through the mid-1990s.
Officer Dean Royston testified that he was disciplined in 2002
for supporting the Kennedys during the so-called Parker incident
and otherwise ridiculed by fellow police officers for his
friendship with the family.  The Billerica Police Department
instituted an express policy that no officer could associate with
the family, and that a supervisor be summoned when any contact
with the Kennedys was made.  While the police gave plausible
reasons for these policies - i.e., that they were suspected
felons - the jury was free not to credit them.`

    Plaintiffs submitted the evidence of a police expert about
the inadequate procedures.  This expert opined that the Billerica
police department: lacked the capacity to handle complaints from
citizens, frequently ignored complaints from the Kennedys, failed
to train adequately its officers about the meanings of probable
cause, encouraged its officers to give bogus traffic citations to
individuals who complained about the department, and actively

fostered an "us-versus-them" mentality designed to protect fellow-officers (even at the expense of the rights of others). While this evidence was all hotly disputed, the jury could have reasonably found it reliable.

Defendants point out that Chief Rosa did institute better practices and procedures for handling complaints. Still, plaintiffs argue that Chief Rosa was part of the problem because he personally set a custom and policy of encouraging harassment of the Kennedy family so that they would leave town. In fact, one witness, Ms. Kaiser, bolstered these accusations by testifying that Chief Rosa attempted to get her to press charges against one of the children because he wanted to "nail[] the Kennedys" so bad that he could "taste it." (Trial Tr. 6, 8, April 10, 2007).

Perhaps the most poignant testimony came from Officer Tsoukalas, a newer member of the force, who admitted that he followed the Kennedys everywhere because he was told they were criminals and were likely to be up to no good. According to Tsoukalas, during his training, he was made aware of particular individuals in Billerica to be cautious of: "Criminals, people I should be aware of, people that committing law doing these crimes," including "the Kennedys and Billy Ashton." (Trial Tr. 149, April 25, 2007). Because of this warning, he reported that he had frequent "interactions" with the Kennedys. (Id.) Tsoukalas admitted that he routinely followed them because "they

6

were criminals, that they were up to something." (Trial Tr. 23,
April 26, 2007.)

To be sure, the Kennedy parents were no angels. There was
persuasive evidence that they were drug traffickers in the early
1990s, that they were also drug addicts, that they had received
multiple <u>valid</u> traffic citations for driving with suspended
licenses, that Michelle mouthed-off at the police with four-
letter words, and that both parents had hair-trigger tempers with
a propensity towards violence. The police were understandably
hostile to the parents. Still, a reasonable jury could have
found that the evidence supported the plaintiffs' claim that the
message from supervisors to police officers throughout the decade
was that the Kennedys were "trailer-trash," and harassment of
them would be tolerated without consequence. Significantly,
there was evidence that the police harassed the Kennedy sons by
unlawfully arresting and prosecuting them, and that police
officers followed the boys in their cruisers from school and
hockey practice. The jury could reasonably have found that this
pattern of harassment was designed to drive the plaintiffs out of
town, which it ultimately did. Thus, the jury's negligent
supervision and deliberate indifference verdict was based on
sufficient evidence.

### 3. Amount of Damages

Finally, defendants argue that, at minimum, the damages must

7

be capped at $100,000 per defendant under state law.  See Mass.
Gen. Laws ch. 258, § 2.  Plaintiffs do not oppose this position.
Accordingly, Brian Kennedy, Jr.'s award must be reduced from
$190,000 to $100,000.[3]  There is sufficient evidence to support
an award of $100,000 for the boys because their claims of
harassment were not time-limited like the parents' claims.

        Mitchell's situation is more difficult because the jury also
found that the Town was deliberately indifferent to Mitchell's
civil rights under a Monell theory, as well as for negligent
supervision, and awarded him a total of $235,000.  See Monell,
436 U.S. at 694-95.  Thus, under this Monell theory, the Town
could be liable for more than $100,000 because there is no cap on
civil rights damages.  There is sufficient evidence to find the
Town liable against Mitchell Kennedy under a Monell theory for at
least $15,000, which is the amount that the jury reasonably
awarded Mitchell Kennedy for Officer Tsoukalas's violation of his
civil rights during the unlawful arrest.  There was sufficient
evidence introduced during trial that would allow a jury to
conclude that Mitchell Kennedy was impermissibly arrested and
that the Town of Billerica, which received numerous complaints of

---

        [3] Based on the testimony of Ms. Kaiser and the plaintiffs,
there was also sufficient evidence to support Brian, Jr.'s
separate intentional infliction of emotional distress claim
against Rosa.  Kaiser testified that she did not want to press
charges against Brian, Jr. for the rock throwing because he
apologized for the incident and cleaned up the rocks.
Nevertheless, she was pressured to complain against the family by
the police, and she alleged that the police forged her name on
the criminal complaint to secure charges against the boy in an
effort to drive the family out of Billerica.

police misconduct and encouraged Tsoukalas to treat the family as criminals, was deliberately indifferent towards the young plaintiff.

The tougher question is whether there is sufficient evidence to support a <u>Monell</u> violation for amounts greater than $15,000. The problem here is that there is no evidence of a civil rights violation against Mitchell by any defendant officer other than the unlawful arrest by Tsoukalas. The jury found <u>against</u> Mitchell on his other claims of unlawful prosecution arising from the so-called Dianne Massone incident. The only other possible civil rights claim that Mitchell has involves the alleged course of harassment of the Kennedy family over fifteen years by the police. Plaintiff introduced evidence that officers of the Billerica Police force followed them around in their cruisers, parked near their home to intimidate them, and engaged in various other conduct (like verbal insults) which rose to the level of a deprivation of liberty. But the plaintiffs specifically waived this novel civil rights claim under the substantive due process clause of the Fourteenth Amendment at trial. Accordingly, I find that there is insufficient evidence to support Mitchell's <u>Monell</u> claim against the Town in an amount greater than the $15,000 for the unlawful arrest claim. Thus, Mitchell Kennedy's damage award against the Town will be reduced to a total of $115,000.

The jury's verdict in favor of Michelle Kennedy is somewhat closer, but there is still sufficient evidence to support a damage award in her favor for $50,000. Remember, unlike the

children's claims, Michelle Kennedy's claims predating November
5, 2001 are time barred.  After November 5, 2001, she can point
to several incidents of alleged misconduct by the police that may
have caused her harm.  In particular, she testified that
Tsoukalas repeatedly tailed her vehicle after 2001, that Officer
Connors frequently sat outside of her trailer and flashed his
lights on their house, and that she was verbally and physically
assaulted by Scott Parker, a Billerica officer, in a parking lot
in 2002.  Further, she testified that she repeatedly complained
about these incidents to the chief of police and to the town
manager, but her complaints were ignored.  Based on all of this
evidence, the jury could have found that the town acted
negligently in supervising its police, thus causing harm to
Michelle Kennedy.

   C. **<u>CASE MANAGEMENT</u>**

   Defendants challenge the Court's ruling limiting the
examination of Chief Rosa at the end of the month-long trial.
Defendants protest that they "were precluded from presenting [a]
full defense and testimony as it related to the incidents
involving Mark Tsoukalas (and others) when the Court arbitrarily
cut the defense from completion of its allotted trial time.  This
action prevented the defense from fully presenting its case and
tainted the jury."  (Def.'s Mot. for J. as a Matter of Law 2.)
In particular, the defendants complain that the Court improperly
cut off Rosa's testimony even though the defendants had time

remaining on their trial clock.

As background, the Court had given each side 24 hours of
trial time.  The pre-trial proceedings and trial itself were
extremely acrimonious and hard fought, posing extraordinarily
difficult trial management challenges.  For example, trial
counsel engaged in a shoving match at sidebar in front of the
jury and launched bitter *ad hominem* accusations at each other
before, during, and after the trial day.  There were innumerable
sidebars that consumed significant portions of the allotted trial
time.  Trial counsel for both sides routinely ignored rulings on
objections, frequently asking the same questions after objections
were sustained.  There were credible complaints that plaintiffs
and/or their friends were intimidating witnesses, and that some
witnesses for plaintiffs stated they were afraid to testify
because of fear of police retaliation.  Essentially, this trial
marked the culmination of years of bad blood between the Kennedy
family and the many members of the Billerica Police force.
Emotions of counsel, witnesses, and parties were high.  As a
result, the trial proceeded at a slower pace than originally
expected and was highly stressful for all involved.

To return to defense counsel's complaint, Rosa testified on
the last day at trial.  He had already testified at length during
plaintiffs' case, but the defense chose to call him separately as
part of its case.  At this juncture, counsel still had time left

11

on "his clock," but plaintiffs had run out of time.  All parties, and most importantly the jury and the Court had long-planned for the trial to be over by the end of the month.  During the impanelment, the jury had been informed that the trial would end within the month.  Indeed, the Court had cleared the full day on April 26, 2007, with that goal in mind.  In fact, a charge conference had been completed the day before.  On the final morning of trial, during Rosa's testimony, the Court asked:

> THE COURT:      I'm thinking hard.  How much longer do
>                 you think you have with him [Rosa]?
>
> MR. KESTEN:     A lot.
>
> THE COURT:      Like?
>
> MR. KESTEN:     An hour or two.

(Trial Tr. 96, April 26, 2007.)

Based on this comment, the Court announced, "This jury wants this case today and I want to try.  An hour seems fair enough, not two, you'll just lose him."  (Id.)  The Court added, "We're likely to go to the jury today if I have time to.  Let me be clear about that."  (Id. at 97.)  Defense counsel proceeded to examine Rosa for about two additional hours - the amount of time he had requested.  Now pressed to finish prior to the jury's lunch break, the Court asked counsel, "How much longer?"  When counsel replied that he required "at least an hour," the following conversation occurred at sidebar:

```
THE COURT:       Finish by ten of one.

MR. KESTEN:      Finish. I cannot.

THE COURT:       Finish.
```

(Id. at 146.)   Thereafter, testimony (including a very brief

cross by plaintiffs) continued for approximately thirty more

minutes, past 1:00.  Defense counsel was permitted a re-direct

examination.  At the request of defendant, the Court also allowed

defense counsel to ask Rosa some important clean-up questions

after the lunch break.

Although counsel did not get the full 24 hours set at the

start of the trial (ultimately, he was able to use approximately

22.5 hours), he did get more than the full amount he requested

earlier that morning.  See Fed. R. Evid. 611(a).

Further, defense counsel was not clear as to why he needed

at least another hour.  Counsel had ignored this Court's rulings

on objections to his questions which tried to elicit evidence

about complaints made by tenants at the trailer park to the

police about the Kennedy family and how the police investigated

these complaints, thus wasting some of the time he could have

otherwise used.[4]  At one point, counsel proposed to utilize the

balance of his time to play, in full, six videotapes made by the

Kennedy family, some of which had already been shown to the jury

---

[4] Indeed, the Court ordered defense counsel to provide a
written explanation of why he ignored the Court's rulings, which
has yet to be filed.

13

on numerous occasions, and all of which were introduced into evidence.  He repeatedly stated, without much explanation, "I want to show some of the videotapes."[5]  (Trial Tr. 150, April 26, 2007).  Counsel never made a clear proffer why he wanted to show fully the videotapes made by the Kennedys.  While this evidence might have shown the police investigating other complaints made by the Kennedys against other persons, they involved many incidents not charged in the case and claims which the Court dismissed at the request of defendants (like the so-called fish-pond assault).  Later, he changed his argument somewhat, claiming that he wanted further time to have Chief Rosa "at the very least to testify about the various no trespass orders" issued to the Kennedys.[6]  (Id. at 184).  However, to rebut the inference that the police drove the Kennedy family out of the trailer park, defendants introduced ample evidence that the Kennedys were less than ideal tenants and were evicted from the park.

**ORDER**

The motion for judgment as a matter of law [Docket No. 259]

---

[5] Defense counsel also commented on the Court's refusal to allow him to play the extended videotapes during his closing argument, stating: "You're going to get to look at the stuff, and get a good look. I suggest you go in the jury room.  Your Honor, as you can see, won't let me.  Get a good look." (Id. at 206-07). The jury had full access to the tapes during deliberations.

[6] In their brief, defendants state that they wanted to introduce evidence relating to the Kennedy children, but there is nothing in the transcript to support an inference that defendants wished to produce admissible evidence relating to these three plaintiffs.

is **ALLOWED**, in part, and **DENIED**, in part.

The negligence award against the Town of Billerica in favor of Brian Kennedy, Jr. is reduced to $100,000.  In addition, the damage award against the Town of Billerica in favor of Mitchell Kennedy is reduced to $115,000.  The motion is otherwise denied.

**S/PATTI B. SARIS**
PATTI B. SARIS
United States District Judge

15