UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-CV-12357-PBS

BRIAN KENNEDY AND MICHELLE KENNEDY,        )
Individually and as mother and next friend of        )
BRIAN KENNEDY, JR.,        )
MITCHELL KENNEDY AND DYLAN KENNEDY        )
                     Plaintiffs        )
                             )
VS.        )
                             )
TOWN OF BILLERICA, DANIEL C. ROSA, JR.        )
Individually and as Chief of the Billerica Police Department,  )
JOHN BARRETTO, Individually and as former Chief of the        )
Billerica Police Department, PAUL W. MATTHEWS,        )
Individually and as former Chief of the Billerica Police        )
Department, ROBERT LEE, Individually and as former        )
Deputy Chief of the Billerica Police Department, THOMAS        )
CONNORS, FRANK A. MACKENZIE, RICHARD        )
RHONSTOCK, ROBERT BAILEY, JONN ZARRO, MARK        )
TSOUKALAS, TARA CONNORS, MARTIN E. CONWAY,        )
ANDREW DEVITO, RICHARD HOWE, STEVEN ELMORE,  )
WILLIAM MCNULTY, DONALD MACEACHERN,        )
MICHAEL A. CASEY, RICHARD NESTOR, ROBERT        )
BROWN, WILLIAM G. WEST, GREGORY KATZ,        )
GERALD B. ROCHE, BRIAN MICCICHE, WILLIAM        )
MCNULTY, SCOTT PARKER, ALAN, TIMOTHY        )
F. MCKENNA AND JOHN DOE,        )
                     Defendants

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR SECOND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**

**INTRODUCTION**

      This case began with a complaint in which the plaintiffs sued 27 named individual, current and former, members of the Billerica Police Department, as well as a "John Doe" police officer. Additionally, the plaintiffs sued the Town of Billerica. The gravamen of the complaint was the allegation that virtually the entire Billerica Police Department engaged in a conspiracy to violate the plaintiffs' Civil Rights over a period of some thirteen years. The complaint

described some 65 discreet incidents allegedly perpetrated by these 28 individual officers over those 13 years. The plaintiffs alleged that this pattern of Civil Rights violations began as a result of Michelle Kennedy's spurning the sexual advances of one Billerica officer in 1991.  The plaintiffs consist of Michelle Kennedy, her husband Brian Kennedy, and their minor children, Brian Kennedy, Jr., Mitchell Kennedy, and Dylan Kennedy.

The Kennedys began the process of suing these defendants by sending a M.G.L. c. 258 presentment letter on February 20, 2002. It is clear that the precipitating event, which caused the Kennedys to send the letter and subsequently file the lawsuit, was the fact that Michelle, Brian, and Mitchell Kennedy were charged with serious felonies as a result of an attack on three women that caused serious injuries to the victims and which occurred immediately in front of the Kennedys' trailer in the early morning hours of November 8, 2001. The Kennedys claimed that various members of the Billerica "conspiracy" fabricated the charges against them. The Kennedys also accused Billerica Police Sgt. Rohnstock of physically assaulting Michelle Kennedy in a cell on November 8, 2001 while defendant Dan Rosa stood by, and claimed that Brian Kennedy was kicked and punched by five Billerica Police officers later that day. In the presentment letter, virtually all of the allegations of wrongdoing claimed that the victims were Brian and Michelle Kennedy. The Kennedy children were very minor players in the letter and the complaint.

From the beginning of the civil suit commencing at the initial conference with the Court, the defendants indicated to this Court that virtually all of the allegations made in the complaint were untimely because they had occurred more than three years prior to the filing of the complaint and should be

dismissed. Additionally, defendants pointed out that if the Court were inclined to allow a trial as to all of the allegations against all of the defendants, the trial would last approximately one year. In response to the defendants' pleas, the Court determined that the case would be managed by a bifurcation. The Court ordered the plaintiffs to pick seven target defendants to proceed against initially. The plaintiffs selected Frank Mackenzie, Thomas Connors, Daniel Rosa, Michael Casey, Martin Conway, Mark Tsoukalas, Steven Elmore and the Town of Billerica as the initial defendants against whom the trial would proceed.

Subsequent to the selection, three of those initial defendants, Frank Mackenzie, Steven Elmore, and Michael Casey brought a Motion for Summary Judgment primarily based on statute of limitations grounds. The other defendants did not similarly move since the allegations against them included actions within the statute of limitations. The defendants asked that the Court bar all claims regarding incidents that preceeded November 5, 2001. Additionally, the defendants asked that the Court dismiss the loss of consortium claims by the Kennedy children arising out of all such time barred claims as well as all consortium claims arising out of alleged violations of Civil Rights.

In March of 2007, before the first Trial, the Court allowed the Summary Judgment Motion in part, ordering that the Motion was allowed as to "all conduct that predates November 5, 2001," **SJ Order dated March 26, 2007, page 19**, and as to all claims for loss of consortium.  The Motion was denied in part. Significantly, the Court allowed the plaintiffs to proceed to Trial against defendants Mackenzie, Elmore and Casey only on a conspiracy theory, holding that "the moving defendants may be held liable for any acts of their co conspirators that occurred after November 5, 2001. Such liability, however,

cannot rest on alleged civil rights violations that predate the limitations period". **SJ Order dated March 26, 2007, page 10.**

Thus, as of March 26, 2007, the defendants understood that the only incidents going to Trial in April would be events that occurred after November 5, 2001, and which involved Officers Tsoukalas, Conway, Rosa, and Connors. Officers Mackenzie, Casey, and Elmore would only be defendants at the Trial to see if the plaintiffs could prove that they acted in conspiracy with the other defendants to harm the plaintiffs after November 5, 2001. It seemed clear that the claims by the Kennedy children thus would be limited to four discreet incidents. The first was the bringing of criminal charges against Brian Kennedy Jr. in the fall of 1997. The second was the bringing of criminal charges against Mitchell Kennedy arising out of the November 2001 incident. The third incident was a confrontation between Brian Jr. and Officer Tsoukalas in which Brian Jr. alleged that the officer called him a "moron" and grabbed him by the shoulder in March of 2004. The final incident was an arrest of Mitchell by Officer Tsoukalas for assault and battery on a police officer.

Prior to the Trial, and during the Trial, defendants repeatedly urged the Court to bifurcate the claims against the individual officers from the supervisory claims against the Town. The defendants argued that the plaintiffs could not recover additional damages pursuant to the supervisory claims. The only damages that the plaintiffs could recover against the Town necessarily would stem from wrongful acts, either Civil Rights violations or State Torts, committed by the individual defendants. The defendants urged the Court to recognize that the only purpose of the supervisory claims would be to make the Town jointly liable with the officers for the damages awarded against them. Inexplicably, the

Court denied the motion and the Trial of the supervisory claims went forward with that of the initial individual defendants.

As the Trial proceeded, the Court reversed field on the pre-trial ruling regarding the time barred claims and allowed the plaintiffs to introduce evidence of incidents going back to 1991. The Court indicated that this evidence could be relevant to the supervisory claims. In making this ruling, the Court ignored the fact that the supervisor of the Billerica Police Department in 1991 was retired Billerica Police Chief John Barretto. Barretto retired in November of 1994 and was replaced by Chief Paul Mathews who was Chief for nine years. Chief Mathews was then replaced by Chief Dan Rosa in December of 2001. As a result of this reversal of the pre-trial ruling, the majority of the Trial was devoted to evidence of time barred claims.

At the close of the evidence, the Court entered a directed verdict regarding the claims of Brian and Michelle Kennedy as to their arrest for the November 8, 2001, incident. The Court directed a verdict for Officers Casey and Conway. The rest of the case was submitted to the Jury.

As the Trial concluded, the Court presented the parties with a verdict slip that included a provision for independent damages for the supervisory claims. The defendants again urged the Court to remove that provision on the grounds that a finding of supervisory liability would only result in the Town being liable for any damages caused by the individual officers. The Court refused to change the verdict slip.

The Jury verdict in this Trial exonerated Officers Mackenzie, Connors, and Elmore fully. The plaintiffs' central allegation throughout this litigation – that there was a conspiracy among Billerica Police officers to violate their Civil Rights

-- was rejected by the Jury as to all defendants. Michelle Kennedy's claim that she was assaulted in the jail cell by defendant Rosa was rejected. Brian Kennedy's claim that he was beaten by five Billerica officers on November 8, 2001, was rejected. In fact, the only individual officers who were found liable were defendants Rosa and Tsoukalas. Defendant Rosa was found liable for intentional infliction of emotional distress on Brian Kennedy Jr. in 1997 and the Jury awarded $10,000 in damages. The Jury found that Officer Tsoukalas arrested Mitchell Kennedy without probable cause in 2004. Significantly, the Jury rejected the claim that Tsoukalas maliciously prosecuted Mitchell Kennedy for that crime. The Jury also found that Tsoukalas intentionally inflicted emotional distress on Mitchell and Dylan Kennedy, but rejected claims that he intentionally inflicted emotional distress on the other members of the Kennedy family. The Jury found that the tortious actions of Tsoukalas resulted in no damage to Dylan Kennedy and a total of $15,000.00 in damages to Mitchell.

The Jury found supervisory liability against the Town. The Jury found that the Town failed to properly discipline or supervise the defendant officers in a manner that was deliberately indifferent to the Civil Rights of the plaintiff Mitchell Kennedy, only. Notably, however, there had been absolutely no evidence presented about any history of complaints to any supervisors in Billerica about the treatment of Mitchell Kennedy by any Billerica police officer. The Jury then found that the Town was negligent in the manner that it disciplined or supervised its police officers and found that this negligence caused harm to Michelle Kennedy, Brian Kennedy Jr., Mitchell Kennedy, and Dylan Kennedy but not to Brian Kennedy Sr. The Jury then awarded $50,000.00 to

Michelle Kennedy, $190,000.00 to Brian Kennedy Jr., $235,000.00 to Mitchell Kennedy, and $100,000.00 to Dylan Kennedy on that negligent supervision claim.

The defendants filed their first Motion for JNOV subsequent to this verdict, arguing, among other things, that the Negligence damages were limited to $100,000.00 per plaintiff. In response, the Court reduced the amounts awarded to Brian Kennedy Jr. and Mitchell Kennedy for negligence to the statutory $100,000.00 cap but otherwise denied the motion.

The plaintiffs then indicated that they wished to proceed to Trial against six additional defendants, Alan Munn, Richard Howe, Richard Rhonstock, Andrew Devito, Scott Parker, and Richard Nestor. The plaintiffs informed the Court that they were not proceeding against the other 16 defendants. The six additional defendants filed a Motion for Summary Judgment. The Court decided the motion in favor of defendants Munn, Howe, Rhonstock and Devito. The Court denied the Motion as to Parker and Nestor.

The allegations against Nestor stemmed from an application for criminal complaint that he filed in 1993 against Michelle Kennedy. The Court ruled that the plaintiff Brian Kennedy Jr., who was five years old at the time, could proceed to Trial against Nestor on a theory of intentional infliction of emotional distress against him because "an issue of fact remains as to whether Nestor acted in an extreme and outrageous fashion in arresting Michelle in 1993 in front of Brian Jr." **SJ Order dated August 15, 2007.**

The case proceeded to a second Trial in October of 2007. At the outset of the Trial, defendant Nestor demonstrated that he had not arrested Michelle Kennedy in front of her son Brian Jr. Indeed, he demonstrated that he had not

even asked that an arrest warrant issue for Michelle. Despite this undisputed fact, the Court allowed the claim by Brian Jr. against Nestor to go forward.

With regard to defendant Parker, the claim against him arose from an incident that occurred in April of 2002. He had an unpleasant interaction with Michelle Kennedy during which they both swore at each other. Michelle Kennedy claimed that Officer Parker shoved her, kicked her car door, swore at her, threatened to arrest her, and falsely imprisoned her during this encounter. Parker admitted that he swore at Michelle Kennedy, but denied that he pushed her or threatened her with arrest. Michelle Kennedy brought claims of assault, excessive force, and a 14th Amendment claim alleging that Officer Parker's conduct "shocked the conscience" and thus was a Civil Rights violation. Before the case went to the Jury, the defendants urged the Court to dismiss the 14th Amendment claim, but the Court declined.

The Jury found against Officer Nestor on Brian Jr.'s claim for intentional infliction of emotional distress and awarded 2,500.00 in damages. The Jury found in favor of Officer Parker on the false arrest and excessive force claims. The Jury found against Parker on the assault claim, on the Intentional Infliction of Emotional Distress claim, and the 14th Amendment claim and awarded $2,000 in compensatory damages and $30,000.00 in punitive damages.

The defendants bring this Motion for JNOV or in the alternative for New Trial on multiple grounds and with respect to both Trials as described as follows.

## ARGUMENT

I.     **Standards of Review**

      A.     **Fed. R. Civ .P. 50 Standard**

The standard governing a Rule 50 motion for judgment as a matter of law is the same as a motion for summary judgment; they are merely made at different times during the proceedings before the district Court. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000).   Because the standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, "the inquiry under each is the same." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-251 (1986) (standard for granting a renewed motion for judgment as a matter of law, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure mirrors standard for granting a motion for summary judgment); <u>See also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Therefore, in entertaining a motion for judgment as a matter of law, the Court should review all of the evidence in the record, and draw all reasonable inferences in favor of the nonmoving party. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151-152 (2000); <u>Lytle v. Household Mfg., Inc.</u>, 494 U.S. 545, 554-555 (1990). In the analogous context of summary judgment under Rule 56, the Supreme Court has stated that it must review the record "taken as a whole." <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  Accordingly, this Court should employ the same standard as a motion for summary judgment upon review of this motion.  Employing the same, the defendants submit that judgment should enter in their favor as a matter of law for the reasons discussed herein.  Alternatively, they seek a new Trial.

### B.    Fed. R. Civ. P. 59 Standard.

This Court may set aside a Jury's verdict and order a new Trial where the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice. <u>Coffran v. Hitchock Clinic, Inc.</u>, 683 F.2d 5, 6 (1st

Cir.), cert. denied 459 U.S. 1087, 103 S.Ct. 571 (1982).   As discussed further below, such is the case here.

## II.    Defendants Are Entitled to Judgment NOV Regarding the Second Trial or Alternatively to a New Trial

### A.  The Verdict Against Officer Scott Parker

This Court should enter judgment in favor of Officer Parker as a matter of law, under Fed. R. Civ. P. 50(b) (1) on the Fourteenth Amendment substantive due process claim against him because reasonable persons could not have reached the Jury's conclusion that Officer Parker's conduct "shocked the conscience," as defined by the Supreme Court and First Circuit, especially when the Jury found that Officer Parker did not use excessive force, batter or unreasonably detain Michelle Kennedy; (2) on the intentional infliction of emotional distress claim because his conduct does not support such a claim under Massachusetts Supreme Judicial Court precedent; and (3) on the assault claim against Officer Parker.  In the alternative, under Fed. R. Civ. P. 59, this Court should grant a new Trial to prevent a miscarriage of justice.

As noted above, on August 15, 2007, Officer Parker's June 7, 2007, motion for summary judgment was denied by this Court.  Trial began on October 1, 2007, and Parker's motion for judgment as a matter of law was denied at the conclusion of evidence.  On October 5, 2007, this Court allowed five claims to go to the Jury against Officer Parker: 1) constitutional claim of excessive force; 2) constitutional claim of unreasonable detainment; 3) substantive due process claim, specifically, "[w]as the conduct of defendant Scott Parker egregiously unacceptable, outrageous, or conscience-shocking?"; 4) assault; and 5) intentional infliction of emotional distress. On October 9, 2007, the Jury returned a plaintiffs'

verdict on the third, fourth and fifth claims. **See Verdict Form, October 9, 2007.**

The Jury found for Officer Parker on the first and second constitutional claims.

### III.    There Was No Substantive Due Process Violation.

#### A.    The Threshold To Establish a Substantive Due Process Violation Properly is a High One.

Section 1983 does not create substantive rights, but provides a vehicle by

which individuals may bring claims for violations of rights secured by the

Constitution.  To demonstrate a violation of § 1983, a plaintiff must establish that

the act complained of was carried out under color of state law and also that this

conduct deprived him of rights, privileges, or immunities secured by the laws or

Constitution of the United States.  Chiplin Enterprises, Inc. v. City of Lebanon,

712 F.2d 1524, 1527 (1st Cir. 1983).

Here, one of the plaintiffs' contentions was that they were deprived of

their substantive due process under the 14th Amendment.  The 14th Amendment

protects against the deprivation of life, liberty, or property without due process

of law.  See U.S. Const. Amend XIV.  The substantive component of this

guarantee guards against "certain government actions regardless of the fairness

of the procedures used to implement them."  Daniels v. Williams, 474 U.S. 327,

331, 106 S.Ct. 662 (1986).  As the First Circuit has stated,

> In the substantive due process context (as in the procedural due process context), a plaintiff, as a condition precedent to stating a valid claim, must exhibit a constitutionally protected interest in life, liberty, or property.

Centro Medico Del Turabo, Inc. v. Feliciano De Melecio, 406 F.3d 1, 8 (1st Cir.

2005), citing Washington v. Glucksburg, 521 U.S. 702, 722, 117 S.Ct. 2258 (1997).

In this case, the plaintiff's claims against Officer Parker of false arrest and

excessive force were unsuccessful and have fallen away. There remains no claim

against him of any constitutional dimension – only a state law claim of assault. As it stands then, there is no constitutionally protected interest to support the plaintiff's claim against Officer Parker for a deprivation of substantive due process. Where the condition precedent to a substantive due process claim is missing, the claim necessarily fails.

> **B.     Officer Parker's Conduct Does Not "Shock The Conscience" As Defined By The U.S. Supreme Court And First Circuit.**

Even if this Court decides that an assault that may "shock the conscience can, by itself, form the basis of a 14th Amendment plan, this Court should grant judgment in Officer Parker's favor on the 14th Amendment substantive due process claim because his conduct, even when viewed in the light most favorable to the plaintiff, fails to "shock the conscience" in the way the Supreme Court and the First Circuit has explained those terms.  Cummings v. McIntyre, 271 F.3d 341, 344 (1st Cir. 2001).

Whether Officer Parker's alleged conduct "shocks the conscience" is a matter of law for this Court to decide.  Benn v. Universal Health System, Inc., 371 F.3d 165 (3rd Cir. 2004) (quoting Rochin v. California, 342 U.S. 165, 172 (1952)). The Supreme Court has instructed that the conscience-shocking standard is intended to limit substantive due process liability; accordingly, it is an issue of law for the judge, not a question of fact for the Jury. Collins v. City of Harker Heights, 503 U.S. 115, 126 (1992) (established standard that "arbitrary government action that must 'shock the conscience' of federal judges"); City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 753 (1999) (Souter, J., concurring in part and dissenting in part) ("Substantive due process claims

are, of course, routinely reserved without question for the court," (citing <u>Lewis</u>, 523 U.S. at 853-55)).

According to the Supreme Court, "in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 847, fn. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

The First Circuit has recognized that various formulations have been used to identify conduct sufficiently outrageous to meet that standard, which deliberately was set high to protect the Constitution from demotion to merely "a font of tort law." <u>Cummings v. McIntyre</u>, 271 F.3d 341, 344 (1st Cir. 2001) (quoting <u>Lewis</u>, 523 U.S. at 847 n. 8, 848). Accordingly, the First Circuit has held that the acts must so outrageous at to "offend even hardened sensibilities," "uncivilized and intolerable," "offensive to human dignity," or must constitute force that is brutal, inhumane, or vicious." <u>Id</u>. Moreover, for an officer to be held liable for a 14th Amendment substantive due process violation, the Court must find that the officer's conduct was done "maliciously and sadistically for the very purpose of causing harm." <u>Id</u>. at 345.

The evidence, viewed in the light most favorable to the plaintiff, clearly does not "shock the conscience." [1] At Trial, the plaintiff Michelle Kennedy testified that, on March 31, 2002, she and her husband had a confrontation with Officer Parker regarding some "ramps," which the Boys' Club had given them permission to take. <u>Kennedy v. Parker</u>, Trial Transcript, Michelle Kennedy's

---

[1] The Defendants present these facts for the purposes of this motion only.

testimony, p. 104, lines 15-25; p. 105, lines 1-10 ("Michelle Kennedy"). While they were taking the ramps, Officer Parker arrived in a police cruiser, and asked what they were doing and then threatened to arrest Michele Kennedy if the ramps were not put back. Id. at p. 105, lines 3-8. Officer Parker started swearing at Brian Kennedy and "saying rude comments" to him. Id. at p. 8-10. At this point, the plaintiff Michelle told her husband and others to leave and called her friend, Billerica Police Officer Dean Royster.[2] Id. at p. 105, lines 8-16.

According to Michelle Kennedy, as she was walking back to her car, Officer Parker said, "you're not going anywhere" and shoved her really hard. Id. at p. 105, lines 19-21. She then walked to her car and locked the doors. Id. at p. 105, lines 21-24. Then, plaintiff claims, Officer Parker was "trying to get in at it, and he was kicking it and calling me really bad names and things like that." Id. at p. 105, lines 18-25; p. 106, line 1. She further claims, "Oh, [Officer Parker] called me a cunt and said, 'You think you can get away with things because you're F'ing a nigger, and, like just bad names." Id. at p. 106, lines 2-7. According to Michelle Kennedy, she was on the phone with former Billerica police officer Dean Royston at this time and, therefore, "didn't hear him say much more." Id. at p. 106, lines 7-9. The plaintiff told Royston, "I'm down the Boys Club. He said, 'I just got a call for backup there. I'll be there in a minute.'" Id. at p. 106, lines 9-12.

It took Officer Royston "almost a minute" or "not even quite a whole minute" to arrive and during this time the plaintiff maintained that Officer

---

[2]    Dean Royston has since been terminated from the Billerica Police Department.

Parker "just kept trying to get in my car at me" and told her that she would be arrested if she left.  Id. at p. 106, lines 13-22.

When Royston arrived, the plaintiff got out of her car and told him that Officer Parker was a "F'ing asshole." Royston told her to get back into her car and leave, which she did.  Id. at p. 107, lines 11-17.

According to Royston, on March 31, 2002, while on patrol, the dispatcher put out a call for a suspicious vehicle at the Boys' Club.  Kennedy v. Parker, Dean Royston's testimony, Day Two, p. 217, lines 20-25, p. 218, lines 1-5.  Officer Parker took the call because he was closer but, soon after, Officer Parker requested another cruiser.  Id. at 218, lines 1-23. Royston headed to back up Officer Parker.  Id. at p. 213, lines 2-12.  Soon after, Royston received a cell phone call from Michelle Kennedy.  Id. at 235, lines 3-4.  Over the phone Royston could hear Michelle Kennedy and Officer Parker yelling at each other.  Id. at p. 237, lines 3-5.

When Royston arrived he heard the plaintiff and Officer Parker swearing at each other. Id. at p. 237, lines 6-8.  At first, the plaintiff was in her vehicle in the driver's seat with the windows closed, but as Royston approached she got out of the car.  Id. at p. 237, lines 20-21; p. 221, lines 5-8.  Both the plaintiff and Officer Parker were "yelling obscenities to each other," so Royston separated them.  Id. at p. 20-22.  The plaintiff was swearing at Officer Parker as much he was swearing at her.  Id. at p. 237, lines 14-17.  Ultimately, however, Royston was able to separate them and convince the plaintiff to get into her vehicle and leave the scene.  Id. at p. 224, lines 1-7.

Officer Parker denied shoving the plaintiff and denied threatening her with arrest. Indeed, he testified that he wanted the plaintiff to leave the scene. He

admitted swearing at her in response to her swearing at him. After hearing the evidence, the Jury evaluated the testimony and found that Parker had not used excessive force and had not battered the plaintiff.  Thus, the Jury determined that Parker did not shove the plaintiff.  Additionally, Mrs. Kennedy claimed that she was wrongfully detained and prevented from leaving because she claimed Parker threatened her with arrest if she did so. The Jury rejected that claim as well, and thus they accepted Officer Parker's testimony that Mrs. Kennedy was free to leave the scene.  Accordingly, the only evidence that may have supported the Jury verdict was that the Jury believed that Parker kicked the car door and swore at the plaintiff.

Clearly, under the Supreme Court and First Circuit standards, the allegations that the plaintiff was called offensive names and had her car kicked does not "shock the conscience." Although Officer Parker acted offensively and lost his cool, his actions were not highly physically intrusive or so outrageous as to "offend even hardened sensibilities," "uncivilized and intolerable," "offensive to human dignity," constitute force that is "brutal, inhumane, or vicious" or done "maliciously and sadistically for the very purpose of causing harm." Cummings v. McIntyre, 271 F.3d at 344-345.

C.     **The First Circuit has Repeatedly Held that Conduct More Egregious than Officer Parker's Does Not Shock the Conscience.**

When faced with far more egregious facts, the First Circuit has consistently found no substantive due process violation.  For example, in Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617 (1st Cir. 2000), the plaintiffs-homeowners attempted to get their house back from police officers who had moved in without permission.  The homeowners brought a § 1983 action against the police officers

alleging that they were verbally harassed, threatened with physical violence and threatened with violence against their daughter.  Further, their pregnant daughter was also personally insulted and pushed by an officer and two days later suffered a miscarriage.  Finally, the officers intimidated the homeowners, occupied their property without permission, filed false criminal charges against them, deliberately lied in official documents and perjured themselves in official court proceedings with the intention of causing harm.   Even in light of all that evidence, which the Court found "disgraceful," the First Circuit held that the officers' conduct did not sufficiently "shock the conscience" so as to violate substantive due process.  <u>Cruz-Erazo v. Rivera-Montañez</u>, 212 F.3d at 622-23. Certainly, Officer Parker's alleged statements and shove does not come close to the conduct rejected by the First Circuit.

Likewise, in <u>Pittsley v. Warish</u>, 927 F.2d 3 (1st Cir.1991), the defendant police officers allegedly threatened to kill Ms. Pittsley on more than one occasion, told her four and ten year-old children that if the police caught their father figure the children would never see him again, and also refused to allow the children to give the father a goodbye hug when he was arrested.  Although the First Circuit refused to condone such "despicable and wrongful" harassment, the Court held that the conduct did not rise to the level of a constitutional violation under the Fourteenth Amendment "shocks the conscience" standard. <u>Id</u>. at 7.

In another case more egregious than the allegations here, the First Circuit held that a police officer's violent shoving of a pedestrian who was merely asking for directions causing "immediate pain [to the plaintiff's] left back and left leg and foot" eventually resulting in back surgery, though "inconsistent with [the officer's] public responsibilities" and "deserv[ing] condemnation" did not shock

the conscience. <u>Cummings v. McIntyre</u>, 271 F.3d at 344-345.  The same result should be found here.

Indeed, conduct may be "despicable and wrongful" but still not rise to the level of conscience shocking.  <u>Pittsley v. Warish</u>, 927 F.2d 3, 7 (1st Cir. 1991).  See also <u>Souza v. Pina</u>, 53 F.3d at 427 (finding that action of district attorney and members of his staff in conducting numerous press conferences and other media interviews in which they linked petitioner's son to killings of nine young women did not shock the conscience even though petitioner's son subsequently killed himself); <u>Santiago de Castro v. Morales Medina</u>, 943 F.2d 129, 131 (1st Cir. 1991) (finding that verbal harassment from supervisor which caused plaintiff to become ill was not conscience shocking). Against the backdrop of the multiple times that the First Circuit has rejected conduct far worse than anything Officer Parker allegedly said or did, judgment for Parker should enter.

Indeed, the inadequacy of plaintiff's evidence to meet the "shocks the conscience" standard is further established by comparing the facts of this case to other substantive due process claims involving physical and verbal conduct.  The First Circuit found a government entity's conditioning employment upon a police officer's undergoing a penile plethysmograph  to "shock the conscience" because it constitutes an "unwanted manipulation of an individual's body." <u>Harrington v. Almy</u>, 977 F.2d 37, 43 (1st Cir. 1992).  In the Second Circuit, a group of police officers who aided and abetted a third-party in *shooting an arrestee (apparently five times)* engaged in "conscience shocking" behavior because they engaged in conduct "maliciously and sadistically for the very purpose of causing

harm," rather than "to maintain or restore discipline." Hemphill v. Schott, 141 F.2d 412, 419 (2d Cir. 1998).

In other federal appellate courts, rape by a police officer in connection with a car stop, Rogers v. City of Little Rock, 152 F.3d 790 (8th Cir. 1998), and a 57-day detention over repeated requests for release, Armstrong v. Squadrito, 152 F.3d 564 (7th Cir. 1998) were found to shock the conscience. An officer pointing his gun at the head of a motorist, without any legitimate law enforcement purpose for doing so, was sufficient to satisfy the shocks-the-conscience standard, Black v. Stephens, 662 F.2d 181, 188-89 (3d Cir.1981), cert. denied, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982), as did a case where police officers aided a third-party in *shooting* the plaintiff. Hemphill v. Schott, 141 F.3d 564, 582 (7th Cir.1998). The conduct in these cases, involving serious physical intrusions or sustained abuse, differs markedly from Officer Parker's isolated outburst.

Here, Officer Parker's conduct certainly included profane language and possibly kicking the plaintiff's car door. Such conduct, while unacceptable in the context of police rules and regulations, does not come close to the type of behavior found to be conscience-shocking behavior by the Federal Courts. Accordingly, judgment should enter for Officer Parker on the constitutional claims.

### IV.     Intentional Infliction of Emotional Distress.

In order to prevail on the claim of intentional infliction of emotional distress, a plaintiff must show " '(1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (2) that the defendant's conduct was extreme and outrageous, beyond all bounds of decency and utterly intolerable in

a civilized community, (3) [that] the actions of the defendant were the cause of the plaintiff's distress, and (4) [that] the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.' " <u>Tetrault v. Mahoney, Hawkes & Goldings</u>, 425 Mass. 456, 466, 681 N.E.2d 1189 (1997). It is insufficient to establish liability under this tort on " 'mere insults, indignities, threats, annoyances, petty oppressions or other trivialities' [even if] 'the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.' " <u>Id.</u>, quoting <u>Foley v. Polaroid Corp.</u>, 400 Mass. 82, 99, 508 N.E.2d 72 (1987).  That is an extremely high standard to meet and, as a matter of law, the record in this case does not support a finding that such behavior occurred.

Indeed, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Foley</u> at 99.  According to the First Circuit, physical harm is not a required element of this tort, but "[t]he standard for making a claim of intentional infliction of emotional distress is very high." <u>Doyle v. Hasbro, Inc.</u>, 103 F.3d 186, 195 (1st Cir.1996).

In light of this rugged standard, the plaintiff does not have an intentional infliction of emotional distress claim.  Officer Parker's name calling and kicking her car was not extreme, outrageous, beyond all bounds of decency, intolerable in a civilized community or "profoundly shocking." <u>Conway v. Smerling</u>, 37 Mass.App.Ct. 1, 8, 635 N.E.2d 268 (1994).  This is particularly true in light of the

fact that she was also swearing at him. Moreover, the plaintiff has advanced no evidence showing that she had suffered severe emotional distress as the result of the defendants' conduct. The plaintiff merely claims that for "several months" she was "nervous" of being arrested, "couldn't think straight," and "couldn't sleep." Kennedy v. Parker, Day One, p. 111, lines 10-23. Thus, the plaintiff does not claim to have suffered from emotional distress "of such a nature that no reasonable person could be expected to endure it.' " Tetrault at 466, and therefore, judgment should enter for Officer Parker.

### V.     Reasonable Jury could not have found Officer Parker's conduct to be an assault.

A reasonable Jury could not have found that Officer Parker assaulted the plaintiff, Michelle Kennedy. An assault, under Massachusetts law, is an intentional tort subjecting an actor to liability if he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact. A battery is a harmful contact with the person. Waters v. Blackshear, 412 Mass. 589, 590, 591 N.E.2d 184, 185 (1992) citing Restatement 2d of Torts, § 13 (1965) see also Commonwealth v. Gorassi, 432 Mass. 244, 248, 733 N.E.2d 106, 110 (2000) (claimant has the burden of proving that the actor "engaged in 'objectively menacing' conduct with the intent to put the victim in fear of immediate bodily harm). Furthermore, "words do not make the actor liable for assault unless together with other acts or circumstances they put the other in reasonable apprehension of an imminent harmful or offensive contact with his person." Commonwealth v. Delgado, 367 Mass. 432, 326 N.E.2d 716 (1975) (quoting Restatement (Second) of Torts § 31).

Here, the Jury found that Officer Parker did not commit a battery against

the plaintiff, nor did he use excessive force or unreasonably detain Michelle. He did verbally insult her and may have kicked her car. A reasonable person could not have been placed in fear of imminent physical harm by those actions. Accordingly, judgment should enter for Officer Parker.

**VI.  The Court Erred in Awarding Interest on the Negligence Claims**

As a result of the first Trial, the plaintiffs Michelle Kennedy, Brian Kennedy Jr., Mitchell Kennedy, and Dylan Kennedy were awarded a total of $350,000.00 in compensatory damages as a result of the finding of negligent supervision and discipline by the Town of Billerica. The Court erred when it granted prejudgment interest to plaintiffs for the four successful negligent supervision claims against defendant Town of Billerica.  **See Judgment and Order, December 10, 2007, §§ 7-10**.  Indeed, a negligence action against a municipality is limited to the Commonwealth's Tort Claims Act, and the plain language of the statute reads that public employers "shall not be liable for interest prior to judgment."  M.G.L. c. 258, § 2; Onofrio v. Department of Mental Health, 411 Mass. 657, 658-659 (1992).  Likewise, post judgment interest is not allowed for claims under M.G.L. c. 258.  Onofrio, 411 Mass. 657, 658-659 (1992). Accordingly, this Court should correct its error and preclude prejudgment interest for the negligent supervision claims.

**VII.    Negligent Supervision**

The bulk of the damages awarded in this case were to compensate four of the five plaintiffs for the negligence of the Town of Billerica in the way that it supervised and disciplined its police officers. This Court denied the defendants' first Motion for JNOV on this issue and made a number of factual assertions in

22

its Order.  However, there are critical and factual issues regarding this issue that need to be addressed.

### VIII.   Presentment

A negligence action against a municipality is limited to an action under the Commonwealth's Tort Claims Act, M.G.L. c. 258.   As a condition precedent to bringing a civil action for damages under M.G.L. c. 258, the claimant must "present" the claim in writing, within two years after the cause of action arose. Vasys v. Metropolitan Dist. Commn., 387 Mass. 51, 54-55, 438 N.E.2d 836 (1982). Therefore, a plaintiff can recover only for causes of action that occurred within the two-year timeframe prior to the presentment letter; and not for incidents that occurred more than two years prior, or after the presentment letter.

In the event of a claimant's minority, the two-year timeframe is not tolled. The Massachusetts Supreme Judicial Court has held that age does not toll the two-year presentment requirement. George v. Saugus, 394 Mass. 40, 41, 474 N.E.2d 169 (1985).  Indeed, the three-year statute of limitations provision of M.G.L. c. 258, § 4, is tolled by 260, § 7, only if the minor plaintiff first complies with the presentment requirement of the Massachusetts Tort Claims Act. George, 394 Mass. 42.  Therefore, M.G.L. c. 260, § 7, does not apply to the presentment requirement. Rather, the presentment requirement must be met regardless of the claimant's age.  George, 394 Mass. at 44.

Here, the Kennedy plaintiffs filed their M.G.L. c. 258 notice of claim on February 20, 2002. Thus, to support their negligent supervision claim they were limited to events that occurred between February 20, 2000, and February 20, 2002. The bulk of the plaintiffs' alleged complaints about the conduct of the Billerica Police were allegedly made to retired Chief John Barretto, who left the

department in 1994. The Police Chief during the bulk of critical time period, 2000 to early 2002 was Paul Mathews. The plaintiffs introduced no evidence whatsoever as to any complaints that they made to Chief Mathews. The Court spoke regarding this dispositive issue by finding that "defendants fairly point out that there was no evidence about complaints to Chief Mathews for two or three years in the late 1990s. However, there was evidence of persistent complaints to the police and Town both before and after his tenure". **JNOV Order, dated August 21, 2007, footnote 2.**  However, the fact is that Paul Mathews was the Chief from 1994 until December of 2001. Even this Court recognized that there was no evidence offered by the plaintiffs that would support a finding of inadequate supervision by Mathews. This Jury was not free to find that the allegation that a police chief ignored complaints by the Kennedys about certain police officers between 1991 and 1994 would support a verdict that a subsequent chief of police was negligent in the way he supervised his department between February of 2000 and February of 2002.

### A.    There was No Tortious Conduct in the Relevant Time Frame

Even if the plaintiffs could prove that there was negligent supervision of the Police Department between February of 2000 and February of 2002, they failed to prove that any tortious conduct occurred between those dates.  M.G.L. c. 258, § 2, expressly states that public employers can be liable for injury or loss of property or personal injury or death *caused by the negligent or wrongful act or omission of any public employee* while acting within the scope of his office or employment.  (Emphasis added).  The key under this statute to liability of a public employer like the Town is a showing of a "negligent or wrongful act or omission" of a public employee.  Without a showing of such an underlying

negligent or wrongful act or omission, there can be no liability against the Town by virtue of this section.  One hinges upon the other.  In this case, the Jury was permitted to assess a separate liability upon the Town for negligent supervision without hinging it to a corresponding showing of a negligent or wrongful act or omission by a public employee.

The only allegedly tortious actions presented to this Jury about the Kennedys that occurred between February of 2000 and February of 2002 were the actions surrounding the incident of November 8, 2001, the so-called Deanne Massone fiasco. Michelle and Brian Kennedy claimed that they were arrested without probable cause, maliciously prosecuted, and brutalized by Billerica Police officers as a result of a conspiracy. Mitchell Kennedy claimed that he was maliciously prosecuted as a result of the same conspiracy. However, this Court found that there was probable cause as a matter of law to support the arrests of Brian and Michelle Kennedy for the felonies committed that night. Later, the Jury found that Michelle was not assaulted in the cell; that Brian was not beaten; and that Mitchell was not maliciously prosecuted. The Jury heard of no allegedly tortious conduct as to Dylan and Brian Jr. in the relevant time period. Thus, the plaintiffs failed to prove that any tortious conduct occurred in those two years.

### IX.    There was No Evidence to Support Additional Damages for Negligent Supervision Even Outside the Relevant Time Period

Even if this Court looks at the proof of damages outside of the critical time period, February of 2000 to February of 2002, the evidence cannot support the awards made by the Jury.  In this case, the Jury was permitted to assess a separate liability upon the Town for negligent supervision without hinging it to a corresponding showing of a negligent or wrongful act or omission by a public

employee.  This is perhaps most glaring in terms of the award of $100,000 against the Town to Dylan Kennedy.  There was no finding against any individual defendant public employee against Dylan Kennedy.  That is, there was no showing of any wrongful or negligent act or omission by any public employee as to Dylan Kennedy. Because there was no finding against any individual defendant public employee against Dylan Kennedy for any tort, there was no basis for this award.

In terms of the other plaintiffs, the awards against the Town vastly exceeds those assessed against the individual public employees.  But, again, § 2 permits an exception to sovereign immunity only to the extent of holding a public employer liable for injury *caused by the negligent or wrongful act or omission of any public employee*.  If, as the Jury found, Chief Rosa injured Brian Jr. to the extent of $10,000, and Officer Nestor injured him to the extent of $2,500.00, the Town cannot be held to any amount beyond those figures.  The same holds true for plaintiffs Mitchell Kennedy and Michelle Kennedy.  The Town cannot be held liable for any amount beyond that awarded by the Jury for the injury caused by the conduct of the public employee.  With regard to Mitchell, the Jury found that Tsoukalas injured him to the extent of $15,000.00 awarded for the arrest in 2004.  Even if this Court decides that this plaintiff can be compensated for negligence which was never presented, since this incident postdates the presentment letter, then this is the only amount he can recover against the Town.

In assessing the sufficiency of the evidence to support a negligent supervision award on behalf of the Children, this Court wrote that "there was evidence that the police harassed the Kennedy sons by unlawfully arresting and prosecuting them, and that police officers followed the boys in their cruisers

from school and hockey practice. The Jury could have reasonably found that this pattern of harassment was designed to drive the plaintiffs out of Town." **JNOV (8/21/07 order page 7).** This conclusion is erroneous on many levels. First, there was no evidence that the police unlawfully arrested "them." The Jury found that there was a total of one unlawful arrest as to Mitchell and awarded $15,000.00. The Jury found that he was properly charged as to the Deanne Massone attack. The Jury found that there was one improper application for criminal complaint as to Brian Jr. and awarded $10,000.00. Brian Jr.'s complaint that he was "grabbed by the shoulder" and called "numbnuts" by officer Tsoukalas was rejected by the Jury. Thus, there were no unlawful arrests or prosecutions that would support an award of additional damages against the Town.

The Court's conclusion that damages could be awarded for "following" the "boys" is particularly troubling. First, there is no such Tort as following or general harassment. One cannot prevail on an action against a police officer merely by proving that one was followed by a cruiser. Conceptually, one can try to argue that following might be Intentional Infliction of Emotional Distress. First, the defendants suggest that police cruisers following cars, without stopping them, cannot be found to be Intentional Infliction of Emotional Distress as a matter of law. However, even if the Court disagrees, defendant Tsoukalas was sued for that tort by all the plaintiffs. The Jury found that this tort, combined with the improper arrest of Mitchell, caused him a total of $15,000.00 in damages. The Jury found that while his conduct as to Dylan was tortious, it caused him no damages. The Jury found that Tsoukalas actions which included his admitted following of Michelle, Brian, and Brian Jr. were not tortious.

With regards to Michelle Kennedy, the Jury found against her as to all of her myriad claims of wrongdoing against the defendants whose actions were tried, and the Court disposed of her claims against all of the other individual defendants by entering judgment on their behalf. Thus, she failed to prove that any police officer acted tortiously against her. This Court has previously ruled that the award of damages as to her was supported because "Tsoukalas tailed her vehicle after 2001, that Officer Connors frequently sat outside her trailer and flashed his lights on their house, and that she was verbally and physically assaulted by Scott Parker, a Billerica officer, in a parking lot". (**8/21/07 order page 10).** However, Michelle lost in all of her claims against Tsoukalas and lost on all of her claims against Connors. Thus, the finding against the Town for negligently supervising Tsoukalas and Connors was not supported by a finding that these officers committed any torts, a necessary prerequisite. With regards to Officer Parker, he was not a party to the first Trial. Indeed, the very act the Court indicated might have supported an award of $50,000.00 to Michelle Kennedy was not even tried until the second Trial. That Jury found his behavior to be tortious and determined that the compensatory damages were $2,000.00. Therefore, there is no support whatsoever for an award for more that $2,000.00 in damages for Michelle Kennedy against the Town.

The concept that a municipality cannot be liable for damages greater than those awarded against the individual tortfeasors has been clearly established in this jurisdiction. In Lewis v. Kendrick, 944 F.2d 949 (1st Cir. 1991), the plaintiff sued the City of Brockton and two police officers for several claims arising from an arrest without probable cause.  The Jury returned verdicts against the two police officers for $1,000 under § 1983 and $1,000 for M.G.L. c. 258, § 2 for false

imprisonment.  The Jury also returned $3,000 judgment against the City for negligent supervision. The appellate panel reduced the judgment to $1,000 because it found that the judgment was duplicative.  The Court vacated the $3,000 judgment against the city because the Jury found that the damages totalled $1,000 for the false imprisonment and that the plaintiff should not receive a greater recovery against the city.  The Court also vacated one of the $1,000 judgments against the officers because it arose out of the same occurrence, but Negligence and Civil Rights violations were alternate theories of reaching the same result.  The Court then assigned liability to the two police officers and the city in the amount of $1,000 jointly and severally.

The same principle must be applied in this case. The allegedly negligent supervision by the Town of Billerica, which the defendants adamantly deny was proven, conceptually may have caused Officer Rosa to wrongfully bring charges against Brian Jr., worth $10,000. It may have caused Tsoukalas to inflict emotional distress and wrongfully arrest Mitchell Kennedy, worth $15,000.00, which should be the only damage award against the Town of Billerica.

The judgments in this case are inconsistent with the reasoning in Lewis where officers and the Town were found liable based on § 1983 and M.G.L. c. 258, § 2.  The holding in Lewis made it clear that the same incident may have multiple theories to allege liability, but there cannot be multiple recovery for the same injury arising from the same facts.  In other words, if liability is found, the damages have one value.  That value neither increases nor decreases based on the number of parties who are liable or how many theories under which liability was found.  The value is constant.  In this case, the total value of the tortious conduct by the individual officers to the individual plaintiffs was established at

$25,000.00 for torts committed by two officers. There were no other torts proven as to these officers and no torts whatsoever proven against the other 27 individual defendants. Thus, there can be no award for non-tortious conduct, such as "following" or "flashing of lights". There must be an underlying tort, in this case, there was none.

### X.     There was Insufficient Evidence to Support a Monell Claim

In order to present a proper municipal liability claim, "The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. at 404 (emphasis in original).  "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  Id. at 405.  There must be a direct causal link between the municipal policy and the plaintiff's harm.  Id. at 404.  A plaintiff must show that the municipality "had a custom or policy which was causally responsible for the plaintiffs alleged constitutional deprivation."  Harrell v. City of Jacksonville, 976 F. Supp. 777, 781 (C. Dist. Ill. 1997).  A policy of not investigating citizen complaints must be related to the alleged deprivation of right.  Id.

In the context of failure to adequately train police officers, the Supreme Court held, "the inadequacy of the police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  Canton v. Harris, 489 U.S. 378, 388 (1989).  The plaintiff must still prove that the ultimate injury was caused by the "identified deficiency in the city's training program[.]"

Id. at 391.  "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty program."  Id. at 390-391.

In this case, the only constitutional injury found by the first Jury was the wrongful arrest of Mitchell Kennedy by Officer Tsoukalas in 2004. To support their municipal liability claim, the plaintiffs relied on evidence that they complained to former Chief Barretto between 1991 and 1994, and that they sent a presentment letter to the Town in February of 2002. The plaintiffs relied on the testimony of their expert, Reginald Allard, to support the Monell claim. He was allowed to testify about the investigation of allegations against officer Dean Royston. This testimony was wholly irrelevant and supported no claims. He opined that the investigation of the stolen badge incident in 1997 was inadequate, again, not relevant to anything in this case. He then testified about "noble cause corruption" (transcript 10-75) as a concept. However, he never linked the arrest of Mitchell to any shortcoming in the supervision and discipline of the department. Indeed, despite the allegations of "harassment" by the plaintiffs, this Court heard evidence of numerous crimes, arrests based on ample probable cause, and traffic violations committed by the plaintiffs through the years. Indeed, although the Court allowed Brian and Michelle Kennedy to challenge their traffic citations at the Trial, the evidence was uncontroverted that they were found responsible for all of them. Brian pled guilty to at least one crime, and a Jury found Michelle guilty of threatening officer Tsoukalas.

The evidence linking Tsoukalas' arrest of Mitchell to any municipal custom or policy was totally lacking. While he testified that he was told that the Kennedys were criminals, the fact is there was ample support for that

proposition. During his interactions with them, he only brought two criminal charges against members of the family. Michelle was found guilty of one, and the Commonwealth failed to prove beyond a reasonable doubt that Mitchell was guilty of the other. From this record, no reasonable Jury could find that Mitchell's arrest was caused by a constitutionally deficient custom or policy of the Town.

### XI.   The Court's Remarks About Chief Rosa Were Not Supported By The Evidence

In the JNOV Order dated August 21, 2007, this Court indicated that the plaintiffs argued that Chief Rosa was "part of the problem" with regard to a department attitude towards the Kennedys. The Court wrote "Ms. Kaiser bolstered these accusations by testifying that Chief Rosa attempted to get her to press charges against one of the children because he wanted to 'nail the Kennedys so bad that he could taste it'". <u>See</u> Order page 6.  This statement by the Court is unsupported by the evidence and should be retracted.

In fact, Ms. Kaiser testified that an officer came to her house on a motorcycle and said that she should press charges against Brian Jr. and said "we're trying to get them out of the Town of Billerica so bad that I can taste it" <u>See</u> transcript of testimony of Kaiser (hereinafter "TK"), page 6.  She went on to say that she did not remember names of the multiple officers who spoke to her about this incident other than "a Rosa or something", TK page 6. The Court interrupted the testimony to ask "Excuse me.  Was Officer Rosa the one who said 'we're trying to get them out of town' or was that somebody else?" TK page 7. The witness replied, "I don't recall because I spoken to a couple different officers, and a couple of different remarks were made." TK page 7.  Plaintiffs' counsel

then reaffirmed with the witness that it was the officer on the motorcycle who made the above remark.  TK page 7.  Later in the trial, Chief Rosa testified that he was not riding a motorcycle in 1997 but that Sgt. Elmore, who was primarily involved in the Kaiser incident, was riding the motorcycle.  Further, in their complaint, the plaintiffs alleged that "Officer Elmore and another officer responded to the call … one of the officers told Ms. Kaiser that he wanted to 'nail Mr. Kennedy to the wall'.  In a follow up conversation with officer McNulty, officer McNulty tried to convince Ms. Kaiser to bring charges against Brian Jr…".  See Complaint, paragraph 69.  The Kennedys had interviewed Ms. Kaiser before the complaint was filed in 2004, and her memory was certainly better then than it was at the trial.

This Court should note that Chief Rosa was not even a player in this incident until he testified that he met with Ms. Kaiser and that she signed the complaint.  Indeed, at the trial, Ms. Kaiser did not even recognize Chief Rosa as someone who had talked to her about the incident. TK page 21. Thus, the Court's statement that she testified that "Chief Rosa" made derogatory statements to her about the Kennedys is contrary to the evidence and must be corrected.

Furthermore, it warrants noting that if a Billerica Police Officer told Ms. Kaiser that "we" wanted the Kennedys out of Town, he may well have been referring not to some Billerica Police officers but to the plaintiffs' neighbors in the trailer park. As the Court may recall, Ms. Kaiser was asked "Did the officer who told you that they wanted to get the Kennedys out of town tell you why they would like the Kennedys out of Billerica?" TK page 17.  She replied, "Yes, they did. I guess there was a petition going around trying to get the Kennedys out of the [trailer] park, and supposedly everybody hated them…" TK page 17.

Indeed, the manager of the trailer park testified that he evicted the Kennedys from the park, but was precluded by this Court from testifying that he did so because of numerous complaints by the neighbors, not because of any actions of the police.

Accordingly, the defendants ask that this Court retract the statement regarding Ms. Kaiser's testimony that Chief Rosa attempted to get her to press charges against one of the children because he wanted to get the Kennedys out of Billerica.  She testified to no such thing and the evidence was that Chief Rosa did not make any such statement.

### XII.    The Court Should Reconsider Its Ruling Regarding Trial Management

In their first Motion for JNOV, the defendants complained that the defense was truncated at the first trial when the Court refused to allow Chief Rosa to finish his testimony despite the fact that the defendants had only used 21 hours and 26 minutes of their allotted 24 hours, while the plaintiffs were allowed to use in excess of 24 hours to present their evidence.  In the Order denying the defendants' Motion for New Trial on the grounds that the Court abused its discretion in cutting off the defendants' case, the Court made a number of statements about the conduct of the trial. The defendants take exception to some of those remarks.

The Court stated that "this trial proceeded at a slower pace then originally expected".  See JNOV Order, page 11.  However, the defendants were given 24 hours of time within which to present their case and were not allowed to use the entire 24 hours.  Thus, the Trial proceeded exactly on schedule, not more slowly then expected.

The Court also made a statement that is troubling to the defendants. The Court stated, "trial counsel engaged in a shoving match at sidebar in front of the Jury." <u>See</u> JNOV Order, page 11. Surely, the Court remembers that there was no "match." Attorney Fischer shoved Attorney Kesten with no provocation or retaliation, thus the Court's description of a mutual "shoving match" is wrong, and Attorney Kesten respectfully asks that this be corrected. Likewise, the defendants do not feel that the Court's description of "routine" disregard of Court Orders and "ad hominem" attacks is fair to the defense.

In denying the Motion for New Trial, the Court referenced only one part of the transcript when suggesting that the defense received the time that it needed to conclude the testimony of Chief Rosa. At the beginning of the final day of evidence, defense counsel specifically told the Court: "Your Honor, I don't see how we can get to the Jury today. I am going to have a very lengthy examination of the Chief about everything he knew." Trial Transcript (hereinafter "TT") April 26, page 15.

Defense counsel was aware of how much time he had, was aware that the plaintiffs had run out of time, and was acutely aware that Chief Rosa was the key witness for the defense in this matter. Counsel alerted this Court to the fact that the examination would be lengthy and would have been concluded within the allotted time. It was the Court that kept telling the parties to hurry up throughout the trial, even though the parties should have been free to use the time allotted as they saw fit. For example, the Court refused to allow the defense to play video tapes that were in evidence. In this case, the plaintiffs contended that they were harassed by police vehicles and that they had videotapes that depicted the alleged harassment. The defense wanted to show that the tapes in

fact depicted nothing of the sort, but rather depicted routine police behavior that the plaintiffs simply characterized as "harassment." The defendants should have been free to use their allotted time to show these tapes in full.  Instead, the Court repeatedly instructed defense counsel that he could only play short portions and that the Jury could look at the full tapes while deliberating if they so chose.   The Court abused its discretion by refusing to allow the defense to play the entire tapes and cross-examine the plaintiffs regarding the contents.

As the final day of evidence progressed, it was the Court that again asked about cutting off the testimony of the key defense witness. When asked how much longer he had with the witness, Attorney Kesten replied "a lot… an hour or two".  TT April 26, page 96. The Court remarked "This Jury wants the case today and I want to try.  An hour seems fair enough, not two, you'll just lose him."  TT, page 96.  Later, the Court raised the issue of time again.  The Court asked "How much longer?" The defense indicated "about an hour."  TT, page 145 l 22-23. Later at sidebar, the Court ordered the defense to "finish by ten of one" to which the defense stated "Finish, I cannot." The Court responded "finish." TT, page 146 l 1-3.

Subsequently, the testimony moved on to a key area of the defense, the issue of what steps Chief Rosa took with the complaints by the Kennedys after he became Chief of Police in December of 2001. The testimony on this issue had just commenced when the court suddenly instructed the defense counsel to "finish up." TT page 162 l 4.  As the defense was entering this key testimony, the Court said "one closing question." Defense counsel said "I don't have a closing question" to which the Court replied, "It's done.  Unless you have a sort of clean –up." The defense objected.  TT, page 163 L 16-20.

With all due respect, this action by the Court was unfair to the defense, and an abuse of discretion. The fact that the great bulk of the jury award was based on alleged inadequate supervision of the department highlights the fact that Chief Rosa should have been allowed to testify as to what he did about the Kennedy complaints and how he supervised the department, which he was not allowed to do.  That was what he was going to testify about when this Court abruptly blew the whistle and declared the trial over even though there were over **two and one half hours** left on the defense clock. It is clear that this decision was not based on the lack of relevancy of the evidence being presented.

What the jury heard was accusations about Chief Barretto, who retired in 1994, no evidence about Chief Mathews, who ran the department form 1994 until the end of 2001, and vague accusations against Chief Rosa, the key supervisor. The only Billerica Police Chief who testified live at trial was Daniel Rosa Jr.  He wanted to explain to the Court and the Jury that he took his responsibilities seriously, and that he took great pains to deal with the Kennedys appropriately, consulting with counsel regularly, from February of 2002 onwards.  He wanted to explain that he looked into each incident alleged by the plaintiffs and discussed his actions with the Town Manager and counsel.  He was not allowed to, however, because of the unfair termination of the trial.  Accordingly, he was improperly foreclosed from testifying on these key issues.

This Court should recognize that, in retrospect, it would have been fair to allow the defense to finish its case within the time allotted, as opposed to shutting the defense down in the middle of the testimony of the key defense witness. Once the Court grants an allotment of time to a party within which to

present it's case, this allotment should not be reduced. The actions by this Court in terminating the defense were arbitrary and capricious.

If this Court does not reverse the verdict and enter judgment for the defendants, then it should at least grant them a new trial and give them an opportunity to present their case in the manner that they deem appropriate as long as it is done within the full time limit allotted by the Court. The defendants assure the Court that they can and will do so.

## CONCLUSION

For the reasons stated above, and incorporating the defendants' first Motion for Judgment Notwithstanding the Verdict or for New Trial by this reference as those fully stated herein, the defendants ask that this Court vacate the Judgment for the Plaintiffs and enter Judgment for the defendants Daniel Rosa, Mark Tsoukalas, Richard Nestor, Scott Parker, and the Town of Billerica, or, in the alternative, grant the defendants a New Trial.

Respectfully submitted,
DEFENDANTS,
By their attorneys,

/s/ Leonard H. Kesten
Leonard H. Kesten, BBO No. 542042
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA 02116
617- 880-7100

Dated:  December 20, 2007