UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| BRIAN KENNEDY AND MICHELLE KENNEDY, | * |
| Individually and as father and next friend of | * |
| BRIAN KENNEDY, JR., Individually and as mother | * |
| next friend of BRIAN KENNEDY, JR.. | * |
| | * |
| Plaintiffs | * |
| | * |
| v. | *    C. A. No. 04-CV-12357-PBS |
| | * |
| TOWN OF BILLERICA, et al | * |
| | * |
| Defendants | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
## FOR ATTORNEY'S FEES AND EXPENSES

### INTRODUCTION

Pursuant to Fed.R.Civ.P. Rule 54, plaintiffs seek an award of attorney's fees and costs from defendant Town of Billerica, et al., under 42 USC § 1983 and the Equal Access to Justice Act ("EAJA"),  28 U.S.C. § 2412(d).  Plaintiffs have obtained a judgment against the defendant Town of Billerica for violations of the plaintiffs' civil rights and against four individual defendants, either for civil rights violations or for intentional torts that arose from the defendant Town's failure to train, supervise and discipline these defendant officers.  In total two separate juries awarded the plaintiffs damages in excess of $630,000.00.

Specifically, plaintiffs obtained a jury verdict that the defendant Town of Billerica had deliberately violated their civil rights by failing to train, supervise and discipline its police officers, allowing its police officers to violate the constitutional rights of the plaintiffs as a pattern and practice.  Additionally, the plaintiffs obtained verdicts and judgments against four individual defendants, including verdicts for civil rights violations, against defendants Mark

Tsoukalis, Scott Parker, Richard Nestor and Daniel Rosa, the police chief of the defendant town, each for different incidents.

Although the judgments against the four individual defendants were not all specifically for civil rights, they each arose from the failure of the defendant Town of Billerica to train, supervise and discipline its officers. Thus each of the judgments arose from and relate to the civil rights violations.

Having recovered such judgments, plaintiffs are prevailing parties as a matter of law. As such they are now entitled to recover costs and attorneys fees, pursuant to pursuant to 42 USC § 1983 and the Equal Access to Justice Act, 28 U.S.C. § 2412(d) [hereinafter EAJA]. Plaintiffs hereby now move this Court to award attorneys fees for time spent on this case along with allowable costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

**LEGAL ARGUMENT**

## A.  PLAINTIFFS ARE THE PREVAILING PARTY AND THUS ENTITLED TO THEIR FULL COSTS AND ATTORNEYS FEES.

The Supreme Court has declared that "Plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefits the parties sought in bringing the suit." *Hensley v. Eckerhart*, 461 U.S. 424 at 433, 103 S.Ct. 1933, 76 L.Ed. 2d 40 (1983). The Supreme Court has reaffirmed the *Hensley* "prevailing party" standard by elaborating, in *Farrar v. Hobby*, 506 U.S. 103, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992) that a plaintiff is a prevailing party in a civil rights case where the plaintiff obtains at least some relief on the merits of the claim.

As plaintiffs obtained both substantial monetary damages and a verdict that the Town of Billerica Police Department failed "to properly discipline or supervise the defendant police officers in a manner that was deliberately indifferent to the civil rights of the plaintiffs" [Verdict Form, V. 1., p. 20], as well as civil rights verdicts against defendant Tsoukalis and Parker, the Plaintiffs are prevailing parties under the EAJA. Therefore they are entitled to attorneys fees, as there was a successful recovery against the defendants for the Constitutional violations alleged, violations of 42 USC § 1983. These violations, particularly the express finding that the defendant Town failed to properly discipline or supervise its officers in a manner that was deliberately indifferent to the plaintiffs' civil rights, support a full attorney fee award.

The First Circuit reiterates the Supreme Court standard, stating "[t]o prevail, a party must 'succeed on **any significant issue** in litigation which achieves some of the benefit [it] sought in bringing suit.' " *Boston's Children First v. City of Boston*, 395 F.3d 10 (1ˢᵗ Cir.2005). [emphasis added]  The plaintiffs clearly have done so here.

Not only have four of the five plaintiffs recovered judgments for substantial monetary damages, totaling $634,500 (but reduced by the Court by $225,000 to $409,500), plaintiffs also obtained a judgment on a *Monell* failure to supervise and discipline claim against the defendant Town of Billerica. The plaintiffs also obtained an awarded of punitive damages of $30,000 upon a jury finding that the conduct of defendant Parker shocked their consciences.

This represents a substantial victory and vindication of their claims. The plaintiffs thus have achieved the primary purpose of this lawsuit. Therefore, plaintiffs are the prevailing party entitled to a full fee award.

Moreover, all of the claims, even the intentional torts of the individual officers, were rooted in and arose from the Town's failure to supervise and discipline its police officers, including the defendant police officers. Thus the plaintiffs' success on the _Monell_ claim constitutes a substantial vindication of the rights and claims asserted by the plaintiffs. The defendants may argue that twenty four of twenty eight individual defendants avoided judgments against them, but this is a spurious argument at best, as nineteen of these twenty four defendants did not prevail upon the merits. Rather, these defendants asserted a statute of limitations defense that allowed them to avoid being judged on the merits for their conduct. The jury finding on the _Monell_ claim delivered a clear message as to the conduct of the many defendants who managed to avoid an individual judgment on a jury verdict.

By contrast, the plaintiffs, in order to prevail on their _Monell_ claim, were obliged to establish a broad enough pattern of harassment and abuse by multiple members of the defendant police department to warrant a finding of liability against the defendant town. To do so, the plaintiffs had to convince the jury that many of the acts alleged against the defendants who avoided judgment based not on the merits but on the statute of limitations did in fact occur, as alleged by the plaintiffs. Thus, for purposes of the award of attorneys fees under the EAJA, the plaintiffs should be considered prevailing parties upon the totality of their claims.

To argue otherwise would require this Court to engage in an impossible and improper arithmetic parsing and apportionment of attorneys hours to determine which part of which evidence related to which claim. Such a task would not only prove burdensome to the Court: it is inappropriate. "'Prevailing party' success cannot be measured by an arithmetic comparison of the claims." _Domegan v. Ponte_, 972 F2d 401(1st Cir., 1992), citing _Rogers v. Okin_, 821 F2d 22

-4-

(1st Cir., 1987).  This is particularly true here, where the plaintiffs had to and successfully did provide evidence of a pattern of behavior over a thirteen (13) year period sufficient to support their _Monell_ claim.

As the Supreme Court teaches "Although attorney's fees should not be awarded for time spent in litigating (or preparing to litigate) unsuccessful, severable claims, they may be awarded for time spent on unsuccessful claims if such claims are interconnected to the successful claims, i.e. the claims rest on the same facts or legal theories." _Hensley v. Eckerhart_, 461 U.S. 424, 435 (1983), as cited in _Coutin v. Young & Rubicam P.R., Inc._, 124 Fed3d 331, 339.

That is precisely the case here, where facts and legal theories relied upon by the plaintiffs in support of the claims on which they did not prevail are the same facts and legal theories advanced by the plaintiffs in support of the successful claims, particularly the _Monell_ claim. Because of the nature of the _Monell_ claim, the plaintiffs had to offer evidence of a broad array of the misdeeds by defendants from whom the plaintiffs could not recover because of the statute of limitations.

The judgments against defendant Rosa, Tsoukalis, Parker and Nestor, to the extent that they were for intentional tort claims and not expressly for civil rights claims, likewise, are too intertwined with the overall civil rights claim against the town that is at the heart of this case. They are too inextricably entwined to be considered as separate from the civil rights claims. First, these intentional torts likely would not have occurred but for the Town's failure to supervise and control its police officers.  If the Town had responded to the initial 1991 complaints of Michelle Kennedy, the atmosphere and culture that allowed and nurtured the intentional torts against the Kennedys would not have existed, let alone thrived.

What is more, it is difficult, if not impossible to isolate the intentional torts as separate from the ongoing _Monell_ civil rights violations.  For example, defendant Parker's assault upon plaintiff Michelle Kennedy cannot be discretely separated from his willful and outrageous violation of her civil rights. Nor can defendant Tsoukalis' intentional infliction of emotional distress upon Mitchell be separated from his violation of Mitchell's civil rights.  Likewise, defendant Rosa's intentional infliction of emotional distress upon Brian Kennedy, Jr., cannot easily be distinguished from the deliberate intent to violate the Kennedys' civil rights, found in the _Monell_ claim, by driving the Kennedys out of town, as Rosa threatened to do.

In _Hensley v. Eckerhart_, supra, still the lead case on civil rights attorneys fees awards, the Supreme Court rejected the contention that a prevailing party cannot recover all his or her attorneys fees in a civil rights case where the plaintiffs had not prevailed on all the original claims or against all the defendants.  The Supreme Court ruled that the lower court could award total compensation based on its conclusion that all the plaintiffs' claims were based on a common core of facts and that the size of the damage award or the fact that the plaintiffs did not prevail on every claim, did not imply limited success.  Rather the plaintiffs' success was more accurately reflected, as is the case here, by the excellent results achieved in a highly complex case.

Moreover, _Hensley v. Eckerhart_ pointed out that civil-rights actions were not simply private tort suits and that Congress, in enacting Section 1988 expressly recognized that plaintiffs in those actions function as "private attorneys general".  _Gray v. New England Tel. and Tel. Co._ 792 F.2d 251 at 259 (1st Cir., 1986),  _King v. Greenblatt_, 560 F.2d 1024, 1026 (1st Cir.1977), cert. denied, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161

In following _Hensley_, courts have made clear that prevailing parties in actions under 42 U.S.C. Section 1983 are entitled to attorneys fees as a matter of course.  _Poy v. Boutselis_, 352 F2d 479 (1st Cir., 2003), _Planned Parenthood of Houston and Southeast Texas v. Sanchez_, 480 F3d 734 (5th Cir., 2007) _Pickett v. Milam_, 579 F.2d 118 (8th Cir. 1978); _International Society for Krishna Consciousness, Inc. v. Anderson,_ 569 F. 2d 1027 (8th Cir. 1977) and _Wharton v. Knefel_, 562 F. 2d 550 (8th Cir. 1977)

Statutes which award attorneys fees are remedial in nature and should be broadly interpreted to facilitate the congressional purpose.  _Williams v. City of Fairburn_, 702 F.2d. 973, 976 (11th Cir., 1983); _Runyon v. Fasi_ 762 F. Supp. 280 (D. Hawaii, 1991)

Moreover, as the Court wrote in _Norris v Murphy_, 287 F.Supp2d 111, at 115, citing _Gay Officers League v. Puerto Rico_, 247 F3d 288, 295 (1st Cir., 2001)  "the First Circuit has found on occasion that an award of attorneys' fees serves a public policy when [as here] civil rights issues are at stake."

"In civil rights cases the award of attorneys fees "encourages citizens to vindicate their civil rights, which are matters that involve the public as a whole." _Norris v. Murphy_, supra at 115, citing _O'Connor v. Huard_, 117 F3d 12, 18 (1st Cir., 1997).  A full award is appropriate here, in light of not just the award of substantial monetary damages but the findings of two juries: the first finding that the defendant town was deliberately indifferent in disciplining its police officers in their dealings with the plaintiffs and the second in awarding punitive damages after finding that the conduct of the defendant police officer shocked their conscious.

**B. <u>LODESTAR</u>**

An award of attorney's fees to a prevailing plaintiff in an action under 42 U.S.C. § 1983 should follow the same principles as an award under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. §1988, which provides for attorney's fees to be awarded to a prevailing plaintiff against the defendants in an action under 42 U.S.C. §1983.  The same method should be utilized in awarding the plaintiffs their attorneys fees, as the prevailing party.   The purpose of the Act is to require defendants to pay counsel fees to successful civil rights plaintiffs to encourage competent counsel to take these cases.  <u>Hensley v. Eckerhart</u>, <u>supra</u>.  Compensatory attorney's fees are to be awarded absent "special circumstances."  <u>Burke v. Guiney</u>, 700 F.2d 772 (1st Cir. 1983).

Attorney's fees are determined based on the "lodestar" method.  <u>Grendel's Den Inc. v. Larkin</u>, 749 F.2d 945 (1st Cir. 1984)   Under this method the court determines a reasonable hourly rate and the amount of time that was reasonably necessary to litigate the case.  The product of the hourly rate times the number of hours is the lodestar fee, which is presumed to be reasonable.  After the lodestar fee is determined, the court may adjust the fee based on specific circumstances.

As explained below, plaintiffs should be entitled to the lodestar fee as described in the following chart.

| Name | Hours | Rate | Total |
|------|-------|------|-------|
| • Principle Lawyer Gilgun | | | |
| General Legal work | 2,239.5 | 250.00-350.00 | $396,120.00 |
| • Principle Lawyer Fischer | | | |
| General legal work | 1,099.15 | 300.00 | 329,745.00 |

| | | | |
|---|---|---|---|
| • Associate Attorney Brodie | | | |
| General legal work | 55.80 | 175.00 | 9,765.00 |
| • Paralegal Lisa Clough | | | |
| General paralegal work | 41.00 | 60.00 | 2,460.00 |
| **TOTAL FEE** | | | $738,090.00 |

The hourly rate for an attorney's fees award should be based on the prevailing market rates in the community, which means "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." _Blum v. Stenson_, 465 U.S. 886, 895 n. 11 (1984). Plaintiff requests a blended hourly rate of $250.00-$350.00 per hour for Frederick V. Gilgun, Jr., and a rate of $300.00 per hour for Andrew Fischer. Plaintiff further requests an hourly rate of $175.00 per hour for the work of junior associate Andrew Brodie on pre-trial and trial support matters and $60.00 per hour for paralegal Lisa Clough for trial support matters.

In support of this motion counsel for plaintiffs have filed affidavits with complete billing information and a list of compensable expenses. Plaintiffs have also provided affidavits from attorneys Dennis E. McKenna, Joel Suttenberg and Howard Friedman to verify the attorneys' hourly rates and the reasonableness of the total time.

### 1. Reasonable Rate

Under the lodestar, plaintiffs are entitled to a "reasonable" hourly rate. _Grendel's Den Inc. v. Larkin_, 749 F.2d 945 (1st Cir. 1984) A reasonable hourly rate is based upon "counsel's skill and experience and prevailing market rates". _Phetosomphone v. Allison Reed Group, Inc._, 984 F2d 4, 8 (1st Cir., 1993). The rates requested by plaintiff are reasonable compared both to comparable fee awards in civil rights cases and to hourly rates for litigation attorneys with comparable experience.

In his September 28, 2007 Order Awarding Attorneys Fees in _Burke v. McDonald_, Case No., 00-10376 GAO , Judge O'Toole of this Court awarded plaintiff's attorneys a rate of $300 for lead attorney, Robert Sinsheimer and $225 for his two associates.[1]  In _Cerqueira v. American Airlines, Inc_., 484 F.Supp., 2d 241, Judge Young, of this Court, on April 12, 2007, awarded an hourly rate of $325  an hour in a case that was not as complex as this case.  In _Porter v. Cabral_, Case No. 04-11935-DPW, (D. Mass., Feb. 21, 2007), Judge Woodlock found that the prevailing rates for lead civil rights attorneys in the Boston area ranges between $200 and $350 per hour. This represents recognition of increase in hourly rates from 2000, when Magistrate Nieman found $250 per hour to be a reasonable rate for lead counsel in a civil rights claim in _Rolland et al v. Cellucci, et al_, 106 F.Sup 2d 128 (D. Mass., 2000)

Like Mr. Sinsheimer, Mr. Gilgun is a former prosecutor with significant trial experience, including experience trying civil rights cases, as is set forth below.  Thus a blended rate of $250-350 per hour is within the reasonable range established by Judge Woodlock.  Similarly, Mr. Fischer has significant experience trying police misconduct cases and extensive involvement in the civil rights bar, both locally and nationally.  Thus an hourly fee of $300 is consistent with a lawyer of Mr. Fischer's reputation and experience.  The requested rate of $175 for Mr. Brodie is, in fact, below the rates being awarded to associate counsel in _Burke v. McDonald_ and _Cerqueira v. American Airlines, Inc_., _Rolland et al v. Cellucci, et al_, cited above.  The requested rate of $60.00 for paralegal Lisa Clough is consistent with paralegal rates for the greater Boston area.

---

[1]

The hourly rate of $300 was an increase from $250 an hour awarded Attorney Sinsheimer by Judge O'Toole in 2004, in _Contrada v. Hall-Brewster_, with Judge O'Toole noting that this was a reasonable increase "[g]iven the length of time this case took to get to final judgment".

<u>Massachusetts Lawyers Weekly</u> publishes an annual survey of the largest law firms in Massachusetts that includes fee information.  The survey in the <u>Massachusetts Lawyers Weekly</u>, 2007 Supplement shows the following range of billing rates:

- Sullivan & Worcester — partners $415-$700, junior partners $245-530, paralegals $175-$245;
- Edwards & Angell — partners $474 average, junior partners $321 average paralegals $144 average;
- Burns & Levinson — partners $375-$475, junior partners $210-350 paralegals $125-$200;
- Hinckley, Allen & Snyder — partners $300-480, junior partners $200-380, paralegals $160-$230;
- Prince, Lobel, Glovsky & Tye — partners $275-$475, junior partners $175-265, paralegals $100-$200;
- Mirick O'Connell — partners $280-$450, junior partners $160-250, paralegals $140-155;
- Marcus, Errico, Emmer & Brooks — partners $300-$360, junior partners $250, paralegals $135;
- LeBoeuf, Lamb, Greene & MacRae — partners $600-$725, junior partners $395-$550, paralegals $165-$180;

The hourly rates requested by counsel in this case are well within the range of hourly rates documented in the <u>Lawyers Weekly</u> study.  Indeed, the blended rate Mr. Gilgun seeks and the $300 rate Mr. Fischer seeks are modest, given the prevailing hourly charges of large firm partners with comparable trial experience

Mr. Fischer is a member of the Massachusetts Bar Association and Boston Bar Association and has practiced before this court for over twenty five (25) years.  He has been trying civil rights cases in state and federal courts in Massachusetts since 1983, when he tried <u>*Grant et al v City of Boston*</u>  in the Federal District Court for Eastern Massachusetts.

In addition to the Massachusetts Trial Lawyers Association (MATA), the American Trial Lawyers Association (ATLA, now the AAJ, the American Association of Justice) and the

National Lawyers Guild (NLG), Mr. Fischer is active in several civil rights bar associations. He

is an active member of the National Police Accountability Project (NPAP) and the Civil Rights

section of the AAJ, which he chaired from 2004-2005. In his capacity as Chair of the Civil

Rights litigation Section of ATLA, Mr. Fischer put together and moderated a half day civil rights

litigation educational program at the 2004 annual ATLA convention, July 3-7 in Boston.

More recently, Mr. Fischer has arranged a seminar in Civil Rights in Hawaii for the 2006

ATLA Winter's Convention February 18, 2006 to February 22, 2006, participated in the 2007

NPAP CLE program on November 1, 2007 and is participating in the organization and

presentation of a program on civil rights and police misconduct litigation in Puerto Rico to be

presented at the 2008 AAJ winter convention in San Juan, Puerto Rico. Mr. Fischer is also

active in an informal association of police misconduct attorneys, chaired by Howard Friedman,

that meets regularly at Suffolk University, under the auspices of Suffolk Law School professors

Karen Blum and Michael Avery. Mr. Fischer continues to sit on the executive board of the AAJ

Civil Rights Section.

Mr. Gilgun is admitted to practice in both the Commonwealth of Massachusetts and the

State of New York.  Mr. Gilgun has been a litigation and trial attorney for more than twenty (20)

years.  He began his legal career as a prosecutor in the Kings County District Attorney's Office in

Brooklyn, New York, where in addition to numerous misdemeanor and bench trials, he tried over

ten (10) felony jury trials.  Mr. Gilgun has been involved in civil rights litigation involving

claims of police misconduct since 1990, when, as an associate for Riemer & Braunstein, he acted

as lead counsel in defending officers in five civil rights jury cases tried in the Superior Court for

the Commonwealth of Massachusetts and the Federal District Court for the District of

-12-

Massachusetts.  More recently, Mr. Gilgun has acted as plaintiff's counsel in several police misconduct cases.  In addition, Mr. Gilgun has tried numerous civil cases involving various legal claims in the trial courts of the Commonwealth of Massachusetts.

The reasonableness of the hourly rates is attested to by the affidavits from Attorney Howard Friedman, one of the most prominent civil rights attorneys not just in the Commonwealth but in the nation, Attorney Joel Suttenberg, a former assistant attorney general who now practices employment law and civil rights law and Attorney Dennis E. Mckenna, a partner with the law firm of Reimer & Braunstein.  In this light, the rates requested, of $300 per hour for Attorney Fischer and the blended rate of $250-350 for Attorney Gilgun is quite reasonable.

2.  Upward Adjustment

Plaintiffs should be entitled to an upward adjustment.  Such an adjustment is justified by the difficulty of the case and by the obstruction and unreasonableness throughout the litgation of the defendants.

The difficulty of the case is clear.  The case involved multiple and complex claims extending over many years.  This caused the time necessary to litigate the claim to be much more extensive than usual.  Discovery was extensive and there were multiple summary judgment motions and two trials, one lasting a full month.  To take on this case meant that both Mr. Fischer and Mr. Gilgun made a sacrifice as to the rest of their small firm practices for the three and seven years, respectively, they each have spent on the case and the time they continue to spend to litigate this case to a conclusion.   In addition, Attorney Gilgun and Attorney Fischer have put at risk in excess of $40,000 to fund the out of pocket costs necessary to litigate this case.

Plaintiffs' counsel has spent significant amounts of time, much of which was not billed, addressing the unique and unusual needs of the plaintiffs as clients and the nature and character of many of the witnesses.   This included dealing with threats or perceived threats by the defendants upon both the plaintiffs and many witnesses and responding to accusation by the defendants – none of which were ever substantiated or proven – that the plaintiffs were threatening witnesses.

Plaintiffs' counsel also encountered unique obstruction by the defendants' claims of the need to protect "confidential informants", claiming that the plaintiffs could not use key witnesses (particularly Tracey Heffernan) or evidence relating to forgeries by the defendants that related to these witnesses.  The fact that the defendants did not hesitate to breach the alleged confidentiality of Ms. Heffernan and other supposed confidential informants makes evident that their real concern was not "protecting" any confidentiality but obstructing access to evidence.

These are the types of difficulties Attorney Howard Friedman anticipated in declining to accept this case [see affidavit of Howard Friedman ¶4] and, particularly where the burden on a small practitioner is increased by the conduct of the defendants, an upward adjustment in the lodestar hourly rate is appropriate and justified.  It is cases like this "where a multiplier is essential to attract competent counsel".  Avery, Rudovsky and Blum, Police Misconduct Law and Litigation, §14:1, Attorneys' Fees, citing *City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed. 2d 449 (1992)

> 3.    Hours and Time Requested Were Reasonable Based upon the Complexity of the Claims and the Obstruction of the Defense.

> a.    The complexity of the *Monell* Claim required the time spent

In obtaining a jury verdict that the Town  Billerica Police Department failed "to properly discipline or supervise the defendant police officers in a manner that was deliberately indifferent

to the civil rights of the plaintiffs" [Verdict Form, V. 1., p. 20], the Plaintiffs obtained full

vindication of their claims and have obtained a "full degree of success".

"[T]he most critical factor 'in determining the reasonableness of a fee award 'is the

degree of success obtained.'"  _Norris v. Murphy_, 287 F.Supp.2d 111 (D.Mass., 2003), citing

_Hensley_, supra, 461 U.S. at 436, 103 S.Ct. at 1941 and _Marek v. Chesny_, 473 U.S. 1, 11, 105

S.Ct. 3012, 3017, 87 L.Ed.2d 1 (1985).  Here the plaintiffs were fully vindicated.

However, to establish the failure to supervise _Monell_ claim, it was necessary for the

plaintiffs to provide evidence of the long term pattern of conduct, a pattern of conduct that began

in 1991 and continues to this day, a pattern of conduct that affected all five plaintiffs and went

beyond the twenty eight (28) individual defendants.  All this evidence was necessary in order to

prove that defendant Parker's conscious shocking behavior towards Michelle Kennedy in 2002

and defendant Tsoukalas' wrongful arrest of Mitchell Kennedy in 2004 were both the result of a

long and well established policy of condoning, even encouraging, harassment of the Kennedy

family.

The  evidence necessary to prove this pattern of harassment included the threats and

assaults upon Mitchell's father at the Concord Shores in 1991 and Mr. Tipps Restaurant in 1993.

It included the traffic stops of Mitchell's parents, Brian and Michelle through the early 90's, the

wrongful arrests of his parents (including blaming the Kennedys for the theft of defendant

Connors' hat and badge),  and the defendant police regularly following his family's car.  It

included the now chief, defendant Rosa, telling the Kennedys' neighbors that he and his fellow

police were intent on driving the Kennedys out of town.

The necessary evidence also included the multiple complaints Michelle Kennedy made over thirteen (13) years, beginning in 1991, and the failure of the defendant town to address these complaints properly and appropriately. The evidence included the defendants' actual response to these complaints: not to address the complaints but either to pressure the Kennedys' witnesses, Tracey Heffernan and Craig Pickering, into retracting their statements supporting the Kennedys or to fabricate forged retractions, depending upon which version of the evidence one believes. The evidence also included the facts that the perpetrators -- Rosa, Connors, Mackenzie, Elmore -- noot only were never investigated or disciplined: they were promoted, in effect rewarded for their abuse of power.

Unlike a policy or practice that is unconstitutional on its face, it is always problematic and far more difficult to prove a policy or practice resulting from a pattern of conduct. This is especially true where, as plaintiffs' expert Reginald Allard, explained, the "code of blue" is strong and officers are reluctant to break that code by testifying against their fellow officers. That was certainly the case here, where even former Officer Royston, a friend of the plaintiffs, showed reluctance in offering testimony against his fellow officers.

The only way the plaintiffs could prove a pattern of conduct was by introducing all the evidence of the many acts that comprised the full panoply of the pattern of conduct. Based on this evidence, the plaintiffs' expert, Reginald Allard, was then able to explain in his testimony how these multiple acts resulted in a policy and practice. Thus, to establish Mitchell and Michelle Kennedy's respective *Monell* claims against the Town, the plaintiffs were required to show the jury the many multiple acts of harassment, many of which may not have been significant civil rights violations or even civil rights violations at all, and then offer the testimony of their expert.

The plaintiffs also were required and did offer testimony that the defendant town was aware of the conduct of its officers, as Ms. Kennedy made repeated complaints that began in 1991.  There was evidence not just that the complaints went unheeded, but that the mistreatment of the Kennedys was condoned, based on the testimony of defendants Rosa and Tsoukalis and the locker room cartoons mocking Dean Royston's relationship with Ms. Kennedy.  The plaintiffs had to offer evidence as to the manner in which the defendant town's supervisory officers ignored the Kennedys' complaints to allow their expert, Mr. Allard, to explain how this tacit or de facto policy was established and condoned.

It would have been difficult, even unreasonable, for the plaintiffs to be forced to decide which of the many acts of harassment could or should have been excluded.  The Court clearly understood this, in allowing in evidence, quite properly, many acts of harassment which it ruled were beyond the statute of limitations, for indeed that evidence was relevant to the  plaintiffs' _Monell_ claim.

As the First Circuit makes clear  "[a]ll of the plaintiff's claims were premised on the same nucleus of facts, so no reduction need be taken for [the plaintiffs'] failure to succeed on all counts."  _Norris v. Murphy_, 287 F.Supp.2d 111 (D.Mass., 2003), citing  _Krewson v. Finn_, 107 F.3d 84, 85 (1st Cir.1997).

It would be disingenuous for the defendants to argue, as anticipated, that the plaintiffs' fees should be reduced because the plaintiffs only succeeded on limited civil rights claims.  There can be no dispute that the jury finding that "the Town of Billerica fail[ed] to properly discipline or supervise the defendant officers in a manner that was deliberately indifferent to the civil rights of the plaintiffs" [Verdict at p. 20] was a full vindication for the plaintiffs, marking a full degree

of success.  Had the jury been given the opportunity to rule on the many acts of harassment that were excluded not on the merits, but on the statute of limitations, the condemnation of the attitude and conduct of the defendant police department would only have been more clear.

Moreover, the verdicts, in their awards primarily to the three Kennedy children, reflect the extent to which the defendants were able to smear Brian and Michelle Kennedy as drug dealers and criminal hoodlums, suggesting that they were not entitled to the same treatment by the police and equal protection under the law as other citizens.  This required the plaintiffs to address complex evidentiary issues raised by the extraordinarily aggressive defense [see §b, below] and compounded the unique problems posed presenting unattractive plaintiffs to a jury.

Although the Court gave limiting instructions, the two contrasting verdicts suggest that these instructions were not adequate to offset the taint of the defendants' smears.  The best evidence of this is that the second jury, which did not hear about the alleged drug dealing, methadone use and other smears, showed no reluctance to award Michelle Kennedy damages on the weakest of the plaintiffs' claims, even awarding punitive damages.

 b.  <u>The Defendants' obstruction caused significant additional legal time.</u>

The defendants' obstruction from the outset of the case required the plaintiffs to spend many additional hours of attorneys time.  The plaintiffs are entitled to recover for this time. Indeed to hold otherwise would be to reward the defendants for their recalcitrance and obstruction, a pattern of conduct that began with their delay of over a year in providing initial automatic disclosure through the dumping of more than a thousand of page of unsorted records on the eve of trial.

The defendants, when they did produce their initial automatic disclosure, a year after suit was filed, produced a box of over two thousand pages of documents in no apparent order. Many of the documents were repeated multiple times. Many other relevant documents were clearly withheld: the initial disclosure did not include personnel files, which the plaintiffs had to file motions to compel to obtain and over four thousand pages of documents were eventually also produced, much of which came in a last minute dump on the eve of trial.

This posed a severe handicap to the plaintiffs who conducted depositions not knowing about the many documents hidden until the eve of trial. These last minute documents included, for example, the second copy of defendant Connors' report of the arson of the plaintiffs' truck in 1991, a report that stifled any investigation of possible involvement of defendant MacKenzie or other Billerica police defendants.

The copy of this document, included in the eve of trial dumping but only uncovered during trial, provided evidence that either defendant Connors or Howe had altered the original report years later, when the plaintiffs presented their claims and brought suit.[2] To discover this, plaintiffs' counsel had to divert their energies from preparation for trial and from trial to review the many documents that constituted the last haystack in which the defendants were hiding evidence. Indeed, there may well be more needles still uncovered.

When plaintiffs complained about the inadequate initial disclosure, they were advised by the Court to take a deposition of the person with the most knowledge, pursuant to F.R.C.P., Rule 30(B)(6). This should have resolved the problem, except the deponent produced by the

---

[2] There were two versions of defendant Connors report of the truck firebombing, printed at different times. The earlier report, printed in 1999, makes no reference to Michelle Kennedy blaming Robert Reslow. The second copy, printed in 2002, after receipt of the presentment letter which accuses MacKenzie of the firebombing, has language added to it, falsely claiming that Michelle Kennedy blamed Robert Reslow.

defendants, Chief Rosa, testified that he did not know and could not explain the order or arrangement of documents or why they were assembled in the manner in which they were assembled. [See Rosa Deposition testimony, pp. 90-114, Exhibit A, hereto]

The defendants continued with this combination of stonewalling and hiding the needles in haystacks of documents that were unsorted and not in any coherent or understandable order. It took four separate depositions, three of the defendant chief Rosa and a fourth of Detective Howe, who plaintiffs learned through the Rosa depositions was involved with Detective West in assembling the box of over two thousand documents. However, the documents as originally assembled had been sorted into folders by incident, in order of the plaintiffs' presentment letter, which the plaintiffs did not learn until July 7, 2006, the second of the three days of deposition of defendant Rosa.

Testimony from his deposition [pp. 90-114, Exhibit A hereto] suggests that defendant Rosa, then the chief of the department, was deliberately obfuscating. The box of two thousand documents delivered to the plaintiffs had no folders, or anything else identifying any group of documents by incident, the manner in which defendant Rosa claimed the originals were maintained, and defendant Rosa's testimony was no help to the plaintiffs in determining which documents belonged to which file, something the defendants never clarified for the plaintiffs.

More important, the defendants automatic disclosure did not contain any personnel records or records of internal investigations, of the Kennedys' complaints or of any other complaints. Such records generally are essential elements of a _Monell_ failure to supervise claim and were critical to the plaintiffs' ability to document and prove their failure to supervise and discipline _Monell_ claim. Yet obtaining this information required multiple motions to compel. [see docket entries 23, 46 and 50, for example]

The defendants engaged in other discovery games.  They submitted a list of potential witnesses numbering in the hundreds, again playing a game of needle in the haystack, and failed, even after multiple requests by the Court to reduce the list to witnesses they actually intended to call at trial, continuing this refusal to narrow their witness list into the commencement of trial, when the Court was seeking a witness list to read to the jury.

The defendants filed a motion for an order that the Middlesex District Attorney produce certain records relating to the Kennedys.  Plaintiffs assented with the proviso that the district attorney produce ALL records relating to the Kennedys and not just the records the defendants sought.  An order to this effect was entered by the Court. [see Docket number 68]  After this order was vacated by the Court, the defendants filed a new motion [Docket number 123] and again plaintiffs assented, with the proviso that the district attorney provide ALL relevant documents.  [Docket number 128]

The defendants withdrew this, their second motion, after obtaining from the district attorney the items they sought, without providing them to the plaintiffs.  This required the plaintiffs, first, to find out from the Attorney General, who was representing the district attorney, that documents had been provided.  Then the plaintiffs were required to file motions and thereafter go to considerable length, due to opposition of the Attorney General's office, who was representing the district attorney, to obtain documents relating to the defendants' prosecutions of the Kennedys, something the plaintiffs never did obtain.

The defendants caused the plaintiffs to incur further legal time and expenses by their direct and inappropriate contacts with witnesses – not contact by counsel but the defendants themselves, police officers with badges and in uniform.   The result of this was that one after

another of the plaintiffs' witnesses became unwilling to testify at trial. [see docket number 88, Plaintiffs' Motion for Protective Order Regarding Inappropriate Contact With Witnesses By Defendant Police Officers] This conduct could well be construed as witness tampering and obstruction of justice. At the very least, it showed poor judgment which drastically interfered with the plaintiffs' ability to prepare their case and increased the difficulty of the case for plaintiffs' counsel.

Likewise, the defendants made claims of protection of Tracy Heffernan's identity as a confidential informant some sixteen years before trial. What is notable is that the plaintiffs were fully aware of Ms. Heffernan's role as a confidential informant, in part because the defendants had disclosed this in documents they produced. Where the defendants had disclosed her role themselves, it can only be concluded that their self serving intent to protect her identity was one more ploy at obstructing plaintiffs' discovery and making it more difficult for the plaintiffs to use evidence at trial.

Thus it is clear that many of the pre-trial hours spent by plaintiffs' counsel were rendered necessary solely because of the intransigence and obstruction and other improper behavior of the defendants. It would be grossly unfair to allow the defendants to seek a reduction in time and attorneys fees caused by the defendants' conduct. To the contrary, a full award of attorneys fees, without any deduction, is the only way to deter such conduct by defendants and defense counsel.

c. The Plaintiffs were reasonable in the amount and nature of time billed.

This request is based on contemporaneous time and computer records kept by the attorneys and paralegals and then entered into the computer. It does not include any of the hundreds of hours of time spent by plaintiff's paralegal Jacqueline Chiu, much of it attempting to

organize or make sense of the thousands of pages of documents that kept coming from the defendants or other time she spent organizing and maintaining the large files of a complex case. The time sheets do reflect that much of the simpler legal work was assigned to junior counsel, Andrew Brodie, whose time was billed at $175 per hour rather than the rates charged by Attorneys Fischer and Gilgun.  However, the plaintiffs did not bill the time Mr. Brodie spent "acting" the part of defendant Chief Barreto, reading his deposition testimony into evidence, or the many hours he spent shuttling documents and other items to and from the Court.

The plaintiff did not bill for clerical or administrative work of any paralegal.  Nor did the plaintiffs bill for postage, most of the extensive copying costs or for telephone costs.  If the attorney performed clerical work, it was not billed.  In many instances this time was not recorded because it should not be billed.  Also, despite best efforts, inevitably some time was negligently not recorded.  Most of the time spent editing the billing records was not billed.  The plaintiffs have also not billed any of the time spent after October 18, 2007, including well over twenty-five additional hours preparing the fee petition submissions, reviewing the judgment and other legal work since the second trial.

Plaintiffs would accept a reduction of 21.25 hours of Attorney Fischer's time for entries on 9/7/07, 9/8/07, 9/10/07, 9/12/07, 9/24/07, 9/27/07, 9/28/07 10/2/07, 10/11/07, 10/17/07 and 10/18/07, as this time relates to the September 7, 2007 arrest of Dylan and Mitchell Kennedy and not to this lawsuit.

In the end, the amount of hours and the necessity of two lengthy trials, the first a month long, was largely the result of the refusal of the defendants to acknowledge their likely liability and resolve the claim before plaintiff had accrued substantial legal costs.

Plaintiffs invited a response to their settlement demand, but defendants refused. Plaintiffs repeated this request several times, both before extensive discovery, when the Court referred the parties to a mediation that failed because the defendants would not participate, and again at the outset of trial, during the first trial and after each of the verdicts. Each time the defendants refused outright to even consider settlement. During the first trial, the Court suggested discussing settlement several times. Each time, the plaintiffs were willing and the defendants did not just refuse: they scoffed at the plaintiffs' claims.

That continues to be the defendants' attitude. After the first trial, the defendants failing to acknowledge the message of the first jury, still refused to engage in any discussion of resolution of the plaintiffs' claims. Now with a second jury delivering a verdict of punitive damages, the defendants still not only fail to accept the possibility that they did anything wrong: they continue to fight everything as aggressively as they have fought from the outset. This overly aggressive defense has required undue diligence, effort, patience and restraint from plaintiffs' counsel, warranting an appropriately generous award of attorneys fees.

The EAJA was enacted to provide sufficient awards of attorneys fees to make attorneys "available in civil rights so as to attract competent counsel to litigate in this area" [see Avery, Rudovsky and Blum, Police Misconduct Law and Litigation, §14:1, Attorneys' Fees, citing "The extensive legislative history to the EAJA"] In determining the amount of attorneys fees, the Court should look to "considerations such as the 'deterrent impact' of the lawsuit and 'the importance of providing an incentive to attorneys to represent litigants . . . who seek to vindicate constitutional rights but whose claim may not result in substantial monetary compensation" *Norris v Murphy*, 287 F.Supp2d 111 (D. Mass., 2003)

While defendants are entitled to mount a vigorous defense, they can hardly complain when they have to pay for the consequences of that vigorous defense after losing the case. See *Rodriguez-Hernandez v. Miranda-Velez*, 132 F.3d 848, 860 (1998)   The defendants, unwilling to ever consider settlement, neither early in the case or after verdicts began to fall against them, defended vigorously and aggressively, to say the least. This was the cause of a large portion of plaintiff's fees. Plaintiff's counsel was reasonable in the legal time spent, but was obliged to respond to the litigation tactics of the defense. These tactics greatly increased the amount of legal time necessary for the plaintiffs. The amount of legal fees claimed is quite modest and reasonable in this context.

4.    An upward Adjustments is Appropriate to the Lodestar Rate

Because of the several issues articulated above, this is the type of unusual case in which an upward adjustment from the lodestar fee is appropriate. *Hensley v. Eckerhart*, 461 U.S. 424, 435. See, *Wagenmann v. Adams*, 829 F.2d 196, 225 (1st Cir. 1987).

In light of what was necessary for plaintiffs' success in obtaining a judgment against the Town of Billerica, plaintiffs' requested fees are, in fact, quite modest. Much of the time required was because of the defendants' obstructions not just throughout discovery but throughout the litigation, the multiple summary judgment motions and two trials lasting a total of five (5) weeks. However, this is not the primary reason an upward adjustment is appropriate.

Plaintiffs' counsel undertook significant in taking on this case. They did so because of the significant issue and public interest served by holding police accountable. They achieved a significant result in spite of many hurdles posed by this case. The Equal Access to Justice Statute contemplates sufficient compensation of attorney's fee, so that attorneys are encouraged to take civil rights cases.

Indeed, the Supreme Court has indicated that in cases like this, which are particularly undesirable because the plaintiffs, due to their criminal record, are likely to be "so unattractive to jurors that their chance of success on meritorious claims is substantially reduced", upward enhancements are not only appropriate but necessary as it is essential to attract competent counsel, where there is, as here [see affidavit of Howard Friedman], particular difficulty in obtaining counsel. *City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed. 2d 449 (1992)

In this light, an upward adjustment, in the Court's discretion, would be appropriate.

## PLAINTIFFS ARE ENTITLED TO COSTS

Plaintiffs are entitled to the costs of litigation under 42 USC § 1983 and the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d). Plaintiffs are entitled to recover costs of depositions, sheriff/constable's fees, photography, investigations, expert witness fees, court costs, other costs such as copying, parking, and telephone charges under Massachusetts law. *Deary v. City of Gloucester*, 789 F.Supp. 61(D.Mass. 1992), *aff'd* 9 F.3d 191 (1st Cir. 1993). Plaintiffs incurred out of pocket expenses, compensable under federal law, of $46,517.29 ($35,666.74 by Gilgun and $10,850.55 by Jason & Fischer) as documented by the affidavits of Cassandra Pettway-Johnson Fred Gilgun and the accompanying accountings. Defendants are liable for these expenses.

## CONCLUSION

The court should award the plaintiffs here their full request for $738,090.00 for attorney's fees and $46,517.29 for costs against defendants for a total of $784,607.29. Considerations such as the "deterrent impact" of the lawsuit and "the importance of providing an incentive to

attorneys to represent litigants . . . who seek to vindicate constitutional rights" *Norris v Murphy*, 287 F.Supp2d 111 (D. Mass., 2003) make the full award of attorneys fees appropriate here.  The Court should also consider the appropriateness of an upward adjustment to the Lodestar for the same reasons.

Respectfully submitted,
Brian Kennedy, et al
by their counsel

Date:    December 21, 2007

/s/ Andrew M. Fischer
Andrew M. Fischer
BB0# 167040
JASON & FISCHER
47 Winter Street
Boston, MA 02108
(617) 423-7904
afischer@jasonandfischer.com

kennedy\memattyfees