Daniel C. Rosa, Jr. 7-7-2006
Brian Kennedy, et al. v. Town of Billerica, et al.

```
1                UNITED STATES DISTRICT COURT
2                  DISTRICT OF MASSACHUSETTS
3
4                                    C.A. NO. 04-CV-12357-PBS
5
6   _____
7   BRIAN KENNEDY AND MICHELLE KENNEDY Individually,
8   and as Mother and next friend of BRIAN KENNEDY,
9   JR., MITCHELL KENNEDY, and DYLAN KENNEDY,
10                   Plaintiffs
11  vs.
12
13  TOWN OF BILLERICA, ET AL.,
14                   Defendants
15  _____
16
17    DEPOSITION of POLICE CHIEF DANIEL C. ROSA, JR., called by
18  the Plaintiffs, taken pursuant to the provisions of the
19  Massachusetts Rules of Civil Procedure, before Barry M.
20  Harris, a Court reporter and Notary Public in and for the
21  Commonwealth of Massachusetts, at the Offices of Jason &
22  Fischer, 47 Winter Street, 4th Floor, Boston, Massachusetts,
23  on Thursday, July 7, 2006, at 11:00 a.m.
24
```

1

Daniel C. Rosa, Jr. 7-7-2006
Brian Kennedy, et al. v. Town of Billerica, et al.

## 2

```
 1   APPEARANCES:
 2
 3   FREDERICK V. GILGUN, JR., ESQUIRE,
 4   Law Offices of Nocholson, Sreter & Gilgun, PC
 5   33 Bedford Street, Suite 4
 6   Lexington, MA 02420
 7      for the Plaintiffs
 8
 9   JEREMY L. SILVERFINE, ESQUIRE
10   Brody, Hardoon, Perkins & Kesten, LLP
11   One Exeter Plaza
12   Boston, MA 02116
13   (617) 880-7100   FAX: (617) 880-7117
14
15   ALSO PRESENT:
16   Andrew M. Fischer, Esquire
```

## 3

```
 1              I N D E X
 2
 3   WITNESS:   POLICE CHIEF DANIEL C. ROSA, JR.
 4
 5   EXAMINATION BY:          PAGE:
 6   (Mr. Gilgun)              4
 7
 8
 9         E X H I B I T S
10
11   NO:                      PAGE:
12
13   1   Notice of Deposition   5
14
15   2   Bates stamp 0241      116
16
17   3   Bates stamp 0409      116
18
19   4   Bates stamp 0410      116
20
21   5   Bates stamp 993-994   122
```

## 4

```
 1              PROCEEDINGS
 2
 3      POLICE CHIEF DANIEL ROSA, a witness, having been
 4   satisfactorily identified, and having been first duly
 5   sworn by the Notary Public, was examined and testifed
 6   in answer to direct interrogatories:
 7
 8   EXAMINATION BY MR. GILGUN:
 9
10   Q.   Good morning, Chief.
11   A.   Good morning.
12   Q.   As you probably know, my name is Fred Gilgun, and
13   I represent the Plaintiffs in this action, the Kennedys.
14      MR. GILGUN:  Before we begin, I want to confirm
15   with counsel that we will proceed with the standard
16   stipulations, and will reserve all objections, except
17   as to form of the question, and motions to strike,
18   until the time of trial.
19      MR. SILVERFINE:  Just note for the record, that
20   we have been here since 10:00, and it is now a little
21   past 11:00 a.m., through no fault of Mr. Gilgun's.
22      MR. GILGUN:  This was due to a mix-up in the
23   ordering of the stenographer, and, unfortunately,
24   the stenographer wasn't present until an hour after
```

## 5

```
 1   the said scheduled time for the deposition.
 2      Will you have the Chief read and sign?
 3      MR. SILVERFINE:  Yes.  Please waive the notary,
 4   and 30 days after receipt of the transcript is
 5   sufficient.
 6   Q.   (By Mr. Gilgun) Chief, you are here pursuant to a
 7   Notice of Deposition, pursuant to Federal Rule 30b6, that you
 8   have been designated as the person with the most knowledge in
 9   the Town of Billerica, for the purposes of this deposition?
10   A.   Yes, I have.
11      MR. GILGUN:  This has been marked as Exhibit 1,
12
13         (Exhibit 1, Notice of
14         Deposition, was previously
15         marked.)
16
17   Q.   (By Mr. Gilgun) Now, attached to the Notice of
18   Deposition, there is an Attachment A where there are two
19   categories defined pursuant to which you were requested to
20   bring any documents related to those categories.
21      I was provided earlier with a set of documents.  I
22   counted 51 pages.  Are these the documents that you have
23   provided?  Without going over through them all, those are the
24   ones that Attorney Silverfine gave to me.
```

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

Daniel C. Rosa, Jr. 7-7-2006
Brian Kennedy, et al. v. Town of Billerica, et al.

90

1  Q.  I'm talking more specifically in September of '05,
2  when you produced a batch of 2000 documents to your counsel,
3  and you indicated that you had a Beverly help you?
4  A.  Beverly wasn't there then.
5  Q.  Beverly was back in 2002 with Detective Howe?
6  A.  Beverly wasn't even employed back then.
7  Q.  I asked you who assisted you in compiling the
8  documents that were produced to Plaintiffs in this case.
9  A.  Maybe I misunderstood what you asked for the
10 personnel files and what not. I went through it, myself, and
11 got that stuff.
12     Beverly and one of the clerks --
13 Q.  If I can focus your attention on the time frame of
14 September of 2005; can you recall around that time, that you
15 produced some 2,000 documents that came from the box in
16 Deputy Chief Conner's Office, known as the Kennedy box?
17 A.  Yes, that's right.
18 Q.  Did anybody assist you in gathering those
19 documents at that time?
20 A.  I don't believe so.
21 Q.  Did you review the documents in the file at that
22 time?
23 A.  On the day that they were delivered?
24 Q.  Yes.

91

1  A.  In the process of gathering them for counsel, I
2  think that w reviewed them.
3  Q.  Who is "we"?
4  A.  I have reviewed them over the course of time.
5  There are a lot of documents there. Did I sit there one day
6  and review all of the documents, no. But over the course of
7  time, after the Complaint was filed, and the lawsuit was
8  filed, I did review the documents before they were sent in.
9  Q.  Did you place them in any order -- strike that.
10 .   Did you copy the documents and give the copies to
11 your counsel, or did you just give the documents to your
12 counsel?
13 A.  As I recall, there was a duplicate set that was
14 made for counsel.
15 Q.  Who made that set?
16 A.  Inspector Howe.
17 Q.  At your direction?
18 A.  Yes.
19 Q.  Do you know once the duplicate set of documents
20 were made, in what order they were made, relative to how they
21 were in the box?
22 A.  No.
23 Q.  Do you know if the box had any particular filing
24 system that dictated the order in which the documents were

92

1  deposited into the box?
2  A.  No.
3  Q.  It wasn't chronological, for example?
4  A.  No.
5  Q.  The documents that came to the Plaintiffs in this
6  case, came attached in separate groups?
7     They were paperclipped or held by rubber bands
8  together in separate groupings, or Detective Howe compiled
9  these documents for presentation to counsel.
10    Did you clip together documents that came out of a
11 file for the purpose of keeping them together as part of one
12 batch of documents?
13 A.  I did not.
14 Q.  Do you know if when they were produced to counsel,
15 they were produced in such a manner?
16 A.  I don't know.
17 Q.  But it's fair to say, that within the box, the
18 documents were segregated by files or three-ring binders?
19 A.  It wasn't a bunch of single page documents in a
20 box; that's correct.
21    I don't recall the box that we sent to counsel,
22 exactly how it was.
23 Q.  My question is the actual box, itself?
24 A.  The box, itself, I have it in my possession, in

93

1  the Deputy Chief's Office, it's three-ring binder, and it
2  does have separate files, yes.
3  Q.  So there are not a lot of single page documents
4  sitting there by themselves?
5  A.  No.
6  Q.  Can you tell me by this grouping of documents --
7  strike that.
8     Did you copy the actual file if it had a heading
9  on it, or did you copy -- did you have Detective Howe copy
10 the full file, or the folder that had a heading on it, when
11 you produced them to counsel.
12 A.  I can't speak as to what Detective Howe did, but I
13 did not.
14 Q.  Did you review the documents after Detective Howe
15 copied them prior to sending it to counsel?
16 A.  No.
17 Q.  Just looking at the documents, Bates stamped 1
18 through 38, are you able to determine the file from which
19 they came, if there was a heading on the file, or a title to
20 the file?
21 A.  What was that question, again?
22 Q.  Can you tell, by looking at those documents, what
23 the heading or the title of the file would have been, that
24 contained those documents?

24 (Pages 90 to 93)

Case 1:04-cv-12357-PBS   Document 339-2   Filed 12/21/2007   Page 4 of 10

Daniel C. Rosa, Jr. 7-7-2006
Brian Kennedy, et al. v. Town of Billerica, et al.

94

1  A.  For sure, I don't think that I could, but I would
2  say this is the driving record, and the motor vehicle
3  incident involving Brian and Michelle Kennedy.
4  Q.  Do you remember if there was a particular sub-file
5  in the Kennedy box, that pertains to driving records and
6  traffic citations to Brian and Michelle Kennedy?
7  A.  I believe that there is, but I'm not 100 percent
8  positive, but I will look.
9  Q.  If you can look at the next batch of documents
10 that are clipped together, which is Bates stamp 39 to Bates
11 stamp 42.
12 A.  Okay.
13 Q.  Before I have you look at that, do you know who
14 was responsible for Bates stamping those documents?
15 A.  I have no idea.
16 Q.  I ask you the same question. If you can tell from
17 looking at those documents what the heading or the title of
18 the file was from which they came.
19 A.  Maybe I'm not understanding. I would like to talk
20 to counsel.
21      MR. SILVERFINE:  Off the record.
22
23      (Discussion held off the record.)
24

95

1  Q.  (By Mr. Gilgun) So, just so I can reask the
2  question again, can you tell, from looking at those
3  documents, beginning with Bates stamp 39, what the title or
4  heading of the file is from which they came?
5  A.  I can't tell you the heading or the number of the
6  file that this would have gone with, but the file was set up
7  based on the Complaint.
8       So the Complaint was by paragraph, each Complaint
9  that came to us in that order, and we set it up so that
10 documents relating to a particular Complaint, or paragraph,
11 corresponded, or were together. As you went through, I would
12 say, this particular -- I don't know the number or heading,
13 but I think that this had to do with the badge incident.
14 Q.  Was that file organized in that way to correspond
15 to paragraphs in the Complaint?
16 A.  The first time after we received the original
17 Complaint letter.
18 Q.  The Complaint letter is the letter that was
19 produced at the last deposition known as the "Presentment
20 Letter," in February 2002; is that correct?
21 A.  That's correct.
22 Q.  As opposed to the formal Complaint filed in
23 Federal Court, which was sometime in 2005?
24 A.  That's correct.

96

1  Q.  Would it have been Detective Howe that would have
2  gone through and organized this box of documents in the
3  filing to correspond to those paragraphs in the Presentment
4  Letter?
5  A.  Yes.
6  Q.  Was it done chronologically so that the document
7  at the front of the box would have related to the first
8  paragraph, that alleged anything about the police?
9  A.  If I said that was true, I would have to assume
10 that, but I know that it was grouped in the way that the
11 Complaint was grouped by paragraph in the Complaint, and that
12 the box was grouped that way.
13      I can't tell you exactly how the numbers are
14 ordered, or how they line up in the box, but --
15 Q.  Well, if you would look at what has been Bates
16 stamped 43 through 110, which came clipped together, and if
17 you can tell me by reviewing that, what allegations in that
18 Presentment Letter that these documents would relate to?
19
20      (The witness looks at documents.)
21
22 Q.  Chief, can you tell from reviewing those
23 documents, the title or heading on the file from which these
24 documents would have been produced?

97

1  A.  Those documents would have been produced with
2  William Ashton, who lived with the Kennedys at that time, and
3  was involved in part of the Complaint, and there were some
4  things mentioned in there that William Ashton was involved.
5       It was a file to do with William Ashton.
6  Q.  And do you remember after the documents or files
7  in the Kennedy box were organized to correspond to the
8  Presentment Letter, whether or not there were actual folders
9  created?
10      For example, is there a folder that says page 7,
11 paragraph 2, and has documents in it, or were the folders
12 already pre-existing, and just reordered to correspond to the
13 paragraphs in the Presentment Letter?
14 A.  I don't remember; I don't know. I know that they
15 were organized by Presentment Letters organization, as far as
16 the paragraphs in general.
17      There may have been sections that dealt with
18 incidents involved, and sections that dealt with people
19 involved like William Ashton.
20 Q.  How were the documents organized in this box
21 before they were reorganized to correspond to the Presentment
22 Letter?
23 A.  I don't know.
24 Q.  Do you know if there was any organization to the

Case 1:04-cv-12357-PBS   Document 339-2   Filed 12/21/2007   Page 5 of 10

Daniel C. Rosa, Jr. 7-7-2006
Brian Kennedy, et al. v. Town of Billerica, et al.

### 98

1 files in that box?
2    A.   I don't know if they were in the box prior to
3 reorganizing them, and gathering them together -- to be put
4 into the --
5       MR. SILVERFINE: Objection.
6    A.   This box was put to me after I instructed Sergeant
7 Laskey to gather it all together into one place, and I wanted
8 to review it.
9    Q.   In 1999, you indicated that there was a file
10 created in connection with the investigation by the FBI,
11 under the custody of Captain West; is that correct?
12   A.   I would have to assume that it was under the
13 custody of Captain West.
14   Q.   But there was an actual Kennedy file created in
15 1999 to the best of your understanding?
16       MR. SILVERFINE: Objection to the form.
17   A.   To the best of my understanding, yes. I did not
18 physically see the file.
19   Q.   How did you know about it?
20   A.   Because I was aware that the FBI had come in, and
21 was coming in, and I knew that Inspector Howe was gathering
22 all the information and documentation to do with the
23 Kennedys. I don't know how he had it organized.
24   Q.   How did you know that he was gathering documents?

### 99

1    A.   Because we were aware that the Kennedys had filed
2 Complaints with the FBI. I don't know what date it was, but
3 I knew that there was a date set that they were going to come
4 in for investigation by the FBI.
5    Q.   In any event, you knew that Detective Howe was
6 gathering files?
7    A.   Files or information, whatever that we had in
8 connection with the Kennedys.
9    Q.   After the FBI left you, do you know what, if
10 anything, was done with the files that Detective Howe had
11 gathered?
12   A.   No, I don't know.
13   Q.   You approached the detective in 2002, and directed
14 him to gather information relating to the Kennedy Presentment
15 Letter, did you have any discussion with him about the
16 documents that you gathered in 1999 at that time that the FBI
17 were investigating the Kennedy matter?
18   A.   I did.
19       Let me put it this way. I had a discussion with
20 him about the documents. He was instructed to get all of
21 those documents together, and everything that we had up to
22 date, and get it organized.
23   Q.   As far as that discussion, did he inform you, "I
24 already have a headstart on this, because I had compiled

### 100

1 documents in 1999 when the FBI was investigating"?
2       Was there a discussion that you had gone through
3 this process, and still had a certain folder set aside?
4    A.   I don't remember that.
5       I think that I assumed that there was, knowing
6 that there was quite a bit of information.
7    Q.   Just to be more specific, between 1999 and 2002
8 when Detective Howe gathered all the documents together under
9 your direction, you don't know whether an actual file, a box
10 compilation of documents were set aside, designated for the
11 Kennedys, that was in the office where now Deputy Chief
12 Conners resides?
13   A.   I'm not 100 percent positive. At that time, I
14 didn't have access to go and look.
15   Q.   You don't know whether Detective Howe said, "I
16 have those documents, or I can get those documents which were
17 filed"?
18   A.   I had a discussion, there's no doubt about it, but
19 he was instructed to get all of the Kennedys stuff together
20 in one file, and that is what we did.
21       I don't know whether it was discussed in 1999.
22       MR. GILGUN: If I can have these next documents
23 marked.
24       Off the record.

### 101

1
2       (Discussion held off the record.)
3
4       MR. GILGUN: We are not going to mark it.
5    Q.   (By Mr. Gilgun) I'm showing you a document that
6 is a copy of an exhibit, with a sticker on it, which I
7 believe is Exhibit 21 of the Rosa deposition.
8       The document is dated -- it's a Presentment Letter
9 dated February 20, 2002, and this is a document that you
10 reviewed at the deposition the last time that you were here;
11 is that right?
12   A.   I believe so.
13   Q.   I will represent that it's the exhibit that was
14 marked as part of that deposition.
15   A.   Okay.
16   Q.   You were indicating that the documents were
17 organized to follow the allegations made in the Presentment
18 Letter, when Detective Howe was organizing the documents in
19 this Kennedy box.
20   A.   Yes.
21   Q.   My question to you is, if you look at that letter,
22 and the allegations made by the Kennedys against the
23 Billerica Police Department, they dated to as early as 1991.
24       The order of the documents in the first batch of

Daniel C. Rosa, Jr. 7-7-2006
Brian Kennedy, et al. v. Town of Billerica, et al.

**102**

1  documents that you just reviewed relate to the stolen badge
2  incident, that took place in 1997.
3       So, when you say that the documents were organized
4  pursuant to the allegations in the Presentment letter, it's
5  fair to say that they weren't put in the order consistent
6  with the chronology set forth in the Presentment Letter;
7  isn't that correct?
8       MR. SILVERFINE: Objection.
9  A.  I don't understand the question; what you're
10  asking.
11  Q.  If you just look at the first couple of pages of
12  the Presentment Letter, you can see that the letter reads
13  chronologically, in terms of allegations against the
14  Billerica Police Department?
15  A.  Yes.
16  Q.  The earliest allegation dates back to 1991; isn't
17  that correct?
18  A.  That's correct.
19  Q.  We just went through three batches of documents,
20  and the first batch was traffic citations; and the driving
21  history of Brian and Michelle Kennedy.
22       The second batch of documents that you referred to
23  relating to the stolen badge incident that took place in
24  1997?

**103**

1  A.  If you say so; you have the documents.
2  Q.  If you want to look at it, again, and refresh your
3  memory when the stolen badge incident took place, feel free
4  to do that.
5  A.  This statement is dated 02/20/98.
6  Q.  The alleged burglary took place in '97. Whether
7  it's '97 or '98 is not my relevant point. My point is that
8  given these batches of documents, are the documents that were
9  produced first in order, they don't correspond to the
10  chronology set forth in the Presentment Letter; do they?
11      MR. SILVERFINE: Objection to the form.
12  A.  I don't know how you got your documents, or
13  whatever. I do know how I had Inspector Howe organize the
14  documents, and we made a duplicate copy of those documents,
15  and we sent them to counsel.
16  Q.  My question is, then, just to confirm that point,
17  when you presented the documents to counsel, they would have
18  been in the order that was consistent in the chronology set
19  forth in that Presentment Letter?
20  A.  I'm not positive of that; I didn't review the
21  second set of documents, that we used the whole box of
22  documents and went through it.
23  Q.  When you set up the box of documents before you
24  copied it, were they set up in order consistent with the

**104**

1  Presentment Letter?
2  A.  Yes.
3  Q.  So that if they arrived in our office
4  chronologically out of order, it either happened at the time
5  of setting up the box, the time of copying, or the time of
6  copying for counsel?
7  A.  I don't know.
8       MR. SILVERFINE: Just for the record; we can have
9  only one counsel.
10  Q.  (By Mr. Gilgun) Is the box still in the order
11  pursuant to the chronology set forth in the Presentment
12  Letter?
13  A.  I'm not sure.
14  Q.  When was the last time that you reviewed the box?
15  A.  Maybe within the last month.
16  Q.  What was the purpose of reviewing it then?
17  A.  When I was there, there was a motion filed in
18  Federal Court, that referred to some of the documents within
19  the box. Two weeks ago, whatever it was.
20  Q.  I would like to show you the next batch of
21  documents that are beginning with Bates stamp 111.
22      MR. SILVERFINE: Could I go off the record to
23  speed things up, again.
24      MR. GILGUN: Sure.

**105**

1       MR. SILVERFINE: Off the record.
2
3       (Discussion held off the record.)
4
5       MR. FISCHER: If you could get these pages
6  that the documents are no longer in order, we would
7  like that section expedited.
8       The document says that you have to keep them
9  in order.
10      MR. SILVERFINE: Off the record.
11
12      (Discussion held off the record.)
13
14  Q.  (By Mr. Gilgun) After Detective Howe compiled the
15  documents, did you review the folders that were set up within
16  the Kennedy box?
17  A.  Yes.
18  Q.  Could you look at what has been Bates stamped 262
19  through 317, and tell me if you can indicate why those
20  documents are clipped together?
21
22      (The witness looks at documents)
23
24      MR. SILVERFINE: For the purpose of any record,

27 (Pages 102 to 105)

Case 1:04-cv-12357-PBS   Document 339-2   Filed 12/21/2007   Page 7 of 10

Daniel C. Rosa, Jr. 7-7-2006
Brian Kennedy, et al. v. Town of Billerica, et al.

### 106

1  I don't know that the copying place didn't necessarily
2  put these clips together, just for the record.
3      MR. GILGUN: Who Bates stamped it?
4      MR. SILVERFINE: The copying place. I don't
5  want to represent to you that it was sent -- just
6  ask your question.
7      Q. (By Mr. Gilgun) You had an opportunity to review
8  those, Chief?
9      A. I did.
10     Q. Did those documents look familiar to you as
11 documents that were included in this box that Detective Howe
12 had compiled for you in 2002?
13     A. Yes.
14     Q. You have seen these documents before?
15     A. Yes, I have.
16     Q. These documents came to the Plaintiff clipped
17 together, so documents 262 through 317 were clipped together?
18     A. Yes.
19     Q. Do you know whether or not these documents were
20 maintained in a separate file, or folder, in the Kennedy box,
21 or they were clipped together to be separated from other
22 documents in the Kennedy box?
23     A. I don't know that, no.
24     Q. Having reviewed these documents, do you have any

### 107

1  knowledge as to why these various documents would be grouped
2  together?
3      A. Well, I believe that there is a history on someone
4  named Jared Conner. It's on the front, his history, right
5  here.
6      He is mentioned in the report in the back. So,
7  many of the people who were mentioned, also had a history
8  with them, and Michelle is in here, and Brian is in here, and
9  some are outside the State, incidents not related to the
10 Complaint, but I think that do relate to the histories in
11 here.
12     Also, State Police reports are related in here.
13 They relate to the Grey Street incident. If I'm not
14 mistaken, that Grey Street incident, she made a very similar
15 Complaint about the trooper that she made in Salem, New
16 Hampshire, and that would be a reason that they were put
17 together.
18     Q. Can you be more specific about why a Complaint or
19 a report about allegations made against Jared Conner for
20 threatening Brian Kennedy, would be included with a police
21 report concerning Michelle Kennedy's out-of-state arrests for
22 shoplifting?
23     A. No, I couldn't.
24     Q. And also in here, did you see a statement that was

### 108

1  purportedly signed by Tracy Heffernan, H-e-f-f-e-r-n-a-n?
2      A. I did.
3      Q. About allegations made about Frank MacKenzie?
4      A. Yes, I did.
5      Q. And can you explain why that statement would be
6  included in a package of documents that also included a
7  report of assault and alleged threat by Jared Conner against
8  Brian Kennedy?
9      A. I would have to read the report, again, to see if
10 there is a connection. There may be a connection.
11     Having reviewed them now, nothing comes to mind
12 between the statement of Tracy Heffernan. I didn't read them
13 completely; I will read them now.
14
15     (The witness reads documents.)
16
17     Q. (By Mr. Gilgun) The point of my question is to
18 determine the organization of files within the Department,
19 and, particularly, now in this box that is set aside for the
20 Kennedy matters.
21     And I'm trying to, first of all, confirm that the
22 documents in that box are grouped together in groupings that
23 the Plaintiff received them in this case. And to the extent
24 that they are, what would be the common thread among the

### 109

1  documents that are attached together, that would necessitate,
2  or would justify them being grouped together?
3      Having said that, as a way of explanation where
4  I'm going from here, statements from Tracy Heffernan from
5  1991, where she makes allegations against Frank MacKenzie,
6  about allegations about him offering her money to beat up
7  Michelle Kennedy.
8      There is also a police report in here, about an
9  incident involving a Jared Conner, and the date of that
10 incident, according to the report was December 2, 2000, so
11 nine years after the Tracy Heffernan statement.
12     So my question is, is there any correlation
13 between the statement of Tracy Heffernan, and the report by
14 Jared Conner, that would justify these reports be included in
15 this package of documents?
16     A. I don't know.
17     Q. Specifically, you don't know whether there would
18 out of State arrest reports related to Michelle Kennedy,
19 included in a package of documents that also inclues a police
20 report on Jared Conner threatening Brian Kennedy?
21     A. No, I don't know.
22     Q. Do you know how Detective Howe went about
23 compiling these documents in response to the Presentment
24 Letter in 2002?

Case 1:04-cv-12357-PBS   Document 339-2   Filed 12/21/2007   Page 8 of 10

Daniel C. Rosa, Jr. 7-7-2006
Brian Kennedy, et al. v. Town of Billerica, et al.

110

1   A.   No.
2   Q.   But, as we discussed before, the method of
3   tracking related records and documents is by the log number;
4   is that correct?
5   A.   That's true.
6   Q.   Do you know if there is a log number on the Jared
7   Conner report that relates to a log number on the Tracy
8   Heffernan statement, that would justify that being included
9   in the same package of documents?
10       You can look, again.
11
12       (The witness looks at documents.)
13
14   A.   Please ask me that question, again.
15   Q.   Sure. Given that you indicated before, that one
16   way of tracking related documents is by the log number, what
17   I'm asking you, in that batch of documents there, can you
18   tell from the log number assigned to the Jared Conner
19   investigation, if there is a log number that correlates to
20   the Tracy Heffernan statement, that would suggest that they
21   are related?
22   A.   Not that I'm aware of.
23   Q.   Do you know any other reason why Tracy Heffernan's
24   statement would be in with Jared Conner's police report?

111

1   A.   No, I don't.
2   Q.   Do you have any explanation why the statements
3   provided by Tracy Heffernan in 1991 is included in --
4   A.   Excuse me.
5   Q.   Do you have any explanation why the Tracy
6   Heffernan statement provided in 1991 is included among the
7   2,000 documents originally produced by the Defendant in this
8   matter, no less than 11 times in separate clipped packages?
9   A.   As those were broken up, as I said, by the
10  incident on the letter, and by the people involved, it may
11  have been in each incident. If you look, it may have been a
12  credibility type of thing, or whatever, may have been the
13  involvement with that person.
14       As you went down the line, you wanted to reference
15  that.
16  Q.   When you say a "credibility issue," that is a
17  "credibility issue," pertaining to Tracy Heffernan?
18  A.   Or Michelle Kennedy.
19  Q.   You reviewed the statement that Tracy Heffernan
20  gave in 1991?
21  A.   Not completely.
22  Q.   Enough to think that it pertains to Michelle
23  Kennedy's credibility.
24       Having reviewed the report that you did just now,

112

1   the Tracy Heffernan report, and to the extent that you
2   reviewed it prior to today, do you think that would have
3   bearing on Michelle Kennedy's credibility that would justify
4   being included, in subsequent police investigation involving
5   Michelle Kennedy?
6   A.   I think that it goes to her credibility.
7   Q.   If it can go to her credibility, do you consider
8   it to be relevant to the extent that it should be included in
9   the files designed to investigate later crimes -- strike
10  that.
11       Do you think that the Tracy Heffernan statement
12  included at least 11 crimes?
13  A.   I don't know.
14  Q.   Who would know?
15  A.   Probably who put those documents together.
16  Q.   And that is Detective Howe?
17  A.   Yes.
18  Q.   If you were required to gather the documents
19  relating to the Jared Conner incident, how would you go about
20  doing that?
21  A.   You're talking about the report that is there?
22  Q.   Yes.
23  A.   I would search his name in the Records Management
24  System. Then I would print out the first selection, and then

113

1   I can print the report that I wanted to, based on how many
2   involvements he had in the Department.
3        There may be several, and there may be only one.
4   Q.   If you were doing that, how would you come across
5   Tracy Heffernan's statement?
6   A.   I don't know. Tracy Heffernan's statement is not
7   the Records Management System persay.
8   Q.   So, how would Detective Howe come across that
9   statement as it relates to the Jared Conner case?
10       MR. SILVERFINE: Objection.
11  A.   I don't know.
12  Q.   As far as you know, there is not a separate
13  physical file of Jared Conner, that has not only the police
14  report, the Complaint report, but also has Tracy Heffernan's
15  statement?
16       You are not aware of any physical file like that
17  other than what might be in the box that Detective Howe
18  created?
19  A.   Other than what might be in the box?
20  Q.   Yes.
21  A.   I don't have any knowledge of that.
22  Q.   Who would?
23  A.   I don't know.
24  Q.   Many of the other groups of documents produced in

Case 1:04-cv-12357-PBS   Document 339-2   Filed 12/21/2007   Page 9 of 10

Daniel C. Rosa, Jr. 7-7-2006
Brian Kennedy, et al. v. Town of Billerica, et al.

114

1 the original 2000 are out of jurisdiction incidents involving
2 Michelle Kennedy such as a New Hampshire arrest for
3 shoplifting, and are they contained in those groupings?
4  A.  I don't know why they would be repeatedly
5 reproduced.
6  Q.  Reproduced from a different set of documents?
7  A.  No.
8  Q.  Going through the first 2,000 documents that
9 again, as I understand it, were taken from the box that
10 Detective Howe compiled at your direction, can you tell me
11 which documents related to the investigation made by the
12 Department, of police misconduct, as alleged by the Kennedys?
13  A.  That whole file was compiled because of the
14 Complaint that you sent me, you sent to the Court, whatever
15 it's in reference to.
16  Q.  What is in that Complaint?
17  A.  Which Complaint?
18  Q.  Against the Police Department.
19    Can you tell me which documents were generated,
20 not copied, but created, in response to the Complaints made
21 by the Kennedys about police misconduct?
22  A.  I don't think that I understand what you mean by
23 "created."
24  Q.  We talked before that if a civilian makes a

115

1 Complaint, and my question to you is, then there may be
2 investigations done, and documents generated in connection
3 with that investigation, and can you tell me, from that
4 package of 2,000 documents produced, originally, which
5 documents relate to any Complaints made by the Kennedys, or
6 investigations done relative to such Complaints?
7  A.  Again, all of the documents, in that some were
8 created by our Records Management System. As you can see,
9 there were documents that were handwritten. All those
10 documents were gathered together in the Complaint against the
11 Billerica Depaertment.
12  Q.  I'm not talking about when they were printed out
13 from the computer. I'm talking about when they were drafted
14 or created.
15    I ask you, can you tell me from these 2,000
16 documents, which ones were created in response to a Complaint
17 made by the Kennedys about police misconduct, or an
18 investigation conducted into police misconduct? (He wants
19 this as part of expedite.)
20  A.  I don't believe so.
21  Q.  You can't tell?
22  A.  I don't believe so.
23  Q.  Following the receipt of the Presentment Letter,
24 you indicated that you had Detective Howe gather the

116

1 documents that we have been talking about.
2  A.  That's correct.
3  Q.  In addition, did you give him any instructions or
4 directions concerning an investigation that he should conduct
5 into the various matters involving the Kennedys over the
6 years?
7  A.  No.
8  Q.  You didn't ask him to go back and interview
9 witnesses from incidents that took place, that were alleged
10 in the Presentment Letter?
11  A.  I don't recall if I did.
12    MR. GILGUN: I would like to show you -- let's
13 have this marked as Exhibit 2, as Bates stamp 241.
14    Exhibit 3 is Bates Stamp 0409.
15    Exhibit 4 is Bates Stamp 0410.
16
17    (Exhibit 2, Bates stamp 0241,
18    was so marked.)
19
20    (Exhibit 3, Bates stamp 0409,
21    was so marked.)
22
23    (Exhibit 4, Bates stamp O410,
24    was so marked.)

117

1
2  Q.  (By Mr. Gilgun) Chief, please take time to read
3 Exhibit 3 and Exhibit 4.
4
5    (The witness reads documents.)
6
7  Q.  (By Mr. Gilgun) Chief, you have been given an
8 opportunity to read Exhibit 3 and Exhibit 4?
9  A.  That's correct.
10  Q.  Have you seen those records prior to today?
11  A.  I probably have. I don't know for sure. They
12 wouldd have been in those documents. I probably have, but I
13 don't recall them.
14  Q.  Having read these documents, do you recall whether
15 or not you instructed or directed Detective Howe to follow up
16 investigate, and interview witnesses, for the incidents
17 relating to the Kennedys over the years?
18  A.  No.
19  Q.  Do you remember having a discussion with him that
20 he had done that?
21  A.  No, I don't remember. We had discussions over the
22 whole thing, in general, but I don't particularly remember
23 any specific discussions.
24  Q.  What were the discussions that you had with him,

30 (Pages 114 to 117)

Daniel C. Rosa, Jr. 7-7-2006
Brian Kennedy, et al. v. Town of Billerica, et al.

126

1  Q. What were in the three-ring binders?
2  A. The first thing is that you open up one is the
3  Presentment Letter, and then, as I recall, they were either
4  by paragraph, you could refer to read the paragraph, and then
5  you could refer to the section that would explain what we had
6  involving that paragraph, or what reports we have explaining
7  it, similar to what you have in your hand.
8      Then there might be a list of reports that might
9  be included with that particular incident.
10     Then, another section, are the people involved,
11 their records, and background, and such.
12 Q. Would that be in the binder, as well?
13 A. May have been in one of the binders, or the file,
14 itself.
15 Q. So your best recollection there is at least one
16 binder that has at least one Presentment Letter as its first
17 document, and behind that there are police reports, and
18 witness' statements, and things like that, all gathered
19 together in this binder; is that right?
20 A. I believe so, yes.
21 Q. That would be in the ordinary course in which that
22 binder would be maintained within the Department; is that
23 correct?
24 A. You would have to reask that; I don't know.

127

1  Q. Has the Police Department ever been sued before?
2  A. Yes.
3  Q. Do you know if the Department followed the same
4  procedure as was done here in organizing a box of documents
5  relative to that loss?
6  A. I don't know if it was done that way or not. I
7  also can't remember a case that encompassed nearly as much
8  information as this case does, with its thousands of
9  documents.
10 Q. Were you the Chief when other lawsuits came in
11 that you were thinking of?
12 A. I may not have been the Chief when those were
13 filed, but I have been there when the case was settled.
14     I shouldn't say "settled," I should say,
15 "finished," or "concluded," or whatever.
16 Q. Besides Detective Howe, did you assign anybody
17 else to investigate a Presentment Letter that was made by the
18 the Kennedys, and not the individual question of harassment
19 that Lieutenant Commander Glavin investigated, but when you
20 were making the assignment, did you assign anybody else to
21 work with him?
22 A. Sergeant Laskey is his boss. It was done in
23 conjunction with him. I don't know how much Laskey may have
24 done, or Laskey participated in, but it was primarily

128

1  Detective Howe.
2      MR. SILVERFINE: Off the record.
3
4      (Discussion off the record.)
5
6      MR. GILGUN: We are going to now suspend the
7  deposition to a later date to be determined.
8
9      (WHEREUPON, at 4:05 p.m., the deposition was suspended.)

129

1  COMMONWEALTH OF MASSACHUSETTS    MIDDLESEX, SS.
2      I, BARRY M. HARRIS, a Court reporter and Notary Public duly
3  commissioned and qualified in and for the Commonwealth of
4  Massachusetts, do hereby certify that there came before me at
5  11:00 a.m., on the 7th day of July, 2006, the person
6  hereinbefore named, DANIEL C. ROSA, JR., who provided
7  satisfactory evidence of identification, and who was by me
8  duly sworn to testify to the truth and nothing but the truth
9  of his knowledge, touching and concerning the matters in
10 controversy in this cause; that he was thereupon examined
11 upon his oath, and his examination reduced to typewriting
12 under my direction; and that this is a true record of the
13 testimony given by the witness to the best of my ability.
14 I further certify that I am neither attorney nor counsel
15 for, nor related to or employed by, any of the parties to the
16 action in which this deposition is taken, and further, that I
17 am not a relative or employee of any attorney or counsel
18 employed by the parties hereto, or financially interested in
19 the action.
20
21 My Commission Expires: August 7, 2009.
22
23 _____
24 Barry M. Harris, Notary Public