UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.:  04-CV-12357-PBS

| | |
|---|---|
| BRIAN KENNEDY AND MICHELLE KENNEDY, Individually and as mother and next friend of BRIAN KENNEDY, Jr. Individually and as mother and next friend of MITCHELL KENNEDY and Individually and as mother and next friend of DYLAN KENNEDY, Plaintiffs | ) ) ) ) ) ) ) |
| VS. | ) ) |
| TOWN OF BILLERICA, DANIEL C. ROSA, JR. Individually and as Chief of the Billerica Police Department, JOHN BARRETTO, Individually and as former Chief of the Billerica Police Department, PAUL W. MATTHEWS, Individually and as former Chief of the Billerica Police Department, ROBERT LEE, Individually and as former Deputy Chief of the Billerica Police Department, THOMAS CONNORS, FRANK A. MACKENZIE, RICHARD RHONSTOCK, ROBERT BAILEY, JONN ZARRO, MARK TSOUKALAS, TARA CONNORS,  MARTIN E. CONWAY, ANDREW DEVITO, RICHARD HOWE, STEVEN ELMORE, WILLIAM MCNULTY, DONALD MACEACHERN, MICHAEL A. CASEY, RICHARD NESTOR, ROBERT BROWN, WILLIAM G. WEST, GREGORY KATZ, GERALD B. ROCHE, BRIAN MICCICHE, WILLIAM MCNULTY, SCOTT PARKER, ALAN MUNN, TIMOTHY F. MCKENNA AND JOHN DOE, Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**DEFENDANTS' MOTION FOR SANCTIONS AND
REFERRAL TO THE UNITED STATES ATTORNEY**

I.    THE PLAINTIFFS LIED TO THE JURY AND THIS COURT REGARDING
      THE DESTRUCTION OF ORIGINAL VIDEOTAPES AND IN SO DOING
      COMMITTED A FRAUD UPON THIS COURT

      A.    The Discovery of the Original Tapes

      As the Court is aware, during the first trial of this matter the defendants

asked the plaintiffs to produce the original videotapes that the plaintiffs had

made of their interactions with the Billerica Police. After the defendants sought a

Court order for the tapes, and issued a subpoena for the original tapes, plaintiffs'
counsel elicited trial testimony from Mitchell Kennedy and William Ashton that
the original tape recordings had been destroyed at the Kennedy residence due to
a water leak. As a result, no original tapes were delivered to the defendants in
response to the subpoena.

On Tuesday, July 1, 2008, members of the Billerica and Lowell Police
executed a search warrant at the plaintiffs' current residence in Lowell. During
that search, the police discovered a full box of videocassettes, most of which were
not in the VHS format, which was the format of the copies produced during
discovery in this case. The majority of the tapes were in other formats and some
had labels such as identifying them as tapes of police. The officers had probable
cause to believe that they had stumbled across the original tapes taken by the
Kennedys and their associate, William Ashton. The Billerica Officers involved
were aware that Mitchell Kennedy and William Ashton had testified in Court
under oath that the original tapes had been destroyed and no longer existed.
Accordingly, they were seized as possible evidence of perjury.[1]

Examination of the videocassettes confirmed that the tape collection
included the original recordings of the VHS tapes produced to the defendants in
discovery, which included the original recording of the November 9, 2001,

---

[1] The officers were lawfully within the premises pursuant to a warrant issued by
Judge Dianne Kottmeyer.  The tapes were in plain view and the officers
immediately appreciated that the tapes were probably the ones that the
Kennedys had lied about under oath in these proceedings.  Plaintiffs' claim that
the search and seizure wherein these tapes were discovered was unlawful is
unavailing.  Under the plain-view doctrine, there was no Fourth Amendment
violation.  Regardless, the Fourth Amendment exclusionary rule has no
applicability in civil proceedings.  United States v. Janis, 428 U.S. 433, 447 – 455
(1976)(refusing to extend exclusionary rule to bar evidence in a civil proceeding).

incident involving the assault on Deanne Massone and two other women.  This original recording begins approximately *two minutes before the recording provided to the defendants in discovery*. Those two minutes contain statements made by Michelle Kennedy to defendant Rosa. Whoever made the copy of the tape produced to the defendants in discovery deliberately deleted this section.  The originals also reveal that another recording produced to the defendants had been edited.  Furthermore, the collection discovered contains other recordings responsive to the subpoena that were not produced. Those recordings contain interactions between the plaintiffs and the Billerica Police, some made overtly and some made surreptitiously.  The discovery of these original recordings in the possession of the plaintiffs demonstrate that the plaintiffs conspired to perpetrate a fraud on this Court and to present perjured testimony about the amount of videocassettes in their possession and the destruction of the originals.

     B.     Factual Background

        1.     The Plaintiffs' Story of the Tapes.

The plaintiffs brought this action claiming that they were continually harassed for many years by various members of the Billerica Police Department. At the outset of the case, the plaintiffs disclosed that they had made videotapes documenting the alleged pattern of harassment.  After repeated requests, the plaintiffs produced six VHS tapes that they claimed contained complete copies of all of the *original* tapes of all of the incidents that they had videotaped.

A key event in the Complaint was the plaintiffs' arrests on November 9, 2001, following an assault and battery on Deanne Massone and two other victims.  The plaintiffs' videotaped a portion of their encounter with the police that night and the plaintiffs produced to the defendants in discovery a

purported complete copy of that tape. At the outset of the trial, the defendants realized that the copy they received from plaintiffs' counsel had been edited. A longer version of the same taped encounter had been produced to the District Attorney's Office in connection with the criminal matter arising from the same incident. The defendants received that copy during discovery and had not realized that the two were different until the beginning of trial. After noting the difference, the defendants' counsel asked plaintiffs' counsel to produce the original videotape from which the two variant copies had been made. Plaintiffs' counsel indicated that he would "look into it." In the meantime, defense counsel served upon plaintiffs' counsel a subpoena for all of the original tapes that the plaintiffs had in their possession.

The next day, defense counsel raised the issue with the Court and asked this Court to order the plaintiffs and their associate, William Ashton, to produce the original videotapes. The Court declined to issue such an order. However, the plaintiffs and their Attorneys were aware that the subpoena was in force and that the defendants were now seeking the original recordings. They were also aware that if the originals were produced, the fact that they had edited the tapes produced to the defendants, as well as the fact that they had not produced all of the tapes would be discovered.

It is important to note that at no time during discovery, nor at anytime during the discussion of the production of the original videotapes did either of plaintiffs' counsel, Andrew Fischer or Fred Gilgun, inform the defendants' counsel or the Court that any of the original tapes had been destroyed. Likewise, at no time during their depositions did the plaintiffs or their associate William Ashton indicate that any original tapes had been destroyed.

Shortly after the sidebar conference and the issuance of the subpoena, without any notice to the Court or defense counsel, Attorney Andrew Fischer elicited testimony from Mitchell Kennedy that "some" of the original tapes had been *destroyed* as a result of a water heater leak.  This was the first time that the notion that any of the original videotapes no longer existed had been introduced. Neither Attorney Fischer nor Attorney Gilgun ever informed defense counsel or the Court that some evidence had been destroyed.  Instead, the plaintiffs put Mitchell Kennedy on the stand to testify that the tapes were destroyed in a flood. We now know that this testimony was false.

To further the fraud, the plaintiffs put William Ashton on the stand.  On direct examination by Attorney Fischer, Mr. Ashton testified that most of the original tapes had been destroyed by a water heater leak. He claimed that all of the tapes, including the destroyed ones, contained evidence of police harassment. On cross-examination, Mr. Ashton was confronted with the discrepancy in the November 9th videos.  In response, he specifically testified that the original of the November 9th video had been destroyed. This testimony was false.

We now know that the original tapes include another edit of a tape produced to the defendants and that contain other video and audio recordings of Billerica Police that were never produced. It is obvious that Mitchell Kennedy and William Ashton falsely testified that the relevant tapes had been destroyed in order to hide the fact that the plaintiffs had lied to the defendants by stating that they had produced complete copies of all tapes.

    2.     Evolution of a Fraud on the Court.

In their initial disclosures, the plaintiffs identified videotapes in their possession that they claimed documented incidents between them and various members of the Billerica Police Department.

On December 2, 2005, the defendants took the deposition of William Ashton. He was asked about the videotaping of the Billerica Police and testified that he stored many original videotapes in a "safe" at the Kennedy apartment. See relevant deposition testimony, Pages 77 - 82, attached as Exhibit "A".

For several months following the deposition testimony, the defendants made numerous requests both oral and in writing for the production of the videotapes and audiotapes, see letters of December 12, 2005; February 8, 2006; March 28, 2006; May 25, 2006, attached as Exhibit "B"

Finally, on June 7, 2006, plaintiffs' counsel produced five VHS format videotapes, see letter attached as Exhibit "C". Upon receipt of the five videotapes, defense counsel questioned completeness of the production since deposition testimony indicated that the plaintiffs had "boxes" of tapes. Thus, another written request was made to plaintiffs' counsel on June 7, 2006, see letter attached as Exhibit "D".

Attorney Gilgun responded to the defendants' letter of June 7, 2006, alleging that the five VHS cassette tapes and a number of audiotapes produced constituted copies of "all of the video tapes and audio tapes that are within the plaintiffs' possession, custody and control", see letter attached as Exhibit "E".

Despite these assurances, Michelle Kennedy testified at her deposition of July 12, 2006, that she had not given to her Attorneys all of the videotapes in her possession. During the deposition, Attorney Fischer discussed his understanding of at least some of the original tapes. He now claimed that Ms. Kennedy had told

6

him that she did have other videotapes but that they were in a format that she could not view because she no longer had such a camera. He indicated that he would obtain the originals and make copies. See relevant deposition testimony, Pages 124 - 125, attached as Exhibit "F".

As a result, the defendants filed a Motion to Compel, seeking in part, copies of all videotapes. In response, Attorney Fischer wrote on July 27, 2006, that "much to my surprise" his client, Michelle Kennedy, had testified at the deposition that she had additional videotapes. Attorney Fischer indicated that he had taken possession of some of the original videos and "we have paid to have them reformatted." He indicated that he would copy the "six or seven" incidents onto one tape and would produce the tape to the defendants. See letter attached as Exhibit "G". Shortly thereafter, the plaintiffs produced one or more VHS cassette and claimed that they now produced copies of all of the videotapes of encounters by the Kennedys and the Billerica Police. This has now turned out to be false.

Thus, by the end of July 2006, the plaintiffs and their counsel had given both written and verbal assurances to the defendants and their counsel that they had produced copies of *all videotapes* depicting interactions between the plaintiffs and the Billerica Police. Importantly, there was no suggestion either during the deposition testimony or from plaintiffs' counsel that any relevant videotape had been destroyed. Indeed, it was clear that at least some of the original tapes had been in the possession of plaintiffs' counsel for copying in July of 2006.

II.    THE TRIAL

The first witness called by the plaintiffs at the first trial of this matter was Michelle Kennedy. Before her cross-examination was to begin, Attorney Kesten

spoke to Attorney Gilgun and requested that he produce the original tape of the

November 9, 2001, incident.  See affidavit of Attorney Leonard Kesten attached

as Exhibit "H".

On April 4, 2007, Day Three of Jury Trial,  Michelle Kennedy was

cross-examined concerning the videotapes:

See Page 52, Lines 24 - 25

> Q.      I'm sorry. You felt that the police were out to get you,
>         right?

See Page 53, Lines 1-18

> A.      Absolutely.
> Q.      So you wanted to videotape things so that you could not be
>         wrongfully convicted, right?
> A.      I videoed them, you know, to have for evidence, yes, and
>         they were aware of me videoing them.
> Q.      Did you save those tapes?
> A.      I actually didn't video them. Billy Ashton videoed them.
>         I probably videoed maybe twice.
> Q.      Did you save the tapes?
> A.      Of the videos? Yes.
> Q.      Yes. So you saved every one?
> A.      Well, most of them. Billy Ashton videoed all of them
>         except a couple that I did.
> Q.      So was Billy Ashton the videographer of the family?
> A.      Yes.
> Q.      So his job was to videotape the Kennedys and their
>         interactions with the police?
> A.      Yes.

It is important to note that at this point of the Trial, Michelle Kennedy did

not even suggest that any of the saved videotapes had been destroyed.

Later that day, Attorney Kesten informed the Court of the situation of the

edited tape and the demand for the originals.

See Page 79, Line 11 - 25

> MR. KESTEN:       I would just like to --
> THE COURT:        Come on up, Mrs. Kennedy.
> THE WITNESS:      Thank you.

THE COURT:          What do you need? I don't understand.
MR. KESTEN:         Here's the situation, your Honor. What I discovered
                    yesterday is we have a tape that was given --we were
                    given tapes by the plaintiffs' counsel some time ago,
                    this being one of them. We also got -- I believe in
                    December we got a tape from the DA's office, which,
                    according to our notes, we gave them a copy of that
                    one. It was identical. It was a tape used at the criminal
                    trial. We've always assumed it was identical. I
                    discovered yesterday the tape the DA has, which the

                    DA got from them, this tape was made by the
                    Kennedys or by Billy Ashton.
THE COURT:          So what's the issue?

See Page 80, Lines 1 -25

MR. KESTEN:         It starts about a minute before the tape they gave us.
                    So I asked Mr. Gilgun yesterday to obtain the original
                    tape from the Kennedys and I subpoenaed it and
                    that's the issue. I want to see the original tape that
                    they made, because what we were given starts a
                    minute after the tape they gave the DA,and I wonder-
THE COURT:          Where's the original one?
MR. FISCHER:        The original? As far as I knew that was the original.
MR. KESTEN:         We gave them --
MR. FISCHER:        This is -- I came in here weeks ago, several weeks ago,
                    asking, Can we have what the DA gave the defense?
                    And --
THE COURT:          Right now --
MR. FISCHER:        This is the pot calling the kettle --
THE COURT:          Excuse me. You know, since we have begun this
                    morning, both sides have been slinging mud. I just
                    want to understand one thing: Do you have the
                    original?
MR. KESTEN:         Your Honor --
THE COURT:          You say no. What do you think?
MR. FISCHER:        We -- I'm understanding now -- what I understand is
                    we have copied what -- the original is on a two-hour
                    tape with lots of other stuff.
THE COURT:          This is what we're going to do. I

See Page 81, Lines 1 - 25

                    don't have time to sort this out now. You'll show
                    whatever you want to show, and if it turns out there's
                    another one --
MR. FISCHER:        But he has both of them.
THE COURT:          Excuse me. Now you interrupted me. This is a three-
                    week trial. If there's more tape and more that needs to

|   |   |
|---|---|
|   | be shown, we can fix this. |
| MR. FISCHER: | Can we revisit the plaintiffs' motion that whatever -- that the full DA files come to us, because this is what - |
| THE COURT: | No. Right now I've got a jury sitting out there. Right now you said you had a tape. Whatever you're going to put in, you're going to put in now. If it turns out there's another tape, then we're going to have to sort that through. |
| MR. KESTEN: | What I am asking for is that you order Michelle Kennedy, Billy Ashton, and Brian Kennedy to produce the -- |
| THE COURT: | I'm not ordering Billy Ashton to do anything. |
| MR. KESTEN: | She says he has the tapes. |
| THE COURT: | I don't care. I am not -- Billy Ashton is not a party to this litigation. That is not mine. I will tell her -- did you turn over everything you've got? |
| MS. KENNEDY: | Yes. |
| THE COURT: | Who did you give it to? |

See Page 82, Lines 1 - 20

|   |   |
|---|---|
| MS. KENNEDY: | Billy Ashton gave it to the defense which gave it to the DA. And when we have to make copies -- |
| THE COURT: | Excuse me, when you say "the defense," you're not referring to these gentlemen, right? |
| MS. KENNEDY: | No, no, no -- |
| THE COURT: | Criminal trial. |
| MS. KENNEDY: | So the defendants and the DA got the originals -- |
| THE COURT: | All right. Good. So the DA -- |
| MR. KESTEN: | I will subpoena the defendant. |
| THE COURT: | Excuse me? |
| MR. KESTEN: | What I'll do is subpoena Mr. Mixon. |
| THE COURT: | No. As far as I know, the DA's office has it. So whatever you have from the DA -- |
| MR. KESTEN: | What I have from the DA is clearly an edited tape used at the trial. |
| THE COURT: | Only if the DA edited it. I can't sort it out. |
| MR. KESTEN: | I agree with you, we can't sort it out now. |

At this point of the Trial, neither Mrs. Kennedy nor her Attorneys even hinted that the original tape had been destroyed. Indeed, Attorney Fischer stated during the above sidebar "We -- I'm understanding now -- what I understand is we have copied what -- the original is on a 24 two-hour tape with lots of other stuff."

If the plaintiffs actually believed that the original tape had been destroyed by a water leak, this sidebar would have been the time to notify the Court and the defendants. However, the plaintiffs knew that the original existed at their home, and that if they produced it the Court, the defendants, and the Jury would discover that they had tampered with the evidence by producing edited versions of their tapes. They were also aware that the subpoena issued by defense counsel for the original tape was still in force and the plaintiffs and their counsel were now on notice that the defendants had two versions of the November 9, 2001, tape and were demanding the original.

III.     THE FALSE TESTIMONY

Knowing that the defendants were pursuing the original videotapes, and without any prior notice suggesting that the tapes were lost, Attorney Fischer put Mitchell Kennedy on the stand and elicited the following testimony:

Thursday, April 6, 2007, Day Five of Jury Trial.

See Page 55, Lines 23 - 25

      Q.     Now, does your family take videotapes?
      A.     Yes.
      Q.     And when did -- and what does your family videotape?

See Page 56, Lines 1 -14

      A.     Billy videotapes -- he videotapes -- every time we go out, he'll, like, take the video camera, and if we see a police officer coming towards us in his car or if we see an officer, we start videotaping.
      Q.     And why do you do that?
      A.     For our own protection in case they try and say we did something that we didn't do.
      Q.     And do you have a lot of videotapes?
      A.     Billy takes care of those, but, yes, we do.
      Q.     Do you know whether any of those videotapes have been damaged?
      A.     Yes.
      Q.     And what do you know about that?
      A.     Some of them got water damage from a pipe that burst.

Attorney Fischer did not inform the Court or opposing counsel of the alleged destruction of the tapes at any time during discovery; Attorney Gilgun did not inform Attorney Kesten of any destruction during their discussion; neither of plaintiffs' counsel made any mention of any destruction when the subpoena was issued; and finally neither of them mentioned this at the sidebar. Instead, Mitchell Kennedy, in front of the Jury, made the first suggestion that the original tapes under subpoena were unavailable. The plaintiffs then compounded this false testimony when they called their associate, William Ashton, the supposed custodian of the tapes to the stand. During his direct testimony, Attorney Fischer asked a number of questions regarding the allegedly destroyed original cassettes:

Tuesday, April 10, 2007, Day Seven of Jury Trial.

See Page 119, Lines 13 - 25

> Q.     And at some point did the Kennedys begin videotaping incidents they had with the police?
> A.     Yes.
> Q.     Okay. And do you know -- were you there -- were you living with them when that began?
> A.     Yes, I was.
> Q.     And did you have a role in that?
> A.     Yeah, I was mostly the person that videoed.
> Q.     Okay. And can you tell us why you did this?
> A.     For two -- one main reason being that because every time we would drive through Billerica or -- we'd either get followed or, you know, they would do stuff like driving by, you know, and it was just like -- it was getting to the point where it

See Page 120, Lines 1 - 25

> was just so much, you know, it was pathetic. I would catch it on video, you know, what I could, I would get on video.
> Q.     Now, do you have a lot of these videos?
> A.     I did have a lot of videos, yeah.
> Q.     And what happened to them?
> A.     Well, the one -- I had a bunch of them and I had kept them in the

> basement at 1240 Gorham Street, and a hot water pipe had
> busted off the hot water heater and the tapes were damaged
> besides a few that I had kept upstairs.
>
> Q.    Okay. And those are the ones we have in court today?
> A.    Yeah. I gave you all the tapes, yes.
> Q.    Now, let me ask you something else. Do you have videotape -- or
>       did you obtain good videotape from every time you took out the
>       camera and videotaped?
> A.    No, no, sometimes -- sometimes the kids would take the
>       video camera and video their friends and whatever and it
>       wouldn't charge, the battery would go dead, they'd take the
>       videotape out. Sometimes, like, if I was videoing, by the time I got
>       the thing -- it's a cheap camcorder, it's nothing expensive, so by the
>       time I got it focused and everything I wouldn't be able to video or
>       the incident would already have happened.
> Q.    Now, did you take the video of police coming to the Kennedy's
>       house the night of the Deann
> A.    Did I video?

See Page 121, Lines 1 - 2

> Q.    Yes.
> A.    Yes, sir.

In this portion of his testimony, Mr. Ashton claimed that the original tapes were damaged by a water heater leak, except for the tapes that he had given to Attorney Fischer that were in Court. Of course, defense counsel was aware that the tapes provided to the defendant and the tapes that Attorney Fischer had in Court were VHS copies and that the originals were filmed in a different format. Indeed, one of the primary tapes that the defense wanted to examine was an original of a tape in Court, the November 9th incident. Thus, during cross-examination, Mr. Ashton was examined as to the destruction of the original tapes as follows:

See Page 137, Lines 2 - 25

> Q.    And these videos, you've been taking videos for a long time,
>       haven't you?
> A.    Yeah, a few years.
> Q.    For years you've been taking videos all over town when you see the
>       Billerica police, right?

A.      Yeah.
Q.      And you've been taking videos of the Tewksbury police, have you?
A.      No.
Q.      Just Billerica?
A.      Right.
Q.      And when did this family, your family, the Kennedys and Uncle Billy, move to Lowell?
A.      I believe it was two years ago or going on two years ago.
Q.      Around 2005, right?
A.      Yeah.
Q.      So when this lawsuit started, which was 2004, you had lots of videos in Billerica, didn't you?
A.      Yeah, I would say I had a few, yeah.
Q.      And you gave a selection of videos to your lawyers, right -- to the Kennedys' lawyers, right?
A.      Right.
Q.      And the water damage to all these other videos happened within the last two years, did it?

See Pages 138, Lines 1 - 25

A.      Yes. Well maybe even longer than that.
Q.      Did it happen after I subpoenaed them?
A.      No, it was before that.
Q.      Well, the videos that we have in court, Mr. Ashton, are all VCR -- VHS. Do you see these? For example, Exhibit 2 is a VHS video, right?
A.      Right.
Q.      And the VHS video -- this is not the format you filmed in, is it?
A.      No.
Q.      How many video cameras have you used, Mr. Ashton, to film this -- this film that you're apparently making?
A.      Two, I believe.
Q.      And what format were those?
A.      They're like VHS, but they're small cassettes, almost like a tape that you put in a radio.
Q.      And those were always kept in the Kennedy house, weren't they?
A.      Yes.
Q.      And the originals have now disappeared because they're water damaged?
A.      No.
Q.      So do you have any of those cassettes in the house?
A.      **There's no cassettes in the house. You have -- all the videotapes are here.**

See Pages 139, Lines 1 - 25

Q.      Say what?
A.      All the videotapes that I have are here.

Q.     How do you know?
A.     How would I know?
Q.     Yes.
A.     Well, I'm in charge of the videotapes.
Q.     Okay. So you're in charge of transferring from the little
       cassettes onto the big -- the VHS cassettes, right?
A.     No, that's wrong. I'm not like that -- I don't know how to
       do that technology.
Q.     But you're the one that decided which videos to put on the
       VHS, right?
A.     Well, yes, yeah, you could say that.
Q.     And so -- and you decided which portions of the videos to put on
       the VHS, didn't you?
A.     No. When I would take it to the place, I would tell them, the lady, I
       would say -- because sometimes the kids were using the video, like
       I said, and I would say just strictly the police things on this tape.
Q.     You did it for the lawsuit, right?
A.     Right.
Q.     So when you -- when the Kennedys decided to file this lawsuit, you
       took certain video cassettes and you had them transferred onto
       VHS to give to the lawyers, right?
A.     Well, not certain videos, just the videos that I had that

See Pages 140, Lines 1 - 25

       weren't damaged.
Q.     But you see, Mr. Ashton, they weren't damaged yet when you did
       it, were they?
A.     Yeah, they were damaged.
Q.     Mr. Ashton, did you not pre-make this VHS cassette right at the
       beginning of the lawsuit?
A.     In the beginning of the lawsuit?
Q.     Yeah, 2004.
A.     No, everything was done when the lawyers asked for them.
       When they asked for them, I'm not sure of the exact dates.
Q.     And Mr. Ashton, so did you only transfer onto the VHS the
       undamaged videos?
A.     Right.
Q.     Mr. Ashton, so the only undamaged videos are the ones that
       support your case, right, or so you think, right?
A.     Well, they would all --

MR. FISCHER:     Objection, your Honor, that's for the jury to
                 determine.
THE COURT:       Overruled.

A.     They would all -- can I answer?

THE COURT:       Yeah, go ahead.

15

> A.     Can you repeat the question?
> Q.     Yes, Mr. Ashton.  The only videos that survived this tragic pipe
> 25 burst --

See Pages 141, Lines 1 - 11

> THE COURT:          No, no.
> BY MR. KESTEN:
> Q.     The pipe burst -- that survived the pipe burst on Gorham Street in
>        Lowell are the ones you believe support the Kennedys' allegations,
>        right?
> A.     Well, I would say they all support because they're all from the
>        police harassing us, so I mean -- I guess you could say yes, they do
>        support it.
> Q.     And, Mr. Ashton, on November 9, 2001 -- you were videotaping
>        regularly by 2001, right?
> A.     Regularly? Yeah, I guess you could say that.

At this point, Mr. Ashton claimed that the original videocassettes had

been damaged long before the Trial – which, if true, was information that the

plaintiffs were obligated to share with the defense during discovery.  There had

been no such testimony by Mr. Ashton or the Kennedys during any deposition.

Additionally, by testifying that the supposedly damaged tapes captured

harassment by the police, he suggested to the Jury that the missing damaged

tapes *supported* the Kennedys' allegations.

At the end of his cross-examination, Mr. Ashton was confronted with the

fact that someone had made two versions of the November 9, 2001, tape:

See Page 158, Lines 5 - 25

> Q.     Mr. Ashton, when you made these tapes -- strike that. When you
>        had these tapes transferred from the original format to VHS, you
>        arranged that, right?
> A.     Yes. Well I -- do you mean like I arranged like I did it or I arranged
>        for it to be done by somebody?
> Q.     You were the one that took them somewhere to have it done?
> A.     Yeah.
> Q.     And, Mr. Ashton, you were the one that arranged to make the
>        tape -- to transfer the tape of the two -- of the 2001 incident with
>        Diane Masone onto VHS, correct?

A.      Brought it to have it done, yes.

Q.      And the first time you had it done was to provide it to the defense lawyers in the criminal trial, right?

A.      I believe so. I believe it was one for the -- one for the -- my attorney and one for the district attorney, I believe.

Q.      And did you have it done, Mr. Ashton, a second time to give to the lawyers in this case?

THE COURT:          We've been through the tapes.

BY MR. KESTEN:

Q.      Did you?

See Page 159, Lines 1 - 23

THE COURT:          Haven't we already asked these 2 questions?

MR. KESTEN:         No.

BY MR. KESTEN:

Q.      Did you do it a second time?

A.      I don't believe I did.

Q.      Do you know, Mr. Ashton, why --

MR. FISCHER:        Objection, your Honor.

THE COURT:          I have to hear the question.

BY MR. KESTEN:

Q.      Do you know, Mr. Ashton, why the tape that was transferred to VHS in 2001 starts quite a bit sooner than the tape that was admitted in this case?

MR. FISCHER:        Objection, your Honor.

THE COURT:          Overruled.
                    Did you do any editing of the tapes?

THE WITNESS:        No, I took it to somebody. If it is
                    shorter, I don't know, but if it is, I had nothing to do
                    with that, to the lady.

BY MR. KESTEN:

Q.      **And the original tape that you took in 2001 has been destroyed by water?**

A.      **Yeah.**

At this point, Mr. Ashton claimed not to know whether, or by whom, the

tape had been edited. However, we now know that the tape given by the

Kennedys to the Office of the District Attorney had been edited to take out

statements by Michelle Kennedy and that the tape given to the defense in

17

discovery in the instant case had been edited further. Mr. Ashton and the Kennedys were aware that the original tape was at the moment of Mr. Ashton's testimony at their apartment in Lowell and was the subject of a defense subpoena. However, the choice made by the plaintiffs and Mr. Ashton was to have him falsely testify that the original of the November 9, 2001, tape had been destroyed by water.

The above testimony by Mr. Ashton was and is material and false. Given the fact that it was elicited by Attorney Fischer, there is little doubt that it was the product of consultation between the Kennedys and Mr. Ashton. The original exists and was at the apartment occupied by the Kennedys and Mr. Ashton on July 1 of this year. The original videotape demonstrates that the VHS copy provided in discovery in this case was edited to remove over two minutes of recording that contained Michelle Kennedy making statements to defendant Dan Rosa. There is no doubt that Mr. Ashton, in consultation with Brian and Michelle Kennedy, perjured himself on the stand on a material fact.

During a sidebar discussion on another matter, Brian Kennedy alluded to the supposed flood and the destruction of the tapes:

Tuesday, April 17, 2007, Day 10 of Jury Trial
See Page 189, Lines 20 - 22

Brian Kennedy: "we have tapes doing it <u>before they got damaged</u> . . ."

There is no question that the issue of the supposed destroyed original tapes was material to the trial and was an important factor for the Jury.  Just before the end of the Trial, the Jury specifically inquired as to the missing tapes:

Wednesday, April 25, 2007, Day 14 of Jury Trial
See Page 176, Lines 8 - 14

THE COURT:          Please, I'm concerned about the threats, okay. So here
                    are the questions from the jurors. You may want to
                    take a look. One is whether there were fingerprints on
                    the badge, and, second, were water damaged videos
                    ever sent to see if they could be recovered or fixed?

Finally, during closing arguments the defense discussed the videos

at length. Plaintiffs' counsel conceded that the missing videos played a

major role at the Trial:

Thursday, April 26, 2007, Day 15 of Jury Trial
See Page 243, Lines 14 - 25 and Page 244, Lines 1 - 3

"Really an issue for the defense in the case has been the missing
videotapes. I don't know when the last time so much time has been
spent on missing videos since probably the Kennedy assassination.
This is what they think the case is all about, missing videotapes. Were
there more videotapes that were destroyed is this? That's a question for
you to decide. The one thing we know about the videos though is the
video was a shield for the Kennedys, just like the filing of the notice of
suit letter was a shield for the Kennedys, because you notice when they
would do that, the officers weren't foolish enough to pursue the
harassment, so that's as much of the reason why they had it, not so
much to catch them on tape. As soon as we put it on, they're not so
foolish to do something that's in front of the camera."

## IV.    THE VERDICT

The Jury awarded damages for four incidents against three officers. The

Jury awarded $10,000.00 against Defendant Rosa in favor of Brian Kennedy Jr.;

$15,000.00 against defendant Tsoukalas in favor of Mitchell Kennedy; $2,500.00

in favor of Brian Kennedy Jr. against defendant Nestor; and $2,000.00 against

defendant Parker in favor of Michelle Kennedy. The bulk of the damages

awarded in this case were for "Negligent Supervision" which resulted in a

damages award of $350,000.00.

The Jury had made specific findings of torts committed by four officers

and valued those damages for a total of $29,500.00 The additional $350,000.00

supervision damages are not attached to any findings against any individual

officers. Indeed, the Jury in the first trial rejected claims against other officers and

rejected the plaintiffs central theory, that of a conspiracy among Billerica Police

officers to violate the plaintiffs' Civil Rights.

It is reasonable to conclude that the "Negligent Supervision" award was

based largely on the testimony by the plaintiffs of "harassment". Their claims

that they had videotapes of the alleged harassment, which were destroyed, must

have played a role in the findings of the Jury. The videotapes edited and

withheld in this case clearly played an important role in the decisions by the

Jury. There is no question that the plaintiffs' fraud on the Court regarding the

videotapes was significant.

V.      ARGUMENT

It is impossible to conceive that the findings of fact by the Jury in this case

were not affected by the false testimony regarding the "destroyed" videotapes.

The defense was severely prejudiced by the fact that the plaintiffs produced

edited videotapes, withheld others, and hid the originals. Finally, the defendants

were prejudiced because the numerous videotapes withheld by the plaintiffs

would have aided the defense. The deliberate misconduct by the plaintiffs and

their associate, William Ashton, call for the most severe sanctions.

Fed. R.Civ.P. 60 states, in relevant, part as follows:

"On motion and upon such terms as are just, the court may relieve a

party . . .  from a final judgment, order, or proceeding for the following

reasons:  . . . (3) fraud (whether heretofore denominated intrinsic or

extrinsic), misrepresentation, or other misconduct of an adverse party . . ."

Fed.R.Civ.P. 60(b)(3). A motion to set aside a final judgment for fraud upon the court may be raised at any time. Fed.R.Civ.P.60(d).

The failure to disclose materials requested in discovery is a form of 'misconduct' under Rule 60. Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988). The same misconduct, when deliberate and intended to thwart the opponents of a fair presentation of its case, can also be a fraud on the court. "Fraud on the court occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." Aoude v. Mobil Oil Corporation, 892 F.2d 1115, 1118 (1st. Cir. 1989). Ordinarily, the movant must establish the misconduct by clear and convincing evidence, and must demonstrate that the misconduct prevented a full and fair preparation or presentation of its case. Id., at. 923 – 924 (gathering cases). Unlike the standard in Rule 60(b)(2) for newly discovered evidence, the movant under Rule 60(b)(3) need not prove that the new evidence would necessarily have altered the verdict. Id., at 924. This is so because Rule 60(b)(3) is not concerned with erroneous judgments *per se*, but on judgments that were obtained unfairly. "When wrongful secretion [sic] of discovery material makes it inequitable for the withholder to retain the benefit of the verdict, the aggrieved party should not be required to assemble a further showing." Id., at 924, n.10. "In the case of intentional misconduct, as where concealment was knowing and purposeful, it seems fair to presume that the suppressed evidence would have damaged the non-disclosing party." Id. at 925.

21

When a successful litigant is later discovered to have intentionally withheld evidence, there is a presumption that the withheld evidence would have harmed that party's case.  Id. at 925, *citing* National Association of Radiation Survivors v. Turnage, 115 F.R.D. 543, 557 (N.D.Cal. 1987)("Where one party wrongly denies another the evidence necessary to establish a fact in dispute, the court must draw the strongest allowable inferences in favor of the aggrieved party.").

The plaintiffs in this case intentionally withheld some videotapes from the defense and produced edited copies of others. Faced with a subpoena for all of the original tapes, they concocted a false story indicating that the original taps were destroyed. They then claimed that other destroyed tapes contained evidence of harassment. By falsely testifying that the original tapes were destroyed, the plaintiffs gained an unfair advantage.  The Billerica Police were unable to fully and fairly present their case to the Jury because of the false testimony.

Mitchell Kennedy and William Ashton lied to this Court and to the Jury by testifying that the tapes were destroyed because they believed that the tapes would help the defense and hurt their case. It is reasonable to infer that Michelle and Brian Kennedy were part of the scheme to present the false testimony. The Kennedys also knew that if they produced the original tapes, their editing of the tapes and withholding others would be brought to light in front of the Court and Jury. Accordingly, they chose to lie.

 A scheme to deprive an opponent of evidence is itself, "evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him."  Nation-Wide Check Corp. v. Forest Hills

Distributors, Inc. 692 F.2d 214, 217 – 219 (1st Cir. 1982); *see also*, Marquis Theater

Corp. v. Condado Mini Cinema, 846 F.2d 86, 89 – 90 (1st Cir. 1988); Knightsbridge

Marketing v. Promociones y Proyectos, 728 F.2d 572, 575 (1st Cir. 1984). The fact

that the Kennedys perjured themselves to hide the remaining tapes is strong

evidence that the Kennedys considered the evidence harmful to them.

     Having demonstrated that the Kennedys acted deliberately and

knowingly to conceal the existence of these tapes, the defendants are entitled to a

new trial absent clear and convincing evidence that the evidentiary value of the

tapes to the defendants was trivial or non-existent.

     The videotapes were central to the presentation of the case. Defendants

repeatedly asked to view all of the tapes and after the perjured testimony about

the tapes fictitious destruction was aired to the Jury, the Jury made a specific

inquiry into what efforts had been undertaken to retrieve data from the

"damaged" cassettes. The dynamic of how the tapes could be used by the

plaintiffs now shifted with the aid of their perjury. Whereas the actual tapes

show no real instances of alleged misconduct by the police, the plaintiffs could

use the tapes fictitious "destruction" to invite the Jury to infer that the evidence

on the tapes, had they not been "destroyed", actually buttressed their claims.

Plaintiffs' counsel argued to the Jury in part as follows:

> "This is what they think the case is all about, missing videotapes. Were
> there more videotapes that were destroyed is this? That's a question for
> you to decide. The one thing we know about the videos though is the
> video was a shield for the Kennedys, just like the filing of the notice of suit
> letter was a shield for the Kennedys, because you notice when they would
> do that, the officers weren't foolish enough to pursue the harassment, so
> that's as much of the reason why they had it, not so much to catch them on
> tape." Day 14, p. 176.

This argument would not have been possible had all of the tapes been produced and presented to the Jury. Some of the original tapes withheld from the defense demonstrate surreptitious recording of the Billerica Police and no harassment. Thus, had the Jury been allowed to view these tapes, the argument that the taping prevented harassment would have been impossible. However, by editing some of the tapes, withholding others, and then informing the Jury that many originals had been destroyed, the plaintiffs obtained an unfair advantage.

The editing of these tapes alone amounts to a fraud on the Court. See e.g., McMunn v. Memorial Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 454 (S.D. N.Y. 2002)(sanctioning plaintiff by dismissing action with prejudice after plaintiff engaged in discovery misconduct that included editing taped conversations "so that they would provide stronger evidence in support of her lawsuit than do the unedited originals.")

It is particularly telling that despite years of discovery and multiple requests for all of the videotapes in the Kennedy's possession, the "story" of the water leak and the first mention that any evidence had been destroyed (which was untrue) was announced, not from the plaintiffs' lawyers in response to any of the repeated requests, but rather from young Mitchell Kennedy on direct examination during the trial. A fair resolution of this motion requires judicial inquiry into the scope of the conspiracy that resulted in a minor being called upon to commit perjury in aid of a fraud on this Court.

The judiciary not only has the unquestionable *authority* to sanction the type of conduct found here, but also has an affirmative *obligation* to monitor and control the conduct of litigation in such a way as to discourage such misconduct. Chambers v. NASCO, Inc., 501 U.S. 32, 43-46 (1991). *See also* Hazel-Atlas Glass

Co. v. Hartford-Empire Co., 322 U.S. 238, 246 (1944)(courts have "general duty" to preserve the integrity of the judicial process and prevent the perpetration of fraud on the tribunal).  This Court should actively confront these issues.

Setting aside the judgment and dismissing the case is the only remedy that can fairly address the wrong committed by these litigants.  The purpose of such a sanction is multifold.  It may be imposed to correct the harm done by the litigant whose failure to participate honestly in the proceedings has undermined the judicial process.  It may be imposed to deter the party and others whose similar conduct may go undiscovered and to thus send a message that there are serious repercussions to lying in Court and encouraging others to do so in order to gain unfair advantage.  Hull v. Municipality of San Juan, 356 F.3d 98, 103 (1st Cir. 2004)(upholding sanction of dismissal in part on the grounds that "since not everyone will be caught, the penalty needs to be severe enough to deter.") Moreover, where there is a fraud on the court, "monetary sanctions may be inherently inadequate to remedy the harm to the public interest and in preserving the integrity of the courts, and in deterring future misconduct on the part of other litigants." Derzack v. County of Allegheny, Pennsylvania, 173 F.R.D. 400, 417 (W.D. Penn. 1996), citing Tutu Wells Contamination Lit., 162 F.R.D. 46, 78 (D.Vt. 1995)("monetary sanctions alone will not suffice to vindicate the court's authority and compensate the aggrieved parties for the prejudice suffered.").

The First Circuit has held that when misconduct is intentional, the aggrieved party need not demonstrate harm in order to obtain a new trial. Anderson v. Cryovac, Inc., 862 F.2d 910, 924 (1st Cir. 1988).  The repeated discovery requests for these tapes were straightforward.  When inconsistencies in

the numbers of the tapes were noted, the Kennedys chose to stick to their story that they had produced all of the tapes.  When the defendants discovered that a key tape had been edited and demanded the originals of all of the tapes, they conspired to lie about the basement flood.  It is clear beyond cavil that the Kennedys intentionally withheld this evidence. Accordingly, a presumption arises that "the suppressed evidence would have damaged the non-disclosing party." Id. at p. 925.  The burden then shifts to the disobedient party who must demonstrate by "clear and convincing evidence demonstrating that the withheld material was in fact inconsequential."  Id.  The standard is "stringen[t] and "a heavy burden." Id.  "[S]ince parties ought not to benefit from their own mis-, mal-, or nonfeasance, uncertainties attending the application of hindsight in this area should redound to the movant's benefit."  Anderson, 862 F.2d at 924, *citing* Minneapolis, St. Paul Ste Marie Ry. Co. v. Moquin, 283 U.S. 520, 521 – 22, (1931)(litigant who engages in misconduct "will not be permitted the benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his opponent.")

Any lingering doubt about the potential value of this withheld evidence to the defendants' fair preparation or presentation of this case easily dissipates when one considers that the Jury made a specific request to learn more about whether and to what extent efforts had been made to recover data from these "destroyed tapes."   The fabricated story of the tapes destruction itself became a focus of the Jury's consideration of the evidence.  It is anyone's guess what the Jury might have concluded had the Kennedys not deliberately withheld this evidence -- but that is precisely the point.  The Jury was focused on these tapes – the edited versions presented by the Kennedys – and focused on what they *might*

*have been able to view* if someone had tried to restore the "damaged" ones. Because uncertainties attending the application of hindsight in this area redound to the benefit of the defendants, the Kennedys cannot carry their "heavy" and "stringent" burden to demonstrate by clear and convincing evidence that the harm was trifling.

VI.    CONCLUSION

Plaintiffs Michelle Kennedy, Brian Kennedy and Mitchell Kennedy deliberately and willfully withheld evidence.  When evidence of their wrongdoing surfaced in the form of two different versions of the same tape, the plaintiffs conspired to lie to this Court and to the Jury concerning the tapes supposed destruction.  The Jury was left to consider only the videotape footage that the plaintiffs had selectively edited.  Although the defendants repeatedly requested that the plaintiffs produce the entire contents of all the tapes wherein they filmed the defendants, those requests were at first met with claims that all of the tapes had been produced and that no other originals existed.  That lie began to unravel when the defendants pointed out a discrepancy in the length of one tape which did not match the length of a similar tape produced by the plaintiffs to the District Attorney's Office in another proceeding.  In response, counsel for the plaintiffs said he would "look into it."  Then, without any prior notice to the defendants or the Court, plaintiffs' counsel elicited testimony from Mitchell Kennedy and William Ashton that the original tapes had been destroyed in a water leak.  The plaintiffs, knowing this to be untrue, nevertheless went along with this story.  Up to that point and despite repeated efforts by the defendants to discover this evidence, no mention had been made of any destruction of the tapes by any of the plaintiffs or their attorneys.  The story of the water was

deliberately fabricated during trial to thwart any further efforts to get to the bottom of the discrepancy. The original tapes, including the entire tape of the November 9, 2001, incident that was the focus of the plaintiffs' Complaint, were in the possession or control of the plaintiffs all along. Because the conduct of the plaintiffs in refusing to turn over these tapes and then lying about their destruction was intended to, and had the effect of, hampering the defendants in their presentation of the case and because the plaintiffs are fiscally unable to satisfy any monetary penalty, the only just remedy is to set aside the verdict and enter judgment for the defendants.

WHEREFORE, the defendants respectfully request that this Court take into its possession the original tapes taken from the Kennedy household on July 1, 2008; hold an evidentiary hearing regarding the alleged destruction of the original videotapes; make findings of fact declaring that the plaintiffs have committed a fraud on the Court; and enter Judgment for the defendants. The defendants also request that the Court refer this matter to the United States Attorney for investigation of perjury.

Respectfully submitted,
DEFENDANTS,
By their Attorneys,

/s/ Leonard H. Kesten
Leonard H. Kesten, BBO No. 542042
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA 02116
617- 880-7100

Dated: September 2, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent to those participants indicated as non-registered participants.

/s/ Leonard H. Kesten
Leonard H. Kesten, BBO No. 542042